UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SHABAKA SHAKUR,

                                        Plaintiff,
                                                                9:14-CV-00427
v.
                                                                (MAD/TWD)
HAROLD GRAHAM, Superintendent; JUSTIN
THOMAS, Deputy Superintendent; CHUTTY,
Security Captain; E. FAGAN, Captain; ROGOFSKY,
Sergeant; MURRAY, Sergeant; G, STEINBERG,
Correction Officer; GIFFORD, Correction Officer;
PELT, Correction Officer; HEWITE, Correction
Officer; DONNA MARTIN, Food Service
Administrator,
                                        Defendants.
_____

APPEARANCES:

SHABAKA SHAKUR
89-A-2546
Plaintiff, *pro se*
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, NY 12589

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**ORDER AND REPORT-RECOMMENDATION**

## I.      INTRODUCTION

        The Clerk has sent to the Court for review a Complaint brought pursuant to 42 U.S.C.

§§ 1983, 1985, and 1986 and the Religious Land Use and Institutionalized Person Act

("RLUIPA"), 42 U.S.C. § 2000cc, *et seq.*, by *pro se* Plaintiff Shabaka Shakur.  (Dkt. No. 1.)

Plaintiff, who has not paid the filing fee for this action, has filed an application for leave to

proceed *in forma pauperis* ("IFP Application").  (Dkt. No. 2.)  Plaintiff is presently incarcerated

at Shawangunk Correctional Facility ("Shawangunk").

## II.     IFP APPLICATION

As to plaintiff's IFP Application, the Court finds that plaintiff has demonstrated economic need and has filed the inmate authorization form required in the Northern District to proceed with this matter *in forma pauperis*.  (Dkt. No. 3.)  As a result, Plaintiff's IFP Application is granted.

## III.    INITIAL SCREENING

Having found that Plaintiff meets the financial criteria for commencing this case in forma pauperis, and because Plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the Complaint in light of 28 U.S.C. §§ 1915(e) and 1915A.  Section 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).[1]

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief can be granted; or . . . seeks monetary relief against a person who is immune

---

[1] To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or fact."  *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).

2

from such relief." 28 U.S.C. § 1915A.

In reviewing a *pro se* complaint, the Court has the duty to show liberality towards *pro se* litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990), and should exercise "extreme caution . . . in ordering *sua sponte* dismissal of a pro se complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the Plaintiff has stated "enough facts to state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court should construe the factual allegations in the light most favorable to Plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the possibility of misconduct, the complaint has alleged    but it has not "show[n] that the pleader is entitled to relief." *Id*. at 679 (quoting Federal Rule of Civil Procedure 8(a)(2)). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id*. (internal quotations marks and alterations omitted). Allegations that "are so

vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal.  *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it."  *Cuoco*, 222 F.3d at 112 (citation omitted).

## IV.    PLAINTIFF'S COMPLAINT

### A.    False Weapon Charge

In September of 2012, Plaintiff was confined in the Auburn Correctional Facility ("Auburn").  (Dkt. No. 1, ¶ 22.)  Plaintiff was the inmate Facilitator for the Shia Muslim community at Auburn, and Rashad Ruhani ("Ruhani") was the inmate Facilitator for the Sunni Muslim community.  *Id*. at  ¶ 23.  On September 12, 2012, Plaintiff learned from Ruhani that they were the subject of an investigation by Corrections Sergeant Hai because they were allegedly planning a work stoppage/protest for September 13, 2012, in commemoration of the Attica riot in 1971.  *Id*. at ¶ ¶ 22, 24.  The investigation had been ordered by Defendant Security Captain Chutty ("Chutty").  *Id*. at ¶ 25.

There was no protest on September 13, 2012.  *Id*. at ¶ 26.  On September 17, 2012, Chutty ordered Plaintiff to undergo a urine test, which was negative for drugs.  *Id*. at ¶¶ 26-27.  Upon Chutty's orders, Plaintiff's cell was then searched by Defendant Corrections Officer Gifford ("Gifford").  *Id*. at ¶ 29.  According to Plaintiff, Gifford planted a weapon in his cell, and

Plaintiff was immediately escorted to the Special Housing Unit ("SHU") and served with a false misbehavior report because of the weapon. *Id*. at ¶¶ 29-31. On September 19, 2012, Plaintiff was told by Auburn Muslim Chaplain, Ali Muhsin, that Ruhani had also been brought to SHU for a weapon allegedly found in his cell by Gifford on September 17, 2012. *Id*. at ¶ 33. The Chaplain told Plaintiff that he believed Plaintiff was being targeted because of his position as Shia inmate Facilitator. *Id*. at ¶ 32. Plaintiff was found guilty of weapon possession at the hearing on the misbehavior report and given ninety days in SHU, including ninety days loss of phone, packages, and commissary. *Id*. at ¶ 34. Plaintiff's appeal was denied by the Department of Corrections and Community Supervision ("DOCCS") central office. *Id*. at ¶ 55. However, on or about April 29, 2013, the misbehavior report of September 17, 2012, was expunged after review by Defendant Superintendent Harold Graham ("Graham"). *Id*. at ¶ 62. Plaintiff's request to be reinstated to honor block status in light of the expungement was denied per Defendant Chutty. *Id.* at ¶ 63.

**B.    Eid ul-Adha Religious Feast**

Plaintiff, registered as a member of the Islamic faith while at Auburn, was in SHU at the time of the Eid ul-Adha feast in October of 2012. (Dkt. No. 1, ¶¶ 38-39.) The policy in place at Auburn allowed prisoners confined to SHU to observe the Eid by making the Eid prayer in their cells and provided them with the halal meal. *Id*. at ¶ 40. Although Plaintiff placed Defendant Corrections Officer Pelt ("Pelt") on notice that he was a practicing Muslim and would be observing the Eid feast in his cell, on the morning of October 27, 2012, when Plaintiff inquired about his halal meal at lunch time, he was told by Pelt that the mess hall had not sent any halal meals to SHU. *Id*. at ¶¶ 42. Plaintiff did not receive his halal meal and since he was in SHU

had no alternative halal food supply of his own. *Id*. at ¶ 45.

Plaintiff wrote to food service administrator Defendant Donna Martin to find out why he had not been given his halal meal, and she responded that the halal meals had been prepared and delivered to SHU. *Id*. at ¶ 48. An investigation revealed that none of the Muslim inmates in SHU had received a halal meal on October 27, 2012. *Id*. at ¶ 53. Plaintiff filed a grievance regarding the denial of the halal meal and requesting that a procedure be implemented to ensure that inmates in SHU receive their religious meals. *Id*. at ¶ 51. The grievance response from Defendant Deputy Superintendent Justin Thomas ("Thomas") stated that the food service had been reminded to closely monitor special diet delivery locations but did not address Plaintiff's suggestion for implementation of a special procedure. *Id*. at ¶ 56.

## C.    Prison Shutdown During Ramadan in 2013

On July 8, 2013, Plaintiff began his thirty-day fast of Ramadan. (Dkt. No. 1, ¶ 66.) Auburn was shut down for a routine facility search from July 29, 2013, to August 3, 2013, and during that time, no halal meals or sahur bags were distributed.[2] *Id*. at ¶¶ 70, 72. The Auburn Muslim Chaplain made an announcement to the Muslim community that he had asked Defendant Thomas to provide Muslim inmates with halal meals and Thomas had refused. *Id*. at ¶ 71.

Plaintiff filed a grievance regarding the halal meals and sahur bags on August 7, 2013, and on August 8, 2013, was warned by an inmate who worked as a prison grievance clerk, that Plaintiff's name had come up in a discussion among officers in the grievance office as a litigator who would cause trouble over the prison shut-down. *Id*. at ¶¶ 72-73. On August 11, 2013,

---

[2] Sahur is the light pre-dawn meal eaten by Muslims during Ramadan. *See* www.al-islam.org/articles/fasting-during-month-ramadhan-hussein-al-hussein (last visited September 12, 2014).

Plaintiff was interviewed by a crisis intervention officer who indicated he had been assigned by the security captain to investigate allegations that Plaintiff was "riling up" the Muslim inmates to protest the shut-down of the prison during Ramadan. *Id*. at ¶ 74. Plaintiff assured the officer that he was not instigating problems and had followed the facility sanctioned process of filing a grievance. *Id.* at ¶ 75. On August 29, 2013, the Inmate Grievance Review Committee ("IGRC") reached a deadlocked decision on Plaintiff's August 7, 2013, grievance, with Defendant Martin stating that the facility did not have to provide the Muslim inmates with their halal meal. *Id.* at ¶ 95. Plaintiff passed the grievance on to Graham. *Id*.

### D. Urine Test

On August 12, 2013, while Plaintiff was in the mosque during the six day fast of Shawwal, he was summoned for a urine test and was unable to make the congregational prayer or have his halal meal. *Id*. at ¶ 76. Plaintiff was told by Defendant Corrections Officer Hewite ("Hewite") that the test had been authorized by Defendant Corrections Sergeant Rogofsky ("Rogofsky") based on confidential information. *Id*. at ¶ 77. When Plaintiff informed Hewite that he had been fasting for fifteen hours and was dehydrated and requested water, he was authorized to have three cups of water and placed in a holding pen after Hewite had given Plaintiff the first cup. *Id*. at ¶¶ 79-80. Plaintiff never received the remaining cups of water. *Id.* at ¶ 82. When ordered to urinate by Defendant Corrections Officer Steinberg, after being kept in the holding pen for nearly three hours, Plaintiff explained that he had not had the water and could not urinate. As a result, he was placed in keeplock. *Id*. Plaintiff was not given his halal meal or anything else to eat the entire day. *Id.* at ¶ 83.

On August 13, 2013, Plaintiff was served an allegedly fabricated misbehavior report in

which Steinberg falsely implied that he had personally given Plaintiff three cups of water. *Id*. at ¶ 84. At the August 16, 2013, hearing on the urine test misbehavior report, Plaintiff argued that the misbehavior report was false and was written in response to a grievance filed by Plaintiff on August 15, 2013, regarding not being given a halal meal on August 12, 2013. Plaintiff was found not guilty and the charge was dismissed. *Id*. at ¶ 90.

On September 15, 2013, the IGRC reached a deadlocked decision on Plaintiff's grievance over not being given his halal meal on August 12, 2013. *Id*. at ¶ 89. Defendant Corrections Sergeant Murray ("Murray") stated in the deadlocked decision that Plaintiff should have urinated when ordered even though the grievance was over not being given his halal meal. *Id*. at ¶ 96. That grievance was also passed on to Graham. *Id.* On September 16, 2013, Plaintiff received a decision on his grievance from Graham, who concluded that Plaintiff should have been given his halal meal for Shawwal on August 12, 2013. *Id*. at ¶ 102.

### E.    Administrative Segregation

On August 13, 2013, Plaintiff was taken to SHU and placed in administrative segregation based upon confidential information. *Id*. at ¶ 85. On August 15, 2013, Plaintiff was served with an administrative segregation recommendation authored by Defendant Corrections Captain Fagan ("Fagan") and alleging that Plaintiff was a "facilitator of information" and detrimental to the safety and security of the facility. *Id*. at ¶ 88. At Plaintiff's administrative segregation hearing, which commenced on August 23, 2013, there was testimony from two Muslim inmates that they had also had their cells searched, urine taken, and were placed in SHU on administrative segregation after filing complaints regarding the Ramadan shutdown. *Id*. at ¶¶ 92-93. On August 28, 2013, the hearing officer upheld the administrative segregation. *Id*. at ¶ 94. Plaintiff

appealed and on November 18, 2013, DOCCS Director of SHU, Albert Prack, upheld the determination. *Id*. at ¶¶ 104-05.

### F. Plaintiff's Medical Issues at Auburn

On January 23, 2013, Plaintiff had an MRI to examine unidentified ongoing medical issues that had been exacerbated by his stay in SHU. *Id*. at ¶ 57. As a result of being placed in SHU in August of 2013, Auburn discontinued the physical therapy that had been ordered by medical to treat back and neck pain suffered by Plaintiff due to a degenerative disc condition and nerve damage. *Id*. at ¶ 86. His pain and suffering were exacerbated by having to remain in a cell with a steel bed and used mattress that was less than three inches thick while in SHU at Auburn. *Id*. at ¶ 87.

### G. Wende Correctional Facility

Plaintiff was transferred to Wende Correctional Facility ("Wende") on September 6, 2013, despite a medical "no transfer" hold designed to keep him in the hub where he was being medically treated. *Id*. at ¶ 97. Plaintiff's typewriter did not make the move to Wende with him, and he was placed in a double occupancy cell in contradiction to DOCCS Directive 4003. *Id*. at ¶¶ 98-99.

The nurse at Wende would not refill the prescription for Plaintiff's pain medication and ordered Plaintiff to undergo re-examination. *Id*. at ¶ 101.

## V. ANALYSIS

### A. Plaintiff's Official Capacity Claims For Money Damages Against Defendants Under 42 § 1983

Plaintiff has sued Defendant Graham under 42 U.S.C. §§ 1983, 1985, and 1986 solely in

his official capacity. (Dkt. No. 1 at ¶ 6.) He has sued Defendants Thomas, Chutty, Fagan, Rogofsky, Murray, Steinberg, Gifford, Pelt, Hewite, and Martin in their individual and official capacities. *Id*. at ¶¶ 7-16. Plaintiff is seeking both compensatory and punitive damages against Defendants. *Id*. at ¶ 137(c). The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state, *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006), and, unless waived, bars all money damage claims against state officials acting in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (an inmate plaintiff's claims for damages against individual Department of Correctional Services employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity). Therefore, the Court recommends that the Plaintiff's §§ 1983, 1985, and 1986 claim for money damages against Defendants in their official capacities be dismissed with prejudice on Eleventh Amendment grounds.

**B.      First Cause of Action for Violation of the Free Exercise Clause of the First Amendment**

In his first cause of action, Plaintiff claims that Defendants Pelt and Martin violated his First Amendment right to the free exercise of religion when they refused to provide him with his Eid ul-Adha meal on October 27, 2012, and Defendants Graham and Thomas by failing to take the steps necessary to redress and prevent further occurrences of deprivation of religious meals. (Dkt. No. 1 at ¶ 110.) Plaintiff claims that Defendants Graham and Thomas, by the policies,

practices and acts they were responsible for implementing and enforcing, had authority to redress and prevent further occurrence of the violation and either made no effort to do so, took wholly ineffective steps to do so, or were deliberately indifferent to Pelt and Martin's actions. *Id*. at ¶ 111.

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F. 3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). The reach of the free exercise clause extends to the "right to participate in congregate religious services," *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993), and to "an inmate's diet and participation in religious meals." *Johnson v. Guiffere*, No. 9:04-CV-57 (DNH/DEP), 2007 WL 3046703, at *4, 2007 U.S. Dist. LEXIS 98781, *14-15 (N.D.N.Y. Oct. 17, 2007)[1] ("Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights.").

Mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings be liberally construed, *see, e.g., Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), and finding that the Complaint has made a threshold showing of the sincerity of Plaintiff's religious beliefs, *Salahuddin*, 467 F.3d at 274-75, the Court recommends that Defendants Pelt and Martin be required to respond to Plaintiff's first cause of action.[2]

However, even a liberal reading of the Complaint does not support a claim against

---

[1] Copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

[2] The Court takes no position on whether any of Plaintiff's surviving or amended claims might survive a properly filed motion to dismiss or for summary judgment.

Defendant Thomas in Plaintiff's first cause of action. The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22-23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections . . . in a § 1983 claim") (citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)); *see also Dolan v. Connolly*, No. 13 Civ. 5726 (GBD)(GWG), 2014 WL 1876524, at *4, 2014 U.S. Dist. LEXIS 63757, at *12 (S.D.N.Y. May 8, 2014) (personal involvement is required for a claim under 42 U.S.C. § 1985). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which

unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 872, 873 (2d Cir. 1995).[3]

Plaintiff has not alleged direct involvement by Thomas in Pelt and Martin's alleged refusal to give him his Eid ul-Adha meal on October 27, 2012. Plaintiff claims only that following the incident, on January 25, 2013, he sent Thomas a letter asking him to institute a procedure to insure that religious meals were received by religious adherents. *Id.* at ¶ 58. At the time Plaintiff sent Thomas the letter, there was nothing Thomas could have done to remedy what had occurred nearly three months earlier. Morever, Plaintiff has acknowledged that in response to his grievance regarding the denial of his Eid meal, Thomas stated that food service had been reminded to closely monitor special diet delivery locations. *Id.* at ¶ 56. Given the lack of allegations making a plausible showing that Thomas had any personal involvement in Plaintiff being denied his Eid meal, the Court recommends dismissal of Plaintiff's first cause of action against him without prejudice.

As to the claims asserted against Defendant Graham in Plaintiff's first cause of action, the

---

[3] The Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) has arguably nullified some of the categories set forth in *Colon*. *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of this motion that *Colon* remains good law. *See Hogan v. Fischer*, 738 F.3d 509, 519, n.3 ("We express no view on the extent to which the Supreme Court's decision in [*Iqbal*] "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations.") (citation and internal quotation marks omitted).

Court has already recommended that because he was sued solely in his official capacity, that all

claims for money damages asserted against him in the Complaint be dismissed with prejudice.[4]

### C. Third Cause of Action for Violation of the Free Exercise Clause of the First Amendment

In his third cause of action, Plaintiff claims that Defendants Graham, Thomas, Chutty, and

Martin violated his free exercise rights under the First Amendment by refusing to provide him

with halal meals and sahur bags during the prison shutdown from July 29, 2013, through August

3, 2013, thereby preventing him from participating in the mandatory religious fasting during

Ramadan.[5]  *Id*. at ¶¶ 113-115.

Plaintiff's Complaint is devoid of factual allegations showing that Defendants Chutty and

Martin had any person involvement in Plaintiff being deprived of halal meals and safur bags for a

number of days during Ramadan.  Plaintiff's conclusory allegation that Chutty, and Martin

violated his free exercise rights "by the policies, practices and acts they are responsible for

---

[4] The Court's recommendation for dismissal of all money damage claims against Graham on the ground that he has been sued solely in his official capacity, is not intended to foreclose Plaintiff from amending his Complaint to assert claims for money damages against Graham in his individual capacity in the event he is able to state a viable claim.  The Court notes, however, that had Graham been sued in his individual capacity, the Court still would have recommended dismissal of the first cause of action against him because Plaintiff has failed to make of a plausible showing of personal involvement in his Complaint.  However, the recommendation would have been for dismissal without prejudice.

[5] In paragraph 67 and 69 of his Complaint, Plaintiff alleges that the kitchen was shut down from July 29, 2013, to August 3, 2013, and that he was deprived of his halal meals and sahur bags during that time.  In paragraph 114, he alleges that the dates were August 29, 2013, to September 3, 2013.  (Dkt. No. 1 at ¶¶ 67, 69, 114.)  Since Ramadan began on July 9, 2013, and continued until August 7, 2013, the Court has assumed that July 29, 2013, to August 3, 2013, are the dates intended by Plaintiff in his third cause of action.  *See* www.when-is.com/ramadan-2013.asp (last visited on September 12, 2014).

implementing and enforcing," *id*. at ¶ 115, fails to state a claim. *See McKinnon,* 568 F.2d at 934;

*Colon,* 58 F.3d at 872-73. Therefore, the Court finds that Plaintiff's third cause of action does not

state a claim against Defendants Chutty and Martin and recommends that the third cause of action

be dismissed without prejudice as against them.

Thomas, on the other hand, is alleged to have been asked by the Muslim Chaplain to give

Muslim inmates halal meals as soon as the Chaplain learned of the shutdown and to have refused

the request. *Id*. at ¶ 71. Therefore, the Court recommends that Thomas be required to respond to

Plaintiff's third cause of action.

As with his first cause of action, Plaintiff's claim for money damages against Defendant

Graham in his official capacity in the third cause of action is barred by the Eleventh Amendment.

Therefore, the Court recommends that the official capacity claim against Graham be dismissed

with prejudice.[6]

**D.    Fifth Cause of Action for Violation of the Free Exercise Clause of the First Amendment**

In his fifth cause of action, Plaintiff claims that Defendants Hewite and Steinberg violated

his free exercise rights under the First Amendment by preventing him from participating in the

religious congregational prayer during Shawwal and denying him a halal meal. *Id*. at ¶¶ 120-121.

Defendant Rogofsky is alleged to have authorized the urine test based upon confidential

information. (Dkt. No. 1 at ¶ 77.) Defendant Murray is alleged to have been informed about, and

been in a position to, redress the unconstitutional conduct, but failed to do so and condoned or

---

[6] As with the first cause of action, had Graham been sued in his individual capacity on in Plaintiff's third cause of action, the Court would have recommended dismissal against him without prejudice for failure to make a plausible showing of personal involvement.

allowed the conduct to continue.

The factual allegations in the Complaint do not make a plausible showing that Defendants Hewite and Steinberg were personally involved in Plaintiff not being allowed to remain in the mosque for religious services. According to Plaintiff, he was summoned to the officer's desk while in the mosque and escorted to first aid for the urine test that had been authorized by Rogofsky. *Id.* at ¶¶ 76-77. The first mention of either Hewite or Steinberg is when Plaintiff was at first aid. *Id.* at ¶¶ 77, 81.

Plaintiff has alleged that he asked Hewite to have his halal meal sent to first aid or his cell, and he never received the meal. *Id.* at ¶¶ 77, 83. There are no specific allegations in the Complaint showing any direct involvement by Steinberg in Plaintiff not receiving his halal meal. However, Steinberg was aware that Plaintiff had been held in first aid for an extended period of time and had escorted Plaintiff back to his cell and placed him in keeplock because he had not urinated. *Id.* at ¶ 81. Therefore, for purposes of this initial review, the Court can infer from the Complaint that Steinberg was aware that Plaintiff did not receive his halal meal. In response to a grievance filed by Plaintiff, Defendant Graham agreed that arrangements should have been made for Plaintiff to received a halal meal in his cell since he was not going to make it back to the mess hall from the urine test in time. (Dkt. No. 1-1 at 52.)

Mindful of the Court's obligation to liberally construe a *pro se* prisoner's complaint, *Sealed Plaintiff*, 537 F.3d at 191, and of the Second Circuit's recent decision in *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014)[7], the Court recommends that Defendants Hewite, and Steinberg

---

[7] In *Holland*, the Second Circuit found that ordering the plaintiff prisoner in that case to provide a urine sample and drink water in violation in violation of his religious fast, or face confinement in keeplock substantially burdened his First Amendment rights.

be required to respond to the First Amendment claim made against them in the Complaint. However, because the sole allegation against Defendant Rogofsky is that he authorized the urine test, the Court recommends that the Complaint be dismissed against him without prejudice.

The only factual allegation relating to Plaintiff's First Amendment claim against Defendant Murray is that in the deadlocked decision on Plaintiff's grievance over not receiving his halal meal on August 12, 2013, Murray stated that Plaintiff should have urinated when ordered. *Id*. at ¶ 96. "[I]t is well established that the review, denial or affirmance of denial of a grievance is insufficient to establish personal involvement." *Smith v. Perlman*, No. 9:11-CV-00020 (MAD/CFH), 2014 WL 991854, at *10, 2014 U.S. Dist. LEXIS 32554, at *22 (N.D.N.Y. Mar. 13, 2014) (quoting *Perrilla v. Fischer*, No. 13-CV-0398M, 2013 WL 5798557, at *7, 2013 U.S. Dist. LEXIS 154449, at *21 (W.D.N.Y. Oct. 28, 2013)). Given Plaintiff's failure to allege facts showing Murray's personal involvement in his not receiving a halal meal or being required to undergo a urine test during a period of religious fasting, the Court recommends that the Complaint be dismissed against him without prejudice.

### E. Second, Fourth, and Sixth Causes of Action for Violation of RLUIPA

Plaintiff's second cause of action alleges a RLUIPA violation by Defendants Pelt, Martin, Graham, and Thomas with respect to his being deprived of a halal meal Eid ul-Adha on October 27, 2012. (Dkt. No. 1 at ¶¶ 109-112.) His fourth cause of action alleges a RLUIPA violation by Defendants Graham, Thomas, Chutty, and Martin for refusing to provide Plaintiff with halal meals and sahur bags for six days during Ramadan, and for implementing and enforcing policies that allowed it to happen. *Id*. at ¶¶ 113-115. Plaintiff's sixth cause of action alleges the violation of RLUIPA by Defendants Hewite and Steinberg for failure to provide Plaintiff with a halal meal

for Shawwal on August 12, 2013, and against Murray for refusing to redress the unconstitutional policy, practice or custom that permitted it to happen. *Id*. at ¶¶ 123-26.

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise" of an institutionalized person unless the government shows that the burden imposed "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering" that interest. 42 U.S.C. § 2000cc-1(a). RLUIPA includes an express private cause of action: "A person may assert a violation of [RLUIPA] as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a). "Government" includes, *inter alia*, States, counties, municipalities, their instrumentalities and officers, and persons acting under color of state law. 42 U.S.C. § 2000cc-5(4)(A).

RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities. *See Holland,* 758 F.3d at 224 (citing *Washington v. Gonyea*, 731 F.3d 143-45 (2d Cir. 2013) (*per curiam*); *Sossamon v. Texas*, ___ U.S. ___, 131 S.Ct. 1651, 1663 (2011)). Therefore, the Court recommends that Plaintiff's second, fourth, and sixth causes of action be dismissed with prejudice to the extent Plaintiff seeks monetary damages against the Defendants.

 **F. Seventh Cause of Action for Conspiracy and Supervisory Liability in the Violation of Plaintiff's First and Fourteenth Amendment Rights**

In his seventh cause of action, Plaintiff claims that over a twelve month period, Defendant Chutty conspired with others to target him with unconstitutional practices and policies by: (1) substantially burdening his free exercise of religion; (2) subjecting him to unnecessary urine tests; (3) submitting false misbehavior reports; (4) placing him in SHU; (5) theft of his typewriter; and

(6) delay and disruption in medical treatment.[8]  (Dkt. No. 1, ¶ 129.)  Plaintiff alleges that he was

targeted by Chutty because of his leadership position in the Muslim community and in retaliation

for Plaintiff filing grievances to redress the continued and repetitive violations of his free exercise

rights.  *Id.* at ¶ 128.

Plaintiff claims that Chutty conspired with Defendant Gifford, and in furtherance of the

conspiracy subjected Plaintiff to an unnecessary urine test and filed a false misbehavior report to

have Plaintiff placed in SHU because of his position in the Muslim community.  *Id*. at ¶ 130.

Plaintiff also claims that Defendant Steinberg conspired with Chutty and Defendant Fagan, and in

furtherance thereof, subjected Plaintiff to unnecessary urine testing and filed a false misbehavior

report so that Plaintiff would be placed in SHU in retaliation for filing grievances to redress

violations of his free exercise rights under the First Amendment.  *Id*. at ¶ 129.

### 1.    Plaintiff's Conspiracy Claims

In order to support a claim for conspiracy under §§ 1983 or 1985, there must be "(1) an

agreement . . .; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done

in furtherance of that goal causing damages."  *Ciambriello v. Cnty. of Nassau*, 292 F. 3d 307, 324-

25 (2d Cir. 2002); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 468 (N.D.N.Y. 2009).  "An

agreement must be proven with specificity as bare allegations of a conspiracy supported by

allegations of conduct easily explained as individual action is insufficient." *Gillard v. Rovelli*, No.

9:12-CV-0083 (LEK/CFH), 2013 WL 5503317, at *13, 2013 U.S. Dist. LEXIS 142055, at *29

(N.D.N.Y. Sept. 30, 2013).  Conclusory, vague, and general allegations are insufficient to support

---

[8]  There are no factual allegations in Plaintiff's Complaint suggesting that Chutty was
involved in either the alleged theft of Plaintiff's typewriter or any delay and disruption in his
medical treatment.

a conspiracy claim. *Ciambriello*, 292 F.3d at 325.

Plaintiff's claims of conspiracy against Defendants Chutty, Gifford, Steinberg, Fagan, Pelt, and Hewite are wholly conclusory. Moreover, the factual allegations with regard to each could easily be explained as independent conduct or simply following the orders of superiors.

What is more, all of Plaintiff's conspiracy claims under §§ 1983 and 1985 fail to state a claim because as pleaded they are barred by the intra-corporate conspiracy doctrine. The doctrine states that "officers, agents, and employees of a single corporate entity are legally incapable of conspiring together." *Nassau Cnty. Employee "L" v. Cnty. of Nassau*, 345 F. Supp. 2d 293, 304 (E.D.N.Y. 2004) (internal citations and quotation marks omitted). The doctrine applies when officers and officials are working within the scope of their official duties. *Id*. The doctrine which began in cases involving corporations, has been extended to allegations of a conspiracy involving employees of a public entity. *Id*. The doctrine would therefore exclude conspiracy claims against DOCCS employees working within the scope of their employment. *Hartline v. Gallo*, 546 F.3d 95, 00 n. 3 (2d Cir. 2008) (citations omitted). There is an exception to the doctrine when those involved in the alleged conspiracy are "pursuing personal interests that are separate and apart from the entity." *Nassau Cnty. Employee "L"*, 345 F. Supp. 2d at 304. Personal bias is not considered a personal interest and is not within the exception. *Everson v. New York City Transit Auth*., 216 F. Supp. 2d 71, 76 (E.D.N.Y. 2002).

For the foregoing reasons, the Court recommends that Plaintiff's §§ 1983 and 1985 conspiracy claims against Defendants Chutty, Gifford, Steinberg, Fagan, Pelt, and Hewite be dismissed, and that the dismissal be without prejudice. The Court also recommends that Plaintiff's claim under § 1986 be dismissed without prejudice since liability under § 1985 is a

necessary predicate to a claim under § 1986. *See Brown v. City of Oneonta, New York*, 221 F.3d 329, 341 (2d Cir. 2000) (claim under § 1986 must be predicated on a valid § 1985 claim).

        2.   <u>Individual Claims Against Chutty, Gifford, Steinberg, Fagan, Pelt, and Hewite</u>

Although the Court has recommended dismissal without prejudice of the conspiracy claims against these Defendants, review of the allegations in Plaintiff's seventh cause of action for possible individual claims against Defendants for violation of Plaintiff's First Amendment right to free expression of religion, right to equal protection under the Fourteenth Amendment, and for retaliation against Plaintiff for the exercise of his First Amendment rights is called for in light of his *pro se* status.

Plaintiff's allegations regarding the actions Defendants Chutty and Gifford include: (1) Chutty ordering Plaintiff to take a urine test on September 17, 2012, and ordering Defendant Gifford to search Plaintiff's cell; (2) Gifford planting a weapon in Plaintiff's cell, causing him to be taken immediately to SHU; and (3) Gifford filing a false misbehavior against Plaintiff regarding the weapon, resulting in the imposition of a penalty of 90 days in SHU when Plaintiff was found guilty on the weapons charge. (Dkt. No. 1 at ¶¶ 27, 29-31, 34.) Plaintiff was told he was targeted because of his position as Shia inmate Facilitator, and that on the same day, the Sunni inmate Facilitator was also sent to SHU on a weapons charge. *Id*. at ¶¶ 32-33. Furthermore, the original guilty finding on the weapons charge misbehavior report was reversed and expunged by Defendant Graham. *Id*. at ¶ 62.

The claim in Plaintiff's seventh cause of action that Fagan was involved with Chutty and Steinberg in subjecting Plaintiff to unnecessary urine testing and a false misbehavior report that

resulted in Plaintiff being placed in punitive confinement in retaliation for filing grievances to redress the violation of his First Amendment right to free expression of religion is not supported as to Fagan by any factual allegations in the Complaint. *Id*. at ¶ 131. Furthermore, although there are allegations in the Complaint, addressed above, that Chutty was involved in ordering Plaintiff's urine test on September 17, 2012, there are no factual allegations supporting Plaintiff's claim that Chutty ordered the urine test involving Steinberg on August 12, 2013, or misbehavior report filed by Steinberg. *Id*. In fact, Plaintiff has alleged that the urine test was authorized by Defendant Rogofsky. *Id*. at ¶ 77. Without allegations of personal involvement, a valid claim for money damages cannot be stated under § 1983. *See McKinnon*, 568 F.2d at 934.

As to Steinberg, the Court has recommended that he be required to respond to Plaintiff's fifth cause of action for violation of Plaintiff's First Amendment right to free exercise of religion arising out of the August 13, 2012, denial of a halal meal, urine testing, and allegedly false misbehavior report.

Certain other of Plaintiff's claims in his seventh cause of action are duplicative as well. They include Plaintiff's claims against Pelt, Hewite, and Steinberg for violating his free exercise rights under the First Amendment by substantially burdening his observance of his religion by denying him religious meals. *Id.* at ¶ 133. The Court has recommended that Defendant Pelt be required to respond to Plaintiff's first cause of action for violation of First Amendment rights by denying him his Eid meal on October 27, 2012. The Court has also recommended that Defendants Hewite and Steinberg be required to respond to the First Amendment claim in Plaintiff's fifth cause of action regarding the August 13, 2013, denial of his halal meal.

Plaintiff was placed in administrative segregation on August 13, 2013, based upon

confidential information. *Id*. at ¶ 85. On August 13, 2013, Defendant Fagan prepared an Administrative Segregation Recommendation for Plaintiff on the grounds that communications had been received by facility administration identifying Plaintiff as a "facilitator of information that would have a negative impact in the operation of this Facility. His presence in general population would have a detrimental effect to the safety and security of this Facility." (Dkt. No. 1-1 at 36.) The recommendation was upheld following a hearing. (Dkt. No. 1 at ¶ 94.) Although Plaintiff claims that Chutty and Fagan conspired to have him placed in administrative segregation for filing grievances to redress the violation of his First Amendment right to freely exercise his religion, there are no factual allegations in the Complaint showing personal involvement by Chutty. *Id*. at ¶ 132.

Plaintiff's seventh cause of action also includes conclusory assertions against Defendants Graham, Thomas, and Murray for violation of his rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. *Id*. at ¶134. The assertions essentially track the language of the *Colon* categories for showing personal involvement by a supervisory official under § 1983. *See Colon*, 58 F.3d at 872-73. Plaintiff has not identified the specific instances of the alleged violation of the constitutional rights to which he is referring and has alleged no facts showing that Graham, Thomas, or Murray's actions constituted personal involvement under the *Colon* categories. Conclusory assertions and formulaic recitation of the *Colon* categories, without factual support, cannot state a claim of personal involvement under § 1983. *See Eldridge v. Kenney*, No. 11-CV-6459-FPG, 2014 WL 2717982, at *2, 2014 U.S. Dist. LEXIS 84437, at *5-6 (W.D.N.Y. June 16, 2014) (Supreme Court in *Twombly*, 550 U.S. at 555, found that "statement[s], devoid of any factual support, contain[ing] nothing more than conclusory

statements and formulaic recitations of the cause of action" are insufficient to state a claim under § 1983).

Based upon the foregoing, the Court recommends with regard to Plaintiff's seventh cause of action that: (1) the conspiracy claims be dismissed in their entirety without prejudice for failure to state a claim; (2) Defendants Chutty and Gifford be required to respond to Plaintiff's claim of violation of his right to free exercise of religion under the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and retaliation claim with regard to the September 17, 2012, urine test, cell search, planting of a weapon in Plaintiff's cell, and filing a false misbehavior report because of Plaintiff's position as Shia inmate Facilitator at Auburn; (3) Plaintiff's claim against Defendants Fagan and Chutty with regard to the urine testing that took place on August 12, 2013, and the allegedly false misbehavior report filed in retaliation for Plaintiff filing grievances to redress the violations of his First Amendment right to the free exercise of religion, be dismissed without prejudice for failure to state a claim; (4) Defendant Steinberg be required to respond to Plaintiff's claim with regard to the urine test and retaliatory false misbehavior report; (5) Defendants Pelt, Hewite, and Steinberg be required to respond to Plaintiff's First Amendment claim with regard to his being deprived of religious meals; (6) Defendant Fagan be required to respond to Plaintiff's claim that he placed Plaintiff in administrative segregation in retaliation for Plaintiff filing grievances to redress the violation of his First Amendment free exercise rights; (7) Plaintiff's claim with regard to being placed in administrative segregation be dismissed without prejudice against Defendant Chutty for failure to state a claim; and (8) Plaintiff's general supervisory liability claim against Defendants Graham, Thomas, and Murray be dismissed without prejudice.

**G.      Eighth Cause of Action for Deliberate Indifference to Plaintiff's Serious Medical Needs in Violation of his Eighth Amendment Rights**

Plaintiff has alleged that Defendants Graham, Thomas, Chutty, and Fagan exhibited deliberate indifference to his medical needs by inappropriately placing him in SHU, thereby subjecting him to an environment that worsened his medical condition, discontinued treatment, and transferred him from the hub where he was under the care of a non-prison medical specialist. Plaintiff has alleged that he had back and neck pain due to a degenerative disc condition and nerve damage. *Id.* at ¶ 86. A sick call response from August 19, 2013, shows that Plaintiff was prescribed Motrin to decrease swelling in his cervical spine. (Dkt. No. 1-1 at 40.)

Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Prison officials must ensure, among other things, that inmates receive adequate medical care. *Id*. (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

A claim that prison officials have intentionally disregarded an inmate's serious medical needs has both objective and subjective elements. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Id*. at 72. (citation and internal quotation marks omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance,* 912 F.2d at 607 (Pratt, J. dissenting) (citations omitted), *accord Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03.

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Id.* at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). To establish deliberate indifference, an inmate must show that a defendant was "aware of facts from which an inference could be drawn that the inmate had a serious medical need" and drew that inference, *Farmer,* 511 U.S. at 837, and "consciously and intentionally disregarded or ignored that serious medical need. *Id.* at 835.

Even were the Court to find that Plaintiff has made a plausible showing of a serious medical need, which cannot be done on the sparse facts in the Complaint, the Complaint is devoid of allegations that Graham, Thomas, or Murray were aware that Plaintiff had a serious medical need and that being placed in SHU worsened his medical condition. Therefore, the Court recommends that Plaintiff's Eighth Amendment claim for indifference to a serious medical condition be dismissed without prejudice.

### H.    Declaratory and Injunctive Relief

Plaintiff has also included requests for declaratory and injunctive relief with respect to his First, Eighth, and Fourteenth Amendment claims and claim under RLUIPA in his prayer for relief. (Dkt. No. 1 at ¶ 137.)  All of Plaintiff's claims that are directed towards Defendants in this action arise out of occurrences while he was confined in Auburn, and all of the Defendants worked at Auburn during the relevant time period.[9]  *Id.* at ¶¶ 6-16.  Plaintiff is now housed at Shawangunk. (Dkt. No. 4.)  "In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."  *Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006)).  In *Shepherd*, the Court concluded that speculation that a plaintiff may be transferred again in the future does not warrant a departure from the principle enunciated in *Salahuddin*.  *Id.*  Inasmuch as Plaintiff's Complaint contains no allegations indicating that the alleged violations of his First, Eighth, and Fourteenth Amendment rights and RLUIPA resulted from application of a statewide policy, or any other allegations that would exempt the claims from the general rule regarding mootness, *see, e.g., Smith v. Artus*, 522 F. App'x 82, 84 (2d Cir. 2013) (claim for injunctive relief not mooted by transfer when statewide policy was involved), the Court recommends that the request for declaratory and injunctive relief be dismissed.  The Court further recommends that the dismissal be without prejudice so that in the event there are facts which render the general

---

[9] Plaintiff has included allegations in his Complaint regarding his medical care at Wende. (Dkt. No. 1 at ¶¶ 98-101.)  However, none of the Wende allegations involve the named Defendants, who were all employed at Auburn, and Plaintiff has not named the alleged wrongdoers from Wende as defendants in this case.

mootness rule inapplicable, Plaintiff will not be foreclosed from amending his Complaint.

**ACCORDINGLY**, it is hereby

**ORDERED,** that Plaintiff's motion to proceed *in forma pauperis* is **GRANTED**; and it is

**RECOMMENDED**, that:

1.    Plaintiff's claims for money damages against Defendants in their official capacities under 42 U.S.C. §§ 1983, 1985, and 1986 be dismissed with prejudice on the grounds that they are barred by the Eleventh Amendment;

2.    Plaintiff's RLUIPA claims for money damages against Defendants in their official and individual capacities be dismissed with prejudice;

3.    Plaintiff's request for injunctive and declaratory relief against Defendants be dismissed without prejudice on mootness grounds;

4.    Plaintiff's Complaint be dismissed as against Defendant Rogofsky without prejudice;

5.    Defendants Pelt and Martin be required to respond to the First Amendment claim in Plaintiff's first cause of action;

6.    Plaintiff's first cause of action be dismissed without prejudice against Defendant Thomas;

7.    Defendant Thomas be required to respond to Plaintiff's third cause of action;

8.    Plaintiff's third cause of action be dismissed without prejudice as against Defendants Chutty and Martin;

9.    Defendants Hewite and Steinberg be required to respond to Plaintiff's fifth cause of action;

10.    Plaintiff's conspiracy claims under 42 U.S.C. §§ 1983, 1985, and 1986 in his seventh

cause of action against Defendants Chutty, Gifford, Steinberg, Fagan, Pelt and Hewite be dismissed without prejudice;

11.    Defendants Chutty and Gifford be required to respond to Plaintiff's claims under the First and Fourteenth Amendments and for retaliation regarding the September 17, 2012, urine test, cell search, planting of a weapon in his cell, and false misbehavior report because of Plaintiff's position as Shia inmate Facilitator at Auburn asserted in his seventh cause of action;

12.    Defendant Steinberg be required to respond to Plaintiff's claim in the seventh cause of action that he retaliated against Plaintiff for filing grievances to redress denials of his First Amendment right to free expression of religion by ordering unnecessary urine testing on August 12, 2013, and filing a false misbehavior report;

13.    Plaintiff's claim for retaliation against Defendants Chutty and Fagan regarding the August 12, 2013, urine testing and false misbehavior report be dismissed without prejudice;

14.    Defendants Pelt, Hewite, and Steinberg be required to respond to Plaintiff's claim in the seventh cause of action that the Defendants deprived him of religious meals in violation of his First Amendment right to free exercise of religion;

15.    Defendant Fagan be required to respond to Plaintiff's retaliation claim in the seventh cause of action regarding Plaintiff's placement in administrative segregation for filing grievances to redress denials of his First Amendment right to free expression of religion;

16.    Plaintiff's retaliation claim against Defendant Chutty in the seventh cause of action regarding his placement in administrative segregation be dismissed without prejudice;

17.    Plaintiff's supervisory liability claims against Defendants Graham, Thomas and Murray in his seventh cause of action be dismissed without prejudice; and

29

18.    Plaintiff's eighth cause of action for deliberate indifference to his medical needs in violation of the Eighth Amendment against Defendants Graham, Thomas, Chutty, and Fagan be dismissed without prejudice; and it is further

**RECOMMENDED**, that Plaintiff be granted leave to amend with regard to the claims on which the Court has recommended dismissal without prejudice; and it is hereby

**ORDERED**, that the Clerk provide Plaintiff with copies of unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: September 17, 2014
       Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge

Slip Copy, 2014 WL 1876524 (S.D.N.Y.)
**(Cite as: 2014 WL 1876524 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Rory DOLAN, Plaintiff,
v.
William J. CONNOLLY, et al., Defendants.

No. 13 Civ. 5726(GBD)(GWG).
Signed May 8, 2014.

*REPORT AND RECOMMENDATION*
GABRIEL W. GORENSTEIN, United States Magistrate Judge.

**\*1** Plaintiff Rory Dolan, proceeding pro se, brings this action under 42 U.S.C. §§ 1983 and 1985(3) alleging that five employees of the New York Department of Correctional Services ("DOCS") violated his rights under the federal and state constitutions during his incarceration at Fishkill Correctional Facility and Cayuga Correctional Facility.[FN1] Defendants have moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6). For the reasons stated below, defendants' motion to dismiss should be granted.

> **FN1.** The five defendants are: William Connolly, Superintendent of Fishkill Correctional Facility; David Stallone, Superintendent of Cayuga Correctional Facility; Roger Maines, Plant Superintendent at Fishkill; M. Callendar, Lieutenant at Fishkill; and Carl Good, Senior Correction Counselor at Fishkill.

I. *BACKGROUND*

A. *Facts Alleged by Dolan*

For purposes of deciding defendants' motion to dismiss, the Court assumes the allegations in Dolan's complaint are true and draws all reasonable inferences from those facts in Dolan's favor. See, e.g. *Steginsky v. Xcelera Inc.,* 741 F.3d 365, 368 (2d Cir.2014). Furthermore, in light of Dolan's pro se status, the Court has in some instances considered factual allegations contained in his memoranda submitted in opposition to the defendants' motion where they amplify claims made in the complaint. See, e.g., *Woods v. Goord,* 2002 WL 731691, at \* 1 n. 2 (S.D.N.Y. Apr. 23, 2002) (considering pro se prisoner's factual allegations in briefs as supplementing complaint); *Burgess v. Goord,* 1999 WL 33458, at \*1 n. 1 (S.D.N.Y. Jan. 26, 1999) ("In general, 'a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of pro se litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.' ") (quoting *Gadson v. Goord,* 1997 WL 714878, at \*1 n. 2 (S.D.N.Y. Nov. 17, 1997)) (additional citations omitted).

On July 28, 2008, Dolan was transferred to Fishkill Correctional Facility ("Fishkill") in Beacon, New York. *See* Complaint Pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3), filed Aug. 13, 2013 (Docket # 2) ("Compl."), ¶¶ 7, 15. While incarcerated at Fishkill, Dolan worked as a clerk at the prison's law library and helped other prisoners with various legal matters, including appeals, habeas petitions, and grievances filed against prison employees. *Id.* ¶¶ 23, 26–27, 30. Dolan asserts that his skills as a "jailhouse lawyer" come from having helped other prisoners in this way for more than twenty-three years. *Id.* ¶¶ 27, 31. In Dolan's words, "news of Mr. Dolan's legal knowledge of administrative prison procedures as well as criminal and civil rights law spread through the facility by word

of mouth ... [and] Mr. Dolan's skills became known to—and then heavily sought after by—the prison population." *Id.* ¶ 28.

Additionally, Dolan became a member of Fishkill's Inmate Liaison Committee ("ILC"), where he helped foster effective communication "between incarcerated individuals and various administration[s] for accurate dissemination and exchange of information." *Id.* ¶ 2. Dolan served two terms on the ILC Executive Board, from August 2009 to January 2010 and from February 2010 to July 2010. *Id.* ¶ 32–33. During this time, defendant William Connolly, who was the superintendent at Fishkill, and defendant Carl Good, who was a senior correction counselor at Fishkill, also served on the Executive Board. *Id.* Dolan was once again elected to serve on the ILC in July 2010, but Connolly prohibited him from serving this term. *Id.* ¶ 34. According to Dolan, "[t]he employees at Fishkill ... became cognizant of Mr. Dolan's reputation and standing as a jailhouse lawyer and I.L.C. representative, as many became the subject of civil suits and administrative complaints filed against them by incarcerated individuals who had availed themselves of Mr. Dolan's legal acumen." *Id.* ¶ 28. Dolan alleges that "the culture at Fishkill ... was culturally and ideologically opposed to such activities ... [and thus] Dolan inadvertently charted a collision course with that norm of retaliation and abuse." *Id.* ¶ 30.

**\*2** On January 20, 2011, Dolan was elected as Chairman of the ILC. *Id.* ¶ 36. Soon thereafter, "[o]n January 24, 2011, January 25, 2011, and January 26, 2011, Correction Officer Cardwell, Correction Officer Dunn, and Defendant Good formed an enterprise ... with the explicit objective [to] fabricate a misbehavior report, [and] conspired to consciously fabricate false departmental rule violations to be lodged against [Dolan]." *Id.* ¶ 41. In Dolan's view, the corrections officers "were motivated by their discriminatory animus against Mr. Dolan due to his membership in the jailhouse lawyer class and I.L.C. membership, acting in concert to discriminate against him and prevent him

from aiding others ... as well as, impeding his fulfilling of his duties as the newly elected Chairman of the I.L.C." *Id.* ¶ 40. Furthermore, Dolan asserts that the officers "were motivated by Mr. Dolan's exercise of his protected rights to aid other incarcerated individuals in filing prison grievances and pursuing civil litigation, as well as exercising his rights for his own benefits." *Id.* ¶ 78. Dolan alleges that other clerks at the prison library overheard these prison officials "endeavoring to conspire and/or manufacture a way to fabricate a misbehavior report against [Dolan]." *Id.* ¶ 45.

On January 24, 2011, Good entered Dolan's room in the law library so that he could search the contents of Dolan's computer. *Id.* ¶ 37. The next day, Dunn seized Dolan's computer and three floppy disks, asserting that the computer contained password-protected files in violation of prison rules. *Id.* ¶¶ 38, 43. Dolan alleges that the only password-protected documents on the computer were more than a year old and had been "present for countless personal computer checks without incident." *Id.* ¶¶ 43–44. On January 26, 2011, Good "authored a Memorandum disallowing the use of 'Passwords' on the personal computers used by law clerks." *Id.* ¶ 46. Dolan asserts that, prior to this date, there had been no such rule against the use of passwords and that there had been no objections to the use of passwords in all of the previous monthly inspections of the computers. *Id.*

Nevertheless, during the night of January 26, Dolan was physically removed from the law library, placed in restraints, and escorted to a solitary confinement cell at the Special Housing Unit ("SITU") of the prison. *Id.* ¶ 48. Dolan was confined to the SITU for ninety days. *Id.* ¶ 53. During that time, Dolan was only allowed one hour a day of outdoor exercise, was only allowed to shower and shave twice a week, and was denied access to the prison law library, recreation, receipt of packages, commissary, and telephone calls. *Id.* ¶ 52–53. Additionally, because Dolan was not allowed to associate with the general prison popula-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1876524 (S.D.N.Y.)
**(Cite as: 2014 WL 1876524 (S.D.N.Y.))**

tion during this time, "[t]his effectively guaranteed that Mr. Dolan could not help his fellow incarcerated individuals with their legal matters and facility grievances, and that he could not help himself." *Id.* ¶ 53.

**\*3** On January 27, 2011, M. Callendar, who worked as a Correction Lieutenant at Fishkill, arranged for Dolan to be questioned about his alleged computer violations and about his providing of legal services to other prisoners. *Id.* ¶ 50. The next day, Callendar "knowingly falsely issued a deficient misbehavior report that alleged [Dolan] violated Departmental rules in a misbehavior report charging rule violations of 7 N.Y.C.C.R. § 270.2(7)(i) [which states that] [']An inmate shall obey all orders of departmental personnel promptly and without argument['] and 7 N.Y.C.C.R. § 270.2(26)(vii) [which states that] [']An inmate may not provide legal assistance to another inmate [without] prior approval of the superintendent or designee [and][a]n inmate shall not receive any form of compensation for providing legal assistance.[']" *Id.* ¶ 54. Dolan received this misbehavior report on January 31. *Id.* ¶ 56.

Then, on February 8, 2011, Fishkill Plant Superintendent Roger Maines commenced a tier III superintendent disciplinary hearing against Dolan.<sup>FN2</sup>

Then, on February 8, 2011, Fishkill Plant Superintendent Roger Maines commenced a tier III superintendent disciplinary hearing against Dolan.[FN2] *Id.* ¶ 60. Dolan alleges that Superintendent Connolly "designated Defendant Maines to preside over the Tier III Superintendent's disciplinary hearing despite the fact that he possessed no training." *Id.* ¶ 61. On February 10, Dolan's immediate supervisor at the law library, Correction Officer Quigley, testified "that all information contained on the confiscated personal computer was authorized and that the Plaintiff never disobeyed a direct order." *Id.* ¶ 63. On February 15, Callendar testified that "the direct order [that Dolan allegedly did not follow] was implied, not actually given." *Id.* ¶ 65. Despite this, Maines found that Dolan had violated 7 N.Y.C.C.R. § 270.2(7)(i) for disobeying a direct order. *Id.* However, he found that Dolan had not violated 7 N.Y.C.C.R. § 270.2(26)(vii) when

he provided legal advice to other inmates. *Id.* Accordingly, Maines sentenced Dolan to spend ninety days in the SHU. *Id.* Dolan asserts that "Maines knew or reasonably should have known that the entire disciplinary process was flawed and failed to comport with the requirements of due process where there was a voluminous amount [of] clearly established law contradicting ... finding [Dolan] guilty. [Maines] intentionally violated [Dolan's] constitutional rights in furtherance of retaliatory actions promulgated by the Fishkill Defendants." *Id.* ¶ 66. On February 16, 2011, Dolan submitted a written request to Superintendent Connolly to review the disciplinary hearing result, but on February 22, Connolly denied Dolan's request and forwarded it to the Commissioner's Office. *Id.* ¶¶ 68, 70. Dolan also submitted an administrative appeal on February 15. *Id.* ¶ 84. On February 19, Lieutenant Callendar came to Dolan's cell and told Dolan, "It wasn't personal,—it was business." *Id.* ¶ 69.

> **FN2.** As was explained in *Criscolo v. Vagianelis,* 12 N.Y.3d 92, 93–94 (2009)
>
> Inmates incarcerated in prisons operated by the New York State Department of Correctional Services (DOCS) must comply with standards of conduct (7 NYCRR part 270), which are enforced through issuance of inmate misbehavior reports in those instances where a rule violation endangers life, health, security or property (7 NYCRR 251–3.1). These reports are subject to review at an administrative hearing at which a hearing officer determines the truth of the allegations and imposes penalties accordingly. There are three levels of these administrative hearings—tier I (violation hearing), tier II (disciplinary hearing) and tier III (superintendent's hearing)—with differing requirements for each (7 NYCRR 270.3; 7 NYCRR parts 252, 253, 254).... Tier III hearings [ ] address the most serious inmate misbehavior im-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

plicating the most severe punishment (7 NYCRR 251–2.2[b] [3] )....

On March 1, 2011, Dolan was transferred to the SHU at Cayuga Correctional Facility ("Cayuga") in Moravia, New York. *Id.* ¶¶ 7, 71. At Cayuga, Dolan twice requested that Superintendent David Stallone review the disciplinary hearing decision, but his request was denied both times. *Id.* ¶¶ 72–73. Then, on April 14, Albert Prack, the Director of the SHU Program at Cayuga, granted Dolan an administrative reversal of the misbehavior report, and on April 21, Prack issued an additional correspondence to Stallone "reiterating the hearing reversal." *Id.* ¶¶ 74, 76. However, "Stallone refrained from performing his duty," and Dolan was not transferred out of the SHU until his ninety-day penalty was completed on April 26. *Id.* ¶¶ 76–77, 80. On April 26, Dolan was transferred from the Cayuga SHU to the general population at Gowanda Correctional Facility ("Gowanda") in Gowanda, New York. *Id.* ¶ 77.

**\*4** Dolan alleges that the fabricated misbehavior report damaged him in the following ways: "[it] resulted in a period of ninety days confined to Special Housing Units[,] resulted in loss of prison wages, transfer to Gowanda Correctional Facility (a disciplinary designated correctional facility within D.O.C.C.S), loss of personal property, and continuous duress during this period." *Id.* ¶ 79. It also "prevented other incarcerated individuals at Fishkill from receiving legal assistance and advocacy within the I.L.C. from Mr. Dolan." *Id.* ¶ 83.

**B. Procedural History**

Dolan's pro se complaint names as defendants Connolly, Stallone, Maines, Callendar, and Good. *See* Compl. ¶¶ 9–14. Defendants filed the instant motion to dismiss on December 19, 2013.[FN3] Defendants' motion papers assert the following arguments: Dolan's claims against Stallone are improperly venued and thus must either be dismissed or transferred to the Northern District of New York under Fed.R.Civ.P.

12(b)(3); Dolan's claims against Connolly and Stallone are barred because Dolan failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"); the complaint fails to sufficiently allege the personal involvement of Connolly and Stallone in any claims; Dolan's claims arising under 42 U.S.C. § 1983 and § 1985(3) must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failing to state a claim; and Dolan's state law claims are barred by New York Corrections Law § 24. *See* Def. Mem. at 8–25; Def. Reply at 2–11.

> FN3. *See* Notice of Motion to Dismiss the Complaint, filed Dec. 19, 2013 (Docket # 17); Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, filed Dec. 19, 2013 (Docket # 18) ("Def.Mem."); Declaration of Jeffrey Hale, dated Dec. 19, 2013 (Docket # 19); Notice to Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings, filed Dec. 19, 2013 (Docket # 20); Notice of Motion in Opposition to Dismiss, filed Jan. 6, 2014 (Docket # 23) ("Notice of Opp"); Memorandum of Law in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss the Complaint, filed Jan. 6, 2014 (annexed to Notice of Opp) ("Pl.Mem."); Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Complaint, filed Jan. 17, 2014 (Docket # 27) ("Def.Reply"); Memorandum of Law in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss the Complaint, filed Feb. 11, 2014 (Docket # 30); Supplemental Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Complaint, filed Feb. 28, 2014 (Docket # 31) ("Def.2d Reply").

**II. MOTION TO TRANSFER CLAIMS AGAINST STALLONE**

We first address defendants' argument that the

Slip Copy, 2014 WL 1876524 (S.D.N.Y.)
**(Cite as: 2014 WL 1876524 (S.D.N.Y.))**

claims against Stallone must either be dismissed or transferred to the Northern District of New York pursuant to Fed.R.Civ.P. 12(b)(3) because Dolan "cannot meet his burden of demonstrating that the Southern District of New York is the proper venue for his claims against Supt. Stallone, who is the Superintendent of Cayuga, which is located in Cayuga County [because] Cayuga is approximately 240 miles from the Southern District Courthouse and is located in the Northern District of New York." Def. Mem. at 9. Defendants continue, "it is clear that the Northern District is the only district in which there occurred a 'substantial part of the events or omissions giving rise to the claim[s]' asserted against Supt. Stallone." *Id.* (quoting 28 U.S.C. § 1391(b)(2)).

Under the federal statute governing venue, a plaintiff can bring a civil action in

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or 3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

**\*5** 28 U.S.C. § 1391(b). The venue requirement "serves the purpose of protecting a defendant from the inconvenience of having to defend an action in a trial that is either remote from the defendant's residence or from the place where the acts underlying the controversy occurred." *Shariff v. Goord,* 2005 WL 2087840, at *6 (S.D.N.Y. Aug. 26, 2005) (internal quotation marks and citation omitted).

Courts in this Circuit have consistently held that "[o]n a motion to dismiss a complaint under Rule

12(b)(3) for improper venue, the plaintiff bears the burden of establishing that venue is proper." *Cold Spring Harbor Lab. v. Ropes & Gray LLP,* 762 F.Supp.2d 543, 551 (E.D.N.Y.2011) (internal quotation marks and citation omitted); *accord Sepanski v. Janiking, Inc.,* 822 F.Supp.2d 309, 312–13 (W.D.N.Y.2011); *Basile v. Walt Disney Co.,* 717 F.Supp.2d 381, 386 (S.D.N.Y.2010). Where there are multiple claims, "the plaintiff must show that venue is proper for each claim asserted, but dismissal of an improperly venued claim is not warranted if it is factually related to a properly venued claim and the claims could be considered one cause of action with two grounds of relief." *Solow Bldg. Co., LLC v. ATC Assocs., Inc.,* 175 F.Supp.2d 465, 469 (E.D.N.Y.2001) (internal quotation marks and citation omitted); *accord Holmes v. Grant,* 2006 WL 851753, at *21 (S.D.N.Y. Mar. 31, 2006); *U.S. E.P.A. ex rel. McKeown v. The Port Auth. of N.Y. & N. J.,* 162 F.Supp.2d 173, 183 (S.D.N.Y.2001). For purposes of the venue statute, "state officers 'reside' in the district where they perform their official duties." *Holmes,* 2006 WL 851753, at *21 (citing *Amaker v. Haponik,* 198 F.R.D. 386, 391 (S.D.N.Y.2000); *Baker v. Coughlin,* 1993 WL 356852, at *2 (S.D.N.Y. Sept. 9, 1993)); *accord Springle v. City of New York,* 2013 WL 592656, at *8 (S.D.N.Y. Feb. 14, 2013) ("Where the natural person is a public official, courts in this Circuit have held that residence for the purpose of venue is where the officials perform their duties.") (internal quotation marks and citation omitted).

Here, Dolan has asserted the same claims against all five individual defendants. *See* Compl. at 25–27. He has alleged in his complaint, and defendants have not disputed, that Connolly, Maines, Callendar, and Good work at the Fishkill Correctional Facility, which is in the Southern District of New York, and that Stallone works at the Cayuga Correctional Facility, which is in the Northern District of New York. *See id.* ¶¶ 7–14. Thus, for the purpose of defendants' motion to dismiss, we accept as true that all of the defendants reside in the Southern District of New York except

Slip Copy, 2014 WL 1876524 (S.D.N.Y.)
**(Cite as: 2014 WL 1876524 (S.D.N.Y.))**

Stallone who resides in the Northern District of New York. *See U.S. E.P.A. ex rel McKeown,* 162 F.Supp.2d at 183 (with respect to motion to dismiss for improper venue, "[t]he court must take all allegations in the complaint as true, unless contradicted by the defendants' affidavits").

**\*6** Defendants argue in their reply brief that "the Northern District of New York is the only proper district for the claims against Superintendent Stallone under 28 U.S.C. § 1391(b)(1) because it is the district where he resides as he works in Cayuga Correctional Facility." Def.2d Reply at 2. But 28 U.S.C. § 1391(b)(1) is clear that venue is proper in a "judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." Venue is proper in the Southern District because, with respect to all of Dolan's claims, four of the defendants reside in the Southern District, the district where the suit was brought, and all five defendants reside within the State of New York. *See, e.g., Springle,* 2013 WL 592656, at \*8 (where one of the defendants resided in the Eastern District New York and the other defendants all resided within New York State, venue was proper in the Eastern District); *AlGhena Intern. Corp. v. Radwan,* 957 F.Supp.2d 511, 521 (D.N.J.2013) ("[T]he Central District of California ... would provide a proper venue for this action because at least two of the Defendants ... reside in that district and all defendants are residents of the State of California.").

Because we have found that venue is proper under 28 U.S.C. § 1391(b)(1), we need not address the parties' arguments about whether venue would be proper under § 1391(b)(2).[FN4]

    FN4. It is of no moment that Dolan did not cite 28 U.S.C. § 1391(b) (1) as the basis for venue in his complaint as there is no requirement that a complaint allege venue. *See Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.,* 869 F.Supp. 152, 154 (S.D.N.Y.1994) ("The plaintiff need not include in his complaint an allegation showing proper venue."); *Ferraioli v. Cantor,* 259 F.Supp. 842, 846 (S.D.N.Y.1966); see also *Neufeld v. Neufeld,* 910 F.Supp. 977, 986 (S.D.N.Y.1996) (venue proper under a provision plaintiffs "overlooked in the Complaint"); *Dudash v. Varnell Struck & Assocs., Inc.,* 2004 WL 2623903, at \*4 (N.D.Cal. Nov. 16, 2004) ("The rules of pleading do not require a plaintiff to allege venue, though it is good practice to do so.") (citations omitted).

Defendants argue in the alternative that even if venue is proper in the Southern District of New York, Dolan's claims against Stallone should be transferred to the Northern District of New York pursuant to 28 U.S.C. § 1404(a). *See* Def. Mem. at 9. Defendants essentially contend that because the "center of gravity" of the claims asserted against Stallone is in the Northern District of New York, the court should exercise its discretion under § 1404(a) to transfer the claims against Stallone to that district. *Id.* at 10; Def.2d Reply at 2.

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." In general, the decision whether to transfer a case from one judicial district to another absent consent requires a two-part inquiry. First, the court must determine whether the case sought to be transferred could have been brought in the proposed transferee court. Second, the court must decide whether transfer is warranted for the convenience of parties and witnesses and is in the interest of justice. See, e.g., *Whitehaus Collection v. Barclay Prods., Ltd.,* 2011 WL 4036097, at \*1 (S.D.N.Y. Aug. 29, 2011); *Matta v. Roswell Park Cancer Inst. Corp.,* 2011 WL 3104889, at \*3 (S.D.N.Y. July 26, 2011).

In this case, defendants are not asking for a

Slip Copy, 2014 WL 1876524 (S.D.N.Y.)
**(Cite as: 2014 WL 1876524 (S.D.N.Y.))**

transfer of Dolan's entire action; instead, they request that we first sever the claims brought against Stallone and then transfer only those claims to the Northern District of New York—a procedure that case law has deemed permissible. See, e.g., *Wyndham Assocs. v. Bintliff,* 398 F.2d 614, 618 (2d Cir.1968); *Cain v. N.Y. State Bd. of Elections,* 630 F.Supp. 221, 225–26 (E.D.N.Y.1986). While we recognize that "[a] district court has broad discretion in determining whether severance and transfer of a claim or claims against one or more defendants is appropriate," *Steuben Foods, Inc. v. Oystar Grp.,* 2013 WL 2105894, at *7 (W.D.N.Y. May 14, 2013) (citing *New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1082 (2d Cir.1988)), at the same time "[t]here is a strong policy favoring the litigation of related claims in the same tribunal in order that pretrial discovery can be conducted more efficiently, duplicitous litigation can be avoided, thereby saving time and expense for both parties and witnesses, and inconsistent results can be avoided." *Wyndham,* 398 F.2d at 619.

**\*7** Before severing and transferring claims brought against fewer than all defendants, courts typically examine the following factors:

(1) whether the issues sought to be tried separately are significantly different from one another, (2) whether the separable issues require the testimony of different witnesses and different documentary proof, (3) whether the party opposing the severance will be prejudiced if it is granted and (4) whether the party requesting the severance will be prejudiced if it is not granted.

*Randle v. Alexander,* 960 F.Supp.2d 457, 486 (S.D.N.Y.2013) (quoting *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,* 104 F.Supp.2d 279, 288 (S.D.N.Y.2000)).

Here, defendants have made no showing that severance and transfer of the claims brought against

Stallone would be appropriate. Instead, they have conclusorily asserted, "transfer of plaintiff's claims against defendant Stallone is appropriate under § 1404(a)" because "Stallone and the witnesses and documents relevant to plaintiff's claims against him are located in the Northern District, where Cayuga is located." Def.2d Reply at 2. But a critical witness—the plaintiff himself—is incarcerated in the Southern District of New York. *See* Compl. ¶ 8. More importantly, severing and transferring the claims against Stallone would obviously lead to duplicative litigation. Indeed, Dolan has raised the exact same claims against all five defendants. *See id.* at 25–27. All of these claims involve essentially the same operative facts concerning Dolan's alleged violation of the rules at Fishkill and the ensuing disciplinary hearing and punishment taken against Dolan at both Fishkill and Cayuga.

Furthermore, because Dolan has asserted that Stallone and the other defendants conspired to deprive Dolan of his rights, the actions of the Fishkill defendants in the Southern District of New York are relevant with regard to the claims brought against Stallone. *See id.* at 25–26. In short, because severing and transferring the Stallone claims would require Dolan to litigate essentially the same claims involving, in large part, the same operative facts in two separate forums, defendants' request to sever and transfer these claims should be denied. Cf. *Steuben Foods, Inc.,* 2013 WL 2105894, at *7 (denying request to sever and transfer claims where it would result in "duplicative litigation"); *Tomjai Enters., Corp. v. Laboratorie Pharmaplus USA,* Inc., 2012 WL 3104891, at *8 (S.D.N.Y. July 31, 2012) (rejecting motion to sever and transfer where "[d]efendants have raised no contentions concerning the differentiability of issues to be tried, the different witnesses or evidence involved or whether Defendants will be prejudiced should severance be denied").

We next turn to defendants' motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6).[FN5]

Slip Copy, 2014 WL 1876524 (S.D.N.Y.)
**(Cite as: 2014 WL 1876524 (S.D.N.Y.))**

FN5. In support of their motion to dismiss plaintiff's claims, defendants have proffered documents not contained in the pleadings—principally documents relating to their argument that plaintiff has not exhausted his administrative remedies. Where materials outside the pleadings are presented on a motion to dismiss under Rule 12(b)(6), a court "must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material." *Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000) (citations and internal quotation marks omitted). Here, we elect to not consider any materials outside the pleadings as we do not reach defendants' arguments regarding exhaustion. *See* 42 U.S.C. § 1997e(c)(2) (permitting a district court to "dismiss the underlying claim without first requiring the exhaustion of administrative remedies" where the claim "fails to state a claim upon which relief can be granted"); *accord Woodford v. Ngo,* 548 U.S. 81, 101 (2006) (" § 1997e(c)(2) still serves a useful function by making it clear that the PLRA exhaustion requirement is not jurisdictional, and thus allowing a district court to dismiss plainly meritless claims without first addressing what may be a much more complex question, namely, whether the prisoner did in fact properly exhaust available administrative remedies.").

### III. *LAW GOVERNING MOTIONS TO DISMISS*

A party may move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) where the opposing party's pleading "fail[s] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). While a court must accept as true all of the allegations contained in a complaint, that principle does not apply to legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (citation, internal quotation marks, and brackets omitted). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal,* 556 U.S. at 678, and thus a court's first task is to disregard any conclusory statements in a complaint, *id.* at 679.

**\*8** Next, a court must determine if a complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." *Id.* at 678 (citation and internal quotation marks omitted); *accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007) ("[A] complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion."). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed.R.Civ.P. 8(a) because it has merely "alleged" but not " 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed.R.Civ.P. 8(a)(2)).

In the case of pro se plaintiffs, "[a] document filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U .S. 89, 94 (2007) (citations and internal quotation marks omit-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1876524 (S.D.N.Y.)
**(Cite as: 2014 WL 1876524 (S.D.N.Y.))**

ted); *accord McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be construed liberally and interpreted " 'to raise the strongest arguments that they suggest' ") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). However, even pro se pleadings must contain factual allegations that " 'raise a right to relief above the speculative level.' " *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 603 (S.D.N.Y.2009) (quoting *Twombly,* 550 U.S. at 555).

IV. *DISCUSSION*

Dolan raises the following claims against the five defendants: (1) a claim under 42 U.S.C. § 1983 asserting that defendants "unlawfully retaliated against [Dolan] for exercising his constitutional right [arising under the First Amendment] to report abuses suffered by his fellow incarcerated individuals, provide them legal advice, and to pursue his own claims through filing grievances," Compl. at 25; (2) a claim under 42 U.S.C. § 1985(3) asserting that defendants conspired to deprive Dolan of "equal protection of laws owing to his membership in the jailhouse lawyer class and Inmate Liaison Committee," *id.* at 25–26; and (3) claims under various provisions of the New York State Constitution, *see id.* at 27.

A. *Claims Arising Under* 42 U.S.C. § 1983

42 U.S.C. § 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**\*9** To state a claim under § 1983, Dolan must show that he was denied a constitutional or federal

statutory right and that the deprivation of that right occurred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988). Section 1983 does not grant any substantive rights but rather "provides only a procedure for redress for the deprivation of rights established elsewhere," such as in the Constitution or a federal statute. *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). Dolan asserts that his First Amendment rights, as incorporated against the State by the Fourteenth Amendment, were violated when defendants "unlawfully retaliated against [him] for exercising his constitutional right to report abuses suffered by his fellow incarcerated individuals, provide them legal advice, and to pursue his own claims through filing grievances." Compl. at 25. Furthermore, Dolan alleges, "Defendants' actions were ... motivated by [Dolan's] exercise of his protected rights to file prison grievances, pursue civil litigation, and help other incarcerated individuals at Fishkill do the same." *Id.* While defendants have presented individualized arguments as to how Dolan has failed to state § 1983 claims against each particular defendant, we need not address defendants separately as we find that Dolan has failed to allege adequate facts to support a retaliation claim against any defendant.

To establish a prima facie case of First Amendment retaliation, an inmate must show: (1) that his speech or conduct was constitutionally protected; (2) that the defendant took adverse action against the plaintiff; and (3) that a causal connection exists between the protected speech and the adverse action. *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (citing *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)). Because of the ease with which claims of retaliation can be fabricated, the Second Circuit has directed courts to examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citation omitted).

We will assume that the second element is met inasmuch as Dolan has asserted that defendants brought a fabricated misbehavior report against him,

Slip Copy, 2014 WL 1876524 (S.D.N.Y.)
**(Cite as: 2014 WL 1876524 (S.D.N.Y.))**

punished him by putting him the SITU for ninety days, and refused to release him from the SITU even after the hearing decision had been reversed. But Dolan's complaint falls short because he has not sufficiently alleged facts supporting the first and third of these elements. While it is well-established that the First Amendment protects prisoners from retaliation for submitting grievances regarding prison conditions, *see Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988), Dolan has not identified any specific grievance he filed that resulted in retaliation. Instead, Dolan alleges in the most conclusory and imprecise terms that he engaged in protected conduct involving grievances. *See* Compl. ¶¶ 5, 78. Dolan's complaint provides no allegations as to when such grievances were filed, whom they were filed against, or what they concerned. Furthermore, while the complaint discusses Dolan's general activities in helping other inmates with their legal issues and in serving on the ILC, *see id.* ¶¶ 26–36, 39–40, it does not provide any information about particular statements that Dolan made as an ILC member or specific actions he took that may have implicated his First Amendment rights. Courts have held that a plaintiff in prison retaliation cases must do more than simply assert that his status as an ILC member or as a jailhouse lawyer caused prison officials to retaliate against him. *See, e.g., Tolliver v. Skinner,* 2013 WL 658079, at *21 (S.D.N.Y. Feb. 11, 2013) (plaintiff had "not allege[d] any constitutionally protected activity" where, *inter* alia, he stated in his complaint that defendants retaliated against him because he was co-chairman of the inmate liaison committee) (internal punctuation omitted); *Diaz v. Fischer,* 2010 WL 1133074, at *3 (N.D.N.Y. Mar. 23, 2010) (stating that "[t]he mere allegation that [defendant officer] 'did not like' that Plaintiff was a member of the ILC and became hostile to him after finding out about such membership, does not causally link the alleged unconstitutional retaliation by [the defendant] to Plaintiff's ILC membership"); *Anderson v. Lapolt,* 2009 WL 3232418, at *5 (N.D.N.Y. Oct. 1,

2009) (finding that the plaintiff's "general claim that all Defendants retaliated against him for providing legal assistance to other inmates is conclusory and implausible"); *see also Muhammad v. Reeves,* 2012 WL 5617113, at *8 (W.D.N.Y. Nov. 15, 2012) (granting the defendants' motion for summary judgment where the plaintiff "merely alleged that he was issued fraudulent misbehavior reports and was 'lied about' in retaliation for his grievances").

**\*10** As a result of Dolan's inability to identify any specific protected conduct, his complaint necessarily lacks sufficient factual allegations establishing the causal link to the adverse action. "In order to satisfy the causation requirement, allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action." *Davis v.. Goord,* 320 F.3d 346, 354 (2d Cir.2003) (internal quotation marks and citation omitted). One court has pointed to several factors that may be used to determine whether a causal connection exists: "(1) the temporal proximity between the plaintiff's protected activity and the defendant's adverse action, (2) the prior disciplinary record of the inmate, (3) the outcomes of any hearings regarding the allegedly retaliatory charges, and (4) any statements defendant makes concerning his motive." *Davidson v. Bartholome,* 460 F.Supp.2d 436, 444 (S.D.N.Y.2006) (citing *Colon,* 58 F.3d at 872–873). "A plaintiff cannot state a retaliation claim in wholly conclusory terms, but rather, must provide a pleading that is 'supported by specific and detailed factual allegations.' " *Anderson,* 2009 WL 3232418, at *5 (quoting *Friedl,* 210 F.3d at 85–86).

In this case, two factors weigh in Dolan's favor, including the fact that he did not have any misbehavior reports in his record prior to the adverse action being taken, see Compl. ¶¶ 15, 59, and that the disciplinary charges that defendants brought against him were eventually reversed, *see id.* ¶¶ 74, 80. The other two factors, however, do not favor Dolan inasmuch as Dolan had been serving on the ILC and assisting inmates with grievances at Fishkill for several years, *see*

Slip Copy, 2014 WL 1876524 (S.D.N.Y.)
**(Cite as: 2014 WL 1876524 (S.D.N.Y.))**

*id.* ¶¶ 31–35. Nor does the complaint contain any specific statements that any defendant made that showed an improper motive. Rather, the complaint alleges in the most vague and conclusory fashion that Good and other prison officers "were continuously overheard, by facility law clerks, endeavoring to conspire and/or manufacture a way to fabricate a misbehavior report." *See id.* ¶ 45. Furthermore, the allegation that Callendar told Dolan, "It wasn't personal,—it was business," *id* . ¶ 69, is, at best, ambiguous.

But the causation requirement is missing most obviously because, while Dolan asserts in his complaint that defendants targeted him because he provided legal assistance to other inmates and because he filed grievances on his own behalf, *see id.* ¶¶ 3, 5, 39–40, 78, he has not identified any particular complaint or grievance that served as the catalyst for defendants' retaliatory actions. Instead, Dolan conclusorily contends that defendants "unlawfully retaliated against [him] for exercising his constitutional right to report abuses suffered by his fellow incarcerated individuals, provide them legal advice, and to pursue his own claims through filing grievances." Compl. at 25. Dolan does not provide any facts explaining what speech was involved or why defendants waited until January 2011 to retaliate against him even though Dolan had been helping inmates file grievances at Fishkill since he started working at Fishkill's law library in August 2008. *See* Compl. ¶ 31.

**\*11** In other prison retaliation cases, claims have survived motions to dismiss where plaintiffs have alleged facts showing a link between a particular grievance complaint and an adverse action, such as where the particular officer who retaliated against the prisoner had been the subject of the prisoner's prior grievance complaint. *See, e.g., Gill v. Hoadley,* 261 F.Supp.2d 113, 123–24 (N.D.N.Y.2003); *Mateo v. Fischer,* 682 F.Supp.2d 423, 435 (S.D.N.Y.2010). Dolan, however, has not described a single instance where he engaged in specific protected speech prior to

the adverse action being taken.

Instead, the complaint makes conclusory contentions such as "[defendants were] motivated by Mr. Dolan's membership in a small but constitutionally empowered jailhouse lawyer class" and "[defendants] acted swiftly and in concert to deter Mr. Dolan from further exercise of his constitutionally protected First Amendment rights." Compl. ¶ 3. It has been repeatedly held, however, that given the potential for abuse in prison retaliation cases, threadbare assertions like this will not survive a motion to dismiss. See, e.g., *Crenshaw v. Hartman,* 681 F.Supp.2d 412, 417 (W.D.N.Y.2010) (dismissing retaliation claim where it "is unsupported by any facts showing a nexus between these events and any constitutionally protected activity on plaintiff's part"); *Anderson,* 2009 WL 3232418, at *8 (plaintiff's "general claim that all Defendants retaliated against him for providing legal assistance to other inmates is conclusory and implausible") (citing *Iqbal,* 556 U.S. at 678).

Nor are there any non-conclusory allegations showing a causal link between Dolan's actions as an ILC member and the adverse action taken against him. Instead, he has simply contended that defendants' retaliatory actions were "motivated by [Dolan's] membership ... [in] the I.L.C. and the rights-vindicating behavior he undertook in that role." *Id.* ¶ 3. Notably, the adverse action was not taken until January 2011, years after Dolan first began serving as an ILC member and four months after his service ended. *Id.* ¶ 34. That Dolan has been unable to identify what specific ILC conduct motivated defendants to bring the falsified misbehavior report against him, together with the fact that no retaliatory action was taken against Dolan until months after he last served on the ILC, leads us to conclude that the necessary causal connection has not been alleged.

Dolan implies in his complaint that defendants' retaliatory actions may have been motivated, in part, by his election as chairman of the ILC on January 20,

Slip Copy, 2014 WL 1876524 (S.D.N.Y.)
**(Cite as: 2014 WL 1876524 (S.D.N.Y.))**

2011. *Id.* ¶¶ 36, 39. However, it does not appear, nor has Dolan alleged, that he engaged in any protected conduct as ILC chairman prior to the adverse action being taken against him. To the extent that Dolan has claimed that defendants' animus toward him stems simply from his status as the newly-elected ILC chairman, this is insufficient to demonstrate protected speech or conduct for a retaliation claim. *See Tolliver, 2013 WL 658079, at *21* (finding that plaintiff had "not allege[d] any constitutionally protected activity" where he stated in his complaint that defendants acted "out of revenge and retaliation of [him] as co-chairman of the inmate liaison committee").

**\*12** In sum, the complaint fails to state a claim for retaliation against any defendant, and thus, all retaliation claims should be dismissed.

B. *Claims Arising Under 42 U.S.C. § 1985(3)*

Dolan asserts that defendants are liable under 42 U.S.C. § 1985(3) for engaging in "a conspiracy to deprive [Dolan] of equal protection of laws owing to his membership in the jailhouse lawyer class and Inmate Liaison Committee." Compl. at 26. He further alleges, "[i]n furtherance of their conspiracy, Defendants engaged in concerted efforts to intimidate Plaintiff, as a jailhouse lawyer and Inmate Liaison Committee representative, from zealously enforcing constitutional rights on his own behalf, as well as on behalf of other incarcerated individuals." *Id.* Defendants argue that these conspiracy claims should be dismissed because Dolan has not sufficiently stated a constitutional violation, because he has not alleged membership in a protected group, and because these claims are impermissibly vague and conclusory. *See* Def. Mem. at 19–20.

To state a claim for conspiracy under 42 U.S.C. § 1985(3), a plaintiff must allege four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in fur-

therance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters and Joiners v. Scott, 463 U.S. 825, 828–29 (1983).* These allegations must be more than "conclusory, vague, or general" if they are to withstand a motion to dismiss. *Webb v. Goord, 340 F.3d 105, 111 (2d Cir.2003)* (quoting *Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997)*).

Case law requires that the conspiracy be motivated "by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas v. Roach, 165 F.3d 137, 146 (2d Cir.1999)* (internal quotation marks and citation omitted). "In this context, 'class-based animus' encompasses only those groups with discrete and immutable characteristics such as race, national origin, and sex." *Vega v. Artus, 610 F.Supp.2d 185, 204 (N.D.N.Y.2009)* (quoting *Martin v. N.Y. State Dep't of Corr. Servs., 115 F.Supp.2d 307, 316 (N.D.N.Y.2000)); see also Segreto v. Kirschner, 977 F.Supp. 553, 565 (D.Conn.1997)* ("Section 1985(3) should only extend beyond its racial parameters where either the courts designate the class in question a 'suspect' or 'quasi-suspect' classification requiring more exacting scrutiny, or where Congress has indicated through legislation that the class require[s] special protection.") (internal quotation marks omitted) (quoting *Schultz v. Sundberg, 759 F.2d 714, 718 (9th Cir.1985)); Orshan v. Anker, 489 F.Supp. 820, 823 (E.D.N.Y.1980)* ("The language of § 1985 has been interpreted to require discrimination between classes based on racial bias, national origin or religion, ... and the class must be well defined and a traditionally disadvantaged group.") (internal quotation marks and citations omitted).

**\*13** Here, the only "class-based invidiously discriminatory animus" that Dolan has alleged is his status as a "jailhouse lawyer" and as an ILC member. While Dolan has asserted that as a jailhouse lawyer he is a "member of a constitutional[ly] protected group,"

Slip Copy, 2014 WL 1876524 (S.D.N.Y.)
**(Cite as: 2014 WL 1876524 (S.D.N.Y.))**

Pl. Mem. at 7, the only case he cites for this proposition, *Johnson v. Avery,* 393 U.S. 484 (1969), does not support his argument. Rather, *Johnson* held only that the State cannot prohibit an inmate from receiving legal assistance from other inmates, at least where it has not provided other reasonable alternatives for helping inmates prepare petitions for post-conviction relief. 393 U.S. at 490. There is no suggestion in *Johnson* or, to the Court's knowledge, elsewhere in case law that jailhouse lawyers as a group should be given special constitutional protection. Moreover, courts that have specifically considered the issue of whether jailhouse lawyers or ILC members are cognizable classes for § 1985(3) claims have consistently found that they are not. *See Webster v. Fischer,* 694 F.Supp.2d 163, 196 (N.D.N.Y.2010); *Carter v. Dragovich,* 1999 WL 549030, at *3 (E.D.Pa. July 27, 1999); *Faust v. Parke,* 1996 WL 698024, at *7 (N.D.Ind. Oct. 3, 1996). Because Dolan has failed to plead membership in a protected class for purposes of his § 1985(3) claims, they should be dismissed.

C. *Claims Arising Under New York State Constitution*

The only remaining claims in Dolan's complaint are those arising under the New York State Constitution. Federal courts have "supplemental jurisdiction" over state law claims if they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). Nonetheless, a district court may decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3); *accord United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966) (state claims "should be dismissed" if federal claims are dismissed before trial); *In re Merrill Lynch Ltd. P'ships Litig.,* 154 F.3d 56, 61 (2d Cir.1998); *Lennon v. Miller,* 66 F.3d 416, 426 (2d Cir.1995). Here, Dolan's § 1983 and § 1985(3) claims provided the only basis for federal jurisdiction. Thus, the Court should decline to exercise supplemental jurisdiction over Dolan's state law claims.

V. *CONCLUSION*

For the foregoing reasons, the motion to dismiss Dolan's complaint (Docket # 17) should be granted. Dolan should be given leave to file an amended complaint in the event he is able to correct the deficiencies by pleading facts that would state a claim against any of the defendants. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead .") (citations omitted).

**PROCEDURE FOR FILING OBJECTIONS TO THIS EPORT AND RECOMMENDATION**

**\*14** Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. *See* also Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. George Daniels, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Daniels. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010).

S.D.N.Y.,2014.
Dolan v. Connolly
Slip Copy, 2014 WL 1876524 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 2717982 (W.D.N.Y.)
**(Cite as: 2014 WL 2717982 (W.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Thamud ELDRIDGE, Plaintiff,
v.
Officer KENNEY, Officer Springer, Officer Vogt and
Niagara County Sheriff, Defendants.

No. 11–CV–6459–FPG.
Signed June 16, 2014.

Thamud Eldridge, Mayville, NY, pro se.

Michael F. Perley, Hurwitz & Fine, Buffalo, NY, for
Defendants.

DECISION AND ORDER

FRANK P. GERACI, JR., District Judge.

**\*1** *Pro se* Plaintiff Thamud Eldridge is an inmate
at the Niagara County Jail and brings this action under
42 U.S.C. § 1983, alleging that three officers and the
Niagara County Sheriff violated his civil rights. Dkt. #
6. One named defendant, the Niagara County Sheriff
("Sheriff"), has moved to dismiss Plaintiff's Amended
Complaint as to him under Federal Rule of Civil
Procedure 12(b)(6). Because Plaintiff has failed to
allege any facts involving the Sheriff that would
plausibly entitle him to relief, the motion is granted,
and the Niagara County Sheriff is dismissed from this
action.

BACKGROUND

Plaintiff alleges that he was assaulted by De-
fendant Officers Kenney, Springer, and Vogt as they
were transporting him to the Special Housing Unit on
December 2, 2010. Plaintiff further contends that
because the Sheriff supervises the three officers, he is

liable to Plaintiff for failing to adequately train, su-
pervise, discipline, or control the Officers. Plaintiff
further alleges that the Sheriff failed to remedy the
violations suffered by Plaintiff after he learned of
them through the prison's disciplinary process, and
that this occurred because of a policy or custom al-
legedly maintained by the Sheriff that allowed the
alleged constitutional violations to occur.

DISCUSSION

To succeed on a motion to dismiss under Federal
Rule of Civil Procedure 12(b)(6), a defendant must
show that the complaint contains insufficient facts to
state a claim for relief that is plausible on its face. *Bell
Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 127
S.Ct. 1955, 167 L.Ed.2d 929 (2007). A complaint is
plausible when a plaintiff pleads sufficient facts that
allow the Court to draw reasonable inferences that the
defendant is liable for the alleged conduct. *Ashcroft v.
Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d
868 (2009). Plausibility "is not akin to a probability
requirement," rather plausibility requires "more than a
sheer possibility that a defendant has acted unlawful-
ly." *Id.* (quotation marks omitted). "Where a com-
plaint pleads facts that are merely consistent with a
defendant's liability, it stops short of the line between
possibility and plausibility of entitlement to relief." *Id.*
(quotation marks and citation omitted). A pleading
that consists of "labels and conclusions" or "a for-
mulaic recitation of the elements of a cause of action
will not do." *Twombly,* 550 U.S. at 555. Nor does a
complaint suffice if it tenders "naked assertion[s]"
devoid of "further factual enhancement." *Id., at* 557.
In considering the plausibility of a claim, the Court
must accept factual allegations as true and draw all
reasonable inferences in the plaintiff's favor. *Faber v.
Metro. Life Ins. Co.,* 648 F.3d 98, 104 (2d Cir.2011).
At the same time, the Court is not required to accord
"[l]egal conclusions, deductions, or opinions couched
as factual allegations ... a presumption of truthful-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2717982 (W.D.N.Y.)
**(Cite as: 2014 WL 2717982 (W.D.N.Y.))**

ness." *In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir.2007) (quotation marks omitted).

**\*2** Because the Plaintiff is *pro se,* his pleadings are held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (internal quotation marks omitted). Accordingly, the Court interprets Plaintiff's pleadings "to raise the strongest arguments that they suggest." *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir.2009). Nevertheless, all pleadings, regardless of who drafts them, must contain enough facts to give defendants fair notice of the claim and the facts on which it is based. *Twombly,* 550 U.S. at 555.

A complaint alleging a § 1983 violation must contain enough facts to show that the defendant acted under color of state law and that the conduct complained of "deprived the plaintiff of a right guaranteed in the [C]onstitution or laws of the United States." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). In the case of a supervisory defendant, it is well settled that a supervisor may not be held liable in a § 1983 action on a theory of *respondeat superior. Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation omitted). Rather, "supervisor liability depends on a showing of some personal responsibility," *Id.,* and the plaintiff must plead sufficient facts to establish the personal involvement of each particular defendant in the alleged violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

In order to establish the personal involvement of a supervisory official, a plaintiff can demonstrate that: (1) the defendant participated directly in the alleged conduct; (2) the defendant did not remedy a wrong after learning of it through a report or appeal; (3) the defendant formed a policy or custom under which the conduct transpired, or allowed the policy or custom to continue; (4) the defendant's supervision of subordinates who engaged in the conduct was grossly negli-

gent; or (5) the defendant demonstrated deliberate indifference to the rights of inmates by failing to act on information showing that the conduct was occurring. *Colon,* 58 F.3d at 873.

With these standards in mind, I find that the Plaintiff has fallen far short of alleging sufficient facts to demonstrate the Sheriff's personal involvement in the alleged violations. The closest Plaintiff comes to alleging the Sheriff's involvement is found in the Amended Complaint, where Plaintiff recites the fourth *Colon* factor by stating that the Sheriff was "grossly negligent in managing subordinates ... by failing to adequately train, supervise, and in any other way direct or control officers in the exercise of their police duties and functions." Dkt. # 6. That statement, devoid of any factual support, contains nothing more than conclusory statements and formulaic recitations of the cause of action, which the Supreme Court has deemed to be insufficient. *See Twombly,* 550 U.S. at 555. Rather than alleging facts that could "nudge[ ][his] claims across the line from conceivable to plausible," *Twombly,* 550 U.S. at 570, Plaintiff has instead provided no facts to support his claims against the Sheriff, and as a result, his cause of action against the Sheriff cannot survive.

**\*3** Even considering allegations made by Plaintiff outside of the Amended Complaint—which I will consider because of the Plaintiff's *pro se* status-Plaintiff fares no better. While Plaintiff's Response to the Sheriff's Motion to Dismiss (Dkt.# 15) contains references to the second and third *Colon* factors, they suffer from the same fatal flaw: they contain nothing more than conclusory statements and formulaic recitations of the *Colon* factors and are wholly unsupported by facts. As a result, these allegations are also insufficient and cannot survive the Sheriff's Motion to Dismiss.

*CONCLUSION*

For the foregoing reasons, Defendant Niagara County Sheriff's Motion to Dismiss the Complaint as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2717982 (W.D.N.Y.)
**(Cite as: 2014 WL 2717982 (W.D.N.Y.))**

to him (Dkt.# 10) is GRANTED. The Clerk of the Court shall terminate the Sheriff as a defendant in this action.

IT IS SO ORDERED.

W.D.N.Y.,2014.
Eldridge v. Kenney
Slip Copy, 2014 WL 2717982 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Gary GILLARD, Plaintiff,
v.
Michael ROVELLI, et al., Defendants.

No. 9:12–CV–0083 (LEK/CFH).
Sept. 30, 2013.

Gary Gillard, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Richard Lombardo, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***
LAWRENCE E. KAHN, District Judge.
**I. INTRODUCTION**
    **\*1** This matter comes before the Court following a Report–Recommendation filed on July 18, 2013, by the Honorable Christian F. Hummel, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3 of the Northern District of New York. Dkt. No. 84 ("Report–Recommendation"). After fourteen days from the service thereof, the Clerk has sent the entire file to the undersigned, including Defendants' and *Pro se* Plaintiff Gary Gillard's Objections. Dkt. Nos. 85 ("Defendants' Objections"); 86 ("Plaintiff's Objections"). For the following reasons, the Court approves and adopts the Report–Recommendation in its entirety and grants in part Defendants' Motion to dismiss. Dkt. No. 41 ("Motion").

**II. BACKGROUND**

**A. Factual Background**

    The Court presumes the parties' familiarity with the facts underlying this case. For a complete statement of the facts, reference is made to the Report–Recommendation.

**B. Procedural History**
    On January 18, 2012, Plaintiff commenced this action, seeking relief under 42 U.S.C. § 1983. Dkt. No. 1 ("Complaint"). Plaintiff alleges that Defendants, fourteen current and retired employees of the New York State Department of Correctional and Community Supervision ("DOCCS") and one inmate, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. *See generally id.*

    On October 17, 2012, all Defendants except Defendant Jose Nunez filed the Motion seeking: (1) dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6); and (2) a protective order pursuant to Federal Rule of Civil Procedure 26(c)(1). Mot. Plaintiff then filed a Response opposing the Motion. Dkt. No. 50 ("Response").

    Judge Hummel recommends that Defendants' Motion be granted as to Plaintiff's: (1) § 1983 claims against all individual Defendants in their official capacities; and (2) conspiracy claims against all Defendants. *See* Report–Rec. However, Judge Hummel recommends that the Motion be denied as to the Fourteenth Amendment procedural due process claims. *Id.* Judge Hummel also recommends that Plaintiff's First Amendment claims based on access to courts and interference with mail be dismissed without prejudice. *Id.* Finally, Judge Hummel recommends that Defendants' request for a protective order staying

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

discovery be granted. *Id.*

## III. LEGAL STANDARDS

### A. Review of a Magistrate Judge's Report–Recommendation

A district court must review *de novo* any objected-to portions of a magistrate judge's report-recommendation or specific proposed findings or recommendations therein and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b); *accord* FED. R. CIV . P. 72(b); *see also Morris v. Local 804, Int'l Bhd. of Teamsters,* 167 F. App'x 230, 232 (2d Cir.2006); *Barnes v. Prack,* No. 11–CV–0857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. *Chylinski v. Bank of Am., N.A.,* 434 F. App'x 47, 48 (2d Cir.2011); *Barnes,* 2013 WL 1121353, at *1; *Farid v. Bouey,* 554 F.Supp.2d 301, 306–07 & n. 2 (N.D.N.Y.2008); *see also Machicote v. Ercole,* No. 06 Civ. 13320, 2011 WL 3809920, at *2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). A district court also "may receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b); *accord* FED. R. CIV. P. 72(b)(3).

### B. Motion to Dismiss

**\*2** To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); *see also* FED. R. CIV. P. 12(b) (6). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. *See Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir.2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." *Id.* at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U .S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly,* 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. *See id .* at 678–79. Additionally, when a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). "[A] pro se litigant's submissions must be construed liberally, and ... such submissions must be read to raise the strongest arguments that they suggest." *Id.*

## IV. DISCUSSION

### A. The Report–Recommendation

In the Report–Recommendation, Judge Hummel refused to dismiss Plaintiff's Fourteenth Amendment due process claim, in which Plaintiff argues that Defendants deprived him of a hearing regarding his 90–day keeplock confinement. *See* Report–Rec. at 19. Judge Hummel found that there were questions of fact

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

as to whether Plaintiff's confinement was an atypical and significant hardship in relation to the ordinary incidents of prison life, such that a liberty interest protected by the Due Process Clause of the Fourteenth Amendment was implicated. *See Sandin v. Conner, 515 U.S. 472, 484 (1995);* Report–Rec. at 18–19. The Report–Recommendation acknowledged that: (1) the length of Plaintiff's confinement failed to amount to even the "intermediate duration' " for which the Second Circuit has determined that " 'a detailed record of the conditions of confinement relative to ordinary prison conditions is required[ ]' " to establish a liberty interest; and (2) the Complaint did not contain any such record or "any allegations to indicate that [Plaintiff's] confinement was atypical or significant in relation to the ordinary prison life." Report–Rec. at 18–19 (citing *Palmer v. Richards,* 364 F.3d 60, 64–65 (2d. Cir.2004)). However, the Report–Recommendation noted that dismissal of due process claims unsupported by a factual record is generally proper only where the period of time spent in solitary confinement is less than thirty days and there is no indication the prisoner endured unusual Special Housing Unit ("SHU") conditions. *See Palmer,* 364 F.3d at 64–65. Because Plaintiff is a *pro se* litigant whose submissions must be construed liberally, and because Plaintiff's keeplock confinement exceeded the thirty-day period set forth in *Palmer,* Judge Hummel denied Defendants' Motion with respect to Plaintiff's Fourteenth Amendment procedural due process claims. *Id.* at 19.

**B. Objections**

**\*3** In their Objections, Defendants argue that Judge Hummel erred in finding that *Palmer* 's thirty-day rule is controlling in the present case. Objs. at 3–4. They base this contention solely on the Second Circuit's holding in *Sealey v. Giltner,* 197 F.3d 578, 589–90 (2d Cir.1999), that an inmate's 101-day confinement in SHU did not constitute an atypical or significant hardship under *Sandin.* Objs. at 4 Defendants argue that because: (1) Plaintiff's 90-day confinement was shorter than the 101-day confine-

ment in *Sealey;* and (2) keeplock is less confining than SHU, Plaintiff's confinement cannot constitute an atypical and significant hardship. *Id.* (citing *Sealey,* 197 F.3d at 589–90). Defendants argue that even if Plaintiff had been confined to keeplock for up to 305 days, he still could not establish a liberty interest because he neglected to provide details of the conditions of his confinement, as *Palmer* requires. *Id.*

Plaintiff asserts that the Report–Recommendation failed to understand that Plaintiff is asserting a Fourteenth Amendment claim based on Defendants' denial of his access to a hearing regarding his 90-day confinement, rather than on the confinement itself. Pl's Objs.

**C. Decision to Adopt the Report–Recommendation**

*1. Defendants' Objections*

Upon a *de novo* review of the record and the Report–Recommendation, the Court concludes that the Report–Recommendation's denial of Defendants' Motion to dismiss Plaintiff's Fourteenth Amendment claim was proper. Defendants contend that, because *Sealey* held that up to 101 days of SITU confinement under normal conditions is not an atypical and significant hardship, any confinement below that 101-day threshold necessarily fails to implicate a liberty interest. Defs' Objs. at 4. But *Sealey* did not set any durational floor or deem duration dispositive; rather, the Second Circuit held that *"[b]oth* the conditions [of confinement] and their duration must be considered ... since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey,* 197 F.3d at 586 (internal citation omitted and emphasis added). Nor does *Sealey* even remotely suggest that, because keeplock is generally less confining than SITU, keeplock confinement of less than 101 days is necessarily insufficiently harsh to implicate a liberty interest. Under *Sealey,* even if

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

Plaintiff's keeplock stay had been merely a "brief interval" rather than 90 days, it could still implicate a liberty interest if the conditions were sufficiently harsh.

Defendants, after making their 101–day–absolute–minimum argument, assert that the Complaint should also be dismissed because Plaintiff must offer evidence of the conditions of his confinement, which he has not done. But Defendants fail to distinguish between the Report–Recommendation's treatment of: (1) the showing Plaintiff must make to *prevail* on his Fourteenth Amendment due process claim; and (2) the showing Plaintiff must make to *avoid dismissal* of that claim. Defendants argue that the Complaint fails to allege the requisite non-durational facts suggesting atypicality. Defs' Objs. at 4. The Report–Recommendation holds likewise. Report–Rec. at 18–19. The Report–Recommendation, however, holds that, in light of Plaintiff's *pro se* status, his failure to allege such facts does not necessitate dismissal. Report–Rec. at 19. The only authority cited by Defendants allegedly pertaining to dismissal involved a motion for summary judgment, *not* a motion to dismiss. *See Gee v. Fischer,* No. 9–CV–1057, 2011 WL 4965297 (N.D.N.Y. Sept. 30, 2013); Defs' Objs. at 6. It is therefore inapposite. In light of the Second Circuit's command that a *pro se* litigant's complaints "must be construed liberally, and ... read to raise the strongest arguments that they suggest," *Palmer,* 364 F.3d at 64–65, the Court adopts the Report–Recommendation so that Plaintiff may further elaborate on the conditions of his keeplock confinement.

*2. Plaintiff's Objections*

**\*4** Plaintiff argues that the Report–Recommendation failed to recognize that his Fourteenth Amendment claim is premised on Defendants' denial of his access to a disciplinary hearing. Pl's Objs. This is incorrect. The Report–Recommendation examines the nature of Plaintiff's confinement not to determine whether the confinement is itself actionable, but rather whether that confinement was sufficiently atypical and significant to implicate a liberty interest entitling Plaintiff to a hearing. *See* Report–Rec. at 17–19.

**V. CONCLUSION**

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 84) is **APPROVED and ADOPTED in its ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion (Dkt. No. 41) to dismiss is **GRANTED** as to Plaintiff's: (1) § 1983 claims against all individual Defendants in their official capacities; and (2) conspiracy claims against all Defendants; and it is further

**ORDERED,** that Defendants' Motion (Dkt. No. 41) to dismiss is **DENIED** as to: (1) Plaintiff's Fourteenth Amendment due process claims; and (2) Defendants' qualified immunity defense; and it is further

**ORDERED,** that Plaintiff's First Amendment claims based on access to courts and interference with mail are **DISMISSED without prejudice;** and it is further

**ORDERED,** that as to those claims, Plaintiff may file an amended complaint **within twenty days** from the filing date of this Order if he wishes to pursue those claims; and is is further

**ORDERED,** that, if **within twenty days,** such an amended complaint is not filed, those claims shall be dismissed pursuant to this Order without further action of the Court; and it is further

**ORDERED,** that Defendants' request for a protective order is **GRANTED** and discovery in this matter is stayed until the issuance of a scheduling order pursuant to Federal Rule of Civil Procedure 16;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

and it is further

 **ORDERED,** that the Clerk of the Court serve a copy of this Decision and Order upon the parties to this action.

 **IT IS SO ORDERED.**

 GARY GILLARD, Plaintiff,

 v.

 MICHAEL ROVELLI, Correctional Officer, Great Meadow Correctional Facility; THOMAS LAFOUNTAIN, Correctional Officer, Great Meadow Correctional Facility; CURTIS POIRIER, Correctional Officer, Great Meadow Correctional Facility; TOM LYNCH, Correctional Officer, Great Meadow Correctional Facility; GARY LIPHA, Correctional Officer, Great Meadow Correctional Facility; AN-DREW ROSE, Correctional Officer, Great Meadow Correctional Facility; DARIN WILLIAMS, Correctional Sergeant, Great Meadow Correctional Facility; KEITH HENDRY, Correctional Sergeant, Great Meadow Correctional Facility; NICHOLAS DELUCA, Correctional Sergeant, Great Meadow Correctional Facility; PETER BESSON, Correctional Lieutenant, Great Meadow Correctional Facility; PAUL ZARNETSKI, Correctional Lieutenant, Great Meadow Correctional Facility; CHARLES F. KELLY, Deputy Superintendent of Security, Great Meadow Correctional Facility; GARY RAMEY, Industrial Supervisor, Great Meadow Correctional Facility; DAVID ROCK, Superintendent, Great Meadow Correctional Facility; JOSE NUNEZ, Inmate: DIN # 98–A–6830, NOW AT SING SING C.F., previously housed at Great Meadow Correctional Facility, Defendants.

 **REPORT–RECOMMENDATION AND ORDER**[FN1]

FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

**CHRISTIAN F. HUMMEL,** United States Magistrate Judge.

 **\*5** Plaintiff pro se Gary Gillard ("Gillard"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, fourteen current and retired DOCCS employees and one inmate, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Compl. (Dkt. No. 1). Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) on behalf of all defendants except for defendant Nunez.[FN2] Dkt. No. 41. Defendants also move for a protective order pursuant to Fed.R.Civ.P. 26(c)(1). Gillard opposes this motion. Gillard Resp. (Dkt. No. 50). For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

FN2. By letter motion dated June 7, 2013, defendants' counsel requested that defendant Deluca be permitted to join in the motion to dismiss. Dkt. No. 79. By decision and order dated July 10, 2013, the Honorable Lawrence E. Kahn granted that motion for joinder. Dkt. No. 83. Deluca was served on April 29, 2013. Dkt. No. 75. Given the Court's decision and order, as well as service of summons and complaint on Deluca, Gillard's objections as to the Office of the Attorney General's representation of Deluca in this action are effectively negated. Gillard Resp. (Dkt. No. 50) at 2.

 **I. Background**

 The facts are related herein in the light most favorable to Gillard as the non-moving party. *See* subsection II(A) *infra.* At all relevant times, Gillard was

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

confined at the Great Meadow Correctional Facility ("Great Meadow"). Compl. ¶ 4.

On January 23, 2009, at approximately 7:00 p.m., defendant Williams, a sergeant, approached Gillard with an inmate-authored note dated January 22, 2009 and asked Gillard whether he wanted to be placed in protective custody. Compl. ¶ 21. Because of the nature of Gillard's criminal history,[FN3] the inmate wrote the note requesting that Gillard be transferred out of Great Meadow. *Id.* ¶ 20. Gillard advised Williams that the correctional staff issued that note, not an inmate, in retaliation for Gillard lodging complaints against the staff. *Id.* ¶ 21. Despite Gillard's explanation, on January 25, 2009, Williams recommended Gillard for Involuntary Protective Custody ("IPC"), stating that

> [FN3]. Based on the allegations contained in the complaint, it appears that Gillard was accused of committing sexual assault on a nine-year-old girl. Compl. ¶¶ 20, 35.

Gillard's verbal statement that inmates wanted to hurt him because of his criminal history and anonymous[ly] written note threatening to kill Gillard are the reasons for this recommendation. Also because of this inmate['s] litigious nature and his statement that it is my responsibility to put him in [IPC] for the safety of his person and this facility. *Id.* ¶ 22.

On January 28, 2009, the IPC hearing commenced but it was adjourned because Williams was unavailable for the hearing. Compl. ¶ 23. On February 4, 2009, defendant Lynch, a corrections officer, escorted Gillard to the courthouse for the hearing. *Id.* ¶ 24. Gillard was ordered to sit and wait because defendant Hearing Officer and Supervisor Ramey was absent at the time. *Id.* ¶ 25. Lynch entered an unidentified room along with other unidentified officers, leaving Gillard alone. *Id.* ¶ 26. Defendant Lieutenant Besson approached and advised Gillard that Gillard

was to blame for the ongoing issues. *Id.* ¶ 27. Besson proceeded to walk into the room with defendants Lynch, Lipha, Rose, all correction officers, and other unidentified individuals. *Id.*

At this point, Lipha left the room. Compl. ¶ 28. Besson followed, taking another inmate into the hearing room and left Gillard alone. *Id.* ¶ 29. Lipha returned with defendant Inmate Nunez and ordered Nunez to sit next to Gillard as Lipha walked into the room with Lynch and other unidentified individuals. *Id.* ¶ 30. Gillard could see in the room that Rose and Besson were conducting a hearing. *Id.*

**\*6** While Gillard was sitting with his hands in his pockets, watching Rose and Besson, Nunez grabbed Gillard's right tricep with his left hand, cut Gillard's neck, and pushed Gillard off balance. Compl. ¶ 31. Nunez proceeded to run to the center of the room, used his back to block the views of Rose and Besson, and held out a weapon.[FN4] *Id.* Gillard yelled, staff personnel exited from different rooms, and Nunez surrendered his weapon to unidentified persons. *Id.* Gillard refrained from hitting or swinging at Nunez, complied with all staff orders, and was handcuffed and transported for medical review. *Id.* Gillard contends that defendant Rovelli, a corrections officer, ordered Nunez to murder Gillard. *Id.* at 14.

> [FN4]. In his response to defendants' motion, Gillard characterized the weapon as a "can top." Gillard Resp. at 1.

On February 5, 2009, a false misbehavior report was issued against Gillard, stating that Besson witnessed Gillard punching Nunez in the head. Compl. ¶ 33. Gillard also alleged that the misbehavior report "confirmed this was a sanctioned hit and setup and conspiracy on behalf of Michael Rovelli and all named defendants played parts by filing false ... reports against [Gillard] in retaliation and revenge to all the grievances that have been filed." *Id.* At some point,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

Rovelli came to Gillard's cell to threaten him.[FN5] *Id.* ¶ 34. On the same day, at approximately 9:45 a.m., Gillard was ordered to pack and leave his cell. *Id.* ¶ 35. When Gillard reached the lobby area, Rovelli was standing with unidentified individuals and told Gillard, "Gary, it's not over yet ...." *Id.* Gillard did not respond. *Id.* Gillard filed a grievance against Rovelli, naming inmates as witnesses. *Id.* ¶ 36. The grievance was denied. *Id.* Finally, at some point during the same day, Gillard was on his way to a visit when Rovelli, who was standing in the hall area with unidentified officers and inmates, called Gillard "a rat." *Id.* ¶ 37. All the unidentified officers and inmates turned to look at Gillard. *Id.*

> **FN5.** To the extent Gillard attempted to allege a potential Eighth Amendment claim against Rovelli for making verbal threats, such a claim must fail. A claim of threats and harassment alone, without allegations of accompanied injury or use of force, is insufficient to state an Eighth Amendment claim. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) (per curiam) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed."); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983."). Because Gillard does not allege that Rovelli used force against him and no injury resulted from the verbal threats, Gillard has failed to state an Eighth Amendment claim based on such threats. Accordingly, Gillard's potential claim based on verbal threats against Rovelli cannot withstand this motion to dismiss.

On February 6, 2009, defendant Lafountain, a corrections officer, came to Gillard's cell and told Gillard, "you['re] refusing the hearing right[s]." Compl. ¶ 38. Gillard replied that he did not refuse his hearing rights and wanted to attend his hearing; however, Lafountain walked away. *Id.* Non-party Inmate Johnson witnessed this exchange. *Id.* Shortly thereafter, Gillard was ordered to pack his cell in preparation again to be placed in IPC. *Id.* ¶ 39. At approximately 1:30, presumably in the afternoon, Lafountain provided Gillard the disposition of the hearing through Gillard's feed-up slot, saying, "you can read it." *Id.* Non-party Inmate Hooper witnessed this exchange. *Id.* Thereafter, while defendant Kelly, a deputy superintendent of security, made rounds, Gillard advised Kelly that he was denied the right to participate in his hearing, to which Kelly responded that he would investigate Gillard's claim and grant a rehearing if the claim was valid. *Id.* ¶ 40.

**\*7** On February 9, 2009, the IPC hearing resumed. Compl. ¶ 41. Williams testified and lied about Gillard expressing fear of other inmates wanting to hurt him. *Id.* Ramey denied Gillard's request to have Williams take a lie detector test.[FN6] *Id.* Ramey, relying on Kelly's testimony that Gillard's issues involved security staff and not inmates, stated off-the-record he would not grant the IPC placement because such placement was unsupported by the evidence. *Id.* ¶ 42.

> **FN6.** Gillard asserts that Rovelli attempted to use the inmate population against Gillard as justification for placing Gillard in IPC. Compl. ¶ 41.

On February 10, 2009, Gillard moved to another cell. Compl. ¶ 43. On February 11, 2009, Rovelli went to Gillard's cell and stated, "I have the power not you, I brought you back. It's not over yet and the next one will be better .... " *Id.* ¶ 44. All the inmates in nearby cells overheard these comments; thus, creating a hostile living environment for Gillard. *Id.* Gillard asserts that Rovelli also ordered security officers to impede Gillard's ability to send legal papers by refusing to

take out legal disbursements from Gillard's prisoner account. *Id.* ¶ 45, at 14.

On February 17, 2009, Gillard received the tape of his IPC hearing for review. Compl. ¶ 46. On the tape, Lafountain testified Gillard "stated he did not want to get cut again." *Id* . Defendant Hearing Officer and Lieutenant Zarnetski conducted that hearing; however, Gillard asserts that Zarnetski was not impartial, the hearing was staged, and Zarnetski never stated on-the-record that Gillard was offered to sign a hearing denial form and never signed it. *Id.*

On February 20, 2009, Gillard was denied a callout to review his medical file. Compl. ¶ 47. Gillard alleged that he was denied access to the law library during his three months of keeplock confinement.[FN7] *Id.* at 14. Gillard specifically alleged that he was denied access to legal supplies on February 10, 18, and 23, 2009 because of keeplock confinement, which prevented him from responding to motions. *Id.* ¶ 48. Gillard further asserts that the use of force incident report filed against him, presumably resulted in his keeplock confinement, was based on false and conspiratorial accusations by defendants Deluca and Hendry, both sergeants, that Gillard admitted to striking Nunez on the head. *Id.* ¶ 49.

> FN7. "Keeplock" is a form of disciplinary confinement where an inmate is confined in his cell for the duration of the disciplinary sanction. *Gittens v. Lefevre,* 891 F.2d 38, 39 (2d Cir.1989) (citing N.Y. COMP.CODES R. & REGS. tit. 7, § 251–1.6 (2012)).

Williams continued to tamper with Gillard's grievances by ensuring those grievances were devoid of wrongdoing on the part of the security staff. Compl. ¶ 50. Gillard's grievance appeals were denied. *Id.*

Kelly has been continuously advised of the ongoing threats made by Rovelli. Compl. ¶ 51. Specifi-

cally, Rovelli has been "lobbying for inmates to take a contract hit on [Gillard]." *Id.* Kelly refused to relocate Gillard in order to prevent contact between Gillard and Rovelli and allowed for the continuing physical and mental abuse on Gillard in retaliation for Gillard's filing of grievances. *Id.*

Defendant Superintendent Rock continued to disregard the conflicts between Gillard and Rovelli despite Gillard having filed over fifty complaints. Compl. ¶ 52. Rock was responsible for investigating these grievances but relied on Rovelli's denial of all wrongdoing. *Id.* Gillard also contends that Rock failed to review all available facts in denying his grievance appeals. *Id.*

**\*8** Gillard was further denied the right to press criminal charges of conspiracy to commit murder, attempted murder, and assault with a dangerous weapon, against the staff and prisoners who acted on behalf of defendants. [FN8] Compl. at 15. Gillard seeks declaratory and injunctive relief as well as compensatory and punitive damages. *Id.* at 16–17.

> FN8. Here, Gillard asserts that he has a constitutional right to press charges against defendants and the defendants violated this right by preventing him from doing so. However, the United States Constitution does not confer a judicially cognizable interest to a private citizen for the prosecution or non-prosecution of another. *Bourguignon v. Lantz,* No. 05–CV–245 (SRU), 2006 WL 214009, at \*6–7 (D.Conn. Jan. 25, 2006) (citing *inter alia Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973)); *see also Marsh v. Kirschner,* 31 F.Supp.2d 79, 81 (D.Conn.1998). Therefore, even if defendants indeed prevented Gillard from pressing criminal charges against them, such a claim must be dismissed as meritless.

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

## II. Discussion

Gillard contends that defendant Rovelli violated his (1) First Amendment right of access to courts by ordering officers to refrain from taking legal disbursements from his prisoner account and (2) Eighth Amendment rights by ordering Nunez to murder him and creating hostile conditions of confinement by making other inmates aware of his criminal history. Gillard contends that defendant Williams violated his (1) First Amendment right of access to courts by tampering with his grievances, (2) Fourteenth Amendment rights by recommending IPC for Gillard and lying at Gillard's IPC hearing. Gillard also contends that defendant Rock violated his (1) Eighth Amendment rights by exhibiting deliberate indifference to his safety and (2) Fourteenth Amendment rights by denying his grievances without reviewing all available facts.

Gillard further contends that: (1) defendants Lynch, Lipha, Rose, Besson, Kelly, Rock violated his Eighth Amendment rights by failing to protect him from Nunez; (2) defendant Lafountain violated his Fourteenth Amendment due process rights by denying him participation at his IPC hearing; (3) defendants Hendry, Deluca, Besson, and Williams violated his Fourteenth Amendment rights by making false allegations against him; (4) defendant Zarnetski violated his Fourteenth Amendment rights by acting as a partial hearing officer, staging a hearing, and never confirming he wanted to give up his hearing rights; and (5) defendant Ramey violated his Fourteenth Amendment rights by denying his request that Williams take a lie detector test. Lastly, Gillard generally alleges that all defendants conspired against him by authoring false reports in retaliation for the grievances he filed. Gillard does not make specific allegations against defendant Poirier.

Defendants contend that Gillard failed to allege a conspiracy claim as well as First Amendment and procedural due process claims. Defendants further contend that they are entitled to Eleventh Amendment immunity, qualified immunity, and a protective order barring discovery pending the resolution of this motion. The balance of Gillard's complaint was not addressed.

### A. Legal Standard

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

**\*9** Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face." *Iqbal,* 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct] .")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 680.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

*Id.* (internal quotation marks, citations, and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). It follows that,

> the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's paper in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.

*Robles v. Bleau,* No. 07–CV–0464, 2008 WL 4693153, at *6 & n. 41 (N.D.N.Y. Oct. 22, 2008) (collecting cases).

## B. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

**\*10** A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, Gillard seeks monetary damages against defendants for acts occurring within the scope of their duties at Great Meadow. Thus, the Eleventh Amendment bar applies and serves to prohibit Gillard's claims for monetary damages against defendants in their official capacity.

Accordingly, defendants' motion on this claim should be granted.

## C. First Amendment

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

Defendants contend that Gillard failed to allege claims of right of access to courts and interference with legal mail under the First Amendment.

## 1. Access to Courts

Gillard alleged that defendants denied him his constitutional right of access to courts by refusing to take out disbursements from his prisoner account for legal fees and denied him access to the law library and legal supplies during his keeplock confinement, which led to his failure to respond to certain motions.

Prisoners have a constitutional right of access to the courts. *Lewis v. Casey,* 518 U.S. 343, 346 (1996). This right is implicated when prison officials "actively [interfer[e] with inmates' attempts to prepare legal documents ... or file them ...." *Id.* at 350 (citing cases). The plaintiff must further allege that the defendant "took or was responsible for actions that 'hindered [his] efforts to pursue a legal claim.'" *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citations omitted). While only minimal assistance to file legal claims is required of prison officials, courts have cited *Lewis* to support "the right to 'proceed with a legal claim' ... suggest [ing], at least, that *pro se* inmates should have the means to defend against dispositive motions and to prepare for trial." *Arce v. Walker,* 58 F.Supp.2d 39, 43 (W.D.N.Y.1999) (listing cases). An inmate would sufficiently state a denial of access to the courts claim by stating that a prison practice prevented him from "raising an argument or asserting a claim in his pleadings, in response to a dispositive motion ...." *Id.* However, a prison regulation or practice that impinges on an inmate's constitutional right must be upheld if it is reasonably related to a legitimate penological interest. *Id.* at 44.

In order to establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citation omitted); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994)

(citation omitted). Second, a showing of an actual injury is required, which "is not satisfied by just any type of frustrated legal claim," because the Constitution guarantees only the tools that "inmates need ... in order to challenge the conditions of their confinement." *Collins v. Goord,* 438 F.Supp.2d 399, 415–16 (S.D.N.Y.2006) (quoting *Lewis,* 518 U.S. at 355); *Howard,* 845 F.Supp. at 946 (citation omitted). "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Collins v. Goord,* 438 F.Supp.2d at 415–16.

**\*11** Viewing the facts in the light most favorable to the plaintiff, if properly pled, Gillard may state a plausible First Amendment claim based on the denial of access to the law library, legal supplies, and his prisoner account. First, Gillard alleged that defendants actively interfered with his ability to prepare legal documents in response to motions filed by opposing counsel. Second, Gillard alleged that Rovelli had ordered other defendants to deny him access to his prisoner account. This could plausibly constitute a prison practice established by Rovelli to impede Gillard from responding to opposing counsel's motions. Such would also indicate that defendants had acted deliberately and maliciously against Gillard. Despite Gillard's failure to proffer any factual allegations going to how defendants' misconduct had adversely affected or impacted his legal claims and lawsuits, as well as the merits of such claims and lawsuits, a properly pled complaint may resolve such defects. *Collins,* 581 F.Supp.2d at 573 (citation omitted) ("To show actual injury, the plaintiff must demonstrate that the defendant's conduct frustrated the plaintiff's efforts to pursue a nonfrivolous claim."). Gillard should be provided this opportunity. *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) (per curiam) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." (citation omitted)). Gillard should amend his complaint to

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

make specific allegations of an injury in connection to defendants' alleged misconduct.

Accordingly, it is recommended that this First Amendment claim be dismissed without prejudice and Gillard be granted an opportunity to file an amended complaint containing all relevant facts regarding this claim against specific defendants.

## 2. Mail Tampering

Gillard also alleged that defendants prevented him from sending legal mail. "A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis,* 320 F.3d at 351 (citations omitted). "Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U .S. Constitution." *Id.* In order to state a claim for denial of access to courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (*citing Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (*quoting Lewis v. Casey,* 518 U.S. 343, 351 (1996)).

"[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation .... Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." *Davis,* 320 F.3d at 351 (citations omitted); *see also Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) (explaining that an action may not give rise to damages if there was "no showing ... that the inmate's right of access to the courts was chilled or the legal representation was impaired."); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975) (holding that a single instance of mail tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge).

**\*12** Additionally, the First Amendment protects an inmate's right to the free flow of incoming and outgoing mail and courts consistently afford greater protection to legal mail than non-legal mail and to outgoing mail then incoming mail. *Davis,* 320 F.3d at 351 (citations omitted). "Restrictions ... are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation and must be no greater than is necessary or essential to the protection of the particular government interest involved." *Id.* (citations omitted).

In this case, defendants merely contend that Gillard failed to allege that he sustained an actual injury from defendants' conduct in failing to take legal disbursements from his prisoner account. Defs.' Mem. of Law at 11. Gillard alleged that his outgoing legal mail was affected by defendants. Specifically, Gillard alleged that defendants' conduct led him to fail to respond to certain motions. Further, Gillard claims that Rovelli ordered the other defendants to continually carry out this conduct. Thus, Gillard has alleged that defendants' conduct was regularly done or an ongoing practice. Even though Gillard does not expressly allege that he suffered an injury from failing to respond to certain motions, if properly pled, Gillard may sufficiently allege a plausible First Amendment claim based on interference with his outgoing legal mail. Because a liberal reading of the complaint may present a valid claim, it is recommended that Gillard be granted an opportunity to amend his complaint to include all allegations relevant to this claim. *Gomez,* 171 F.3d at 795. "This is especially true since [Gillard] alleges that [defendants tampered with] ... his outgoing legal mail, which is subject to greater constitutional protection because of the lesser security concerns presented." *Davis,* 320 F.3d at 352 (citations omitted). Gillard should amend his complaint to make specific allegations of an injury in connection to defendants' alleged misconduct.

Accordingly, it is recommended that this First

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

Amendment claim be dismissed without prejudice and Gillard be granted an opportunity to file an amended complaint containing all relevant facts regarding this claim against specific defendants.

### D. Fourteenth Amendment

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*13** While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of [Special Housing Unit] SHU confinement automatically fails to implicate due process rights." [FN9] *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citing *Colon,* 215 F .3d at 232). "[I]n the ab-

sence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—e.g. 30 days—and there was no indication [of] ... unusual conditions." *Harvey v. Harder,* No. 09–CV–154 (TJM)(ATB), 2012 WL 4093791, at \*6 (N.D.N.Y. July 31, 2012) (citing *inter alia Palmer,* 364 F.3d at 65–66).

> FN9. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

In this case, defendants' contention against Gillard's procedural due process claims rests solely on whether Gillard has established a liberty interest from being confined in keeplock. Defs.' Mem. of Law at 12–13. Gillard was in keeplock confinement for ninety days, over the thirty-day time period that courts have found to not reach atypicality absent unusual conditions. Other than the length of the keeplock confinement, Gillard's complaint does not contain any allegations to indicate that his confinement was atypical or significant in relation to the ordinary prison life. Even though keeplock is less confining than SHU,[FN10] in the past, this Court has concluded that such a period of confinement requires "refined fact-finding" in order to resolve claims under *Sandin. White v. Bergenstock,* No. 08–CV–717 (FJS)(DRH), 2009 WL 4544390, at \*7 (N.D.N.Y. Nov. 25, 2009) (citing *Colon v. Howard,* 215 F.3d 227, 230 (2d. Cir.2000)) (denying a motion to dismiss the procedural due process claim for development of facts going to plaintiff's liberty interest arising from his ninety-day keeplock confinement). Thus, questions of fact exist with respect to whether Gillard's ninety days in keeplock amount to a

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

liberty interest. Given Gillard's pro se status and the length of his keeplock confinement, Gillard's due process claims should not be dismissed at this stage of the litigation.

> FN10. Inmates in keeplock enjoy more amenities than do inmates in SHU such as showers, on-site social and legal visits, sending and receipt of mail, and materials from the law library. *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998).

Accordingly, defendants' motion on this ground should be denied.

### E. Conspiracy[FN11]

> FN11. Defendants also asserts that any conspiracy claims are effectively barred by the intra-corporate conspiracy doctrine. However, because it is recommended herein that defendants' motion as to the conspiracy claim be granted on other grounds, their motion based on the intra-corporate conspiracy doctrine need not be addressed.

In order to support a claim for conspiracy under §§ 1983 or 1985, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143, 177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants en-

tered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). While exact specifics are not required, "the pleadings must present facts tending to show agreement and concerted action." *Anilao v. Spota,* 774 F.Supp.2d 457, 512–13 (E.D.N.Y.2011) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325.

**\*14** Here, Gillard failed to allege sufficient facts to support a viable conspiracy claim between defendants in their alleged failure to protect him as well as retaliation for the filing of grievances. Gillard's claims of conspiracy are solely conclusory. *Ciambriello,* 292 F.3d at 325. There were no factual allegations showing that defendants had any type of agreement between them. Further, there were no allegations outlining with specificity when, why, or how this alleged conspiracy occurred. *Warren,* 33 F.Supp.2d at 177. Even though specifics are unnecessary, Gillard fails to provide any plausible information which would lend credence to his claims of an explicit or implicit agreement between any or all of the defendants. *Anilao,* 774 F.Supp.2d at 512–13.

Accordingly, defendants' motion on this claim should be granted.

### F. Qualified Immunity

Defendants claims that even if Gillard's constitutional claims against them are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry must be discussed with regard to Gillard's First Amendment right to access to courts and interference with mail claims as well as Fourteenth Amendment procedural due process claims.

It is well-settled that between January 23, 2009 and February 20, 2009, the First Amendment protected an inmate's right to access to the courts and the free flow of incoming and outgoing mail. *Lewis,* 518 U.S. at 346; *Davis,* 320 F.3d at 351. It is also well-settled that during this relevant time period, the Fourteenth Amendment protected an inmate's right to procedural due process. *Wolff v. McDonnell,* 418 U.S. 539, 555 (1974) ("Prisoners may also claim the protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law ." (citations omitted)). Thus, accepting all of Gillard's allegations as true, qualified immunity cannot be granted to defendants for their alleged misconduct.

**\*15** Accordingly, defendants' motion on this ground should be denied.

### G. Protective Order

Pursuant to Federal Rule of Civil Procedure

26(c)(1), defendants moved for a protective order staying discovery in this matter pending the resolution of their motion to dismiss. Defs.' Mem. of Law at 16–17. Rule 26(c)(1) provides, in relevant part, that

> [a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending ... The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery.

FED. R. CIV. P. 26(c)(1). Good cause can be shown where, upon the filing of a dispositive motion, the stay is for a modest period of time and not prejudice the opposing party. *Spencer Trask Software and Information Servs., LLC v. Rpost Int'l Ltd.,* 206 F.R.D. 367, 368 (S.D.N.Y.2002) (citation omitted). When considering the issuance of a protective order, a Court may consider "the breadth of discovery sought and the burden of responding to it" as well as "the strength of the dispositive motion that is the basis of the discovery stay application. *Id.* (citations omitted). "This rule is often invoked to avoid potentially expensive and wasteful discovery during the pendency of a determination which could potentially reshape pending claims." *Dabney v. Maddock,* No. 10–CV–0519 (GTS)(DEP), 2011 WL 7479164, at *11 (N.D.N.Y. Nov. 29, 2011) (collecting cases) (recommending stay of discovery pending a Rule 16 pretrial scheduling order is issued and until the claims are framed, and when plaintiff would not be prejudiced by modest delay).

In this case, until a standard Rule 16 pretrial scheduling order is issued, permitting discovery to go forward would serve no purpose. This is particularly in light of the fact that this report recommends Gillard's First and Fourteen Amendment claims, as discussed *supra,* be dismissed without prejudice and Gillard be granted an opportunity to amend his com-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5503317 (N.D.N.Y.)
**(Cite as: 2013 WL 5503317 (N.D.N.Y.))**

plaint. Further, Gillard has provided no reasons for the Court conclude that he would be prejudiced by a modest delay due to stay of discovery at this stage. *Spencer Trask Software,* 206 F.R.D. at 368. Moreover, the Office of the Attorney General represents fourteen separate defendants in this action. To engage in discovery before the resolution of this motion to dismiss, as well as the potential filing of an amended complaint, would result in potentially expensive and wasteful discovery.

Accordingly, defendants' motion for a protective order to stay discovery should be granted.

### III. Conclusion

For the reasons stated above, it is hereby:

1. **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 41) be:

A. **GRANTED** as to the (1) Eleventh Amendment bar to § 1983 claims against all individual defendants in their official capacities; (2) conspiracy claim against all defendants; AND

**\*16** B. **DENIED** as to the (1) Fourteenth Amendment due process claims; and (2) qualified immunity defense.

2. It is further **RECOMMENDED** that Gillard's First Amendment claims based on access to courts and interference with mail be **DISMISSED** without prejudice;

3. It is further **ORDERED** that, as to those claims, Gillard may file an amended complaint within **twenty days** from the filing date of any Order adopting this Report–Recommendation, if he wishes to pursue those claims; AND

4. It is further **RECOMMENDED** that, if within twenty days, such an amended complaint is not

filed, those claims shall be dismissed pursuant to any order adopting this report-recommendation without further action of the Court.

5. It is also **RECOMMENDED** that defendants' request for a protective order be granted.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2013.
Gillard v. Rovelli
Slip Copy, 2013 WL 5503317 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Kenneth Carl GROVES, Sr., Plaintiff,
v.
Brett DAVIS, Secure Care Treatment Aid; David W.
Sill, Secure Care Treatment Aid; Thomas Nicolette,
RN, Ward Nurse; Charmaine Bill, Treatment Team
Leader; Jill E. Carver, Social Worker, Primary Ther-
apist; Edwin Debroize, Psychologist Assist; Jeff
Nowicki, Chief of Mental Health Treatment Serv.;
Terri Maxymillian, Ph.D., Dir. of Mental Health
Serv.; Sgt. Sweet, Security Services, CNYPC; Mi-
chael Hogan, Comm'r, Dep't of Mental Health, De-
fendants.

No. 9:11–CV–1317 (GTS/RFT).
Feb. 28, 2012.

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

**MEMORANDUM DECISION and ORDER**
Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil
rights action filed by Kenneth Carl Groves, Sr.
("Plaintiff"), against numerous employees of New
York State or the Central New York Psychiatric
Center ("Defendants"), are Plaintiff's motion to pro-
ceed *in forma pauperis,* his motion for a temporary
restraining order and preliminary injunction, and his
motion for appointment of counsel. (Dkt.Nos.2, 3, 4.)
[FN1] For the reasons set forth below, Plaintiff's motion
to proceed *in forma pauperis* is granted; his motion for
a preliminary injunction is denied; his motion for
appointment of counsel is denied; Plaintiff's claims of
deliberate indifference to his mental health needs

against Defendants Bill, Carver and DeBroize are *sua
sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault
are *sua sponte* dismissed without prejudice and with leave
to amend in this action in accordance with
Fed.R.Civ.P. 15; Sgt. Sweet is *sua sponte* dismissed
without prejudice as a Defendant in this action; the
Clerk is directed to issue summonses, and the U.S.
Marshal is directed to effect service of process on
Defendants Davis, Sill, and Nicolette.

FN1. This is the fourth civil rights action
filed by Plaintiff in this District. Generally,
two of these actions arose out of Plaintiff's
refusal to consent to a strip search and the
subsequent actions taken against Plaintiff
as a result of his refusal. *See Groves v. New
York,* 09–CV–0406, Decision and Order
(N.D.N.Y. filed May 11, 2009) (Hurd, J.)
(*sua sponte* dismissing complaint pursuant to
28 U.S.C. § 1915[e][2][B] ); *Groves v. The
State of New York,* 9:09–CV–0412, Decision
and Order (N.D.N.Y. filed Mar. 26, 2010)
(Sharpe, J.) (granting defendants' motion to
dismiss the complaint pursuant to
Fed.R.Civ.P. 12[b][6] ). The third action al-
leged numerous violations of Plaintiff's con-
stitutional rights during the period July 23,
2009, and August 26, 2009, and was dis-
missed without prejudice upon Plaintiff's
request in October, 2010. *See Groves v.
Maxymillian,* 9:09–CV–1002, Decision and
Order (N.D.N.Y. filed Oct. 8, 2010)
(Suddaby, J.). As a result, it does not appear
that the current action is barred because of res
judicata, collateral estoppel, and/or the rule
against duplicative litigation.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

## I. RELEVANT BACKGROUND

On November 7, 2011, Plaintiff commenced this action *pro se* by filing a civil rights Complaint, together with a motion to proceed *in forma pauperis*. (Dkt. Nos.1, 2.) [FN2] Liberally construed, Plaintiff's Complaint alleges that the following constitutional violations against him occurred during his confinement at Central New York Psychiatric Center ("CNYPC"): (1) Defendants Davis and Sill used excessive force against him under the Eighth and/or Fourteenth Amendments; (2) Defendant Nicolette knew of and failed to take action to protect Plaintiff from the assault under the Eighth and/or Fourteenth Amendments; (3) Defendants Bill, Carver, and De-Broize were deliberately indifferent to his mental health needs under the Eighth and/or Fourteenth Amendments; and (4) Defendants Bill, Carver, De-Broize, Nowicki, Maxymillian, Bosco, and Hogan failed to "adequately train the staff under their supervision" and to take appropriate action in response to the incident. (*See generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

> FN2. At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis*. (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis*, "(2) ... the court shall dismiss the case at any

time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[FN3]

> FN3. The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for

failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [FN4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [FN5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[FN6]

FN4. *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

FN5. *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

FN6. It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold con-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

victed criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg, 457 U.S. at 315–16.* As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). [FN7]

> FN7. *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

**2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize**

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).).[FN8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703.[FN9]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
(Cite as: 2012 WL 651919 (N.D.N.Y.))

FN8. Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

FN9. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading.[FN10] Rather, this claim is hereby dismissed with prejudice.

FN10. The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.1994). *John Hancock Mut. Life Ins. Co., 22 F.3d at 462.* The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir.1993); see Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir.2000)* ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977).* Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN11]

> FN11. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas, 04–CV–7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008)* (quoting *Bass v. Jackson, 790 F.2d 260, 263* [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis, 964 F.Supp. 127, 130 (S.D.N.Y.1997).*[FN12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally, 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011).*[FN13]

> FN12. *See also Gillard v. Rosati, 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011)* (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin, 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995)* ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin, 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993)* ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

> FN13. *See also Bernstein v. N.Y., 591 F.Supp.2d 448, 460 (S.D.N.Y.2008)* ("Courts within the Second Circuit have determined

that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its*

*entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

**IV. MOTION FOR INJUNCTIVE RELIEF**

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defend-

ants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUN-SEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

[T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case.[FN14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

FN14. For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private

sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

**\*10 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;**[FN15] and it is further

> FN15. Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and De-Broize are *sua sponte* **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

**writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

N.D.N.Y.,2012.
Groves v. Davis
Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3046703 (N.D.N.Y.)
**(Cite as: 2007 WL 3046703 (N.D.N.Y.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
John Earl JOHNSON, Plaintiff,
v.
Joseph GUIFFERE [FN1] and John Pecora, Administrator, Defendants.

> **FN1.** Defendant Joseph A. Guiffere, who is alleged to have been a corrections sergeant at the Montgomery County Jail during the times relevant to plaintiff's claims, was mistakenly named by the plaintiff in his complaint as Sergeant Guiffery. In my earlier report and recommendation, dated May 17, 2005, I directed the clerk to revise his records to reflect that defendant's name as Sergeant Guiffrie. *See* Dkt. No. 48. Because it now appears that the proper spelling of this defendant's name is Guiffere, I will once again ask the clerk's office to adjust its records accordingly.

No. 9:04-CV-57.
Oct. 17, 2007.

John Earl Johnson, Albany, NY, pro se.

Donohue Sabo, Fred Hutchison, Esq., Kenneth G. Varley, Esq., of Counsel, Albany, NY, for Defendant Guiffere.

### ORDER

DAVID N. HURD, United States District Judge.

**\*1** Plaintiff, John Earl Johnson, brought this civil rights action pursuant to 42 U.S.C. § 1983. In a Report Recommendation dated August 10, 2007, the Honorable David E. Peebles, United States Magistrate Judge, recommended that the defendant Sergeant Guiffere's motion for summary judgment be granted

and the plaintiff's complaint be dismissed in all respects, with prejudice regarding defendant Guiffere, but without prejudice as to defendant Pecora. Objections to the Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the Report-Recommendation to which the plaintiff has objected, the Report-Recommendation is accepted and adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. The defendant Sergeant Guiffere's motion for summary judgment is GRANTED;

2. The complaint is DISMISSED in all respects, with prejudice with regard to defendant Guiffere;

3. The complaint is DISMISSED in all respects, without prejudice as to defendant Pecora; and

4. The Clerk shall file judgment accordingly.

IT IS SO ORDERED.

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff John Earl Johnson, who is now a federal prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging violation of his constitutional rights during a one and one-half month period while confined as a federal detainee within the Montgomery County Jail ("MCJ"). Johnson, a practicing Muslim, claims that jail officials at the MCJ violated his constitutional rights by depriving him of a diet consistent with his religious beliefs.

Currently pending before the court is a motion by

Not Reported in F.Supp.2d, 2007 WL 3046703 (N.D.N.Y.)
**(Cite as: 2007 WL 3046703 (N.D.N.Y.))**

Sergeant Guiffere, the lone remaining defendant appearing in the action, seeking the entry of summary judgment dismissing plaintiff's claims against him. Defendant's motion is predicated upon his assertion that the policy in place at the MCJ, requiring only that Islamic inmates be provided a "no pork" diet but that requests for vegetarian or other religious alternative meals be denied, is constitutional under existing law. Defendant Guiffere further contends that if a constitutional violation occurred, he is nonetheless entitled to qualified immunity from suit based upon the legal uncertainties surrounding plaintiff's claims. For the reasons set forth below, I recommend that Guiffere's summary judgment motion be granted and that plaintiff's claims against him be dismissed on the basis of qualified immunity.

I. *BACKGROUND*

At the times relevant to his complaint the plaintiff, who subscribes to strict Islamic religious tenets, was a federal detainee held in the custody of the United States Marshals Service, and incarcerated within the MCJ pursuant to an apparent arrangement between that agency and officials operating the facility for the housing of federal prisoners awaiting trial and/or sentencing. Complaint (Dkt. No. 1) ¶ 3, Facts ¶¶ 1, 20; *see also* Defendant's Motion for Summary Judgment (Dkt. No. 62) Exh. B, at 37. On June 13, 2003, following his transfer into the MCJ, plaintiff informed jail officials that his religion required he be fed meals consistent with his Islamic beliefs, though without providing elaboration regarding the diet being requested.[FN2] Complaint (Dkt. No. 1), Facts ¶¶ 1, 2; Johnson Aff. (Dkt. No. 30) ¶ 1. After an ensuing series of discussions with various prison officials at the MCJ regarding the issue, plaintiff formalized his dietary request on June 16, 2003 through the submission of a special diet request form asking that he not be served any meats "such as beef, chicken, turkey etc." because of his religious affiliation. Johnson Aff. (Dkt. No. 30) ¶¶ 1-2; Complaint (Dkt. No. 1), Facts ¶¶ 2-9; *see also* Guiffere Aff. (Dkt. No. 33-4) Exh. B. That request was denied on June 18, 2003 by defendant Guiffere,

who responded that the MCJ is a "no pork facility" which does "not honor vegetarian diets." Guiffere Aff. (Dkt. No. 33-4) Exh. B; Complaint (Dkt. No. 1), Facts ¶ 12.

> FN2. Plaintiff apparently adheres to a strict Islamic diet, which has been described by one court as follows:
>
> > [p]racticing Muslims eat food that is Halal, which means allowed or lawful. The opposite of Halal is Haram, which means prohibited or unlawful. A Halal diet includes fruits, vegetables and all things from the sea. The flesh of herbivorous animals, such as cows, lambs, chickens and turkeys, is Halal if it is slaughtered with the appropriate prayer and in the appropriate manner.... Haram items include pork and all pork by-products, carrion and the flesh of carnivorous animals, such as cat, dog, rat, lion, tiger, and eagle.... Halal does not require separate preparation and serving facilities after Halal meat is slaughtered according to ritual.
>
> *Abdul-Malik v. Goord,* No. 96 CIV. 1021, 1997 WL 83402, at *1 (S.D.N.Y. Feb. 27, 1997); *see also Smith v. Nuttal,* No. 04-CV-0200, 2007 WL 837111, at *1 n. 3 (W.D.N.Y. Mar. 14, 2007). During his deposition, plaintiff explained the four mandatory characteristics of properly prepared Halal food at length by quoting a translation of the relevant sections of the Koran (Quran). *See* Defendant's Motion for Summary Judgment (Dkt. No. 62) Exh. B, at 18-22.

**\*2** Plaintiff filed a formal grievance regarding the denial of his special dietary request on June 18, 2003. Complaint (Dkt. No. 1), Facts ¶ 13; Johnson Aff. (Dkt.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3046703 (N.D.N.Y.)
**(Cite as: 2007 WL 3046703 (N.D.N.Y.))**

No. 30) ¶ 3. That grievance was denied by the facility's grievance coordinator, Candus M. Kwiatkowski, on June 25, 2003, based upon her finding that the facility's policy of reasonably accommodating prisoners' religious dietary beliefs had been followed. Complaint (Dkt. No. 1), Facts ¶ 14; Johnson Aff. (Dkt. No. 30) ¶ 5. That grievance denial was later upheld on appeal to John F. Pecora, the facility's chief administrative officer, on June 27, 2003. Complaint (Dkt. No. 1), Facts ¶ 19; Johnson Aff. (Dkt. No. 30) ¶ 7.

Plaintiff appealed the matter further to the Citizens' Policy and Complaint Review Council (the "CPCR Council") on or about June 27, 2003. Complaint (Dkt. No. 1), Facts ¶ 19; Johnson Aff. (Dkt. No. 30) ¶ 8. While plaintiff, who was transferred out of the MCJ on July 29, 2003, *see* Complaint (Dkt. No. 1), Facts ¶ 20, maintains that he never received a response with respect to that appeal, defendants assert that the CPCR Council voted on November 19, 2003 to deny the grievance, and notified both the Montgomery County Sheriff and the plaintiff of that determination by letter dated November 25, 2003 from Daniel B. Reardon, Commissioner and Chair of the New York Commission of Correction. Guiffere Aff. (Dkt. No. 33) ¶ 10.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 16, 2004. Complaint (Dkt. No. 1). In his complaint, plaintiff named as defendants the CPCR Council as an entity, as well as John F. Pecora, the Administrator of the MCJ, and Sergeant Guiffere, a corrections employee at the facility.[FN3] *Id.* Plaintiff's complaint asserts various constitutional claims stemming from the denial of his dietary request, including interference with the free exercise of his religious beliefs, procedural and substantive due process violations, and the denial of equal protection, and seeks recovery of compensatory and punitive damages. *Id.*

FN3. Defendant Pecora has neither been served, nor has he appeared in the action. *See*

Dkt. Nos. 13, 16, 22. In light of plaintiff's failure to serve him within the allotted 120 days under Rule 4(m) of the Federal Rules of Civil Procedure, and in the absence of anything which would constitute good cause to extend that period, plaintiff's claims against defendant Pecora are subject to dismissal, without prejudice. Fed.R.Civ.P. 4(m); *see Shuster v. Nassau County,* No. 96 Civ. 3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan. 11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citing *Mississippi Publ'g Corp. v. Murphree,* 326 U.S. 438, 444-45, 66 S.Ct. 242, 245-46 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

On July 15, 2004, in lieu of answering, the CPCR Council moved seeking dismissal of plaintiff's claims against it for failure to state a cause of action upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. Nos. 10, 11. In a report dated May 17, 2005, I recommended that all claims against the CPCR Council as an entity be dismissed as barred by absolute immunity under the Eleventh Amendment, with leave for plaintiff to replead to assert claims against individual members of the council, and further urged the court to deny plaintiff's cross-motion for summary judgment on the merits of his claims.[FN4] Dkt. No. 48. Those recommendations were adopted by order issued by U.S. District Judge David N. Hurd on December 7, 2005. Dkt. No. 51.

FN4. Plaintiff has not availed himself of this limited opportunity to replead.

On October 31, 2006 defendant Guiffere, the only other defendant served in the action, filed a summary

judgment motion with the court, arguing both that the denial of plaintiff's dietary request did not violate a constitutional right because it was reasonably related to a legitimate penological interest, and that in any event he is protected from suit under the doctrine of qualified immunity. Dkt. No. 62. Plaintiff responded in opposition to Guiffere's motion by submission filed on January 22, 2007, Dkt. No. 67, and defendant Guiffere has since countered with the filing on February 1, 2007 of a reply memorandum in response to plaintiff's opposition. Dkt. No. 69. Defendant Guiffere's summary judgment motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) (B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*

**\*3** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though

*pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (citations omitted); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

#### B. *First Amendment Free Exercise Claim*[FN5]

> FN5. Although his complaint does not contain such a cause of action, plaintiff's factual

Not Reported in F.Supp.2d, 2007 WL 3046703 (N.D.N.Y.)
**(Cite as: 2007 WL 3046703 (N.D.N.Y.))**

allegations could support a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), which provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution .... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person-1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Because the principles which inform analysis of plaintiff's free exercise claim are similar to those applicable to his potential RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks, *see Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006), and my finding of defendant's entitlement to qualified immunity applies equally to this potential claim, it is unnecessary to separately determine whether plaintiff's *pro se* complaint should be liberally construed as asserting such a cause of action.

**\*4** In his summary judgment motion, Guiffere initially argues that plaintiff's First Amendment rights were not abridged while being held in the MCJ, since New York State guidelines for religious dietary needs and the facility's local practices, providing that a "pork-free" meal satisfies the constitutional dietary requirements for Muslim inmates, are reasonably related to legitimate penological interests. Defendant's Motion for Summary Judgment (Dkt. No. 62-6) at 2. Plaintiff counters that the budgetary concerns implicitly advanced by the defendant in defense of the relevant dietary practices at the MCJ do not support their

position, since all that he asked was that his meals consist only of fish and vegetables, not that prison officials incur the expense of preparing Halal meals.

The First Amendment to the United States Constitution guarantees the right to the free exercise of religion.[FN6] *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 2020 (2005). That clause, as is true with regard to the First Amendment generally, applies to prison inmates, subject to appropriate limiting factors. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) ( "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974)). Thus, for example, under accepted free exercise jurisprudence inmates are guaranteed the right to participate in congregate religious services under most circumstances. *See, e.g., Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (citing cases).

> FN6. That amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987); *Salahuddin,* 993 F.2d at 308. A determination of whether the refusal to permit attendance at a religious service, for example, hinges upon the balancing of an inmate's First Amendment free exercise right, against institutional needs of officials tasked with the increasingly daunting task of operating prison facilities; that determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right ... is 'reasonably related to legitimate penological interests.' "

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3046703 (N.D.N.Y.)
**(Cite as: 2007 WL 3046703 (N.D.N.Y.))**

*Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372 (1990).

Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet and participation in religious meals. *McEachin v. McGuinnis,* 357 F.3d 197, 204-05 (2d Cir.2004); *Ford,* 352 F.3d at 597. Ordinarily the Eighth Amendment establishes as a constitutional minimum the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials retain considerable discretion in determining dietary constituents. *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001). This requirement, however, is augmented by the First Amendment's free exercise clause, which is broad enough to include an inmate's "clearly established" right "to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597; *see also Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin,* 357 F.3d at 203. A free exercise claim arising from such a denial brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests on the other hand. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990).

**\*5** Examination of plaintiff's free exercise claim entails application of a three-part, burden shifting framework. *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988). A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs.[FN7] *Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006); *King v. Bennett,* No.

02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar. 30, 2007). Importantly, in evaluating this factor the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or a validity of particular litigants' interpretations of those creeds [,]' " *McEachin,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148-49 (1989)), and instead may only consider whether the particular plaintiff holds a belief which is religious in nature. *Ford,* 352 F.3d at 590; *King,* 2007 WL 1017102, at *4. Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny.[FN8] *Salahuddin,* 467 F.3d at 274-75; *Livingston v. Griffen,* No. 04-CV-00607, 2007 WL 1500382, at *15 (W.D.N.Y. May 21, 2007). In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley,* 482 U .S. 78, 107 S.Ct. 2254 (1987). *Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995); *Livingston,* 2007 WL 1500382, at *15.

> FN7. Noting in its decision in *Ford v. McGinnis* a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, the Second Circuit declined to resolve the issue, instead assuming continued applicability of the substantial burden test. 352 F.3d 582, 592-93 (2d Cir.2003). Recent cases from this and other courts suggest that the Second Circuit resolved this split in its decision in *Salahuddin v. Goord,* 467 F.3d 263 (2d Cir.2006) by subscribing to the substantial burden test. *See, e.g., Livingston v. Griffin,* No. 04-CV-00607, 2007 WL 1500382, at *15 (N .D.N.Y. May 21, 2007) (Singleton, J.); *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar. 30, 2007). While harboring some doubt that the Second Circuit has in fact laid the matter to rest, I

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3046703 (N.D.N.Y.)
**(Cite as: 2007 WL 3046703 (N.D.N.Y.))**

find it unnecessary to take a stance regarding this issue.

FN8. While this framework is particularly well-suited for analysis of an agency wide or facility policy or practice affecting inmates generally, it applies with equal force to individual decisions such as that involved in this case, which impacts only a single inmate. *Salahuddin,* 467 F.3d at 274, n. 4.

Under *Turner,* the court must determine "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective." *Thornburgh v. Abbott,* 490 U.S. 401, 414, 109 S.Ct. 1874, 1882 (1989). The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question. *Id.* at 417, 109 S.Ct. at 1884. Lastly, the court must examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id.* at 418, 109 S.Ct. 1884. Decisions rendered since *Turner* have clarified that when applying this test, a court should examine "the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Smith v. Nuttal,* No. 04-CV-0200, 2007 WL837111, at *5 (W.D.N.Y. Mar. 14, 2007) (citing *Salahuddin,* 467 F.3d at 274).

In his motion, defendant does not question the sincerity of plaintiff's Islamic religious beliefs. Plaintiff maintains that by providing him with meals containing meat other than pork, defendants have interfered with free exercise of his religion, the beliefs associated with which require him to observe a vegetarian diet-with the exception of fish, which he is permitted to eat. While plaintiff offers nothing, aside from his naked assertions in this regard, as evidence that his sincerely held religious beliefs require such a dietary accommodation, the Second Circuit has encouraged "courts [to] resist the dangerous temptation

to try to judge the significance of particular devotional obligations to an observant practitioner of faith." [FN9] *McEachin,* 357 F.3d at 201. Accordingly, the plaintiff has satisfied his burden at step one of the inquiry.

FN9. The Second Circuit had occasion to address this element-the bonafides of a plaintiff's sincerely held religious beliefs-in the context of a religious dietary restriction request made by an inmate in *Ford v. McGinnis,* 352 F.3d 582 (2d Cir.2003). While noting the difficulties inherent in casting upon the judiciary the task of probing the extent of a plaintiff's legitimately held beliefs, the court observed that "[a]n individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.' " *Id.* at 588 (citations omitted).

**\*6** It would ordinarily be incumbent at this juncture for the defendant to articulate palpably legitimate penological concerns to justify his refusal to provide the plaintiff with a vegetarian-plus-fish diet. Typically, defendants in similar cases offer up the financial burden associated with affording inmates particular diets, including those involving preparation and serving of Halal meals. *See, e.g., Williams v. Morton,* 343 F.3d 212, 217-18 (3d Cir.2003); *Abdul-Malik v. Goord,* No. 96 CIV. 1021, 1997 WL 83402, at \*4 (S.D.N.Y. Feb. 27, 1997). With the articulation of such a justification, the focus would then return to the plaintiff, under the governing test, to establish that the policy is not reasonably related to legitimate penological interests. *Ford,* 352 F.3d at 595-96. Such an inquiry is particularly fact-laden, and generally ill-suited for resolution on motion for summary judgment. *See generally Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (holding that fact issues existed as to whether DOCS' ban on literature and assembly of religious group was reasonably related to legitimate penological interests); *Show v.*

Not Reported in F.Supp.2d, 2007 WL 3046703 (N.D.N.Y.)
**(Cite as: 2007 WL 3046703 (N.D.N.Y.))**

*Patterson,* 955 F.Supp. 182, 190-91 (S.D.N.Y.1997) (finding fact issues precluding summary judgment regarding whether strip search of Muslim inmates was reasonably related to legitimate penological interests).

In this instance the defendant has not offered any justification for his refusal to provide the plaintiff with the requested, vegetarian-plus-fish diet, the reasonableness of which could then be examined under *Turner,* instead arguing only his belief that plaintiff's non-pork diet should satisfy the requirements of mainstream Islamic religious tenets. Since this represents little more than an invitation for the court to examine the bonafides of plaintiff's religious beliefs-an invitation which, the Second Circuit has counseled, should be firmly resisted-I find defendant's failure to offer justification for his denial of plaintiff's dieting request to be fatal to his motion, and that accordingly he is not entitled to summary judgment in connection with the merits of plaintiff's First Amendment free exercise claim.

C. *Equal Protection*

In addition to raising concerns under the free exercise clause of the First Amendment, plaintiff's complaint asserts a cause of action under the equal protection clause of the Fourteenth Amendment. The essence of that claim, however, is not well-defined in plaintiff's complaint, and his response in opposition to defendant's summary judgment motion fails to illuminate the claim.

The equal protection clause directs state actors to treat similarly situated people alike. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the equal protection clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano,* 54 F.3d at 1057 (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that

the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475, 1477 (2001)) (internal quotation marks omitted).

**\*7** It may be that plaintiff asserts an equal protection violation stemming from the failure of prison officials to provide him with a diet consistent with his religious beliefs, while members of other religions are accommodated. In such a case plaintiff's equal protection claim is properly analyzed under the framework articulated by the Supreme Court in *Turner. Smith,* 2007 WL 837111, at *5.

As is the case with regard to plaintiff's First Amendment claim, defendant has offered little of value to assist in determining whether it can be said, as a matter of law, that plaintiff's dietary request could not be accommodated consistent with legitimate penological concerns, and that the disparate treatment afforded to plaintiff, based upon his religious beliefs, thus did not abridge his rights to equal protection under the Fourteenth Amendment. Accordingly, defendant Guiffere is not entitled to summary judgment at this juncture with regard to the merits of plaintiff's equal protection claim.

D. *Procedural Due Process*[FN10]

> FN10. Plaintiff's complaint also alleges deprivation of substantive due process. Because plaintiff's complaint adequately alleges a violation of the First Amendment free exercise clause and the denial of equal protection as guaranteed by the Fourteenth Amendment, there is no need to resort to the more generic substantive due process provision for an analysis of those claims. *See Velez v. Levy,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3046703 (N.D.N.Y.)
**(Cite as: 2007 WL 3046703 (N.D.N.Y.))**

401 F.3d 75, 94 (2d Cir.2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."). In any event, it cannot be said that plaintiff's allegations arise to a level sufficient to offend notions of substantive due process. *See id.* (noting alternatively that plaintiff's substantive due process claim must fail because alleged actions of defendants were not sufficiently shocking to create substantive due process violation).

In his complaint plaintiff also asserts a claim for deprivation of his procedural due process rights. Plaintiff's procedural due process claim contains two elements.

The first component of that claim derives from plaintiff's contention that in denying his request for a vegetarian-plus-fish diet, prison officials at the MCJ failed to follow their own internal regulations. This element of plaintiff's due process claim is easily discounted. It is well-established that no due process claims arise from the failure of prison officials to follow internal prison regulations. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citing *Hyman v. Holder,* No. 96 Civ. 7748, 2001 WL 262665, at *6 (S.D.N.Y. Mar. 15, 2001)).

The second portion of plaintiff's due process claim stems from the failure of prison officials to provide a hearing before denying his request for a religious meal. To successfully state a claim under 42 U.S.C. § 1983 for denial of due process, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillance,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *Bedoya v. Coughlin,* 91

F.3d 349, 351-52 (2d Cir.1996).

In his papers plaintiff has cited no provision under which New York has created a liberty interest guarantying prisoners meals including only vegetables and fish, as requested by him. Consequently, in order to prevail on his due process claim plaintiff must establish that the denial of his request in that regard imposed upon him "atypical and significant hardship" in relation to the ordinary incidents of prison life. *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 2300 (1995); *see also McEachin,* 357 F.3d at 202-03; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Because plaintiff's complaint, even when most generously construed, fails to contain any such allegation, his procedural due process claim is subject to dismissal as a matter of law.

E. *Qualified Immunity*

**\*8** In addition to seeking dismissal of plaintiff's claims on the merits, defendant now presses qualified immunity as an alternative basis for dismissal of plaintiff's claims against him.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 2007 WL 2067932, at *20-21 (2d Cir. July 20, 2007); *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007). The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an

Not Reported in F.Supp.2d, 2007 WL 3046703 (N.D.N.Y.)
**(Cite as: 2007 WL 3046703 (N.D.N.Y.))**

unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162-63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

> [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Analysis of a claim of qualified immunity entails a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter, it must first be determined whether, based upon the facts alleged, plaintiff has facially established a constitutional violation. *Id.* If the answer to this inquiry is in the affirmative, the court must then turn its focus to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002). Finally, if the plaintiff had a clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

**\*9** The first two elements, as they apply to the facts of this case, are not controversial. Addressing the merits of the plaintiff's free exercise and equal pro-

tection claims, I have found at least the existence of genuinely disputed material facts precluding a finding, as a matter of law, that no substantive violation occurred. Moreover, the right at stake, including of a prison inmate to receive meals consonant with their religious beliefs, subject only to the constraints of legitimate penological concerns, was clearly established at the times in dispute. *See, e.g., Ford,* 352 F.3d at 507; *Bass,* 976 F.2d at 99; *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975).

It is the third element, addressing on Sergeant Guiffere's state of mind, that is the focus of his application for immunity from suit. In this instance, Sergeant Guiffere asserts-and plaintiff does not contest-that it was his belief at the relevant times that the prescribed pork-free diet was in conformance with Johnson's Islamic dietary restrictions. *See, e.g.,* Guiffere Aff. (Dkt. No. 33-3) ¶ 6. Guiffere's belief in this regard was apparently influenced in large part by an advisory chart maintained at the MCJ reflecting that the dietary beliefs of the Islamic (Muslim) religion require consumption of Kosher meals, to include "meat, but no pork or pork by-products." Hutchinson Aff. (Dkt. No. 33) ¶ 5 and Exh. A. It also should be noted that at the time in question the provision of pork-free diets to Islamic inmates had been approved by the New York courts as "satisf[ying] the constitutional requirement." *See Malik v. Coughlin,* 158 A.D.2d 833, 834, 551 N.Y.S.2d 418, 418 (3d Dep't 1990) (citing *O'Lone,* 482 U.S. at 352, 107 S.Ct. at 2406); *see also Majid v. Leonardo,* 172 A.D.2d 914, 914, 568 N.Y.S.2d 200, 201 (3d Dep't 1991). Under these circumstances I find that it was objectively reasonable for the defendant to believe that his actions in denying plaintiff's request for a vegetarian-plus-fish diet did not violate Johnson's clearly established constitutional rights.[FN11] *See generally Kind v. Frank,* 329 F.3d 979 (8th Cir.2003).

> FN11. Undeniably, the Second Circuit has been less than generous in finding qualified immunity in settings such as that now pre-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3046703 (N.D.N.Y.)
**(Cite as: 2007 WL 3046703 (N.D.N.Y.))**

sented. *See Ford,* 352 F.3d at 596-98. In *Ford,* for example, the Second Circuit rejected a finding of qualified immunity based upon the failure of prison officials to provide an Islamic inmate with the Eid ul Fitr meal to celebrate the close of Ramadan, in reliance upon advice from religious authorities that postponement of the feast meal was not religiously significant. *Id.* at 597-98. The instant case, however, presents a far more compelling argument for invocation of qualified immunity, based upon facts which are strikingly similar to those involved in *Kind,* in which the Eighth Circuit endorsed a finding of qualified immunity under analogous circumstances to those now presented. 329 F.3d at 980-81.

## IV. *SUMMARY AND RECOMMENDATION*

Analysis of plaintiff's substantive free exercise and equal protection claims turn upon resolution by the factfinder of critical issues of fact, including whether his sincerely held religious beliefs require the diet which he requested, and whether legitimate penological concerns preclude providing him with the meals sought by him. I find, however, that a reasonable person in the defendant's circumstances, denying plaintiff's meal request based upon an established facility policy and a practice which has passed state court scrutiny, would not have appreciated that he or she was violating plaintiff's clearly established constitutional rights. Accordingly, I recommend a finding that defendant Guiffere is entitled to dismissal of plaintiff's claims against him on the ground of qualified immunity.

**\*10** Based upon the foregoing, it is therefor hereby

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 62) be GRANTED, and the plaintiff's complaint be DISMISSED in all respects, with prejudice with respect to defendant

Guiffere, but without prejudice as to defendant Pecora.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the plaintiff by regular mail and the defendant electronically.

N.D.N.Y.,2007.
Johnson v. Guiffere
Not Reported in F.Supp.2d, 2007 WL 3046703 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2013 WL 5798557 (W.D.N.Y.)
**(Cite as: 2013 WL 5798557 (W.D.N.Y.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Sergio PERRILLA, Plaintiff,
v.
Brian FISCHER, Commissioner, NYS Doccs; Karen
Bellamy, C.O.R.C. Coordinator; P. Griffin, Superin-
tendent, Southport Correctional Facility; Iman Affy,
Iman of Southport Correctional Facility; T. Meeker,
Food Service Administrator, Southport Correctional
Facility; and I.G.R.C, Southport Correctional Facility,
Defendants.

No. 13–CV–0398M.
Oct. 28, 2013.

Sergio Perrilla, Marcy, NY, pro se.

**DECISION AND ORDER**
RICHARD J. ARCARA, District Judge.
                *INTRODUCTION*
      **\*1** Plaintiff, Sergio Perrilla, currently an inmate at
the Mid–State Correctional Facility, initially com-
menced this *pro se* action under 42 U.S.C. § 1983 in
the United States District Court for the Northern Dis-
trict of New York alleging a denial of his First
Amendment Free Exercise rights while he was incar-
cerated at the Southport Correctional Facility. Be-
cause the events alleged in the complaint occurred
within this District and the defendants most likely
resided in this District, *see* 28 U.S.C. § 1391(b), the
Northern District transferred the action to this District.
(Docket No. 7, Decision and Order.) Plaintiff also
sought permission to proceed *in forma pauperis* and
filed a Prison Authorization. (Docket Nos. 2, 4 and 5.)
For the following reasons, plaintiffs motion to proceed

as a poor person is granted and some of claims alleged
in the complaint are dismissed with prejudice pursuant
to 28 U.S.C. § § 1915(e)(2)(B)(ii) and 1915A(b), for
their failure to state a claim upon which relief can be
granted, and the remainder of the complaint will be
dismissed unless plaintiff files an amended complaint
as directed below..

                *DISCUSSION*
      Because plaintiff has met the statutory require-
ments of 28 U.S.C. § 1915(a) and filed an Authoriza-
tion with respect to this action, plaintiff is granted
permission to proceed *in forma pauperis.* Sections
1915(e)(2)(B) and 1915A(a) of 28 U.S.C. require the
Court to conduct an initial screening of this complaint.
In evaluating the complaint, the Court must accept as
true all of the factual allegations and must draw all
inferences in plaintiff's favor. *See Larkin v. Savage,*
318 F.3d 138, 139 (2d Cir.2003) (per curiam); *King v.
Simpson,* 189 F.3d 284, 287 (2d Cir.1999). While "a
court is obliged to construe [*pro se* ] pleadings liber-
ally, particularly when they allege civil rights viola-
tions," *McEachin v. McGuinnis,* 357 F.3d 197, 200
(2d Cir.2004), even pleadings submitted *pro se* must
meet the notice requirements of Rule 8 of the Federal
Rules of Civil Procedure. *Wynder v. McMahon,* 360
F.3d 73 (2d Cir.2004). "Specific facts are not neces-
sary," and the plaintiff "need only 'give the defendant
fair notice of what the ... claim is and the grounds upon
which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 93,
127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting
*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555,
127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal
quotation marks and citation omitted); *see also Boykin
v. Keycorp,* 521 F.3d 202, 213 (2d Cir.2008) (dis-
cussing pleading standard in *pro se* cases after
*Twombly;* "even after *Twombly,* dismissal of a pro se
claim as insufficiently pleaded is appropriate only in
the most unsustainable of cases."). Generally, the
Court will afford a *pro se* plaintiff an opportunity to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5798557 (W.D.N.Y.)
**(Cite as: 2013 WL 5798557 (W.D.N.Y.))**

amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007) (quoting *Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999) (*per curiam* )).

**\*2** Plaintiff brings this action pursuant to 42 U.S.C. § 1983. "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton,* 126 F.3d 400, 405 (2d. Cir.1997) (citing *Eagleston v. Guido,* 41 F.3d 865, 875–76 (2d Cir.1994)). Based on its evaluation of the complaint, the Court finds that several of plaintiffs claims must be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b) because they fail to state a claim upon which relief may be granted.

## A. PLAINTIFF'S CLAIMS

Plaintiff alleges that on or about June 26, 2011, he forwarded a letter to defendant Iman Affy at Southport asking to be placed on the list for Ramadan Muslim Observance Services. (Complaint, ¶ 1, Exh. A.) On or about June 28, 2011, he received a memorandum from defendant Meeker, Southport's Food Service Administrator, informing inmates that Ramadan Observance Meals would begin on August 1 and that the last meal would be served on August 14, 2011. (*Id.,* ¶ 2, Exh. B.) On September 1, 2011, plaintiff wrote to Iman Affy and informed him that he had spoken to defendant Superintendent Grffin regarding why his "Shawwal Meal" had been discontinued and was advised by Griffin to contact the Iman. On that same date, plaintiff filed a grievance complaining that he had told Iman Affy that he wanted to attend Ramadan Services but was advised he could not pursuant to New York State Department of Corrections and Community Supervision Directive No. 4933, 7 N.Y.

Comp. R. & Regs § 304.9, which prohibits inmates confined in SHU from participating in congregate religious services. (*Id.,* ¶ ¶ 13–4, Exhs.C, D.)

In September 2011, plaintiff filed two additional grievances, SPT–52336–11 ("Grievance I") and SPT–52337–11 ("Grievance II"). Grievance I alleged that plaintiffs right to be provided Halal food during Ramadan to break his fast was denied when Meeker and Iman Affy did not provide him with "double portions" as set forth in the Ramadan Menu and oatmeal in the Sahoor bags, and that the evening meal during Ramadan was "ill[-]prepared" and served by non-believers. (Complaint, ¶ ¶ 5,10, Exh. E, J.) He also claims that when the meal was prepared by believers, the chicken and fish was "unclean, filthy and raw (not coooked peroperly)." (*Id.,* Exh. E.) The Inmate Grievance Review Committee ("IGRC") granted Grievance I in part "to the extent that per religious staff Muslim and NOI [Nation of Islam] inmates cooked and prepared Ramadan food. All food and meals served were in accordance with the Statewide Menu ... All meals were supervised by staff and prepared properly." § *Id.,* Exh. J.) Superintendent Griffin concurred with the IGRC's decision and affirmed the recommendation of the IGRC. (*Id.*)

**\*3** The Second Grievance complained that plaintiff was not permitted to attend congregate services during Ramadan pursuant to DOCCS Directive 4933, 7 NYCRR § 304.9(d),[FN1] which provides that individuals in SHU are not permitted to attend congregate religious services. (Complaint, ¶ ¶ 7–10, Exhs.G-l). Accommodations are provided in the form of counseling by the facility's ministerial staff and a rounding in SHU by the facility senior chaplain or a designee at least once per week. *Id.* The Grievance was denied by the IGRC pursuant to Directive 4933, and the denial was affirmed by Griffin and the Central Review Office Committee. (*Id.*)

FN1. Directive 4933, which applies only SHU inmates, provides:

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5798557 (W.D.N.Y.)
**(Cite as: 2013 WL 5798557 (W.D.N.Y.))**

(a) Counseling by a member of the facility's ministerial services staff will be provided upon written request of an inmate.

(b) The facility senior chaplain or a designated member of the ministerial services staff will be required to make a minimum of one round per week in SHU.

(c) No inmate religious advisor or assistant will be permitted to visit SHU.

(d) Attendance at congregate religious services will not be permitted.

Plaintiff's claims are brought solely under the First Amendment [FN2] and are brought against Brian Fischer, Commissioner; Karen Bellamy, CORC Director; P. Griffin, Superintendent at Southport; Iman Affy; Meeker; and Southport's IGRC Coordinator. Plaintiff seeks compensatory and punitive damages in separate amounts against each of the defendants. For the following reasons, the Court finds that (1) plaintiffs claims related to the denial of his request to attend congregate religious services must be dismissed with prejudice for their failure to state a claim upon which relief can be granted, (2) plaintiff's claims against defendants Fischer, Bellamy, Griffin and the IGRC Coordinator related to the alleged denial and preparation of Halal Meals must be dismissed with prejudice for their failure to state a claim upon which relief can be granted, and (3) plaintiff's claims against Iman Affy and Meeker *only* related to the alleged denial and preparation of Halal Meals must be dismissed unless he files an amended complaint which includes the necessary allegations regarding said claims.

FN2. The Court notes that liberally construing the complaint, as the Court must, *see Norfleet v. Walker,* 684 F.3d 688, 2012 WL 2520465, at *1 (7th Cir.2012) ("courts are

supposed to analyze a litigant's claims and not just the legal theories that he propounds, especially when he is litigating pro se") (citations omitted), the facts alleged could also be construed to support a claim under the Religious Land Use and Incarcerated Persons Act of 2000, 42 U.S.C. § 2000cc–1 (a). However, plaintiff is seeking only compensatory and punitive damages which are not available under RLUIPA. *Ford v. Palmer,* —— Fed.Appx. ——, 2013 WL 5340395, n. 1 (2d Cir. Sept.24, 2013) (Summay Order) ("RLUIPA does not provide a cause of action for damages against state officials in their official capacities, *see Sossamon v. Texas,* —— U.S. ——, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011), or in their individual capacities, *see Washington v. Gonyea,* No. 11–980–cv 731 F.3d 143, 2013 WL 4792375, at*2 (2d Cir. Sept. 10, 2013) (per curiam))." Accordingly, to the extent the complaint could be construed to allege claims under RLUIPA they would be dismissed.

**1. Congregate Religious Services**

Plaintiff alleges that he was denied the right to attend congregate religious services during the Holy Month of Ramadan in 2011 and was advised by Iman Affy that pursuant to Directive No. 4933 he could not attend congregate religious services. Plaintiff also was not permitted to attend Jumah and Eid–ul–Fiter Services. (Complaint, ¶ 4, Exh. D.) While it has been held that the First Amendment does provide inmates the right to participate in congregation religious services "under most circumstances," *Johnson v. Guiffere,* 2007 WL 3046703, at *4 (N.D.N.Y., Oct.17, 2007) (citing *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993), the right is not unfettered and must "be balanced against legitimate penological concerns." *Washington v. Afify,* ——F.Supp.2d ——, 2013 WL 4718693, at 6 (W.D.N.Y., Sept.3, 2013).

"[I]t is well-established [in this Circuit] that the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5798557 (W.D.N.Y.)
**(Cite as: 2013 WL 5798557 (W.D.N.Y.))**

enforcement of DOCS policies which restrict inmates in SHU from attending congregate religious services is rationally related to a valid penological interest and is the least restrictive means of serving that interest.' " *Leon v. Zon,* 920 F.3d 379, 386 (W.D.N.Y.2013) (quoting *Smith v. Artus,* 2010 WL 3910086 at *23 (N.D.N.Y.2010), *vacated on other grounds* 2013 WL 1338359, at n. 1 (2d Cir. Apr.4, 2013); FN3 *see also Washington,* 2013 WL 4718693, at 6 ("In *Smith v. Alius* ... the court, though recognizing that 'a prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock,' granted summary judgment for the defendants on the plaintiffs claim challenging a directive that SHU inmates could not attend congregate religious services, finding that the directive had valid, rational connection to the legitimate penological interest of security, staffing, and the preservation of scarce fiscal resources.) (citing *Smith v. Artus,* 2010 WL 3910086, at *31).

> FN3. The Second Circuit, on appeal vacated the district court's decision on other grounds, noting that the portion of the district court's decision addressing the religious-services issue "remain[s] undisturbed by this order." *Smith v. Artus,* 2013 WL 1338359, at n. 1.

**\*4** Accordingly, plaintiff's claims alleging that he was denied his First Amendment right to attend congregate religious services must be dismissed with prejudice. *See Washington,* 2013 WL 4718693, at 7.

**2. Denial of and Ill–Prepared Halal Meals**

Plaintiff also claims that during Ramadan 2011, he was not provided Halal FN4 food to break fast and that the evening meal was prepared by non-believers and that when it was prepared by believers it was ill-prepared-"unclean, filthy, and raw...." (Complaint, ¶ 5, Exh. E.) Grievance I claimed that Affy and Meeker did not comply with the Ramadan Menu distributed previously (*id.,* ¶ B) inasmuch as he was not provided double portions nor was he provided with

oatmeal in his Sahoor bags (*id.,* Exh. E). The Grievance was granted in part "to the extent that per religious staff Muslim and NOI [Nation of Islam] inmates cooked and prepared Ramadan food. All food and meals served were in accordance with the Statewide Menu ... All meals were supervised by staff and prepared properly." (*Id.,* Exh. J.) Superintendent Griffin concurred with the IGRC's decision and affirmed the recommendation of the IGRC. ( *Id.,* ¶ 10, Exh. J.)

> FN4. As summarized by one district court the Muslim Halal dietary requirement is as follows: "[T]he Koran dictates that practicing Muslims eat food that is Halal, which means allowed or lawful. The opposite of Halal is Haram, which means prohibited or unlawful. A Halal diet includes fruits, vegetables and all things from the sea. The flesh of herbivorous animals, such as cows, lambs, chickens and turkeys, is Halal if it is slaughtered with the appropriate prayer and in the appropriate manner. Certain items are Haram and cannot be made Halal through ritual slaughter. Examples of such Haram items include pork and all pork by-products, carrion and the flesh of carnivorous animals, such as cat, dog, rat, lion, tiger, and eagle. Intoxicants of all types are also Haram. Halal does not require separate preparation and serving facilities after Halal meat is slaughtered according to ritual." *Cox v. Kralik,* 2006 WL 42122, at *1, n. 1 (S.D.N.Y., Jan.6, 2006) (citing *Abdul–Malik v. Goord,* 1997 WL 83402, at *1 (S.D.N.Y. Feb.27, 1997)).

"Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of gion." *O'Lone v. Estates of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citation omitted). Those protections, however, "are not as extensive as the rights enjoyed by an ordinary citizen. Rather, '[a] prison inmate ... retains those First

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5798557 (W.D.N.Y.)
**(Cite as: 2013 WL 5798557 (W.D.N.Y.))**

Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.' " *Washington,* 2013 WL 4718693, at *4 (quoting *Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004) (quoting *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995), and citing *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) ("Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, ... are the interests of prison officials charged with complex duties arising from administration of the penal system") (internal quotation marks and brackets omitted)).

Whether a restriction on a prisoner's religious practices is constitutional under the First Amendment, is determined by a standard of reasonableness. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). *See also Ford,* 352 F.3d 588 ("The free exercise claims of prisoners are therefore judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights") (additional internal quotation marks omitted). "Under the First Amendment ... a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy is reasonably related to legitimate penological interests.' " *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). In order to establish a violation of the First Amendment a "prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salhuddin,* 467 F.3d at 274–75 (citation omitted). Restrictions on an inmate's free exercise rights are only permissible where they are "reasonably related to legitimate penological interests." *Pugh v. Goord,* 571 F.Supp.2d 477, 494 (S.D.N.Y.2008) (quoting *Turner v. Safley,* 482 U.S. 78, 87, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). "An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise."

*Salahuddin,* 467 F.3d at 276, n. 4 (citing *Ford,* 352 F.3d at 595, n. 15 (citing *Young v. Couglin,* 866 F.2d 567 (2d Cir.1989)).

**\*5** The Second Circuit has stated that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004). However, "[t]here may be inconveniences [regarding denials of religiously required food] so trivial that they are most properly ignored." *Tafari v. Annets,* 2008 WL 2413995, at *16 (S.D.N.Y. June 12, 2008) (quoting *McEachin,* 357 F.3d at 203 n. 6). "In this respect, this area of the law is no different from many others in which the time-honored maxim *de minimis non curat lex* applies." *McEachin,* 357 F.3d at 203 n. 6. *See also Norwood v. Strada,* 249 F. App'x. 269, 272 & n. 1 (3d Cir.2007) (denial of religiously certified "halal" meals on seven out of seven occasions, during prison's two-and-one half-day emergency lock-down, was "a mere *de minimis* intrusion" that failed to substantially burden the inmate's religious beliefs); *Brown v. Graham,* 2010 WL 6428251, at *15–16 (N.D.N.Y., March 30, 2010) (collecting cases finding *de minimis* burden on inmate's free exercise rights); *Tafari,* 2008 WL 2413995, at *16 (denial of Kosher meals on a few separate occasions "did not substantially burden [Plaintiff's] religious beliefs and constituted, at most, a *de minimis* violation.")

Plaintiff's complaint and the attached Grievances [FN5] do not allege a plausible claim for relief, *see Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (In order to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' ") (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)), that the denial of double portions to break fast

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5798557 (W.D.N.Y.)
**(Cite as: 2013 WL 5798557 (W.D.N.Y.))**

and being provided some ill-prepared meals of chicken of fish and some meals prepared by non-believers during Ramadan in 2011 substantially burdened plaintiff's right to freely practice his Muslim faith. The allegations allege no more than what has often in this Circuit been referred to as a *de minumus* burden on plaintiffs free exercise rights. *See Brown,* 2010 WL 6428251, at *15–16 (collecting cases); *see also Washington,* 2013 WL 4718693, at *5 ("Courts have generally held that incidents that are isolated, or few in number, involving a denial of religiously-mandated meals, do not give rise to a First Amendment claim.") (citations omitted). Plaintiff only claims that he was denied double portions, that he was not provided oatmeal in his Sohoor bags and that some of the meals provided were provided by non-believers or were ill-prepared. The Ramadan Menu distributed by Meeker prior to the start of Ramadan noted that inmates would be provided one bag of Halal dates for consumption prior to dawn each day and that the daily rations of dates was five and that each bag of dates would contain 14 plus rations of dates with a few extra "which will last each participant a total of [14] dates." (Complaint, Exh. B).

> FN5. "[T]he court may consider facts set forth in exhibits attached as part of the complaint as well as those in the formal complaint itself." *Chance v. Armstrong,* 143 F.3d 698, 698 n. 1 (2d Cir.1998); *see Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) ("the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference").

**\*6** These allegations, in addition to alleging no more than a *de minimus* burden, if at all, on plaintiff's right to practice his Muslim faith during Ramadan, also fail to allege that the denial of double portions of dates or meals prepared properly and in a more pleasing manner was, in any way, a "substantial bur-

den" on exercising plaintiffs faith. *See Saiahuddin,* 467 F.3d at 274–75; *Washington,* 2013 WL 4718693, at *5–6.

Accordingly, the complaint fails to state a claim that plaintiff's right to freely practice his religion was denied but, according to the general rule in this Circuit, the Court will provide plaintiff the opportunity to file an amended complaint alleging that he was denied the right to freely practice his religion by Affy and Meeker only. *See Snider v. Melindez,* 199 F.3d 108, 113 (2d Cir.1999) (Except in "unmistakably clear" cases, "it is bad practice for a district court to dismiss without affording a plaintiff the opportunity to be heard in opposition.")

**3. Personal Involvement/Supervisory Liability**

With respect to the Halal Meal claims against Fischer, Griffin, Bellamy and the unnamed IGRC Supervisor they must be dismissed with prejudice because plaintiff has not alleged that these defendants were personally involved in the alleged denial of his First Amendment rights in relation to the provision or lack thereof of double portions, oatmeal and properly prepared Halal Meals. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (Leave to amend should be denied where "the problem with [plaintiffs] causes of action is substantive" such that "[b]etter pleading will not cure it.") (citation omitted).

It is axiomatic that before a plaintiff can seek to impose liability against a state government official or employee under 42 U.S.C. § 1983, he must establish that the official or employee was personally involved in the alleged constitutional deprivation because the doctrine of respondeat superior does not apply to actions brought under § 1983. *See,* e.g., *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Thus, a defendant cannot be liable for damages for a constitutional violation merely because he occupies a position of authority or is in the chain of command of the prison hierarchy. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN6]

FN6. "Following the Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 676–77, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), there is still disagreement among district courts in this Circuit as to whether all of the [five] 'Colon factors' still apply. It is unclear whether *Iqbal* overrules or limits *Colon,* therefore, in the absence of contrary direction from the Second Circuit, the Court will continue to apply those factors." *Jackson v. Goord,* 2011 WL 4829850, at 9, n. 21 (W.D.N.Y., Oct.12, 2011) (CJS) (citations omitted)).

Plaintiff's claims are brought against Fischer, former DOCCS Commissioner, based on the allegation that he had knowledge of the violations through "Executive Rounds" and the fact that grievances were appealed to his office. (Complaint, ¶ 9[2].FN7) However, as alleged in the complaint, Fischer was not part of rounds at Southport nor were any of the grievances appealed to him. These allegations would apply to Superintendent Griffin, not Fischer. The "WHERE-FORE" Clause, alleges that Fischer failed to create proper policies used to govern Muslim Observances and failed to train his subordinates. ( *Id.,* ¶ 16.) Plaintiff's alleges that Bellamy, CORC Director, was responsible for all final decisions rendered by the Superintendent and had knowledge of the alleged violations through the appeal of Grievance I and II. ( *Id.,* ¶ 10[2] ). Griffin was the Superintendent who plaintiff alleges he told during Executive Rounds on September 1, 2011, that he had been denied his "Shawwal Fast" ( *id.,* ¶ 3) and who concurred in the IGRC's recommendation regarding Grievance I. (Complaint, Exh. J.)

FN7. The complaint contains separate paragraphs each numbered 8–11. The second paragraph of each is denoted by "[2]."

**\*7** Clearly, Fischer and Bellamy are named herein solely in their supervisory roles in DOCCS' hierarchy and are not alleged to have had any personal involvement in the alleged denial of Halal food and meals. Similarly, the allegations against Griffin and the IGRC Supervisor are subject to dismissal because it is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement. *See, e.g., Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation omitted); *James v. Poole,* 2013 WL 132492, at \*7 (W.D.N.Y., January 09, 2013) ("Plaintiff attempts to establish personal involvement by Superintendent Poole and CORC Director Eagan by pointing to their roles in reviewing Plaintiffs grievances. Without more, this is insufficient to create personal involvement in Plaintiff's alleged constitutional violations.") Moreover, because there are no allegations that Griffin was directly involved in the alleged denial of double portions or properly prepared evening Halal Meals, the claims against him must be dismissed. Griffin's role as Superintendent is insufficient to establish his personal involvement in the alleged First Amendment violation. *See Washington,* 2013 WL 4718693, at \*11.

### CONCLUSION

Because plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization, his request to proceed *in forma pauperis* is granted. For the reasons set forth above, plaintiff's claims concerning the denial of congregate religious services and the claims against defendants Fischer, Bellamy, Griffin and IGRC Supervisor, in their entirety, are dismissed with prejudice. In addition, plaintiff's claims concerning the denial of and ill-prepared Halal Meals must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) unless he files an amended complaint which includes the necessary allegations regarding said claims as directed above and in a manner that complies with Rules 8 and 10 of the Federal Rules of Civil Procedure.

Plaintiff is advised that an amended complaint is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5798557 (W.D.N.Y.)
**(Cite as: 2013 WL 5798557 (W.D.N.Y.))**

intended to completely replace the prior complaint in the action. "It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect." *Arce v. Walker,* 139 F.3d 329, 332 n. 4 (2d Cir.1998) (quoting *International Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir.1977)); *see also Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). Therefore, plaintiff's amended complaint must include the allegations against Iman Affy and Meeker regarding only the claims that he was denied Halal Meals so that the amended complaint may stand alone as the sole complaint in this action which the defendants must answer.

Plaintiff is forewarned that if he fails to file an amended complaint as directed, the complaint will be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B). Plaintiff is further forewarned that his right to pursue further relief in federal court at public expense will be greatly curtailed if he has three actions or appeals dismissed under the provisions of 28 U.S.C. § 1915(e)(2)(B). *See* 28 U.S.C. § 1915(g).

### ORDER
**\*8** IT HEREBY IS ORDERED, that plaintiff's motion to proceed *in forma pauperis* is granted;

FURTHER, that plaintiffs claims regarding the denial of congregate religious services and his claims against Fischer, Bellamy, Griffin and IGRC Supervisor are dismissed with prejudice and the Clerk of the Court is directed to terminate defendants Fischer, Bellamy, Griffin and IGRC Supervisor as parties to this action;

FURTHER, that plaintiff is granted leave to file an amended complaint against Iman Affy and Meeker *only* regarding his claims of a denial of Halal Meals in 2011 as directed above by **November 22, 2013;**

FURTHER, that the Clerk of the Court is directed to send to plaintiff with this order a copy of the orig-

inal complaint, a blank § 1983 complaint form, and the instructions for preparing an amended complaint;

FURTHER, that in the event plaintiff fails to file an amended complaint as directed above by **November 22, 2013,** the complaint shall be dismissed with prejudice without further order of the Court;

FURTHER, that if plaintiff has not filed an amended complaint by **November 22,** 2013, the Clerk of the Court is directed to close this case as dismissed with prejudice; and

FURTHER, that in the event the complaint is dismissed because plaintiff has failed to file an amended complaint, the Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

IT IS SO ORDERED.

W.D.N.Y.,2013.
Perrilla v. Fischer
Slip Copy, 2013 WL 5798557 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Aurel SMITH, Plaintiff,
v.
Kenneth PERLMAN, Deputy Commissioner of Programs, NYS Department of Correctional Services;
Mark Leonard, Director of Ministerial Services, NYS Department of Correctional Services; Daniel Martuscello, Superintendent of Coxsackie Correctional Facility; Captain R. Shanley, Captain, Acting Deputy Superintendent of Security at Coxsackie Correctional Facility; Jeffrey A. Hale; Harry S. Graham, Superintendent of Auburn Correctional Facility; G. ROBINSON, Deputy Superintendent of Auburn Correctional Facility, Defendants.

No. 9:11–cv–00020 (MAD/CFH).
Signed March 13, 2014.

Aurel Smith, Attica, NY, pro se.

Office of the New York State Attorney General, Albany Office, The Capitol, Kevin M. Hayden, AAG, of Counsel, Albany, NY, for Defendants.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** Plaintiff, an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights under the First and Fourteenth Amendment, as well as his rights under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *See* Dkt. Nos. 1,

47. In a Report–Recommendation and Order dated February 18, 2014, Magistrate Judge Hummel recommended that the Court deny Plaintiff's motion for partial summary judgment, grant Defendants' cross motion for summary judgment, deny Plaintiff's motion for a preliminary injunction, and dismiss this case. *See* Dkt. No. 90. Neither party has objected to Magistrate Judge Hummel's Report–Recommendation and Order.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011)* (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec'y of Health and Human*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

*Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

**\*2** In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, \*1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

Having carefully reviewed Magistrate Judge Hummel's February 18, 2014 Report–Recommendation and Order, the parties' submissions and the applicable law, the Court finds that Magistrate Judge Hummel correctly recommended that the Court should deny Plaintiff's motion for partial summary judgment, deny Plaintiff's motion for injunctive relief, grant Defendants' cross motion for summary judgment, and dismiss this case. *See* Dkt. No. 90.

In the alternative, the Court finds that Defendants are entitled to qualified immunity. Even if the Court found questions of fact as to whether Plaintiff's constitutional rights had been violated, the record clearly establishes that it was objectively reasonable for Defendants to believe that their conduct did not violate Plaintiff's clearly established rights. The record establishes that all decisions at issue were made with

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

legitimate government interests or with the safety of the facility in mind. As such, the Court grants Defendants' motion for summary judgment on this alternative ground.

**\*3** Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Hummel's February 18, 2014 Report–Recommendation and Order is **ADOPTED** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Plaintiff's motion for partial summary judgment (Dkt. No. 73) is **DENIED;** and the Court further

**ORDERS** that Defendants' cross motion for summary judgment (Dkt. No. 81) is **GRANTED;** and the Court further

**ORDERS** that Plaintiff's motion for a temporary restraining order and preliminary injunction (Dkt. No. 79) is **DENIED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER**[FN1]

FN1. This matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Aurel Smith ("Smith"), an inmate currently in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, seven DOCCS employees, violated his constitutional rights under the First and Fourteenth Amendments as well as rights under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc–1 *et seq.* Second Am. Compl. (Dkt. No. 47). Presently pending is Smith's motion for partial summary judgment (Dkt. No. 73) and defendants' cross motion for summary judgment, both pursuant to Fed.R.Civ.P. 56. Dkt. No. 81. Smith does not oppose defendants' cross motion.[FN2] Smith also filed a motion for a temporary restraining order and preliminary injunction. Dkt. No. 79. For the following reasons, it is recommended that Smith's motion for partial summary judgment be denied, defendants' cross motion be granted, and Smith's motion for a temporary restraining order and preliminary injunction be denied.

FN2. Upon requests, this Court twice granted Smith an extension of time to respond to defendants' cross motion, the most recent deadline being February 5, 2014. Dkt. Nos. 84, 86. The deadline expired and Smith never responded.

**I. Background**

The specific facts of the case are set forth in the Report–Recommendation and Order filed February 28, 2012, familiarity with which is assumed. *See* Dkt. No. 33 (Report–Recommendation); Dkt. No. 38 (Memorandum–Decision and Order).

**A. Procedural History**

Smith is a practicing Muslim who claims that at the Coxsackie Correctional Facility ("Coxsackie"),

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

his: (1) First Amendment and RLUIPA rights were violated when defendants Martuscello and Shanley prohibited him from attending three religious Friday services while keeplocked,[FN3] defendants Saltsman and Adams prohibited him from attending a Saturday religious study group, and defendants Perlman and Leonard changed DOCCS's policy to allow only one family guest event per year; and (2) Fourteenth Amendment rights were violated because defendants Martuscello and Shanley prohibited him from attending religious Friday services while keeplocked and defendants Perlman and Leonard treated Muslims differently than Native Americans concerning the number of family participation events they were allowed annually. Dkt. No. 33 at 2, 10.

> FN3. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. COMP.CODES R. & REGS. tit. 7, § 301.6.

**\*4** Defendants filed a motion to dismiss. Dkt. No. 24. Subsequently, the Court dismissed Smith's: (1) equal protection claims against defendants Martuscello and Shanley; (2) First Amendment and RLUIPA claims against defendants Saltsman and Adams; and (3) state law claims against Martuscello, Saltsman, and Adams. Dkt. No. 38 at 23.

On September 25, 2012, this Court granted Smith's motion to supplement his complaint. Dkt. No. 46. Smith's supplemental complaint, together with his first amended complaint and attached exhibits, became Smith's second amended complaint and operative pleading. Dkt. Nos. 46–47.

### B. Additional Claims

All additional claims alleged in Smith's second amended complaint occurred at Auburn Correctional Facility ("Auburn"), where Smith was transferred to in March 2011. Suppl. Compl. (Dkt. No. 47–4 at 1–13) at 3.

#### i. Dietary Restrictions

As a Muslim, Smith is required to maintain a halal diet through the Religious Alternative Menu ("RAM"), which at times, consists of soy-based proteins. Suppl. Compl. at 3–4, 9. Additionally, during his incarceration in 1999, Smith began having digestive problems and limited his soy intake to resolve those problems. Smith Dep. (Dkt. No. 81–3) at 44:20–46:9. Since 2008, Smith has been medically prescribed a therapeutic diet, which includes non-halal proteins, for treating his digestive issues. Suppl. Compl. at 4; Smith Dep. at 52:18–53:1. Smith tries to consume RAM meals but if it contains soy-based proteins, he reverts to non-halal proteins that are available to the general prison population. Dkt. No. 73–1 ¶ 59. Smith testified that he trades with other inmates for halal items. Smith Dep. at 61:1–20, 62:9–15. Smith sought a meal accommodation in which the therapeutic diet incorporates halal meats. Suppl. Compl. at 9.

Smith contends that Muslim inmates are treated differently from Jewish inmates because Jewish inmates who require a therapeutic diet are provided kosher protein sources. Suppl. Compl. at 10. Smith believes that the kosher meals are of a better quality than the RAM meals. Dkt. No. 73–1 ¶ 91.

On April 28, 2011, Smith filed a grievance requesting religious dietary accommodations.[FN4] Suppl. Compl. at 10–11; Dkt. No. 47–4 at 23–40. The Inmate Grievance Resolution Committee ("IGRC") referred Smith's grievance to defendant Graham, the Auburn Superintendent. Suppl. Compl. at 5; Dkt. No. 47–4 at 31. Graham determined that Smith must "choose to receive either a religious diet or a therapeutic diet, as combinations of the two diets are not offered." Suppl. Compl. at 5–6; Dkt. No. 47–4 at 32. Smith appealed the Superintendent's decision to the Central Office Review Committee ("CORC"). Suppl. Compl. at 6.

On August 31, 2011, CORC denied Smith's appeal, affirming Graham's decision, and stating that "the religious alternative diet is appropriate for Muslim inmates." Suppl. Compl. at 6; Dkt. No. 47–4 at 33.

> FN4. The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

### ii. Religious Friday Services

**\*5** On May 9, 2011, Smith was not advised of a change to his job schedule. Suppl. Compl. at 6. As a result, Smith missed work, was issued a misbehavior report, and placed in keeplock pending a disciplinary hearing. *Id.* at 6–7; Smith Dep. at 34:10–35:1. While confined, Smith filed a special form requesting attendance at religious Friday services. Suppl. Compl. at 7; Smith Dep. at 29:12–30:23; Dkt. No. 47–4 at 14. Defendant Robinson, the deputy superintendent of security, denied this request on May 11, 2011 because of Smith's disciplinary record during the six months prior to being keeplocked. Suppl. Compl. at 7; Dkt. No. 47–4 at 14. However, Smith denies having any prison infractions during that time period. Suppl. Compl. at 7.

On May 15, 2011, Smith was adjudged guilty after a disciplinary hearing and given fifteen days of keeplock. Suppl. Compl. at 7. Smith again filed a request to attend religious services. *Id.;* Dkt. No. 47–4 at 15. Robinson denied that request on May 17, 2011 without an explanation. Suppl. Compl. at 7; Dkt. No. 47–4 at 15. Smith then filed a grievance, "asserting an infringement of his religious ... rights." Suppl. Compl.

at 7; Dkt. No. 47–4 at 16–19. On June 2, 2011, the IGRC responded "the reason for the denial was due to [Smith] being found guilty of Tier 2 tickets on 5/9/10 as well as [on] 10/12/10." Suppl. Compl. at 8; Dkt. No. 47–4 at 20. Smith appealed this denial to Graham, who denied it for the same reasons. Suppl. Compl. at 8; Dkt. No. 47–4 at 21. Smith appealed to CORC, which upheld the decision and determined that Smith "presented a legitimate threat to the safety and security at the facility ... attendance at religious services on keeplock status [is] not an entitlement." Suppl. Compl. at 8; Dkt. No. 47–4 at 22. Smith completed his keeplock confinement on May 24, 2011. Suppl. Compl. at 8.

### C. Defendants' Contentions
#### i. Dietary Restrictions

Non-party Culkin is the Assistant Director of DOCCS's Office of Nutritional Services and a registered dietitian. Culkin Aff. (Dkt. No. 81–34) ¶ 1. Culkin attested that DOCCS provides meals to 54,700 inmates with a standardized state-wide menu that considers factors such as the palatability of food, nutritional quality, accommodation of religious requirements, therapeutic needs, security implications, and cost containment. *Id.* ¶¶ 4–5.

By November 1996, RAM was available virtually at all DOCCS facilities to anyone regardless of religious affiliation. Culkin Aff. ¶¶ 6–7. RAM is served at the same time as the regular menu and accommodates many inmates in an economically viable way. *Id.* ¶ 8. To accommodate non-pork eaters, pork is served only once a month. *Id.* ¶ 9. RAM only provides a halal chicken patty once per week and other alternative entrées are non-halal. *Id.* ¶¶ 10–11; Dkt. No. 81–35 (sample weekly menus). Halal proteins are served on Islamic holy days and DOCCS provides Muslims with halal meat approximately sixty-nine times a year. Culkin Aff. ¶¶ 12–13. Inmates can also receive halal proteins via care package or commissary. *Id.* ¶ 14. If the commissary does not carry halal proteins, an inmate can petition the Inmate Liaison Committee to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

have products obtained for sale. *Id.*

**\*6** The Cold Alternative Diet ("CAD") is DOCCS's kosher diet, which are more expensive single-serve packages. Culkin Aff. ¶ 16. Muslim inmates can consume CAD but Jewish inmates cannot eat RAM, and since CAD is expensive, participation in CAD is limited. *Id.* ¶ 17. Further, religious menus must be strictly followed and are not offered in combination with therapeutic diets. *Id.* ¶ 20; Dkt. No. 81–36 at 7; *see also* Dkt. No. 47–4 at 33 (CORC decision stating religious menus are strictly followed to maintain religious integrity).

Smith is on the "Controlled A" therapeutic menu. Culkin Aff. ¶ 21; Dkt. No. 81–37 (sample modified menus). Controlled A is high fiber and lower fat, cholesterol, and sodium. Culkin Aff. ¶ 22. Controlled A does not have the halal chicken patty because it is high in sodium, which would defeat the Controlled A's purpose. *Id.* ¶ 23. A non-halal chicken patty costs $0.43 versus $0.78 for a halal chicken patty and if the halal chicken patty is added to the Controlled A menu once per week, the estimated cost would be an additional $52,598 annually. *Id.* ¶ 24.

#### ii. Religious Services at Coxsackie

Defendant Martuscello, Coxsackie's superintendent, was responsible for facility supervision and management. Martuscello Aff. (Dkt. No. 81–28) ¶ 3. In August 2009, Martuscello delegated to defendant Shanley, Coxsackie's acting deputy superintendent of security, the duty of reviewing keeplock inmates' requests to attend religious services. *Id.* ¶ 5. Martuscello maintains there was no policy of denying all keeplocked inmates' requests to attend religious services. *Id.* ¶ 8.

Shanley attested that Smith was denied attendance at religious services because of his disciplinary history. Shanley Aff. (Dkt. No. 81–22) ¶ 6. Specifically, Smith received a misbehavior report on Sep-

tember 14, 2007 for creating a disturbance while being escorted to a religious Friday service. *Id.* ¶¶ 7–8; Dkt. Nos. 81–23, 81–24 at 2. Smith received another misbehavior report on August 1, 2009 for refusing direct orders and physical interference. Shanley Aff. ¶ 9; Dkt. No. 81–25. The next day, Smith received a misbehavior report for making threats of violence toward correction officers, urging inmates to participate in detrimental actions, and creating a disturbance. Shanley Aff. ¶ 10; Dkt. No. 81–26. Those misbehavior reports resulted in Smith's placement in keeplock from August 2, 2009 through September 1, 2009. Shanley Aff. ¶ 11; Dkt. No. 81–24 at 2.

While inmates in keeplock are generally not permitted to attend religious services outside of their cells, they are permitted to worship on their own and provided materials to observe their faith. Shanley Aff. ¶ 13. Shanley was tasked with deciding whether to grant requests for religious service attendance based on several considerations such as the reason for the inmate's keeplock confinement, severity or frequency of the conduct that resulted in keeplock, inmate's past violent or disruptive behavior while incarcerated, and security risk involved with requested activity. *Id.* ¶ 16. Shanley maintains that each request was handled on a case-by-case basis. *Id.* ¶ 17. Shanley attested he denied Smith's request in August 2009 due to Smith's disciplinary history and violent and disruptive behavior. *Id.* ¶¶ 18–20.

**\*7** Defendants Perlman and Leonard attested that the policy change for family guest events was implemented with respect to all recognized religions except for Native American inmates, based on fiscal constraints. Perlman Aff. (Dkt. No. 81–29) ¶¶ 5–6; Leonard Aff. (Dkt. No. 81–30) ¶¶ 5–7. DOCCS balanced the requests for religious family guest events with requests for non-religious events as well as the limited number of weekends available to hold the events. Perlman Aff. ¶ 7; Leonard Aff. ¶ 8. The policy change involved religious leaders and DOCCS employees; thus, neither Perlman nor Leonard made the

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

final decision for the policy change. Perlman Aff. ¶ 8; Leonard Aff. ¶¶ 6, 10. Furthermore, defendants explain that pursuant to a voluntary stipulation of dismissal, the policy change did not apply to Native American inmates. Dkt. No. 81–4.

### iii. Religious Services at Auburn

According to Robinson, Smith was keeplocked at Auburn in April 2010, October 2010, and May 2011 for prison infractions. Robinson Aff. (Dkt. No. 81–31) ¶ 6; Dkt. No. 81–32 at 1. Robinson denied Smith attendance at religious services in May 2011 because of Smith's history of disruptive and violent behavior. Robinson Aff. ¶ 7. Keeplock inmates are generally not permitted to attend religious services outside their cells and Directive # 4202 directs that the decision to permit such an attendance rests with Robinson, the Deputy Superintendent for Security. Robinson Aff. ¶¶ 1, 9, 11; Dkt. No. 81–33 at 4. Robinson employed the same factors as those Shanley employed in determining whether to grant Smith's request. Robinson Aff. ¶ 12. Robinson maintains that Auburn did not hold a policy of denying all keeplock inmates' requests to attend religious services. *Id.* ¶ 13.

### II. Discussion

Smith contends that: (1) defendants Perlman and Leonard violated his First Amendment, Fourteenth Amendment, and RLUIPA rights when DOCCS limited family guest events for Muslim inmates to one per year but did not similarly reduce Native American family guest events (Dkt. No. 47 at 17–20); (2) defendants Martuscello and Shanley violated his First Amendments and RLUIPA rights when they denied him permission to attend religious services on three occasions in August 2009 while he was keeplocked (*id.* at 20–22); (3) defendants Perlman, Leonard, Hale, and Graham violated his First Amendment and RLUIPA rights when they failed to provide him with meals that combine therapeutic diet and halal restrictions (Suppl. Compl. at 9); (4) defendants Robinson and Graham violated his First Amendments and RLUIPA rights when they denied him permission to

attend religious services on two occasions while in keeplock (*id.* at 11); and (5) defendants violated his Fourteenth Amendment equal protection rights when they failed to accommodate his religious and dietary needs while fulfilling the same needs of Jewish inmates (*id.* 47–4 at 10).

Defendants argue that Smith's motion should be denied because Smith failed to include a Statement of Material Facts as required by N.D.N.Y.L.R. § 7.1(a)(3). Defs.' Cross Mot. (Dkt. No. 81–6) at 3. Defendants next argue that Smith's motion seeking injunctive relief, which has already been denied (Dkt. No. 32), fails to establish any irreparable harm. *Id.* Furthermore, defendants argue they are entitled to the personal involvement defense. *Id.* at 24. Defendants assert that summary judgment should be granted in their favor because Smith's claims under the First Amendment, RLUIPA, and the Fourteenth Amendment are without merit. *Id.*

### A. Legal Standard

**\*8** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,".... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

**B. Statement of Material Fact**

**\*9** Local Rule 7.1(a)(3) requires that "[a]ny motion for summary judgment shall contain a Statement of Material Facts.... *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."* N.D.N.Y.L.R. § 7.1(a)(3) (emphasis in original). "Our District's requirements are not empty formalities. Rules such as L.R. 7.1(a) [ (3) ] 'serve to notify the parties of the factual support for their opponent's arguments, but more importantly inform the court of the evidence and arguments in an organized way—thus facilitating its judgment of the necessity for trial.' " *Jackson v. Broome Cnty. Corr. Facility,* 194 F.R.D. 436, 437 (N.D.N.Y.2000) (citation omitted).

Defendants argue that this District has previously dismissed a pro se plaintiff's summary judgment motion based, in part, that the plaintiff has failed to file a proper Rule 7.1 Statement of Material Facts. *Rivera v. Lawrence,* No. 05–CV–0967 (TJM/GHL), 2009 WL 1734735, at *7–8 (N.D.N.Y. June 18, 2009) (Dkt. No. 81–14) (adopting report-recommendation where plaintiff's motion for summary judgment was denied based on several filing defects). [FN5] However, this District has also, in the interest of judicial efficiency, proceeded to perform an independent review of the record and address the summary judgment motion despite the absence of a Statement of Material Facts. *Urena v. Fischer,* No. 08–CV–1309 (NAM/GHL), 2010 WL 2134564, at *5 (N.D.N.Y. Apr.16, 2010). Finding Smith has substantially complied with the local rules by filing a supporting memorandum of law and exhibits, a declaration, and an affidavit of service, as well as defendants' pending cross motion before the Court addressing the same claims, in the interest of judicial efficiency, the Court proceeds to address both Smith's motion and defendants' cross motion.

FN5. All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

Recommendation.

Accordingly, defendants' cross motion on this ground is denied.

### C. Personal Involvement

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*10** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN6]

[FN6]. Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal's* impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

### i. DOCCS Policies

Defendants Perlman, Leonard, Graham, and Hale argue that Smith failed to establish their personal involvement in the reduction of the number of Islamic religious family events per year as well as the prohibition against combining religious and therapeutic diets because those are DOCCS policies that they merely followed. Defs.' Cross Mot. at 24–25.

In this case, Perlman responded to Smith's complaints indicating that there were no plans to reinstate an additional family guest event as well as authored and distributed a memoranda that outlined the religious calendar with the number of family guest events. Dkt. Nos. 47–2 at 20–23, 47–3 at 1. Ministerial Services, of which Leonard is the director, provided guidance to CORC when asked to issue a decision for Smith's grievance on the family guest event policy. Dkt. No. 47–2 at 12. Graham denied Smith's grievance on dietary accommodations, stating Smith was required to choose either a therapeutic or religious diet, as well as the grievance on attending Friday services because of Smith's disciplinary history. Hale had signed two CORC decisions denying Smith dietary

accommodations and attendance of Friday services. Viewing the facts in the light most favorable to the *pro se* litigant, given the above evidence, Smith has alleged that these defendants were involved in the continuation of the allegedly unconstitutional policies. *Colon,* 58 F.3d at 873; *see also McClary v. Coughlin,* 87 F.Supp.2d 205, 215 (W.D.N.Y.2000) ("Personal involvement does not hinge on who has the ultimate authority for constitutionally offensive decisions. Rather, the proper focus is the defendant's direct participation in, and connection to, the constitutional deprivation.").

Accordingly, defendants' motion on this ground should be denied.

### ii. Hale

A material factual issue exists with respect to Hale's personal involvement in the alleged constitutional violations. Smith contends that Hale was personally involved in the alleged constitutional violations by signing the CORC denials of his grievances. "[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement." *Perilla v. Fischer,* No. 13–CV–398M, 2013 WL 5798557, at *7 (W.D.N.Y. Oct.28, 2013) (Dkt. No. 81–13) (citing inter alia *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation omitted)). However, "while personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." *Molano v. Bezio,* No. 10–CV–6481 L, 2012 WL 1252630, at *5 (W.D.N.Y. Apr.13, 2012) (citing *Collins v. Ferguson,* 804 F.Supp.2d 134, 140 (W.D.N.Y.2011), *Black v. Coughlin,* 76 F.3d 72, 74–75 (2d. Cir.1996)). Here, a factual dispute exists as to whether Hale had proactively participated in CORC's decision-making process. In his CORC appeals, Smith stated that his religious and other constitutional rights were violated. Dkt. No. 47–4 at 21, 32. Yet, defendants do not provide any supporting affidavit or documents to argue that Hale did not proactively review the appeals. As such, this is sufficient to create an issue of fact with respect to Hale's personal involvement in the alleged constitutional violations. *Celotex Corp.,* 477 U.S. at 323

**\*11** Accordingly, defendants' motion on this ground should be denied.

### iii. Martuscello

Smith has failed to show that Martuscello was personally involved in the alleged constitutional violations. The Court found that in his amended complaint, Smith had "alleged that Martuscello created an unconstitutional policy, or at least allowed such a policy to continue" with respect to denying keeplocked inmates from attending religious services. Dkt. No. 38 at 13. However, Martuscello attested that no such blanket policy existed. Rather, Martuscello and Shanley both attested that Shanley was tasked with reviewing keeplock inmates' requests, including Smith's, on a case-by-case basis in accordance with DOCCS Directive. Martuscello Aff. ¶ 8; Shanley Aff. ¶¶ 17–18, 20; Dkt. No. 81–27 (Directive # 4202). Further, defendants submitted DOCCs documents showing that Smith was denied participation due to his past disciplinary history. Morever, Smith does not proffer any factual allegations or support to show the contrary. As such, Smith's conclusory allegations are insufficient to create a material issue of fact. *Celotex Corp.,* 477 U.S. at 323.

Accordingly, defendants' motion on this ground should be granted.

### D. First Amendment

The First Amendment protects the right to free exercise of religion. U.S. CONST. amend. I; *see generally Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citations omitted); *see also Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation ... is reasonably related to legitimate penological interests.") (citations omitted).

To make a claim under the First Amendment, the inmate must establish at the threshold that his sincerely held religious beliefs were substantially burdened [FN7] by the challenged conduct. *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006) (citing *Ford,* 352 F.3d at 591). "A substantial burden is more than a mere inconvenience" but "involves, for example, a situation where an adherent is forced to modify his behavior and violate his beliefs." *Gill v. Defrank,* No. 98–CV–7851(NRB), 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000), *aff'd,* 8 F. App'x 35 (2d Cir.2001) (citing *inter alia Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)). The defendants must then identify the legitimate penological interests justifying the challenged conduct. *Salahuddin,* 467 F.3d at 274–75. The burden shifts back to the inmate to show that such interests are irrational. *Id.* In making a reasonable determination,

FN7. In the Second Circuit, it is uncertain whether the "substantial burden" test, or a lesser "burdened" test is employed in carrying out a free exercise claim analysis. *Scott v. Shansiddeen,* No. 12–CV–84, 2013 WL 3187071, at *4 n. 7 (N.D.N.Y. June 20, 2013) (explaining that while the Second Circuit has applied the "substantial burden" test under free exercise claims in § 1983 cases, the

Circuit has also explicitly refused to adopt the test). In this case, because the Court finds that legitimate and reasonable penological interests justified defendants' actions, we need not decide which standard is appropriate. *Majid v. Fischer,* No. 07–CV–4585(NRB), 2009 U.S. Dist. LEXIS 71616, at *14 n. 7 (S.D.N.Y. July 31, 2009) (Dkt. No. 81–11).

**\*12** The *Turner* Court determined that the factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Benjamin,* 905 F.2d at 574 (citing *Turner v. Safley,* 483 U.S. 78, 89–91 (1987)); *see also Salahuddin,* 467 F.3d at 274 (citing the same). Defendants do not dispute that Smith's religious beliefs are sincerely held.

### 1. Family Guest Events

"[A] generally applicable policy will not be held to violate a [prisoner's] right to free exercise of religion if that policy 'is reasonably related to legitimate penological interests.' " *Hall v. Ekpe,* 408 F. App'x 385, 387–88 (2d Cir.2010) (citing *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010)).

Here, defendants argue that the reduction on the number of religious family events was due to legitimate penological interests consisting of fiscal and staffing concerns in light of the growing demand for limited weekend events. *Salahuddin,* 467 F.3d at 274–75. Such interests are rationally related to the policy changes. *Turner,* 483 U.S. at 89–91. This rational relationship is bolstered by the policy change being applied to all recognized religions except for Native Americans and as a decision collectively made

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

by religious leaders and prison officials. *See, e.g.,* Dkt. Nos. 47–1 at 12–16 (religious calendar for 2008), 17–20 (religious calendar for 2007), 47–2 at 2–4 (religious calendar for 2011), 47–3 (religious calendar for 2010). Further, Smith was able to practice his religion through access to a special religious menu, prayer, and a day off from work. Perlman Aff. ¶ 9; Dkt. No. 47–1 at 15. Moreover, reverting the policy back to two family religious events per year for all religious groups affected would be counterproductive to the objective in reducing financial and administrative burden. Lastly, no viable and ready alternatives were proffered which accommodate the right and satisfy the governmental interest. *Cf.* Dkt. No. 47–4 at 19 (grievance enumerating demands but are not alternatives). Given the above, defendants have proffered legitimate penological interests that reasonably burden Smith's religious beliefs. *Salahuddin,* 467 F.3d at 274–75.

Accordingly, defendants' motion on this ground should be granted.

### 2. Attendance at the Friday Services

"[P]risoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (citations omitted). "Confinement in keeplock does not deprive prisoners of this right." *Id.* (citations omitted). While the Second Circuit has accorded prison officials great deference in the administration and "responsibility of maintaining order in prisons, ... prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible." *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989) (citations omitted). "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (citations omitted). The same analysis is undertaken when there is an allegation that "an individual dec[ided] to deny a prisoner the ability

to engage in some requested religious practice." *Ford,* 352 F.3d at 595 n. 15 (citations omitted).

**\*13** The Supreme Court has previously recognized the importance of these Friday services, explaining that they are "commanded by the Koran and must be held ... after the sun reaches its zenith and before the ... afternoon prayer." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 345, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *see also Salahuddin,* 993 F.2d at 307 ("Participation in Jumu'ah [the Muslim Friday prayer service,] is the central observance of Islam."). Accordingly, significant importance attaches to the prayer services.

However, some courts have determined that individual prayer is adequate to fulfill a Muslim's prayer obligations and that legitimate excusals from prayer services do not substantially burden religious beliefs. *See Abdur–Rahman v. Michigan Dep't of Corr.,* 65 F.3d 489, 492 (6th Cir.1995) (concluding that because "the Islamic religion expressly excuses individuals who are in prison for good cause [and that] ... Friday services are not fundamental to [the Islamic] religion ..." no substantial burden had occurred); *Boomer v. Irving,* 963 F.Supp. 227, 230–31 (W.D.N.Y.1997) (explaining that "two Muslim Imams [testified] ... that an inmate's failure or inability to attend one [prayer] service does not substantially interfere with the inmate's obligations as a practicing Muslim because those obligations may be fulfilled by individual prayer offerings with no adverse consequences.").

Here, a logical connection exists between the regulation and the legitimate government interests asserted. *Turner,* 483 U.S. at 89–91. Shanley and Robinson attested that inmates in keeplock are generally not permitted to attend religious services outside their cells. However, under Directive # 4202 inmates may make a written request for such a attendance and Shanley and Robinson were tasked with granting or denying these requests upon a review of several factors. Both Shanley and Robinson attested, along with

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

submission of misbehavior reports and disciplinary records, that they denied Smith's requests, at Coxsackie and Auburn respectively, due to Smith's disciplinary history of violence and Smith was determined to be a security risk. Smith was denied permission to attend the services for the same reasons which led to his keeplock confinement, that he had threatened a corrections officer and received a disciplinary confinement for such actions. It is well-established that institutional security is a valid penological objective. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citations omitted). Furthermore, the Muslim faith allows "excuse[s] from Friday services for [legitimate] reasons ...." which would include releases precluded because of security risks. *Abdur–Rahman,* 65 F.3d at 491–92 (dismissing inmate's First Amendment claims when his requests to leave his work assignment to attend religious services was denied due to the resulting security threat); *Boomer,* 963 F.Supp. at 230–31. Accordingly, Shanley and Robinson acted pursuant to legitimate penological concerns.

**\*14** Further, Smith and other Islamic inmates in keeplock had the alternative means to exercise their religion by being able to practice and pray in their own cells. Smith does not allege, nor does the record reflect the contrary, that he was prevented from practicing in his cell while keeplocked. Furthermore, permitting inmates with histories of violent behavior to attend out-of-cell religious activities could jeopardize the safety and security for the prison's facility and staff. Moreover, Smith does not proffer other ready alternatives that accommodate his free exercise right while satisfying the asserted penological interests. Additionally, courts have held that denial of two religious services to be a *de minimis* burden on an inmate's ability to freely exercise his religion. *Smith v. Graziano,* No. 08–CV–469 (GLS/RFT), 2010 WL 1330019, at \*9 (N.D.N.Y. Mar.16, 2010) (Dkt. No. 81–18) (citations omitted). It follows that Smith's denial of access to Friday services, three at Coxsackie and two at Auburn, did not substantially burden Smith's right

to exercise his religion.

Accordingly, defendants' motion on this ground should be granted.

### 3. Dietary Restrictions

The Free Exercise Clause extends to an inmate's diet and participation in religious meals. *See McEachin v. McGuinnis,* 357 F.3d 197, 204–05 (2d Cir.2004); *Ford,* 352 F.3d at 597. The Constitution requires that an inmate, at a minimum, "be provided with nutritionally adequate meals ...." *Walker v. Fischer,* No. 10–CV–01431 (MAD/DEP), 2012 WL 1029614, at \*6 (N.D.N.Y. Mar.26, 2012) (citing *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001)). In addition, the Second Circuit directs "that prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975); *Ford,* 352 F.3d at 597. Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004). "Courts, however, are reluctant to grant dietary requests where the cost is prohibitive, or the accommodation is administratively unfeasible." *Benjamin,* 905 F.2d at 579.

In this case, Smith has failed to establish a factual issue with regard to his claim based on dietary needs. DOCCS's dietary policy against combining RAM and therapeutic diets is reasonably related to a legitimate penological interest. First, there is a rational relationship between the regulation and the legitimate government interests asserted because including halal proteins, which has high sodium content, in a therapeutic diet, would vitiate the therapeutic diet's purpose. "Courts have consistently held that DOCCS'[s] [RAM] is sufficient to sustain Muslim prisoners' good health without violating dietary laws and that a strictly Halal diet is not required." *Walker,* 2012 WL 1029614, at \*7 (citation omitted). Furthermore, adding halal proteins to the therapeutic diet, even once per

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

week, would increase costs for DOCCS. *See Majid v. Fischer,* No. 07–CV–4585(NRB), 2009 U.S. Dist. LEXIS 71616, at *18–19 (S.D.N.Y. July 31, 2009) (Dkt. No. 81–11) ("[It] is well established that DOCS has a legitimate interest in cost-effectively meeting the religious dietary needs of multiple inmate groups, and that the RAM program, which was 'designed to accommodate the needs of inmates who may have different dietary requirements due to their religious beliefs or personal dietary beliefs ... in an economically viable way' is rationally related to that interest." (citations omitted)); *see also Williams v. Senkowski,* 00–CV–1580, at *33 (N.D.N.Y. Aug. 20, 2003) (Dkt. No. 81–21) (finding a logical connection between the denial of vegetarian meals and the legitimate government interest to support it, that it would be financially and administratively unfeasible).

**\*15** Second, it is undisputed that Muslim inmates have alternative means of obtaining halal proteins. Smith can supplement his diet with halal proteins by receiving them through care packages or purchasing them through the facility's commissary. *See Majid,* 2009 U.S. Dist. LEXIS 71616, at *19 (finding plaintiffs admitted they had could access halal items through the prison facility's commissary or care packages). Furthermore, if the commissary does not carry halal proteins, Smith can petition the Inmate Liaison Committee to have halal products obtained for sale.

Third, providing a separate halal meal program for Smith would significantly burden prison resources and staff. *Majid,* 2009 U.S. Dist. LEXIS 71616, at *19 (noting the RAM program was created to accommodate as many inmate groups as possible). DOCCS provides meals for 54,700 inmates while considering several factors in creating a standardized state-wide menu. Creating a separate program from RAM would impose economic burdens on DOCCS. For example, Jewish inmates consume CAD, which are single-serve packages that are more expensive than other meal options. Further, as discussed, including and increas-

ing a halal option to the therapeutic diet even, once per week, would cause cost increases for DOCCS.

And lastly, while Smith proffers alternatives to accommodate the right, such alternatives are not viable. By reference in his supplemental complaint to a grievance filed, Smith proposed that DOCCS replace all non-halal proteins with halal proteins. Dkt. No. 47–4 at 27–30. Thus, rather than serving halal proteins exclusively to Muslim inmates, all inmates would consume halal proteins. *Id.* For the reasons discussed above, this alternative implicates DOCCS's legitimate penological interests. According to Culkin, halal proteins are more expensive than non-halal proteins. It follows that replacing all non-halal items with halal items would be counterproductive to DOCCS's asserted penological interests. Given the above reasons, Smith has failed to establish a material factual dispute with regard to his claim based on dietary accommodations. *Celotex Corp.,* 477 U.S. at 323.

Accordingly, defendants' motion on this issue should be granted.

### E. RLUIPA

The RLUIPA provides that

[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1. In a RLUIPA claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs. The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct."

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

*Salahuddin,* 467 F.3d at 274–75.

**\*16** Congress, in enacting the RLUIPA, anticipated that Courts would give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources. Nevertheless, prison officials cannot simply use the words "security" and "safety," and expect that their conduct will be permissible.

*Singh v. Goord,* 520 F.Supp.2d 487, 499 (S.D.N.Y.2007) (internal citations omitted).

As an initial matter, Smith cannot obtain certain relief from defendants pursuant to the RLUIPA claim. Defendants are correct to argue that Smith is barred from obtaining monetary damages from them in their individual or official capacities under the RLUIPA claim. *Pugh v. Goord,* 571 F.Supp.2d 477, 506–09 (S.D.N.Y.2008). Thus, Smith cannot recover monetary damages under this claim.

As discussed above, Smith has failed to establish that defendants' conduct infringed his religious beliefs and practices. Moreover, because "when reviewing a claim under RLUIPA, a court must afford due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources," Smith's claims should be denied for the alternative reasons also discussed above. *Hamilton v. Smith,* No. 06–CV–805, 2009 WL 3199520, at *7 (N.D.N.Y. Sept. 30, 2009) (internal quotation marks and citations omitted).

Accordingly, defendants' motion on this ground should be granted.

**F. Fourteenth Amendment**

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons are treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) ("To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

[T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Vegas,* 610 F.Supp.2d at 209 (internal quotation marks and citations omitted). However, "[t]he Supreme Court has specifically held that in the prison context, the Equal Protection clause does not require that every religious sect or group within a prison ... have identical facilities or personnel." *Pugh,* 571 F.Supp.2d. at 502 (internal quotation marks and citations omitted). Thus, even if Smith alleges that two groups were similarly situated, disparate treatment may still have been permissible if the distinctions were reasonably related to legitimate penological interests. *Id.*

**1. Family Guest Events**

**\*17** In this case, Smith claims that his equal protection rights were violated when he was only permitted one family participation event per year as opposed to two. Smith argues that as a Muslim inmate, he was treated differently from Native Americans, who have nine family participation events per year. Smith's equal protection claim here fails as he does not show that the removal of one family participation

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

event was a result of intentional or discriminatory conduct. The record is devoid of any such evidence showing that the removal had stemmed from animus towards him or Islamic inmates. In fact, defendants attested, which is supported by record evidence, that the same reduction was imposed on inmates of other religious affiliations. Moreover, defendants explain that the Native American family guest events are designated by a stipulation. This strengthens the defendants' position that the disparity was not a result of purposeful discrimination. *Phillips,* 408 F.3d at 129. Thus, Smith has failed to demonstrate an issue of material fact with respect to his equal protection based on the policy change.

Accordingly, defendants' motion on this ground should be granted.

### 2. Religious Friday Services

Smith contends that Robinson violated his equal protection rights when he was denied access to religious Friday services while keeplocked. Such a claim must fail as a matter of law. As previously discussed by Memorandum–Decision and Order, Smith was not similarly situated to inmates in the general population because he was adjudged guilty of a disciplinary charge that resulted in keeplock confinement. Dkt. No. 38 at 19–20; Dkt. No. 33 at 21–22. Second, Robinson did not intentionally discriminate against Smith. *Phillips,* 408 F.3d at 129. Smith was precluded from attending services for legitimate penological reasons which are unrelated to Smith's religious affiliation. There is no record evidence showing the contrary. Third, Smith's claim that all keeplocked inmates were prevented from attending any religious services are conclusory and unsupported. Smith does not identify other inmates who were also denied attendance to religious services due to their religious affiliations. Thus, Smith has failed to establish an issue of fact with respect to the equal protection claim against Robinson. *Celotex Corp.,* 477 U.S. at 323.

Accordingly, defendants' motion on this ground

should be granted.

### 3. Dietary Restrictions

Lastly, Smith has failed to show a genuine issue of fact with respect to the claim that he was treated differently than others similarly situated. First, Smith does not proffer any factual allegations that he was treated differently from Jewish inmates as a result of intentional or purposeful discrimination. *Phillips,* 408 F.3d at 129. The record is devoid of any evidence showing the alleged disparity in treatment between Muslim and Jewish inmates was a result of intentional or purposeful discrimination. *Simmons v. Robinson,* No. 07–CV–7383, 2010 WL 5538412, at *17–18 (S.D.N.Y. Jan.4, 2011) (Dkt. No. 81–17). Rather, as previously discussed, DOCCS has a legitimate interest in meeting the dietary needs of multiple inmate groups in a cost-effective manner. Creating a separate Halal meal for Muslims would impose unduly costs on the prison system. Second, there is no evidence showing that CAD can be combined with a therapeutic menu while RAM cannot be combined with a therapeutic menu. In fact, the record indicates that all religious diets are strictly followed and cannot be combined with therapeutic menus. As such, Smith cannot establish an equal protection claim based on denied dietary accommodations.

**\*18** Accordingly, defendants' motion on this ground should be granted.

### G. Qualified Immunity

Defendants claims that even if Smith's constitutional claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir.2003). However,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be addressed with respect to Smith's First and Fourteenth Amendment claims because, as discussed *supra,* it has not been shown that defendants violated Smith's First and Fourteenth Amendment rights.

Accordingly, defendants' motion on this ground should be granted.

### III. Motion for Temporary Restraining Order and Preliminary Injunction

Preliminary injunctive relief " 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consol. Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)). The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this Circuit. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35, 38 (2d Cir.2010). To prevail on a motion for preliminary injunctive relief, a plaintiff must demonstrate irreparable harm and either a sub-

stantial likelihood of success on the merits of the claim, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *Id.* at 35; *Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 405–06 (2d Cir.2011). However, when the moving party seeks "a mandatory preliminary injunction that alters the status quo by commanding some positive act," the burden is even higher. *Citigroup Global Mkts.,* 598 F.3d at 35 n. 4 (internal quotation marks, alterations, and citations omitted); *see also Jolly v.Coughlin,* 76 F.3d 468, 473 (2d Cir.1996). Thus, a mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Citigroup Global Mkts.,* 598 F.3d at 35 n. 4 (internal quotation marks omitted). The same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order. *Local 1814, Int'l Longshoremen's Ass'n, AFL–CIO v. New York Shipping Ass'n, Inc.,* 965 F.2d 1224, 1228 (2d Cir.1992); *Perri v. Bloomberg,* No. 06–CV–403 (CBA)(LB), 2008 WL 2944642, at * 2 (E.D.N.Y. July 31, 2008). The district court has wide discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

**\*19** Smith seeks a temporary restraining order and a preliminary injunction requiring defendants to accommodate his religious dietary needs and his medical dietary needs by substituting halal meat for haram meat in his therapeutic diet. Dkt. No. 79. Here, however, the Court has already recommended that defendants' motion for summary judgment be granted and that Smith's second amended complaint be dismissed with prejudice. Accordingly, the Court recommends that Smith's motion for a temporary restraining order and preliminary injunction (Dkt. No. 79) be denied.

### IV. Conclusion

For the reasons stated above, it is hereby

Slip Copy, 2014 WL 991854 (N.D.N.Y.)
**(Cite as: 2014 WL 991854 (N.D.N.Y.))**

**RECOMMENDED** that defendants' cross motion for summary judgment (Dkt. No. 81) be **GRANTED,** Smith's motion for partial summary judgment (Dkt. No. 73) be **DENIED,** and Smith's motion for a temporary restraining order and preliminary injunction (Dkt. No. 79) be **DENIED.** It is further **RECOMMENDED** that Smith's second amended complaint (Dkt. No. 47) be dismissed with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Dated: Feb. 18, 2014.

N.D.N.Y.,2014.
Smith v. Perlman
Slip Copy, 2014 WL 991854 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.