UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SHABAKA SHAKUR,

                                    Plaintiff,
                                                        9:14-CV-00427
v.                                                       (MAD/TWD)

JUSTIN THOMAS, et al.,

                                    Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

SHABAKA SHAKUR
*Plaintiff pro se*
145-38 106 Avenue
Queens, NY 11435

HON. ERIC T. SCHNEIDERMAN                        NICOLE E. HAIMSON, ESQ.
Attorney General for the State of New York
*Counsel for Defendants*
The Capitol
Albany, NY 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## <u>ORDER AND REPORT- RECOMMENDATION</u>

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Mae A. D'Agostino,

United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Currently

before the Court for report and recommendation is Defendants' motion to dismiss Plaintiff's

Amended Complaint (Dkt. No. 39) for failure to state a claim upon which relief may be granted,

pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkt. No. 41.)  For the reasons that follow,

the Court recommends that Defendants' motion to dismiss be granted in part and denied in part.

## I. PROCEDURAL HISTORY

On April 16, 2014, Plaintiff Shabaka Shakur commenced this civil rights action asserting claims for the violation of his rights protected under the First, Eighth, and Fourteenth Amendments to the United States Constitution and the Religious Land Use and Institutionalized Person Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq*., arising out of his confinement at Auburn Correctional Facility ("Auburn") from September 2012 through September 2013.[1]  (Dkt. No. 1.) Plaintiff originally named eleven Department of Corrections and Community Supervision ("DOCCS") employees working at Auburn as Defendants.  (Dkt. No. 1.)

### A. Initial Review

By Decision and Order dated May 1, 2015, the Court dismissed all but three of Plaintiff's causes of action on initial review pursuant to 28 U.S.C. §§ 1915(e) and 1915A.  (Dkt. No. 12.) The following causes of action survived initial review: (1) First Amendment Free Exercise Clause claim against Defendants Corrections Officer Pelc ("Pelc"), food service administrator Martin ("Martin"), Deputy Superintendent Thomas ("Thomas"), Corrections Officer Hewite ("Hewite"), and G. Steinberg ("Steinberg"); (2) First Amendment retaliation claims against Defendant Security Captain Chutty ("Chutty"), Corrections Officer Gifford ("Gifford"), Corrections Captain Fagan ("Fagan"), and Steinberg; and (3) Plaintiff's Fourteenth Amendment Equal Protection claim against Defendants Chutty and Gifford.  *Id.*  A number of Plaintiff's claims were dismissed without prejudice and with leave to amend.  (*See* Dkt. Nos. 6 and 12.)

---

[1] Plaintiff was released from Department of Corrections and Community Supervision custody in June 2015.  (Dkt. No. 27.)

**B.      Motion to File an Amended Complaint**

On September 16, 2015, Plaintiff moved for leave to file an amended complaint.  (Dkt.

No. 34.)  Defendants did not oppose the Plaintiff's motion, subject to the Court's review and

Defendants' ability to fully respond.  (Dkt. No. 35.)  By Decision and Order dated September 28,

2015, the Court granted in part and denied in part Plaintiff's motion.  (Dkt. No. 38.)[2]

The Court granted the motion to amend as to the following claims: (1) violation of

Plaintiff's rights under the First Amendment Free Exercise Clause by Defendants Pelc, Martin,

and Thomas in denying Plaintiff an Eid ul-Adha ("Eid") religious meal on October 27, 2012,

(Dkt. No. 39 at ¶¶ 108-110); (2)  violation of Plaintiff's rights under the First Amendment Free

Exercise Clause by Defendant Thomas in refusing to provide Plaintiff with halal meals and sahur

bags from July 29, 2013, through August 3, 2013, thereby preventing him from participating in

the mandatory religious fasting during Ramadan, *id*. at ¶¶ 111-12; (3) violation of Plaintiff's

rights under the First Amendment Free Exercise Clause by Defendants Hewite and Steinberg in

preventing Plaintiff from participating in the religious congregational prayer during Shawwal

and denying him a halal meal on August 12, 2013, *id*. at ¶¶ 113-15; (4) retaliation in violation of

Plaintiff's First Amendment rights and violation of his rights under the Fourteenth Amendment

Equal Protection Clause by Defendants Chutty and Gifford with regard to the September 17,

2012, urine test, cell search, planting a weapon in Plaintiff's cell, and filing a false misbehavior

report against Plaintiff, resulting in his placement in the Special Housing Unit ("SHU"), *id*. at ¶¶

118-19; (5) First Amendment retaliation claim against Defendant Steinberg with regard to the

---

[2] The Amended Complaint (Dkt. No. 39) as accepted by the Court (Dkt. No. 38) became
the operative pleading in this case.

August 12, 2013, urine test and retaliatory false misbehavior report, *id*. at ¶ 120; and (6) First Amendment retaliation claim against Defendant Fagan for placing Plaintiff in administrative segregation in retaliation for filing grievances to redress violations of his rights under the First Amendment Free Exercise Clause. *Id*. at ¶ 121.

## II.     BACKGROUND

### A.     September 12, 2012

In September of 2012, while confined at Auburn, Plaintiff was the inmate facilitator for the Muslim Shia community at Auburn, and Rashad Ruhani ("Ruhani") was the inmate facilitator for the Muslim Sunni community. (Dkt. No. 39 at ¶ 21.) On September 12, 2012, Plaintiff learned from Ruhani that they were the subject of an investigation by Corrections Sergeant Hai because they were allegedly planning a work stoppage/protest for September 13, 2012, in commemoration of the Attica riot in 1971. *Id*. at ¶¶ 20, 22. The investigation had been ordered by Defendant Chutty. *Id*. at ¶ 23.

There was no protest on September 13, 2012. *Id*. at ¶ 24. On September 17, 2012, Defendant Chutty ordered Plaintiff to undergo a urine test, which was negative for drugs. *Id*. at ¶¶ 25-26. Upon Defendant Chutty's orders, Plaintiff's cell was then searched by Defendant Gifford. (Dkt. No. 39 at ¶ 27.) According to Plaintiff, Defendant Gifford planted a weapon in his cell, and Plaintiff was immediately escorted to Special Housing Unit ("SHU") and served with a false misbehavior report because of the weapon. *Id*. at ¶¶ 28-30. On September 19, 2012, Plaintiff was told by Auburn Muslim Chaplain, Ali Muhsin, that Ruhani had also been brought to SHU for a weapon allegedly found in his cell by Defendant Gifford on September 17, 2012. *Id*. at ¶ 32. The Chaplain told Plaintiff that he believed Plaintiff was being targeted because of his

position as Muslim Shia inmate facilitator. *Id*. at ¶ 31. Plaintiff was found guilty of weapon possession at the hearing on the misbehavior report and given ninety days in SHU, including ninety days loss of phone, packages, and commissary. *Id*. at ¶ 33. Plaintiff's appeal was denied by the DOCCS central office. *Id*. at ¶ 55. However, on or about April 29, 2013, the misbehavior report of September 17, 2012, was expunged after review by Superintendent Graham. *Id*. at ¶ 62. Plaintiff's request to be reinstated to honor block status in light of the expungement was denied per Defendant Chutty. *Id.* at ¶ 63.

**B.      Eid ul-Adha Religious Feast**

Plaintiff, registered as a member of the Islamic faith while at Auburn, was in SHU at the time of the Eid feast in October of 2012. (*Id.* at ¶ 38.) The policy in place at Auburn allowed prisoners confined to SHU to observe the Eid by making the Eid prayer in their cells, and they were provided a halal meal. *Id*. at ¶ 39. Although Plaintiff placed Defendant Pelc on notice that he was a practicing Muslim and would be observing the Eid feast in his cell, on the morning of October 27, 2012, when Plaintiff inquired about his halal meal at lunch time, he was told by Pelc that the mess hall had not sent any halal meals to SHU. *Id*. at ¶¶ 40-41. Plaintiff did not receive his halal meal and since he was in SHU had no alternative halal food supply of his own. (Dkt. No. 39 at ¶ 44.)

Plaintiff wrote to Defendant Martin to find out why he had not been given his halal meal, and she responded that the halal meals had been prepared and delivered to SHU. *Id*. at ¶ 48. An investigation revealed that none of the Muslim inmates in SHU had received a halal meal on October 27, 2012. *Id*. at ¶ 53. Plaintiff filed a grievance regarding the denial of the halal meal and requesting that a procedure be implemented to ensure that inmates in SHU receive their

religious meals.  *Id*. at ¶ 51.  The grievance response from Defendant Thomas stated that the food

service had been reminded to closely monitor special diet delivery locations but did not address

Plaintiff's suggestion for implementation of a special procedure.  *Id*. at ¶ 56.

### C.     Prison Shutdown During Ramadan in 2013

On July 8, 2013, Plaintiff began his thirty-day fast of Ramadan.  (Dkt. No. 39 at ¶ 66.)

Auburn was shut down for a routine facility search from July 29, 2013, to August 3, 2013, and

during that time no halal meals or sahur bags were distributed.[3]  *Id*. at ¶ 67, second ¶ 70.  The

Auburn Muslim Chaplain made an announcement to the Muslim community that he had asked

Defendant Thomas to provide Muslim inmates with halal meals, and Thomas had refused.  *Id*. at

¶ 71.

Plaintiff filed a grievance regarding the halal meals and sahur bags on August 7, 2013,

and on August 8, 2013, was warned by an inmate who worked as a prison grievance clerk, that

Plaintiff's name had come up in a discussion among officers in the grievance office as a litigator

who would cause trouble over the prison shutdown.  (Dkt. No. 39 at ¶¶ 72-73.)  On August 11,

2013, Plaintiff was interviewed by a crisis intervention officer who indicated he had been

assigned by the security captain to investigate allegations that Plaintiff was "riling up" the

Muslim inmates to protest the shutdown of the prison during Ramadan.  *Id*. at ¶ 74.  Plaintiff

assured the officer that he was not instigating problems and had followed the facility sanctioned

process of filing a grievance.  *Id.* at ¶ 75.  On August 29, 2013, the Inmate Grievance Review

Committee ("IGRC") reached a deadlocked decision on Plaintiff's August 7, 2013, grievance

---

[3] Sahur is the light pre-dawn meal eaten by Muslims during Ramadan.  *See*
http://en.islamway.net/article/12571/suhur-pre-dawn-meal (last visited May 25, 2016).

with Defendant Martin stating that the facility did not have to provide the Muslim inmates with their halal meal. *Id*. at ¶ 97. Plaintiff passed the grievance on to Superintendent Graham. *Id*.

### D. Urine Test

On August 12, 2013, while Plaintiff was in the mosque during the six day fast of Shawwal, he was summoned for a urine test and was unable to make the Shawwal congregational prayer or have his halal meal. *Id*. at ¶ 76. Plaintiff was told by Defendant Hewite that the test had been authorized based on confidential information. *Id*. at ¶ 77. Plaintiff informed Defendant Hewite that he had been fasting for fifteen hours and was dehydrated. *Id*. at ¶ 78. Plaintiff requested water in accordance with a DOCCS directive governing urine testing and was told by Hewite that he would be given three cups of water, one each hour. *Id*. at ¶¶ 78-79. Plaintiff also requested that his halal meal be sent to the clinic where he had been taken for the urine test, or to his cell. *Id.* at ¶ 78. Hewite gave Plaintiff one cup of water at approximately 8:30pm and placed him in the waiting pens. *Id*. at ¶¶ 79-80. Plaintiff was not given the remaining cups of water. *Id.* at ¶ 82. At 11:25pm, Defendant Steinberg removed Plaintiff from the waiting area and ordered him to urinate. *Id*. at ¶ 81. When Plaintiff explained to Steinberg that he had not been given the three cups of water and could not urinate, Steinberg escorted Plaintiff to his cell and placed him in keeplock. (Dkt. No. 39 at ¶ 82.) Plaintiff was not given his halal meal or anything else to eat. *Id.* at ¶ 83.

On August 13, 2013, Plaintiff was served with what he claims to have been a fabricated misbehavior report in which Defendant Steinberg falsely implied that he had personally given Plaintiff three cups of water. *Id*. at ¶ 84. At the August 16, 2013, hearing on the urine test misbehavior report, Plaintiff argued that the misbehavior report was false and was written in

response to a grievance filed by Plaintiff. *Id*. at ¶ 90. Plaintiff was found not guilty and the charge was dismissed. *Id*. at ¶ 91.

On August 15, 2013, Plaintiff filed a grievance over not having been given his halal meal on August 12, 2013. *Id*. at ¶ 89. On September 5, 2013, the IGRC reached a deadlocked decision on Plaintiff's grievance. *Id*. at ¶ 98. The grievance was passed on to Superintendent Graham. *Id.* On September 16, 2013, Plaintiff received a decision on his grievance from Graham, who concluded that Plaintiff should have been given his halal meal for Shawwal on August 12, 2013. *Id*. at ¶ 104.

### E. Administrative Segregation

On August 13, 2013, Plaintiff was taken to SHU and placed in administrative segregation based upon confidential information. (Dkt. No. 39 at ¶ 85.) On August 15, 2013, Plaintiff was served with an administrative segregation recommendation authored by Defendant Fagan and alleging that Plaintiff was a "facilitator of information" and detrimental to the safety and security of the facility. *Id*. at ¶ 88. At Plaintiff's administrative segregation hearing, which commenced on August 23, 2013, there was testimony from two Muslim inmates that they had also had their cells searched, urine taken, and were placed in SHU on administrative segregation after filing complaints regarding the Ramadan shutdown. *Id*. at ¶¶ 93-943. On August 28, 2013, hearing officer Deputy Superintendent Robinson upheld the administrative segregation stating that while he did not believe Plaintiff was a threat, he could not risk placing him back in general population and risk having an incident occur. *Id*. at ¶ 96. Plaintiff was transferred to Wende Correctional Facility just over a week later on September 6, 2013. *Id*. at 99. Albert Prack, DOCCS Director of SHU, subsequently upheld the determination on the administrative segregation on appeal. *Id*.

at ¶ 107.

## III.  LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6).  The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y. 1972).  Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Iqbal,* 556 U.S. at 679 (internal citation and punctuation omitted).

A complaint may be dismissed, pursuant to Rule 12(b)(6), only where it appears that there are not "enough facts to state a claim that is plausible on its face."  *Twombly*. 550 U.S. at 570.  While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation."  *Iqbal,* 556 U.S. at 678 (citation and internal quotation marks omitted).  A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice.  *Id.*  (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the

material facts alleged in the complaint as true and construe all reasonable inferences in the

plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).

However, "the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written

documents attached to them, and any matter of which the court can take judicial notice for the

factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir.

2011) (citation and internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum

Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (A court may consider "any written instrument

attached [to the complaint] as an exhibit or documents incorporated in it by reference."). "The

mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a

plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the

allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent

with the allegations of the Plaintiff's complaint." *Robles v. Bleau*, No. 07-CV-0464, 2008 WL

4693153, at *6 and n.41 (N.D.N.Y. Oct. 22, 2008)[4] (collecting cases); *Donhauser v. Goord*, 314

F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (where a *pro se* is faced with a motion to dismiss, a court

may consider materials outside of the complaint "to the extent they are consistent with the

allegations in the complaint."), *vacated in part on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y.

2004); *see also Gil v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) (in reviewing district court's

---

[4] The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

dismissal of *pro se* plaintiff's claim, Second Circuit considered plaintiff's affidavit submitted in opposition to motion to dismiss). The Court has taken judicial notice of papers filed in other litigation involving Plaintiff and has considered documents in Plaintiff's submissions in opposition to the extent they are consistent with the allegations in Plaintiff's Amended Complaint.

Where a party is proceeding pro se, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (citations omitted); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe pro se complaints liberally even after *Twombly*).

Where a pro se complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.* (citation omitted).

## IV. ANALYSIS

### A. Denial of Plaintiff's Eid ul-Adha Meal (First Cause of Action)

Plaintiff claims that Defendants Pelc, Martin, and Thomas violated the First Amendment Free Exercise Clause by denying him a religious meal on the Eid festival on October 27, 2012. (Dkt. No. 39 at ¶¶ 108-110.) "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise

11

Clause." *Ford v. McGinnis*, 352 F. 3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  The reach of the free exercise clause extends to the "right to participate in congregate religious services," *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993), and to "an inmate's diet and participation in religious meals."  *Johnson v. Guiffere*, No. 9:04-CV-57 (DNH/DEP), 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) ("Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights.").

In *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014), the Second Circuit clarified that it had yet to decide "whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.'" (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006)).  Because Plaintiff argues in this case that his sincerely held religious beliefs were substantially burdened by denial of the Eid meal (Dkt. No. 43 at 4), the threshold requirement issue need not be resolved.  *See Williams v. Does*, No. 15-692, 2016 WL 2610028 (Mem), at *1 (2d Cir. May 6, 2016).  Assuming that the substantial burden requirement does apply, Second Circuit precedent leads to the conclusion that denial of Plaintiff's Eid religious meal did substantially burden what the Court accepts to be, for purposes of this motion, Plaintiff's sincerely held religious beliefs.

Defendants seek dismissal of Plaintiff's claim on the grounds that denial of one or two religious meals is *de minimis* and does not substantially burden an inmate's sincerely held

religious beliefs. (Dkt. No. 41-1 at 6.[5]) In *McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004), the Second Circuit recognized that "[t]here may be inconveniences [to one's religious practices] so trivial that they are most properly ignored." A number of district court decisions in the Circuit have subsequently concluded that the denial of a single or small number of religious meals represents a *de minimis*, or insubstantial burden on an inmate's ability to freely exercise his religion. *See, e.g.*, *Wilson v. Woodburne Correctional Facility,* No. 9:11-CV-1088 (DNH/ATB), 2012 WL 1377615, at *3 (N.D.N.Y. March 21, 2012) ("The withholding of a single meal . . . is at most, a *de minimis* burden on plaintiff's religious expression.") (collecting cases); *Thaxton v. Simmons*, No. 10-CV-1318, 2012 WL 360104, at *6 (N.D.N.Y. Jan. 5, 2012) ("[T]he minor disruption of two kosher meals during a four-month period can hardly be called a substantial burden. At best, these incidents present a *de minimis,* or insubstantial, burden on Plaintiff's ability to freely exercise his religion.)

In seeking dismissal of Plaintiff's claim, however, Defendants have completely ignored the Second Circuit decision in *Ford*, 352 F.3d at 595 n.12, in which the Court recognized that Eid religious meals are "sufficiently unique in [their] importance within Islam to distinguish the present case from those in which the mere inability to provide a small number of meals commensurate with a prisoner's religious dietary restrictions was found to be a *de minimis* burden." *See also Shakur v. Selsky*, 391 F.3d 106, 120 (2d Cir. 2004) (reversing the district court holding that "the missing of a single Eid ul Fitr feast simply does not amount to a 'substantial burden' on his religious exercise.").

---

[5] **Error! Main Document Only.**Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

In light of the Second Circuit decisions in *Ford* and *Selsky*, the Court finds that Plaintiff has stated a claim for violation of the First Amendment Free Exercise Clause against Defendants Pelc, Martin, and Thomas with regard to being deprived of his Eid religious meal, and recommends that their motion to dismiss Plaintiff's first cause of action for failure to state a claim be denied.

**B.      Denial of Halal Meals and Sahur Bags During Ramadan (Second Cause of Action)**

Plaintiff also claims that Defendant Thomas violated his First Amendment Free Exercise Clause rights by refusing to provide him with halal meals and sahur bags during the prison shutdown from July 29, 2013, through August 3, 2013, thereby preventing him from participating in the mandatory religious fasting during Ramadan.  (Dkt. No. 39 at ¶¶ 111-12.)

In *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987), the Supreme Court acknowledged that while prisoners do not abandon their constitutional rights when they become incarcerated, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations of our prison system." (citation and internal quotation marks omitted).  "Accordingly, the Court held that a challenged prison regulation [or conduct] is judged 'under a reasonableness test less restrictive than that ordinarily applied': a regulation [or conduct] that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.'"  *Salahuddin*, 467 F.3d at 274 (quoting *O'Lone*, 482 U.S. at 349) (some internal quotation marks omitted).  Once a plaintiff has established that a sincere religious belief has been substantially burdened, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated

14

concerns were irrational." *Id*. at 275 (quoting *Ford*, 352 F. 3d at 595).

When determining whether an action that impinges on an inmate's constitutional rights can be sustained as reasonably related to a valid legitimate penological interest, a court evaluates four factors: (1) whether there is a valid, rational connection between the action and the claimed legitimate penological interest; (2) whether there are alternative means of exercising the right that remain open to inmates; (3) the impact that accommodation of the asserted constitutional right will have on fellow inmates or prison staff; and (4) whether there is an alternative to the conduct that accommodates the asserted constitutional right at a *de minimis* cost to the legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89-91 (1987) (citations omitted).

Defendants have conceded solely for purposes of this motion that the denial of religious meals for six days of Ramadan burdened Plaintiff's sincerely held religious beliefs. (Dkt. No. 41-1 at 10.) They seek dismissal of the claim instead on the ground that there was a legitimate penological purpose for the denial of halal meals and sahur bags during the prison shutdown. (Dkt. No. 41-1 at 9-12.)

In support of their motion for dismissal of the claim, Defendants rely on Plaintiff's failure to contest that the shutdown was imposed for legitimate reasons, namely, a routine facility search.[6] *Id*. at 12. The question, however, is not whether there was a legitimate penological

---

[6] Despite acknowledging that the lockdown was for a routine facility search, Defendants rely on *McLeod v. Scully*, No. 81 Civ. 3139 (RLC),1984 WL 692, at *1 (S.D.N.Y. July 30, 1984) in support of their argument that "there are clearly legitimate penological purposes for any denial of Plaintiff's religious meals during the Auburn C.F. lockdown." (Dkt. No. 41-1 at 11.) The lockdown in *Scully*, however, was hardly for a routine facility search. In *Scully*, a lockdown was ordered when a corrections officer was reported missing on duty and there had been an unsuccessful initial search to locate her. The lockdown in *Scully* was continued after the body of the officer, who had been brutally murdered, was found the following day in a landfill twenty

interest for the shutdown, but rather whether there was a legitimate penological interest in withholding Ramadan meals from Muslim inmates during the shutdown.

"[The] Turner factors are highly fact-intensive and, therefore commonly cannot be adequately addressed until the summary judgment stage." *Colón v. Davis*, No. 11-cv-01169-WJM-KMT, 2012 WL 4120001, at *6 (D. Colo. Aug. 8, 2012); *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) ("*Turner* thus requires courts, on a case-by-case basis, to look closely at the facts of a particular case and the specific regulations and interests of the prison system in determining whether prisoner's constitutional rights may be curtailed."); *Ford v. Fischer*, No. 09-CV-723, 2011 WL 856416, at *12 (N.D.N.Y. Jan. 31, 2011) ("Because prison officials have some burden to demonstrate a penological justification for restricting an inmate's right to marry, and to satisfy elements of the *Turner* test, such claims are not conducive to resolution in the context of a Rule 12(b)(6) motion to dismiss."); *Al-Owhali v. Mukasey*, No. 07-cv-02214-LTB-BNB, 2012 WL 5651033, at *11 (D. Colo. June 17, 2010) ( "[The *Turner*] analysis requires facts that are not properly before the court on a motion to dismiss pursuant to Rule 12(b)(6).").

The *Turner* analysis required to determine whether Thomas had a legitimate penological interest in denying Plaintiff his halal meals and sahur bags during six days of Ramadan due to the facility shutdown will be fact intensive. Therefore, the Court therefore concludes that the issue of legitimate penological interest claim cannot be resolved in the context of a Rule 12(b)(6)

---

miles from the correctional facility. *Id.* Given the dramatic reason for the lockdown in *Scully*, Defendants' reliance on the court's description of a lockdown *Scully* as "undoubtedly one of the most extreme and disruptive measures a prison can impose . . . [where] '[g]enerally, dining room meals are suspended and in some cases, only two meals per day are served for a period of time," to establish legitimate penological interest is questionable. *Id.* at *1.

motion and recommends that Thomas's motion to dismiss the free exercise claim alleged in Plaintiff's second cause of action for failure to state a claim be denied.

### C. Denial of Participation in Congregational Prayer During Shawwal and Halal Meal (Third Cause of Action)

Plaintiff has alleged that Defendants Hewite and Steinberg violated his First Amendment Free Exercise Clause rights by preventing him from participating in the religious congregational prayer during Shawwal and denying him a halal meal without any legitimate penological interest on August 12, 2013. (Dkt. No. 39 at ¶¶ 113-15.) Defendants argue that while Plaintiff has alleged that Hewite and Steinberg denied him the right to congregational prayer during the Muslim holiday of Shawwal, missing one or two religious services is *de minimis*, and that Plaintiff has in any event failed to allege he was prevented from worshipping privately in his cell, or participating in other religious ceremonies, prayer, or discussion. *Id*. at 7. Defendants further assert that being denied one or two religious meals over the course of approximately 359 days was *de minimis*. *Id*. at 6.

In Plaintiff's opposing papers, which as noted above may properly be considered by the Court as effectively amending his Amended Complaint, *Robles*, 2008 WL 4693153, at *6, n.41, he has explained the religious significance of his removal from the Shawwal congregational prayer on August 12, 2013. (Dkt. No. 43 at 4-5.) According to Plaintiff, the significance of the Shawwal congregational prayer, which is followed by a supplication and halal meal, is that it allows for the proper breaking of the Shawwal fast. *Id*. at 5. In addition, Plaintiff points out that, contrary to Defendants' claim, he was not allowed to go to his cell to worship privately because he was taken from the mosque to the clinic for the urine test. *Id*.

"A substantial burden exists where the state puts substantial pressure on an adherent to

modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (quotation and alterations omitted). In *McEachin*, 357 F.3d at 203, the Second Circuit explained that "[w]e have reasoned that when determining whether a prisoner's religious beliefs have been substantially burdened, the relevant question is whether the infringed-upon religious activity is considered central or important to the prisoner's practice of his religion. *See also Lopez v. Cipolini*, 136 F. Supp. 3d 570, 588 (S.D.N.Y. 2015) (dismissing without prejudice plaintiff's claim that her ability to exercise her religious beliefs was substantially burdened by missing two religious services where plaintiff did not allege that the services were "central or important to [her] faith.") (quoting *Rossi v. Fischer*, No. 13-cv-3167 (PKC)(DF), 2015 WL 769551, at *8 (S.D.N.Y. Feb. 24, 2015) (finding that plaintiff, who had shown that celebrating the four holy days at issue, refraining from work and programming, attending a congregate worship service, and sharing a holy day meal were central or important to his faith, had plausibly alleged a substantial burden on his religious beliefs)).

Recently, in its unpublished decision in *Williams* 2016 WL 2610028, at *1, the Second Circuit, in rejecting the district court's determination that the burden on the plaintiff's sincerely held religious beliefs was *de minimis* because only a few of his Ramadan meals had been delivered prematurely, explained that a proper focus in considering substantial burden is on whether the religious expression of which Plaintiff has been deprived is considered by him to be "central or important" to the practice of his religion, not only whether the deprivation occurred a small number of times. *Id.* The Court finds that Plaintiff, in his Amended Complaint as amended by his opposition papers, has made a plausible showing that the Shawwal congregate prayer and supplication, and the halal meal intended to break the fast were important to his

religious faith, and that the denial of those things by Defendants Hewite and Steinberg as a result of ordering Plaintiff to undergo a urine test substantially burdened his sincerely held religious beliefs. Therefore, the Court recommends that Defendants Hewite and Steinberg's motion to dismiss the third cause of action in Plaintiff's Amended Complaint be denied.[7]

### D. Retaliation Claim against Defendants Chutty and Gifford (Fourth Cause of Action)

Plaintiff claims that Defendants Chutty and Gifford violated his First Amendment right to freely exercise his religious beliefs when they retaliated against him because of his leadership position in the Muslim community as Muslim Shia inmate facilitator by forcing him to undergo a urine test, searching his cell, planting a weapon during the search, filing a false misbehavior report, and placing him in SHU. (Dkt. No. 39 at ¶¶ 24-30, 118-19.)

To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech [or conduct] and the adverse action." *Holland,* 758 F.3d at 225 (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes v.*

---

[7] Defendants argue that ordering Plaintiff to undergo a urine test on August 12, 2013, did not violate his rights under the First Amendment Free Exercise Clause by requiring him to drink water during the Shawwal fast. (Dkt. No. 41-1 at 8-9.) *See Holland*, 758 F.3d at 221 (ordering plaintiff to drink water in violation of his Ramadan fast to produce a urine sample substantially burdened his religious expression where plaintiff submitted evidence that breaking his fast prior to sundown would be a grave sin). Plaintiff does not claim that he was forced to drink water and has not asserted a free exercise claim regarding drinking water so that he could comply with the urine test in his Amended Complaint. (Dkt. Nos. 39 at ¶¶ 113-15; 41-1 at 8-9.) Plaintiff has alleged that he requested that he be given the three cups of water he was entitled to under a DOCCS directive. (Dkt. No. 39 at ¶ 77.) Moreover, in his opposition papers, Plaintiff states that Defendants did not force him to drink water. (Dkt. No. 43 at 5.)

*Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema,* 534 U.S. 506, 508 (2002)).  "Adverse action" for purposes of a retaliation claim has been defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381.  The Second Circuit has made clear that the objective test applies even where a particular plaintiff was not himself subjectively deterred and continued the protected conduct.  *Id.*

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions.  *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (N.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).  Those factors include: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his or her motivation.  *Id.* (citing *Colon*, 58 F.3d at 872-73).  The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action."  *Id.*

Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care.  *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds*, *Swierkiewicz,* 534 U.S. 506.  As the Second Circuit has noted,

> [t]his is true for several reasons.  First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated.  Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.  This is so because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed

20

retaliatory act.

Once the plaintiff has made the requisite showing to state a claim for retaliation, the burden shifts to the defendant to show that he would have taken exactly the same action absent the improper motive. *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. Of Educ. V. Doyle*, 429 U.S. 274, 287 (1977).

        1.      <u>Urine Test</u>

Prison inmates retain First Amendment protection of the free exercise of religion. *O'Lone*, 482 U.S. at 348. The Court finds that for purposes of this motion to dismiss Plaintiff has made a plausible showing that maintaining a leadership position in the Muslim community as Muslim Shia inmate facilitator at Auburn was conduct protected under the First Amendment for purposes of his retaliation claim against Chutty and Gifford.

However, the Court also finds that requiring Plaintiff to undergo a single urine test on September 17, 2012, does not constitute adverse action for purposes of a retaliation claim. In *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 327 (W.D.N.Y. 2007), the court explained that, "[p]risoners may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse. Urine tests are a fact of prison life, and . . . one urine test would [not] chill a prisoner of ordinary firmness from filing grievances." (quoting, *inter alia*, *Dawes,* 239 F.3d at 491 (2d Cir. 2001) (internal quotation marks omitted)). *See also Fann v. Arnold*, No. 14-CV-6187-FPG, 2016 WL 2858927, at *3 (W.D.N.Y. May 16, 2016) (subjecting plaintiff to a single urine test did not constitute adverse action); *Partak v. Behrle*, No. 9:09-CV-1256 (FJS/ATB), 2011 WL 7629500, at *14 (N.D.N.Y. Sept. 12, 2011) (three urine tests in three days did not constitute adverse action for purposes of a retaliation claim); *Carl v. Griffin*, No. 08

Civ. 4981(RMB) (MHD), 2011 WL 723553, at *5 (S.D.N.Y. March 2, 2011) (being forced to give a urine sample on one occasion not an adverse action because it is not sufficient to deter a person of ordinary firmness from exercising First Amendment rights).

Therefore, the Court finds that Plaintiff has failed to state a retaliation claim against Chutty and Gifford with regard to ordering him to undergo a urine test on September 12, 2012.

## 2. Cell Search

"It is well-settled that retaliatory cell searches are not actionable under section 1983." *Partak,* 2011 WL 7629500, at *14 (citing *Salahuddin v. Mead*, No. 95 Civ. 8581 (MBM), 2002 WL 1968329, at * 5 (S.D.N.Y. Aug. 26, 2002)); *Jones v. Harris*, 665 F. Supp. 2d 384, 398 (S.D.N.Y. 2009) ("If a prisoner, who enjoys no Fourth Amendment privacy right in his cell, can be expected to tolerate such interruptions in the ordinary course, it is hard to see how the three searches of which plaintiff complains, taken together, would qualify as an 'adverse action' for purposes of the First Amendment retaliation analysis."); *Lashley v. Wakefield*, 367 F. Supp. 2d 461, 470 (W.D.N.Y. 2005) (no constitutional protection from retaliatory cell searches).

Therefore, the Court finds that Plaintiff has failed to state a retaliation claim against Chutty and Gifford with regard to the cell search on September 12, 2012.

## 3. Planting a Weapon and False Misbehavior Report

The Court finds that Plaintiff has stated retaliation claims against Gifford with respect to his claim that Gifford planted a weapon in his cell (Dkt. No. 39 at ¶ 28), and against both Gifford and Chutty with respect to filing a false misbehavior report based upon the planted weapon in retaliation for Plaintiff's actions as Muslim Shia inmate facilitator. *Id*. at ¶ 118. According to Plaintiff, Gifford planted a weapon in his cell during a cell search, and as a result, Plaintiff was

22

taken to SHU. (Dkt. No. 39 at ¶¶ 27-28.) Gifford, with Chutty's alleged involvement, thereafter authored a false misbehavior report alleging that Plaintiff was in possession of a weapon. *Id.* at ¶¶ 30, 118-19. Although Chutty is alleged to have instructed Gifford to search Plaintiff's cell and to have been involved in the filing of a false misbehavior report, there are no allegations in Plaintiff's Amended Complaint plausibly showing Chutty's involvement in the alleged planting of a weapon. *Id.* at ¶¶ 28, 118-19.

The planting of evidence and issuance of a false misbehavior report based upon that evidence has been found to constitute adverse action for purposes of a retaliation claim. *See Pidlypchak*, 389 F.3d at 384 (filing a false misbehavior report constitutes adverse action); *Colon*, 58 F.3d at 872-73 (finding adverse action where plaintiff alleged that prison officials had planted contraband in his cell); *Williams v. King*, 56 F. Supp. 3d 308, 328 (S.D.N.Y. 2014) (the alleged planting of contraband and allegedly disproportionate administrative actions that follow have been found serious enough to constitute adverse action for retaliation purposes), *order clarified on other grounds, Williams v, King*, 56 F. Supp. 3d 389 (S.D.N.Y. 2014); *Payne v. Axelrod*, 871 F. Supp. 1551, 1556 (N.D.N.Y. 1995) (valid § 1983 retaliation claim stated where prisoner alleged that corrections officers planted contraband evidence in his cell and falsely charged him with possession).

Furthermore, the allegations in Plaintiff's Amended Complaint plausibly show a causal connection between Plaintiff's position as Muslim Shia inmate facilitator and the alleged planting of a weapon in his cell by Gifford and false misbehavior report by Gifford and Chutty. Plaintiff has alleged that on September 19, 2012, he was informed by Muslim Chaplain Muhsin that he believed Plaintiff was being targeted because of his position as inmate facilitator. *Id.* at ¶

31. The existence of a causal connection finds further support in the allegation that Muslim Sunni inmate facilitator Ruhani had been taken to SHU on the same day as Plaintiff for a weapon allegedly found in his cell by Defendant Gifford. *Id*. at ¶ 32.

Based on the foregoing, the Court finds that Plaintiff has stated a retaliation claim against Gifford with regard to planting a weapon in Plaintiff's cell and filing a false misbehavior report, and a retaliation claim against Chutty with respect to filing a false misbehavior report. The Court further finds that Plaintiff has failed to state a retaliation claim against Chutty with regard to planting a weapon in his cell.

4. <u>Summary</u>

The Court recommends that Defendant Chutty and Gifford's motion to dismiss Plaintiff's retaliation claims with respect to the urine test and cell search be granted. Because the law is well-settled that neither a urine test nor a cell search constitutes an adverse action for retaliation purposes, the Court recommends that the dismissal be with prejudice. *See Cuoco,* 222 F.3d at 112 (opportunity to amend is not required where the problem is substantive such that a better pleading will not cure it).

In addition, Court recommends that Gifford's motion to dismiss Plaintiff's retaliation claim with respect to planting the weapon and the false misbehavior report be denied. As to Defendant Chutty, the Court recommends that the motion to dismiss Plaintiff's retaliation claim with respect to planting the weapon be granted and the claim be dismissed, and that the motion be denied as to the false misbehavior report. The Court further recommends that dismissal of the retaliation claim against Chutty with respect to planting the weapon be without prejudice and with leave to amend in light of Plaintiff's pro se status and the allegations in Plaintiff's Amended

Complaint, which although inadequate to state a conspiracy claim, may suggest Chutty's possible involvement in the alleged planting of a weapon. *Id.* at ¶ 119.

### E. Fourteenth Amendment Equal Protection Claim Against Defendants Chutty and Gifford (Fourth Cause of Action)

Plaintiff claims that Defendants Chutty and Gifford violated his rights under the Fourteenth Amendment Equal Protection Clause because of his leadership position in the Muslim community by: (1) ordering an investigation by Sergeant Hai of Plaintiff and Muslim Sunni inmate facilitator Ruhani's involvement in a planned work stoppage/protest in commemoration of the Attica riot of 1971, while none of the non-muslim inmate facilitators were investigated; and (2) ordering a urine test, searching Plaintiff's cell, planting a weapon in Plaintiff's cell, and filing a false misbehavior report regarding the weapon, because of his position as a Muslim Shia inmate facilitator. (Dkt. No. 39 at ¶¶ 20, 22-23; 25-30; 118-19.)

The Equal Protection Clause provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, *or malicious or bad faith intent to injure a person*.'" *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)) (emphasis added).

Thus, a plaintiff asserting an equal protection claim must allege facts plausibly suggesting that (1) he was treated differently from similarly situated individuals; and (2) the

defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, acted out of malice, or acted irrationally and arbitrarily. *Harlen Assocs. V. Incorp. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

Plaintiff claims that he was treated differently than non-Muslim inmate facilitators with respect to the investigation conducted by Sergeant Hai because of his leadership status in the Muslim community at Auburn. (Dkt. No. 39 at ¶ 21.) The Amended Complaint is, however, devoid of factual allegations providing information regarding the identity or religion of the non-Muslim inmate facilitators, or their connection, if any, to the alleged planning of a work stoppage/protest. Conclusory assertions are not sufficient to state a claim. *See Gebhardt v. Allspect*, 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000) ("Generally, conclusory assertions or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss") (citation and internal quotation marks and punctuation omitted). As to the urine test, cell search, planted weapon, and false misbehavior report, Plaintiff has not identified similarly situated persons who were treated differently. Given the foregoing, the Court finds that Plaintiff has failed to state an equal protection claim against Chutty and Gifford.

Even if the Court were to find that Plaintiff had stated an equal protection claim, because the claim involves the same set of facts implicated in his retaliation claim against Chutty and Gifford, Plaintiff's equal protection claim would be redundant. *See Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005) (dismissing equal protection and Eighth Amendment claims based on the same circumstances as free exercise claim because free exercise claim "gains nothing by attracting additional constitutional labels"); *Williams v. Snyder*, 150 F. App'x 549, 552 (7th Cir. 2005) (dismissing as redundant equal protection claim which involved same set of facts as in

retaliation and free exercise claims); *Washington v. Afify*, 968 F. Supp. 2d 532, 541 (W.D.N.Y. 2013) (claims that plaintiff has been "singled out" for retaliatory treatment are more properly addressed in the context of his retaliation claims); *Frisenda v. Incorp. Vill. Of Malverne*, 775 F. Supp. 2d 486, 518 (E.D.N.Y. 2011) ("To the extent that plaintiff also may be attempting to assert an equal protection claim based upon retaliation for First Amendment activity . . . , such a claim is completely duplicative of the First Amendment retaliation claim and, therefore, should not go forward.").

Based upon the foregoing, the Court recommends dismissal of Plaintiff's equal protection claim against Chutty and Gifford with prejudice for failure to state a claim and on redundancy grounds inasmuch as it merely duplicates his retaliation claim against the Defendants.

### F. Retaliation Claim Against Defendant Steinberg (Fourth Cause of Action)

Plaintiff claims that Defendant Steinberg ordered him to undergo a urine test on August 12, 2013, and filed a false misbehavior report implying that he had given Plaintiff three cups of water and Plaintiff had failed to comply with the urine test. (Dkt. No. 39 at ¶¶ 82, 84.) Plaintiff claims that the actions were taken in retaliation for the filing of grievances by Plaintiff to redress the violation of his First Amendment right to the free exercise of his religion. *Id*. at ¶ 120.

The filing of grievances has been found to constitute protected First Amendment conduct for purposes of a retaliation claim. *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) ("Retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendment.") Therefore, Plaintiff has made a plausible showing as to the first element of a retaliation claim.

As discussed above, being required to undergo a urine test does not constitute adverse

action for purposes of a retaliation claim, *Bumpus,* 495 F. Supp. 2d at 327, while the filing of a

false misbehavior report does. *See Pidlypchak*, 389 F.3d at 384. On the question of a causal

relationship, Plaintiff has failed to identify the grievance that he claims was the cause for

Steinberg's retaliation. Allegations in the Amended Complaint, however, reveal that on or about

August 7, 2013, less than a week before Steinberg's alleged retaliatory actions, Plaintiff filed a

grievance regarding the failure of the facility to provide him with halal meals and sahur bags for

a number of days during Ramadan. (Dkt. No. 39 at ¶ 72.) In addition, Plaintiff has alleged that

on August 8, 2013, he was warned by the inmate grievance clerk that his name had come up in

discussions by officers in the grievance office as a litigator who would cause trouble over the

Ramadan matter. *Id.* at ¶ 73. On August 11, 2013, Plaintiff was interviewed by a crisis

intervention officer assigned to investigate whether Plaintiff was riling up the Muslim inmate

population to protest in response to the Ramadan matter. *Id.* at ¶ 74. The urine test, which led to

the false misbehavior report occurred just a day after the interview. *Id.* at ¶ 12.

     The temporal proximity between the protected activity and the alleged retaliatory act is

one of the factors given consideration in determining causal connection. *See Baskerville,* 224 F.

Supp. 2d at 732; *see also Bennet v. Goord*, 343 F.3d 133, 138 (2d Cir. 2003) ("the temporal

proximity of an allegedly retaliatory misbehavior report to a grievance may serve as

circumstantial evidence of retaliation.") (citation and internal quotation marks omitted).

Although the Amended Complaint does not allege a direct connection between the grievance and

Steinberg, the Court finds for purposes of Defendant's motion to dismiss, that the extremely

close temporal proximity to the filing of Plaintiff's grievance, along with the allegation that two

other Muslim inmates were subjected to urine tests after complaining about Ramadan, *id.* at ¶ 94,

plausibly shows a causal connection between the grievance and the filing of the allegedly false misbehavior report by Steinberg.

Therefore, the Court recommends that Steinberg's motion to dismiss be granted with prejudice as to Plaintiff's retaliation claim with regard to the urine test and be denied with regard to the alleged filing of a false misbehavior report.

### G. Retaliation Claim Against Defendant Fagan (Fourth Cause of Action)

Plaintiff has alleged that on August 15, 2013, he was served with an administrative segregation recommendation authored by Defendant Fagan, in which it was alleged that Plaintiff was a "facilitator of information" and detrimental to the safety and security of the facility. (Dkt. No. 39 at ¶ 88.) Plaintiff learned at his administrative segregation hearing that a member of the Muslim Sunni Community and a member of the NOI Muslim Community had both had their cell searched and urine taken and were also placed in SHU on administrative segregation after filing complaints about the shutdown during Ramadan. *Id.* at ¶ 94. Plaintiff was in administrative segregation from August 15, 2013, until his transfer to Wende Correctional Facility on September 6, 2013. *Id.* at ¶¶ 88, 99.

Plaintiff has alleged that he was placed in administrative segregation by Fagan for filing a grievance to redress the violations of his First Amendment rights to freely exercise his religion. *Id.* at ¶ 121. As noted above, Plaintiff filed a grievance on August 7, 2013, regarding the failure to provide him with halal meals and sahur bags for Ramadan during the lockdown. *Id.* at ¶ 72. In light of the temporal proximity between the filing of the grievance and Plaintiff's placement in administrative segregation, the Court finds that for purposes of this motion, Plaintiff has sufficiently alleged protected conduct.

In *Allah v. Seiverling*, 229 F.3d 220, 225-26 (3d Cir. 2000), the Third Court vacated a district court order that had dismissed the plaintiff's retaliation claim on initial review in part based upon a finding that being placed in administrative segregation did not constitute adverse action. The Court explained that

> [a]lthough it is possible that in some cases placement in administrative segregation would not deter a prisoner of ordinary firmness from exercising his or her First Amendment rights, we cannot say that such action can never amount to adverse action. On the contrary, whether a prisoner-plaintiff has met that prong of his or her retaliation claim will depend on the facts of a particular case.

In *Allah*, the plaintiff had specifically alleged in his complaint that his confinement in administrative segregation resulted, *inter alia*, in reduced access to recreation, phone calls, commissary, rehabilitative programs, and access to legal research materials, and he was confined to his cell for all but five hours a week. *Id*. at 225.

Although unlike the plaintiff in *Allah*, Plaintiff has not included allegations in his Amended Complaint regarding the conditions to which he was subjected during the approximately three weeks he remained in administrative segregation, the Amended Complaint does allege that he was placed in SHU for administrative segregation. *Id*. at ¶ 85. Thus, while Plaintiff may not ultimately be able to establish adverse action, the Court is not willing to find on Defendants' 12(b)(6) motion that Plaintiff has failed to sufficiently allege adverse action with regard to his retaliation claim against Fagan.

The Court finds for purposes of the motion to dismiss that Plaintiff has also made a plausible showing of a causal connection between his grievance regarding Ramadan and his being placed in administrative segregation. Not only was there a close temporal proximity, but according to Plaintiff's Amended Complaint, two other Muslin inmates had been placed in

administrative segregation following their complaints regarding Ramadan. *Id.* at ¶ 94.

Therefore, based upon the foregoing, the Court recommends that Fagan's motion to dismiss Plaintiff's retaliation claim against him for failure to state a claim be denied.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 41) for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure be **GRANTED IN PART AND DENIED IN PART**; and it is further

**RECOMMENDED** that the motion to dismiss be **GRANTED** as to Plaintiff's retaliation claim against Defendants Chutty and Gifford with regard to ordering Plaintiff to undergo a urine test and searching his cell on September 12, 2012 (Fourth Cause of Action), and that the claim be **DISMISSED WITH PREJUDICE**; and it is further

**RECOMMENDED** that the motion to dismiss be **GRANTED** as to Plaintiff's retaliation claim against Defendant Chutty with regard to the planting of a weapon in Plaintiff's cell on September 12, 2012 (Fourth Cause of Action), and that the claim be **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**; and it is further

**RECOMMENDED** that the motion to dismiss be **GRANTED** as to Plaintiff's Fourteenth Amendment Equal Protection Clause claim against Defendants Chutty and Gifford and retaliation claim against Defendant Steinberg with regard to ordering Plaintiff to undergo a urine test on August 12, 2013 (Fourth Cause of Action), and that those claims be **DISMISSED WITH PREJUDICE**; and it is further

**RECOMMENDED** that Defendants' Rule 12(b)(6) motion to dismiss be in all other respects **DENIED**, including as to Plaintiff's claims for: (1) violation of his rights under the First

Amendment Free exercise Clause against Defendants Pelc, Martin, and Thomas with respect to the denial of his Eid meal (First Cause of Action); (2) violation of his rights under the First Amendment Free Exercise Clause against Defendant Thomas with respect to denial of Ramadan meals (Second Cause of Action); (3) violation of his rights under the First Amendment Free Exercise Clause against Defendants Hewite and Steinberg with respect to denial of participation in religious congregational prayer during Shawwal and denial of a halal meal; (4) First Amendment retaliation claim against Defendant Steinberg with respect to filing a false misbehavior report; (5) First Amendment retaliation claim against Defendant Gifford with respect to planting a weapon in Plaintiff's cell and filing a false misbehavior report (Fourth Cause of Action); (6) First Amendment retaliation claim against Defendant Chutty with respect to issuing a false misbehavior report (Fourth Cause of Action); and (7) First Amendment retaliation claim against Defendant Fagan with respect to placing Plaintiff in administrative segregation (Fourth Cause of Action); and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. <u>**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**</u>. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: June 2, 2016
       Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

2010 WL 5651033
Only the Westlaw citation is currently available.
United States District Court,
D. Colorado.

Mohamed Rashed D. AL–OWHALI, Plaintiff,

v.

Michael MUKASEY, in his official capacity as
U.S. Attorney General, Harley Lappin, in his
official capacity as Director, Federal Bureau of
Prisons, Harrell Watts, in his official capacity as
Administrator, National Inmate Appeals, Federal
Bureau of Prisons, Ronald Wiley, in his official
capacity as Warden, USP Florence ADMAX, and
Federal Bureau of Investigation, Defendants.

Civil Action No. 07–cv–02214–LTB–BNB.
|
June 17, 2010.

**Attorneys and Law Firms**

Daniel Edward Manville, Daniel E. Manville, P.C., Ferndale,
MI, Joyce Ellen Rosendahl, Joyce Ellen Rosendahl, Law
Offices of, Newport Beach, CA, for Plaintiff.

Kevin Thomas Traskos, U.S. Attorney's Office, Denver, CO,
for Harley Lappin.

Susan Begesse Prose, U.S. Attorney's Office, Denver, CO, for
Harley Lappin, Federal Bureau of Investigations.

**RECOMMENDATION OF UNITED
STATES MAGISTRATE JUDGE**

BOYD N. BOLAND, United States Magistrate Judge.

**\*1** This matter is before me on the **Defendants' Motion
to Dismiss Second Amended Complaint** [Doc. # 51, filed
10/15/2009] (the "Motion"). I respectfully RECOMMEND
that the Motion be GRANTED IN PART and DENIED IN
PART.

**I. STANDARD OF REVIEW**

In ruling on a motion to dismiss pursuant to Rule 12(b)
(6), Fed.R .Civ.P., the court must accept the plaintiff's well-

pleaded allegations as true and must construe all reasonable
inferences in favor of the plaintiff. *City of Los Angeles v.
Preferred Communications, Inc.,* 476 U.S. 488, 493 (1986);
*Mitchell v. King,* 537 F.2d 385, 386 (10th Cir.1976). The
complaint must contain specific allegations sufficient to
establish that it plausibly supports a claim for relief. *Alvarado
v. KOB–TV, L.L.C.,* 493 F.3d 1210, 1215 n. 2 (10th Cir.2007).
"The issue is not whether a plaintiff will ultimately prevail but
whether the claimant is entitled to offer evidence to support
the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974),
overruled on other grounds by *Davis v. Scherer,* 468 U.S. 183
(1984).

In ruling on a motion to dismiss for failure to state a claim
upon which relief can be granted, I may treat the motion
as seeking summary judgment under Rule 56, Fed.R.Civ.P.,
when matters outside the pleadings are presented to and not
excluded by me and all parties have been given a reasonable
opportunity to respond as provided in Rule 56. Fed.R.Civ.P.
12(d). The plaintiff has submitted with his response an
unauthenticated letter addressed to his attorney (Ex. 4) and
his mental health records under seal [Doc. # 60], and the
defendants have attached to their reply an unauthenticated
memorandum (Ex. A–1). Because I do not refer to the exhibits
in my analysis of the defendants' Motion, I need not convert
the motion into one for summary judgment. Fed.R.Civ.P.
12(d).

The standard of review for a motion to dismiss for lack of
subject matter jurisdiction under Rule 12(b)(1) is described
as follows:

> Generally, Rule 12(b)(1) motions to dismiss for lack of
> subject matter jurisdiction take two forms. First, a facial
> attack on the complaint's allegations as to subject matter
> jurisdiction questions the sufficiency of the complaint. In
> reviewing a facial attack on the complaint, a district court
> must accept the allegations in the complaint as true.

> Second, a party may go beyond allegations contained in
> the complaint and challenge the facts upon which subject
> matter jurisdiction depends. When reviewing a factual
> attack on subject matter jurisdiction, a district court may
> not presume the truthfulness of the complaint's factual
> allegations. A court has wide discretion to allow affidavits,
> other documents, and a limited evidentiary hearing to
> resolve disputed jurisdictional facts under Rule 12(b)(1). In
> such instances, a court's reference to evidence outside the
> pleadings does not convert the motion to a Rule 56 motion.

However, a court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case. The jurisdictional question is intertwined with the merits of the case if subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case.

*2 *Holt v. United States,* 46 F.3d 1000, 1003 (10th Cir.1995) (citations omitted).

## II. BACKGROUND

The plaintiff filed his initial Complaint on November 2, 2007, while proceeding *pro se* [Doc. # 5]. The plaintiff, through counsel, filed a First Amended Complaint as a matter of course on June 30, 2008 [Doc. # 25]. On September 14, 2009 [Doc. # 44], the plaintiff was permitted to file a Second Amended Complaint [Doc. # 41] (the "Complaint"). [1] The Complaint contains the following allegations:

1. The plaintiff is currently incarcerated by the Federal Bureau of Prisons ("BOP") at the United States Penitentiary Administrative Maximum in Florence, Colorado ("ADX"). *Complaint,* opening paragraph and ¶¶ 5, 11. Inmates at ADX are housed in solitary confinement for approximately 23 hours per day. *Id.* at ¶ 17.

2. The plaintiff was convicted in the United States District Court for the Southern District of New York on charges related to the 1998 United States Embassy bombing in Nairobi, Kenya. He is serving a sentence of life plus 40 years. *Id.* at ¶ 11.

3. The plaintiff was placed under Special Administrative Measures ("SAMs") on October 16, 1998, and has been on the SAMs since then. He was not provided with the reasons for his initial placement on SAMs, nor was he provided with the reasons for its yearly continuations. *Id.* at ¶ 12.

4. After his conviction in 2001, the plaintiff was transferred to ADX where he is housed in the Special Security Unit, commonly referred to as the "H–Unit." *Id.* at ¶ 11.

5. The SAMs are authorized by BOP regulations which are codified in the Code of Federal Regulations:

Upon direction of the Attorney General, the Director, Bureau of Prisons, may authorize the Warden to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury. These procedures may be implemented upon written notification to the Director, Bureau of Prisons, by the Attorney General ... that there is a substantial risk that an inmate's communication or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.

28 C.F.R. § 501.3 (2007). *Id.* at ¶ 16.

6. The trial court did not order that the SAMs remain in effect during the plaintiff's sentence. *Id.* at ¶ 17.

7. Inmates on SAMs at the ADX are housed in solitary confinement for approximately 23 hours per day under highly restrictive conditions characterized by social isolation and sensory deprivation. These inmates are precluded from communicating with other inmates and are highly restricted as to those in the outside world with whom they are permitted to communicate. Inmates who are not under SAMs restrictions and who are housed in segregation cells are permitted to communicate with the outside world pursuant to BOP and ADX regulations unless restricted as part of the disciplinary process. *Id.* at ¶ 19.

*3 8. The inmates on SAMs are restricted as to what television programs they may watch; the publications such as books and magazines they may receive; and to whom they may write and from whom they can receive mail. *Id.* at ¶ 20.

9. Under BOP regulations, inmates are told that they have numerous "rights" and "responsibilities." Non–SAMs inmates at the ADX have these "rights" and "responsibilities" despite the fact that they are housed in solitary confinement. The plaintiff has been deprived of many of these rights by the terms and conditions of his SAMs. *Id.* at ¶ 21.

10. The plaintiff's religious beliefs include group prayers. Due to his placement on SAMs, he is precluded from participating in group prayer. *Id.* ¶ 23.

11. BOP regulations state that inmates have the right to "visit and correspond with family members and friends ... in keeping with Bureau rules and institution guidelines." Under SAMs, the plaintiff is permitted to visit and correspond only with his parents, siblings, and grandparents. He is not permitted to communicate with his nieces, nephews, and friends. *Id.* at ¶ 25.

12. Prior to 2004, the plaintiff was allowed to communicate through letters with his nieces and nephews and others so long as those persons were not considered by the defendants to be media representatives or their agents. *Id.* at ¶ 26. In 2004, the SAMs significantly increased the review and analysis periods for English mail from 5 to 14 business days and for non-English mail from 10 to 60 business days. *Id.* at ¶ 27. Also in 2004, the SAMs were altered so that the plaintiff's correspondence may be limited to three double-sided 8.5 x 11 inch sheets of paper, once per calendar week, to a single approved recipient. *Id.* at ¶ 29.

13. "On information and belief," SAMs inmates are permitted to write one letter per week. That letter and its contents can be addressed only to one person, such as the father or mother but not both, or that letter will not be sent. This restriction is not imposed on the nonSAMs inmates. *Id.* at ¶ 30.

14. The plaintiff's letters to his father have been rejected when they contain discussions of political, historical, sociological, and/or religious issues even though the letters do not incite violence. Neither the plaintiff nor his father are given an opportunity to challenge the rejection of the letters. *Id.* at ¶ 31.

15. BOP regulations state that inmates have the right to "a wide range of reading materials for educational purposes and for [their] own enjoyment" including "magazines and newspapers sent from the community, with certain restrictions." BOP regulations also permit inmates to receive subscriptions without obtaining prior approval, with limited exceptions in the case of publications containing nudity or sexually-explicit material. *Id.* at ¶ 32.

16. In 1999, the plaintiff purchased subscriptions to two Arabic newspapers: *Al–Quds Al–Arabi* and *Al–Hayat*. The subscriptions were purchased with the knowledge and approval of the FBI and the Assistant U.S. Attorney for

the Southern District of New York. The newspapers were delivered on time and intact. The plaintiff did not violate BOP regulations with regard to the newspapers, nor did he use them for unlawful purposes. *Id.* at ¶ 33.

**\*4** 17. In 2004, the SAMs restricted the plaintiff's access to television channels and radio stations which primarily broadcast news and restricted newspapers with the exception of *USA Today*. Until June 2008, the plaintiff was not allowed to receive the newspaper until it was at least 30 days old. He is still not allowed to receive the complete newspaper; he currently receives the newspaper with whole sections removed from each edition. *Id.* at ¶ 34. "On information and belief," neither the plaintiff nor the publishers of *Al–Quds Al–Arabi* and *Al–Hayat* received notice that the plaintiff was not allowed to receive publications in Arabic, the reasons the publications were banned, or an opportunity to challenge the bans. *Id.* at ¶ 35.

18. The plaintiff received notice in June 2008 that he would be permitted to subscribe to certain additional publications printed in English, but he believes that the additional publications will be subject to censorship and delay at the discretion of the FBI. *Id.* at ¶ 36.

19. "On information and belief," the plaintiff has been restricted from receiving the book *Palestine: Peace Not Apartheid* written by former President Jimmy Carter. The non-SAMs inmates have not been precluded from ordering this book. The defendants and their agents have not provided notice to the plaintiff or the publisher that the book was banned or the reasons for the ban, nor have they provided an opportunity to challenge the ban. *Id.* at ¶ 37.

20. BOP regulations state that inmates have the right to unrestricted and confidential access to the courts by correspondence. Under the terms of the plaintiff's SAMs, he has no confidential access to the courts, restricted or unrestricted. The plaintiff's mail that is not "clearly and properly" addressed to or from his pre-approved SAMs attorney is classified under the SAMs as non-legal mail, is copied and forwarded for government analysis and approval, and is subject to the 14 business day hold for such analysis and approval. *Id.* at ¶ 38.

21. BOP regulations state that there is a class of ingoing and outgoing mail that may be treated as legal or "special" mail. This includes mail to the U.S. Attorney's Offices, members of Congress, the BOP, federal law enforcement

agencies, and verified consular representatives. Properly marked incoming special mail is inspected only for the presence of contraband. Outgoing special mail may be sent sealed by the inmate and not read by staff. Under SAMs, the plaintiff has only one category of legal/special mail: mail that is clearly and properly addressed to or from his SAMs-authorized attorney. His incoming and outgoing mail to the U.S. Attorney's Offices, members of Congress, the BOP, federal law enforcement agencies, and verified consular representatives is classified as non-legal mail and must be routed through the FBI for analysis and approval. *Id.* at ¶¶ 39–40.

22. BOP regulations state that federal inmates have the right to legal counsel from an attorney of choice by interviews and correspondence. Under the SAMs, the plaintiff is not permitted to write to lawyers or law clinics to solicit legal counsel. He is restricted to legal counsel from pre-approved attorneys who have signed a SAMs affirmation document. In practice, the plaintiff is not allowed to communicate with an attorney unless that attorney is approved by the United States Attorney's Office for the Southern District of New York. *Id.* at ¶ 42. This restriction prevents the plaintiff from confidentially contacting an attorney to inquire whether the attorney would be interested handling a criminal or civil matter. *Id.* at ¶ 43.

**\*5** 23. BOP regulations permit inmates to correspond with members of the news media so long as such communications are "in keeping with Bureau rules and institution guidelines." The SAMs prohibit the plaintiff from communicating with the media either directly or through his attorney. *Id.* at ¶ 45. This restriction prohibits the plaintiff from communicating with the media and commenting on matters of public interest. *Id.* at ¶ 46.

24. BOP regulations state that inmates shall be given notice in writing of the "disciplinary system within the institution and the time limits thereof," as well as the "[p]rohibited acts and disciplinary severity scale," and the applicable "[s]anctions by severity of prohibited act." An inmate must be given notice of a charge against him, and he is entitled to a hearing on the matter. Sanctions are imposed if the Unit Discipline Committee or a Disciplinary Hearing Officer finds that an inmate committed a prohibited act. Disciplinary sanctions include the loss of privileges such as commissary, movies, and recreation. *Id.* at ¶ 47.

25. The United States Attorney and the FBI decide the plaintiff's continued confinement in segregation without

regard to the decisions of the BOP. *Id.* at ¶ 51. On May 16, 2007, Harrell Watts, Administrator for the BOP Central Office's National Inmate Appeals, informed the plaintiff of the following:

> You may object to the provisions of the SAMs, but as the Warden appropriately advised you, the Bureau merely informs you of the requirements of the SAMs and ensures the measures are followed. The continued need of the restriction is reviewed annually by the Attorney General (AG), and will remain in place until the AG determines they are no longer necessary.

The BOP has little, if any, say about the restrictions that are imposed upon the plaintiff. As a result, the BOP's Administrative Remedy Program does not offer the plaintiff a meaningful review of the conditions of his confinement with regard to the SAMs, and the plaintiff does not have any means to challenge the continuation of his SAMs. *Id.* at ¶¶ 48–54.

26. The plaintiff's communication with other prisoners on his unit has been severely restricted since his confinement at ADX in 2001. *Id.* at ¶ 57. "On information and belief," prison staff has been instructed by the defendants or their agents to minimize their conversations with SAMs inmates. *Id.* at ¶ 58.

27. The plaintiff has conducted hunger strikes to protest the "almost absolute isolation" resulting from his SAMs. The hunger strikes are also conducted out of frustration because his SAMS are continued yearly and he is not provided the reasons for the continuation, the means to contest the continuation, or a meaningful hearing and appeal process when they are continued. *id.* at ¶ 59. The plaintiff's mental health has deteriorated due to his indefinite solitary confinement and reduced environmental stimulation. *Id.* at ¶ 61.

**\*6** 28. The conditions of confinement imposed under SAMs are disproportionate to the security requirements of SAMs and are imposed to punish those placed on SAMs. *Id.* at ¶ 60.

The Complaint asserts seven claims for relief. Claim One alleges that the "[d]efendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs" deprives the plaintiff of his

procedural due process and equal protection rights. *Id.* at ¶¶ 64–65.

Claim Two alleges that the "[d]efendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs" violates the plaintiff's substantive due process rights. *Id.* at ¶ 67.

Claim Three alleges that the "[d]efendants' policies, practices, acts, and omissions in connection with the continuing extension and enforcement of the SAMs have the effect of virtually burying Mr. Al–Owhali alive in solitary confinement at the ADX" in violation of the plaintiff's Eighth Amendment rights. *Id.* at ¶ 71.

Claim Four alleges that the "[d]efendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs" deprives the plaintiff of his equal protection rights and deprives him of his "freedom of speech, freedom of expression, freedom of association, and the right to receive information consistent with his status as an inmate, and deprive Mr. Al–Owhali of the equal protection of the law compared to fellow nonSAMs inmates at the ADX." *Id.* at ¶ 74.

Claim Five alleges that the "[d]efendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs eviscerate Mr. Al–Owhali's right to consult with and/or retain attorneys or law clinics by prohibiting Mr. Al–Owhali from communicating with attorneys who have not already signed a SAMs affirmation" in violation of the plaintiff's First Amendment "rights of association and petition" and the Sixth Amendment right "to communicate with counsel pertaining to criminal matters." *Id.* at ¶¶ 78–80.

Claim Six alleges that "[d]efendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs" deprives the plaintiff of his equal protection rights and his constitutional rights to communicate confidentially with attorneys, federal courts and judges, the U.S. Attorney's Office, members of the U.S. Congress, the BOP, federal law enforcement entities, and verified consular officials "by classifying Mr. Al–Owhali's incoming and outgoing mail to these persons as non-legal mail that must be forwarded to the FBI for analysis and approval before delivery." *Id.* at ¶ 82. Specifically, the plaintiff has been deprived of his First Amendment rights of association, petition, and free speech; his Fourth Amendment

rights to be free from unreasonable search and seizure; and his Fifth Amendment right to the equal protection of the law. *Id.* at ¶ 83.

**\*7** Claim Seven alleges that the "[d]efendants' policies and practices have imposed indefinite isolation on Mr. Al–Owhali, and subjected him to extreme sensory deprivation" in violation of his Eighth Amendment right to be free from cruel and unusual punishment. *Id.* at ¶¶ 86–87.

On March 3, 2010, the plaintiff's equal protection claims were dismissed without prejudice [Doc. # 69]. The plaintiff sues the individual defendants in their official capacities. *Complaint,* caption. He seeks declaratory and injunctive relief. *Id.* at p. 22. He brings his claims pursuant to 28 U.S.C. § 1331; 5 U.S.C. § 702 and Rule 65, Fed.R.Civ.P.; and 28 U.S.C. § 1361 and Rule 81(b), Fed.R.Civ.P. *Id.* at pp. 1–2.

## III. ANALYSIS

### A. Claim One

Claim One alleges that the "[d]efendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs" deprive the plaintiff of his procedural due process rights. *Id.* at ¶¶ 64–65. The defendants assert that Claim One is barred by the statute of limitation and, consequently, that the court lacks subject matter jurisdiction over the claim.

The parties agree that the action is subject to the six year statute of limitation in 28 U.S.C. § 2401(a).[2] *Motion,* p. 7; *Plaintiff's Response to Defendants' Motion to Dismiss Second Amended Complaint* [Doc. # 61] (the "Response"), pp. 6, 16. The statute of limitation in section 2401(a) is jurisdictional and is not subject to waiver. *Ute Distribution Corp. v. Secretary of Interior of U.S.,* 584 F.3d 1275, 1282 (10th Cir.2009) (citing *UIP v. United States of America,* 99 F.3d 344, 347 (9th Cir.1996)). Therefore, the plaintiffs are asserting a factual challenge to the court's subject matter jurisdiction. Under *Holt,* I do not presume the truthfulness of the Complaint's factual allegations, and I may consider affidavits and other documents to resolve disputed jurisdictional facts. *Holt,* 46 F.3d at 1003. In addition, determination of the limitation issue does not touch on the merits of the case. Therefore, I analyze this issue under the standards applicable to Rule 12(b)(1) rather than the Rule

56 summary judgment standards. "The party invoking the jurisdiction of the court has the duty to establish that federal jurisdiction does exist." *Basso v. Utah Power & Light Co.,* 495 F.2d 906, 909 (10th Cir.1974).

The statute of limitations begins to run "when the plaintiff discovered or had reason to discover that he has suffered injury due to the defendant's actions." *United States v. Rodriguez–Aguirre,* 264 F.3d 1195, 1212 (10th Cir.2001). "Indeed, the federal common law rule on when a statute of limitations begins to run is that it is when the plaintiff discovers, or by exercise of due diligence would have discovered, that he has been injured and who caused the injury." *Id.* (internal quotations and citations omitted).

Here, the plaintiff claims that he was denied procedural due process when the SAMs were first imposed and has been denied procedural due process every year thereafter upon renewal of the SAMs because he was not provided the reasons for the initial imposition of the SAMs or their continuation; the means to contest the continuation; or a meaningful hearing and appeal process when they are continued. The issue presented here is when did the plaintiff discover, or through the exercise of due diligence would have discovered, that he was not receiving the process he alleges is due.

**\*8** In response to the defendants' limitations argument, the plaintiff states only that he "concedes he is time-barred from challenging the SAM designation imposed in 1998," but that the SAMs designation was renewed after the plaintiff's placement in ADX on November 15, 2002, and every year thereafter, and "he is not time-barred from challenging the renewal of each year since his confinement at ADX in 2001." *Response,* pp. 16–17. The plaintiff does not address the issue of accrual. Therefore, he has failed to meet his burden to establish that the court has subject matter jurisdiction over his claim.

Moreover, the Administrative Remedy Program has been designated as the avenue for inmates to challenge SAMs restriction since 1996. 28 C.F.R. §§ 501.3(e); 542.10–19. Had the plaintiff exercised due diligence by timely and properly challenging his initial SAMs and the continuation of his SAMs, he would have discovered that the Administrative Remedy Program did not provide him with the reasons for the initial imposition of the SAMs or their continuation; the means to contest the continuation; or a meaningful hearing and appeal process when they are continued. Instead, he

waited almost 10 years to challenge the alleged lack of procedural protections.

The plaintiff attempts to classify each yearly renewal of SAMs as a separate and distinct event for purposes of calculating the limitations period. This approach ignores the required accrual analysis and the fact that the plaintiff was aware, or through due diligence would have been aware, of the factual predicate for his claim by 1998 or 1999 at the latest. *See Wood v. Utah Bd. of Pardons & Parole,* 2010 WL 1434400 at \*2 (10th Cir. Apr. 12, 2010); *Jones v. Henry,* 260 Fed.Appx. 130, 131, 2008 WL 110988 at \*1 (10th Cir. Jan. 10, 2008).

In *Jones,* the plaintiff was incarcerated after his conviction of first degree murder. The Oklahoma state legislature amended the statutory provisions governing parole to provide that individuals who had been convicted of a violent crime would be considered for parole every three years instead of every year. The plaintiff did not challenge the amendment until six years after the statute of limitation had run. The district court found that the action was barred by the statute of limitation because the plaintiff was aware of the factual predicate for his claim when he was not granted his first annual review. The Tenth Circuit Court of Appeals rejected the plaintiff's argument that each denial of parole consideration was a separate cause of action for purposes of the statute of limitation. The court affirmed dismissal of the action quoting "*Brown v. Ga. Bd. of Pardons & Paroles,* 335 F.3d 1259, 1262 (11th Cir.2003) ('[S]uccessive denials of parole do not involve separate factual predicates and therefore do not warrant separate statute-of-limitations calculations.')."

As with the plaintiff in *Jones,* the successive renewals of the plaintiff's SAMs—with only the Administrative Review Process available for challenging the SAMs—do not involve separate factual predicates. Accordingly, Claim One should be dismissed because it is barred by the statute of limitations, and the court does not have subject matter jurisdiction over it.

### B. Claim Two

**\*9** Claim Two alleges that the "[d]efendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs" violates the plaintiff's substantive due process rights. *Complaint,* ¶ 67. Specifically, he claims his substantive due process rights are being violated because "he cannot

appeal the continuation of the SAMs; the BOP claims it lacks authority to review the continuation decisions; and the BOP's Administrative Remedy program is rendered "an empty formality." *Id.* These allegations are redundant of the plaintiff's procedural due process claim.

The Supreme Court has "always been reluctant to expand the concept of substantive due process," and "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *County of Sacramento v. Lewis,* 523 U.S. 833, 841 (1998) (internal quotations and citations omitted). Here, the procedural due process clause provides constitutional protection for the allegations in Claim Two. Because Claim Two is duplicative of Claim One, it should be dismissed because it is barred by the statute of limitations and the court does not have subject matter jurisdiction over it.

### C. Claims Three and Seven

Claim Three alleges that the "[d]efendants' policies, practices, acts, and omissions in connection with the continuing extension and enforcement of the SAMs have the effect of virtually burying Mr. Al–Owhali alive in solitary confinement at the ADX" in violation of the plaintiff's Eighth Amendment rights. *Complaint,* ¶ 71. Claim Seven alleges that the "[d]efendants' policies and practices have imposed indefinite isolation on Mr. Al–Owhali, and subjected him to extreme sensory deprivation" in violation of his Eighth Amendment right to be free from cruel and unusual punishment. *Id.* at ¶¶ 86–87.

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment prohibition against cruel and unusual punishment requires prison officials to provide humane conditions of confinement by ensuring that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quotations and citations omitted).

A prisoner claiming an Eighth Amendment violation must establish both objectively and subjectively that particular conditions of confinement constitute cruel and unusual

punishment. *Wilson v. Seiter,* 501 U.S. 294, 297–298 (1991). To satisfy the objective component, a plaintiff must allege a deprivation which objectively is "sufficiently serious" to form an Eighth Amendment violation. *Id.* at 298. To satisfy the subjective component, plaintiffs must demonstrate that the prison official was "deliberately indifferent" to a substantial risk of serious harm. *Farmer,* 511 U.S. at 834.

**\*10** The plaintiff alleges that he is "housed in solitary confinement for approximately 23 hours per day"; "precluded from communicating with other inmates"; "restricted as to what TV programs [he] may watch"; restricted in the publications he may receive; and restricted as to whom he may write and from whom he can receive mail. *Complaint,* ¶¶ 19–20. He also alleges that "[o]n information and belief, the staff working the housing units has been instructed by Defendants or their agents to minimize their conversation" with SAMs inmates. *Id.* at ¶ 58.

The Eighth Amendment "does not mandate comfortable prisons." *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981). "[I]t imposes a duty on prison officials to provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (internal quotations and citations omitted). "Only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991).

The plaintiff's allegations do not state a plausible claim under the Eighth Amendment. *See Hill v. Pugh,* 75 Fed. Appx. 715, 721, 2003 WL 22100960 (10th Cir. Sept. 11, 2003) (affirming dismissal of Eighth Amendment claim based on isolation and sensory deprivation because the complaint failed to allege an "unquestioned and serious deprivation of basic human needs" or "intolerable or shocking conditions"). *See also Sattar v. Gonzales,* No. 07–cv–02698–WDM–KLM, 2009 WL 606115 (D.Colo. March 6, 2009); *Reid v. Wiley,* No. 07–cv–01855–REB–KMT, 2008 WL 4406560, at \*10 (D.Colo. Aug. 21, 2008) (recommending dismissal of Eighth Amendment claim); *Reid v. Wiley,* No. 07–cv–01855–REB– KMT, 2008 WL 4426083 (D.Colo. Aug. 21, 2008) (adopting recommendation regarding dismissal of Eighth Amendment claim).

The plaintiff does not allege that he has been deprived of adequate food, clothing, shelter, medical care, or safety measures. Nor does he allege that he is completely deprived of communications with others. To the contrary, he alleges that he is able to visit and correspond with his parents, siblings and grandparents. *Complaint*, ¶¶ 25, 29. Moreover, he does not allege that he is denied access to reading materials, radio, and television; he complains because he does not have unfettered access to them. *Id.* at ¶¶ 33, 34, 36, 37. Indeed, under his current SAMs, he has access to all television and radio stations that do not primarily broadcast news, and he has access to all books that do not facilitate criminal activity and do not present a substantial threat to the security of the nation and the prison. *Defendants' Reply in Support of Motion to Dismiss Second Amended Complaint* [Doc. # 67], Ex. A–17, p. 15 (as assigned by the court's docketing system).[3] He is also out of his solitary confinement for approximately one hour per day. *Complaint*, ¶ 19.

**\*11** The plaintiff alleges that the isolation imposed by the SAMs has had a "substantial negative impact" on his mental health and has caused him to protest through hunger strikes. *Complaint*, ¶¶ 59, 61. The plaintiff's *reactions to* his conditions of confinement, without more, cannot serve to measure of whether he has been deprived of the minimal civilized measure of life's necessities .[4] *Magluta v. U.S. Federal Bureau of Prisons,* No. 08–cv–00404–CMA–MJW, 2009 WL 1504749, at \*7 (D.Colo. May 28, 2009).

The Motion should be granted insofar as it seeks dismissal of Claims Three and Seven.

### D. Claim Four

Claim Four alleges that the "[d]efendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs" deprives the plaintiff of his First Amendment rights to "freedom of speech, freedom of expression, freedom of association, and the right to receive information consistent with his status as an inmate." *Id.* at ¶¶ 74–76.

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822 (1974). Substantial deference is afforded "to the professional judgment of prison administrators, who bear a significant responsibility for

defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003).

A challenged prison regulation is valid if it is reasonably related to legitimate penological interests. *Id.* at 131–32 (examining a prisoner's right to association); *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989) (addressing freedom of speech). In determining whether a restriction is "reasonably related to legitimate penological interests," the court is guided by the four factors identified in *Turner v. Safley,* 482 U.S. 78, 89–91 (1987). *Kay,* 500 F.3d at 1218–19. The factors are: (1) the existence of a rational connection between the restriction and a legitimate penological interest advanced as its justification; (2) the presence of alternatives for the inmate to exercise the right; (3) the effect that elimination of the restriction would have on guards, other prisoners, and prison resources; and (4) the existence of alternatives for prison officials without restricting inmates' rights to religious expression. *Boles v. Neet,* 486 F.3d 1177, 1181 (10th Cir.2007).

This analysis requires facts that are not properly before the court on a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. Accordingly, I recommend that the Motion be denied insofar as it seeks dismissal of the plaintiff's First Amendment claims.

### E. Claim Five

Claim Five alleges that the "[d]efendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs eviscerate Mr. Al–Owhali's right to consult with and/or retain attorneys or law clinics by prohibiting Mr. Al–Owhali from communicating with attorneys who have not already signed a SAMs affirmation" in violation of the plaintiff's First Amendment "rights of association and petition" and the Sixth Amendment right "to communicate with counsel pertaining to criminal matters." *Complaint,* ¶¶ 78–80. In his Statement of Facts, the plaintiff alleges that the SAMs "restrictions preclude Mr. Al–Owhali from contacting an attorney and inquiring confidentially into whether that attorney would be interested in handling a criminal *or civil* legal matter on his behalf...." *Id.* at ¶ 43 (emphasis added).

**\*12** As with Claim Four, the First Amendment claims are not appropriately addressed on a motion to dismiss. The

Motion should be denied insofar as it seeks dismissal of those claims.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Therefore, to the extent the plaintiff is attempting to assert a Sixth Amendment claim based on his inability to communicate with counsel pertaining to a civil case, the claim must fail.

Moreover, the Complaint does not allege that the plaintiff has been denied the right to "consult with and/or retain" an attorney for his criminal defense or that the plaintiff has a need or will have a need to consult such attorney. The Complaint states only that "[o]n information and belief, many attorneys are likely to be scared off by the government requesting that they agree to the entry of a SAMs agreement before any contact can be had." Complaint, ¶ 79.

The plaintiff has not alleged any facts that, "if assumed to be true, [show that] the plaintiff plausibly (not just speculatively) has a claim for relief." Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir.2008). "The burden is on the plaintiff to frame a complaint with enough factual matter (taken as true) to suggest that he or she is entitled to relief." Id. (internal quotations and citation omitted).

I recommend that the Motion be granted to the extent it seeks dismissal of Claim Five's allegations of a Sixth Amendment violation. I further recommend that the Motion be denied insofar as it seeks dismissal of Claim Five's allegations of a First Amendment violation.

### F. Claim Six

Claim Six alleges that "[d]efendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs" deprives the plaintiff of his constitutional right "to communicate confidentially with attorneys, federal courts and judges, the U.S. Attorney's Office, members of the U.S. Congress, the BOP, federal law enforcement entities, and verified consular officials by classifying Mr. Al–Owhali's incoming and outgoing mail to these persons as non-legal mail that must be forwarded to the FBI for analysis and approval before delivery." Complaint, ¶ 82. Specifically, the plaintiff has been deprived of his First Amendment rights of association, petition, and free speech;

and his Fourth Amendment right to be free from unreasonable search and seizure. Id. at ¶ 83.

As above, the plaintiff's First Amendment claims are not appropriately addressed on a motion to dismiss. The Motion should be denied insofar as it seeks dismissal of Claim Six's allegations of First Amendment violations.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. The United States Supreme Court has stated:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

**\*13** Bell v. Wolfish, 441 U.S. 520, 559 (1979).

"A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional and internal order." Hudson v. Palmer, 468 U.S. 517, 527–28 (1984). In the case of unprivileged incoming and outgoing prison mail, regulation by prison officials is essentially an administrative matter in which the courts will not intervene. United States v. Gordon, 168 F.3d 1222, 1228 (10th Cir.1999) (internal quotations and citation omitted).

In one paragraph, the defendants assert that the plaintiff's Fourth Amendment claim fails because he does not have any reasonable expectation of privacy in mail that is not legally privileged. Motion, p. 37. However, the defendants do not discuss whether any of the mail at issue in this case is legally privileged, nor do they discuss reasonableness in the context of the Fourth Amendment. The Motion should be denied insofar as it seeks dismissal of Claim Six.

### IV. CONCLUSION

I respectfully RECOMMEND that the Motion be GRANTED IN PART and DENIED IN PART as follows:

1. GRANTED to the extent it seeks dismissal of Claims One and Two as barred by the statute of limitation and for lack of subject matter jurisdiction;

2. GRANTED insofar as it seeks dismissal of Claims Three and Seven;

3. DENIED insofar as it seeks dismissal of Claim Four;

4. GRANTED to the extent it seeks dismissal of Claim Five's allegations of a Sixth Amendment violation and DENIED insofar as it seeks dismissal of Claim Five's allegations of a First Amendment violation; and

5. DENIED to the extent it seeks dismissal of Claim Six.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed.R.Civ.P. 72(b); *Thomas v. Arn,* 474 U.S. 140, 147–48 (1985), and also waives appellate review of both factual and legal questions. *In re Key Energy Resources Inc.,* 230 F.3d 1197, 1199–1200 (10th Cir.2000). A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. *United States v. One Parcel of Real Property,* 73 F.3d 1057, 1060 (10th Cir.1996).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 5651033

## Footnotes

1   The plaintiff was represented by counsel when filing Second Amended Complaint (and remains represented to date). Therefore, I do not liberally construe the Complaint. *Haines v. Kerner,* 404 U.S. 519, 520–21 (1972).

2   The plaintiff cannot assert claims against the BOP, as a federal agency, or the defendants in their official capacities pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971). *Farmer v. Perrill,* 275 F.3d 958, 963 (10th Cir.2001). "Section 2401(a) is a catch-all provision; it establishes a general limitations period for civil lawsuits against the United States not otherwise covered by a more specific limitations period." *United States v. Rodriguez–Aguirre,* 264 F.3d 1195, 1210 (10th Cir.2001). "[A]n equitable cause of action derived from the Constitution[ ] is not closely analogous to any statutory cause of action" and is, therefore, properly brought under section 2401(a). *Id.* (internal quotations omitted). Section 2401(a) provides "[e]xcept as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."

3   "[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp. v. Associated Wholesale Grocers,* 130 F.3d 1381, 1384–1385 (10th Cir.1997). The plaintiff's SAMs are referred to in his Complaint and are central to his claims, and he does not dispute the authenticity of the documents. Therefore, I may consider the documents as not "outside the pleading" for purposes of the Rule 12(b)(6) motion to dismiss.

4   The plaintiff does not allege that the defendants have been deliberately indifferent to his mental health needs.

   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   10

2011 WL 723553
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Kim CARL, Plaintiff,

v.

Thomas GRIFFIN, et al., Defendants.

No. 08 Civ. 4981(RMB)(MHD).
|
March 2, 2011.

### DECISION & ORDER

RICHARD M. BERMAN, District Judge.

## I. Background

**\*1** On or about May 30, 2008, *pro se* plaintiff
Kim Carl ("Plaintiff" or "Carl") filed a complaint
("Complaint") pursuant to 42 U.S.C. § 1983 against Thomas
Griffin ("Griffin"), Deputy Superintendent of Security
at Mid–Orange Correctional Facility ("Mid–Orange") in
Warwick, New York; James Nichols, Superintendent at
Mid–Orange; Jackie Ramos ("Ramos"), Nurse at Mid–
Orange; Mid–Orange Lieutenants Cestaro ("Cestaro")
and Urbanski ("Urbanski"); and Mid–Orange Corrections
Officers Mill ("Mill") and Dronke ("Dronke," and
collectively, "Defendants"). (See Compl., dated May 12,
2008.) Plaintiff alleges that Defendants denied him due
process and retaliated against him for his and his family's
exercise of their First Amendment rights when, following
a verbal dispute between Plaintiff and Griffin, Defendants,
among other things, searched Plaintiff's cell, ordered that he
undergo a urinalysis, lodged a "false" disciplinary charge
against him, found him guilty on that charge after a
"partial and bias[ed] hearing," sentenced him to 30 days of
confinement, and failed adequately to respond to freedom of
information law ("FOIL") requests filed by Plaintiff relative
to these events. (Compl.§ D.)

On September 29, 2009, the Court issued an order adopting
United States Magistrate Judge Michael H. Dolinger's report
and recommendation ("Report"), dated September 1, 2009,
denying Defendants' motion, filed September 8, 2008, to
dismiss the Complaint for Plaintiff's failure to exhaust
administrative remedies under the Prison Litigation Reform
Act ("PLRA"), 42 U.S.C. § 1997e(a). (See Order, dated Sept.

29, 2009; Report, dated Sept. 1, 2009.) The Court determined
that exhaustion should be excused because prison officials
failed to timely advance Plaintiff's grievance or otherwise
prevented him from seeking his administrative remedies. (See
Order at 2; Report at 15–16.) [1]

On August 30, 2010, Defendants moved for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure ("Fed. R. Civ.P."), arguing, among other things,
that (1) Plaintiff "was given all the procedural due process
protections guaranteed by the Fourteenth Amendment"; (2)
"[P]laintiff attempts to turn a series of legitimate and
typical penological actions into a constitutional claim by
characterizing them all as retaliatory"; and (3) Defendants
should be entitled to qualified immunity because it was
"objectively reasonable for ... [D]efendants to believe that
their ... penological actions did not violate any constitutional
rights." (Defs.' Mem. of Law in Supp. of Mot. for Summ. J.,
dated Aug. 30, 2010 ("Defs.Mem."), at 2, 15, 20–21.) [2]

On December 6, 2010, Plaintiff submitted opposition papers
restating the facts from his Complaint and arguing that
Defendants should not be granted summary judgment
based upon, among other things, Judge Dolinger's Report,
Defendants' alleged discovery violations, and Defendants'
alleged violations of New York State Corrections Law. (See
Pl.'s Mem. of Law, dated Dec. 1, 2010 ("Pl.Opp'n")); N.Y.
Correct. § 250.2.

**\*2** On December 15, 2010, Defendants filed a two page
letter in reply, noting, among other things, that "[P]laintiff
has ... failed to address any of the legal arguments asserted in
[D]efendants' Memorandum of Law." (Defs.' Ltr. to the Ct.,
dated Dec. 15, 2010 ("Defs.Reply"), at 1.) The parties waived
oral argument. (See Admin. Order, dated Jan. 24, 2011.)

The following facts are not in dispute:

(i) Plaintiff, while an inmate at Mid–Orange, was leaving the
mess hall at approximately 9:30 a.m. on January 18, 2008
when he became engaged in a brief verbal altercation with
Griffin regarding Plaintiff's access through the mess hall's exit
doors;

(ii) Griffin immediately reported to Urbanski that Plaintiff
was "acting strang[ely] and making unusual comments";

(iii) Urbanski ordered that Plaintiff undergo a cell search and
urinalysis "for suspicion due to his unusual behavior";

(iv) at approximately 10:15 a.m., Dronke searched Plaintiff's cell, where—according to Dronke's "Inmate Misbehavior Report," dated January 18, 2008 ("Misbehavior Report")—he "discovered several forms of expired medications";

(v) on that same morning, Plaintiff underwent a urinalysis which came back with "negative results";

(vi) on January 24, 2008, Cestaro held a Tier II disciplinary hearing ("Hearing") (having charged Plaintiff with violating Rule 113.14 of N.Y. Correct. § 270.2 ("Rule 113.14"), which prohibits inmate possession of "outdated" medication, at which Plaintiff stated that the medication was his and affirmed that he was served with a formal copy of the charge against him on January 22, 2008;

(vii) at the end of the Hearing, Cestaro found Plaintiff guilty of violating Rule 113.14 and sentenced him to 30 days in "keeplock"; and

(viii) Plaintiff filed five FOIL requests related to these incidents. (*See* Defs.' Rule 56.1 Statement, dated Aug. 30, 2010 ("Defs.56.1"), ¶¶ 1, 9–11, 15, 17, 18, 20, 21; Tr. of Pl.'s Deposition, dated Dec. 3, 2009 ("Dep.Tr."), at 43:8–44:19; Decl. of Julia H. Lee, dated Aug. 30, 2010 ("Lee Decl."), Ex. B; Urbanski Mem., dated Mar. 4, 2008, Lee Decl., Ex. F; Misbehavior Report, dated Jan. 18, 2008, Lee Decl., Ex. C; Tr. of Hearing, dated Jan. 24, 2008 ("Hr'g Tr."), at 1, 2, 7, Lee Decl., Ex. D; Compl., Ex. A.) [3]

**For the following reasons, Defendants' motion for summary judgment is granted.**

## II. Legal Standard

Summary judgment is appropriate "when, construing all evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 173 (2d Cir.2006) (citing Fed.R.Civ.P. 56(c)) (internal quotation marks and alterations omitted). "[I]n order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in that party's favor." *Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003).

**\*3** "The same standards apply to a *pro se* litigant, but such a litigant is given special latitude in responding to a

summary judgment motion." *Covington v. Westchester Cnty. Dep't of Corr.,* No. 06 Civ. 5369, 2010 WL 572125, at \*4 (S.D.N.Y. Jan. 25, 2010) (internal quotation marks omitted). "By the same token, however, a *pro se* party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Thompson v. Tracy,* No. 00 Civ. 8360, 2008 WL 190449, at \*5 (S.D.N.Y. Jan. 17, 2008) (internal quotation marks omitted).

## III. Analysis

### (1) Due Process Claim

Defendants argue that Plaintiff's claim—that Defendants denied him due process by sentencing him to 30 days of confinement on the basis of "false" charges and testimony (Compl.§ D)—must be dismissed because Plaintiff "had no actual liberty interest since his confinement to keeplock was only 30 days," and because Plaintiff "was afforded sufficient procedural safeguards." (Defs. Mem. at 15–16.) Plaintiff does not appear to respond to this argument. [4]

"[A]n analysis of whether Plaintiff was denied due process turns first, on whether there exists an interest which has been deprived, and second, on whether the procedures implemented to protect that interest afforded due process." *Harris v. Keane,* 962 F.Supp. 397, 403 (S.D.N.Y.1997) (citing *Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992); *Hewitt v. Helms,* 459 U.S. 460, 472 (1983)).

Plaintiff's due process claim fails because he cannot establish any "interest which has been deprived." *Id.* "[T]he decisions in the Second Circuit are unanimous that keeplock of 30 days or less in New York prisons is not 'atypical or significant hardship,' " *Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006) (quoting *Sandin v. Connor,* 515 U.S. 472, 484 (1995)), and, therefore, "does not implicate a liberty interest ... of which Plaintiff would be entitled to due process protections," *Harris,* 962 F.Supp. at 404. [5]

"Even if Plaintiff could establish a cognizable liberty interest, he must still demonstrate that Defendants deprived him of that interest through insufficient process." *Branch v. Goord,* No. 05 Civ. 6495, 2006 WL 2807168, at \*4 (S.D.N.Y. Sept. 28, 2006). The evidence establishes that Defendants provided Plaintiff with "the minimum procedures to which prison inmates are entitled under the fourteenth amendment." *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *see Wolff v. McDonnell,* 418 U.S. 539, 564–66 (1974). That is,

Plaintiff was given "(1) advance written notice of the charges at least 24 hours before the [H]earing." *Freeman,* 808 F.2d at 953; (*see* Hr'g Tr. at 1 (Cestaro: "[T]he record indicates that you were served with a formal copy of the charges on 1/22/08 at 8:15am by Officer Garecky. Is that correct?" Carl: "Yes.").) Plaintiff was afforded "(2) the opportunity to appear at the [H]earing, to call witnesses, and to present rebuttal evidence." *Freeman,* 808 F.2d at 953; (*see* Hr'g Tr. at 1, 6; Dep. Tr. at 68:24–69:11, 89:18–23 (Def. Counsel: "Did you have an opportunity to talk about what happened during the hearing?" Carl: "Yes, I did." ... Def. Counsel: "[Y]ou could call witnesses but you chose not to call any witnesses at the hearing?" ... Carl: "I didn't want to call any witnesses[.]").) And, Plaintiff was provided with (3) a written statement by the factfinders as to the evidence relied on for their decision, and the reasons for the prison committee's actions." *Freeman,* 808 F.2d at 953; (*see* Lee Decl. Ex. E.) "[P]laintiff was afforded all the process due." *Renelique v. Duncan,* No. 03 Civ. 1256, 2007 WL 1110913, at * 14 (N.D.N.Y. Apr. 12, 2007).

**\*4** Plaintiff's due process claim would fail even if the Court were to assume, *arguendo,* that the Misbehavior Report and/or Cestaro and Ramos's statements at the Hearing were "false" (Compl.§ D) because "the key inquiry in assessing an allegation that an inmate has been found guilty of false disciplinary charges is whether or not the prison has provided the inmate with the minimum procedural due process protections," *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988); *see Merced v. Moylan,* 2007 WL 3171800, at *10 (N .D.N.Y. Oct. 29, 2007); *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997);[6] *see also Excell v. Woods,* No. 07 Civ. 305, 2009 WL 3124424, at *22 & n. 49 (N.D.N.Y. Sept. 29, 2009) ("[T]he Fourteenth Amendment does not require any administrative review of disciplinary convictions.") (collecting cases); *Blount v. Brown,* No. 10 Civ. 1548, 2010 WL 1945858, at *2 (E.D.N.Y. May 11, 2010) ("[A] plaintiff has no property interest in obtaining FOIL documents." (internal quotation marks omitted)) (collecting cases); *Freeman v. Goord,* No. 02 Civ. 9033, 2005 WL 3333465, at *5 n. 4 (S.D.N.Y. Dec. 7, 2005) ("[D]eprivation of [a] prisoner's property does not violate Due Process" because "New York provides adequate state court post-deprivation remedies for an inmate's loss of property." (citing *Hudson v. Palmer,* 468 U.S. 517, 539–40 (1984))).

And, to the extent that Plaintiff attempts to assert a "substantive due process" claim by arguing that Defendants' actions "violat[ed]" New York law (*see* Compl. § D; Pl.

Opp'n at 6 (citing *Jackson v. Lefevre,* 494 N.Y.S.2d 797, 799 (Sup.Ct.1985))), such claim would fail because "[s]ubstantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised," *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal citations and quotation marks omitted).

**(2) Retaliation Claim**

Defendants argue that "[P]laintiff fails to allege any protected speech or conduct as the impetus for the retaliation," and Defendants committed no cognizable "adverse action" against Plaintiff. (Defs. Mem. at 6, 8–11, 17–18.) Plaintiff (again) does not appear to respond. *See Monachino,* 2011 WL 349392, at *4.

"[A] plaintiff asserting First Amendment retaliation claims must allege (1) that the speech or conduct at issue was protected, (2) that the defendant[s] took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2001) (internal quotation marks omitted); *see also Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) ("Courts must approach prisoner claims of retaliation with skepticism and particular care."), *overruled on other grounds by Swierkiewicz v. Sorema N.A .,* 534 U.S. 506 (2002).

**\*5** Plaintiff's retaliation claim fails because Plaintiff fails to show that he engaged in any constitutionally protected conduct. *See Davis,* 320 F.3d at 352. He alleges that Defendants retaliated against him for shaking his head and uttering "unbelievable I cant [sic] believe him" when Griffin blocked Plaintiff's access through the door from the mess hall. (Compl.§ D.) Here, the alleged retaliation arose out of a verbal confrontation. *See Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S .D.N.Y.1989); *see Bell v. Hill,* No. 10 Civ. 850, 2010 WL 4256578, at *2 (E.D.Cal. Oct. 21, 2010) ("Plaintiff fails to allege that he was engaged in any protected conduct" where "Plaintiff simply told [a prison official] he thought his behavior was inappropriate."); *Riggs v. Miller,* 480 F.Supp. 799, 804 (E .D. Va.1979) ("[B]ickering, argumentative conversation" "not intended to reach anyone other than the defendant" is not "constitutionally protected activity."); *Lugo v. Van Orden,* No. 07 Civ. 879, 2008 WL 2884925, at *3 n. 4 (N.D.N.Y. July 23, 2008). Plaintiff's "brief and isolated verbal [encounter with Griffin] does not constitute protected First Amendment speech. To construe it as such would elevate

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

every verbal exchange between a prison employee and a prisoner to the level of protected speech under the First Amendment." *Oriakhi v. Wood,* No. 05 Civ. 53, 2006 WL 859543, at *5 (M.D.Pa. Mar. 31, 2006).[7]

Plaintiff also cannot establish any "adverse action" by Defendants because "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis,* 320 F.3d at 352 (internal quotation marks omitted). "A cell search is not considered to be an adverse action." *H'Shaka v. Drown,* No. 03 Civ. 937, 2007 WL 1017275, at *19 (N.D.N.Y. Mar. 30, 2007); *see Salahuddin v. Mead,* 2002 WL 1968329, at *5–6 (S.D.N.Y. Aug. 26, 2002) (collecting cases). Nor is "[b]eing forced to give a urine sample on one occasion ... an adverse action [because it is not] sufficient to deter a person of ordinary firmness" from exercising his First Amendment rights. *Burgos v. Canino,* 641 F.Supp.2d 443, 454 (E.D.Pa.2009), *aff'd,* 358 F. App'x 302 (3d Cir.2009); *see Bumpus v. Canfield,* 495 F.Supp.2d 316, 327 (W.D.N.Y.2007).

Defendants' alleged "threat[s]" and/or "harass[ment]"of Plaintiff were also insufficiently direct or specific to deter an ordinary inmate from exercising his first amendment rights.[8] (Compl.§ D); *see Sharpe v. Taylor,* No. 05 Civ. 1003, 2009 WL 1743987, at *9 (N.D.N.Y. June 18, 2009). "[V]erbal harassment, or even threats, are generally held not to rise to the level of adverse action that will support a First Amendment retaliation claim." *Rosales v. Kikendall,* 677 F.Supp.2d 643, 648 (W.D.N.Y.2010) (citing *Cabassa v. Smith,* No. 08 Civ. 480, 2009 WL 1212495, at *7 (N.D.N.Y. Apr. 30, 2009)); *see Bartley v. Collins,* No. 95 Civ. 10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action."); *Kemp v. LeClaire,* No. 03 Civ. 844, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005).

**\*6** And, Plaintiff's identification of the Misbehavior Report and his 30 day keeplock sentence as "adverse actions" is unpersuasive because "there is no dispute that ... [P]laintiff 'committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.' " *Gayle v.*

*Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (quoting *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998) (per curiam)); *see Battice v. Phillip,* No. 04 Civ. 669, 2006 WL 2190565, at *8 (E.D.N.Y. Aug. 2, 2006); (*see, e.g.,* Hr'g Tr. at 6; Dep. Tr. at 88:22–89:2 (Def. Counsel: "Just to be clear, the medication that Officer Dronke found in your cell, you had that in your possession, right, that was your medication?" Carl: "Yes.").) "Thus, even assuming retaliatory motive, [Defendants would be] entitled to summary judgment '[because] there were proper, non-retaliatory reasons for [Plaintiff's] punishment.' " *Hynes,* 143 F.3d at 657 (quoting *Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996)); *see Lowrance,* 20 F.3d at 535.[9]

In his opposition papers, Plaintiff cites for the first time to the Fourth Amendment, although he does not (either in his Complaint or in opposition) specify a Fourth Amendment violation by Defendants. "Even given the considerable leeway in pleadings afforded *pro se* litigants, Plaintiff here cannot raise a new claim for the first time ... [at] summary judgment." *Evans–Gadsden v. Bernstein Litowitz Berger & Grossman, LLP,* 491 F.Supp.2d 386, 402 (S.D.N.Y.2007); *see Massie v. Ikon Office Solutions, Inc.,* 381 F.Supp.2d 91, 95 (N.D.N.Y.2005).

### (3) Qualified Immunity

"Since the Court has concluded in this case that no First or Fourteenth Amendment violations occurred, the Court need not address qualified immunity." *Vega v. Lareau,* No. 04 Civ. 750, 2010 WL 2682307, at * 15 (N.D.N.Y. Mar. 16, 2010); *see also Freeman v. Goord,* No. 02 Civ. 9033, 2005 WL 3333465, at *12 (S.D.N.Y. Dec. 7, 2005) ("Conduct that does not violate any constitutional right certainly does not violate a constitutional right that was 'clearly established' at the time the conduct occurred." (quoting *Mozzochi v. Borde,* 959 F.2d 1174, 1179 (2d Cir.1992))).

### IV. Conclusion and Order

For the foregoing reasons, Defendants' motion for summary judgment [# 56] is granted. The Clerk of the Court is respectfully requested to close this case.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 723553

Footnotes

1  Plaintiff appears to have been released from custody on March 25, 2010. *See* N.Y. Inmate Info., http://nysdocslookup.docs.state .ny.us; (Tr. of Proceedings, dated Mar. 8, 2010, 5:22–23.)

2  In connection with Defendants' motion for summary judgment, Defendants notified Plaintiff that if he does not "respond to the motion for summary judgment on time with affidavits or documentary evidence contradicting the facts asserted by [Defendants], the Court may accept [D]efendants' factual assertions as true" and "[j]udgment may then be entered in [D]efendants' favor without a trial." (Not. to *Pro Se* Litigant Opposing Mot. for Summ. J., dated Aug. 30, 2010, at 2.)

3  "Although [Plaintiff] has failed to submit [his] own Rule 56.1 Statement in response as required by the Local Rules, the Court has only deemed [Defendants'] stated facts to be admitted to the extent that they are uncontroverted by evidence in admissible form submitted by [Plaintiff] with [his] opposition papers." *Shmueli v. City of New York,* No. 03 Civ. 1195, 2007 WL 1659210, at *1 n. 1 (S.D.N.Y. June 7, 2007).

4  "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Monachino v. Bair,* No. 09 Civ. 3939, 2011 WL 349392, at *4 (S.D.N.Y. Feb. 1, 2011) (quoting *Maher v. Alliance Mortg. Banking Corp.,* 650 F.Supp.2d 249, 267 (E.D.N.Y.2009)). Because Plaintiff is *pro se,* the Court has analyzed his claims on the merits.

5  There is also no indication that Plaintiff endured "unusual" keeplock conditions. *Palmer v. Richards,* 364 F.3d 60, 66 (2d Cir.2004). "[T]he allegation that [P]laintiff was placed in keeplock confinement under otherwise normal conditions for thirty days ... does not establish a claim of cruel and unusual punishment." *McDonald v. Rivera,* No. 06 Civ. 410, 2008 WL 268345, at *8 (N.D.N.Y. Jan. 30, 2008) (citing *Jackson v. Johnson,* 15 F.Supp.2d 341, 363 (S.D.N.Y.1998) (same for 99 days in keeplock)).

6  The record contradicts Plaintiff's claims of falsity. Plaintiff admittedly possessed the medication cited in the Misbehavior Report. (*See* Hr'g Tr. at 2, 4, 6 (Carl: "[W]hen I was in [a different prison] they ... gave me that medication.... I had them update my medication and I just looked over it, I never really, it wasn't a lot I never paid attention to it."); Lee Decl. Ex. C.) And, Rule 113.14, to which the Misbehavior Report cites, provides, in pertinent part, that "[a]n inmate shall not possess **outdated** or unauthorized types or quantities of medication." Rule 113.14 (emphasis added).

7  Two other activities alleged by Plaintiff are also not protected speech, namely a letter written by Plaintiff's "family member ... [to] the inspector general on Jan[uary] 18[,] 2008 at 1.30 pm" (Compl.§ D); and a letter written by Plaintiff, at some point during Plaintiff's time in keeplock, to the Commissioner of the New York Department of Correctional Services ("Commissioner") (Dep. Tr. at 39:17–40:4; *see* Compl. § D). (Although Plaintiff provided the Court with copies of the Commissioner's responses to these letters (*see* Pl. Opp'n, Ex. A), the letters themselves do not seem to be included in the record.) Because the cell search, urinalysis, and Misbehavior Report, which led to Plaintiff's punishment, all took place in the morning hours of January 18, 2008—*i.e.,* **before** these letters were written or received—"[P]laintiff's claim that he was retaliated against for [these letters] must be dismissed." (Defs. Mem. at 7 (citing *Gill v. Pilypchak,* 389 F.3d 379, 380 (2d Cir.2004)); *see* Compl. § D; Lee Decl. Ex C.)

8  Plaintiff appears to allege three such instances: (i) during Plaintiff's verbal exchange with Griffin, Griffin stated, "I will have something done to you"; (ii) Mill asked Plaintiff if Plaintiff got a "ticket" (infraction), presumably in relation to the events of January 18, 2008; and (iii) Cestaro said to Plaintiff at the end of the Hearing, "[W]hile you['re] in [keeplock,] think about why you curse[d] at ... Griffin." (Compl.§ D.)

9  "Because the [C]ourt finds that Plaintiff has not engaged in protected speech and did not suffer any adverse ... action, the [C]ourt does not reach the issue of causation." *Reed v. Aiken Cnty.,* No. 09 Civ. 1744, 2010 WL 4238848, at *5 (D.S.C. Oct. 21, 2010); *see Davis,* 320 F.3d at 352.

2012 WL 4120001
Only the Westlaw citation is currently available.
United States District Court,
D. Colorado.

Gustavo COLÓN, Plaintiff,
v.
Blake R. DAVIS—Warden, Defendant.

Civil Action No. 11–cv–01169–WJM–KMT.
|
Aug. 8, 2012.

**Attorneys and Law Firms**

Gustavo Colon, Florence, CO, pro se.

Nathalie Erin Cohen, U.S. Attorney's Office, Denver, CO, for
Defendant.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

KATHLEEN M. TAFOYA, United States Magistrate Judge.

 **\*1** This matter is before the court on Defendant Blake
R. Davis' "Motion to Dismiss Pursuant to Fed.R.Civ.P.
12(b)(1) and 12(b)(6)" (Doc. No. 21 [Mot. Dismiss], filed
September 28, 2011) and "Plaintiff['s] Motion for Summary
Judgment" (Doc. No. 34 [Mot. Summ. J.], filed January 3,
2012).

## I. FACTUAL BACKGROUND

The following facts are taken from Plaintiff's "Prisoner
Complaint" (Doc. No. 4 [Compl.], filed June 8, 2011) as well
as the parties' briefing with respect to this Recommendation.

Plaintiff alleges Defendant, the Warden of the United
States Penitentiary in Florence, Colorado, where Plaintiff is
incarcerated, has violated his Fifth Amendment Due Process
rights. (See Compl. at 2–3.) Specifically, Plaintiff alleges on
December 16, 2008, Defendant placed a freeze on his trust
fund account without giving Plaintiff adequate notice. (Id. at
4.) Plaintiff also alleges on December 16, 2008, Defendant
placed Plaintiff on mail and telephone restriction and has
refused to allow Plaintiff to correspond with or communicate

with anyone other than his immediate family members. (Id.
at 5–6.) Plaintiff also alleges Defendant has failed to provide
a six-months' review to have the restrictions removed in
violation of his due process rights. (Id. at 4–6.)

Plaintiff seeks an injunction requiring Defendant to reinstate
all privileges. (Id. at 8.) Plaintiff also seeks compensatory
damages. (Id.)

## II. PROCEDURAL HISTORY

Plaintiff filed his Prisoner Complaint on June 8, 2011.
(Compl.) On September 7, 2011, Plaintiff filed a document
in which he clarified that he asserts claims against Defendant
Davis in his official capacity only. (See Doc. No. 20.)

Defendant filed his Motion to Dismiss on September
28, 2011. (Mot .Dismiss.) Plaintiff filed his response on
November 25, 2011. (Doc. No. 32 [Pl.'s Resp.].) Defendant
filed his reply on December 12, 2011. (Doc. No. 33 [Def.'s
Reply].)

Plaintiff filed his Motion for Summary Judgment on January
3, 2012. (Mot.Summ. J.) Defendant filed his response on
January 24, 2012. (Doc. No. 38 [Def.'s Resp.].) Plaintiff filed
his reply on February 13, 2012. (Doc. No. 39 [Pl.'s Reply].)
These motions are ripe for recommendation and ruling.

## III. LEGAL STANDARDS

### A. Pro Se *Plaintiff*

Plaintiff is proceeding *pro se.* The court, therefore, "review[s]
his pleadings and other papers liberally and hold[s] them to
a less stringent standard than those drafted by attorneys."
*Trackwell v. United States,* 472 F.3d 1242, 1243 (10th
Cir.2007) (citations omitted); *see also Haines v. Kerner,*
404 U.S. 519, 520 (1972) (holding allegations of a *pro
se* complaint "to less stringent standards than formal
pleadings drafted by lawyers"). However, a *pro se* litigant's
"conclusory allegations without supporting factual averments
are insufficient to state a claim upon which relief can
be based." *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th
Cir.1991) (citations omitted). A court may not assume that
a plaintiff can prove facts that have not been alleged, or
that a defendant has violated laws in ways that a plaintiff
has not alleged. *Associated Gen. Contractors of Cal., Inc. v.
Cal. State Council of Carpenters,* 459 U.S. 519, 526 (1983);

*see also* *Whitney v. New Mexico,* 113 F.3d 1170, 1173–74 (10th Cir.1997) (a court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins,* 927 F.2d 1156, 1159 (10th Cir.1991) (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues").

### B. Lack of Subject Matter Jurisdiction

**\*2** Fed.R.Civ.P. 12(b)(1) empowers a court to dismiss a complaint for lack of subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case. Rather, it calls for a determination that the court lacks authority to adjudicate the matter, attacking the existence of jurisdiction rather than the allegations of the complaint. *See* *Castaneda v. INS,* 23 F.3d 1576, 1580 (10th Cir.1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Basso v. Utah Power & Light Co.,* 495 F.2d 906, 909 (10th Cir.1974). A court lacking jurisdiction "must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *See Basso,* 495 F.2d at 909. The dismissal is without prejudice. *Brereton v. Bountiful City Corp.,* 434 F.3d 1213, 1218 (10th Cir.2006); *see also* *Frederiksen v. City of Lockport,* 384 F.3d 437, 438 (7th Cir.2004) (noting that dismissals for lack of jurisdiction should be without prejudice because a dismissal with prejudice is a disposition on the merits which a court lacking jurisdiction may not render).

A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction." *Groundhog v. Keeler,* 442 F.2d 674, 677 (10th Cir.1971). When considering a Rule 12(b)(1) motion, however, the Court may consider matters outside the pleadings without transforming the motion into one for summary judgment. *Holt v. United States,* 46 F.3d 1000, 1003 (10th Cir.1995). Where a party challenges the facts upon which subject matter jurisdiction depends, a district court may not presume the truthfulness of the complaint's "factual allegations ... [and] has wide discretion to allow affidavits, other documents, and [may even hold] a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.*

### B. Failure to State a Claim Upon Which Relief Can Be Granted

Fed.R.Civ.P. 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6) (2007). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1201 (10th Cir.2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon,* 935 F.2d 1106, 1198 (10th Cir.1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory. *Id.* at 1949–51. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 1951. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 1950.

**\*3** Notwithstanding, the court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc., v. Texas Waste,* 161 F.3d 1259, 1262 (10th Cir.1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1940. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* at 1949 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Iqbal,* 129 S.Ct. at 1949 (citation omitted).

### C. Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver,* 36 F.3d 1513, 1518 (10th Cir.1994) (citing *Celotex,* 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see also* Fed.R.Civ.P. 56(c). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metropolitan Life Ins. Co.,* 631 F.3d 1153, 1160 (10th Cir.2011) (citing *Anderson,* 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld County, Colo.,* 594 F.3d 1202, 1209–10 (10th Cir.2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works,* 36 F.3d at 1517. At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.,* 584 F.3d 1304, 1312 (10th Cir.2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007); *Thomson,* 584 F.3d at 1312.

### IV. ANALYSIS

#### A. Motion to Dismiss

*4 Defendant moves to dismiss Plaintiff's Complaint on the grounds that the Court lacks subject matter jurisdiction over Plaintiff's claims for money damages and that Plaintiff fails to state a due process claim. (*See* Mot. Dismiss at 3–15.)

#### 1. Sovereign Immunity

Defendant argues that this Court lacks subject matter jurisdiction over Plaintiff's official capacity claims. In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971), the Supreme Court recognized "an implied private right of action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Services Corp. v. Malesko,* 534 U.S. 61, 66 (2001). "The prisoner may not bring a *Bivens* claim against the officer's employer, the United States, or the BOP." *Id.; See Weaver v. United States,* 98 F.3d 518, 520 (10th Cir.1996) (claim for damages against a federal defendant in his official capacity is treated as a claim against the United States).

"[A] *Bivens* claim lies against the federal official in his individual capacity-not ... against officials in their official capacity." *Simmat v. United States Bureau of Prisons,* 413 F.3d 1225, 1231 (10th Cir.2005). "A suit for damages against a federal agent in his official capacity would be barred by sovereign immunity, unless the government has waived sovereign immunity." *Pleasant v. Lovell,* 876 F.2d 787, 793 (10th Cir.1989) (citing *Atkinson v. O'Neill,* 867 F.2d 589, 590 (10th Cir.1989) (sovereign immunity bars suit against IRS agents sued in their official capacities)). An official-capacity claim under *Bivens*

> contradicts the very nature of a *Bivens* action. There is no such animal as a *Bivens* suit against a public official tortfeasor in his or her official capacity. Instead, any action that charges such an official with wrongdoing while operating in his or her official capacity as a United States agent operates as a claim against the United States.

*Farmer v. Perrill,* 275 F.3d 958, 963 (10th Cir.2001). Sovereign immunity, therefore, bars Plaintiff's claims for damages against the defendant in his official capacity, and his damages claims are appropriately dismissed for lack of jurisdiction.

#### 2. Failure to State a Claim

Defendant next argues that Plaintiff's claims for injunctive relief fail to state a due process claim. The court "review[s] property and liberty interest claims arising from prison conditions by asking whether the prison condition

complained of presents 'the type of atypical, significant deprivation in which a State might conceivably create a liberty [or property] interest.' " *Cosco v. Uphoff,* 195 F.3d 1221, 1224 (10th Cir.1999) (quoting *Sandin v. Conner,* 515 U.S. 472, 486 (1995)). In *Sandin v. Conner,* the Supreme Court held that a deprivation occasioned by prison conditions or a prison regulation does not reach protected liberty interest status and require procedural due process protection unless it imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484. The Tenth Circuit subsequently ruled that property interest claims by inmates are also to be reviewed under *Sandin's* analysis. *Cosco,* 195 F.3d at 1224.

### a. Inmate Trust Fund Account

**\*5** Defendant argues that Plaintiff has failed to allege sufficient facts showing that the restriction on his inmate account amounted to an atypical and significant hardship. (Mot. Dismiss at 13–14.) Defendant argues that the only facts alleged by Plaintiff in Claim One to establish a property interest are that (1) since December 16, 2008, he has not had access to his funds and (2) "when money is sent to [him] by [his] family it is placed on HOLD–FROZEN by the Warden." (*Id.* at 13 [citing Compl. at 4].) Defendant also argues that the records attached to Plaintiff's Complaint reveal that the restrictions on Plaintiff's inmate account were imposed to identify and seize contraband funds related to gang activity, causing incoming funds to be placed on administrative hold "until cleared of Latin King gang activity origination" and encumbering all funds in Plaintiff's inmate account "determined to originate from individuals associated with Latin King gang activity." [1] (*Id.* [citing Compl. at 13.)

Taking Plaintiff's allegations as true, however, the court finds they are sufficient to state a claim for a due process violation. Though the Tenth Circuit has held that the seizure and forfeiture of currency as contraband is a typical incident of prison life, and is not a significant property interest deprivation, *Steffey v. Orman,* 461 F.3d 1218, here Plaintiff alleges all of his funds have been held and frozen-even money sent to him by family members-for almost four years. At this juncture, it is impossible for the court to determine that any or all of the funds being held are contraband. Moreover, there is no indication in the Complaint or the attached records that any of the funds have been released after a determination they are not contraband.

Finally, " 'to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.' " *Steffey,* 461 F.3d at 1223 (quoting *Bd, if Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972)). Unlike in *Steffey,* where the court was able to conclude that the property interest involved-fifty dollars-was insignificant, here the court was unable to make such a determination at this time. Rather, because Plaintiff alleges his inmate funds have been frozen since 2008, it is possible Plaintiff's property interest is significant. Moreover, because it is impossible to determine at this time if the funds that have been frozen are contraband, it also is impossible for the court to determine if Plaintiff has a legitimate claim of entitlement to the money.

Therefore, based on the foregoing, the court recommends that Defendant's motion to dismiss Plaintiff's claim for injunctive relief relating to his inmate trust fund account be denied.

### b. Mail and Telephone Communications

Plaintiff alleges (1) he has been on telephone and mail restrictions from December 16, 2008, which limits his communications to immediate family members only; (2) he was denied "the right to keep a normal relationship with other family members"; and (3) the restrictions are indefinite. (Compl. at 5–6.) Plaintiff alleges the failure of the defendant to conduct any required reviews of the restrictions on his communications and the indefinite nature of the restrictions constitute a violation of his due process rights. (*Id* .)

**\*6** Regulation of a prisoner's communications is permissible so long as it is " 'reasonably related to legitimate penological interests.' " *Thornburgh v. Abbott,* 490 U.S. 401, 409 (1989)(quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The Supreme Court in *Turner* outlined factors courts should consider when determining whether a restriction is reasonably related to legitimate penological interests. *See Turner,* 482 U.S. at 89–91. First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it." 482 U.S. at 89 (internal quotation omitted). Second, if alternative means of exercising the constitutional right are available to the inmate, courts should accord prison officials substantial deference in determining the validity of the regulation. *Id.* at 90. A third consideration is the impact the accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources. *Id.* Finally, the existence of "obvious, easy alternatives" that fully accommodate the

inmate's rights at *de minimis* cost to valid penological interests indicates that the prison regulation is not reasonable, but is an "exaggerated response" to prison concerns." *Id.* at 90–91.

These *Turner* factors are highly fact-intensive and, therefore, commonly cannot be adequately addressed until the summary judgment stage. *See, e.g., Al–Owhali v. Mukasey,* No. 07–cv–02214–LTB–BNB, 2010 WL 5651033, at \*11 (D. Colo. June 17, 2010) ("This analysis requires facts that are not properly before the court on a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P."); *see also Beerheide v. Suthers,* 286 F.3d 1179, 1185 (10th Cir.2002) ("*Turner* thus requires courts, on a case-by-case basis, to look closely at the facts of a particular case and the specific regulations and interests of the prison system in determining whether prisoners' constitutional rights maybe curtailed."); *Monroe v. Beard,* 2007 WL 764086, at \* 13 (E.D.Pa. March 7, 2007) (noting that, while "[c]hallengers of the regulation have the ultimate burden of persuasion that the policy is unreasonable and fails step one of the *Turner* analysis," the government "must provide a government interest that justifies the regulation and 'demonstrate that the policy drafters could rationally have seen a connection between the policy and that interest' ").

Here, Plaintiff alleges that he is cut off from certain family members but not others without adequate justification. Giving Plaintiff the benefit of all favorable inferences, he may be able to demonstrate that the restriction of his privileges imposes atypical and significant hardship in relation to the ordinary incidents of prison life. Plaintiff also may be able to support the inference that the restrictions are not reasonably related to the proffered penological interest. Accordingly, dismissal of Plaintiff's claims regarding his mail and telephone restrictions is not appropriate at this time.

### B. Motion for Summary Judgment

**\*7** Plaintiff moves for summary judgment on the basis that Defendant Davis is not authorized to issue restrictions against him. (*See generally* Mot. Summ. J.) Plaintiff argues that the defendant "failed to have his Appointment Affidavit/ Oath of Office" as a "Coop–Student" for the BOP "properly administrated to make it a legally authentic document according to the Law." (*Id.* at 4.) Plaintiff therefore asserts that the defendant is "*NOT* a Warden–Government Agent" and he had no authority to issue any restrictions against the Plaintiff." (*Id.*)

However, though Plaintiff attempts to prove that Defendant Davis is "not a Warden–Government Agent" by attacking an Appointment Affidavit from 1988 relating to Warden Davis's appointment to the position of "Coop Student" with the BOP, the Appointment Affidavit relates to Warden Davis being appointed as a "Coop Student" in 1988, not as the current warden of the ADX. (*See id.* at 6.) Accordingly, the Appointment Affidavit does not establish the assertion that Plaintiff is trying prove.

Second, Plaintiff's contention that the Appointment Affidavit is void because it is not signed by a notary public is misguided. Plaintiff argues that 5 U.S.C. § 2903 requires that oaths of office for federal officials be sworn before a notary public. (*Id* . at 3–4.) Specifically, Plaintiff focuses on the language in subsections (a) and (c) that states that an oath may be administered by "an individual authorized" by "local law to administer oaths." 5 U.S.C. § 2903(a) and (c)(2). However, Plaintiff completely ignores subsection (b) of § 2903, which states:

> (b) An employee of an Executive agency designated in writing by the head of the Executive agency, or the Secretary of a military department with respect to an employee of his department, may administer-
>
> > (1) the oath of office required by section 3331 of this title, incident to entrance into the executive branch; or
> >
> > (2) any other oath required by law in connection with employment in the executive branch.

5 U.S.C. § 2903. Plaintiff has not established that the 1988 Appointment Affidavit attached to his motion was not administered pursuant to subsection (b), *i.e.,* by an employee of the BOP, an Executive agency within the Department of Justice, who has been designated in writing by the Attorney General or the Director of the BOP. Because Plaintiff has filed the motion for summary judgment, it is his burden to show that the 1988 Appointment Affidavit is invalid, to the extent it has any relevance to his position as Warden in 2012, *Celotex,* 477 U.S. at 325, but he fails to do so.

Accordingly, Plaintiff fails to present evidence in his motion showing that there is no genuine issue of material fact regarding his due process claims and that he is entitled to judgment as a matter of law on those claims.

WHEREFORE, for the foregoing reasons, the court respectfully

**RECOMMENDS** that

(1) Defendant Blake R. Davis' "Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6)" (Doc. No. 21) be GRANTED in part and DENIED in part as follows:

> **\*8** a. Plaintiff's damages claims should be dismissed for lack of jurisdiction; and
>
> b. Plaintiff's claims for injunctive relief should proceed; and

(2) "Plaintiff['s] Motion for Summary Judgment" (Doc. No. 34) be DENIED.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *In re Griego,* 64 F.3d 580, 583 (10th Cir.1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.,* 73 F.3d 1057, 1060 (10th Cir.1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers,* 195 F.3d 573, 579–80 (10th Cir.1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.,* 73 F.3d at 1059–60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.,* 52 F.3d 901, 904 (10th Cir.1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States,* 980 F.2d 1342, 1352 (10th Cir.1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales–Fernandez v. INS,* 418 F.3d 1116, 1122 (10th Cir.2005) (firm waiver rule does not apply when the interests of justice require review).

## All Citations

Not Reported in F.Supp.2d, 2012 WL 4120001

---

Footnotes

1    "Generally, the sufficiency of a complaint must rest on its contents alone." *Gee v. Pacheco,* 627 F.3d 1178, 1186 (10th Cir.2010) (citation omitted). Plaintiff, however, refers to a number of documents in his Complaint and has attached them thereto, and the court may therefore consider them. *See id.* (providing that the limited exceptions to the general rule regarding assessment of a complaint's sufficiency are "(1) documents that the complaint incorporates by reference, (2) 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity,' and (3) 'matters of which a court may take judicial notice.' ") (citations omitted).

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 2858927
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Jermaine Fann, Plaintiff,

v.

Nurse Arnold et al., Defendants.

Case # 14-CV-6187-FPG
|
Signed 05/16/2016

DECISION AND ORDER

HON. FRANK P. GERACI, JR. Chief Judge

**\*1** Before this Court are Plaintiff Jermaine Farm's ("Plaintiff") Motion for Reconsideration (ECF No. 13), Motion for Default Judgment (ECF No. 18), Motion to Amend the Revised Second Amended Complaint (ECF No. 26), and Motion to Appoint Counsel (ECF No. 28).

## BACKGROUND

Plaintiff is a prisoner at Auburn Correctional Facility in Auburn, New York. He brings this *pro se* action against various prison officials for issues arising out of his incarceration at Orleans Correctional Facility ("Orleans") in Albion, New York. Because Plaintiff is proceeding *in forma pauperis*, the Court conducted an initial screening of his Complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, and by Order dated May 7, 2015, the Court dismissed several claims and defendants from the lawsuit. ECF No. 12. Plaintiff moved for reconsideration of that Order (ECF No. 13), moved to amend his Revised Second Amended Complaint (ECF No. 26), and moved for the appointment of counsel (ECF No. 28). Defendants responded to Plaintiff's Motion to Amend on November 20, 2015. ECF No. 27.

## DISCUSSION

### I. Motion for Reconsideration

Motions for reconsideration are governed by Local Rule of Civil Procedure 7(d)(3) and Federal Rules of Civil Procedure

59(e) and 60(b). The standard for granting a motion for reconsideration is "strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (citation omitted). "A motion for reconsideration should be granted only when the [party] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice. " *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013) (citation and internal quotation marks omitted); *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). It is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Analytical Surveys*, 684 F.3d at 52 (citation omitted). Accordingly, on a motion for reconsideration, a party may not merely offer the same "arguments already briefed, considered and decided" or "advance new facts, issues or arguments not previously presented to the Court." *Schonberger v. Serchuk*, 742 F. Supp. 108, 119 (S.D.N.Y. 1990). The decision to grant or deny the motion for reconsideration is committed to "the sound discretion of the district court." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009).

### A. Retaliation Claim against Officer Anstey

The Court previously dismissed Plaintiff's retaliation claim against Officer Anstey, finding that while Plaintiff engaged in constitutionally protected speech or conduct by filing grievances and thus satisfied the first element of a retaliation claim, the alleged deprivation of one meal was insufficient to constitute an adverse action to satisfy the second element of the claim. ECF No. 12, at 7-8. Plaintiff again asserts that the denial of one meal constitutes an adverse action, but he provides no authority or evidence that persuades this Court to deviate from its previous ruling. Plaintiff also contends that Officer Anstey verbally harassed him. ECF No. 13, at 3-5 (citing ECF No. 10, at ¶¶ 43, 45, 47, 48).

**\*2** Officer Anstey's alleged statements to Plaintiff (ECF No. 10, at ¶ 43 ("You want to keep filing grievances, I'll make your time here even harder."), ¶ 45 ("I'll wipe my ass with you and your lawsuit.")) do not constitute adverse action because they are merely insulting or disrespectful, which does not give rise to a constitutional violation. *See Lunney v. Brureton*, No. 04 Civ. 2438 (LAK) (GWG), 2007 WL 1544629, at \*16 (S.D.N.Y. May 29, 2007) ("In its prior ruling, the Court dismissed [Plaintiff]'s general allegations

of threats and harassment because comments that are merely insulting or disrespectful do not give rise to a constitutional violation.") (citations and internal quotations omitted). There is no indication that Officer Anstey threatened bodily injury or that he committed physical violence. *Hernandez v. Goord*, 312 F. Supp. 2d 537, 545 (S.D.N.Y. 2004) (finding that the plaintiff stated a retaliation claim where he alleged several attacks and threats on his life as specific factual instances of retaliation against him for filing grievances).

The allegations that Officer Anstey "threatened" and "harassed" Plaintiff as a result of his grievance writing cannot meet the requirement that the plaintiff experience an adverse action. While "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker*, 239 F.3d 489, 492-93 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Only retaliatory conduct that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" may support such a claim. *Id.* at 493. This Court concludes that Officer Anstey's alleged threats cannot plausibly be viewed as deterring a person of ordinary firmness from exercising his or her First Amendment rights. Accordingly, Plaintiff's Motion for Reconsideration as to the retaliation claim against Officer Anstey is DENIED.

## B. Retaliation Claim against Sergeant Andrews

Plaintiff correctly points out that the Court overlooked the retaliation claim against Sergeant Andrews. ECF No. 13, at 5-6. Because overlooked information is a proper basis for a motion for reconsideration, *see Analytical Surveys*, 684 F.3d at 52, Plaintiff's Motion for Reconsideration is granted as to this claim. For the reasons that follow, unless Plaintiff files a Fourth Amended Complaint, his claim will be dismissed with prejudice.

Plaintiff asserts that Sgt. Andrews retaliated against him after he complained to her and filed a grievance about the prison's food distribution policy. ECF No. 13, at 5-6 (citing ECF No. 10, at ¶¶ 31-33). Plaintiff alleges that on the same day he complained, Sgt. Andrews "had officers trash [Plaintiff's] cell allowing them to throw all [his] property in the shower, and made false claims of [his] cellmate and [him] smoking and had [them] put in for a[ ] urine test." *Id.*

"[A] plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing: (1)

that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes*, 239 F.3d at 492. Plaintiff has met the first element of a retaliation claim based on his allegations that he filed a grievance. As to the second element, which requires this Court to assess the retaliatory conduct, the adverse actions that Plaintiff alleges are insufficient to state a retaliation claim. Plaintiff vaguely asserts that unnamed officers trashed his cell and claims that Sgt. Andrews ordered them to do so. He states that all of his property was thrown in the shower, but he does not specify what exactly was destroyed. Retaliatory destruction of a prisoner's personal property can qualify as an adverse action where a "substantial amount" of personal property is destroyed and "the conduct appears designed specifically to deter plaintiff's exercise of his constitutional rights." *Smith v. City of New York*, No. 03-Civ-7576 (NRB), 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005) (finding adverse action where the destruction of property was specifically directed against the plaintiff, violated prison regulations, and deprived the plaintiff of a substantial amount of personal property, including his legal papers); *Soto v. Iacavino*, No. 01 Civ. 5850 (JSM), 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003) (denying defendants' motion to dismiss the claims relating to the destruction of the plaintiff's property because the plaintiff alleged that *specific* corrections officers deliberately destroyed his property to retaliate against him for filing grievances). Here, Plaintiff's allegation of property destruction constitutes a *de minimis* act of retaliation and is insufficient to support his retaliation claim. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999) (holding that, to be actionable, retaliation against a prisoner must be likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment); *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996) (en banc) (approving similar standard on the ground that "some non-*de minimis* showing of injury is necessary"), *vacated on other grounds*, 523 U.S. 574 (1998).

**\*3** Additionally, the fact that Plaintiff was subjected to a single urine test does not constitute an adverse action that would deter an inmate from asserting his rights. *Partak v. Behrle*, No. 9:09-CV-1256 (FJS/ATB), 2011 WL 7629500, at *14 (N.D.N.Y. Sept. 12, 2011) (finding that the fact that the defendant ordered three urine tests for the plaintiff in three days did not constitute adverse action for purposes of a retaliation claim); *see Bumpus v. Canfield*, 495 F. Supp. 2d 316, 327 (W.D.N.Y. 2007). In *Bumpus*, the court held that

"[u]rine tests are a fact of prison life ... and I do not find that one urine test would chill a prisoner of ordinary firmness from filing grievances." *Id.* (citations omitted). That court found, and this Court agrees, that the urine test was "simply *de minimis* and therefore outside the ambit of constitutional protection." *Id.* (quoting *Dawes*, 239 F.3d at 493).

Accordingly, Plaintiff's Motion for Reconsideration is granted as to the retaliation claim against Sgt. Andrews. However, this Court finds that Plaintiff has not plausibly alleged facts to satisfy the adverse action element of this claim, and it must be dismissed. However, Plaintiff is granted leave to amend with respect to the alleged retaliatory destruction of property, because this Court cannot conclusively hold at this time that Plaintiff's allegations do not "raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and "*sua sponte* dismissals of a *pro se* complaint before ... an opportunity to amend are frowned on in this Circuit." *Avent v. Herbert*, No. 02-0828Sr., 2007 WL 3355060, at *3 (W.D.N.Y. Nov. 5, 2007) (citations omitted). Plaintiff may not amend, however, as to the alleged retaliatory urine test because this is merely a *de minimis* injury and thus amendment would be futile. *Price v. Hasly*, No. 04-CV-0090S(SR), 2004 WL 1305744, at * (W.D.N.Y. June 8, 2004) ("[W]hile the usual practice is to allow leave to replead a deficient complaint, such leave may be denied where amendment would be futile.") (citations omitted). If Plaintiff wishes to amend his Third Amended Complaint regarding the destruction of property claim, he must do so within 30 days of this Order. If Plaintiff fails to file a Fourth Amended Complaint by that time, his claim against Sgt. Andrews will be dismissed with prejudice.

**C. Denial of Access to Medical Records**

Plaintiff argues that the Court improperly dismissed his denial of access to medical records claim. ECF No. 13, at 6-8. Plaintiff fails to meet the demanding standard to obtain reconsideration on this issue. His motion largely reiterates points that were previously made, which is not an appropriate basis for seeking reconsideration. When the Court dismissed this claim with prejudice, it observed that Plaintiff at most alleged a delay in obtaining his medical records. The Court also noted that Plaintiff failed to allege harm resulting from that delay. Moreover, Plaintiff continues to assert that he has a "property" interest in these medical records. As explained in the Court's prior Order (ECF No. 12, at 4), Plaintiff's medical records are not his "property" for purposes of this claim. *See Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S.*

*Postal Serv.*, 604 F. Supp. 2d 665, 674 (S.D.N.Y. 2009) (citing *Gotkin v. Miller*, 514 F.2d 125, 129 (2d Cir. 1975) and *Webb v. Goldstein*, 117 F. Supp. 2d 289, 295 (E.D.N.Y. 2000)) (discussing the principle that there is no property interest in one's medical records)). Plaintiff fails to point to controlling decisions or data that the Court overlooked, which is required to obtain reconsideration. Thus, Plaintiff's Motion for Reconsideration as to the denial of access to medical records claim is DENIED.

**D. Unconstitutional Policy**

**\*4** Plaintiff also correctly points out that the Court overlooked his claim that the Orleans food distribution policy is unconstitutional. ECF No. 13, at 8-9. Accordingly, Plaintiff's Motion for Reconsideration is granted as to this claim. For the reasons that follow, however, this claim is also dismissed with prejudice.

Plaintiff asserts that the Orleans food distribution policy is unconstitutional because it is vague and used to harass and punish inmates. ECF No. 13, at 8-9 (citing ECF No. 10, at 20-22). Plaintiff describes the policy as requiring the inmate to stand at his door when food is being distributed. If the inmate is not at his door, he is considered to have refused his meal and will not be fed on that occasion.

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Bell v. Wolfish*, 441 U.S. 520, 546-47 (1979) (citations omitted). A prisoner's constitutional rights may be properly limited or retracted to maintain institutional security and preserve internal order. *Id.* "Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Id.* at 547. Thus, courts "have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* (citations omitted).

Plaintiff's displeasure with this policy is not enough to make it unconstitutional. Although Plaintiff would prefer to "sit at his desk" or "wash his hands" (ECF No. 10, at ¶¶ 27, 39) as a meal is handed out, prison officials have the discretion to implement this type of policy. With the exception of the allegation that he was deprived a single meal, as explained above, Plaintiff does not contend that this

policy led prison officials to withhold meals from him. *See Williams v. Coughlin*, 875 F. Supp. 1004, 1013 (W.D.N.Y. 1995) (explaining that the withholding of food from a prisoner for two days or more may state a claim under the Eighth Amendment and that food deprivation should not be used as a disciplinary measure).

Accordingly, Plaintiff's Motion for Reconsideration is granted as to the unconstitutional policy claim, however, for the reasons stated above, this claim is dismissed with prejudice.

## II. Motion for Default Judgment

On August 31, 2015, Plaintiff moved for default judgment against all defendants. ECF No. 18. On September 4, 2015, Defendants wrote a letter to this Court requesting that default not be entered (ECF No. 19) and on September 8, 2015, Defendants filed a Notice of Appearance (ECF No. 20). On September 14, 2015, Plaintiff wrote a letter to this Court in which he stated, "I do not oppose the Attorney General's Office request to not enter default." ECF No. 24. Accordingly, this Court considers Plaintiff's Motion for Default Judgment to be withdrawn.

## III. Motion to Amend Revised Second Amended Complaint

Under Federal Rule of Civil Procedure 15(a)(2), leave to file an amended complaint should be freely granted unless the proposed amended complaint alleges claims or seeks to add parties that are untimely, prejudicial, or futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). A document filed *pro se* must be "liberally construed," and "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (internal quotation marks and citations omitted). An amended complaint is intended to completely replace the prior complaint in the action, and thus it "renders [any prior complaint] of no legal effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977), *cert. denied sub nom., Vesco & Co., Inc. v. Int'l Controls Corp.*, 434 U.S. 1014 (1978); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

**\*5** Plaintiff filed his original Complaint on April 18, 2014. ECF No. 1.[1] Thereafter, Plaintiff moved to amend his Complaint (ECF No. 3), the Court granted his motion (ECF No. 6), and he filed his Second Amended Complaint (ECF No. 7). On October 2, 2014, Plaintiff filed his Revised Second

Amended Complaint. ECF No. 10. Plaintiff's proposed Third Amended Complaint (ECF No. 26) contains six claims that are addressed in turn below.

### A. First Claim: Unconstitutional Due Process Violation

In Plaintiff's proposed Third Amended Complaint, he alleges that his due process rights were violated when he was denied access to his medical records. ECF No. 26, at 5-9. The Court dismissed this claim with prejudice on May 7, 2015 (ECF No. 12) and this Court has now denied reconsideration. "The dismissal with prejudice is *res judicata* on the merits of a claim in favor of the defendants." *Santiago v. Booker*, No. 06-CV-282A, 2008 WL 850246, at *1 (W.D.N. Y Mar. 27, 2008) (citing *Nemaizer v. Baker*, 793 F.2d 58, 60-61 (2d Cir. 1986)). Accordingly, Plaintiff is barred from reviving this claim in his Third Amended Complaint.

### B. Second Claim: Retaliation Related to Medical Records by Nurses Arnold and Carlotta

In Plaintiff's proposed Third Amended Complaint, he elaborates on a claim against Nurses Arnold and Carlotta for alleged retaliatory conduct after Plaintiff filed a grievance related to accessing his medical records. ECF No. 26, at 10-13. In its May 7, 2015 Decision and Order, the Court determined that this claim may go forward. ECF No. 12, at 6. Accordingly, this claim may proceed in Plaintiff's Third Amended Complaint.

### C. Third Claim: Unconstitutional Policy and Retaliation by Officer Anstey and Sergeant Andrews

The Court dismissed the retaliation claim against Officer Anstey with prejudice on May 7, 2015 (ECF No. 12) and this Court has now denied reconsideration. "The dismissal with prejudice is *res judicata* on the merits of a claim in favor of the defendants." *Santiago*, 2008 WL 850246, at *1. Accordingly, Plaintiff is barred from reviving these claims against Officer Anstey in his Third Amended Complaint. Additionally, as explained above, the unconstitutional policy claim has been dismissed with prejudice and may not proceed in Plaintiff's Third Amended Complaint. Finally, Plaintiff's claims against Sgt. Andrews may not proceed in his Third Amended Complaint, but Plaintiff has been granted leave to amend with respect to his destruction of property claim.

### D. Fourth Claim: Retaliation Related to Medical Care by Nurse Stern

**\*6** In Plaintiff's proposed Third Amended Complaint, he elaborates on a claim against Nurse Stern for retaliation related to providing medical care. ECF No. 26, at 21-26. In its May 7, 2015 Decision and Order, the Court determined that this claim may go forward. ECF No. 12, at 12. Accordingly, this claim may proceed in Plaintiff's Third Amended Complaint.

**E. Fifth Claim: Denial of Medical Care**

The Court dismissed Plaintiff's denial of medical care claim without prejudice on May 7, 2015. ECF No. 12, at 10-12. In Plaintiff's Third Amended Complaint, he asserts this claim again against Nurse Stern, Nurse Clarey, Nurse Carlotta, Dr. Lewis, and Dr. Carl Koenigsmann. For the reasons that follow, this claim may proceed against Nurses Stern, Clarey, and Carlotta, and Dr. Lewis, but not against Dr. Koenigsmann.

The Supreme Court has held that when prison officials deny medical care to prisoners, they violate the Eighth Amendment only if the denial rises to the level of "deliberate indifference to serious medical needs." *See Estelle*, 429 U.S. at 104. The deliberate indifference standard has an objective and subjective prong. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). "First, the alleged deprivation must be, in objective terms, sufficiently serious." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations and internal quotations omitted). "A serious medical condition exists where the failure to treat a prisoner's condition could result in farther significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) (citations and internal quotation marks omitted).

Second, the official must act with a "culpable state of mind" which the Second Circuit has held, equates to "recklessness" as that term is used in criminal law. *See id.* at 140; *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) (per curiam). An official acts with a sufficiently culpable state of mind when he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The official must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Critically, an inadvertent failure to provide adequate medical care or mere negligence is not "repugnant to the conscience of mankind" and thus does not violate the Constitution. *See Estelle*, 429 U.S. at 105-06 (internal quotations and citation omitted). Stated differently, "[m]edical malpractice does not become

a constitutional violation merely because the victim is a prisoner." *Id.* at 106.

**1. Nurse Stern**

According to the proposed Third Amended Complaint, Plaintiff told Nurse Stern about his "vomiting and severe chronic abdominal pain" on April 1, 2014. ECF No. 26, at ¶ 68. Nurse Stern then "left without examining [Plaintiff] or providing any medical treatment." *Id.* Plaintiff indicated that Nurse Stern would respond to Plaintiff's sick calls by simply giving him Ibuprofen or Tylenol. *Id.* at ¶ 71. Plaintiff also allegedly told Nurse Stem that those medications did not work, i.e., they did not stop his vomiting or pain. *Id.* at ¶ 72. Plaintiff alleges that he made several requests to Nurse Stern to see a doctor, but his requests were always disregarded. *Id.* at ¶¶ 73, 74.

On May 2, 2014, Plaintiff submitted a sick call request. *Id.* at ¶ 81. When Nurse Stem arrived, Plaintiff told her that he was "continuing to suffer from abdominal pain and vomiting and [his] condition [wa]s getting wors[e]." *Id.* Plaintiff alleges that Nurse Stem denied him medical care and stated "you didn't sign up for sick call." *Id.* That same day, Nurse Stern gave Plaintiff Tylenol even though he previously explained to her that it was ineffective. *Id.* at ¶ 82.

**\*7** On June 1, 2014, Nurse Stern gave Plaintiff Milk of Magnesia, and he "immediately ... began vomiting uncontrollably." *Id.* at ¶ 83. Nurse Stern was called to return to Plaintiff's cell and she allegedly "denied [him] any further treatment or assistance." *Id.* Plaintiff alleges that, for several weeks and months, he told Nurse Stern about his abdominal pain and vomiting. *Id.* at ¶ 85. Nurse Stern allegedly "took no steps to find the source of [Plaintiff's] pain and suffering and refused [his] requests to be taken to the medical official who could properly diagnose [his] condition." *Id.* at ¶ 86.

On June 18, 2014, Plaintiff allegedly tried to talk to Dr. Lewis, but Nurse Stern interfered by telling Dr. Lewis not to talk to Plaintiff and pushing him away from Plaintiff's cell. *Id.* at ¶ 87. Plaintiff alleges that throughout the entire day, officers told Nurse Stern about Plaintiff's symptoms and his ongoing requests for medical attention and Nurse Stem "refused to see [him]." *Id.* at ¶ 88.

On August 1, 2014, Plaintiff asked Nurse Stern to take him to a medical official or hospital for treatment and she refused. *Id.*

at ¶ 94. On August 10, 2014, Plaintiff signed up for a sick call and Nurse Stern allegedly "denied [him] medical attention. That same week Nurse Stern denied [his] requests to see a[ ] doctor." *Id.* at ¶ 96. On August 15, 2014, Nurse Stern again denied Plaintiff's sick call. *Id.* at ¶ 97. When officers requested emergency assistance, Nurse Stern responded five hours later but "refused to treat" Plaintiff. *Id.*

Accepting these allegations as true, as this Court must at the pleading stage, Plaintiff satisfies the objective and subjective prongs to state a claim for the denial of medical care against Nurse Stern. Accordingly, this claim may proceed in Plaintiff's Third Amended Complaint.

### 2. Nurse Clarey

According to the proposed Third Amended Complaint, Nurse Clarey responded to Plaintiff's sick call requests on several occasions and gave him Ibuprofen or Tylenol. ECF No. 26, at ¶ 71. Plaintiff alleges that he informed Nurse Clarey that those medications did not work, *i.e.*, they did not stop his vomiting or pain. *Id.* at ¶ 72. Plaintiff also alleges that he made many requests to Nurse Clarey "to see a doctor or to be provided with a[ ] more effective treatment." *Id.* at ¶ 73. Instead of fulfilling his requests, Nurse Clarey gave Plaintiff "sarcasm." *Id.* at ¶ 74.

On April 16, 2014, Plaintiff was waiting for Nurse Clarey to respond to his sick call request. *Id.* at ¶ 75. Plaintiff alleges that Nurse Clarey "walked right pass[ed] [him] and denied [him] medical attention and treatment as punishment for allegedly not having [his] lights on and not standing on [his] door" and that she "knowingly denied and refused to answer [his] sick call requests." *Id.* at ¶ 76. On the same day, Nurse Clarey brought Plaintiff his medication. *Id.* at ¶ 77. When Plaintiff requested an emergency sick call, Nurse Clarey allegedly threw his medication on the floor and stated, "I don't have time for this." *Id.*

On or about May 1, 2014, Plaintiff told Nurse Clarey that the Prilosec Dr. Lewis gave him was not working and was making his symptoms worse. *Id.* at ¶ 80. Nurse Clarey allegedly denied Plaintiff's request to see a doctor. *Id.* Plaintiff alleges that, for several weeks, he told Nurse Clarey about his abdominal pain and vomiting. *Id.* at ¶ 85. Despite this, Nurse Clarey "took no steps to find the source of [Plaintiff's] pain and refused [his] requests to be taken to the medical official who could properly diagnose [his] condition." *Id.* at ¶ 86.

**\*8** Accepting these allegations as true, as this Court must at the pleading stage, Plaintiff satisfies the objective and subjective prongs to state a claim for the denial of medical care against Nurse Clarey. Accordingly, this claim may proceed in Plaintiff's Third Amended Complaint.

### 3. Nurse Carlotta

According to the proposed Third Amended Complaint, Nurse Carlotta responded to Plaintiff's sick call requests on several occasions and gave him Ibuprofen or Tylenol. ECF No. 26, at ¶ 71. Plaintiff alleges that he informed Nurse Carlotta that those medications did not work, i.e., they did not stop his vomiting or pain. *Id.* at ¶ 72. Plaintiff also alleges that he made many requests to Nurse Carlotta "to see a doctor or to be provided with a[ ] more effective treatment" (*Id.* at ¶ 73), but that Nurse Carlotta "would completely deny [his] requests" (*Id.* at ¶ 74).

On or about August 21, 2014, Plaintiff asserts that Nurse Carlotta "outright denied [him] medical attention and care as punishment for [his] complaints. Nurse Carlotta looked at [him] and stated, 'you don't get anything.' +" *Id.* at ¶ 98.

Accepting these allegations as true, as this Court must at the pleading stage, Plaintiff satisfies the objective and subjective prongs to state a claim for the denial of medical care against Nurse Carlotta. Accordingly, this claim may proceed in Plaintiff's Third Amended Complaint.

### 4. Dr. Lewis

According to the proposed Third Amended Complaint, Plaintiff saw Dr. Lewis on or about April 23, 2014. *Id.* at ¶ 78. Plaintiff asserts that Dr. Lewis only gave him a "cursory look" through the window, even though Plaintiff informed him that he was "having severe chronic abdominal pain, vomiting, and trouble and painful bathroom problems." *Id.* Dr. Lewis prescribed Plaintiff Prilosec without conducting an examination. *Id.* Plaintiff alleges that immediately after taking the Prilosec, he was dizzy, had dry mouth, and his abdominal pain and vomiting did not improve. *Id.* at ¶ 79.

On July 3, 2014, Plaintiff was temporarily transferred to Wende Correctional Facility for an ultrasound, which indicated that Plaintiff needed to undergo further testing.

*Id.* at ¶ 89. Plaintiff asserts that Dr. Lewis refused to order additional tests because he believed that Plaintiff would be leaving Orleans soon. *Id.* at ¶ 90.

On August 6, 2014, Plaintiff saw Dr. Lewis and informed him of his abdominal pain and vomiting, and that the medications he received did not relieve his symptoms. *Id.* at ¶ 95. Dr. Lewis allegedly told Plaintiff that he did not have a life threatening condition and was only causing "a lot of paperwork and time." *Id.*

Accepting these allegations as true, as this Court must at the pleading stage, Plaintiff satisfies the objective and subjective prongs to state a claim for the denial of medical care against Dr. Lewis. Accordingly, this claim may proceed in Plaintiff's Third Amended Complaint.

### 5. Dr. Carl Koenigsmann

In Plaintiff's proposed Third Amended Complaint, he alleges that Dr. Koenigsmann, the Deputy Commissioner/ Chief Medical Officer of the New York State Department of Corrections and Community Supervision ("DOCCS"), "created a [ ] policy that allows medical officials at Orleans Correctional Facility to conduct sick call in a[ ] manner that does not provide an adequate examination and does not provide timely medical assistance to those in need". *Id.* at ¶ 105. Plaintiff also alleges that Dr. Koenigsmann "implemented, enforced, and failed to rectify a policy, practice, and custom allowing medical officials at Orleans Correctional Facility to knowingly deny inmates medical attention as punishment for alleged rule violations." *Id.* at ¶ 106. Plaintiff asserts that Dr. Koenigsmann was "responsible for ensuring that medical officials at Orleans Correctional Facility obey the Constitution and laws of the United States." *Id.* at ¶ 107. Plaintiff concludes that Dr. Koenigsmann was deliberately indifferent to his medical needs. *Id.* at ¶ 108.

**\*9** A supervisory defendant may not be held liable in a § 1983 action on a theory of *respondeat superior. Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citation omitted). "[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility," *Hernandez,* 341 F.3d at 144, and a plaintiff must plead sufficient facts to establish the personal involvement of each particular defendant in the alleged violation. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

To establish the personal involvement of a supervisory official, the plaintiff must demonstrate that: (1) the defendant participated directly in the alleged conduct; (2) the defendant did not remedy a wrong after learning of it through a report or appeal; (3) the defendant formed a policy or custom under which the conduct transpired, or allowed the policy or custom to continue; (4) the defendant's supervision of subordinates who engaged in the conduct was grossly negligent; or (5) the defendant demonstrated deliberate indifference to the rights of inmates by failing to act on information showing that the conduct was occurring. *Colon*, 58 F.3d at 873.

Here, Plaintiff merely offers conclusory allegations that Dr. Koenigsmann created and enforced an improper medical policy without any evidence that such a policy existed. Moreover, the Court dismissed this claim without prejudice against Dr. Koenigsmann in its May 7, 2015 Order (ECF No. 12, at 10-12) and Plaintiff has again failed to allege sufficient facts to plausibly state a claim against Dr. Koenigsmann. Accordingly, the denial of medical care claim against Dr. Koenigsmann is dismissed with prejudice and may not proceed in Plaintiff's Third Amended Complaint.

### F. Sixth Claim: Breach of Privacy Against Nurse Arnold, Nurse Carlotta, and Dr. Lewis and Retaliation

The Court previously dismissed the breach of privacy claim against Nurse Arnold with prejudice on May 7, 2015 (ECF No. 12) and this Court has now denied reconsideration. "The dismissal with prejudice is *res judicata* on the merits of a claim in favor of the defendants." *Santiago*, 2008 WL 850246, at *1*. Accordingly, Plaintiff is barred from reviving this claim in his Third Amended Complaint. However, the Court found that the breach of privacy claim against Nurse Carlotta and Dr. Lewis could go forward. ECF No. 12, at 3. Thus, this claim may proceed in Plaintiff's Third Amended Complaint against Nurse Carlotta and Dr. Lewis only.

Plaintiff also alleges that Nurses Carlotta and Arnold retaliated against him. According to his Third Amended Complaint, Nurse Carlotta provided "false statements" to Nurse Arnold and the grievance panel. ECF No. 26, at ¶ 125. Plaintiff also asserts that Nurses Carlotta and Arnold provided "false statements to cover up Nurse Carlotta's professional misconduct and to continue to deprive [Plaintiff] of [his] right to access and review [his] medical records as retaliation for filing a[ ] grievance due to the improper deprivation of [his] medical records." *Id.* at ¶ 126.

As explained in detail above, "a plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes*, 239 F.3d at 492. Here, Plaintiff satisfies the first element of a retaliation claim by alleging that he filed a grievance, but he fails to establish that adverse action was taken against him. Merely asserting that "false statements" were made as a result of filing a grievance without any information about the nature of the statements, what harm such statements caused, or when the statements were made in relation to when the grievance was filed is insufficient to state a claim for retaliation. Accordingly, this claim is dismissed without prejudice and Plaintiff is granted leave to amend. *Avent*, 2007 WL 3355060, at *3 ("*[S]ua sponte* dismissals of a *pro se* complaint before ... an opportunity to amend are frowned on in this Circuit."). If Plaintiff wishes to amend his Third Amended Complaint regarding this claim, he must do so within 30 days of this Order. If Plaintiff fails to file a Fourth Amended Complaint by that time, his retaliation claim against Nurses Carlotta and Arnold will be dismissed with prejudice.

**IV. Motion to Appoint Counsel**

 *10 Plaintiff claims that the appointment of counsel is necessary because this "is not a straight forward case" and is too "complex" for him to handle on his own, his "status as a prisoner alone shows that he will not be able to adequately proceed on his own," and "the examination of witnesses will be best conducted by a[ ] properly trained counsel." ECF No. 28. For the reasons that follow, Plaintiff's motion for the appointment of counsel is denied without prejudice to renew.

There is no constitutional right to counsel in civil cases. *See In re Martin-Trigona*, 737 F.2d 1254, 1260 (2d Cir. 1984). Although the court may appoint counsel to assist indigent litigants pursuant to 28 U.S.C. § 1915(e), *see, e.g., Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc.*, 865 F.2d 22, 23 (2d Cir. 1988), such appointment is within the court's broad discretion. *Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986). The factors to be considered in deciding whether to appoint counsel include: (1) "whether the indigent's position seems likely to be of substance;" (2) "the indigent's ability to investigate the crucial facts;" (3) "whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder;" (4) "the indigent's ability to present the case" and "the complexity of the legal issues;" and (5) "any special reason in

that case why appointment of counsel would be more likely to lead to a just determination." *Id.* at 61-62.

"Volunteer lawyer time is a precious commodity" that "should not be allocated arbitrarily." *Cooper v. A. Sargenti Co.*, 877 F.2d 170, 172 (2d Cir. 1989). Upon review of Plaintiff's motions and complaints, this Court finds that the appointment of *pro bono* counsel is not warranted at this stage of the litigation. Plaintiff's submissions are detailed and adequately describe the events that led to his alleged injuries, the factual circumstances surrounding Plaintiff's claims do not appear unusually complicated, and Plaintiff has shown that he is capable of presenting his case. Plaintiff has drafted several legible, organized, cogent, and appropriate pleadings and motions. *See Castro v. Manhattan E. Suite Hotel*, 279 F. Supp. 2d 356, 358 (S.D.N.Y. 2003) (denying the appointment of counsel after noting that "there is no indication that [plaintiff] lacks the ability to present his case").

This Court finds no "special reason" why appointment of counsel at this stage would be more likely to lead to a just determination. *See Boomer v. Deperio*, 2005 WL 15451, at *1-2 (W.D.N.Y. Jan. 3, 2005) (denying motion to appoint counsel despite the plaintiff's claims that the matter was complex and he had limited knowledge of the law); *Harris v. McGinnis*, No. 02 Civ. 6481 (LTSDF), 2003 WL 21108370, at *2 (S.D.N.Y. May 14, 2003) (application denied where the plaintiff "offered no special reason why appointment of counsel ... would increase the likelihood of a just determination"). It is Plaintiff's responsibility to either retain counsel or to proceed *pro se*.

**CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Reconsideration (ECF No. 13) is GRANTED IN PART and DENIED IN PART, his Motion for Default Judgment (ECF No. 18) is deemed WITHDRAWN, his Motion to Amend the Revised Second Amended Complaint (ECF No. 26) is GRANTED IN PART and DENIED IN PART, and his Motion to Appoint Counsel (ECF No. 28) is DENIED without prejudice to renew.

The claims that may proceed in Plaintiff's Third Amended Complaint are the Second Claim (retaliation related to medical records by Nurses Arnold and Carlotta), the Fourth Claim (retaliation related to medical care by Nurse Stern), the Fifth Claim (against defendants Stem, Clarey, Carlotta, and

Lewis only), and the breach of privacy portion of the Sixth Claim (against Nurse Carlota and Dr. Lewis only). Plaintiff is granted leave to amend with respect to his retaliatory destruction of property claim against Sgt. Andrews and his retaliatory false statements claim against Nurses Carlotta and Arnold.

**\*11** IT IS SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 2858927

Footnotes

1   This Court notes that Plaintiff's original Complaint contains a Motion for Preliminary Injunction wherein Plaintiff requests an Order directing the Orleans superintendent, staff, and affiliates to: (1) refrain from any retaliation or retaliatory conduct; (2) provide Plaintiff with his guaranteed three meals a day; (3) provide Plaintiff with continued medical care and assistance; (4) not destroy Plaintiff's legal materials; (5) provide Plaintiff with continued access to the courts; and (6) refrain from any physical and/or mental abuse. ECF No. 1. The Court need not consider this motion because it is moot—Plaintiff was transferred from Orleans to Auburn Correctional Facility after the motion was filed. Moreover, Plaintiff's Amended Complaint (ECF No. 4), Second Amended Complaint (ECF No. 7), and Revised Second Amended Complaint (ECF No. 10) do not request preliminary injunctive relief. An amended complaint is intended to completely replace the prior complaint in the action, and thus it "renders [any prior complaint] of no legal effect." *Int'l Controls Corp.,* 556 F.2d at 668; *see also Shields,* 25 F.3d at 1128.

**End of Document**                           © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 856416
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Corey FORD, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

No. 9:09–CV–723 (DNH/ATB).
|
Jan. 31, 2011.

**Attorneys and Law Firms**

Corey Ford, pro se.

Brian J. O'Donnell, Asst. Attorney General for Defendant.

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred to me for Report and Recommendation on March 8, 2010 by U.S. District Judge David N. Hurd, pursuant to 28 U .S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). Plaintiff's second amended complaint ("AC," Dkt. No. 28) seeks monetary damages, under 42 U.S.C. § 1983, for various alleged violations of his constitutional rights arising from his confinement by the New York State Department of Correctional Services ("DOCS") at the Shawangunk Correctional Facility ("Shawangunk") in 2008 and 2009. Presently before this court is defendants' motion to dismiss the second amended complaint for failure to state a claim, pursuant to FED. R. CIV. P. 12(b)(6), which was supported by several substantive affidavits and substantial documentary evidence. (Dkt. No. 32). Plaintiff has filed a lengthy declaration and voluminous documentary exhibits in opposition to the defendants' motion. (Dkt. No. 35). For the reasons set forth below, this court recommends granting in part and denying in part defendants' motion.

### DISCUSSION

**I.** *Facts*

On or about April 14, 2004, plaintiff was transferred to the Special Housing Unit ("SHU") at Shawangunk, following his violent assault on a correction officer at Green Haven Correctional Facility ("Green Haven"). [1] Plaintiff alleges, and defendants admit, that plaintiff was the subject of a "mail watch" at Shawangunk, from the time of his transfer in April 2004, through at least late 2009. (AC, Facts ¶ 9; Defts.' Memo. of Law at 6, Dkt. No. 32–24). Plaintiff claims that the screening of his incoming and outgoing mail at Shawangunk included some privileged legal mail, and resulted in delays of many days in delivery of his mail. (AC ¶¶ 11–15, 22). Shawangunk Superintendent Joseph T. Smith admittedly approved the initial mail watch, and renewed the approval every 60 days thereafter. (AC, Facts ¶ 9; Defts.' Memo. of Law at 6). Plaintiff alleges that John Maly, Deputy Superintendent for Security, and Ms. Parisi, a mail clerk, were involved in executing the mail watch. (AC ¶¶ 11–15, 22–23).

On or about March 22, 2009, plaintiff was charged in an Inmate Misbehavior Report based on two of his letters which were reviewed and confiscated by defendant Maly pursuant to the continuing mail watch. In one letter, plaintiff allegedly asks an unincarcerated individual to harass and threaten plaintiff's "fiancee." In the other letter, which plaintiff sent to another inmate through a person outside the facility (a prohibited process known as "kiting"), plaintiff allegedly asks one inmate to assault another inmate. (AC ¶ 25). Plaintiff claims that, in connection with the disciplinary hearing conducted by defendant Eric Gutwein, he was deprived of proper assistance, in that he was denied documents he deemed critical to his defense. Plaintiff also claims that Hearing Officer Gutwein improperly refused to allow certain witnesses, requested by plaintiff, to testify. Plaintiff was found guilty of the disciplinary charges and sentenced to an additional 18 months in the SHU and 18 months loss of good time. (AC ¶ 29). [2]

**\*2** Plaintiff requested permission to marry his fiancee on or about April 1, 2008, while he was still confined in the SHU at Shawangunk. Defendant Smith refused plaintiff's request based on his long-term SHU status. (AC ¶¶ 16–18; 4/24/08 Smith Ltr., Dkt. No. 35–3 at 58). In April 2009, Supt. Smith indefinitely revoked the visiting privileges of plaintiff's fiancee because of her alleged involvement in smuggling a note from another inmate to plaintiff in the visiting room, and because of purported concerns for her safety based on the intercepted letter in which plaintiff allegedly asked another individual to harass and threaten her. (AC ¶¶ 24, 30–32, 34). Plaintiff claims that Supt. Smith and Dep. Supt. Maly pursued "an anti-family agenda against plaintiff, all in retaliation" for plaintiff's assault of a correction officer at Green Haven in

April 2004, and his filing of grievances and lawsuits against certain defendants. (AC ¶¶ 17, 33–34). Plaintiff alleges that he formally appealed the revocation of his fiancee's visitation rights to defendant Brian Fischer, the DOCS Commissioner, but did not receive any reply. (AC ¶ 35).

Plaintiff alleges that his cell was searched three times in one week in July 2009, purportedly in retaliation for his initiation of this lawsuit and his filing of grievances and other court actions. Plaintiff claims that several correction officers informed him that "higher ups," including defendants Smith and Maly, had ordered them to destroy plaintiff's cell and take his legal magazines and books. (AC ¶¶ 36–39).

## II. Contentions and Summary of Recommendations

Plaintiff purports to sue DOCS Commissioner Fischer, Shawangunk Supt. Smith, Dep. Supt. Maly, Mail Clerk Parisi, and Hearing Officer Gutwein in their individual and official capacities. [3] The second amended complaint states five causes of action based on particular constitutional rights that plaintiff alleges were violated in various ways. However, it will be easier to address plaintiff's claims if they are considered by reference to the nature of the defendants' alleged underlying conduct.

Plaintiff alleges that the repeated extensions of the "mail watch" directed at him were not supported by current information establishing reasonable cause, and were motivated by a desire to retaliate against him for pursuing protected activity. Plaintiff claims that the mail watch violated applicable DOCS Directives, his due process rights, and his First Amendment rights—by interfering with the "free flow" of his incoming and outgoing mail, and by improperly denying him access to courts. Relying on affidavits that go beyond the allegations in the complaint or the documents reasonably associated with it, defendants argue that there was sufficient cause for the ongoing mail watch to pass constitutional muster. However, on the basis of the information properly considered in the context of a motion to dismiss, this court finds that plaintiff has stated a plausible claim that, by continuing the mail watch through all of 2008 and 2009, defendants Smith and Maly violated plaintiff's First Amendment rights. Plaintiff's claim that the mail watch denied him access to the courts should be dismissed because he fails to make plausible allegations that he was prejudiced in connection with any litigation.

*3 The second amended complaint suggests that the disciplinary charges against plaintiff violated his constitutional rights because they were predicated on his letters, which were improperly reviewed and confiscated pursuant to the ongoing mail watch. However, because inmates are not constitutionally entitled to the suppression of illegally obtained evidence in the context of a disciplinary hearing, this cause of action would fail even if the ongoing mail watch were ultimately determined to violate the First Amendment. Plaintiff also alleges that he was deprived of due process at his disciplinary hearing because he was denied certain documents and because the hearing officer refused to call two witnesses, without adequate supporting reasons. Plaintiff's motion papers attach extensive documentary evidence, including the hearing transcript, in which defendant Gutwein articulates rational reasons for not allowing the particular documents and witnesses. In any event, none of the excluded evidence would have effected the outcome of the hearing, and so any procedural errors were harmless. Based on plaintiff's allegations and submissions, without reference to the hearing officer's affidavit, the plaintiff's due process claims relating to the disciplinary hearing should be dismissed under Rule 12(b)(6).

Plaintiff claims that defendant Smith denied his request to marry, based on retaliatory motives and without reasonable penological justification, in violation of plaintiff's First and Eighth Amendment rights. Relying on affidavits beyond the proper scope of a motion to dismiss, the defendants attempt to document and defend Supt. Smith's reasons for denying plaintiff's request. This court concludes that, based on the information properly considered under Rule 12, plaintiff establishes a plausible claim that, in preventing plaintiff from marrying, perhaps for the entire duration of his long-term SHU confinement, defendant Smith violated plaintiff's First Amendment rights.

Plaintiff asserts that the revocation of his fiancee's visitation rights was retaliatory and a violation of his due process, and Eighth Amendment rights. This court concludes that plaintiff's conclusory allegations of retaliation fail to state a viable claim. The denial of visitation cannot be the basis of an Eighth Amendment or due process claim by a inmate. Plaintiff's complaint will be liberally construed to also include a claim under the First Amendment; however, the admitted reasons stated for the denial of visitation clearly constitute a rational penological justification. Because DOCS Commissioner Fisher's alleged role in the violations alleged in the second amended complaint seems to be limited to

his failure to respond to plaintiff's appeals or complaints involving visitation and, perhaps, other issues, he was not personally involved to the extent necessary to establish his liability under Section 1983.

Finally, plaintiff alleges that the cell searches in July 2009 were in retaliation for his involvement in grievances and law suits against DOCS officials. However, even if plaintiff's sparse allegations suggested a retaliatory motive, cell searches in the prison setting are not the type of "adverse action" that will support a civil rights claim.[4]

## III. *Motion to Dismiss*

**\*4** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v.. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). No exhibits are attached to the second amended complaint, although it does reference a number of specific documents. The defendants have submitted three

affidavits and a number of documents that go beyond what should properly be considered in connection with their motion to dismiss. *See, e.g., Sira v. Morton,* 380 F.3d 57, 67–68 (2d Cir.2004) (because the district court did not exclude, from its consideration, a document not incorporated by reference in or integral to the complaint, the district court should have converted the motion to dismiss into one for summary judgment).

The plaintiff responded in kind to the defendants' motion and its supporting affidavits and exhibits, filing a 78–page declaration and a substantial number of supporting documents. At least to the extent the additional factual information submitted by plaintiff is consistent with the allegations in the complaint, it may be considered in connection with the motion to dismiss, as a *de facto* amendment of the complaint. See, e.g., *Benitez v. Ham,* 9:04–CV–1159 (NAM/GHL), 2009 WL 3486379, at \*8 & n. 21 (N.D.N.Y. Oct. 21, 2009) (citing, *inter alia, Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss). There is some authority for the proposition that, when "it is clear from the record" that the party responding to a motion to dismiss knew that additional factual submissions "were being considered and, in fact, responded with its own evidentiary submissions," a court may consider factual allegations outside the complaint in deciding the motion. *See, e.g., Reliance Ins. Co. v. Polyvision Corp.,* 474 F .3d 54, 57 (2d Cir.2007) (under those circumstances, it was harmless error for the court to fail to give explicit notice that it was converting the Rule 12 motion to a Rule 56 motion). However, because this *pro se* plaintiff has not been given any notice that the defendants' motion to dismiss would or could be converted to one for summary judgment, this court finds it inappropriate to consider defendants' factual affidavits and most of the supporting documents against the *pro se* plaintiff in resolving the current motion.[5] Plaintiff has asserted two facially plausible claims that are better resolved by a properly noticed and documented motion for summary judgment.

## IV. Mail Watch and Related Conduct

### A. Mail Watch

#### 1. Legal Standards

**\*5** Among the protections enjoyed by prison inmates, subject to appropriate limitations, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek,* No. 05–CV–172 (GLS/

DRH), 2007 WL 3254373, at *6 (N.D.N.Y.2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)). [6] That right, however, must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities, in which case no constitutional violation has occurred. *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F .3d 688, 699 (2d Cir.1996)). "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safely,* 482 U.S. 78, 84 (1987)).

Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safely,* 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection ... to outgoing mail than to incoming mail." *Davis,* 320 F.3d at 351 (citations omitted). Nonetheless, the Second Circuit has held that " 'where good cause is shown, outgoing mail can be read' without violating inmates' First Amendment rights." *Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979)).

## 2. Application

Although the second amended complaint alleges that the mail watch relating to plaintiff was unlawful from its inception in April 2004 (AC, Facts ¶ 9), this lawsuit focuses on the claim that the mail watch was continued through 2008 and 2009, without any new or current factual information to establish good cause or penological justification. (AC ¶¶ 40, 52–53). Plaintiff would likely be foreclosed from challenging the validity of the initial mail watch based on his prior litigation of this issue. In *Ford v. Phillips,* et al., 05 Civ. 6646, 2007 WL 946703, at * 14–15 (S.D.N.Y. Mar. 27, 2007), a district judge in the Southern District of New York rejected this plaintiff's prior civil rights challenge to the mail watch at Shawangunk, for the period from April 2004 through the date of filing of the complaint in that action in 2005. The judge concluded that DOCS officials had ample good cause to monitor plaintiff's mail, including the need (1) to investigate his April 2004

assault on a correction officer at Green Haven, (2) to prevent Ford from instigating further violence following the assault, and (3) to monitor efforts by Ford to improperly influence witnesses in connection with his impending criminal trial. *Id.* at * 14. [7] If plaintiff were attempting to relitigate the legality of the initial mail watch in this action, he would be barred by claim preclusion. *Ford v. Krusen,* 9:06–CV–890 (GTS/DEP), 2009 WL 959534, at *7 (Apr. 6, 2009) (Corey Ford's prior, unsuccessful, due process challenge to the disciplinary hearing leading to his prolonged SHU confinement in the Southern District of New York barred him from pursuing that claim further in a subsequent action in the Northern District of New York).

**\*6** Plaintiff focuses on the fact that the continuation of the mail watch for approximately five years, violated the internal guidelines of DOCS Directive 4422. [8] However, a violation of this DOCS Directive does not state a claim for a constitutional violation under Section 1983. *See, e.g., Dillhunt v. Theriault,* 2009 WL 4985477, at *11 (collecting cases).

Liberally construing the second amended complaint, plaintiff also alleges that his constitutional rights were violated because successive 60–day renewals of the mail watch were "rubber stamp[ed]" by Supt. Smith through 2008 and 2009 without any "new underlying facts" establishing good cause to continue the mail watch. (AC ¶¶ 40, 52–53). The allegations of the complaint and the related documents which are arguably incorporated by reference in the complaint, or were submitted by plaintiff in his motion papers, identify two abuses of the prison mail system by plaintiff in March 2009 that would certainly appear to justify a mail watch for some period of time thereafter. [9] DOCS reviewed and confiscated two sets of letters from plaintiff at that time—one which allegedly reflected an effort by plaintiff to harass or threaten his fiancee through others outside the institution over some disputed money, and another, which was improperly "kited" through someone outside the facility, and which purportedly sought to induce one inmate to threaten or do harm to another inmate at plaintiff's behest. (AC ¶ 25). [10]

The affidavits of defendants Smith and Maly, which this court is **not** using against the plaintiff in connection with this motion to dismiss, provide no factual information relating to any misconduct of plaintiff that would provide current justification for the mail watch after 2005 or 2006 (as described in the prior case from the Southern District of

New York, *Ford v. Phillips,* 2007 WL 946703, at * 14–15), but before March 2009, when plaintiff was accused of several instances of mail-related misconduct. (Smith Aff ., Dkt. No. 32–1; Maly Aff., Dkt. No. 32–7). [11] Moreover, the 33 memoranda by which Supt. Smith repeatedly renewed plaintiff's mail watch between June 2004 and August 2009 (Dkt. No. 32–2 at 6–38) do not set forth any justification for continuing the mail watch. The Second Circuit has suggested that, although prison officials are entitled to considerable deference in ordering a mail watch for security reasons, justification for a mail watch should be relatively current, and the duration of the screening of mail should be reasonably limited based on the perceived threat. *Duamutef v. Hollins,* 297 F.3d at 113 (mail-related disciplinary charge in 1994, following a history of involvement in prohibited organizational activities, was not too remote to justify a "temporary" (30–day) watch on plaintiff's mail in 1995). Given that the legitimacy of the penological justification for a mail watch is difficult to validate, in the context of a Rule 12(b)(6) motion, [12] this court finds, that plaintiff's First Amendment cause of action against defendants Smith and Malay should not be dismissed at this stage of the proceedings.

## 2. Personal Involvement of Defendant Parisi

**\*7** Mail Clerk Doreen Parisi was clearly involved in the implementation of the mail watch authorized by Supt. Smith. (AC ¶ 55). However, she lacked the authority to decline the directions of Supt. Smith and Dep. Supt. Maly to intercept plaintiff's mail and provide it defendant Maly for his review. Unlike defendants Smith and Maly, Ms. Parisi had no personal involvement in the acts which allegedly violated plaintiff's constitutional rights—the authorization of the mail watch without adequate and current penological justification. Under these circumstances, defendant Parisi should not be liable, under Section 1983, for her clerical role in carrying out the mail watch at the direction of her superiors. See, e.g., *Webster v. Fischer,* 694 F.Supp.2d 163, 181 (N.D.N.Y. Mar. 9, 2010) (dismissing claim of senior mail clerk that she initiated and participated in a mail watch, which only the Superintendent of the facility had the authority to institute); *Davidson v. Goord,* 99–CV–555S, 2000 WL 33174399, at \*9 (W.D.N.Y. Sept. 27, 2000) (plaintiff's allegations regarding delays in legal mail were not sufficient to state a constitutional claims against DOCS personnel who merely handled inmate mail consistently with applicable DOCS policies) *See also Smith v. Woods,* 9:05–CV–1439 (LEK/DEP), 2008 WL 788573 at \*9 (N.D.N.Y. Mar. 20, 2008) (dismissing medical

indifference claim against social worker and psychologist in prison who had no authority to override the decision of the treating psychiatrist). Thus, the amended complaint may be dismissed in its entirety as to defendant Parisi.

## B. Access to Courts

Plaintiff has also alleged that the mail watch resulted in delays of his legal correspondence. The First and Fourteenth Amendments to the U.S. Constitution are implicated when a prisoner's legal mail is obstructed, but a plaintiff must allege that the defendants' actions hindered the prisoner's "efforts to pursue a legal claim." *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d. Cir.1997). In order to establish a claim that a prisoner's right of access to the courts has been abrogated, actual injury must be shown. *See Lewis v. Casey,* 518 U.S. 343, 351–52 (1996). In this case, plaintiff has not alleged that any delays in his mail resulted in prejudice to him in any legal proceeding, and thus he fails to state a claim for denial of access to courts. *See, e.g, Zimmerman v. Seyfert,* 9:03–CV–1389 (TJM), 2007 WL 2080517, at \*31 (N.D.N.Y. July 19, 2007) (plaintiff's First Amendment claim of denial of access to courts based upon the mail watch must be dismissed because he cites no case that was hindered or lost because of the mail watch); *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (a mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation). [13] Thus, this court recommends that plaintiff's access-to-courts claim be dismissed as to all defendants.

## C. Retaliation and Due Process

**\*8** The second amended complaint suggests that the mail watch was instituted in retaliation for plaintiff's participation in protected activity and violated his due process rights. Conclusory allegations of retaliation, like those in plaintiff's complaint, are insufficient to support a viable claim of retaliation. *See, e.g., Douglas v. Smith,* 2008 WL 434605, at \*15 (conclusory allegation that defendants' actions, including initiation of a mail watch, were motivated by plaintiff's filing of grievances, failed to state an actionable claim). Moreover, mere delays in the transfer of plaintiff's legal papers, even if motivated by retaliation, is not the type of "adverse action" required to support a retaliation claim. *See, e.g., Rivera v. Pataki,* No. 04 Civ. 1286, 2005 WL 407710, at \*19 (S.D.N.Y. Feb. 7, 2005) (several temporary incidents of actively preventing plaintiff from mailing his legal documents were not sufficiently serious to constitute "adverse action").

With respect to the due process claim, the Second Circuit has held that the DOCS policies regarding discretionary restrictions on mail in prisons do not create a liberty interest protected by the due process clause. *Silano v. Sag Harbor Union Free School Dist. Bd. of Educ.,* 42 F.3d 719, 724–25 (2d Cir.1994) (in *Purnell,* we rejected plaintiff's argument that a liberty interest relating to inmate mail was created by DOCS Directive 4422) (citing *Purnell v. Lord,* 952 F.2d 679, 685 (2d Cir.1992).

## V. Due Process Claims Relating to Plaintiff's Disciplinary Hearing

### A. Legal Standards

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d at 69 (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some" or "a modicum" of "reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455 (1985)). Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W.D.N.Y.2008) (citing, *inter alia, Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

**\*9** An inmate's right to assistance with his disciplinary hearing is limited. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is, *e.g.,* confined in SHU, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able. *Id. See also Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (a hearing assistant's role is not to act as legal advisor or advocate, but to serve as a surrogate, performing functions, such as contacting witnesses, which the charged inmate could not do because he is not among the general population) (collecting cases); *Clyde v. Bellnier,* 9:08–CV–909, 2010 WL 1489897, at \*6 (N.D.N.Y. Apr. 13, 2010) (Singleton, J.) (no due process violation arose when the hearing officer/assistant failed to provide documents that did not exist, were confidential, or were not relevant to the defense).

Although due process includes a right to call witnesses, this right is also not unfettered. *Alicia v. Howell,* 387 F.Supp.2d 227, 234 (W.D.N.Y.2005) (citing *Ponte v. Real,* 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia, Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991)). An inmate's due process rights are violated when a prison hearing officer refuses to interview witnesses without assigning a reason "logically related to preventing undue hazards to 'institutional safety or correctional goals.' " *Ponte v. Real,* 471 U.S. at 497. The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of his position. *Id.* at 499; *Kingsley v. Bureau of Prisons,* 937 F.2d at 30–31.

### B. Application

Plaintiff appears to claim that he was deprived of due process in connection with the disciplinary charges leveled against him in March 2009 because they were based on letters confiscated pursuant to an illegal mail watch. However, even if the mail watch was contrary to DOCS Directives or unconstitutional, plaintiff's letters would not be subject to suppression, and could be considered in the context of a prison disciplinary hearing. *See, e.g., Dillhunt v. Theriault,* 9:07–CV–0412 (GTS/DEP), 2009 WL 4985477, at \*15 (N.D.N.Y. Dec. 15, 2009) (the "fruit of the poisonous tree doctrine," which applies to evidence that is unconstitutionally obtained during a criminal investigation, has no applicability to prison disciplinary hearings) (citing *Rabb v. McMaher,* No. 94–CV–614, 1998 WL 214425, at \*7 (N.D.N.Y. Apr. 24, 1998) (Pooler, J .)). *See also United States v. Green,* No. 92–CR–159C, 1994 WL 178139, at \*5–6 (W.D.N.Y. Feb. 10, 1994) (Curtin, J.) (in the context of a criminal case, evidence

from a mail watch may be introduced even though it was implemented in violation of DOCS Directive 4422).

 **\*10**  In the second amended complaint and the declaration in opposition to defendants' motion, the plaintiff specifies how he believes his due process rights were violated in connection with his disciplinary hearing. First, plaintiff claims that he was denied adequate assistance in preparing for the hearing because he was not provided with two types of documents —the records authorizing and stating the justification for the ongoing monitoring of his mail and his prior grievances, in response to which DOCS officials allegedly denied that the mail watch was in place. (AC ¶¶ 29, 56; Pltf.'s Decl., Dkt. No. 35 at 24, 53–57).[14] Plaintiff objects, in passing, that the hearing officer relied on information that "was never read into the record," (AC ¶ 56), presumably referring to *ex parte* testimony that the hearing officer received out of the presence of the plaintiff, because of security concerns. Plaintiff also alleges that he was improperly denied the right to call two witnesses at the hearing: (1) Supt. Smith, to testify about the circumstances relating to the approval of the ongoing mail watch, and (2) Lt. Barone, who plaintiff wanted to explain a perceived inconsistency in testimony about who the "reviewing officer" was for the inmate misbehavior report filed against plaintiff by Lt. Gardner. (Pltf.'s Decl., Dkt. No. 35 at 25–26, 59–62).

According to the hearing transcript submitted by plaintiff, he was denied requested documents regarding the authorization of his prior mail watch because the underlying facts were deemed confidential. (Dkt. No. 35–4 at 27–29, 57). Plaintiff was given some of his prior grievances, but requested all of his other grievances for the prior five years which, he stated during the hearing, would show that officials at Shawangunk previously denied he was being subjected to a mail watch. (Dkt. No. 35–4 at 30, 33–35). Defendant Gutwein denied plaintiff the additional grievances, finding they would be "redundant." (Dkt. No. 35–4 at 57). Based on the authority cited above, the Hearing Officer's stated reasons for refusing plaintiff the additional documents appear, on their face, to be rationally related to penological goals of maintaining institutional security and avoiding repetitive and irrelevant evidence at the hearing. In any event, even if these documents were not properly denied, the procedural error would have had no impact on the outcome of plaintiff's disciplinary hearing and thus, would be harmless. Plaintiff was clearly attempting to use these documents to establish that the correspondence used against him at the hearing were seized pursuant to an illegal mail watch. However, as noted above, because there

is no suppression remedy for illegally seized evidence in the context of a disciplinary hearing, plaintiff would not have altered the outcome of the hearing even if he were able to introduce additional evidence regarding the propriety of the mail watch.

At the conclusion of the hearing, defendant Gutwein notified plaintiff that he was relying, in part, on confidential testimony that he received from two witnesses when plaintiff was not present. (Dkt. No. 35–4 at 55–56). Taking testimony from witnesses out of plaintiff's presence does not violate due process requirements. *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) (citing *Baxter v. Palmigiano,* 425 U.S. 308, 322–23 & n. 5 (1976)) (inmates are not entitled to the right to confront and cross-examine witnesses at a disciplinary hearing, and the hearing officer may rely upon evidence not presented at the hearing). The witnesses called at plaintiff's disciplinary hearing included Lt. Gardner, who issued the misbehavior report against plaintiff; the two inmates who were implicated in the correspondence by which plaintiff allegedly tried to induce one to assault the other; Sgt. Kimler, who testified about the assistance she provided plaintiff in connection with the hearing; and Dep. Supt. Maly who testified, *inter alia,* about the mail watch which resulted in the discovery to the correspondence which was the basis of the charges against the plaintiff. (Dkt. No. 35–4 at 58). Plaintiff Ford also wanted to call Supt. Smith regarding the reasons for the authorization of the mail watch. Defendant Gutwein denied this request, finding that Supt. Smith's testimony would be redundant given that Dep. Supt. Maly had already testified about the mail watch. (Dkt. No. 35–4 at 56). The Hearing Officer's stated reason for not calling Supt. Smith was rationally related to the penological goal of avoiding duplicative evidence at the hearing. In any event, plaintiff's attempt to call Supt. Smith was clearly part of his effort to prove the illegality of the mail watch. Again, because the seized correspondence would not have been subject to suppression even if plaintiff had proven that the mail watch was illegal, any procedural error relating to not calling Supt. Smith would not have effected the outcome of the hearing, and would be harmless.

 **\*11**  Plaintiff also asked to call a "Lt. Barone" to clarify an alleged inconsistency between Lt. Gardner and Sgt. Kimler about who was the "reviewing" officer on Lt. Gardner's misbehavior report against plaintiff. Defendant Gutwein denied the request for this further testimony as being irrelevant and redundant. (Dkt. No. 35–4 at 57). Despite the plaintiff's extensive efforts to articulate why this testimony was relevant to his hearing (Pltf.'s Decl., Dkt. No. 35 at 24–

26, 59–63), this court does not find that further evidence regarding this minor procedural issue would have been relevant or would have any impact on the outcome of the hearing. Based on the submissions of plaintiff, this court concludes that the second amended complaint fails to state a plausible due process claim relating to the disciplinary hearing.

## VI. Denial of Plaintiff's Request to Marry

The Supreme Court has recognized that prisoners have a fundamental constitutional right to marry. *Turner v. Safely,* 482 U.S. at 95, 96 (citing *Zablocki v. Redhail,* 434 U.S. 374 (1978) and *Loving v. Virginia,* 388 U.S. 1, 12 (1967)). However, the right to marry, like many other rights is subject to substantial restrictions as a result of incarceration. *Turner,* 482 U.S. at 95. In determining whether a prison regulation that infringes on a fundamental right is reasonable, a court must decide: (1) whether there is a "valid rational connection" between the regulation and a legitimate and neutral governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, on an inmates' liberty, and on the allocation of limited prison resources; and (4) whether the regulation is reasonable, or whether it represents an "exaggerated response" to prison concerns. *Turner,* 482 U.S. at 89–90.[15]

Plaintiff alleges that defendant Smith denied his request to marry based on his long-term SHU status, pursuant to DOCS Directive 4201, which grants the Superintendent of a DOCS facility the discretion to deny a marriage request for an inmate confined in disciplinary housing. (AC ¶¶ 16–17, 20).[16] At the time he made his request, plaintiff faced approximately four more years in SHU confinement.

In *Turner,* the Supreme Court invalidated a Missouri regulation which prohibited inmates from marrying other inmates or civilians unless the prison superintendent determined that were compelling reasons for the marriage, finding that this "almost complete ban on the decision to marry" was not reasonably related to any legitimate penological objective. *Turner v. Safely,* 482 U.S. at 94–99). There is some case law which suggests that temporary delays in allowing an inmate to marry for disciplinary reasons would pass muster under the *Turner* standards, but that indefinite or prolonged refusals might not. *See, e.g., Castellanos v. Gomez,* C–93–0503, 1994 WL 519465, at *6 (N.D.Cal. Sept.

21, 1994) (although defendants' initial statement to plaintiff that there were no procedures in place for SHU inmate marriages approaches the blanket denial of marriage held unconstitutional in *Turner,* defendants moved expeditiously to put procedures in place to allow the marriage; plaintiff's Section 1983 claims based on the defendants' 12–month delay in allowing his marriage dismissed under Rule 56); *Martin v. Snyder,* 329 F.3d 919, 921–22 (7th Cir.2003) (because warden postponed, but did not preclude inmate's marriage based on a disciplinary charge and temporary denial of visitation of plaintiff's girlfriend, constitutional claim based on 12–month delay in marriage was properly dismissed).

**\*12** Because prison officials have some burden to demonstrate a penological justification for restricting an inmate's right to marry, and to satisfy the other elements of the *Turner* test, such claims are not conducive to resolution in the context of a Rule 12(b)(6) motion to dismiss.[17] *See, e.g., Martin v. Snyder,* 329 F.3d 921, 922 (a legitimate penological justification for refusing to allow an inmate's marriage is a defense that cannot be adjudicated under Rule 12(b)(6)); *Engel v. Ricci,* 07–5354, 2008 WL 2167994, at *5– 6 (D.N.J. May 22, 2008) (denying a Rule 12(b)(6) motion to dismiss a claim based on a 19–month delay in approval of an inmate's marriage). As discussed above, defendant Smith has presented and defended his reasons for denying plaintiff's request to marry in an affidavit and supporting documents that are not fairly considered against the plaintiff in the context of this motion to dismiss. Based on the facts properly before this court in addressing the pending motion, it is unclear whether Supt. Smith refused plaintiff's right to marry for the four years or more he remained in the SHU, or whether he would reconsider approval while plaintiff was still confined in a disciplinary setting. This court concludes that the second amended complaint states a facially valid First Amendment claim against defendant Smith relating to his denial of the marriage request. Supt. Smith is, of course, not precluded from establishing, in the context of a properly noticed summary judgment motion, that his decision passes muster under the *Turner* standards.

## VII. Visitation

### A. Imputed First Amendment Claim

In *Overton v. Bazzetta,* the Supreme Court considered the nature and scope of visitation rights of prisoners:

Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An

inmate does not retain rights inconsistent with proper incarceration.... And, as our cases have established, freedom of association is among the rights least compatible with incarceration.... Some curtailment of that freedom must be expected in the prison context.

We do not hold, and we do not imply, that any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners.

*Overton v. Bazzetta,* 529 U.S. 126, 131 (2003). The Court concluded that it did not need to explore and define, at length, the associational rights of inmates under the First Amendment, because the restrictions in question, including an indefinite ban [18] on the visitation rights of prisoners with two substance abuse violations, bore "a rational relation to legitimate penological interests" under the standards of *Turner v. Safely. Id.* at 132, 134–36.

"[I]nmates who claim that restrictions on their visitation privileges violated their First Amendment right to association ... must allege facts sufficient to support a finding that the challenged restrictions bear no 'rational relation to legitimate penological interests.' " *Calderon v. Conn. Dep't of Corrs.,* Civ. 04–1562, 2006 WL 3085716, at *9 (D.Conn. Sept. 1, 2006)* (quoting *Overton v. Bazzetta,* 539 U.S. at 131–32). Plaintiff does not explicitly raise a First Amendment challenge to the visitation restrictions imposed on him, although this court would liberally construe his complaint to raise such a claim. Plaintiff acknowledges that the visiting privileges of his fiancee were indefinitely suspended in April 2009 because of her alleged involvement in smuggling a note from another inmate to plaintiff in the visiting room, and because of concerns for her safety based on the intercepted letter in which plaintiff allegedly asked another individual to harass and threaten her. (AC ¶¶ 24, 30–32, 34). These are clearly legitimate penological interests that justified Supt. Smith's suspension of plaintiff's fiancee's visiting privileges under the *Turner* standards. *See, e.g., Calderon v. Conn. Dep't of Corrs.,* 2006 WL 3085716, at *9, 11* (denial of visitation for disciplinary reasons would likely constitute a legitimate penological interest under Rule 12(b)(6) standards; only the claim that visitation was denied because of plaintiff's ethnicity was not dismissed); *Phillips v. Girdich,* 9:03–CV–1019 (DNH/DHR), 2007 WL 3046744, at *2–4 (N.D.N.Y. Oct. 17, 2007)* (indefinite suspension of visitation privileges, lasting about three years, imposed due to improper conduct during a visit and an ensuing positive drug test, advanced legitimate penological goals and otherwise satisfied the

*Turner* criteria); *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 227–28 (W.D.N.Y.2003)* (revocation of inmate's visitation rights, which lasted roughly three years, served a legitimate purpose—deterring visit-related misconduct and promoting internal security).

## B. Due Process Claim

**\*13** To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000)* (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998)*. In *Sandin v. Conner,* 515 U.S. 472, 484 (1995),* the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Following the Supreme Court's decision in *Sandin v. Connor,* "in a majority (if not the entirety) of the circuits—including the Second Circuit— prisoners have no protected liberty interest in contact visits." *Zimmerman v. Burge,* 06–CV–0176 (GLS–GHL), 2008 WL 850677, at *2–3, 12 & n. 53 (N.D.N.Y. Mar. 28, 2008)* (collecting cases) (restrictions on the conditions in which inmates may visit with non-inmates would appear to be a hardship that is rather typical and necessary in relation to the ordinary incidents of prison life, and thus does not implicate a protected liberty interest). [19]

Although plaintiff alleges that his complaints to the DOCS Commissioner about the denial of his fiancee's visitation rights were not answered (AC ¶¶ 35, 51 (p. 30)), he attaches to his opposition papers several grievances regarding the visitation issue that were considered and denied by DOCS. (Dkt. 35–6 at 3–6). Even if restrictions on visitation implicated some limited liberty interest, the grievance process would provide adequate due process under the circumstances. *Id.* at * 13.

## C. Eighth Amendment Claim

To the extent plaintiff is alleging that the restriction on his visitation rights violated the Eighth Amendment, he fails to state a claim upon which relief may be granted. Under Supreme Court and Second Circuit authority, the challenged

denial of visitation "does not amount to the infliction of pain at all, and that, even it did, it does not amount to the sort of wanton (and penologically unjustified) infliction of pain prohibited by the Eighth Amendment." *Id.* at *3, 14 & n. 63 (citing, *inter alia, Overton v. Bazzetta,* 539 U.S. at 136–137 (prison regulation that subjected inmates with two substance-abuse violations to ban of at least two years on all visitation privileges did not create inhumane prison conditions, or deprive the inmate of basic necessities, under Eighth Amendment).

### D. Retaliation Claim

The second amended complaint makes completely unsupported claims that certain defendants restricted his visitation rights in retaliation for his filing of grievances and lawsuits. (AC ¶¶ 30, 46). Based on the authority cited below, such conclusory allegations are insufficient to state a plausible claim of retaliation.

### VIII. Personal Involvement of Defendant Fischer

**\*14** Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* 129 S.Ct. 1937 (U.S.2009).

DOCS Commissioner Fischer is mentioned as a defendant in a number of the causes of action in the second amended complaint. However, plaintiff's allegation that defendant Fischer failed to respond to written appeals/complaints

regarding the denial of his fiancee's visitation rights (AC ¶¶ 35, 51), is the sole basis for the claim that Commissioner Fischer was involved in any of the purported constitutional violations. As noted above, defendant also filed grievances with regard to the restrictions on his visitation, which were addressed by DOCS. Defendant Fischer's receipt of, and/ or failure to respond to, plaintiff's letters of complaint is not a sufficient basis to render him liable under Section 1983, and he should be dismissed from this action. *See, e.g., Sealely v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS commissioner was not personally involved in alleged constitutional violation where he only referred plaintiff's complaint to a subordinate for decision); *Greenwalt v. Coughlin,* No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations .") (collecting cases).

### IX. Retaliation—Cell Searches

#### A. Legal Standards

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004).

**\*15** The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citations omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action

even in the absence of the protected conduct. *Id.* (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977))

**B. Application**

As noted above, plaintiff makes conclusory allegations that, in carrying out most of the conduct described in the second amended complaint, the defendants were retaliating against him for filing grievances and lawsuits against DOCS officials. The only instance in which plaintiff provides any supporting facts relates to the three cell searches conducted at Shawangunk in July 2009. Plaintiff claims that, just after the first search, he had received correspondence from the court relating to this lawsuit, and he was doing legal research in this case and in connection with a post-conviction proceeding in his criminal case. (AC ¶¶ 37–38). During the second search, on July 16th, two correction officers purportedly told plaintiff that they were directed by "higher ups," including defendants Smith and Maly, to destroy his cell because plaintiff "pissed them off." He was also allegedly told that the officers were directed to take his legal magazines and books. (*Id.*). However, even if these allegations, accepted as true, were sufficient to support a plausible claim of a connection between his protected activities involving litigation and the searches of his cell, plaintiff cannot state a viable cause of action for retaliation. Numerous cases in this circuit have held a prison cell search is not the type of "adverse action" that can support a viable claim of retaliation. *See, e.g, Lebron v. Selsky,* 9:05–CV–172 (GTS/DRH), 2010 WL 1235593, at *5 & n. 8 (N.D.N .Y. Mar. 21, 2010) (collecting cases) (cell

searches, even if conducted because of retaliatory motives, are not actionable under Section 1983).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 32) be denied with respect to the First Amendment claim against defendants Maly and Smith relating to the continuation of the mail watch against plaintiff in 2008 and 2009, and the First Amendment claim against defendant Smith relating to his refusal to permit plaintiff to marry; and it is further

***16 RECOMMENDED,** that defendants' motion be granted and plaintiff's second amended complaint be dismissed with respect to all other defendants and claims.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 856416

Footnotes

1   Plaintiff threw hot oil in the face of the correction officer at Green Haven and then stabbed him three times. *Ford v. Smith,* 23 A.D.3d 874, 875, 803 N.Y.S.2d 821 (3d Dept.2005), *lv. app. den.,* 6 N.Y. 708, 813 N.Y.S.2d 44 (N.Y.2006). Plaintiff was found guilty of various disciplinary charges at Green Haven and sentenced to serve eight years in the SHU, which disposition was upheld in an Article 78 proceeding and affirmed on appeal. *Id.* Plaintiff was also convicted on related criminal charges in Dutchess County, New York, for which he was sentenced, on June 11, 2008, to a consecutive prison term of 22 years to life. (AC ¶ 27; 6/11/08 Transcript of Sentencing at 1, 13–14, Dkt. No. 35–2 at 7, 19–20).

2   The disciplinary proceeding resulted in sanctions affecting both the conditions and duration of plaintiff's confinement. In order to be allowed to proceed with this Section 1983 action seeking money damages for alleged constitutional violations in connection with the disciplinary hearing, without first pursuing a habeas action to attack the sanctions affecting the term of imprisonment, plaintiff states that he forever abandoned any claim of challenging the loss of good time. (AC at p. 36, citing *Peralta v. Vasquez,* 467 F.3d 98 (2d Cir.2006), *cert. denied sub nom. Jones v. Peralta,* 551 U.S. 1145 (2007)).

3   It is now well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (*citing Will v. Michigan Department of Police,* 491 U.S. 58, 71 (1989)). An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87–88 & n. 1 (2d Cir.1991) (citations omitted). To the extent that the DOCS defendants are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh

Amendment. *Huang v. Johnson,* 251 F.3d 65, 69–70 (2d Cir.2001); *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999).

4    The "fourth cause of action" in the second amended complaint, which purports to state claims under the Eighth Amendment, makes a passing reference to conditions of confinement at Shawangunk. (AC at p. 27). The vague allegations about un-shoveled snow and bird droppings in the exercise areas, occasional discoloration in the water, and late Ramadan meals are insufficient to state a plausible claim that the defendants were personally responsible for, or deliberately indifferent to, conditions of confinement that imposed an excessive risk to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 837 (1994).

5    The court will not consider, against the plaintiff, the affidavits of defendants Smith (Dkt. No. 32–1), Maly (Dkt. No. 32–7), and Gutwein (Dkt. No. 32–16) or, except to the extent discussed below, the supporting documents.

6    This discussion of the applicable legal standards draws heavily on Magistrate Judge Peebles' report-recommendation in *Dillhunt v. Theriault,* 9:07–CV–0412 (GTS/DEP), 2009 WL 4985477, at *9 (N.D.N.Y. Dec. 15, 2009), which was adopted by District Judge Suddaby.

7    The district judge in the Southern District noted that, during the mail watch, DOCS officials found, in or before 2006, at least one letter that was relevant to the prison's investigation of the assault, and one letter through which Ford attempted to influence a witness in his trial. *Id.* The second amended complaint points out that the state court judge who presided over plaintiff's criminal trial for the April 2004 assault, suppressed a letter seized pursuant to the mail watch in late 2004. (AC ¶ 10). Transcripts of the state court proceedings submitted by plaintiff in opposition to defendants' motion, makes clear that the state court judge found that repeated 60–day renewals of the mail watch, without any factual statements of justification, violated "due process" because DOCS did not follow its own rules and regulations, in DOCS Directive 4422. (Dkt. No. 35–2 at 1–4; AC ¶ 10). It is not clear whether the state judge purported to apply New York state or federal due process standards. However, as discussed below, a violation of DOCS directives in connection with the mail watch would not constitute a federal constitutional violation cognizable under Section 1983. Hence, the state judge's suppression ruling would not undermine the preclusive effect of the federal judge's adverse ruling in the Southern District of New York on plaintiff's federal constitutional claim relating to the mail watch during the period from April 2004 through the date plaintiff filed the prior action in 2005.

8    Mail watches are governed by DOCS Directive # 4422, which provides, in relevant part, as follows:

    **III.B.[9.]** Outgoing correspondence [ ... ] shall not be opened, inspected, or read without express written authorization from the facility Superintendent.

    a. The Superintendent shall not authorize the opening or inspection of such outgoing mail unless there is a reason to believe that the provisions of this or any directive or inmate rule or regulation have been violated, that any applicable state or federal law has been violated, or that such mail threatens the safety, security, or good order of a facility or the safety or well being of any person. Such written authorization by the Superintendent shall set forth specific facts forming the basis for the action.

    b. If after inspecting the contents of outgoing mail it is determined that the provisions of a directive, rule or regulation, or state or federal law have been violated, or that such correspondence threatens the safety, security or good order of the facility or the safety or well being of any person, then the correspondence may be confiscated. The inmate must be informed in writing unless doing so would interfere with an ongoing investigation.

    Where the inmate has been so notified, he or she may appeal the action to the Superintendent. * * *

    **III.G.5.** Incoming general correspondence, other than inmate-to-inmate letters and inmate business mail, will not be read unless there is evidence that the correspondence may contain one or more of the following:

    a. Plans for sending contraband in or out of the facility;

    b. Plans for criminal activity including escape; and

    c. Information which, if communicated, would create a clear and present danger to the safety of persons and/or the security and good order of the facility.

    **III.G.6.** Written authorization from the facility Superintendent to read incoming mail must be placed in the inmate's file specifying the reasons such action is considered necessary and whether all mail or certain correspondence shall be read. Such authorization shall be for a 60 day period subject to renewal by the Superintendent. The Superintendent shall request documentation from the person recommending inspection to determine that there are sufficient grounds for reading the mail, that the reasons for reading the mail are related to the legitimate interests of safety, security, and order, and that the reading is no more extensive than necessary to further these interests.

    *Jackson v. Portuondo,* 9:01–CV–00379 (GLS/DEP), 2007 WL 607342, at *5 n. 7 (N.D.N.Y. Feb. 20, 2007).

9    See, e.g., *Jackson v. Portuondo,* 2007 WL 607342, at *6–7, 13 (granting summary judgment on claim challenging mail watch, which was supported by evidence that inmate was "kiting" mail in an effort to harm another inmate and smuggle contraband) (citing, *inter alia, United States v. Felipe,* 148 F.3d 101, 107–108 (2d Cir.1998)) (knowledge that plaintiff had violated prison regulations related to mail, and had written about the commission of illegal acts constituted reasonable cause to intercept the inmate's correspondence).

10   While not validating the DOCS interpretations of this correspondence, plaintiff refers to it with some specificity in the second amended complaint. (AC ¶ 25). Thus, the copies of the letters attached to defendant Maly's affidavit (Dkt. No. 32–11 & 32–12) are properly considered here. *Sira v. Morton,* 380 F.3d at 67 (where the complaint explicitly refers to and relies upon documents, they are properly considered in the context of a Rule 12(b)(6) motion). In any event, plaintiff attaches, to his motion papers, the transcript from his March 2009 disciplinary hearing where the letters are discussed in detail and, often at the behest of plaintiff, read into the record. (*See, e.g.,* Dkt. No. 35–4 at 14, 20, 39, 40). Notwithstanding plaintiff's dispute about the import of these letters, the text clearly implicated the safety and security concerns of the facility. Hence, the confiscation of this particular mail would clearly be supported by good cause and would not support a Section 1983 claim. *See Ford v. Phillips,* 2007 WL 946703, at * 14 (confiscation of letters admitting to assault and attempting to properly influence witnesses "did not go beyond what was necessary to protect the prison's legitimate penological interests").

11   The Smith affidavit (¶ 7) and the Maly affidavit (¶ 9) vaguely suggest that plaintiff engaged in some other instances of mail kiting, but provide no dates or other specific information.

12   *See, e.g., Knight v. Keane,* 247 F.Supp.2d 379, 384–85 (S . D.N.Y.2002) (in the context of a Rule 12(b)(6) motion, the record is insufficient to establish that inspection of plaintiff's mail was based on good cause, distinguishing *Duamutef,* 297 F.3d 108 (upon an application for summary judgment, finding that "a rational jury" could not find that the watch on plaintiff's mail was not reasonably related to legitimate penological interests); *LeBron v. Swaitek,* 2007 WL 3254373, at *7 (it may be the case that the confiscation of LeBron's outgoing mail is supported by legitimate governmental interests; however, it would be inappropriate to dismiss LeBron's claim at this time under Rule 12(b)(6) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986)) (reversing the district court's dismissal of claims relating to interference with plaintiff's outgoing and incoming mail under Rule 12(b)(6)).

13   The fact that the Dutchess County District Attorney attempted to introduce a letter intercepted by the mail watch in late 2004 at plaintiff's criminal trial does not support a claim of prejudice for the purpose of an access-to-courts claim in this action, which is focused on the legality of the mail watch in 2008 to 2009. In any event, the state court criminal judge did not allow the letter to be used against Ford, so he was not prejudiced, in any event. *See Douglas v. Smith,* 9:05–CV–1000 (LEK/DRH), 2008 WL 434605, at *13 (N.D.N.Y. Feb. 14, 2008) (fact that letter seized by prison authorities and offered at plaintiff's criminal trial was suppressed by the state court judge negated any impact on him).

14   Because of the inconsistent page numbering of plaintiff's declaration, references will be to the page numbers in the CM–ECF header.

15   The *Turner* court did not decide whether an inmate's right to marry should be reviewed under a more stringent standard than the "reasonable relationship" test because it also implicates the rights of marriage partners who are not prisoners. *Turner v. Safely,* 482 U.S. 97. However, two years thereafter, the Supreme Court has made clear that to apply a heightened level of scrutiny to cases involving prison regulations affecting the rights of both prisoners and outsiders would unreasonably constrain the corrections system. *See Thornburgh v. Abbott,* 490 U.S. 401, 410 n. 9 (1989) (any attempt to forge separate standards for cases implicating the First Amendment rights of outsiders and inmates is out of step with Supreme Court case law).

16   Plaintiff also makes conclusory allegations that Supt. Smith denied plaintiff's request to marry in retaliation for his filing of grievances and lawsuits. (AC ¶ 46). The only factual support for the claim of retaliation is an allegation that Supt. Smith told plaintiff that he would not allow him to marry because of his involvement in the assault of a correction officer at Green Haven. (AC ¶ 18). Participation in an assault is not a protected activity that can form the basis for a retaliation claim. Based on the authority set forth below, plaintiff's unsupported allegations fail to state a plausible claim of retaliation relating to the denial of his marriage request. Plaintiff also asserts that the refusal of his marriage request violated his Eighth Amendment rights, but the court finds no authority to suggest that the inability to marry is the type of cruel and unusual deprivation required to support such a claim. *See Johnson v. Rockefeller,* 365 F.Supp. 377, 381 (S.D.N.Y.1973) (the prohibition against participating in the marriage ceremony does not subject a life-term prisoner to a "fate forbidden by the principle of civilized treatment guaranteed by the Eighth Amendment," nor is it "barbarous" or "shocking to the conscience"), *aff'd without opinion sub nom. Butler v. Wilson,* 415 U.S. 953 (1974). *Johnson v. Rockefeller* was distinguished, but not repudiated in *Turner v.. Safely,* 482 U.S. at 97, leading this court to conclude that the denial of plaintiff's marriage request should be evaluated under the *Turner* standards, not the Eighth Amendment.

**17**   *See Saluhuddin v. Goord,* 467 F.3d 263, 275 (2d Cir.2006) (under *Turner,* the defendants bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational).

**18**   The visitation ban had a term of at least two years; reinstatement at the end of that period was not automatic, but could be granted the discretion of the warden. *Id.* at 130, 134.

**19**   To the extent plaintiff predicates his due process claim regarding visitation on alleged violations of DOCS directives or state regulations (AC ¶ 31), that alone does not support a viable constitutional claim under Section 1983. *Id.* at *11 & n. 48; *Holcomb v. Lykens,* 337 F.3d 217, 224–25 (2d Cir.2003) (state corrections officials did not violate inmate's due process rights when they revoked inmate's extended furlough without following procedures outlined in department of corrections manual).

---

**End of Document**                                                  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   14

2007 WL 3046703
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John Earl JOHNSON, Plaintiff,

v.

Joseph GUIFFERE [1] and John
Pecora, Administrator, Defendants.

No. 9:04-CV-57.
|
Oct. 17, 2007.

**Attorneys and Law Firms**

John Earl Johnson, Albany, NY, pro se.

Donohue Sabo, Fred Hutchison, Esq., Kenneth G. Varlely, Esq., of Counsel, Albany, NY, for Defendant Guiffere.

### *ORDER*

DAVID N. HURD, United States District Judge.

**\*1** Plaintiff, John Earl Johnson, brought this civil rights action pursuant to 42 U.S.C. § 1983. In a Report Recommendation dated August 10, 2007, the Honorable David E. Peebles, United States Magistrate Judge, recommended that the defendant Sergeant Guiffere's motion for summary judgment be granted and the plaintiff's complaint be dismissed in all respects, with prejudice regarding defendant Guiffere, but without prejudice as to defendant Pecora. Objections to the Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the Report-Recommendation to which the plaintiff has objected, the Report-Recommendation is accepted and adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. The defendant Sergeant Guiffere's motion for summary judgment is GRANTED;

2. The complaint is DISMISSED in all respects, with prejudice with regard to defendant Guiffere;

3. The complaint is DISMISSED in all respects, without prejudice as to defendant Pecora; and

4. The Clerk shall file judgment accordingly.

IT IS SO ORDERED.

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff John Earl Johnson, who is now a federal prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging violation of his constitutional rights during a one and one-half month period while confined as a federal detainee within the Montgomery County Jail ("MCJ"). Johnson, a practicing Muslim, claims that jail officials at the MCJ violated his constitutional rights by depriving him of a diet consistent with his religious beliefs.

Currently pending before the court is a motion by Sergeant Guiffere, the lone remaining defendant appearing in the action, seeking the entry of summary judgment dismissing plaintiff's claims against him. Defendant's motion is predicated upon his assertion that the policy in place at the MCJ, requiring only that Islamic inmates be provided a "no pork" diet but that requests for vegetarian or other religious alternative meals be denied, is constitutional under existing law. Defendant Guiffere further contends that if a constitutional violation occurred, he is nonetheless entitled to qualified immunity from suit based upon the legal uncertainties surrounding plaintiff's claims. For the reasons set forth below, I recommend that Guiffere's summary judgment motion be granted and that plaintiff's claims against him be dismissed on the basis of qualified immunity.

### I. BACKGROUND

At the times relevant to his complaint the plaintiff, who subscribes to strict Islamic religious tenets, was a federal detainee held in the custody of the United States Marshals Service, and incarcerated within the MCJ pursuant to an apparent arrangement between that agency and officials operating the facility for the housing of federal prisoners awaiting trial and/or sentencing. Complaint (Dkt. No. 1) ¶ 3, Facts ¶¶ 1, 20; *see also* Defendant's Motion for Summary

Judgment (Dkt. No. 62) Exh. B, at 37. On June 13, 2003, following his transfer into the MCJ, plaintiff informed jail officials that his religion required he be fed meals consistent with his Islamic beliefs, though without providing elaboration regarding the diet being requested. [2] Complaint (Dkt. No. 1), Facts ¶¶ 1, 2; Johnson Aff. (Dkt. No. 30) ¶ 1. After an ensuing series of discussions with various prison officials at the MCJ regarding the issue, plaintiff formalized his dietary request on June 16, 2003 through the submission of a special diet request form asking that he not be served any meats "such as beef, chicken, turkey etc." because of his religious affiliation. Johnson Aff. (Dkt. No. 30) ¶¶ 1-2; Complaint (Dkt. No. 1), Facts ¶¶ 2-9; *see also* Guiffere Aff. (Dkt. No. 33-4) Exh. B. That request was denied on June 18, 2003 by defendant Guiffere, who responded that the MCJ is a "no pork facility" which does "not honor vegetarian diets." Guiffere Aff. (Dkt. No. 33-4) Exh. B; Complaint (Dkt. No. 1), Facts ¶ 12.

**\*2** Plaintiff filed a formal grievance regarding the denial of his special dietary request on June 18, 2003. Complaint (Dkt. No. 1), Facts ¶ 13; Johnson Aff. (Dkt. No. 30) ¶ 3. That grievance was denied by the facility's grievance coordinator, Candus M. Kwiatkowski, on June 25, 2003, based upon her finding that the facility's policy of reasonably accommodating prisoners' religious dietary beliefs had been followed. Complaint (Dkt. No. 1), Facts ¶ 14; Johnson Aff. (Dkt. No. 30) ¶ 5. That grievance denial was later upheld on appeal to John F. Pecora, the facility's chief administrative officer, on June 27, 2003. Complaint (Dkt. No. 1), Facts ¶ 19; Johnson Aff. (Dkt. No. 30) ¶ 7.

Plaintiff appealed the matter further to the Citizens' Policy and Complaint Review Council (the "CPCR Council") on or about June 27, 2003. Complaint (Dkt. No. 1), Facts ¶ 19; Johnson Aff. (Dkt. No. 30) ¶ 8. While plaintiff, who was transferred out of the MCJ on July 29, 2003, *see* Complaint (Dkt. No. 1), Facts ¶ 20, maintains that he never received a response with respect to that appeal, defendants assert that the CPCR Council voted on November 19, 2003 to deny the grievance, and notified both the Montgomery County Sheriff and the plaintiff of that determination by letter dated November 25, 2003 from Daniel B. Reardon, Commissioner and Chair of the New York Commission of Correction. Guiffere Aff. (Dkt. No. 33) ¶ 10.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 16, 2004. Complaint (Dkt. No. 1). In his complaint, plaintiff named as defendants the CPCR Council as an entity, as well as John F. Pecora, the Administrator of the MCJ, and Sergeant Guiffere, a corrections employee at the facility. [3] *Id.* Plaintiff's complaint asserts various constitutional claims stemming from the denial of his dietary request, including interference with the free exercise of his religious beliefs, procedural and substantive due process violations, and the denial of equal protection, and seeks recovery of compensatory and punitive damages. *Id.*

On July 15, 2004, in lieu of answering, the CPCR Council moved seeking dismissal of plaintiff's claims against it for failure to state a cause of action upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. Nos. 10, 11. In a report dated May 17, 2005, I recommended that all claims against the CPCR Council as an entity be dismissed as barred by absolute immunity under the Eleventh Amendment, with leave for plaintiff to replead to assert claims against individual members of the council, and further urged the court to deny plaintiff's cross-motion for summary judgment on the merits of his claims. [4] Dkt. No. 48. Those recommendations were adopted by order issued by U.S. District Judge David N. Hurd on December 7, 2005. Dkt. No. 51.

On October 31, 2006 defendant Guiffere, the only other defendant served in the action, filed a summary judgment motion with the court, arguing both that the denial of plaintiff's dietary request did not violate a constitutional right because it was reasonably related to a legitimate penological interest, and that in any event he is protected from suit under the doctrine of qualified immunity. Dkt. No. 62. Plaintiff responded in opposition to Guiffere's motion by submission filed on January 22, 2007, Dkt. No. 67, and defendant Guiffere has since countered with the filing on February 1, 2007 of a reply memorandum in response to plaintiff's opposition. Dkt. No. 69. Defendant Guiffere's summary judgment motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) (B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

**\*3** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary

judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (citations omitted); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only

when "there can be but one reasonable conclusion as to the verdict").

B. *First Amendment Free Exercise Claim* [5]

**\*4** In his summary judgment motion, Guiffere initially argues that plaintiff's First Amendment rights were not abridged while being held in the MCJ, since New York State guidelines for religious dietary needs and the facility's local practices, providing that a "pork-free" meal satisfies the constitutional dietary requirements for Muslim inmates, are reasonably related to legitimate penological interests. Defendant's Motion for Summary Judgment (Dkt. No. 62-6) at 2. Plaintiff counters that the budgetary concerns implicitly advanced by the defendant in defense of the relevant dietary practices at the MCJ do not support their position, since all that he asked was that his meals consist only of fish and vegetables, not that prison officials incur the expense of preparing Halal meals.

The First Amendment to the United States Constitution guarantees the right to the free exercise of religion. [6] *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 2020 (2005). That clause, as is true with regard to the First Amendment generally, applies to prison inmates, subject to appropriate limiting factors. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) ( "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974)). Thus, for example, under accepted free exercise jurisprudence inmates are guaranteed the right to participate in congregate religious services under most circumstances. *See, e.g., Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (citing cases).

The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987); *Salahuddin,* 993 F.2d at 308. A determination of whether the refusal to permit attendance at a religious service, for example, hinges upon the balancing of an inmate's First Amendment free exercise right, against institutional needs of officials tasked with the increasingly daunting task of operating prison facilities; that determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right ... is 'reasonably related to legitimate penological interests.' "

*Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372 (1990).

Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet and participation in religious meals. *McEachin v. McGuinnis,* 357 F.3d 197, 204-05 (2d Cir.2004); *Ford,* 352 F.3d at 597. Ordinarily the Eighth Amendment establishes as a constitutional minimum the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials retain considerable discretion in determining dietary constituents. *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001). This requirement, however, is augmented by the First Amendment's free exercise clause, which is broad enough to include an inmate's "clearly established" right "to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597; *see also Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin,* 357 F.3d at 203. A free exercise claim arising from such a denial brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests on the other hand. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990).

 **\*5** Examination of plaintiff's free exercise claim entails application of a three-part, burden shifting framework. *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988). A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs. [7] *Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006); *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at \*4 (W.D.N.Y. Mar. 30, 2007). Importantly, in evaluating this factor the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or a validity of particular litigants' interpretations of those creeds [,]' " *McEachin,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148-49 (1989)), and instead may only consider whether the particular plaintiff holds a belief which is religious in nature. *Ford,* 352 F.3d at 590; *King,* 2007 WL 1017102, at \*4. Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate

penological purpose justifying the decision under scrutiny. [8] *Salahuddin,* 467 F.3d at 274-75; *Livingston v. Griffen,* No. 04-CV-00607, 2007 WL 1500382, at \*15 (W.D.N.Y. May 21, 2007). In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254 (1987). *Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995); *Livingston,* 2007 WL 1500382, at \*15.

Under *Turner,* the court must determine "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective." *Thornburgh v. Abbott,* 490 U.S. 401, 414, 109 S.Ct. 1874, 1882 (1989). The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question. *Id.* at 417, 109 S.Ct. at 1884. Lastly, the court must examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id.* at 418, 109 S.Ct. 1884. Decisions rendered since *Turner* has clarified that when applying this test, a court should examine "the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Smith v. Nuttal,* No. 04-CV-0200, 2007 WL837111, at \*5 (W.D.N.Y. Mar. 14, 2007) (citing *Salahuddin,* 467 F.3d at 274).

In his motion, defendant does not question the sincerity of plaintiff's Islamic religious beliefs. Plaintiff maintains that by providing him with meals containing meat other than pork, defendants have interfered with free exercise of his religion, the beliefs associated with which require him to observe a vegetarian diet-with the exception of fish, which he is permitted to eat. While plaintiff offers nothing, aside from his naked assertions in this regard, as evidence that his sincerely held religious beliefs require such a dietary accommodation, the Second Circuit has encouraged "courts [to] resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith." [9] *McEachin,* 357 F.3d at 201. Accordingly, the plaintiff has satisfied his burden at step one of the inquiry.

 **\*6** It would ordinarily be incumbent at this juncture for the defendant to articulate palpably legitimate penological concerns to justify his refusal to provide the plaintiff with a vegetarian-plus-fish diet. Typically, defendants in similar cases offer up the financial burden associated with affording inmates particular diets, including those involving preparation and serving of Halal meals. *See, e.g., Williams*

*v. Morton,* 343 F.3d 212, 217-18 (3d Cir.2003); *Abdul-Malik v. Goord,* No. 96 CIV. 1021, 1997 WL 83402, at \*4 (S.D.N.Y. Feb. 27, 1997). With the articulation of such a justification, the focus would then return to the plaintiff, under the governing test, to establish that the policy is not reasonably related to legitimate penological interests. *Ford,* 352 F.3d at 595-96. Such an inquiry is particularly fact-laden, and generally ill-suited for resolution on motion for summary judgment. *See generally Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (holding that fact issues existed as to whether DOCS' ban on literature and assembly of religious group was reasonably related to legitimate penological interests; *Show v. Patterson,* 955 F.Supp. 182, 190-91 (S.D.N.Y.1997) (finding fact issues precluding summary judgment regarding whether strip search of Muslim inmates was reasonably related to legitimate penological interests).

In this instance the defendant has not offered any justification for his refusal to provide the plaintiff with the requested, vegetarian-plus-fish diet, the reasonableness of which could then be examined under *Turner,* instead arguing only his belief that plaintiff's non-pork diet should satisfy the requirements of mainstream Islamic religious tenets. Since this represents little more than an invitation for the court to examine the bonafides of plaintiff's religious beliefs-an invitation which, the Second Circuit has counseled, should be firmly resisted-I find defendant's failure to offer justification for his denial of plaintiff's dieting request to be fatal to his motion, and that accordingly he is not entitled to summary judgment in connection with the merits of plaintiff's First Amendment free exercise claim.

### C. *Equal Protection*
In addition to raising concerns under the free exercise clause of the First Amendment, plaintiff's complaint asserts a cause of action under the equal protection clause of the Fourteenth Amendment. The essence of that claim, however, is not well-defined in plaintiff's complaint, and his response in opposition to defendant's summary judgment motion fails to illuminate the claim.

The equal protection clause directs state actors to treat similarly situated people alike. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the equal protection clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano,* 54 F.3d at 1057 (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475, 1477 (2001)) (internal quotation marks omitted).

**\*7** It may be that plaintiff asserts an equal protection violation stemming from the failure of prison officials to provide him with a diet consistent with his religious beliefs, while members of other religions are accommodated. In such a case plaintiff's equal protection claim is properly analyzed under the framework articulated by the Supreme Court in *Turner. Smith,* 2007 WL 837111, at \*5.

As is the case with regard to plaintiff's First Amendment claim, defendant has offered little of value to assist in determining whether it can be said, as a matter of law, that plaintiff's dietary request could not be accommodated consistent with legitimate penological concerns, and that the disparate treatment afforded to plaintiff, based upon his religious beliefs, thus did not abridge his rights to equal protection under the Fourteenth Amendment. Accordingly, defendant Guiffere is not entitled to summary judgment at this juncture with regard to the merits of plaintiff's equal protection claim.

### D. *Procedural Due Process* [10]
In his complaint plaintiff also asserts a claim for deprivation of his procedural due process rights. Plaintiff's procedural due process claim contains two elements.

The first component of that claim derives from plaintiff's contention that in denying his request for a vegetarian-plus-fish diet, prison officials at the MCJ failed to follow their own internal regulations. This element of plaintiff's due process claim is easily discounted. It is well-established that no due process claims arise from the failure of prison officials to follow internal prison regulations. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citing *Hyman v. Holder,* No. 96 Civ. 7748, 2001 WL 262665, at \*6 (S.D.N.Y. Mar. 15, 2001)).

The second portion of plaintiff's due process claim stems from the failure of prison officials to provide a hearing before denying his request for a religious meal. To successfully state a claim under 42 U.S.C. § 1983 for denial of due process, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillance,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

In his papers plaintiff has cited no provision under which New York has created a liberty interest guarantying prisoners meals including only vegetables and fish, as requested by him. Consequently, in order to prevail on his due process claim plaintiff must establish that the denial of his request in that regard imposed upon him "atypical and significant hardship" in relation to the ordinary incidents of prison life. *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 2300 (1995); *see also McEachin,* 357 F.3d at 202-03; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Because plaintiff's complaint, even when most generously construed, fails to contain any such allegation, his procedural due process claim is subject to dismissal as a matter of law.

E. *Qualified Immunity*

**\*8** In addition to seeking dismissal of plaintiff's claims on the merits, defendant now presses qualified immunity as an alternative basis for dismissal of plaintiff's claims against him.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 2007 WL 2067932, at \*20-21 (2d Cir. July 20, 2007); *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007). The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly

narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162-63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

> [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Analysis of a claim of qualified immunity entails a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter, it must first be determined whether, based upon the facts alleged, plaintiff has facially established a constitutional violation. *Id.* If the answer to this inquiry is in the affirmative, the court must then turn its focus to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002). Finally, if the plaintiff had a clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

**\*9** The first two elements, as they apply to the facts of this case, are not controversial. Addressing the merits of the plaintiff's free exercise and equal protection claims, I have found at least the existence of genuinely disputed material facts precluding a finding, as a matter of law, that no substantive violation occurred. Moreover, the right at stake, including of a prison inmate to receive meals consonant with their religious beliefs, subject only to the constraints of legitimate penological concerns, was clearly established at the times in dispute. *See, e.g., Ford,* 352 F.3d at 507; *Bass,* 976 F.2d at 99; *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975).

It is the third element, addressing on Sergeant Guiffere's state of mind, that is the focus of his application for immunity from suit. In this instance, Sergeant Guiffere asserts and plaintiff does not contest-that it was his belief at the relevant times that the prescribed pork-free diet was in conformance with Johnson's Islamic dietary restrictions. *See, e.g.,* Guiffere Aff. (Dkt. No. 33-3) ¶ 6. Guiffere's belief in this regard was apparently influenced in large part by an advisory chart maintained at the MCJ reflecting that the dietary beliefs of the Islamic (Muslim) religion require consumption of Kosher meals, to include "meat, but no pork or pork by-products." Hutchinson Aff. (Dkt. No. 33) ¶ 5 and Exh. A. It also should be noted that at the time in question the provision of pork-free diets to Islamic inmates had been approved by the New York courts as "satisf[ying] the constitutional requirement." *See Malik v. Coughlin,* 158 A.D.2d 833, 834, 551 N.Y.S.2d 418, 418 (3d Dep't 1990) (citing *O'Lone,* 482 U.S. at 352, 107 S.Ct. at 2406); *see also Majid v. Leonardo,* 172 A.D.2d 914, 914, 568 N.Y.S.2d 200, 201 (3d Dep't 1991). Under these circumstances I find that it was objectively reasonable for the defendant to believe that his actions in denying plaintiff's request for a vegetarian-plus-fish diet did not violate Johnson's clearly established constitutional rights. [11] *See generally Kind v. Frank,* 329 F.3d 979 (8th Cir.2003).

### IV. *SUMMARY AND RECOMMENDATION*

Analysis of plaintiff's substantive free exercise and equal protection claims turn upon resolution by the factfinder of critical issues of fact, including whether his sincerely held religious beliefs require the diet which he requested, and whether legitimate penological concerns preclude providing him with the meals sought by him. I find, however,

that a reasonable person in the defendant's circumstances, denying plaintiff's meal request based upon an established facility policy and a practice which has passed state court scrutiny, would not have appreciated that he or she was violating plaintiff's clearly established constitutional rights. Accordingly, I recommend a finding that defendant Guiffere is entitled to dismissal of plaintiff's claims against him on the ground of qualified immunity.

**\*10** Based upon the foregoing, it is therefor hereby

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 62) be GRANTED, and the plaintiff's complaint be DISMISSED in all respects, with prejudice with respect to defendant Guiffere, but without prejudice as to defendant Pecora.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the plaintiff by regular mail and the defendant electronically.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 3046703

### Footnotes

1   Defendant Joseph A. Guiffere, who is alleged to have been a corrections sergeant at the Montgomery County Jail during the times relevant to plaintiff's claims, was mistakenly named by the plaintiff in his complaint as Sergeant Guiffery. In my earlier report and recommendation, dated May 17, 2005, I directed the clerk to revise his records to reflect that defendant's name as Sergeant Guiffrie. *See* Dkt. No. 48. Because it now appears that the proper spelling of this defendant's name is Guiffere, I will once again ask the clerk's office to adjust its records accordingly.

2   Plaintiff apparently adheres to a strict Islamic diet, which has been described by one court as follows:
    [p]racticing Muslims eat food that is Halal, which means allowed or lawful. The opposite of Halal is Haram, which means prohibited or unlawful. A Halal diet includes fruits, vegetables and all things from the sea. The flesh of herbivorous animals, such as cows, lambs, chickens and turkeys, is Halal if it is slaughtered with the appropriate prayer and in the appropriate manner.... Haram items include pork and all pork by-products, carrion and the flesh of carnivorous animals, such as cat, dog, rat, lion, tiger, and eagle.... Halal does not require separate preparation and serving facilities after Halal meat is slaughtered according to ritual.
    *Abdul-Malik v. Goord,* No. 96 CIV. 1021, 1997 WL 83402, at *1 (S.D.N.Y. Feb. 27, 1997); *see also Smith v. Nuttal,* No. 04-CV-0200, 2007 WL 837111, at *1 n. 3 (W.D.N.Y. Mar. 14, 2007). During his deposition, plaintiff explained the four

mandatory characteristics of properly prepared Halal food at length by quoting a translation of the relevant sections of the Koran (Quran). *See* Defendant's Motion for Summary Judgment (Dkt. No. 62) Exh. B, at 18-22.

3     Defendant Pecora has neither been served, nor has he appeared in the action. *See* Dkt. Nos. 13, 16, 22. In light of plaintiff's failure to serve him within the allotted 120 days under Rule 4(m) of the Federal Rules of Civil Procedure, and in the absence of anything which would constitute good cause to extend that period, plaintiff's claims against defendant Pecora are subject to dismissal, without prejudice. Fed.R.Civ.P. 4(m); *see Shuster v.. Nassau County,* No. 96 Civ. 3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan. 11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citing *Mississippi Publ'g Corp. v. Murphree,* 326 U.S. 438, 444-45, 66 S.Ct. 242, 245-46 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

4     Plaintiff has not availed himself of this limited opportunity to replead.

5     Although his complaint does not contain such a cause of action, plaintiff's factual allegations could support a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), which provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution .... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person-1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Because the principles which inform analysis of plaintiff's free exercise claim are similar to those applicable to his potential RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks, *see Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006), and my finding of defendant's entitlement to qualified immunity applies equally to this potential claim, it is unnecessary to separately determine whether plaintiff's *pro se* complaint should be liberally construed as asserting such a cause of action.

6     That amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

7     Noting in its decision in *Ford v. McGinnis* a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, the Second Circuit declined to resolve the issue, instead assuming continued applicability of the substantial burden test. 352 F.3d 582, 592-93 (2d Cir.2003). Recent cases from this and other courts suggest that the Second Circuit resolved this split in its decision in *Salahuddin v. Goord,* 467 F.3d 263 (2d Cir.2006) by subscribing to the substantial burden test. *See, e.g., Livingston v. Griffin,* No. 04-CV-00607, 2007 WL 1500382, at *15 (N .D.N.Y. May 21, 2007) (Singleton, J.); *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar. 30, 2007). While harboring some doubt that the Second Circuit has in fact laid the matter to rest, I find it unnecessary to take a stance regarding this issue.

8     While this framework is particularly well-suited for analysis of an agency wide or facility policy or practice affecting inmates generally, it applies with equal force to individual decisions such as that involved in this case, which impacts only a single inmate. *Salahuddin,* 467 F.3d at 274, n. 4.

9     The Second Circuit had occasion to address this element-the bonafides of a plaintiff's sincerely held religious beliefs-in the context of a religious dietary restriction request made by an inmate in *Ford v. McGinnis,* 352 F.3d 582 (2d Cir.2003). While noting the difficulties inherent in casting upon the judiciary the task of probing the extent of a plaintiff's legitimately held beliefs, the court observed that "[a]n individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.' " *Id.* at 588 (citations omitted).

10     Plaintiff's complaint also alleges deprivation of substantive due process. Because plaintiff adequately alleges a violation of the First Amendment free exercise clause and the denial of equal protection as guaranteed by the Fourteenth Amendment, there is no need to resort to the more generic substantive due process provision for an analysis of those claims. *See Velez v. Levy,* 401 F.3d 75, 94 (2d Cir.2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."). In any event, it cannot be said that plaintiff's allegations arise to a level sufficient to offend notions of substantive due process. *See id.* (noting alternatively that plaintiff's substantive due process claim must fail because alleged actions of defendants were not sufficiently shocking to create substantive due process violation).

11     Undeniably, the Second Circuit has been less than generous in finding qualified immunity in settings such as that now presented. *See Ford,* 352 F.3d at 596-98. In *Ford,* for example, the Second Circuit rejected a finding of qualified immunity based upon the failure of prison officials to provide an Islamic inmate with the Eid ul Fitr meal to celebrate the close of Ramadan, in reliance upon advice from religious authorities that postponement of the feast meal was not religiously

significant. *Id.* at 597-98. The instant case, however, presents a far more compelling argument for invocation of qualified immunity, based upon facts which are strikingly similar to those involved in *Kind,* in which the Eighth Circuit endorsed a finding of qualified immunity under analogous circumstances to those now presented. 329 F.3d at 980-81.

---

**End of Document**                                            © 2016 Thomson Reuters. No claim to original U.S. Government Works.

McLeod v. Scully, Not Reported in F.Supp. (1984)

1984 WL 692

1984 WL 692
Only the Westlaw citation is currently available.
United States District Court; S.D. New York.

LONNIE McLEOD, CLIFFORD WILSON, and
ELIJAH WILLIAMS, JR., individually and on
behalf of all persons similarly situated, Plaintiffs,
v.
CHARLES V. SCULLY, Superintendent of Green
Haven Correctional Facility; THOMAS COUGHLIN,
III, Commissioner of the New York State
Department of Correctional Services, Defendants.

No. 81 Civ. 3139 (RLC).
|
July 30, 1984.

**Attorneys and Law Firms**

PRISONERS' LEGAL SERVICES OF NEW YORK
ALICE MANN ROBERT SELCOV 2 Catharine Street
Poughkeepsie, New York 12601.

DAVID C. LEVEN JOHN A. GRESHAM 20 Vesey Street
New York, New York 10007.

ROBERT ABRAMS Attorney General of the State of New
York Two World Trade Center New York, New York 10047,
for defendants; RICHARD HOWARD Assistant Attorney
General of counsel.

OPINION

Carter, District Judge.

**\*1** Three inmates incarcerated at the Green Haven
Correctional facility in Stormville, New York have brought
this action on behalf of all inmates in custody at Green Haven
on or after May 15, 1981, when a facility-wide lockdown was
ordered by defendants Charles Scully and Thomas Coughlin,
III, Superintendent of Green Haven and Commissioner of
the New York State Department of Correctional Services,
respectively. Plaintiffs protest the conditions imposed during
that lockdown and during similar lockdowns that they allege
have occurred previously at Green Haven.[1] They allege
violations of their constitutional rights under the 1st, 8th, and
14th amendments of the federal constitution and under the
state constitution and laws of New York. Cross motions for

summary judgment and a motion for class certification are
before the court.

Under the circumstances surrounding the May 15th lockdown
at Green Haven, defendants' motion for summary judgment is
granted. Plaintiffs' motion for class certification to challenge
other lockdowns at Green Haven, relying as it does on
analogy to conditions prevailing during the lockdown on May
15th, is denied.

*Background*

A lockdown is undoubtedly one of the most extreme
and disruptive measures a prison can impose. Jefferson v.
Southworth, 447 F. Supp. 179 (D.R.I. 1978), aff'd, sub nom
Palmigiano v. Garrahy, 616 F.2d 598 (1st Cir. 1980), cert.
denied, 449 U.S. 839 (1980). By definition, with only some
variation, inmates are confined to their cells without access to
exercise, showers, regular prison programs, religious services
or commissary purchases. Generally, dining room meals are
suspended and in some cases, only two meals per day are
served for a period of time. Restrictions are set on medical
care and other prison routines such as mail and legal services.
The lockdown at Green Haven on May 15th was characteristic
in this sense.

It began at approximately 8:00 p.m. on May 15th when Donna
Payant, a corrections officer, was reported missing on duty
after an unsuccessful initial search to locate her. Her body was
found the following day in a landfill 20 miles from the facility.
There was evidence that Payant had been murdered brutally,
although no one knew who had killed her.[2] The landfill was,
however, the dumping grounds for the facility's garbage truck,
and the obvious inference was that she had been murdered at
the facility.[3]

The reaction to the announcement of her death was as
could be expected—both inmates and corrections officers
were shocked, upset and very tense. Superintendent Scully
issued a 'declaration of emergency' and the lockdown was
continued. The possibility of serious disturbances between
inmates and guards was obviously a major factor in the
lockdown decision. Eight to ten days later, the facility was
returned to normal routine. These facts are undisputed.

Plaintiffs' allegations focus mainly upon certain conditions
of the lockdown which, they contend, created serious
medical risks among prison inmates and prevented inmates

McLeod v. Scully, Not Reported in F.Supp. (1984)

1984 WL 692

from exercising their legal right to challenge the lockdown situation and other problems in the prison.

### Medical Care and General Welfare

**\*2** An 8th amendment claim concerning medical services must be premised on 'deliberate indifference to serious medical needs of prisoners,' conduct that amounts to the 'unnecessary and wanton infliction of pain.' Estelle v. Gamble, 429 U.S. 97, 104 (1977). Such a claim is stated when prison officials are charged with intentionally denying or delaying access to medical care, or interfering with prescribed treatment, but not when medical malpractice constitutes the crux of the allegation. Williams v. Director of Health Services, Dep't of Correctional Services, 542 F. Supp. 883, 884 (S.D.N.Y. 1982) (Lasker, J.), citing Estelle, supra; Johnson v. Harris, 479 F. Supp. 333, 336 (S.D.N.Y. 1979) (Weinfeld, J.).

While the presence of a genuine emergency cannot excuse denial of access to emergency medical care or similar restrictions concerning basic human needs, such a situation, as presented by the murder of a corrections officer, does justify the temporary suspension of certain services and allows prison officials to be more restrictive than they otherwise may be.[4] Hoptowit v. Ray, 682 F.2d 1237, 1259 (9th Cir. 1982); see Todaro v. Ward, 565 F.2d 48, 54 (2d Cir. 1977). The provision of only two meals per day during most of the 8–10 day lockdown does not in this context rise to the level of an 8th amendment violation. Cf. Cunningham v. Jones, 567 F.2d 653 (6th Cir. 1977). Nor is the irregular schedule followed in serving meals tantamount to intentional interference with the medical needs of diabetic prisoners. Dr. Starrett, who submitted an affidavit for plaintiffs, called Green Haven's practice 'not correct medical practice,' (¶¶2–8, 11), a description which, uncontested, nevertheless appears to be one of medical malpractice alone.

Other descriptions by inmates themselves concerning the pain they experienced because they did not receive the special diets prescribed for them (Plaintiffs' Interrogatories, 2a, 4 & 5), also fall short of stating an 8th amendment claim. Although in another context, the failure to provide a special diet might well constitute an 8th amendment violation, see Johnson v. Harris, supra, (pattern of conduct in non-emergency situation ignoring special dietary requirements of diabetic inmate violated 8th amendment), consideration of the staffing problems which resulted from the emergency

situation and the limited time during which special diets were unavailable precludes such a finding here. To state an 8th amendment claim it is not enough to point out, as plaintiffs do legitimately, that different decisions might have been made with regard to the number of days the lockdown was maintained or the way in which prison personnel were assigned. These determinations are difficult matters of prison administration on which, it has been recognized repeatedly, prison officials must be given reasonable leeway when security is at issue. See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119 (1977); Hayward v. Procunier, 629 F.2d 599, 602–03 (9th Cir. 1980), cert. denied, 451 U.S. 937 (1981); Gilliard v. Oswald, 552 F.2d 456, 459 (2d Cir. 1977); Lovell v. Brennan, 566 F. Supp. 672 (D. Maine, 1983), aff'd, 728 F.2d 566 (1st Cir. 1984). The court cannot conclude that the determinations made at Green Haven warrant judicial interference. Stringer v. Thompson, 537 F. Supp. 133, 138 (N. D. Ill. 1982); Saunders v. Packel, 436 F. Supp. 618, 624 (E.D.Pa. 1977).

### Access to Courts and Grievance Procedures

**\*3** Plaintiffs complain that they were denied timely opportunity to challenge lockdown conditions either in the courts or through internal prison channels. Apparently mail was not sent from the institution during the first 6 or 7 days of the lockdown, the law library was closed, the 'phone-home' program was suspended, and the formal internal grievance procedure was seemingly inoperative until May 26th. These are allegations of serious deprivations. Pursuant to the due process clause of the 14th amendment, prisoners must be given access to the courts, Bounds v. Smith, 430 U.S. 817 (1977), and restrictions such as those just described undoubtedly impair such access.

The instant case, however, presents those circumstances in which courts have unfailingly upheld such restrictions. See, e.g., Clifton v. Robinson, 500 F. Supp. 30 (E.D. Pa 1980); Saunders v. Packel, supra. Limited access to legal avenues of complaint in Green Haven were due solely to justified security measures; there are no charges that prison officials were acting in a retaliatory or capricious manner. Cf. Hoptowit v. Ray, supra, 682 F.2d at 1260. Given the circumstances which prompted the lockdown, the week-long curtailment of mail services and complaint procedures cannot be characterized as unreasonable or as a violation of inmates' constitutional rights. It must be noted, however, that such restrictions are not hereby sanctioned. The denial of

McLeod v. Scully, Not Reported in F.Supp. (1984)

1984 WL 692

access to legal services for longer periods of time, or when security considerations could not be strongly urged, might well overstep constitutional bounds.[5]

### Conclusion

Green Haven prison officials were confronted with an emergency situation on May 15th. The deprivations alleged by inmates do not indicate an excessive response to that situation. Plaintiffs cannot challenge other lockdowns at Green Haven in reliance on the facts described. Because it is well-established that prison officials have a reasonable amount of discretion to respond to emergency situations, the constitutionality of a lockdown, as a response to a particular set of events, must be reviewed on a case-by-case basis absent a showing of bad faith or breakdown in prison administration. Pepperling v. Crist, 678 F.2d 787, 789 (9th Cir. 1982); LaBatt v. Twomey, 513 F.2d 641, 647 (7th Cir. 1975). Plaintiffs have made no such showing. Summary judgment is therefore granted with regard to plaintiffs' challenge to the May 15th lockdown as well as to prior lockdowns alleged to have occurred at Green Haven. Plaintiffs' motion for class certification is denied.

IT IS ORDERED.

### All Citations

Not Reported in F.Supp., 1984 WL 692

### Footnotes

1    Plaintiffs request declaratory and injunctive relief.

2    After an investigation, an inmate was indicted and eventually convicted.

3    Deputy Superintendent of Security, Dean Riley, testified in his deposition about the concern generated by Donna Payant's death.

    They had just found a dead correction officer in a landfill twenty miles from this facility, that could have only gotten there by way of our facility garbage truck, which meant that she had to leave this facility in the truck, which meant that she had to be dead before she left the facility to be put in the truck, which could have meant that somebody killed her, and not knowing who killed her, the officers were very uptight, the inmates were very uptight.

    (Deposition, Dean Riley at 91).

4    Although plaintiffs maintain that a genuine issue of fact exists as to whether plaintiffs were deprived of hot water as well as showers, summary judgment against them cannot be avoided on this basis. Deprivation of showers, concomitant to lockdowns, have been upheld where the lockdowns themselves were not subject to constitutional challenge. See cases cited in text upholding lockdown conditions. In this case inmates were permitted to take showers on May 23rd, 8 days after the initiation of the lockdown.

5    To the extent that plaintiffs contend that they were entitled to disciplinary hearings either before or during the lockdown, their claim must be rejected. (Complaint, ¶27). They have failed to brief the issue, and procedural due process claims in the context presented here have been rejected overwhelmingly. See Hayward v. Procunier, supra, 629 F.2d at 601, 602; Gulliard v. Oswald, supra at 459; Jordan v. Robinson, 464 F. Supp. 223, 225–26 (W.D. Pa. 1979).

**End of Document**                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 7629500
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Erik PARTAK, Plaintiff,

v.

Peter D. BEHRLE, et al., Defendants.

No. 9:09–CV–1256 (FJS/ATB).
|
Sept. 12, 2011.

**Attorneys and Law Firms**

Erik Partak, pro se.

James Seaman, Asst. Attorney General, for defendants.

### ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Jr., Senior, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In his second amended complaint, plaintiff alleges that he was denied due process in connection with a disciplinary hearing, after which he was found guilty of drug possession, and that defendants were retaliating against him for complaining about one of the defendants to a member of the Inspector General's Office. (Second Amended Complaint SAC) (Dkt. No. 65). Plaintiff also alleges that he was housed in filthy conditions that violated his Eighth Amendment right to be free from cruel and unusual punishment. *Id.* Plaintiff seeks substantial monetary relief.

Presently before the court is defendants' motion to dismiss the second amended complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 73). Plaintiff has responded in opposition to defendants' motion and has cross-moved to amend the second amended complaint, and has filed a proposed third amended complaint. (Dkt.Nos.74, 79, 79–1(TAC)). Defendants have filed a reply to plaintiff's opposition to the dismissal motion and have opposed the motion to amend. (Dkt.Nos.75, 80). Plaintiff has filed a sur-

reply to defendants' reply in connection with the motion to dismiss. (Dkt. No. 78).

For the following reasons, this court will deny plaintiff's motion to amend and recommend granting defendants' motion to dismiss the complaint in its entirety.

### DISCUSSION

**I.** *Facts*

**A. Second Amended Complaint**

Plaintiff alleges that he was incarcerated in cell 200 of the Greene Correctional Facility Special Housing Unit (SHU) from May 2006 until April 4, 2007. (SAC ¶ 1). Plaintiff states that at some time between November 2006 and January of 2007, he was taken out of his cell for a "cell frisk." (SAC ¶ 2). Plaintiff claims that during the cell frisk, defendant Klein asked plaintiff whether he previously lived in the "Albany region" and then asked plaintiff about mutual acquaintances. (SAC ¶ 3). Plaintiff states that after a few minutes of conversation, it became apparent that he and defendant Klein knew many of the same people. (*Id.*)

Plaintiff states that the following day, defendant Klein approached plaintiff's cell and asked him whether he knew Michael Susko, who happened to be defendant Klein's roommate and who was dating a woman who dated plaintiff. (SAC ¶¶ 4–5). Plaintiff claims that he acknowledged knowing Mr. Susko and then tells a story about plaintiff intervening when Mr. Susko was "beating" his (and plaintiff's) girlfriend. (SAC ¶¶ 5–6). Plaintiff explained to defendant Klein that plaintiff was only "trying to keep the peace," but that Mr. Susko "burst out in a fit of rage." (SAC ¶ 7).

Plaintiff claims that as a result of this conversation, defendant Klein threatened plaintiff by stating "that's my boy's girl you were messing around with. Now you're in my house, we'll see how well you fare now." (SAC ¶ 8). Plaintiff alleges that after that conversation, between January 2007 and April 2007, defendant Klein began harassing plaintiff by ordering him to submit to numerous urine tests. (SAC ¶ 9). On April 1, 2007, when plaintiff had only three days left in SHU, defendant Klein moved plaintiff to a foul-smelling, filthy cell, with a "clearly incompatible" roommate, for no reason. (SAC ¶ 10). On April 4, 2007, plaintiff was transferred to Great Meadow Correctional Facility, and plaintiff claims that,

shortly thereafter, defendant Klein was transferred to the same facility. (SAC ¶¶ 11–12).

**\*2** Plaintiff states that on August 2, 2007, he received a misbehavior report, and was "given" defendant Klein as an assistant to plaintiff's Tier III disciplinary hearing. (SAC ¶ 13). Plaintiff alleges that defendant Klein asked plaintiff to provide information on prior drug smuggling that had occurred at Greene, but plaintiff refused, and defendant Klein became frustrated and threatened plaintiff again by stating that "I got a trick for a tough guy like you." (SAC ¶ 14). On September 7, 2007, plaintiff was transferred back to Greene and was again housed in SHU–200 cell. (SAC ¶ 15).

Plaintiff claims that between November 2007 and January 2008, Inspector Feliciano from the Inspector General's Office came to Greene to visit plaintiff. (SAC ¶ 16). During plaintiff's interview with Inspector Feliciano, plaintiff complained about defendant Klein and told the inspector that the problems with defendant Klein "stemmed from the streets." (SAC ¶ 17). Plaintiff stated that all of defendant Klein's friends worked at Greene, and that plaintiff felt that these friends would retaliate against plaintiff after learning of his complaints to Inspector Feliciano. (*Id.*)

Plaintiff claims that in February of 2008, he spoke to defendant Tietz about defendant Klein and his roommate Mr. Susko. (SAC ¶ 18). Coincidentally, defendant Tietz also was very good friends with Mr. Susko, and "strongly suggested" that plaintiff withdraw the statements he made against Klein to Inspector Feliciano. (*Id.*) When plaintiff refused to do so, defendant Tietz "implied Plaintiff would suffer some form of retaliation as a result, and then stated, '[w]hat goes around comes around, maybe not right now, but certainly, later on down the line.' " (*Id.*)

On April 21, 2008, defendant Santos ordered that plaintiff undergo a "random" urine test. (SAC ¶ 19). On April 23 and 24, 2008, when plaintiff had less than two weeks left of his stay in SHU, defendant Santos ordered plaintiff to undergo two more "random" urine tests. (SAC ¶¶ 21–22). Plaintiff complains that he was brought back to his cell at approximately 3:30 p.m. on April 24, 2008, [1] and at 5:30 p.m., defendant Bailey [2] and Plonka took plaintiff out of his cell for a cell search. (SAC ¶ 26).

As a result of this search, the officers discovered a white powder substance that defendant Ruff tested using a NIK Test. (SAC ¶ 27 & Ex. A). Plaintiff claims that defendant

Ruff did not use the proper protocol for the test, and the substance tested positive for seven grams of cocaine "in error." (*Id.* & Ex. B). Plaintiff claims that defendant Ruff, who is certified to conduct the NIK Test, conducted only one test following his first "positive" reaction, in violation of the Departmental Policy requiring "several tests" to be performed after a positive test. (SAC ¶¶ 27–28).

Defendant Gibilaro ordered the officers to place plaintiff in a filthy cell, in which the toilet was clogged with feces. (SAC ¶ 29). Plaintiff claims that he asked defendants Bailey and Plonka for a plunger, and that Plonka replied that plaintiff would get one in the morning, but he never did, so he lived in a cell with feces for three days. (SAC ¶ 30). On April 24, 2008, plaintiff was given a misbehavior report, charging him with possession of a controlled substance (7 grams of cocaine). (SAC ¶ 31 & Ex. C). Plaintiff maintained his innocence and wrote a letter to defendant Behrle, the Superintendent of Greene, stating that the white powder that was found in his cell was "AJAX," and that defendant Ruff failed to follow proper testing procedures. (SAC ¶ 32). Plaintiff alleges that on April 29, 2008, he was moved to the top bunk for no reason, and that when he asked defendant Santos why she did that she replied that she was the "fucking sergeant" and would "do whatever [she wanted] to do." (SAC ¶ 33).

**\*3** Plaintiff states that his Tier III disciplinary hearing was assigned to defendant Commissioner's Hearing Officer ("CHO") Gutwein, who began the hearing on April 29, 2008, and he continued it on May 7, 2008. (SAC ¶ 37). Plaintiff claims that CHO Gutwein made many errors during the hearing that resulted in a denial of due process. (*Id.*) Plaintiff claims that he requested an adjournment of the hearing in order to wait for the "outside agency" drug test to be completed, so that the result could be admitted as evidence, but defendant Gutwein refused in violation of New York Law. (*Id.*) On May 2, 2008, defendant Ruff conducted a test of AJAX, using the NIK Test, and concluded that AJAX did not test positively for cocaine. (SAC ¶ 35). Plaintiff claims that a memorandum written by defendant Ruff regarding this test was "exculpatory" and was improperly withheld from plaintiff until after the hearing. (*Id.*) Plaintiff claims that because of defendant Ruff's errors in conducting the test and his "deviation from protocol," the NIK Test results were incorrect. (*Id.*) Plaintiff also claims that defendant Gutwein "dismissed the testimony of two witnesses": Morgan Cox and Juan Benedict, who testified that there was AJAX in plaintiff's cell where the powder was found. (*Id.*)

Plaintiff was ultimately found guilty of the violation and sentenced to 36 months in SHU, with 36 months loss of privileges, and 36 months recommended loss of good time. (SAC ¶ 38 & Ex. G). Plaintiff claims that, on May 7, 2008, Inspector Feliciano interviewed plaintiff, and he claimed that he had been "set up" by Greene staff in retaliation for speaking to the Inspector several months prior. (SAC ¶ 36). Inspector Feliciano stated that she would take the cocaine from the evidence locker and personally deliver it to the New York State Police Laboratories for immediate testing. (SAC ¶ 36). She told plaintiff that it would not take more than two weeks to get the test results back. (*Id.*)

Plaintiff appealed his disposition to defendant Bezio, and claims that he made defendant Bezio "personally aware" of defendant Ruff's failure to adhere to the rules and to the governing Directives and of defendant Gutwein's failure to adhere to New York State Law during the hearing. (SAC ¶ 39, Ex. H & Appendix C). On June 20, 2008, defendant Bezio modified plaintiff's sentence to 18 months SHU, 36 months loss of certain privileges, and only 24 months recommended loss of good time, but affirmed the rest of the disposition. (SAC ¶ 44).

Plaintiff states that on May 17, 2008, defendant Santos moved plaintiff to a different cell for no reason, and that this cell was filthy, with feces smeared on the wall next to the toilet. (SAC ¶ 40). Plaintiff claims that defendant Santos refused to provide cleaning supplies, and that she gave plaintiff an "incompatible" roommate, deliberately trying to provoke problems between the two inmates. (*Id.*) Defendant Santos also went through plaintiff's property, and removed pictures of his wife, without providing plaintiff with a "contraband slip." (*Id.*) The pictures were never returned. (*Id.*).

*4 Plaintiff states that on May 20, 2008, he wrote a letter to the New York State Police and requested a copy of the test results under the Freedom of Information Law (FOIL). (SAC ¶ 41). In June of 2008, plaintiff wrote to the Greene Disciplinary Office and requested the test results, but was told by "interdepartmental communication" from Lt. Robbiani, that the test results had not yet been forwarded to Greene. (SAC ¶ 43). On July 9, 2008, plaintiff's FOIL request was denied, and plaintiff appealed that decision on July 29, 2008.[3] (SAC ¶ 45). Plaintiff states that on July 30, 2008, his Tier III hearing disposition was "reviewed and administratively reversed," but that he remained in SHU until August 18, 2008, when he was released into general population. (SAC ¶ 48).

Plaintiff claims that defendant Behrle, the Superintendent of Greene, failed to protect plaintiff's "liberty interests from cruel and unusual punishment" by ignoring the due process violations caused by defendant Behrle's subordinates: defendants Gutwein, Gibilaro, Santos, Ruff, Bailey, Plonka, Tietz, and Klein. (SAC ¶ I) (Dkt. No. 65 at 12).

Plaintiff also alleges that defendant Gutwein violated Department policy, both in the applicable regulations and in the Department of Correctional Services ("DOCS")[4] Directives, withheld "exculpatory" evidence, and then used that evidence to find plaintiff guilty of the violation. (SAC ¶ II). Plaintiff claims that, when he personally informed defendant Bezio of the due process violations allegedly committed by his subordinates, Ruff and Gutwein, defendant Bezio failed to correct those violations. (SAC ¶ III). Finally, plaintiff adds that defendants Gibilaro, Santos, Ruff, Bailey, Plonka, Tietz, and Klein used "retaliation without need or provocation" and failed to "intervene to prevent misuse of power," in violation of the Eighth Amendment. (SAC ¶ IV).

## B. Proposed Third Amended Complaint

In plaintiff's proposed third amended complaint, he seeks to add a new defendant and ten new paragraphs[5] to his second amended complaint. (Dkt. No. 79). Plaintiff also seeks to add exhibits to the second amended complaint, including portions of the transcript of his disciplinary hearing and a copy of the negative outside laboratory drug test. (*See e.g.* Dkt. 79–1, Exs. M, O & P). The new defendant is Inspector Feliciano, who plaintiff now alleges failed to remedy the alleged wrongs done by the Greene Correctional Facility defendants and allowed these wrongs to go "unrepremanded," by failing to "investigate and charge" the Greene Correctional Facility officials with "evidence tampering." (Dkt. No. 79–1 ¶¶ 18, 38–39, 56, 58) (Third Amended Complaint (TAC)). Plaintiff seeks to add claims against defendant Director of Special Housing, Bezio for failing to release plaintiff "promptly" from SHU after "having personal knowledge of plaintiff's innocence." (TAC ¶ 54).

*5 Plaintiff also seeks to add facts regarding defendant Tietz. Plaintiff seeks to bolster his retaliation claims by alleging that defendant Tietz escorted plaintiff to his interview with Inspector Feliciano, that the door to the interview room was left open, that defendant Tietz stayed outside the room while the interview was being conducted, and that defendant Tietz overheard the plaintiff's very specific

complaints about defendant Klein. (TAC ¶ 17). Plaintiff alleges that these specific complaints included that his "problems" with defendant Klein "stemmed from [plaintiff's] knowledge of defendant's ties to known criminal associates in the streets, and [defendant Klein's] endeavors with such criminal associates." *Id.* Plaintiff also claims that he "advised said Inspector that all of defendant Kline's [sic] friends currently worked in GCF and that [plaintiff] felt they would retaliate after learning of the statements [plaintiff] made against him." *Id.*

Plaintiff also seeks to add some facts regarding his conditions of confinement claims. Plaintiff now alleges that when he was not given a plunger to unclog his toilet for three days, he was "forced to defecate on a piece of paper on the floor and throw it outside his 'rec-pen.' (*Compare* SAC ¶ 30 *with* TAC ¶ 31). Plaintiff also claims that he was forced to urinate in the sink and that he became sick because of the methane and ammonia odors and repeatedly threw up in the sink.[6] *Id.*

## II. *Motion to Dismiss*

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " ' fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents

attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)). Finally, in the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. *See Locicero v. O'Connell,* 419 F.Supp.2d 521, 525 (S.D.N.Y.2006) (citation omitted).

## III. *Motion to Amend*

**\*6** Federal Rule of Civil Procedure 15(a) provides that the court should grant leave to amend "freely ... when justice so requires." Generally, the court has discretion whether or not to grant leave to amend a pleading. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Where it appears that granting leave to amend is unlikely to be productive or the amendment is futile, it is not an abuse of discretion to deny leave to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted). The decision to grant or deny a motion to amend is committed to the sound discretion of the trial court, and the court's decision is not subject to review on appeal except for abuse of discretion. *Nettis v. Levitt,* 241 F.3d 186, 192 (2d Cir.2001). An amendment is futile if the pleading fails to state a claim or would otherwise be subject to dismissal. *U.M.G. Recordings, Inc. v. Lindor,* CV–05–1095, 2006 U.S. Dist. LEXIS 83486, \*5–6 (E.D.N.Y. Nov. 9, 2006); *S.S. Silberblatt, Inc. v. East Harlem Pilot Block,* 608 F.2d 28, 42 (2d Cir.1979). The analysis is similar to that employed in a motion to dismiss. *Stetz v. Reeher Enterprises, Inc.,* 70 F.Supp.2d 119, 121 (N.D.N.Y.1999).

In the case of proposed amendments where plaintiff wishes to add a defendant, the Court must also look to Rule 21 of the Federal Rules of Civil Procedure. Rule 21 states that the court may permit a party to be added to an action "at any time, on just terms." Fed.R.Civ.P. 21. Rule 21 is "intended to permit bringing in a person, who through inadvertence, mistake or for some other reason, had not been made a party and whose presence as a party is later found necessary or desirable." *United States v. Commercial Bank of North America,* 31 F.R.D. 133, 135 (S.D.N.Y.1962) (internal quotations omitted). Addition of parties under Rule 21 is guided by the same liberal standard as a motion to amend under Rule 15. *Fair Housing Development Fund Corp. v. Burke,* 55 F.R.D. 414, 419 (E.D.N.Y.1972).

In this case, defendants made their motion to dismiss on February 14, 2011. (Dkt. No. 72). Plaintiff filed his motion to

amend on April 11, 2011. (Dkt. No. 79). Because the standard for futility of amendment is equivalent to the standard for a motion to dismiss, this court has considered all of plaintiff's submissions and the facts stated in both his second amended complaint and his proposed third amended complaint in determining that defendants' motion to dismiss should be granted. The court finds that, notwithstanding plaintiff's efforts to bolster his claim in the proposed third amended complaint, these allegations will not survive a motion to dismiss. Thus, the court will deny the motion to amend at the same time that it recommends granting defendants' motion to dismiss.

## IV. *Proposed Claim Against Inspector Feliciano*

Inspector Feliciano was not named in plaintiff's second amended complaint, thus, the defendants' motion to dismiss is not addressed to any actions by this defendant. This court finds that plaintiff's motion to add this defendant must fail because the amendment is futile and would not survive a motion to dismiss. Inmates do not enjoy a constitutional right to an investigation of any kind by government officials. *Jordan v. Fischer,* 773 F.Supp.2d 255, 278 (N.D.N.Y.2011) (citing *Bernstein v. New York,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008); *Nieves v. Gonzalez,* No. 05 Civ. 17, 2006 WL 758615, at *3–4 (W.D.N.Y. March 2, 2006); *Longi v. County of Suffolk,* No. CV–02–5821, 2008 WL 858997, at *5–6, *22–23 (E.D.N.Y. Mar. 27, 2008)). Thus, to the extent that plaintiff alleges that Inspector Feliciano conducted an inadequate investigation, or no investigation at all, into the alleged abuse by other defendants, this claim would not survive a motion to dismiss.

**\*7** The court also notes that the proposed amendment may be read to allege that Inspector Feliciano was "deliberately indifferent" to the plaintiff's complaint about the defendants "ever plotting misconduct." (TAC ¶ 18). Because the defendants were not reprimanded, the "misconduct escalated" to the point that plaintiff was "framed" with a large quantity of cocaine. *Id.* A similar motion to amend was made and denied in *Brown v. Pritchard,* No. 09–CV–214, 2011 WL 2651806 (W.D.N.Y. July 6, 2011).

In *Brown,* plaintiff moved to amend his complaint to add a claim that the proposed Inspector General defendants disregarded inmate accusations against the corrections officers and allowed them to continue working until plaintiff was harmed. *Id.* at *5. The court held that the Inspector General defendants did not owe a duty to plaintiff, and that "mere accusations" that were found by the Inspectors to be

unsubstantiated, were not sufficient for a finding of liability against the Inspector, if the corrections officer in question is later accused of another incident. *Id.*

In this case, according to plaintiff, when he first spoke to defendant Feliciano, plaintiff said that he advised the Inspector that all of defendant Klein's "friends" worked at Greene and that plaintiff "felt" that they would retaliate after learning of plaintiff's statements. (TAC ¶ 17). A "feeling" that someone was going to retaliate is not a substantiated complaint. It is unclear how Inspector Feliciano would have known which other officers plaintiff was referring to. It is also unclear how Inspector Feliciano would have been able to prevent the alleged "framing" of plaintiff. Although plaintiff now states that he "directly informed" Inspector Feliciano of the named defendants' "ever plotting misconduct, such a vaguely worded complaint would not indicate any particular actions by any of the defendants. Any claims against Inspector Feliciano would not survive a motion to dismiss, and plaintiff's motion to amend to add this defendant and any claims against her is denied.

## V. *Due Process*

### A. Legal Standards

Plaintiff makes various due process challenges to his disciplinary hearing. In order to begin a due process analysis, the court must determine, *inter alia,* that plaintiff had a protected liberty interest in remaining free from the confinement that he challenges. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). "[A] prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sealey v. Giltner,* 197 F.3d 578, 583 (2d Cir.1999) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335–36 (2d Cir.1998).

**\*8** The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary

evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W.D.N.Y.2008) (citing, *inter alia, Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

## B. Analysis

### 1. Liberty Interest

Although plaintiff initially received a three year sentence in SHU, including a three year loss of good time, the determination was reversed, he did not lose good time, and he only spent approximately 106 days in SHU. In any event, defendants appear to assume for purposes of this motion, that plaintiff did have a liberty interest in his original lengthy SHU sentence. [7]

Plaintiff now claims that DOCS received the test report, indicating that the substance was not cocaine on July 18, 2008, but he was not released from SHU until August 18, alleging that he was kept in SHU an extra 31 days. In *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in

such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The Court in *Sandin* determined that the inmate's discipline in segregated confinement for 30 days did not present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

**\*9** Plaintiff claims that he was not transferred back into General Population for 31 days after DOCS received the exculpatory test results. He does not indicate that any of the named defendants were responsible for this extra confinement. More importantly, the court notes that plaintiff alleges that his administrative hearing was not reversed until July 30, 2008 (SAC ¶ 47; TAC ¶ 50 & Ex. P). The exhibit cited by plaintiff indicates that the document was received by the "Inspector General's Office" on July 18, 2008. (TAC ¶ Ex. P). There is no indication when anyone else received this information. The information would have to be processed, transmitted to the appropriate DOCS officials, and used to reverse plaintiff's disciplinary hearing, which apparently happened only twelve days later on July 30. Thus, if anything, plaintiff was kept in SHU for an extra 18 days after the reversal of his disciplinary finding. The brief period of additional confinement is not sufficient to create a liberty interest under *Sandin.* Thus, any new claims regarding the extra time in SHU would not survive a motion to dismiss.

### 2. Sufficiency of Evidence

Plaintiff's main challenges to the disciplinary hearing deal with sufficiency of the evidence. His sufficiency arguments include a claim that defendant Gutwein violated state law by failing to obtain a test from an outside laboratory to confirm the NIK result and to include that "outside" laboratory result in the hearing record. Plaintiff also claims that defendant Gutwein failed to provide plaintiff with defendant Ruff's memorandum, in which he states that he performed a NIK test on AJAX and determined that AJAX does not produce a false positive result for cocaine. [8] Finally, plaintiff alleges that defendant Gutwein "dismissed" the testimony of two of plaintiff's witnesses. [9]

### a. Single Test Result

Plaintiff argues that he could not be found guilty of cocaine possession, utilizing only a single positive NIK test as evidence. Plaintiff claims that he was entitled to a second test,

performed by an outside laboratory, before he could be found guilty of the drug possession. He cites N.Y.Code Rules & Regs. (N.Y.CRR), tit.7 § 1010.5(c) which provides that

> In a subsequent disciplinary hearing, the positive result of a test of suspected contraband drugs may be used as evidence that the suspected substance is what the test result indicates. In addition to the misbehavior report, the inmate shall be served with the following documents and the record of the hearing must include:
>
> (a) the request for test of suspected contraband drugs form, see section 1010.8(a) of this Part;
>
> (b) the contraband test procedure form, see section 1010.8(c) of this Part;
>
> (c) the test report prepared by an outside agency subsequent to testing of the substance; *if any;*
>
> (d) a statement of the scientific principals and validity of the testing materials and procedures used (for the Public Safety, Inc. NIKR System, see 1010.8(c) of the Part).

 **\*10**  (e) a photocopy of the individual test instructions for each test used.

7 N.Y.C.R.R. § 1010.5 (emphasis added). Even if defendant Gutwein had violated this regulation, as stated above, the violation of a state regulation alone does not generally rise to the level of a constitutional violation. [10] *Soto v. Walker,* 44 F.3d at 173. Various courts in New York have held that an inmate does **not** have a constitutional due process right to have the alleged drugs retested by an outside laboratory and "to have his disciplinary hearing interrupted, under the circumstances." *Batista v. Goord,* 2005 WL 2179420, at \*10 (N.D.N.Y. Aug.28, 2005) (citing *Peranzo v. Coughlin,* 850 F.2d 125, 126 (2d Cir.1988)). *See also Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123–24 (S.D.N.Y.2002); *Bolanos v. Coughlin,* No. 91–CV–5330, 1993 WL 7621122, at \*21 (S.D.N.Y. Oct. 15, 1993) (one test of white powder which produced a positive result for controlled substance was sufficient evidence to support a hearing officer's decision).

The facts in *Bolanos* were very similar to those in this case. White powder was found in a plastic bag in inmate Bolanos's cell. 1993 WL 7621122, at \*2. The powder was tested using the NIK test. *Id.* The test indicated the presence of cocaine, and Bolanos was charged with possession of a narcotic. *Id.* Bolanos denied that the white powder found in his cell was cocaine [11] and requested that the substance be

tested again. *Id.* at \*3. His request was denied, and Bolanos was found guilty after a hearing at which the officer who actually performed the test did not testify because he was "unavailable." *Id.* at \*5. Instead, the hearing officer received testimony from another officer who was in the room when the NIK test was being conducted. *Id.* at \*4. Bolanos's disciplinary determination was ultimately reversed, "based on an analysis of the white powder done by an outside lab which found no controlled substances." *Id.* at \*5.

The court in *Bolanos* found no due process violation because "[t]he test performed on the white powder also provided sufficient evidence," even though the sample was only tested once prior to the hearing, and no confirming test was performed at that time. *Id.* at \*9. The court reasoned that unlike urinalysis testing which can be affected by medications or foods, the risk of a false positive is not as great with a white powder. *Id.* Additionally, the court emphasized that "it was not clearly established at the time of this hearing that a confirmatory test on a white powder was required, and defendant ... is entitled to qualified immunity." *Id.* (citation omitted).

The same is true in this case. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002) (citations omitted). Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990).

 **\*11**  Based on the case law cited above, no reasonable official could believe that he was violating plaintiff's constitutional rights by refusing to wait for an additional

test prior to concluding plaintiff's disciplinary hearing. Thus, plaintiff's first challenge to the sufficiency of the evidence at his disciplinary hearing cannot succeed.

**b. Defendant Ruff's Testimony and Memorandum**
Because plaintiff argued that the white powdery substance found in his cell was the cleanser, AJAX, and that AJAX could produce a false positive NIK test, defendant Ruff performed a NIK test on AJAX. It is undisputed that the result of the test was that AJAX did not test positive for cocaine. Defendant Ruff wrote this result in a memorandum to defendant Gutwein. [12] Plaintiff claims that this "report" was "exculpatory evidence," and that defendant Gutwein's failure to produce the report for plaintiff was a denial of due process. Defendant Ruff also testified at the disciplinary hearing. Plaintiff alleges that he was denied due process when he was not allowed to cross examine defendant Ruff.

It is true that an inmate must be afforded the opportunity to present evidence, and with some limitations, to know the evidence supporting the disciplinary ruling. [13] *Sira v. Morton,* 380 F.3d 57, 74–75 (2d Cir.2004). The court has reviewed the transcript of the disciplinary hearing because it was cited, and specifically relied upon, by plaintiff. [14] Plaintiff was clearly allowed to ask defendant Ruff various questions, focusing specifically on plaintiff's argument that the "AJAX" would have produced a false positive test result. (*See e.g.* Dkt. No. 75–1; Defs.' Ex. A at 23–28). [15] At the hearing, plaintiff requested that AJAX be tested to determine if that substance could have produced a false positive result for cocaine. (*Id.* at 26). Plaintiff also requested that the hearing officer call a representative of the company that manufactured the NIK test to ask a representative whether AJAX could test positive for cocaine. (*Id.* at 25–26). The hearing officer **granted** the request, and Alan Miller, the technical manager for "NIK public safety" testified at the hearing. (*Id.* at 32–35). He was questioned extensively by the plaintiff. *Id.*

The plaintiff specifically asked Mr. Miller whether AJAX could produce a false positive result, and Mr. Miller stated that it was not possible because AJAX did not contain the appropriate chemical compounds. (*Id.* at 32). Mr. Miller also testified, however, that although other cleaning substances were tested by his company, AJAX was not one of them. (*Id.* at 33). Plaintiff also asked if the test were 100% no flaws" or whether the test could produce inaccurate results based on the test procedures. (*Id.* at 34). Mr. Miller conceded that the company could not test every possible substance to

determine whether it could produce a false positive result, but that the test is "deemed reliable ... to test for the presence of cocaine." (*Id.*). Based on the above, plaintiff's claim that he did not get a chance to "cross-examine" defendant Ruff is completely contradicted by the transcript of the hearing upon which plaintiff relies for this argument.

**\*12** Plaintiff also complains that defendant Gutwein withheld exculpatory evidence when he did not allow plaintiff to see defendant Ruff's memorandum, submitted to defendant Gutwein after defendant Ruff tested the AJAX and found that it did not create a false positive result for cocaine. As defense counsel argues, defendant Ruff's memorandum, indicating that AJAX did **not** produce a false positive result for cocaine is **not** exculpatory evidence. Additionally, during the hearing, plaintiff requested that the test be performed, thus, the test was performed after the hearing was concluded. Because the test was not exculpatory, there was no reason for defendant Gutwein to produce the results for plaintiff prior to the hearing decision.

The court also notes that although plaintiff states he was not aware of this information, defendant Gutwein specifically mentioned the report on May 7, 2008, when he reconvened the hearing. (Dkt. No. 75–1, Ex. A at 38). Defendant Gutwein was reading the evidence that he relied upon into the record, and he mentioned the May 2, 2008 memorandum, written by defendant Ruff. *Id.* Plaintiff, however, instead of listening to the hearing officer, became irate and stated that "[t]his is rediculus [sic] ... what am I supposed to cooperate with you in a hearing where you. [sic] Gimme my disposition I want to get out of here." *Id.* Although plaintiff was clearly told about the results of the test, that plaintiff himself requested to be performed, he did not articulate a specific objection to the evidence when defendant Gutwein read the information into the record and missed a chance to discuss the report with defendant Gutwein. The memorandum only confirmed what plaintiff was told at the hearing.

In plaintiff's response to defendants' motion to dismiss, he cites *Howard v. Wilkerson,* 768 F.Supp. 1002 (S.D.N.Y.1991) for the proposition that plaintiff could not be found guilty, based upon information that had not been shared with him. (Dkt. No. 74 at 8). While plaintiff is correct in his citation of the law, the facts in this case are distinguishable from *Wilkerson.* In *Wilkerson,* the defendants claimed for the first time in their responses to plaintiff's request for admissions in his federal action, that the hearing officer had "more information that the written material before him." *Id.* at 1009.

Plaintiff in *Wilkerson* was not informed what that additional material was, while in this case, plaintiff requested that AJAX be tested, and defendant Gutwein read the results of the test into the record in the presence of plaintiff. Thus, the failure to provide plaintiff with a copy of the memorandum itself does not rise to the level of a due process violation.

Finally, plaintiff alleges that defendant Ruff was "grossly negligent" in failing to perform the NIK test in accordance with DOCS Directives. Once again, the violation of a state regulation does not generally rise to the level of a constitutional violation. *Soto v. Walker,* 44 F.3d at 173. Even if defendant Ruff was grossly negligent and violated the DOCS Directives regarding the testing of contraband substances, this would not rise to the level of a due process violation. Thus, the evidence was sufficient to find plaintiff guilty of the contraband violation even though the finding was later reversed because the additional test produced a negative result. Plaintiff was not denied the opportunity to question defendant Ruff, nor was he denied "exculpatory evidence" or the opportunity to "marshal" evidence when he was not provided defendant Ruff's memorandum. [16]

#### c. Witnesses

**\*13** Plaintiff alleges that defendant Gutwein "dismissed" the testimony of two of plaintiff's witnesses, Morgan Cox and Juan Benedict. (SAC ¶ 37). Plaintiff's due process protections include the right to "call" witnesses. *Sira v. Morton,* 380 F.3d at 69. A review of the hearing transcript show that both Inmate Cox and Inmate Benedict testified at plaintiff's disciplinary hearing. (Dkt. No. 75–1, Defs.' Ex. A at 5–10). Each inmate testified that plaintiff kept AJAX in a manilla envelope, with his legal papers, and that plaintiff used this cleanser to clean the shower and the toilet. (*Id.* at 7 (Benedict testimony); 10 (Cox testimony)). Inmate Benedict testified that he helped plaintiff clean the shower with the AJAX. (*Id.* at 6). Inmate Benedict also explained why he believed that defendants got a false positive result from testing AJAX, based upon Benedict's reading of the directive regarding how the cocaine turns colors during the test. (*Id.* at 6). Inmate Cox testified that, although he was not familiar with the incident itself, he did know that he was plaintiff's "bunkie" for some time and that plaintiff did see plaintiff keep AJAX in his cell. (*Id.* at 10).

Because it is clear that both inmates testified extensively for plaintiff, he must be arguing that his due process rights were violated because defendant Gutwein did not "believe"

the witnesses. However, while plaintiff has the right to have witnesses called on his behalf, there is no corresponding right that the testimony of those witnesses must be believed by the hearing officer. It is the province of the hearing officer, as the fact finder, to weigh the evidence and make findings of credibility. *Superintendent v. Hill,* 472 U.S. at 455. In the disciplinary hearing context, due process does not require the independent assessment of the credibility of witnesses or the reweighing of evidence. *Id.* Thus, the fact that defendant Gutwein did not believe plaintiff's witnesses does not state a constitutional claim, and the evidence was constitutionally sufficient to find plaintiff guilty of the misbehavior. [17]

The complaint may, therefore, be dismissed as against defendants Ruff and Gutwein for the failure to state a due process violation against them. Because defendant Bezio's involvement in plaintiff's claims was only to affirm the results of a disciplinary hearing that this court has found comported with due process, [18] the second amended complaint may also be dismissed as to defendant Bezio. [19] Plaintiff also alleges that defendant Behrle, (the Superintendent of Greene), failed to protect plaintiff's due process rights "after being put directly on notice by Plaintiff." (SAC ¶ D(1)). For the same reason that the court recommends dismissal against defendant Bezio, the court also recommends dismissal of plaintiff's due process claims as against defendant Behrle. [20]

### VI. *Retaliation*

#### A. Legal Standards

**\*14** Any action taken by defendants in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiffs must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they

demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett,* 343 F.3d at 137.

## B. Application

### 1. Protected Activity

Grievances or complaints to the Inspector General are considered constitutionally protected actions. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (grievances); *Smith v. Maypes–Rhynders,* No. 07 Civ. 11241, at *4 (S.D.N.Y. March 31, 2009) (complaints to IG or filing internal grievances); *Crenshaw v. Herbert,* 445 F.Supp.2d 301, 303 (W.D.N.Y.2006) (filing lawsuits or grievances are constitutionally protected activities). Plaintiff states that he complained about defendant Klein to the Inspector General and alleges that defendants' actions were motivated by this complaint. Thus, plaintiff has sufficiently stated the first factor of a claim for retaliation. The court will proceed to analyze whether the defendants' alleged actions rise to the level of "adverse" actions, and if so, whether plaintiff has sufficiently stated that the adverse actions were motivated by his complaint against defendant Klein.

### 2. Adverse Action

#### a. Urinalysis Testing

Plaintiff claims that he was subjected to "random" urine testing by defendant Santos on April 21, 23, and 24, 2008. The fact that defendant Santos [21] ordered three urine tests for plaintiff in three days does not rise to the level of an adverse action that would deter an inmate from asserting his rights. *See Bumpus v. Canfield,* 495 F.Supp.2d 316, 327 (W.D.N.Y.2007). In *Bumpus,* the court held that "urine tests are a fact of prison life ..., and I do not find that one urine test would chill a prisoner of ordinary firmness from filing grievances." *Id.* (citations omitted). The court found that the urine test was " 'simply *de minimis* and therefore outside the ambit of constitutional protection.' " *Id.* (quoting *Dawes,* 239 F.3d at 493). While plaintiff in this case alleges that he was subjected to three tests, this court does not find that the extra two tests would change the result.

#### b. Cell Search

**\*15** To the extent that plaintiff claims that his one cell search was retaliatory, it is well-settled that retaliatory cell searches are not actionable under section 1983. *See Salahuddin v.*

*Mead,* No. 95 Civ. 8581, 2002 WL 1968329, *5 (S.D.N.Y. Aug.26, 2002) (collecting cases).

#### c. Misbehavior Report

To the extent that plaintiff claims the misbehavior report was "false," false allegations alone do not rise to the level of a constitutional violation. *Freeman v. Rideout,* 808 F.2d 949, 952–53 (2d Cir.1986), *rehearing denied,* 826 F.2d 194 (2d Cir.1987), *cert. denied,* 485 U.S. 978 (1988). It is true, however, that a false misbehavior report filed in retaliation **for the exercise of a constitutional right** is actionable as a substantive due process violation. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Thus, to the extent that plaintiff claims that defendants Gilbaro, Bailey, and Plonka issued plaintiff a false misbehavior report, this claim **on its own** would not rise to the level of a constitutional violation [22]. The court must then determine the sufficiency of plaintiff's claim that the misbehavior report was issued in retaliation for his complaints about defendant Klein to the Inspector General.

### 3. Causal Connection

Plaintiff alleges that he complained to the Inspector General about defendant Klein between November 2007 and January 2008. There appears, however, to be absolutely no connection between Klein and the other defendants, except that they are all corrections officers at Greene. In fact, by the time that plaintiff alleges that Inspector Feliciano visited him, defendant Klein was no longer working at Greene. [23] In the proposed third amended complaint plaintiff now alleges that defendant Tietz escorted plaintiff to the interview room and stayed outside to listen to the conversation. [24] However, defendant Tietz was not involved in the cell search, finding the contraband, or filing the misbehavior report. Thus, there is still no connection between plaintiff's protected activity and the conduct that plaintiff claims is retaliatory. In the second amended complaint, plaintiff states that he "advised" Inspector Feliciano that "all of defendant Klein's friends currently work in GCF and that he felt they would retaliate after learning of the statements Plaintiff made against Defendant Klein." (SAC ¶ 17). Plaintiff's "feeling" that defendant Klein's unknown friends would be somehow retaliating against him after they found out about the complaint is not a basis for a constitutional claim.

Plaintiff states that defendant Gibilaro ordered defendants Bailey and Plonka to search plaintiff's cell—an action which

would not support a retaliation claim. Even if the cell search was an "adverse action," plaintiff does not make any factual allegation indicating that defendant Gilbilaro knew of plaintiff's complaints about defendant Klein or otherwise harbored a retaliatory motive. Because defendants Bailey and Plonka searched the cell in response to a direct order from a superior officer, they clearly had a non-retaliatory reason for their actions.

**\*16** Plaintiff does not deny that the cell search led to the discovery of white powder apparently concealed in an envelope. Plaintiff claims that the white powder was AJAX, and that defendant Ruff was grossly negligent, or did not follow DOCS protocol, in testing the substance. But again, plaintiff makes no factual allegation indicating that defendant Ruff knew of plaintiff's complaints to the Inspector General, or otherwise was acting with a retaliatory animus .[25] And, the discovery of the powder and the positive field test clearly provided a legitimate, non-retaliatory reason for the filing of a misbehavior report against plaintiff.

Plaintiff claims that defendant Gutwein should have waited for the results of re-testing before adjudicating the misbehavior report against plaintiff. However, as discussed above, the hearing officer's decision was consistent with due process and the applicable DOCS protocols. Moreover, plaintiff again provides no factual support for the suggestion that the hearing officer was acting with knowledge of plaintiff's complaints about defendant Klein or acting with a retaliatory motive.

In sum, plaintiff has made only conclusory allegations of a causal connection between his protected conduct and the filing of the misbehavior report against him, which was ultimately reversed. Plaintiff has failed to state a plausible claim of retaliation, and the motion to dismiss that claim should be granted. While plaintiff claimed that it was a cleaning product, the initial test result was positive for cocaine. Whether defendant Ruff erred in testing the substance does not show retaliation for plaintiff's complaint about defendant Klein. Thus, plaintiff's claim of retaliation must fail.

### VII. *Conditions of Confinement*

Plaintiff claims that on April 1, 2007, defendant Klein moved plaintiff to a filthy cell, where the shower was filled with rust and the drain clogged with hair. (SAC ¶ 10). Plaintiff also alleges that the conditions in his SHU cell

in 2008 were deplorable and violated his right to be free from cruel and unusual punishment. In order to show that conditions of confinement violate the Eighth Amendment, the plaintiff must demonstrate that the conditions result in an "unquestioned and serious deprivation of basic human needs," and that defendants imposed those conditions with deliberate indifference. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Whitley v. Albers,* 475 U.S. 312, 319–20, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985)).

Plaintiff's first claim deals with defendant Klein and occurred prior to any complaint to the Inspector General's office, but after the alleged conversation with plaintiff regarding Klein's roommate.[26] Plaintiff alleges that, when plaintiff only had three days left on that SHU sentence, defendant Klein moved plaintiff to a filthy cell, where the shower was clogged with hair, and did not give him a plunger to fix it.[27] Plaintiff claims that defendant Klein just laughed when plaintiff asked for cleaning supplies. Plaintiff also claims that his new "bunky" did not speak English at all, and was "clearly incompatible." (*Id.*)

**\*17** The fact that plaintiff's new roommate was incompatible or did not speak English does not rise to the level of an Eighth Amendment claim. The rust in the shower or the shower drain being clogged for three days is unpleasant, inconvenient, and even if plaintiff got athletes foot as a result, does not rise to the level of a denial of hygienic products sufficient to violate the Eighth Amendment. *See Beckford v. New York State Office of Mental Health,* No. 06–CV–561, 2010 WL 1816689, at \*12 (W.D.N.Y. May 3, 2010) (citing *inter alia McNatt v. Unit Manager Parker,* No. 3:99CV1397, 2000 WL 307000, at \*4 (D.Conn. Jan.18, 2000) (totality of conditions in restrictive housing unit, including stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to the level of Eighth Amendment violation); *Fisher v. Department of Correction,* No. 92 Civ. 6037, 1995 WL 608379, at \*5 (S.D.N.Y. Oct.16, 1995) (prison's failure to provide inmate with toothpaste and soap for eight consecutive days, lighting for twenty days, and hot food 65 percent of the time did not rise to the level of Eighth Amendment violation); *Gill v. Riddick,* No. 9:03–CV–1456, 2005 WL 755745, \*16 (N.D.N.Y.Mar.31, 2005) ("the temporary deprivation of the

right to use the toilet, in the absence of serious physical harm or serious risk of contamination, does not rise to the level of an Eighth Amendment violation.")). Thus, plaintiff does not state a claim against defendant Klein for violation of plaintiff's Eighth Amendment rights with respect to plaintiff's cell conditions in early April of 2007.

Plaintiff's second claim is that, after plaintiff was charged with possession of cocaine, he was moved to a filthy cell, where the toilet was clogged with feces. (SAC ¶ 29). Plaintiff claims that he asked defendants Bailey and Plonka for a plunger, and even though defendant Plonka told plaintiff that he would get a plunger in the morning, he did not receive a plunger for three days. (SAC ¶ 30). There is no question that allegations of unsanitary conditions may support an Eighth Amendment claim. *Gaston v. Coughlin,* 249 F.3d 156, 165–66 (2d Cir.2001). Even assuming that the conditions in the cell for three days were what plaintiff alleges, [28] there is no indication that either defendant Bailey or Plonka was responsible for the failure to give plaintiff a plunger or even that they knew he did not get one for three days. [29] A defendant must have been personally involved in the constitutional deprivation in order to be held liable for the violation. *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983"). Thus, defendants Bailey and Plonka would not be liable for any alleged deprivation because, at worst, they denied plaintiff a plunger overnight, and plaintiff does not allege that they were personally responsible for any extended delay in providing plaintiff with a plunger.

**\*18** Plaintiff alleges that on April 29, 2008, defendant Santos moved plaintiff to a top bunk "for no reason." (SAC ¶ 33). Plaintiff also alleges that on May 13, 2008, defendant Santos moved plaintiff to a cell that was filthy and had feces smeared on the wall. (SAC ¶ 40). Plaintiff claims that defendant Santos refused to provide plaintiff and his "bunky" with anything to clean the wall. (*Id.*) Further, plaintiff claims that his "bunky" was "clearly incompatible" with plaintiff, and that this was a deliberate attempt to provoke a "problem" between the inmates. Plaintiff also alleges that defendant

went through plaintiff's property, removed pictures of his wife, and never gave him a "contraband slip" for the property.

None of the above allegations rises to the level of an Eighth Amendment violation against defendant Santos. Although plaintiff alleges that his roommate was "incompatible," plaintiff does not allege that he ever had a problem with this individual. In his response to the motion to dismiss and in plaintiff's attempt at a third amended complaint, he now alleges that plaintiff had to use his own shirt to clean the feces off of the wall. This one-time incident, however, is not a deprivation of "basic human needs."

To the extent that plaintiff claims that these actions by defendant Santos were in retaliation for plaintiff's complaints about defendant Klein, these alleged actions do not amount to the requisite "adverse action" that would deter a similarly situated inmate from attempting to assert his rights. [30] Thus, plaintiff does not state an Eighth Amendment claim as against any of the defendants, and plaintiff's complaint may be dismissed in its entirety.

**WHEREFORE,** based on the findings above, it is

**ORDERED,** that plaintiff's motion to amend (Dkt. No. 79) is **DENIED,** and it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 72) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY.** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 7629500

---

Footnotes

1    Plaintiff claims that while taking plaintiff to the bathroom, the officers placed the waist chain and the handcuffs on plaintiff so tightly that his circulation was cut off and his wrists became red. (SAC ¶ 24). Plaintiff claims that when he asked

the officers to loosen the handcuffs so he could comply with the order to give a urine sample, one officer responded, "tough shit." *Id.*

2    Plaintiff has spelled this defendant's name "Baily," however, it is clear from the documents that the correct spelling is "Bailey," and the court will use the proper spelling in this Report–Recommendation.

3    His appeal was later denied on August 19, 2008. (SAC ¶ 50).

4    On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of Corrections and Community Supervision. Because the events relevant to this suit occurred before the merger, I will refer to New York State's corrections agency as "DOCS."

5    These ten new paragraphs are: ¶¶ 18, 38, 39, 53–59. One paragraph from the Second Amended Complaint has been removed: ¶ 50.

6    The court notes that plaintiff included these facts in his memorandum of law in opposition to defendants' motion to dismiss. (Dkt. No. 74 at 29; pages as numbered by plaintiff at the bottom of the page).

7    Defendant state that plaintiff must have a liberty interest before due process protections are required (Defs.' Mem. of Law at 14; Dkt. No. 72–1), and then begin their argument by stating that plaintiff received all the process he was due from defendant Gutwein (Defs.' Mem. of Law at 15–17). Thus, defendants assume, without argument, that plaintiff had a liberty interest in being free from the confinement to which he was ultimately subjected. In his response, plaintiff argues that he had a liberty interest in being free from confinement for the 106 days that he was in SHU (Dkt. No. 74 at 5– CM/ECF page numbering), however, there appears to be no dispute regarding this issue, and the court will proceed to consider whether plaintiff was afforded due process.

8    Thus, even if the white powder had been AJAX, as plaintiff argued at the disciplinary hearing, it could not produced a "false positive" result.

9    Because both of these witnesses testified extensively at the disciplinary hearing, this court has interpreted plaintiff's statements as a claim that his due process rights were violated because defendant Gutwein apparently did not believe their testimony, relating to the sufficiency of the evidence.

10    In any event, the court also finds that the state regulation was not violated. Although plaintiff argues that the hearing officer "must" include the test results from an "outside" laboratory, a careful reading of section 1010.5(c) shows that the regulation does not require there to be such a test included with the hearing record. The regulation states that the test of an outside laboratory shall be included in the file, if there is such a test. The words "if any" in the regulation indicate that there need not necessarily be an additional test. Thus, defendant Gutwein did not violate the New York State regulation by failing to include the outside laboratory test in plaintiff's file, because at the time of the hearing, no such test had been conducted. Additionally, defendant Gutwein did not violate the New York State regulation by failing to adjourn the hearing until the outside test could be obtained, regardless of the fact that the outside test result was ultimately negative for cocaine.

11    Bolanos maintained that the white powder contained vitamins. 1993 WL 7621122, at *3.

12    The plaintiff's hearing began on April 28, 2008, and the date of the AJAX test was May 2, 2008, so it is clear that plaintiff could not have been given the Ruff Memorandum before the hearing started. However, the memorandum was clearly in existence on May 7, 2008, when defendant Gutwein reconvened the hearing. Plaintiff seems to allege that the report should have been given to him prior to defendant Gutwein mentioning the report in his written disposition. Plaintiff's claim can be interpreted as an argument that defendant Gutwein used the report to find plaintiff guilty, but did not allow plaintiff to see it first.

13    There are certain security reasons for withholding evidence, such as the identity of a confidential informant. *See Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989).

14    Although this is a motion to dismiss, the court notes that plaintiff has discussed portions of the disciplinary hearing in his second amended complaint, and he has included excerpts of the hearing as exhibits to his proposed third amended complaint. (SAC ¶ 37; TAC Exs. M & O). Plaintiff relies upon these alleged statements from the hearing in his argument. The excerpts from the transcript, attached to plaintiff's proposed third amended complaint come from defendants' reply affirmation as indicated at the bottom of the page. (Dkt. No. 79–1 at Exs. M & O). However, plaintiff has always referred to the disciplinary hearing and has made statements regarding what the hearing officer did or did not do. A document external to the complaint may become "integral" when the complaint relies heavily upon the document's terms and effect. *Chambers v. Time Warner, Inc.,* 282 F.3d at 152–53. *See also Peter F. Gaito Architecture, LLC v. Simone,* 602 F.3d 57, 60 (2d Cir.2010) (in a Rule 12(b)(6) motion, the court derived facts from the allegations in plaintiff's amended complaint together with those documents "attached to the complaint as an exhibit or incorporated in it by reference" (quoting *Chambers, supra* at 153). Because the court is considering both defendants' motion to dismiss as well as plaintiff's motion

to amend, the court has considered all the allegations and submissions contained plaintiff's documents, including the entire transcript of the disciplinary hearing.

15    The pages of the transcript are clearly marked on their own, thus, the court will cite to the page number of the transcript at the top left corner of the page.

16    To the extent that the memorandum was inculpatory, there was sufficient evidence to find plaintiff guilty of the misbehavior with or without defendant Ruff's memorandum. The testimony of Mr. Miller, stating that AJAX would not produce a false positive test result for cocaine was sufficient evidence of this fact, and as stated above, Mr. Miller was questioned by plaintiff at the hearing.

17    The court notes, although not relevant to its decision, that in an exhibit submitted with plaintiff's proposed third amended complaint, it appears that Inmate Benedict may have also been the subject of a charge for the possession of the drugs since he was plaintiff's cell-mate. (TAC Ex. P). This exhibit is the "Controlled Substances Report," finding that the substance did not test positive for cocaine. The subjects of the report are listed as both plaintiff and Inmate Benedict. The court mentions this only because defendant Gutwein may have believed that Inmate Benedict may have had a motive to testify the way he did about the substance found in the cell.

18    Defendant Bezio actually reduced the penalty to 18 months SHU and 24 months loss of good time, together with the original penalty of 36 months loss of privileges. (SAC, Ex. L).

19    The court notes that if plaintiff had stated a due process claim, the fact that defendant Bezio affirmed the disciplinary finding could constitute sufficient personal involvement. *See Thomas v. Calero,* No. 09 Civ. 5209, at \*11–18 (S.D.N.Y. Mar. 17, 2011) (Report–Recommendation) (lengthy discussion of personal involvement as it relates to the affirmance of a disciplinary hearing and determination that such a claim would survive a motion to dismiss); *Rodriguez v. Selsky,* No. 9:07–CV–432, 2011 WL 1086001, at \*4–7 (N.D.N.Y. Jan.25, 2011) (Report–Recommendation), *adopted on other grounds,* (N.D.N.Y, Mar. 3, 2011). *But see Tafari v. McCarthy,* 714 F.Supp.2d 317, 383 (N.D.N.Y.2010) (citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002)) (finding no personal involvement). Without engaging in a lengthy discussion, this court finds that *Joyner,* a case involving a *grievance* review in a medical care case, is distinguishable from the review of a disciplinary hearing).

20    Plaintiff has submitted a memorandum from defendant Superintendent Behrle, written to plaintiff on April 30, 2008, responding to plaintiff's letter of April 24, 2008. (SAC, Ex. D). In this memorandum, defendant Behrle makes it clear that disciplinary hearings are conducted on behalf of the Superintendent by the hearing officer (defendant Gutwein). *Id.* Defendant Behrle also states that "[a]s part of the formal hearing process, the hearing officer will confirm with the drug testing manufacturer that Ajax does or does not register as part of their drug testing protocol. Additionally, the hearing officer may request re-testing of the substance in question if he feels there is a need for such." *Id.* Thus, it is unclear how defendant Behrle would have been involved in any due process violation. He referred the hearing to defendant Gutwein, and defendant Behrle told plaintiff that the hearing officer would confirm plaintiff's allegation. As stated above, there was no due process violation during the hearing, and in fact, plaintiff's argument was fully investigated, albeit not to his satisfaction. Plaintiff's disagreement with the results does not create a due process violation.

21    This assumes that defendant Santos was aware of plaintiff's protected activity. There is, however, no indication that he knew about plaintiff's complaint, which according to plaintiff, was made four months prior to the dates of the urine testing.

22    If the false charges trigger a hearing that does not comport with due process, then the person who filed the charges may be liable for their consequences. *Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995). In this case, as stated above, the hearing comported with due process, thus, there is no claim for a false misbehavior report alone.

23    Plaintiff states that he and Klein were transferred from Greene to Great Meadow in April of 2007. (SAC ¶¶ 11–12). Plaintiff states that he was transferred back to Greene in September of 2007 and complained to Inspector Feliciano "between" November of 2007 and January 2008. Plaintiff never states that defendant Klein was transferred back to Greene, and apparently, plaintiff had no further contact with defendant Klein, relevant to the claims in this case. When plaintiff complained to Inspector Feliciano, defendant Klein was no longer at the same facility as plaintiff, so it would be very difficult for defendant Klein to have been aware of the complaint. The court notes that Greene and Great Meadow are not even close together. (DOCS Facilities Map, http://www . docs.state.ny.us/mapselec.html).

24    Plaintiff may have included this fact in his proposed third amended complaint to bolster his claim of retaliation. (*See* TAC ¶ 17). However, plaintiff has already stated that he spoke to defendant Tietz about plaintiff's complaints about defendant Klein. (SAC ¶ 10). Thus, the fact that defendant Tietz may have also overheard the conversation with Inspector Feliciano does not need to be added in an amended complaint. The third amended complaint also adds facts regarding the "claims" against defendant Klein. Plaintiff now wishes to add that he told Inspector Feliciano about Klein's involvement with "criminal activities" on "the streets." Certainly plaintiff could have added these facts in his second amended complaint,

and may be attempting to add them now for shock value, but these additions would not make a difference in this court's recommendation, and any such additions would be futile.

25    The court must point out that it is making no findings regarding plaintiff's guilt or regarding the errors that may or may not have occurred in testing the substance. The court notes that in plaintiff's response to defendants' motion to dismiss, he now alleges that defendants "indeed planted cocaine in place of 'AJAX' in plaintiff's cell and issued a false misbehavior for the plaintiff ." (Dkt. No. 54 at 52). This is the first time plaintiff makes such a claim, and it is not supported by any of the previous allegations or claims that plaintiff made at his disciplinary hearing or in his amended complaint. In the amended complaint, plaintiff stated that the NIK test results were "in error" because defendant Ruff did not adhere to proper protocol. If cocaine had been planted in place of plaintiff's AJAX, then the test results would have been correct, and presumably, the test would have been confirmed by the outside laboratory.

26    Because this incident occurred prior to any complaints to the Inspector General's office, there is no indication that this is related to any retaliation claim.

27    In plaintiff's response to the motion to dismiss, he now states that there were "snots and dried spit on the walls." (Dkt. No. 74 at 31).

28    In responding to the motion to dismiss and in attempting to amend his complaint, plaintiff alleges that he had to urinate in the sink and "defecate on a sheet of paper on the floor and throw it outside his 'rec-pen." (Dkt. No. 74 at 29; TAC ¶ 31). He states that the odor made him so sick that he repeatedly threw up in the sink. *Id.* However, there is still no indication that any of the defendants knew about these conditions simply because defendants Bailey and Plonka told plaintiff that he would get a plunger in the morning.

29    In his response to the motion to dismiss, plaintiff states that, even though he asked "continuously," he did not receive a plunger for 72 hours. (Dkt. No. 74 at 28). Plaintiff still does not indicate who he asked "continuously," and he does not indicate or even imply that it was defendants Bailey and Plonka. Based on the facts as stated in the second and third amended complaints, these two defendants were only involved in stating that plaintiff would get a plunger "in the morning." The court notes that this incident occurred at approximately 6:30 p.m. (TAC, Ex. C; Misbehavior Report). The misbehavior report indicates that defendant Ruff placed the contraband in the evidence locker at 8:30 p.m. (*Id.*) It is unclear when plaintiff was transferred to the other cell, however, it was certainly after 6:40 p.m., and it could have been later. At that time, it was reasonable that the defendants would have told plaintiff that he could get a plunger in the "morning."

30    Even if defendant Santos went through plaintiff's property and removed pictures of plaintiff's wife or even destroyed plaintiff's property, these claims do not rise to the level of a constitutional violation. The deprivation of property, whether intentional or unintentional is not actionable under section 1983 as long as the state provides an adequate post deprivation procedure. *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates. *See Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Love v. Coughlin,* 714 F.2d 207, 209 (2d Cir.1983); see also N.Y. Ct. Cl. Act § 10(6) (McKinney 1998).

---

**End of Document**        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 769551
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Randolph ROSSI, Plaintiff,
v.
Brian FISHCER, et al., Defendants.

No. 13–cv–3167 (PKC)(DF).
|
Signed Feb. 24, 2015.

*MEMORANDUM AND ORDER*

CASTEL, District Judge.

**\*1** Plaintiff Randolph Rossi, proceeding *pro se,* brings this action against officials of the New York State Department of Corrections and Community Supervision ("DOCCS"). In his Amended Complaint, plaintiff alleges that defendants violated, and continue to violate, his constitutional rights by denying him the right to freely practice his Rastafarian faith while incarcerated. He brings an action asserting violations of the First and Fourteenth Amendments and affirmatively disaffirms any claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Defendants move to dismiss the Amended Complaint for failure to exhaust claims under the Prisoner Litigation Reform Act ("PLRA"), failure to state a claim under the Free Exercise Clause, failure to meet the standards for injunctive relief, lack of personal involvement of certain defendants, and qualified immunity.

For the reasons stated below, the motion to dismiss is granted in part and denied in part. Plaintiff exhausted his administrative remedies as to certain claims and exhaustion is excused as to others. Certain allegations state a claim for relief, but plaintiff fails to plausibly allege a violation under the Free Exercise Clause, Establishment Clause, or Equal Protection Clause with regard to other claims. Defendants' motion to dismiss for lack of personal involvement fails. Finally, defendants have not demonstrated entitlement to qualified immunity at the pleading stage.

BACKGROUND
Plaintiff Rossi is a practicing Nyahbinghi Rastafarian currently incarcerated at the Woodbourne Correctional Facility, maintained by DOCCS. (*See* Amended Complaint ("Am.Compl."), ¶ 3.) He brings this action against the following employees of DOCCS: Brian Fischer, [1] Commissioner of DOCCS; Catherine Jacobsen, Acting Deputy Commissioner for Program Services; Jeff McKoy, [2] Deputy Commissioner for Program Services; Cheryl Morris, Director for Ministerial, Family, and Volunteer Services; Mark Leonard, Director of Ministerial Family and Volunteer Services; Robert Cunningham, Superintendent for the Woodbourne Correctional Facility; Moses Santiago, Coordinating Chaplain; and Dorothy Davis, Drug Counselor at Woodbourne. (*Id.* ¶ ¶ 4–11.) Plaintiff asserts that defendants Fischer, Jacobsen, McKoy, Morris, Leonard, and Cunningham "are responsible for all rules, policies, regulations, and directives governing the religious rights of prisoners under their care and custody." (*Id.* ¶ 13.) He claims that "[d]efendants have denied plaintiff his right to practice his faith in accordance with the traditions, customs, and tenets of Rastafari." (*Id.*)

First, plaintiff claims that he has been denied his right to celebrate, in a manner consistent with his faith, the holy days of April 21, May 25, August 17, and October 7. (*Id.* ¶ ¶ 15–18.) Specifically, plaintiff requests that these four Rastafari holy days be added to the religious calendar with designations that permit plaintiff to (a) refrain from working or attending programs, (b) attend a congregate worship service, and (c) eat a holy day meal with the Rastafarian inmate community. [3] (*Id.;* Hearing before Magistrate Judge Debra Freeman, July 8–9, 2014 ("July Tr."), pp. 82–83.) Plaintiff further requests that April 21 and August 17 be designated as "family events." [4] (Am. Compl., ¶ 16; July Tr., p. 82.) During the pendency of plaintiff's motion, DOCCS added all of the holy days at issue to its "Religious Holy Day Calendar," with varying limitations regarding how each day may be observed. (Religious Holy Day Calendar, Revised July 29, 2014 ("Revised Calendar"), p. 25 (Dkt.82–1).) The revised DOCCS calendar, which was submitted to Magistrate Judge Freeman on the preliminary injunction motion, allows members of the Rastafari faith to be exempt from work and programming, attend a worship service, and share a holy day meal on August 17 and October 7. (*Id.*) For April 21, DOCCS only permits a congregate worship service and for May 25, DOCCS does not authorize any of these three designations. (*Id.*) The revised calendar does not designate any of the four holy days at issue as "family events." (*Id.*)

**\*2** Second, plaintiff claims that defendants have denied him the right to add food items to the holy day meal menu, giving the "Department of Nutritional Services unfettered authority to dictate the dietary laws of the Rastafarian community for holy day celebrations." (Am.Compl., ¶ 27.) He concludes that DOCCS's "Nutritional Services is in effect acting as an ecclesiastical body for the Rastafarian community," in violation of the First and Fourteenth Amendments. (*Id.* ¶¶ 27, A.9.)

Third, plaintiff alleges that Rastafarians at Woodbourne are forced to hold congregate worship services on Wednesdays instead of Fridays, the day of worship Rastafarians traditionally observe. (*Id.* ¶ 26.) Defendant Cunningham denied plaintiff's grievance on the basis that "there was no room available for Rastafarians to conduct congregate worship on Fridays." (*Id.*)

Fourth, plaintiff claims that defendants have denied him the right to wear the Rastafarian religious turban brought to him by his wife.[5] (*Id.* ¶¶ 20–22.) After wearing the turban his wife sent him for two months, a correction sergeant told plaintiff that he was no longer permitted to wear the headgear. (*Id.* ¶ 20.) The sergeant told plaintiff that according to defendant Santiago, the Coordinating Chaplain, the only religious headgear for Rastafarians was a Tsalot Kob. (*Id.* ¶ 21.) Plaintiff asserts that the Tsalot Kob is "restricted to members of the Ba Beta Kristiyan Church of Haile Selassie I (a Christianized House or Mansion within Rastafari)," and does not apply to the Rastafari sect that plaintiff adheres to, the Nyahbinghi "mansion." (*Id.* ¶¶ 3; 20–21.) At no time did defendant Santiago speak to plaintiff to determine the religious significance of his turban. (*Id.* ¶ 22.) Plaintiff complied with the sergeant's order to mail home his turban, and subsequently filed a grievance that was denied by defendant Cunningham. (*Id.* ¶¶ 21–22.)

Fifth, plaintiff challenges Directive 4760, which requires religious groups engaging in fundraising activities to apply for Special Purpose Organization ("SPO") status. (*Id.* ¶ 23.) He explains that SPO status subjects religious groups to the same mandates as non-religious inmate organizations, including the requirement that each organization surrender half of the funds it raises to the Inmate Occupational Therapy Fund ("IOTF") for the benefit of the general inmate population. (*Id.*) Plaintiff challenges this requirement, as it applies to Rastafarians, because he claims it has "the effect of a tax on religion" and burdens the Rastafarians' ability

to purchase necessary materials for congregate services, religious classes, and holy day celebrations. (*Id.* ¶ 24.)

Sixth, plaintiff claims that defendants violated his First and Fourteenth Amendment rights when they denied his request to gain access to spiritual and religious advisers (*Id.* ¶¶ 19, A(7) .) Defendant Morris denied plaintiff's request for advisers on security grounds, and defendant McKoy upheld Morris's determination after plaintiff sent McKoy a letter seeking intervention. (*Id.* ¶ 19.) Plaintiff claims that "[o]ther religious groups are allowed to have religious and spiritual advisors without breaching security concerns." (*Id.*)

**\*3** Finally, plaintiff claims that defendant Davis, a drug counselor at Woodbourne, falsely reported that plaintiff admitted to using marijuana for religious rituals to justify recommending him to a drug treatment program. (*Id.* ¶ 28.) Davis asked plaintiff in an interview about the "ritual use of marijuana within the Rastafarian faith." (*Id.*) "When plaintiff responded to defendant's request, defendant Davis put in her report that plaintiff admitted using marijuana for religious rituals only," despite the fact that plaintiff claims he "denied ever using substances whatsoever," including marijuana. (*Id.*)

Plaintiff seeks declaratory, injunctive, and monetary relief, including compensatory and punitive damages. (*Id.* ¶¶ A–C.)

PROCEDURAL HISTORY

Plaintiff commenced this action on May 8, 2013 (Dkt.2), and filed an Amended Complaint on November 19, 2013. (Dkt.11.) Plaintiff moved for a preliminary injunction to enjoin defendants "from continuing to enforce the policies being challenged in this proceeding." (Dkt.17.) Magistrate Judge Debra Freeman, to whom the preliminary injunction motion was referred to hear and report, bifurcated plaintiff's motion on the basis of the temporal proximity of the relief sought. Magistrate Judge Freeman issued a Report and Recommendation ("R & R") as to plaintiff's ability to celebrate April 21 as a holy day (Dkt.27), and a Supplemental R & R, reexamining some of the issues regarding April 21 and addressing the remaining claims raised by plaintiff's motion. (Dkt.89.) The Court adopted both the R & R (Dkt.37) and the Supplemental R & R. (Dkt.103.) Plaintiff's motion was granted, to the extent that defendants were mandatorily enjoined, pending judgment on the merits, to: (1) permit plaintiff to wear a Rastafari religious turban; (2) allow plaintiff to observe all four of the Rastafari holy days at issue in his motion by (a) refraining from working or attending programs, (b) attending a congregate worship

service, and (c) sharing a holy day meal with other Rastafarian inmates; and (3) provide space for Rastafari Sabbath worship services on Friday afternoons, or, at least, pending the final resolution of the case on its merits, to provide an alternative accommodation for such services on Friday evenings. (Order Adopting Supp. R & R.)

Defendants now move to dismiss plaintiff's Amended Complaint in its entirety. (Dkt.56.)

LEGAL STANDARD FOR MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). " 'Labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' " rather, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly,* 550 U.S. at 555). In considering a Rule 12(b) (6) motion to dismiss, all non-conclusory factual allegations are accepted as true, *see id.* at 678–79, and all reasonable inferences are drawn in favor of the plaintiff. *See In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (per curiam). Moreover, plaintiff's *pro se* pleadings are given a liberal and generous construction and are read "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal quotation marks omitted).

DISCUSSION

I. Exhaustion of Administrative Remedies

**\*4** The exhaustion requirement of the Prison Litigation Reform Act ("PLRA") "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is mandatory before an action is commenced. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds, Porter,* 534 U.S. at 532. The Second Circuit indicated in *Neal,* that "[s]ubsequent exhaustion after suit is filed ... is insufficient" to satisfy the PLRA. *Id.*

While the PLRA's exhaustion requirement is "mandatory," *Woodford v. Ngo,* 548 U.S. 81, 85 (2006), certain caveats

apply. *See Hemphill v. N.Y.,* 380 F.3d 680, 686 (2d Cir.2004). A plaintiff's failure to exhaust administrative remedies may be excused if: (1) administrative remedies were not available; (2) defendants forfeited their affirmative defense of non-exhaustion by failing to raise or preserve it or are estopped from raising non-exhaustion because their own actions inhibited the inmate from exhausting his claims; or (3) "special circumstances" have been plausibly alleged that justify the prisoner's failure to comply with the exhaustion requirements. [6] *Id.*

"A court may not dismiss for failure to exhaust administrative remedies unless it determines that such remedies are available." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (alterations omitted) (quoting *Snider v. Melindez,* 199 F.3d 108, 114 (2d Cir.1999)). Courts must look at the applicable set of grievance procedures when determining the availability of an administrative remedy. *Id.* Plaintiff, as an inmates of a New York State correctional facility, is subject to a three-step, administrative procedure for inmate grievances called the Inmate Grievance Program ("IGP"). *See* 7 N.Y.Codes R. & Reg. ("N.Y.C .R.R.") § 701.5. The first step in the IGP is to file a grievance with the Inmate Grievance Resolution Committee (the "IGRC"). *Id* . § 701.5(b). After receiving a response from the IGRC, an inmate has seven calendar days in which to appeal to the superintendent. *Id.* § 701.5(c). Within seven calendar days of receiving a response from the superintendent, the inmate then must appeal to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The CORC is required to render a decision on each appeal and transmit its decision within 30 calendar days from the time the appeal was received. *Id.*

A number of federal circuit courts have held that a failure to respond to a grievance within the time limit prescribed by the prison grievance process renders an administrative remedy unavailable for purposes of exhaustion. *See Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir.2002); *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir.2002); *Foulk v. Charrier,* 262 F.3d 687, 698 (8th Cir.2001); *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir.1998). While the Second Circuit has not directly addressed this issue, it has treated the decision cited above favorably. *See Hemphill,* 380 F.3d at 686 n. 6 (citing to the cases above and noting that when an inmate does not receive a response to a grievance there may be a question as to whether administrative remedies were available); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004) (citing favorably to *Underwood* and *Foulk* with regard to availability of administrative remedies). The Second

Circuit in *Abney* cited to *Hemphill* for the proposition that "exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance ." 380 F.3d at 667.

**\*5** Judges in this district, including the undersigned, have also agreed with the proposition that administrative remedies may be deemed unavailable when the prison fails to timely respond to a grievance. *See Peoples v. Fischer,* 11–cv–2694 (SAS), 2012 WL 1575302, at \*6 (S.D.N.Y. May 3, 2012) *on reconsideration in part,* 898 F.Supp.2d 618 (S.D.N.Y.2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination." (alterations, internal quotation marks, and citation omitted); *Manos v. Decker,* 03–cv–2370 (PKC), 2005 WL 545215, at \*4 (S.D.N.Y. Mar. 7, 2005) (asserting that *Abney* "held in part that administrative remedies are unavailable when prison officials fail to respond to grievances within the time period prescribed by regulation"); *Dimick v. Baruffo,* 02–cv–2151 (LMM), 2003 WL 660826, at \*4 (S.D.N.Y. Feb. 28, 2003) (holding that plaintiff's claims were properly exhausted where CORC rendered an untimely decision and plaintiff filed his complaint almost two months after CORC had been required to respond pursuant to the prison grievance procedures). *But see Bennett v. Wesley,* 11–cv–8715 (JMF), 2013 WL 1798001, at \*6 (S.D.N.Y. Apr. 29, 2013) ("[T]he Court of Appeals has not adopted the position that a delay in responding to a grievance demonstrates *per se* unavailability." (alterations omitted) (quoting *Mateo v. O'Connor,* 10–cv–8426 (LAP), 2012 WL 1075830, at \*7 (S.D.N.Y. Mar. 29, 2012)); *Rivera v. Anna M. Kross Ctr.,* 10–cv–8696 (RJH), 2012 WL 383941, at \*4–5 (S.D.N.Y. Feb. 7, 2012) (asserting that the Second Circuit has declined to hold that administrative remedies are deemed unavailable when a plaintiff receives no response from prison authorities within the prescribed time limits.)

Here, defendants argue that some of plaintiff's claims were not exhausted before plaintiff brought this action. (Def. Memo in Support of Motion to Dismiss ("Def.MTD"), pp. 46.) Defendants show that CORC's decision regarding plaintiff's appeal of his May 2013 grievance was issued after the filing of both the original Compliant and the Amended Complaint. (*Id.* at 5.) The original Complaint was filed on May 8, 2013, the Amended Complaint was filed on November 19, 2013, and CORC's decision regarding plaintiff's appeal

was not issued until December 18, 2013. (*Id.*) Defendants, however, overlook two important points. First, plaintiff exhausted some of his claims through grievances filed prior to his May 2013 grievance. Second, in regard to the May 2013 grievance, the CORC failed to issue a decision within the 30 day limit set by the IGP, rendering the administrative remedies unavailable to plaintiff.

Plaintiff's original Complaint sought to enjoin defendants from (1) prohibiting the wearing of his religious turban, (2) prohibiting his celebration of certain religious holy days in a manner consistent with his beliefs, and (3) collecting half of the funds raised by the Rastafari inmate organization. Each of these claims were properly raised and exhausted through grievances filed on June 17, 2009, September 12, 2011, and March 14, 2012. (*See* Hehenberger Decl. Ex. B & D (Dkt.58.)) The CORC issued a decision regarding the June 2009 grievance on August 5, 2009, ruled on the September 2011 grievance on January 4, 2012, and rendered a decision on the March 2012 grievance on September 5, 2012. (*Id.*) The original Complaint was filed eight months after the resolution of the lattermost grievance at issue.

**\*6** Plaintiff's Amended Complaint, filed on November 19, 2013, seeks additional relief, including: (1) the addition of October 7 to the religious calendar with various designations; (2) that Rastafari congregate worship be moved to Fridays; (3) that defendants be prohibited from making the menu for holy day meals mandatory; (4) that defendants' failure to provide plaintiff with access to Rastafarian advisers be deemed a constitutional violation; and (5) for the removal of information regarding marijuana use from plaintiff's institutional records. Plaintiff filed a grievance that included these additional claims on May 29, 2013. (*Id.* at Ex. C .) After receiving a response from both the IGRC and the superintendent, plaintiff appealed the superintendent's decision to CORC on July 26, 2013. (*Id.*) More than four months passed between the appeal and CORC's decision, issued on December 18, 2013, which is far longer than the 30 day deadline explicitly set forth in the IGP process. (*Id.*) Had the CORC provided a timely response to plaintiff's appeal, plaintiff would have received a response prior to filing the Amended Complaint. Plaintiff "should not be penalized for the CORC's failure to timely respond, especially where the eventual response denied the requested relief." [7] *Peoples,* 2012 WL 1575302, at \*9 n. 125. Because prison officials failed to respond to plaintiff's grievance within the 30 day time limit set by regulation, administrative remedies were not available to the plaintiff and dismissal for failure to exhaust is

not appropriate. Defendants' motion to dismiss on this ground is denied.

## II. The Free Exercise Clause

### 1. Legal Standard

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). A prisoner's right to exercise his religion is not absolute and must be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (quoting *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990)). Accordingly, free exercise claims of prisoners are judged " 'under a 'reasonableness' test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.' " *Salahuddin v. Goord,* 467 F .3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)).

Under this reasonableness test, a prisoner asserting a free exercise claim "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." [8] *Salahuddin,* 467 F.3d at 274–75. "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Id. at 275* (alterations and internal quotation marks omitted).

**\*7** A substantial burden on religious exercise exists "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Woodward v. Perez,* 12–cv–8671 (ER), 2014 WL 4276416, at *4 (S.D.N.Y. Aug. 29, 2014) (quoting *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)) (alterations and internal quotation marks omitted). Plaintiff need not show that the disputed conduct impedes a religious practice mandated by his religion, but he must show that it burdens a religious practice that is "central or important" to his practice of religion. *Ford,* 352 F.3d at 593–94. "Significantly, the plaintiff's burden in demonstrating substantial burden is not a particularly onerous task." *Woodward,* 2014 WL 4276416, at *4 (internal quotation marks omitted); *see also McEachin v. McGuinnis,* 357 F.3d 197, 202 (2d Cir.2004).

Even if a challenged policy substantially burdens the plaintiff's sincerely held religious beliefs, it is nevertheless valid "if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89 (1987); *see also Ford,* 352 F.3d at 595. When evaluating whether a regulation or official action is reasonable, courts are guided by four factors: (1) "whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective;" (2) "whether prisoners have alternative means of exercising the burdened right;" (3) "the impact on guards, inmates, and prison resources of accommodating the right;" and (4) "the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Salahuddin,* 467 F.3d at 274 (citing *Turner,* 482 U.S. at 89–91).

### 2. Analysis

#### A. Substantial Burden

On this motion, defendants do not challenge that plaintiff has alleged sincerely held religious beliefs; rather defendants argue that plaintiff fails to allege facts that show that his religious beliefs were substantially burdened. (Def.MTD, pp. 6, 9.) The Court concludes that plaintiff has plausibly alleged that defendants have substantially burdened his right to freely exercise his religion as to some but not all of the religious practices he wishes to engage in.

#### i. Claims Involving the Religious Calendar

As noted above, DOCCS has added all of the holy days at issue to the religious calendar, but with varying limitations regarding how each day may be celebrated. (Revised Calendar, p. 25.) The requests that were accommodated are moot. The Court must address whether plaintiff states a claim with respect to those requests which have not been voluntarily accommodated, which include: (1) exemption from work and the provision of a shared meal on April 21 and May 25; (2) permission for a congregate worship service on May 25; and (3) the designation of April 21 and August 17 as "family events." Plaintiff has plausibly alleged a substantial burden on his free exercise of religion with regard to all of the contested holy day restrictions, with the exception that plaintiff cannot reach this threshold burden on his claim concerning "family events."

**\*8** Plaintiff has shown that celebrating the four holy days at issue by refraining from work and programming, attending

a congregate worship service, and sharing a holy day meal is "central or important" to his faith. *See Ford,* 352 F.3d at 593–94. In the telephone conferences and hearings before Magistrate Judge Freeman, plaintiff explained why the holy days are sacred, stating that April 21 is "the day that Emperor Selassie came to Jamaica" (July Tr., p. 13), May 25 is African Liberation Day (Telephone Conference before Magistrate Judge Freeman, March 18, 2014 ("March Tr."), p. 19), August 17 is the birthday of the Rastafari prophet Marcus Mosiah Garvey, (July Tr., p. 24.) and October 7 "respects the day that Emperor Haile Selassie was named heir apparent prior to his coronation." [9] (March Tr., p. 19.) He testified that each holy day at issue should be celebrated in the same manner, by coming together with other Rastafari observers for a congregate service called a "reasoning" and a shared meal, and by refraining from work. (July Tr., pp. 13, 20, 25–26.) The Court concludes that plaintiff has plausibly alleged a substantial burden on his religious beliefs to the extent that plaintiff alleges defendants continue to deny him an exemption from work and provision of a shared meal on April 21 and May 25 and have failed to permit a congregate worship service on May 25. *See Ford,* 352 F.3d at 593–94 (asserting that being denied a holiday meal would be considered a substantial burden on the plaintiff's religious beliefs if participation in the meal was considered central or important to his practice of religion); *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services .").

Plaintiff fails, however, to plausibly allege that his free exercise rights are substantially burdened by the denial of his request to designate April 21 and August 17 as "family events." He asserts, "Rastafari family is the center of Rasta society," (Am. Compl., ¶ 16 n. 1) and that "[d]uring holy days' celebrations, it is necessary for the family to celebrate together, representing the unity established by Emperor Haile Selassie I, Empress Menen, and the Royal Children." (Pl. Objection to Magistrate Judge's R & R ("Pl.Objection"), p. 1.) These conclusory allegations fail to adequately explain the religious significance of the "family event." Nor does plaintiff explain why celebration with family carries religious significance for the holy days of April 21 and August 17, but not for the other holy days at issue. Plaintiff fails to show that celebration with family is "central or important" to his religious beliefs, and thus cannot state a claim under the Free Exercise Clause as to this request.

ii. Holy Day Menus

It has long been established that "prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975); *see also McEachin,* 357 F.3d at 203 ("[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights.")

**\*9** Plaintiff has failed to plausibly allege that DOCCS's policy prohibiting inmates from adding items to the holy day menu substantially burdens his religious exercise. (Am.Compl., ¶ 27.) He does not allege that the holy day meals are inconsistent with his religious beliefs nor does he explain how his ability to add certain items to the meals is "central or important" to his religion. *See Kahane,* 527 F.2d at 496 (holding that a prison was required to provide an orthodox Jewish rabbi with a diet that maintained his good health and did not violate Jewish dietary laws, but refusing to mandate any specific food item or method for fulfilling this order, as "[s]uch details are best left to the prison's management which can provide from the food supplies available within budgetary limitations"). Accordingly, plaintiff does not plausibly allege a Free Exercise Clause claim as to the so-called "mandatory menu" provided by DOCCS for holy day meals.

iii. Friday Worship

Plaintiff asserts that he has "been forced to have congregate worship on Wednesdays instead of the traditional Fridays." (Am.Compl., ¶ 26.) Plaintiff has plausibly alleged that this restriction substantially burdens his right to free exercise. "It is well established that prisoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin,* 993 F.2d at 308; *see also Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989) ("Although we recognize that great deference should be accorded to prison officials as they undertake the difficult responsibility of maintaining order in prisons, we have long held that prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible."). In *Lloyd v. City of New York,* 12–cv–03303 (CM), 2014 WL 4229936, at *5–6 (S.D.N.Y. Aug. 4, 2014), the court held that Muslim inmates plausibly alleged a substantial burden on their religious exercise where they were unable to conduct religious services in a manner that complied with their religious beliefs. The plaintiffs in *Lloyd,* for example, were forced to conduct religious services in a chapel where the pews prevented them from kneeling for prayer. *Id.*

Here, plaintiff has plausibly alleged that defendants have substantially burdened his ability to participate in religious services in a manner consistent with the practices of his religion. Plaintiff alleges that he is forced to conduct services on Wednesdays, but he asserts that Friday is the traditional day of worship. (*See* Am. Compl., ¶ 26.) He explains that the appropriate day for Rastafari congregate worship is Friday because it "carries the Rastafarian Community into the Sabbath," which begins on Friday at sundown. (*Id.*) Plaintiff plausibly alleges that his inability to hold Friday Sabbath services substantially burdens his free exercise of religion.

### iv. Turban
Plaintiff has plausibly alleged that defendants substantially burden his right to free exercise by denying him the right to wear his religious turban. *See Singh v. Goord,* 520 F.Supp.2d 487, 502–03 (S.D.N.Y.2007) (holding that defendants substantially burdened plaintiff's religious exercise where plaintiff was prohibited from wearing the type of turban required by his religion); *Morgan v. City of New York.,* 12–cv–704 (WFK), 2014 WL 3407714, at *8 (E.D.N.Y. July 10, 2014) ("Plaintiff has shown that the removal of his turban substantially burdens his sincerely held religious beliefs.") Plaintiff has explained the significance of wearing a turban in the Rastafari religion, testifying that the "Nya[h]binghi Rastaman's head must be covered" and that wearing a turban represents "the complete discipline of the Rastaman in terms of a priestly life." [10] (July Tr., p. 37–39.) Plaintiff alleges that the only headgear Rastafari males are permitted to wear at Woodbourne is the Tsalot Kob, which is a type of headgear restricted to members of the Ba Beta Kristiyan Church and does not align with plaintiff's sincerely held religious beliefs. (*Id.* at 38–42; Am. Compl., ¶¶ 20–21.) Plaintiff does not provide a full explanation of the how the Rastafari sect that plaintiff adheres to, the Nyahbinghi "mansion," is distinct from the Ba Beta Kristiyan Church, nor does he elaborate on why wearing a Tsalot Kob does not comport with his religious beliefs. Nevertheless, given the special solicitude afforded to *pro se* plaintiffs, the Court concludes that plaintiff has adequately pled that defendants' prohibition on the wearing of his religious turban substantially burdens his sincerely held religious beliefs. The issue may look different at the summary judgment stage.

### v. Fundraising Proceeds
 **\*10** Plaintiff challenges defendants' policy of collecting half of the Rastafari inmate organization's fundraising proceeds; however, he fails to adequately explain how this practice constitutes a substantial burden on his religious beliefs. Plaintiff explains that the collection of half of the organization's funds "creates a burden on [the Rastafari group's] ability to purchase necessary materials for congregate services, religious classes, and religious holy day celebrations." (Am.Compl., ¶ 24.) While forbidding or confiscating religious materials may in some instances support a free exercise claim, *see Breland v. Goord,* 94–cv–3696 (HB), 1997 WL 139533, at *5–6 (S.D.N.Y. Mar. 27, 1997) (holding a claim regarding the confiscation of a prisoner's religious literature survives summary judgment), plaintiff does not assert that defendants have prohibited him from obtaining religious materials. Nowhere does plaintiff claim he is restricted from either buying the religious materials he desires with the funds the Rastafari group retains or obtaining the materials from another source. Plaintiff does not show how the deprivation of half of the funds constitutes a substantial burden on his religious beliefs. As plaintiff has failed to plausibly allege a substantial burden, his free exercise claim challenging defendants' collection of half of the funds raised by the Rastafari organization is dismissed.

### vi. Rastafarian advisers
Plaintiff alleges that defendants violated his rights when they denied his request to gain access to spiritual and religious advisers. (Am.Compl., ¶ 19.) Plaintiff fails, however, to plausibly allege that defendants' actions substantially burden his free exercise of religion. He makes no showing regarding how contact with advisers is "central or important" to the practice of his faith. Thus, his free exercise claim based on lack of access to advisers is dismissed.

### vi. Reporting of Marijuana Use
Plaintiff claims that defendant Davis, a drug counselor at Woodbourne, falsely reported that plaintiff admitted to using marijuana for religious rituals to justify recommending him to a drug treatment program. (Am.Compl., ¶ 28.) He claims that defendant's false reporting was a result of "unconstitutional stereotyping of plaintiff based on his religious beliefs" and the ritual use of marijuana within the Rastafari faith. (*Id.*) Plaintiff, however, fails to explain how defendant's purported stereotyping burdened his free exercise of religion, nor does he show how being recommended for a drug treatment program has any effect on his religious practice. Thus, plaintiff does not state a claim under the Free Exercise Clause as to the alleged false reporting of marijuana use.

## B. Penological Interest

With regard to the claims for which plaintiff has plausibly alleged a substantial burden, defendants contend that they have proffered a legitimate penological interest which justifies not allowing the practice in question. (Def.MTD, p. 6.) Defendants cite "safety and security" concerns for their prohibition of plaintiff's turban and identify "spatial restrictions" as the reason for requiring Rastafari Sabbath services to be held on Wednesdays rather than Fridays. (*Id.* at 11, 13–14.) Defendants do not to offer a justification for their policy regarding plaintiff's religious calendar claims. (*Id.* at 8–9.)

 **\*11** Determining whether a challenged policy is reasonably related to a legitimate penological interest is a fact-laden inquiry that is generally ill-suited for resolution on a motion to dismiss. *See Ford,* 352 F.3d at 596 (refusing to determine whether defendants' conduct was reasonably related to legitimate penological interests because "the record [was] insufficient to resolve this fact—and context—specific dispute"). On this motion to dismiss, the Court cannot assess whether there is a "valid, rational connection" between defendants' actions and their purported concerns. *See Turner,* 482 U.S. at 89. Defendants state in a conclusory manner that the ban on plaintiff's religious turban is due to safety and security concerns, but fail to explain how plaintiff's turban presents a security problem or why concerns exist with respect to plaintiff's turban but not with the other types of permitted headgear. (*See* Def. MTD, pp. 13–14.) Next, while defendants explain that there is a lack of available space for Rastafarians to conduct congregate worship on Fridays (*Id.* at 11), the Court is unable to assess, based on the limited record, the impact accommodation would have on the guards, other inmates, and prison resources and whether there is an "absence of ready alternatives." *See Turner,* 482 U.S. at 90. The Court will not, at this stage, dismiss any of plaintiff's claims based on defendants' stated penological interests. The Court acknowledges that the case may look very different at the summary judgment stage.

To recap, the following free exercise claims survive defendant's motion to dismiss: (1) the denial of plaintiff's ability to observe all four of the Rastafari holy days at issue on his motion by (a) refraining from working or attending programs, (b) attending a congregate worship service, and (c) sharing a holy day meal with other Rastafari inmates; (2) the denial of Friday Sabbath services; and (3) the prohibition on plaintiff's religious turban.

## III. The Establishment Clause and the Equal Protection Clause

While plaintiff asserts violations of the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause, the parties only briefed the claims under the Free Exercise Clause. Where plaintiff has plausibly alleged a free exercise violation, the Court need not decide at this time whether plaintiff also states a claim under the Establishment Clause or the Equal Protection Clause. Because these claims have survived, the Court can make this determination at a later stage after the parties have briefed the issues. However, where plaintiff fails to state a claim under the Free Exercise Clause, the Court will determine whether the claim can nevertheless survive under the Establishment Clause or the Equal Protection Clause.

Plaintiff fails to plead any facts to support a claim under the Establishment Clause with respect to: (1) the designation of April 21 and August 17 as "family events;" (2) the denial of spiritual and religious advisers; and (3) the false reporting regarding plaintiff's marijuana use. Plaintiff fails to plead any facts to support an Equal Protection Clause claim as to: (1) the designation of "family events;" (2) the policy of collecting half of the Rastafari inmate organization's fundraising proceeds; and (3) the mandatory nature of holy day menus. As such, the claim regarding "family events" is dismissed, *see Iqbal,* 556 U.S. at 678, and the Court will analyze plaintiff's holy day menu and fundraising claims under the Establishment Clause and his religious adviser and false reporting claims under the Equal Protection Clause. For reasons to be explained, the Court dismisses each of these four claims.

### 1. The Establishment Clause

 **\*12** The First Amendment of the Constitution provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. In deciding an Establishment Clause claim, courts in this Circuit continue to apply the three-prong test articulated by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602 (1971). *See Bronx Household of Faith v. Bd. of Educ. of City of New York,* 650 F.3d 30, 40 n. 9 (2d Cir.2011) ("Although the Lemon test has been much criticized, the Supreme Court has declined to disavow it and it continues to govern the analysis of Establishment Clause claims in this Circuit."); *see also Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 355 (2d Cir.2007); *Kiryas Joel Alliance v. Vill. of Kiryas Joel,* 495 F. App'x 183, 190 (2d Cir.2012). Under *Lemon,* "government action which

interacts with religion (1) must have a secular purpose, (2) must have a principal or primary effect that neither advances nor inhibits religion, and (3) must not foster an excessive government entanglement with religion." *Bronx Household of Faith,* 650 F.3d at 40 (alterations and internal quotation marks omitted) (citing *Lemon,* 403 U.S. at 612–13). "Because plaintiff is a prisoner challenging a Department of Corrections directive, the *Lemon* test is tempered by the test laid out by the Supreme Court in *Turner* ... which found that a prison regulation that impinges on an inmate's constitutional rights is nevertheless valid if it is reasonably related to legitimate penological interests." *Pugh v. Goord,* 571 F.Supp.2d 477, 494 (S.D.N.Y.2008) (quoting *Salahuddin v. Perez,* 99–cv–10431 (LTS), 2006 WL 266574, at *9 (S.D.N.Y. Feb. 2, 2006) (internal quotation marks omitted)).

First, plaintiff claims that by denying him the ability to supplement holy day meals with additional food items, defendants have given the "New York State Department of Nutritional Services unfettered authority to dictate the dietary laws of the Rastafarian community for holy day celebrations." (Am.Compl., ¶ 27.) He concludes that DOCCS's "Nutritional Services is in effect acting as an ecclesiastical body for the Rastafarian community." (*Id.*) Defendants counter that "a perfect accommodation of each inmate's preferential meal choices" would be "prohibitively expensive." (Def.MTD, p. 13.)

Plaintiff fails to state a claim under the Establishment Clause pursuant to the *Lemon* analysis. *See* 403 U.S at 612–13. First, the prison's policy has the permissible purpose of attempting to reasonably accommodate the inmates' religious dietary practices without subjecting the prison "to prohibitively expensive accommodations of religious dietary meal requests." (*Id.*) *See Benjamin v. Coughlin,* 905 F.2d 571, 579 (2d Cir.1990) (asserting that prisoners have a right to receive diets consistent with their religious beliefs but that this right may be limited where accommodation is prohibitively expensive or administratively unfeasible). Second, plaintiff has failed to allege that DOCCS's policy regarding holy day menus has the primary effect of either advancing or inhibiting religion. Plaintiff does not claim that the holy day meals are inconsistent with his religious beliefs. Finally, DOCCS's policy does not foster excessive entanglement of government with religion. "In order to permit inmates to freely exercise their religion, *some* entanglement is necessary." *Muhammad v. City of New York Dep't of Corr.,* 904 F.Supp. 161, 198 (S.D.N.Y.1995) (emphasis in original) ("[I]n the prison context, the [E]stablishment [C]lause has been interpreted

in the light of the affirmative demands of the [F]ree [E]xercise [C]lause." (internal quotation marks omitted)). DOCCS developed a menu for holy day celebrations in order to accommodate inmates' free exercise right to receive a diet consistent with their religious beliefs. This does not constitute excessive government entanglement with religion. As such, plaintiff's claim regarding the holy day menus is dismissed.

**\*13** Next, plaintiff asserts that "the policy of requiring the Rastafarians to surrender 50% of their fundrais[ing proceeds] had the effect of a tax on religion." (Am.Compl., ¶ 24.) This allegation fails to plausibly allege a violation under the Establishment Clause. First, as plaintiff acknowledges, the policy has the secular purpose of providing funds to the Inmate Occupational Therapy Fund ("IOTF"), which is "for the benefit of the general population's use." (*Id.* ¶ 23.) The policy does not have the primary effect of advancing or inhibiting religion. The fundraising requirement is applied equally to religious and non-religious groups, and plaintiff does not adequately allege how the policy inhibits or burdens his religion. (*Id.*) Finally, the policy does not foster excessive government entanglement with religion. Thus, plaintiff's claim as to defendants' policy regarding fundraising proceeds is dismissed.

**2. The Equal Protection Clause**
The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). To state a claim for an equal protection violation, a plaintiff must plausibly allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Courts in the Second Circuit have emphasized that "it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently ." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 193 (2d Cir.1994); *see also Bishop v. Best Buy, Co. Inc.,* 08–cv–8427 (LBS), 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 13, 2010) ("Well-pled facts showing that the plaintiff has been treated differently from others similarly situated, remains an essential component of [an equal protection] claim." (internal quotation marks omitted)). "While the *Turner* ... standard was established in the context of first amendment issues, it is also relevant to the assessment of equal protection claims in the prison setting." *Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.1990). Thus, "the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between

religious groups in prison are reasonably related to legitimate penological interests." (*Id.*)

Plaintiff's claim regarding defendant Davis's alleged false report fails to state a claim under the Equal Protection Clause because plaintiff fails to allege that he was treated differently than others. In *Bishop,* plaintiff's equal protection claim, alleging that he was discriminated against on the basis of his race, was dismissed because the plaintiff "failed 'to allege or identify a single similarly situated [individual] who was treated differently .' " 2010 WL 4159566, at *12 (quoting *Sweeney v. City of New York,* 03–cv–4410 (JSR)(RLE), 2004 WL 744198, at *5 (S.D.N.Y. Apr. 2, 2004) *subsequently aff'd,* 186 F. App'x 84 (2d Cir.2006)); *see also King v. New York State Div. of Parole,* 260 Fed. App'x. 375, 379–80 (2d Cir.2008) (affirming dismissal of equal protection claim where petitioner "failed to identify a single individual with whom he can be compared for Equal Protection purposes"). Here, plaintiff makes no claim regarding how others were treated during their interviews for the drug treatment program. Thus, plaintiff's equal protection claim regarding religious stereotyping with regard to the alleged false report of his marijuana use is dismissed. As this is the only claim that implicates defendant Davis, she is dismissed from this case.

**\*14** Next, plaintiff alleges that being denied spiritual advisers for security reasons violates his equal protection rights because "[o]ther religious groups are allowed to have religious and spiritual advisors without breaching security concerns." (Am.Compl., ¶ 19.) This allegation is conclusory and fails to identify any specific religious group that is being treated differently. *See Bishop,* 2010 WL 4159566, at *11 ("Conclusory allegations of selective treatment are insufficient to state an equal protection claim."). Plaintiff's equal protection claim regarding spiritual advisers is dismissed.

## IV. Injunctive Relief

Defendants seek to dismiss plaintiff's claims for injunctive relief for lack of merit and mootness. (Def.MTD, pp. 17–20.) Defendants have not established that all of plaintiff's holy day claims are moot. Injunctive relief, however, may not be premised upon claims that this Court has dismissed.

Plaintiff asserts six claims for injunctive relief. (Am.Compl., ¶ B) First, plaintiff seeks to enjoin defendants from "continuing to deny plaintiff and other Rastafarians their holy days." (*Id.* ¶ B(1).) Second, plaintiff seeks injunctive

relief to allow him to wear his turban. (*Id.* ¶ B(2).) Third, plaintiff seeks to enjoin defendants from enforcing the policy which mandates that the Rastafarian inmate organization surrender half of the funds it raises to the IOTF. (*Id.* ¶ B(3).) Fourth, plaintiff seeks an injunction enjoining defendants from retaliating against him. (*Id.* ¶ B(4).) Fifth, plaintiff seeks to direct defendant Davis to expunge the "stereotyped information from plaintiff's institutional records." (*Id.* ¶ B(5).) Sixth, plaintiff seeks to enjoin all defendants from "continuing to deny him his right to freely practice his faith." (*Id.* ¶ B(6).)

Defendants assert that none of plaintiff's claims for injunctive relief can be sustained as a matter of law. (Def.MTD, p. 17.) "To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roach v. Morse,* 440 F.3d 53, 56 (2d Cir.2006) (internal quotation marks omitted). Defendants reason that because "Plaintiff is unable to succeed on the merits of his claims" permanent injunctive relief is not warranted. (Def.MTD, p. 18.) At the pleading stage, defendants are correct only with respect to some of plaintiff's claims. The Court has found that plaintiff has plausibly alleged a constitutional violation with respect to his claims regarding the observance of Rastafari holy days and the wearing of his turban. Accordingly, plaintiff's claims for injunctive relief regarding these rights may not properly be dismissed. However, the Court has determined that plaintiff's claims regarding the purported false report of plaintiff's marijuana use and defendants' policy of collecting half of the Rastafari inmate organization's fundraising proceeds do not state a claim. Thus, plaintiff's claims to (1) to expunge references to marijuana use from his institutional records and (2) enjoin defendants from requiring the Rastafarian organization to surrender half of their funds, are dismissed because the underlying claims upon which they are premised are dismissed.

**\*15** Plaintiff's claim that seeks to prevent future retaliation is also dismissed, as plaintiff fails to plead any facts whatsoever to show that defendants have or would retaliate against plaintiff. *See Iqbal,* 556 U.S. at 678 ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)); *see also Reiter v. Metro. Transp. Auth. of N.Y.,* 01–cv–2762 (JGK), 2003 WL 22271223, at *15 (S.D.N.Y. Sept. 30, 2003) (denying plaintiff's request for a permanent injunction to prevent retaliation because there was

no showing that plaintiff would be retaliated against in the future).

Next, defendants argue that injunctive relief is not appropriate concerning the religious calendar because "it is quite possible that this litigation could continue after Plaintiff's particular sect of Rastafarianism ceases to have followers that are inmates under DOCCS' supervision or custody" and "[a]s such, Plaintiff's request for injunctive relief would be moot." (Def.MTD, p. 19.) This argument lacks merit, as plaintiff brings his claims individually and he is currently an inmate at Woodbourne. "In order for a federal court to retain jurisdiction over a case, an actual controversy must exist at all stages of review, not merely at the time the complaint is filed." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (internal quotation marks omitted). At this time, an actual controversy regarding the religious calendar exists as to the claims that defendants have not voluntarily accommodated. As such, not all of plaintiff's religious calendar claims are moot.

V. Personal Involvement

Defendants contend that plaintiff has failed to allege the personal involvement of defendants Fischer, Jacobson, and Leonard, and as such, they should be dismissed from this suit. (Def.MTD, pp. 15–17.) The Court holds that plaintiff has plausibly alleged the personal involvement of the three defendants at issue.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). Individual liability under section 1983 may not be anchored in a theory of *respondeat superior. Hemmings v. Gorczyk,* 134 F.3d 104, 109 n. 4 (2d Cir.1998) (per curiam). "The bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [a] claim." *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995). Further, "[c]onclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient." *Kee v. Hasty,* 01–cv–2123 (KMW)(DF), 2004 WL 807071, at *12 (S.D.N.Y. Apr. 14, 2004).

In *Colon,* the Second Circuit held that the personal involvement of a supervisory defendant can be shown by evidence that:

*16 (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873. The continuing vitality of the supervisory liability test established in *Colon* has come into question after the Supreme Court's 2009 decision in *Iqbal. See Reynolds v. Barrett,* 685 F.3d 193, 205 n. 14 (2d Cir.2012). There, the Supreme Court noted that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676.

The Second Circuit has not yet definitively addressed how *Iqbal* affects the *Colon* factors, nor have the district courts within this Circuit reached a clear consensus. *See Aguilar v. Immigration & Customs Enforcement Div.,* 811 F.Supp.2d 803, 814 (S.D.N.Y.2011). Despite the lack of agreement regarding the *Colon* factors, courts agree that the third factor, that defendant created a policy or custom under which unconstitutional practices occurred, has survived *Iqbal.* Compare *Bellamy v. Mount Vernon Hosp.,* 07–cv–1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal's* muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."), *aff'd sub nom. Bellamy v. Mount Vernon Hosp.,* 387 F. App'x 55 (2d Cir.2010), *with Hodge v. Sidorowicz,* 10–cv–428 (PAC)(MHD), 2011 WL 6778524, at *16 (S.D.N.Y. Dec. 20, 2011) ("[W]here the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in *Colon* should still apply."), *report and*

*recommendation adopted sub nom. Hodge v. Wladyslaw,* 10–cv–428 (PAC)(MHD), 2012 WL 701150 (S.D.N.Y. Mar. 6, 2012). It is under this factor that plaintiff claims defendants Fischer, Jacobson, and Leonard were personally involved.

Plaintiff alleges that Brian Fischer, as the Commissioner of DOCCS, "has the statutory authority to promulgate rules, regulations, and policies governing the religious rights of prisoners within the department." (Am.Compl., ¶ 4.) Similarly he alleges that Catherine Jacobsen as Acting Deputy Commissioner for Program Services "had the authority to approve policies governing the religious programs in [DOCCS]," (*Id.* ¶ 5), and that Mark Leonard, as the Director of Ministerial, Family, and Volunteer Services "was responsible for the promulgation of policies affecting the religious rights of all Rastafarian prisoners within [DOCCS]." (*Id.* ¶ 8.) Plaintiff attributes DOCCS's policies on holy days and headgear to Fischer, Jacobsen, and Leonard, along with other defendants. (*Id.* ¶ A(1).) A defendant that creates a policy is considered personally involved in any unconstitutional practices that occur under the policy. *See Colon,* 58 F.3d at 873. In *Pugh v. Goord,* 571 F.Supp.2d 477, 485–86 (S.D.N.Y.2008), the plaintiff argued that certain defendants, by creating and continuing policies regarding the accommodation of Shi'ite Muslims, were personally involved in the deprivation of his right as a Shi'ite inmate to have a separate prayer service from the Sunni Muslims. The court agreed with the plaintiff and found that because plaintiff showed that defendants made "certain contributions to formulation of policy," he had adequately established personal involvement with regard to these defendants. *Id.* at 513 (internal quotation marks omitted). Similarly, plaintiff has plausibly alleged that defendants Fischer, Jacobsen, and Leonard were involved in creating policies under which his right to free exercise was substantially burdened. Thus, these defendants are not properly dismissed from this suit at this juncture.

**\*17** Plaintiff also alleges that defendant Fischer is personally involved in the alleged constitutional violations because he has written letters to defendant Fischer "complaining about the unconstitutional impediments to plaintiff's ability to practice his faith," but Fischer has always referred plaintiff's complaints to subordinates. (Am.Compl., ¶ 25.) Defendants are correct in stating that this allegation cannot demonstrate the requisite personal involvement of Fischer. (*See* Def. MTD, p. 16.) "If the supervisor fails to respond to [a prisoner's] letter or passes the letter on to a subordinate to handle, the general rule is that the supervisor

is not personally involved." *Lloyd,* 2014 WL 4229936, at \*9; *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (holding that the inmate failed to produce sufficient evidence to establish personal involvement of the prison commissioner, where the commissioner referred plaintiff's appeal letter to a subordinate); *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) *on reconsideration in part,* 04–cv–8850 (RWS), 2008 WL 591230 (S.D.N.Y. Mar. 3, 2008) (stating that defendant "cannot be held liable on the sole basis that he did not act in response to letters of 'protest' sent by inmate). Nevertheless, because plaintiff has plausibly alleged Fischer's personal involvement in creating policies under which unconstitutional practices have occurred, Fischer is not dismissed from this suit.

## VI. Qualified Immunity

Defendants argue that qualified immunity shields them from money damages. (Def.MTD, pp. 20–25.) On this motion to dismiss, the Court cannot conclude that defendants are entitled to qualified immunity as a matter of law. The case may look very different at the summary judgment phase.

Qualified immunity protects public officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). A government official is entitled to qualified immunity "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001); *see also Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004). In deciding whether defendants are entitled to qualified immunity, courts must look "to both the clarity of the law establishing the right allegedly violated as well as whether a reasonable person, acting under the circumstances the[n] confronting a defendant, would have understood that his actions were unlawful." *Ford v. McGinnis,* 352 F.3d 582, 59697 (2d Cir.2003) (quoting *Hanrahan v. Doling,* 331 F.3d 93, 98 (2d Cir.2003) (per curiam)) (internal quotation marks omitted). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *Coollick v. Hughes,* 699 F.3d 211, 220 (2d Cir.2012) (alterations and citation omitted). While a defendant may assert a qualified immunity defense on a motion to dismiss, "the defense faces a formidable hurdle when advanced on

such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004).

**\*18** Defendants have failed to show that restricting plaintiff from celebrating certain holy days in a manner consistent with his religious beliefs, requiring Friday Sabbath services to be held on Wednesdays, and prohibiting him from wearing a religious turban do not violate clearly established law. An inmate has a "clearly established right to be free of unjustified burdens upon free exercise rights." *Salahuddin v. Dalsheim,* 94–cv–8730 (RWS), 1996 WL 384898, at \*12 (S.D.N.Y. July 9, 1996) (citations omitted); *see also Turner v. Safley,* 482 U.S. 78, 89 (1987). In *Salahuddin v. Goord,* the Second Circuit held that because plaintiff's "free-exercise rights were substantially burdened by a joint-worship policy not justified by a legitimate penological interest," qualified immunity was not appropriate as "it was clearly established at the time of the alleged violation that prison officials may not substantially burden inmates' right to religious exercise without some justification." 467 F.3d 263, 275–76 (2d Cir.2006). Similarly here, because the Court holds that plaintiff has plausibly alleged that defendants substantially burdened his free exercise rights and, at this time, have not established a legitimate penological justification, defendants are not entitled to qualified immunity on the premise that their conduct did not violate clearly established law.

Whether defendants could have reasonably believed that they did not violate an established constitutional right depends, at this stage, "on whether, on the facts alleged in the Complaint, they had a reasonable basis to believe that that [sic] [their actions] served a legitimate penological interest." *Diggs v. Marikah,* 11–cv–6382 (PAE), 2012 WL 934523, at \*5 (S.D.N.Y. Mar. 20, 2012) (denying defendants' motion to dismiss on the basis of qualified immunity, where plaintiff's religious beliefs were substantially burdened and the factual basis for whether defendants' actions were reasonably related to a legitimate penological interest was not yet developed).

At this early stage, there is inadequate information to determine whether defendants were objectively reasonable in their beliefs regarding their proffered penological interests. *See Perez v. Westchester Cnty. Dep't of Corr.,* 05–cv–8120 (RMB), 2007 WL 1288579, at \*6 (S.D.N.Y. Apr. 30, 2007). This determination is more appropriate for summary judgment. *See id.* at \*6 ("It is generally premature to address the defense of qualified immunity in a motion to dismiss pursuant to Rule 12(b)(6)." (alterations and citations omitted)). Thus, defendants are not entitled to qualified immunity at this stage.

## CONCLUSION

For the reasons outlined above, defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff's claims regarding (1) "family events," (2) holy day menus, (3) spiritual advisers, (4) fundraising proceeds, and (5) the reporting of plaintiff's marijuana use are dismissed in their entirety. Because the only claim plaintiff brought against defendant Davis is dismissed, Davis is also dismissed from this suit. Plaintiff's claims regarding (1) the religious calendar, excluding requests for "family events," (2) Friday worship, and (3) plaintiff's turban survive defendants' motion to dismiss.

**\*19** Counsel for defendants shall provide plaintiff with copies of all unreported decisions cited herein. This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and *in forma pauperis* status is denied. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

SO ORDERED.

## All Citations

Slip Copy, 2015 WL 769551

Footnotes

1    The defendant's last name is spelled "Fishcer" on the docket in this case.
2    The defendant's last name is spelled "McCoy" on the docket and in the parties' briefs.
3    Plaintiff's Amended Complaint requests that the holy days at issue be added to the calendar with the designations of "Off Work Program (OWP), Meal Consideration (MC), and Special Consideration (SC)." (Am.Compl., ¶ 16.) In the hearings before Magistrate Judge Debra Freeman, plaintiff clarified that these designations would allow him to (1) refrain from working or attending programs, (b) attend a congregate worship service, and (c) eat a holy day meal with the Rastafarian inmate community. (July Tr., pp. 82–83.)

4    While the plaintiff in his Amended Complaint only requests that August 17 be designated as a "family event," he makes clear in the hearings before Magistrate Judge Freeman that he is asking for this designation to be added to both April 21 and August 17. (July Tr., p. 82.)

5    In the October 2014 declaration of Colonel Dennis W. Bradford, the DOCCS Director of Correction Emergency Response Team Operations, DOCCS consented to alter its policy regarding religious headgear. (Bradford Declaration (Dkt.98).) Colonel Bradford declared that plaintiff would be allowed to wear a turban that conforms to his religious beliefs as long as it complies with mandated color restrictions. (*Id.* ("[A]s long as plaintiff's turban is of an appropriate color DOCCS will accommodate his request to wear it within Woodbourne Correctional Facility.")) Thus, plaintiff's claim regarding the right to wear his turban may be moot. The Court will decide this question at a later stage after the parties have briefed the issue.

6    The Second Circuit had concluded that "special circumstances" may exist where the plaintiff reasonably misinterprets the prison's grievance regulations. *Hemphill,* 380 F.3d at 690. However, in *Woodford,* the Supreme Court held that untimely or otherwise procedurally defective grievances do not satisfy the PLRA's exhaustion requirement. 548 U.S. at 93. The Second Circuit has not yet determined whether the special circumstances exception to the exhaustion requirement survives *Woodford. See Chavis v. Goord,* 333 F. App'x 641, 643 (2d Cir.2009). The Court need not reach this issue in this case.

7    This case is distinguishable from cases where the CORC never renders a decision on the plaintiff's appeal. Under those circumstances, district courts in this Circuit have tended to hold that a motion to dismiss or for summary judgment for failure to exhaust should be granted without prejudice, allowing the plaintiff to refile his complaint once the CORC responds. *See Fuentes v. Furco,* 13–cv–6846 (AJN), 2014 WL 4792110, at *3 (S.D.N.Y. Sept. 25, 2014) (collecting cases). This approach "balance [s] the PLRA's goal of allowing institutions the first opportunity to address an inmate's grievances against the inmate's right to a federal forum when he has complied with all of the procedural formalities expected of him." *Id.* This logic, however, does not extend to the case at bar because the CORC has denied plaintiff's appeal, and thus has already been given the first opportunity to consider the grievance. *See Peoples,* 2012 WL 1575302, at *9.

8    The Second Circuit has noted that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord,* 758 F.3d 215, 220 (2d Cir.2014) (internal quotation marks omitted). However, the Second Circuit and judges in this district have continued to require such a threshold showing, particularly in cases where the parties have not argued otherwise. *See Ford,* 352 F.3d at 592 (applying the substantial burden test where the parties did not brief the issue and the plaintiff did not argue otherwise); *see also Salahuddin,* 467 F.3d at 275 n. 5 (declining to decide whether the substantial burden test applied where resolution of the issue was unnecessary for purposes of the appeal); *Woodward v. Perez,* 12–cv–8671 (ER), 2014 WL 4276416, at *3 (S.D.N.Y. Aug. 29, 2014) (applying the substantial burden test because plaintiff satisfied this threshold step). Here, the Court will apply the substantial burden test as neither party has argued against employing this standard.

9    In the Amended Complaint plaintiff identifies, but does not allege the significance of, certain holy days that defendants have denied him the right to celebrate. In the conferences and hearings before Magistrate Judge Freeman, plaintiff explained the religious significance of each holy day at issue and described how the days must be observed according to his faith. The Court deems these statements to be incorporated into plaintiff's pleadings. Considering these statements on the present motion to dismiss comports with the special solicitude afforded *pro se* litigants.

10    In the Amended Complaint plaintiff alleges that the denial of his religious turban violates his First Amendment rights, but he fails to allege the significance of the turban to his religious beliefs. In the hearings before Magistrate Judge Freeman, plaintiff explained the religious significance of wearing his turban. The Court deems these statements to be incorporated into plaintiff's pleadings.

---

KeyCite Yellow Flag - Negative Treatment

**Declined to Follow by** Chambers v. Nelson, M.D.Ga., March 21, 2008

2002 WL 1968329
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, S.D. New York.

Abdullah Y. SALAHUDDIN, Plaintiff,

v.

Sergeant MEAD, Officer, Robert H. Kuhlman,
Superintendent, Sullivan Correctional
Facility; Philip Coombe, Commissioner,
Department of Correctional Services, Defendants.

No. 95 Civ. 8581(MBM).
|
Aug. 26, 2002.

Inmate brought action against, inter alia, prison officer, alleging he retaliated against inmate for exercise of his First Amendment right to file grievances against prison officials. On officer's motion for judgment on the pleadings, the District Court, Mukasey, J., held that: (1) inmate did not establish prima facie case of First Amendment retaliation, with respect to search of his cell for contraband; (2) officer, who instructed another officer to search inmate's cell for contraband, could not be held liable for retaliation against inmate for exercise of his First Amendment right to file grievances based on other officer's mishandling of inmate's religious book; (3) inmate's requests for individual religious counseling during hours designated for prison work program was not constitutionally protected activity, as required for First Amendment retaliation claim; and (4) inmate did not establish prima facie case of First Amendment retaliation, with respect to his actions of filing grievance about prison food.

Motion granted.

West Headnotes (8)

**[1]** **Federal Civil Procedure**
    Matters considered

Exhibits attached to inmate's § 1983 complaint against prison officer would be considered in determining officer's motion for judgment on the pleadings. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rules 10(c), 12(c), 28 U.S.C.A.

Cases that cite this headnote

**[2]** **Civil Rights**
    Discipline and classification; grievances
**Constitutional Law**
    Prisoners
**Constitutional Law**
    Discipline and classification

Inmate's conduct of filing grievance against prison officer is protected by the First and Fourteenth Amendments, and thus retaliation against inmates who file grievances is actionable under § 1983. U.S.C.A. Const.Amends. 1, 14; 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

**[3]** **Constitutional Law**
    Prisoners
**Constitutional Law**
    Discipline and classification

Inmate's right to file a grievance about prison food is protected by the First and Fourteenth Amendments. U.S.C.A. Const.Amends. 1, 14.

1 Cases that cite this headnote

**[4]** **Constitutional Law**
    Prisoners
**Prisons**
    Particular issues and applications
**Prisons**
    Reading and writing material; libraries

Prison officer's alleged instruction to another officer to search inmate's cell with fine tooth comb for contraband, combined with officer's conduct of forcing inmate to send home books in his cell which exceeded 25-book limit set by facility, did not constitute adverse action, as would support First Amendment retaliation claim against officer; conduct was not of the

type that would deter inmate from continuing to file grievances against prison officials. U.S.C.A. Const.Amend. 1.

7 Cases that cite this headnote

[5]   **Civil Rights**
      👉 Criminal law enforcement;  prisons

Prison officer, who instructed another officer to search inmate's cell for contraband, could not be held liable for retaliation against inmate for exercise of his First Amendment right to file grievances based on other officer's mishandling of inmate's religious book; defendant was not personally involved in search. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

[6]   **Constitutional Law**
      👉 Prisoners

      **Prisons**
      👉 Particular issues and applications

Prison officer's alleged retaliatory search of inmate's cell after inmate filed grievance was insufficient adverse action to support First Amendment retaliation claim, in light of principle that cell searches are so fundamental to effective administration of prisons and to safety of prisoners and staff that searches should not be second-guessed for motivation or arbitrariness. U.S.C.A. Const.Amend. 1.

24 Cases that cite this headnote

[7]   **Constitutional Law**
      👉 Prisons and Pretrial Detention

      **Prisons**
      👉 Religious Practices and Materials

Inmate's requests for individual religious counseling during hours designated for prison work program was not constitutionally protected activity, as required for First Amendment retaliation claim against prison officer for interfering with inmate's exercise of his religious rights. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

[8]   **Constitutional Law**
      👉 Prisoners

      **Prisons**
      👉 Religious Practices and Materials

Inmate did not establish that prison officer's refusal to allow inmate to see chaplain was causally related to inmate's filing grievance about prison food, as required for inmate's First Amendment retaliation claim against officer; temporal connection, alone, between grievance and refusal was not sufficient to support inference that officer's refusal was motivated by inmate's grievance. U.S.C.A. Const.Amend. 1.

4 Cases that cite this headnote

## Attorneys and Law Firms

Abdullah Y. Salahuddin, Attica Correctional Facility, Attica, N.Y., Plaintiff pro se.

Eliot L. Spitzer, Attorney General of the State of New York, Bruce Brown, Assistant Attorney General, New York, N.Y., for Defendants.

## OPINION AND ORDER

MUKASEY, J.

**\*1** Plaintiff Abdullah Salahuddin, an inmate at the Attica Correctional Facility, filed this § 1983 action *pro se* against defendants Sergeant Mead, Superintendent Robert Kuhlman, and Commissioner Philip Coombe of the Department of Correctional Facilities. Salahuddin claims that defendants violated his right to the free exercise of religion guaranteed by the First and Fourteenth Amendments of the U.S. Constitution and by New York law, and that defendant Mead retaliated against him for the exercise of his First Amendment right to file grievances against prison officials. In an earlier opinion, familiarity with which is assumed, I granted defendants' motion to dismiss the free exercise claim for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). *Salahuddin v. Mead,* 95 Civ. 8581, 2000 WL 335552 (S.D.N.Y. Mar.30, 2000). Defendant Mead now moves to dismiss the retaliation claim

on the pleadings under Fed.R.Civ.P. 12(c). For the reasons set forth below, defendant's motion is granted, and plaintiff's complaint is dismissed.

## I.

**[1]** The facts alleged in plaintiff's pleadings, [1] accepted as true for the purposes of this motion, are as follows: At the time of the events at issue, plaintiff was an inmate at the Sullivan Correctional Facility. (Am.Compl.¶ 4) In December 1994, plaintiff was placed on "call-out" status by the facility's Muslim clergyman, Chaplain Muhammed. (*Id.* ¶ 14) This entitled plaintiff to be excused from supervised activity at the chaplain's request in order to prepare for plaintiff's upcoming marriage. (*Id.*) Upon receiving a call from the clergyman who would perform the wedding, Chaplain Muhammad was to call plaintiff to his office. (*Id.*) Shortly thereafter, while at his work assignment, plaintiff's work supervisor informed him that the chaplain had called for him. (*Id.* ¶ 15) However, when Sergeant Mead learned of plaintiff's call-out, Mead, who was responsible for investigating a separate grievance made by plaintiff regarding his diet, ordered plaintiff to return to his work assignment without seeing the chaplain. (*Id.* ¶ 16) Mead then instructed plaintiff's work supervisor not to issue a call-out pass to plaintiff unless there was an emergency. (*Id.* ¶ 17)

In a second incident, on or about January 12, 1995, plaintiff learned that his daughter was "seriously hospitalized," and sought permission to visit Chaplain Muhammad in order to call her. (*Id.* ¶ 18) At that point, plaintiff was still on the prison's approved call-out list, but his work supervisor told him that Sergeant Mead had said not to issue plaintiff any call-out passes absent an emergency. (*Id.* ¶ 20) Plaintiff called Chaplain Muhammad, who in turn called the work supervisor and asked that he send plaintiff to see the chaplain. (*Id.*) Before the supervisor could issue a pass, however, the area officer called a "noon count," for which all inmates had to return to their housing units. (*Id.*) At the end of the noon count, Chaplain Muhammed called plaintiff's housing unit officer, and instructed the officer to issue a pass to plaintiff. (*Id.* ¶ 21) The officer issued the pass. (*Id.*) Before plaintiff could use the pass, however, Sergeant Mead entered plaintiff's housing unit and inquired why plaintiff had been issued a pass. (*Id.*) The unit officer told Mead about Chaplain Muhammad's telephone call, but Mead ordered the officer to cancel the pass, reminding plaintiff that, under facility regulations, the only reason an inmate could leave his job assignment was for religious services. (*Id.* ¶ 22) When

plaintiff informed Mead about his daughter's hospitalization, Mead responded that plaintiff's family problem was not classified as an emergency under facility policy. (*Id.*) Plaintiff then protested that Mead was violating his religious rights. Mead replied that plaintiff's problem did not merit a call-out, and that plaintiff had to return to his work assignment. (*Id.* ¶ 23)

**\*2** The next day, plaintiff wrote to Superintendent Kuhlman about the incidents involving Sergeant Mead. (Compl.Ex. 7) Approximately two days later, due to recent violence at the facility, a general cell facility search was conducted for the purpose of finding contraband. (Am.Compl.¶ 24) During this general search, Sergeant Mead, allegedly in retaliation for the plaintiff's complaint to Kuhlmann about Mead's conduct, told another officer, "I want Salahuddin's cell searched with a fine tooth comb. Anything found that look [sic] like contraband, bring it to me. I'll show this cock sucker, he's just an ordinary inmate, and whose [sic] boss." (Compl.Ex. 8) As a result of the search, plaintiff was forced to send home, at his own expense, books that he had previously been allowed to keep in the cell notwithstanding the 25-book limit imposed by the facility. (Compl.Exs.8, 10) Plaintiff responded to the search by filing a formal complaint against Mead with Superintendant Kuhlmann. (Compl.Ex. 8) In this complaint, plaintiff alleged that officer Fisher, in addition to conducting a search that "deviated from policy," mishandled plaintiff's Quran and threw it on the floor. (*Id.*) After writing a follow-up letter to Kuhlmann (Compl.Ex. 10), plaintiff filed a formal complaint with Commissioner Coombe, who informed plaintiff that he had to comply with facility policies regarding call-outs. (Am.Compl.¶¶ 26–28)

After receiving Coomb's answer, plaintiff commenced this lawsuit pursuant to 42 U.S.C. § 1983, alleging a violation of his rights under the First and Fourteenth Amendments of the U.S. Constitution. I dismissed the case initially on the ground that plaintiff had not exhausted state administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"). *Salahuddin v. Mead,* No. 95 Civ. 8581, 1997 WL 357980 (S.D.N.Y. June 26, 1997). However, the Court of Appeals held that because the PLRA did not apply retroactively, plaintiff was not required to exhaust state remedies before pursuing remedial measures in court. *Salahuddin v. Mead,* 174 F.3d 271 (2d Cir.1999). Defendants then filed an amended motion to dismiss on three remaining grounds: failure to state a claim, failure to allege personal involvement of two of the defendants, and qualified immunity. With respect to the free exercise claim, I granted the motion to

dismiss on all three grounds. *Salahuddin v. Mead,* No. 95 Civ. 8581, 2000 WL 335552 (S.D.N.Y. Mar.20, 2000). However, I reserved judgment on the retaliation claim against defendant Mead, which was not addressed by defendants' amended motion to dismiss.

## II.

Defendant Mead moves to dismiss Salahuddin's complaint under Fed.R.Civ.P. 12(c), which provides for judgment on the pleadings "where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988). The Rule 12(c) standard is the same as that applied under Rule 12(b)(6). *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). Thus, as with Rule 12(b)(6) motions, although the court must construe the claims of a *pro se* plaintiff generously, *see Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), a court may dismiss an action where "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

**\*3** The Second Circuit has emphasized that retaliation claims by prisoners must be treated with skepticism. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). This skepticism is warranted because prisoners can claim retaliation for every decision they dislike. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Accordingly, a complaint of retaliation must not be "wholly conclusory," *see Graham,* 89 F.3d at 79, and must include highly detailed factual allegations. *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987).

To survive a Rule 12(c) motion in a First Amendment retaliation case, a plaintiff must make non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action. *See, e.g., Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001); *Thaddeus–X v. Blatter,* 175 F.3d 378, 386–87 (6th Cir.1999) (en banc) (per curiam).

## III.

**[2]** Plaintiff alleges that defendant Mead retaliated against him for filing a formal complaint with Superintendent Kuhlman. Filing a grievance against a prison officer is protected by the First and Fourteenth Amendments of the U.S. Constitution. *See United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) ("[T]he right[ ] to ... petition for a redress of grievances [is] among the most precious of the liberties safeguarded by the Bill of Rights."). Because filing a grievance is constitutionally protected, retaliation against prisoners who file grievances is actionable under § 1983. *See Graham,* 89 F.3d at 80.

**[3]** In his Responsive Statement, [2] plaintiff also alleges, for the first time, that defendant Mead's refusal to permit plaintiff to leave his assigned work program to see Chaplain Muhammed was itself motivated by the dietary grievance that Mead was investigating. Although plaintiff does not identify the substance of his "food problem grievance" (Am.Compl.¶ 15), his right to file a grievance about prison food is also protected by the First and Fourteenth Amendments of the U.S. Constitution. *See United Mine Workers,* 389 U.S. at 222.

## IV.

**[4]** Although filing grievances is constitutionally protected, plaintiff's pleadings do not adequately allege unlawful retaliation under the second prong of the retaliation standard, because Sergeant Mead's statements and conduct with respect to the search of plaintiff's cell do not rise to the level of actionable retaliation. The Second Circuit has held that "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes,* 239 F.3d at 493; *see also Thaddeus–X,* 175 F.3d at 397 (holding that retaliatory acts that do not chill constitutionally protected activity are not actionable); *Crawford–El v. Britton,* 93 F.3d 813, 826 (D.C.Cir.1996) (en banc) (holding that a retaliation claim requires "some *de minimis* showing of injury"), *vacated on other grounds,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) (Posner, J.) ("It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person

of ordinary firmness from that exercise."). When retaliatory conduct does not chill the exercise of constitutional rights, the conduct is *de minimis,* and is "outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493; *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (per curiam).

**\*4** To determine whether or not alleged retaliatory acts are *de minimis,* the court must tailor its inquiry to the specific context in which the alleged acts took place, in this case a state prison. *See Dawes,* 239 F.3d at 492; *see also Thaddeus X,* 175 F.3d at 398 ("Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse."). Thus, in retaliation actions by prisoners, courts have found that a range of potentially retaliatory acts by prison officers are legally insufficient to state a retaliation claim. *See, e.g., Morales v. Mackalm,* 278 F.3d 126, 131–32 (2d Cir.2002) (finding that an officer's reference to plaintiff as a "stoolie," intended to stigmatize plaintiff as an informant, was insufficient to support a claim for retaliation); *Dawes,* 239 F.3d at 493 (concluding that an officer's references to plaintiff as a "rat" and an "informant," combined with plaintiff's conclusory allegations that the references exposed him to assault from other inmates, were insufficient to support a claim for retaliation); *ACLU of Md. v. Wicomico County,* 999 F.2d 780, 786 & n. 6 (4 th Cir.1993) (holding that termination of an ACLU paralegal's privileges to visit with inmates resulted in "no more than a *de minimis* inconvenience that, on the facts of the case, did not constitute cognizable retaliation under the First Amendment"); *Rivera v. Goord,* 119 F.Supp.2d 327, 340 (S.D.N.Y.2000) (dismissing retaliation claim against defendant who "shoved" an inmate on the ground that the harm was *de minimis* ).

**[5]** Here, plaintiff alleges that, before a general facility search, defendant Mead instructed a subordinate to pay special attention to plaintiff's cell, and that, when books were found in the cell that were, as plaintiff concedes (*see* Compl. Ex. 10), beyond the 25–book limit set by the facility, plaintiff was forced to send those books home.[3] To the extent that any retaliatory act took place, therefore, it amounted to an especially thorough search of plaintiff's cell followed by the enforcement of a preexisting regulation.

These alleged harms are quite unlike the harms that courts in this circuit have identified as legally sufficient for retaliation actions. *See, e.g., Morales* 278 F.3d at 131–32 (allegation that plaintiff was transferred to a psychiatric facility in retaliation for filing a sexual harassment grievance against defendant);

*Graham,* 89 F.3d at 80–81 (allegation that defendants filed false misbehavior reports against plaintiff in retaliation for his leadership in filing a grievance to protest the removal of workshop showers); *Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995) (allegation that defendant planted contraband in his cell in retaliation for plaintiff's filing two lawsuits against the facility); *Jones v. Coughlin,* 45 F.3d 677, 680 (2d Cir.1995) (allegation that defendants, in retaliation for plaintiff's filing administrative complaint, filed a false misbehavior report that led to 120 days of punitive segregation); *Ali v. Szabo,* 81 F.Supp.2d 447, 468–69 (S.D.N.Y.2000) (allegation that defendant instituted a new rule in the prison restricting the right to wear kufis aimed specifically at plaintiff, who was the only inmate in possession of a kufi); *Van Pelt v. Finn,* 92 Civ. 2977, 1993 WL 465297, at \*4–5 (S.D.N.Y. Nov.12, 1993) (allegation that defendants, upon learning about letters written by plaintiff to defendant's supervisor, reassigned plaintiff to a less desirable job with lower pay).

**\*5** In each of these cases, the alleged retaliatory conduct was specifically directed at plaintiffs and substantial enough to deter legitimate grievances against prison officers. In this case, on the other hand, plaintiff has alleged no special deprivation that would deter a prisoner, whose cell can be searched at any time, *see Hudson v. Palmer,* 468 U.S. 517, 527–28, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), and whose interactions with the outside world are subject to extensive regulation by prison authorities, *see Thornburgh v. Abbott,* 490 U.S. 401, 407–08, 109 S.Ct. 1874, 104 L.Ed.2d 459(1989), from continuing to file grievances against prison officials.

V.

**[6]** Plaintiff also fails to meet the second prong of the retaliation test, *i.e.* the requirement that he be subjected to an adverse act, on an alternative ground. Many courts in this district have concluded that a retaliatory cell search is insufficient to support a First Amendment retaliation claim. *See Walker v. Keyser,* 98 Civ. 5217, 2001 WL 1160588, at \*9 (S.D.N.Y. Oct.2, 2001) ("[R]etaliatory searches are not actionable under § 1983."); *Walker v. Goord,* 98 Civ. 5217, 2000 WL 297249, at \*4 (S.D.N.Y. Mar.22, 2000) (same); *Bey v. Eggleston,* 96 Civ. 3302, 1998 WL 118158, at \*4 (S.D.N.Y. Mar.17, 1998) ("A search of an inmate—even for retaliatory reasons—does not implicate a constitutional right."); *Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714878,

*7 (S.D.N.Y. Nov.17, 1997) ("[S]earches of cells implicate no constitutional rights, even if the search is arbitrary or retaliatory in nature."); *Higgins v. Artuz,* 94 Civ. 4810, 1997 WL 466505, at *4 (S.D.N.Y. Aug.14, 1997) (same). [4]

In concluding that retaliatory cell searches are not actionable under § 1983, these courts have relied on *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), where the Supreme Court held that a prisoner has no reasonable expectation of privacy in his prison cell entitling him to the protection of the Fourth Amendment against unreasonable searches. *Id.* at 525–26. The *Hudson* court recognized that cell searches play a uniquely crucial role in prison administration, *see id.* at 527 ("[I]t would be literally impossible to accomplish the prison objectives ... if inmates retained a right to privacy in their cells."), and that prison officials must have broad discretion in deciding when and why to search cells, *see id.* ("Unfettered access to these cells by prison officials ... is imperative if drugs and contraband are to be ferreted out and sanitary surroundings are to be maintained.").

At the very least, *Hudson* supports the proposition that a cell search is different from the various administrative decisions that are actionable under § 1983 if they are retaliatory. *Cf. Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) (noting that "a claim for relief can be stated under *section 1983* if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights"). Unlike prisoner job assignments, for example, cell searches are so fundamental to the effective administration of prisons and to the safety of prisoners and staff that the searches should not be second-guessed for motivation or arbitrariness. [5]

**\*6** Here, plaintiff does not allege that he was singled out for a search, nor does plaintiff go beyond the bare assertion that "[m]y cell, I believe was search [sic] in a manner that deviated from policy." (Compl.Ex. 8) Ultimately, plaintiff alleges only that the search of his cell was conducted differently from other contemporaneous searches. In light of the principles laid out in *Hudson* and applied by courts in this district to prisoner retaliation cases, this harm cannot support a retaliation claim.

### VI.

The existence of a causal connection between the cell search and Salahuddin's grievance against Mead is immaterial, because plaintiff has not adequately alleged an adverse action

by Mead with respect to the search. Even if there is such a connection, [6] the claim must be dismissed on the pleadings based on plaintiff's failure to establish that defendant took adverse action against him.

**[7]** **[8]** To dismiss plaintiff's remaining allegation, on the other hand, namely the allegation that Mead's refusal to allow Salahuddin to see Chaplain Muhammed was motivated by Salahuddin's dietary grievance against the prison, the extent of the harm to Salahuddin need not be measured. Whether or not Mead's decision to prevent plaintiff from seeing the chaplain resulted in a cognizable harm to Salahuddin, Salahuddin cannot establish the necessary causal link between his complaint about the prison food and Mead's application of the facility rules regarding call-outs. Aside from the apparent temporal proximity between the complaint and Mead's action, plaintiff has alleged no other facts to support the inference that Mead's application of the call-out rules was motivated by plaintiff's grievance about the food in the prison. *See Nunez v. Goord,* 172 F.Supp.2d 417, 432 (S.D.N.Y.2001) (temporal proximity alone is insufficient to establish causation). Rather, plaintiff has merely juxtaposed the dietary grievance he filed with Mead's allegedly retaliatory act, and asserted that the former brought about the latter. Plaintiff's allegation that Mead retaliated against him for his dietary grievance, therefore, is "wholly conclusory," and is dismissed on the pleadings. *See Graham,* 89 F.3d at 79 (2d Cir.1996) ("A complaint of retaliation that is 'wholly conclusory' can be dismissed on the pleadings alone."). [7]

### VII.

Because plaintiff has not made out a *prima facie* case of retaliation, I need not reach the issue of whether Mead is entitled to qualified immunity. *See Kerman v. City of New York,* 261 F.3d 229, 235 (2d Cir.2001) (" 'When determining whether qualified immunity protects an official, we must first determine whether the plaintiff has presented facts which, if proven, demonstrate that the defendant violated a constitutional right.' ") (quoting *Monday v. Oullette,* 118 F.3d 1099, 1102 (6th Cir.1997)).

For the reasons stated above, defendant's motion for judgment on the pleadings is granted, and the complaint is dismissed.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 1968329

Footnotes

1    Although a court generally may not look beyond the pleadings when reviewing a Rule 12(c) motion, Fed.R.Civ.P. 10(c)
     authorizes the court to consider any exhibits mentioned in and attached to the pleadings. *See* Fed.R.Civ.P. 10(c) ("A
     copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Goldman v. Belden,*
     754 F.2d 1059, 1065–66 (2d Cir.1985). Here, plaintiff has attached 13 exhibits to his complaint. These exhibits will be
     treated as part of plaintiff's pleadings for the purposes of this motion.

2    "Responsive Statement" refers to plaintiff's "Statement of Facts and Response to Defendant's Summary Judgment
     Motion" filed December 28, 2000.

3    Although plaintiff also alleges that Fisher, who searched the cell, mishandled plaintiff's Quran (Compl.Ex. 8), Fisher is
     not a defendant in this action. Moreover, Mead cannot be liable for any mishandling of the Quran because he was not
     personally involved in the search and, even under the facts presented by plaintiff, did not instruct Fisher to do anything
     more than search Salahuddin's cell for contraband. *See Champion v. Artuz,* 76 F.3d 483, 486–87 (2d Cir.1996) (affirming
     dismissal of retaliation action because defendants had no personal involvement in the alleged retaliatory conduct); *Colon
     v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (noting that personal involvement by the defendant is essential to a § 1983
     action, and laying out the factors to be considered in determining whether a defendant was personally involved).

4    Plaintiff cites *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) for the proposition that a retaliatory search of an inmate's
     cell is an actionable claim. (*See* Responsive Statement, at ¶ 28) However, *Champion* is inapposite. In that case, the
     retaliation claim was dismissed on the threshold ground that the defendants were not personally involved in the cell
     search. *Champion,* 76 F.3d at 486–87. The Second Circuit has not directly addressed the question of whether a retaliatory
     search can create an actionable claim.

5    Of course, precluding retaliation actions based on cell searches does not deprive inmates of all available remedies for
     egregious conduct by prison officers. Inmates still have a remedy under the Eighth Amendment, as well as state tort law,
     for deliberate harassment unrelated to prison needs. *See Hudson,* 468 U.S. at 530.

6    Had plaintiff adequately alleged an adverse action, plaintiff's allegation that Mead ordered the search of plaintiff's cell
     just a day after plaintiff filed his grievance probably would be sufficient to present a triable issue of fact on the question
     of causation. Although temporal proximity between constitutionally protected activity and potentially retaliatory activity
     generally will not, on its own, allow a plaintiff to withstand a motion to dismiss, *see Nunez v. Goord,* 172 F.Supp.2d
     417, 432 (S.D.N.Y.2001), the direct evidence of retaliation presented by plaintiff, *i.e.* defendant's statement to Fisher,
     combined with the temporal proximity between the parties' actions, would preclude the court from resolving the issue
     of causation on the pleadings alone. *See Colon,* 58 F.3d at 872–73 (plaintiff adequately alleged causation where direct
     evidence of defendant's motive was presented along with evidence of temporal proximity); *see also Morales v. Mackalm,*
     278 F.3d 126, 131 (2d Cir.2002) (plaintiff adequately alleged causation where he alleged that defendant was personally
     involved in the decision to transfer plaintiff to psychiatric facility soon after plaintiff filed sexual harassment grievance
     against defendant). Moreover, although, in the summary judgment context, defendant in a retaliation action can rebut
     plaintiff's *prima facie* case through a showing that an adverse action would have taken place even in the absence of the
     protected activity, *see Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994), Mead has moved to dismiss the complaint
     on the pleadings and thus, only the *prima facie* case is relevant.

7    There is also a sentence in plaintiff's Responsive Statement suggesting that, in refusing to allow plaintiff to see Chaplain
     Muhammed, Mead was motivated by plaintiff's "exercise of his religious rights" rather than the dietary grievance. *See*
     Responsive Statement at ¶ 26. Even if this allegation were not wholly conclusory, Mead's retaliatory conduct would not
     be actionable because plaintiff's "exercise of his religious rights" amounted to requests for individual counseling during
     the hours designated for the prison work program. This is not constitutionally protected activity. *See Salahuddin v. Mead,*
     95 Civ. 8581, 2000 WL 335552, at *11 (S.D.N.Y. Mar.30, 2000).

2012 WL 360104
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronnie THAXTON, Plaintiff,

v.

A. SIMMONS, Corrections Officer, Upstate
Correctional Facility; Gary, Corrections
Oficer, Upstate Correctional Facility; Bush,
Corrections Officer, Upstate Correctional
Facility; John Doe, Corrections Officer, Upstate
Correctional Facility; K. Garneau, Nurse,
Upstate Correctional Facility; Lombard, [1]
Upstate Correctional Facility, Defendants.

Civ. No. 9:10–CV–1318 (MAD/RFT).
|
Jan. 5, 2012.

**Attorneys and Law Firms**

Ronnie Thaxton, Comstock, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Christopher W. Hall, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

 **\*1** *Pro se* Plaintiff Ronnie Thaxton brings this civil rights
action, pursuant to 42 U.S.C. § 1983, alleging that the
Defendants violated his constitutional rights while he was
incarcerated at Upstate Correctional Facility. Dkt. No. 1,
Compl. Currently pending before the Court is Defendants'
Motion to Dismiss, Dkt. No. 20, which Plaintiff opposes, Dkt.
No. 26. For the reasons that follow, it is hereby recommended
that Defendants' Motion be **granted in part and denied in
part.**

**I. ALLEGATIONS IN THE COMPLAINT**

In accordance with the applicable standard of review,
discussed below, the following facts are derived from

the Complaint and are taken as true. [2] This factual
recitation includes only those facts relevant to the remaining
Defendants. [3]

At all times relevant to the matters at issue in the Complaint,
Plaintiff was in the custody of the New York State
Department of Corrections and Community Supervision
(DOCCS) and was housed at Upstate Correctional Facility. [4]
On or about January 13, 2009, Plaintiff filed an inmate
grievance regarding Defendant Simmons, whom Plaintiff
claims harassed him and denied him food at dinner. Compl.
at p. 6. Approximately three months later, on April 6, 2009,
Plaintiff asked Defendants Simmons and Gary for another
food tray because there was hair all over the one he had
received. *Id.* Upon receiving another tray, Plaintiff asked
Defendant Simmons why there always seemed to be an issue
with his food each time Defendant Simmons worked. *Id.*
Defendant Simmons replied that he didn't have time to play
with Plaintiff's food, but if he were to play with his food,
Plaintiff would know. *Id.* Defendant Gary added that he
could accommodate Plaintiff by putting something in his
food. *Id.* Plaintiff believed that both Gary and Simmons
were threatening him. The following day, on April 7, 2009,
Defendant Gary made more comments to Plaintiff about his
food while serving his dinner meal. Plaintiff refused to eat
out of fear that his food had been tampered with. *Id.* On April
9, 2009, Plaintiff filed an inmate grievance regarding these
incidents. *Id* .

Later that month, on April 28, 2009, Plaintiff was served
a kosher dinner meal by Defendants Bush and Doe. *Id.* at
p. 8. After putting his sardine sandwich together, Plaintiff
took a few bites, felt a sharp pain and grinding in his mouth,
and promptly spit out the food. *Id.* Plaintiff noticed he had
spit out a gold colored piece of metal and that there were
drops of blood on the spit-out food. He immediately called for
medical attention and Defendant Bush responded by promptly
notifying Defendants Sergeant Lumbard and Nurse Garneau.
*Id.* Upon Lumbard's and Garneau's arrival at Plaintiff's cell,
Plaintiff imparted what occurred. Defendant Garneau gave
Plaintiff a medical incident form to fill out and Defendant
Lumbard took possession of the metal piece and placed it in
a ziplock bag to be photographed and placed on file. [5] *Id.*
Plaintiff asked Defendant Garneau to examine him, to which
she responded that there was not much damage. *Id.* Plaintiff
further emphasized that he was cut and was in pain, to which
Defendant Garneau walked off stating "don't be a cry baby."
*Id.* at p. 9.

## II. DISCUSSION

### A. Standard of Review

**\*2** On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (*overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus. ., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1960, 173 L.Ed.2d 868 (citing *Twombly* ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1949, 173 L.Ed.2d 868. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1950–51, 173 L.Ed.2d 868.

**\*3** With this standard in tow, we consider the plausibility of Plaintiff's Complaint.

### B. Eighth Amendment Claims

#### 1. Failure to Protect

Defendants assert that the only claims raised pursuant to a failure to protect theory are brought against the previously dismissed Defendants, Bellnier, Duvall, and Bellamy. Although Plaintiff attempts to reinvigorate these claims through his Opposition papers, he cannot change the fact that such claims were specifically addressed by the Honorable Gary L. Sharpe, Chief United States District Judge, when he dismissed these Defendants from the action; such rulings are binding upon this Court as law of the case. *In re PCH Assoc.,* 949 F.2d 585, 592 (2d Cir.1991) (noting that the law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"). Plaintiff

has not asserted any facts that would raise the inference that any remaining Defendant failed to protect him.

Furthermore, his allegations regarding veiled threats are not sufficient to raise a constitutional claim against any of the remaining Defendants. *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996), for the proposition that a claim brought under § 1983 is "not designed to rectify harassment or verbal abuse"); *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) (noting that "verbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute a violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983") (internal quotation marks and citations omitted). Therefore, we agree with Defendants that any Eighth Amendment claims arising from a theory of failing to protect Plaintiff or from verbal harassment or threats should be **dismissed .**

### 2. Nutritional Food

The Eighth Amendment places a duty upon prison officials to ensure that prisoners receive adequate food. *Wilson v. Seiter,* 501 U.S. 294, 303–04, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (noting that prisoners are guaranteed a nutritionally adequate diet). In this regard, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* 2005 WL 121720, at *6 (S.D.N.Y. Jan.21, 2005) (citing *Robles v. Coughlin,* 725 F.2d at 14). Consequently, "[d]epriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment ." *Moncrieffe v. Witbeck,* 2000 WL 949457, at *6 (N.D.N.Y. June 29, 2000) (citing *Robles v. Coughlin,* 725 F.2d at 15). Allegations of food tampering alone would not alone suffice to establish an Eighth Amendment violation; in addition, a plaintiff must allege that he or she suffered "distinct and palpable injury." *M.F. v. Reish,* 1996 WL 345953, at *4 (S.D.N.Y. June 21, 1996) (citing *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

**\*4** In the case at bar, there are two alleged incidents wherein the reasonable inference of food tampering can be drawn. The first is the April 6th incident when the food tray served to Plaintiff by Defendant Simmons had hair on it; the second is the April 28th incident when Defendants Bush and Doe served Plaintiff a food tray that contained a piece of metal in the sardines. Because Plaintiff provides no allegations of injury stemming from the April 6th incident, we find that the food tampering claim against Defendant Simmons does not rise to the level of an Eighth Amendment violation. However, the same cannot be said of the April 28th incident wherein Plaintiff ingested, but spit out, the piece of metal, which caused injuries to his tongue and cheek. These injuries developed into dental pain and numbness to the right side of his face. At this stage of the litigation, taking Plaintiff's allegations of fact as true, we find that Plaintiff has stated enough facts to plausibly show that his food was tampered with and that it caused palpable injury to him. Thus, we recommend **denying** Defendants' Motion to Dismiss as to the Eighth Amendment claim against Defendants Bush and Doe. [6]

### 3. Medical Care

The final Eighth Amendment claim asserted in the Complaint is against Defendant Garneau for her alleged failure to provide medical care to Plaintiff. According to Plaintiff, he informed Defendant Garneau that the metal had cut the inside of his mouth and he asked her to examine him, to which she replied, without examination, that he was fine and to not be such a cry baby.

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). When complaining of the denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or

extreme pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

**\*5** At this stage, we find that Plaintiff has adequately pled a claim for deliberate indifference. First, we disagree with Defendants' categorization of the Plaintiff's medical condition as not serious and that Defendant Garneau's reaction to his request for medical care further shows the lack of seriousness of such condition. Plaintiff asserts that the inside of his mouth had been cut by a metal object and that he was bleeding. Such condition is one that is worthy of medical care and, if left untreated, could lead to more serious medical problems. *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Guiterrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997), for the proposition that "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain"). In fact, Plaintiff avers that he suffered further complications from the denial of treatment, such as numbness and difficulty eating. While upon further review of the record, it may be clearer that Plaintiff received treatment, or that his medical condition was not so serious, at this stage, taking all facts alleged by Plaintiff as true, we

find that he has stated enough facts to plausibly allow his claim of deliberate indifference to go forward. Therefore, we recommend **denying** Defendants' Motion to Dismiss with regard to the Eighth Amendment claims stated against Defendant Garneau.

### C. First Amendment Claims

Plaintiff asserts that his First Amendment rights were violated in several ways. First, he states that the threats of food tampering, combined with actual food tampering, impeded his right to exercise his religion by eating a kosher diet. Next, he claims that the Defendants violated his First Amendment rights when they retaliated against him, through threats and food tampering, because he exercised his First Amendment right to file grievances. We consider each of these claims *seriatim.*

#### *1. Interference with Religion*

Prisoners maintain some measure of constitutional protection afforded by the Free Exercise Clause of the First Amendment. *Pell v. Procunier,* 417 U.S. 817, 822 (1974). Among those protected rights is the right to receive a kosher diet. *Ford v. McGinnis,* 352 F.3d 582, 597 (2d Cir.2003) (citing *Kahane v. Carlson,* 527 F.2d 492 (2d Cir.1975), for the proposition that it is clearly established "that a prisoner has a right to a diet consistent with his or her religious scruples"). Such rights, however, are balanced against the "interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990); *see also Pell v. Procunier,* 417 U.S. at 822. Free exercise claims of prisoners are therefore "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)); *see also Ford v. McGinnis,* 352 F.3d at 588. Courts must analyze free exercise claims by evaluating "1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; 2) whether the challenged practice of the prison officials infringes upon the religious belief; and 3) whether the challenged practice of the prison official furthers some legitimate penological objective." *Farid v. Smith,* 850 F.2d at 926 (citations omitted).

**\*6** Plaintiff asserts that because his food tray was contaminated on two occasions, only the latter of which he specifies as a kosher meal, his right to exercise his religion and receive kosher meals has been infringed. First, it is not clear what religion Plaintiff professes to adhere to. Because he makes passing reference to a "jewish diet," we will presume, for our purposes here, that he practices Judaism. However, it is not enough for Plaintiff to merely reference his religion. He must also allege that he possesses sincerely held religious beliefs. "[S]crutiny of the prisoner's sincerity is often essential in differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Ford v. McGinnis,* 352 F.3d at 588 (internal quotation marks and citations omitted). No where in the Complaint does Plaintiff allege the sincerity of his beliefs and what role the kosher diet plays therein. Mere membership in an established religion is not enough to show that a prisoner has sincerely held religious beliefs. *Id.* (citing *Jackson v. Mann,* 196 F.3d 316, 317–21 (2d Cir.1999)).

But the real question is whether the contamination of two meals constitutes a substantial burden on Plaintiff's free exercise claims. We submit that it does not. In making this assessment, we note that in both instances, after Plaintiff brought the problem to the respective Defendant's attention, Plaintiff was provided with a different tray. Thus, Plaintiff was not denied the ability to express his allegedly sincerely held belief of maintaining a religious diet. Notwithstanding Plaintiff's protestations and impressions that the Defendants have all conspired against him, the minor disruption of two kosher meals during a four-month period can hardly be called a substantial burden. At best, these incidents present a *de minimis,* or insubstantial, burden on Plaintiff's ability to freely exercise his religion. *See, e.g., Graham v. Mahmood,* 2008 WL 1849167, at \* 10 (S.D.N.Y. Apr.22, 2008) (citing, *inter alia, Hanton v. Mathiau,* 29 F. App'x 772, 773 (2d Cir.2002), for the proposition that preventing a prisoner who was a member of the Nation of Islam from making one round of bean pie deliveries had a *de minimis* and insubstantial burden on the prisoner's free exercise rights); *Tafari v. Annets,* 2008 WL 4449372, at \*1 (S.D.N.Y. Oct.2, 2008) (Daniels, D.J.) (adopting magistrate judge's report and recommendation that denial of kosher meals on two occasions "constitute[d] a *de minimis,* not a substantial, interference" with the prisoner's free exercise of religion), *aff'd* 363 F. App'x 80 (2010). Therefore, we recommend **granting** Defendants' Motion to Dismiss as to Plaintiff's First Amendment religious exercise claims.

### 2. Retaliation and Conspiracy

Plaintiff's final First Amendment claim is that the Defendants conspired together to retaliate against him for exercising his right to file grievances, and possibly for exercising his religious beliefs.

**\*7** To support a conspiracy claim under § 1983, a plaintiff must demonstrate or allege (1) an agreement between two or more state actors or a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002).

Here, we have no facts, beyond Plaintiff's conclusory statements, that the Defendants have acted in concert. Thus, Plaintiff has failed to plausibly state that the Defendants acted in concert to violate his constitutional rights and such claims should be **dismissed.**

Turning to the specific retaliation allegations, the Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988). Claims of retaliation, like those asserted by Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak,* 389 F.3d 379, 381–83 (2d Cir.2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872 (citation omitted); *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

To state a First Amendment claim for retaliation, an inmate must demonstrate that (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d at 492); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

Plaintiff asserts that the grievance he filed against Defendant Simmons on January 13, 2009, was an exercise of his First Amendment right and was the impetus for all subsequent retaliatory conduct. We can easily find that Plaintiff satisfies the first prong of a retaliation claim when he filed a grievance against Defendant Simmons. Plaintiff also claims that this same Defendant contaminated his food tray with hair. While Simmons promptly provided Plaintiff with another food tray, the close proximity of the filed grievances against him, coupled with the discussion that ensued on April 6th is enough for Plaintiff to eke out a retaliation claim at this stage. [7] Thus, we recommend **denying** Defendant Simmons's request to have the retaliation claim against him dismissed.

*8 However, Plaintiff's claims of retaliation against Defendants Bush and Doe are nothing more than conclusory, and, in light of the factual allegations, implausible. Plaintiff believes that Defendants Bush and Doe contaminated his kosher food tray on April 28th as retaliation for the grievances he filed against Defendant Simmons on January 13th and April 9th. But he provides the Court with no plausible connection between the protected activity and the allegedly adverse conduct nor any plausible connection between Defendants Bush and Doe and Simmons. In satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 492 (internal quotation marks and citations omitted) (cited in *Davis,* 320 F.3d at 353). Here, Plaintiff has failed to connect the allegedly adverse conduct to his protected speech, thus, we recommend **granting** Defendants' Motion to Dismiss as to the retaliation claims against Defendants Bush and Doe.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss be **granted in part and denied in part** as follows:

**1) GRANTED,** as to Eighth Amendment failure to protect claims against Defendants Bellnier, Duvall, and Bellamy, who were each previously dismissed from this action;

**2) GRANTED,** as to claims of verbal harassment and threats against all Defendants;

**3) GRANTED,** as to Eighth Amendment nutrition claims against Defendants Simmons and Gary;

**4) DENIED,** as to Eighth Amendment nutrition claims against Defendants Bush and Doe;

**5) DENIED,** as to Eighth Amendment deliberate medical indifference claims against Defendant Garneau;

**6) GRANTED,** as to First Amendment interference with religion claims against all Defendants;

**7) GRANTED,** as to conspiracy claims against all Defendants;

**8) DENIED,** as to First Amendment retaliation claim against Defendant Simmons;

**9) GRANTED,** as to First Amendment retaliation claims against Defendants Bush and Doe; and it is further

**RECOMMENDED,** that if the above recommendations are adopted, then Defendants Gary and Lumbard should be **dismissed** from this action as there are no claims plausibly stated against them; and it is further

**RECOMMENDED,** that if the above recommendations are adopted, then Defendants Simmons, Bush, Doe, and Garneau should be ordered to file an answer in response to the Complaint and this matter should proceed to the discovery phase on the remaining claims; and it is further

**ORDERED,** that Plaintiff continue to take steps to ascertain the identity of the John Doe Defendant; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human* *Servs.* ., 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

## All Citations

Not Reported in F.Supp.2d, 2012 WL 360104

## Footnotes

1   Upon information and belief, Plaintiff has misspelled this Defendant's name. We will refer to this Defendant by the correct spelling: Lumbard. *See* Dkt. No. 20–1, Defs.' Mem. of Law, at p. 3 n. 2.

2   References to the Complaint are to the page numbers automatically assigned by the Court's Case Management Electronic Case Files System.

3   On March 29, 2011, the Honorable Gary L. Sharpe, Chief United States District Judge, performed an initial review of Plaintiff's Complaint, pursuant to 28 U.S.C. § 1915(e), and dismissed several Defendants and corresponding claims included in the Complaint. Dkt. No. 6. More specifically, Chief Judge Sharpe determined that Plaintiff failed to state a cognizable claim against Defendants Bellnier, Duvall, and Bellamy, and thus dismissed them from this action. *Id.* Any allegation of fact relating solely to these dismissed claims and Defendants will not be discussed.

4   Upstate is a maximum security prison comprised exclusively of special housing unit (SHU) cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept.12, 2002).

5   Based upon responses received to several Freedom of Information Law requests, Plaintiff believes that Defendant Lumbard failed to properly make a record of the incident. Compl. at p. 15.

6   With this recommendation, we provide Plaintiff with his third warning that he must take steps to identify the John Doe Defendant. *See also* Dkt. No. 6 at p. 9 (informing Plaintiff that the Marshals Service cannot serve a Doe Defendant and that he must take steps to ascertain the identify should he wish to avoid dismissal); Dkt. No. 29 at p. 6 (directing Plaintiff to take reasonable steps to ascertain Doe identity). His failure to do so will result in dismissal of his claims against this Defendant. Recently, Plaintiff submitted a letter noting his efforts to identify this individual. Dkt. No. 30. Should this Court's recommendations be adopted, this case will proceed to the discovery phase wherein Plaintiff can seek information directly from the remaining Defendants that may aid him in this effort.

7   It is the Court's view that Plaintiff has barely nudged across the line from conceivable to plausible. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950–51, 173 L.Ed.2d 868 (2009). Nevertheless, because we are bound to give the Plaintiff the benefit of every reasonable inference to be drawn from the allegations in the Complaint, we recommend allowing this claim to proceed. *Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963).

2016 WL 2610028
Only the Westlaw citation is currently available.
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals,
Second Circuit.

Randy WILLIAMS, Plaintiff–Appellant,
v.
John/Jane DOES, Correctional Officers
Responsible for Delivery of Ramadan Trays,
Upstate Correctional Facility, Gerard Jones, Upstate
Correctional Facility, Defendants–Appellees.

No. 15–692.
|
May 6, 2016.

Appeal from a judgment of the United States District Court
for the Northern District of New York (Suddaby, C.J.;
Peebles, M.J.).

**Attorneys and Law Firms**

Randy Williams, pro se, Malone, NY, for Plaintiff–Appellant.

Zainab Chaudhry, Assistant Solicitor General, New York
State Office of the Attorney General, Albany, NY, for
Defendants–Appellees.

Present JOHN M. WALKER, JR., GUIDO CALABRESI and
PETER W. HALL, Circuit Judges.

***SUMMARY ORDER***

**\*1  UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED** in part,
**VACATED** in part, and **REMANDED** for further
proceedings.

Appellant Randy Williams, a prisoner proceeding *pro se,*
appeals the district court's judgment dismissing his 42 U.S.C.
§ 1983 complaint for failure to state a claim. The district
court also dismissed Williams's claim under the Religious
Land Use and Institutionalized Persons Act ("RLUIPA").
Williams does not challenge this latter dismissal on appeal.
We assume the parties' familiarity with the underlying facts,
the procedural history of the case, and the issues on appeal.

We review *de novo* a district court's dismissal of a
complaint pursuant to Federal Rule of Civil Procedure
12(b)(6), construing the complaint liberally, accepting all
factual allegations in the complaint as true, and drawing
all reasonable inferences in the plaintiff's favor. *Chambers
v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002).
To survive a motion to dismiss under Rule 12(b)(6), the
complaint must plead "enough facts to state a claim to relief
that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550
U.S. 544, 570 (2007).

The Free Exercise Clause of the First Amendment, which
protects the free exercise of religion, extends to prisoners
and includes their right to meals that comport with religious
requirements. *Ford v. McGinnis,* 352 F.3d 582, 588, 597
(2d Cir.2003); *see also McEachin v. McGuinnis,* 357 F.3d
197, 203–04 (2d Cir.2004). We have not yet decided
whether a prisoner asserting a free-exercise claim must, as
a threshold requirement, show that the disputed conduct
substantially burdened his sincerely held religious beliefs.
*Holland v. Goord,* 758 F.3d 215, 220–21 (2d Cir.2014). It
is not necessary to resolve this issue here, however, because
Williams does not argue that the substantial burden threshold
requirement is inapplicable and instead argues that he met the
requirement. *See Ford,* 352 F.3d at 592 (declining to address
whether a prisoner must meet the substantial burden threshold
requirement in a free exercise case because he did not raise
the issue on appeal).

Assuming that the substantial burden requirement applies,
this Court's precedent leads us to conclude that
Williams plausibly alleged that his religious exercise was
unconstitutionally burdened. *See Holland,* 758 F.3d at 221
(declining to address the continued viability of the substantial

burden requirement where this Court's precedent reveals that inmate's religious exercise was unconstitutionally burdened); *McEachin,* 357 F.3d at 203 (noting that "courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights," and determining that prisoner, a practicing Muslim, stated a free exercise claim by alleging that the restrictive diet of "loaf" was not properly blessed as required by Islam); *Ford,* 352 F.3d at 593–94 (holding that defendants were not entitled to judgment as a matter of law on question whether prisoner's religious exercise was unconstitutionally burdened when he was denied an Eid ul Fitr feast, which he characterized as religiously significant to his practice of Islam). To satisfy the substantial burden requirement, a prisoner claiming a violation of his free exercise rights must show "that the disputed conduct substantially burden[ed] his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006); *see also Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) ("[A] substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." (quotation and alterations omitted)). We have reasoned that when determining whether a prisoner's religious beliefs have been substantially burdened, the relevant question is whether the infringed-upon religious

activity is considered central or important to the prisoner's practice of his religion. *McEachin,* 357 F.3d at 203; *Ford,* 352 F.3d at 593–94. Here, Williams's complaint alleged that the premature sunset meals forced him to either forego his meal or break his fast; he characterized fasting for Ramadan as important to his practice of Islam and stated that eating before sunset was a "grave spiritual sin" that canceled the "validity" of fasting. Consequently, Williams successfully alleged a plausible free exercise claim. *See Ford,* 352 F.3d at 593–94. The district court relied on non-binding case law when it determined that Williams's burden was *de minimis* because only a few of his meals were delivered prematurely; its reasoning is inconsistent with this Court's case law, which cautions against "the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent...." *Id.* at 593.

**\*2**  For the foregoing reasons, the judgment of the district court is hereby **AFFIRMED** as to its dismissal of Williams's RLUIPA claim, **VACATED** as to its dismissal of Williams's § 1983 claim, and **REMANDED** for further proceedings.

**All Citations**

--- Fed.Appx. ----, 2016 WL 2610028 (Mem)

---

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1377615
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Booker WILSON, Plaintiff,

v.

WOODBOURNE CORRECTIONAL
FACILITY; Donald Depolo, Defendants.

No. 9:11–CV–1088 (DNH/ATB).
|
March 21, 2012.

**Attorneys and Law Firms**

Booker Wilson, pro se.

James J. Seaman, Asst. Attorney General for Defendants.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendant Depolo violated plaintiff's First Amendment right to practice his religion and subjected him to excessive force in violation of the Eighth Amendment. (Compl.; Dkt. No. 1). Plaintiff claims that defendant Depolo engaged in this conduct because he does not like Muslims. Plaintiff seeks compensation for pain and suffering. (Compl.¶ 8).

Presently before the court is defendant Depolo's [1] motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 14). Plaintiff has responded in opposition to the motion. (Dkt. No. 17). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint in its entirety with prejudice.

**DISCUSSION**

**I. *Facts***

In the complaint, plaintiff alleged that defendant Corrections Officer Depolo "misuse[d] his power" when he withheld plaintiff's Ramadan meal for one and one half hours. Plaintiff states that he had been fasting due to the Ramadan Holiday, and the meal that would have broken the fast was delayed from 8:17 p.m. until 9:45 p.m. (Compl.¶ 6). In his response to defendant's motion to dismiss, plaintiff states that this incident occurred on August 2, 2011. [2]

Plaintiff also claims in the complaint that defendant Depolo threw away all plaintiff's "good stuff," including a pair of "medical boots" that were purchased for plaintiff by the State after an operation on plaintiff's feet. [3] Plaintiff alleges that defendant Depolo put handcuffs on plaintiff too tightly when taking him to shower and to recreation. (*Id.*) Plaintiff claims that defendant always gave him "hate looks," made a "gun sign" with his hands, and called plaintiff a "terrorist" because he is Muslim. Plaintiff states that the 23 days he spent in the "Box" was "hell," and that he did not enjoy his Ramadan at all because of defendant's conduct. (*Id.*)

After the complaint was filed, plaintiff sent a letter to the court stating that Woodbourne Correctional Facility ("Woodbourne") returned his property on September 29, 2011. (Dkt. No. 4). Plaintiff states that he did get his medical boots back, but some of his unspecified "stuff" was "still missing." (*Id.*) Plaintiff's response to defendant's motion is unclear. Part of the document is typewritten, and part of the document is written in plaintiff's handwriting, but many of the facts in the typewritten portion are duplicative of the handwritten facts. [4] In the response, plaintiff clarifies that the date defendant allegedly delayed plaintiff's Ramadan meal was August 2, 2011, and the date that plaintiff was denied his medical boots appears to have been August 26, 2011. [5] (Dkt, No. 17 at 3, 4). [6] Plaintiff states that defendant Depolo abused his authority, violated the " 'officer & employee manual and (74 of the public health law.) Unlawful exaction of Domination)." (Dkt. No. 17 at 1).

**II. *Motion to Dismiss***

**\*2** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair

notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp., 550 U.S. at 555* (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

## III. *Religion*

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, but is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04–CV–57, 2007 WL 3046703, at \*4, 2007 U.S. Dist. LEXIS 77239 (N.D.N.Y. Oct. 17, 2007). The Free Exercise Clause extends "beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

\*3 The withholding of a single meal, however, is at most, a *de minimis* burden on plaintiff's religious expression. *See, e.g., Evans v. Albany Cty. Corr. Fac.,* No. 05–CV1400, 2009 WL 1401645, at \*8 (N.D.N.Y. May 14, 2009) (receipt of "wrong meals" approximately 18 out of 354 times is *de minimis* and not actionable under First Amendment); *Ward v. Goord,* No. 9:06–CV–1429, 2009 WL 102928, at \*9 (N.D.N.Y. Jan. 13, 2009) ("The failure to provide a single meal is insufficient to allege a constitutional violation."); *Odom v. Dixion,* No. 04–CV–0889, 2008 WL 466255, at \*11 (W.D.N.Y. Feb. 15, 2008) (failure to provide inmate kosher meals on 7 out of 33 occasions not sufficient under First Amendment or RLUIPA [7] ); *Thomas v. Picio,* No. 04–CV–3174, 2008 WL 820740, at \*6 & n. 8 (S.D.N.Y. Mar. 26, 2008) (assuming inmate plaintiff was denied three or four Kosher meals for one or two consecutive days, "such a denial is not a substantial burden" on her free exercise of religion). *See also Norwood v. Strada,* 249 F. App'x 269, 272 & n. 1 (3d Cir.2007) (denial of religiously certified "halal" meals on seven out of seven occasions, during prison's two-and-one half-day emergency lock-down, was "a mere de minimis intrusion" that failed to substantially burden the inmate's religious beliefs). *Cf. Ford v. McGinnis,* 352 F.3d 582, 594 n. 12 (2d Cir.2003) (whether an inmate's religious beliefs were burdened by a prisonss refusal to serve a meal for the Eid ul Fitr feast was a question of fact, but noting that the "feast is sufficiently unique in its importance within Islam to distinguish the present case from those in which the mere inability to provide a small number of meals commensurate with a prisonerss religious dietary restrictions was found to be a *de minimis* burden").

In this case, plaintiff claims that defendant Depolo does not like Muslims, and as a result, *one* [8] of plaintiff's Ramadan meals was *delayed* for approximately one and one half hours. Plaintiff claims that he was scheduled to break his fast by eating at 8:17 p.m., but did not eat until 9:45 p.m. This delay is a *de minimis* burden on plaintiff, and he states no constitutional or statutory violation as a result. Thus, plaintiff's First Amendment Freedom of Religion claim may be dismissed.

## IV. *Tight Handcuffs*

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes

the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v.. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

**\*4** In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitley v. Albers,* 475 U.S. at 327 (citation omitted); *Hudson,* 503 U.S. at 9. However, "the malicious use of force to cause harm constitute [s][an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

Plaintiff alleges that defendant Depolo placed handcuffs on plaintiff too tightly when escorting plaintiff to recreation or to the shower. The court need not reach the subjective element of the standard for excessive force. Plaintiff's allegation, without more, that defendant Depolo put handcuffs on too tightly is clearly *de minimis,* and is certainly not "repugnant to the conscience of mankind." Although overly tight handcuffing may constitute excessive force,[9] in order to

rise to the constitutional level, it must cause some injury beyond temporary discomfort. *See Schy v.. Vermont,* 2 F. App 'x 101, 101–102 (2d Cir.2001) (painful handcuffing for two hours does not violate the Constitution); *Lynch ex rel. Lynch v. City of Mt. Vernon,* 567 F.Supp.2d 459, 468 (S.D.N.Y.2008) (citing cases); *Wang v. Vahldieck,* No. 09–CV–3783, 2012 WL 92423, at \*7 (E.D.N.Y. Jan. 9, 2012) (dismissing excessive force claim where there was no physical injury associated with the tight handcuffs); *Cunningham v. McCluskey,* No. 05 Civ. 10169, 2011 WL 2791336, at \*7 (S.D.N.Y. June 22, 2011) (tight handcuffing was not excessive force where plaintiff suffered no physical injury as a result). Plaintiff in this case does not allege any injury that occurred as a result of these "real tight" handcuffs. (Compl.¶ 6). These allegations do not even approach stating a claim for excessive force, and any such claim may be dismissed.

### V. *Verbal Harassment*

**\*5** Verbal abuse and harassment, whether threatening, vulgar, or racial in nature, does not, by itself, rise to the level of a constitutional violation. *See, e.g., Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996). In this case, plaintiff alleges that defendant gave him "hate looks" and made a "gun sign." According to plaintiff, he looks like Osama Bin Laden, but he has never had any trouble until being incarcerated at Woodbourne. Even if the defendant did give plaintiff "hate looks" or made a threatening "gun sign," plaintiff alleges no injury as a result, and that form of harassment does not state a constitutional claim. Plaintiff's allegations of verbal harassment may be dismissed.

### VI. Property

The deprivation of property, whether intentional or unintentional is not actionable under section 1983 as long as the state provides an adequate post-deprivation procedure. *Hudson v. Palmer,* 468 U .S. 517, 533 (1984). New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates. *See Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Love v. Coughlin,* 714 F.2d 207, 209 (2d Cir.1983); *see also* N.Y. Ct. Cl. Act § 10(6) (McKinney 1998).

Plaintiff claimed that defendant Depolo "threw away" plaintiff's good stuff, including his medical boots. [10] However, in a letter dated October 3, 2011, plaintiff stated that his property (including the medical boots) was returned

to him, although some was still missing. (Dkt. No. 4). Clearly, based on plaintiff's own letter, defendant Depolo did not "throw away" plaintiff's medical boots, and plaintiff has not articulated what "stuff" was still missing from his property. However, even if some of plaintiff's property were not returned to him, he would have an adequate post-deprivation remedy in the Court of Claims, and any remaining property claims may be dismissed.

## VII. State Law Violations

A violation of state law, even assuming that one existed, does not necessarily rise to the level of a constitutional violation. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred).

In plaintiff's response to defendant's motion to dismiss, he alleges that the defendant violated the "officer and employee manual" and section 74 of the Public Health Law. (Dkt. No. 17 at 1). It is unclear to which "manual" plaintiff is referring, and there is no section 74 of the New York Public Health Law. Even assuming that the court could decipher plaintiff's allegation, at best, he is claiming that the defendant violated state law without any further explanation. This claim may also be dismissed for failure to state a constitutional claim.

## VIII. Opportunity to Amend

 **\*6** The court should not dismiss a *pro se* action without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim may be asserted. *Parrino v. Sun Gard Availability Services, L.P.,* No. CV 11–3315, 2012 WL 826946, at \*4 (E.D.N.Y. Feb. 16, 2012) (citing *Gomez v. USAA Fed. Sav. Bank,* 171

F.3d 794, 795 (2d Cir.1999)). In this case, even under a liberal reading of the complaint, there is no way that plaintiff could state a claim regarding his medical boots or any of his other property items, because it is clear by plaintiff's own admission, that his boots were returned to him, and defendant Depolo had nothing to do with the deprivation. [11] Plaintiff's claim of verbal harassment also fails to state a claim, and there is no way a claim could be stated based on the facts that plaintiff alleges. Plaintiff's claim that a religious meal was delayed for one and one half hours may not be the basis for a constitutional claim, regardless of amendment. Plaintiff has not stated any injury as the result of his "real tight" handcuffs, and his claim that defendant violated state law will not rise to the level of a constitutional violation. Thus, this court will recommend dismissal without giving plaintiff the opportunity to amend his complaint.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant's motion to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(6) (Dkt. No. 14) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1377615

## Footnotes

1   Defendant Depolo is the only remaining defendant. The complaint was dismissed as against Woodbourne Correctional Facility by Judge Hurd's Order, dated November 15, 2011. (Dkt. No. 5).

2   Defendant pointed out in his memorandum of law that the complaint did not specify a particular date for the alleged conduct. (Dkt. No. 14–1 at 3; CM/ECFassigned pages).

3   In plaintiff's response to the motion to dismiss, he alleges that on August 26, 2011, when plaintiff was being moved to another housing area, defendant Depolo forced plaintiff to wear boots that were not his. (Dkt. No. 17 at 4). In his response, plaintiff further states that when he asked about his medical boots, defendant Depolo stated that he did not "know where they were." (*Id.*) From this statement, plaintiff assumed that defendant Depolo threw away plaintiff's boots "to be evil." (*Id.* at 5).

4    The court notes that in the typewritten portion of the plaintiff's response, he mentions that when he was arguing with defendant Depolo about the medical boots, the defendant stated that "he didn't care about all of that this is punishment from Ramadan and snitching on him to the Sgt. which is really his buddy." (Dkt. No. 17 at 2). This is the first, and only time, that plaintiff mentions anything that approaches a claim of retaliation for "snitching." There is absolutely no basis for this claim, and neither the complaint, nor any of plaintiff's handwritten documents mention this. Such a conclusory allegation of "retaliation," to the extent that plaintiff would have wished to add it to his complaint would be dismissed on the pleadings. *Gill v. Pidlypchak,* 389 F.3d 378, 380 (2d Cir.2004) (citation omitted). Claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, Swierkiewicz v. Sorema, N.A., 534 U.S. 506 (2002)). Additionally, any claim of retaliation is further weakened by the fact that plaintiff's boots were returned to him three days later on September 29, 2011. (Dkt. No. 4).

5    Plaintiff alleges that defendant Depolo made plaintiff wear other boots. (Dkt. No. 17 at 5).

6    The court will refer to the pages of documents as assigned by the court's electronic filing system CM/ECF.

7    The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects inmates' religious rights. RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000cc-l(a). For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith. In addition, this interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at * 14 (S.D.N .Y. Apr. 22, 2008). In this case, plaintiff never mentions RLUIPA, but to the extent that the court could interpret such a claim, it would also be subject to dismissal. Delaying plaintiff's meal for one and one half hours is, at worst, an inconvenience, not a substantial burden.

8    Although the typewritten portion of plaintiff's response states that he was "denied" his meal on "two different occasions" (Dkt. No. 17 at 1—typewritten portion of plaintiff's response), there is no indication from plaintiff's complaint or any other handwritten document that plaintiff was "denied" any meals. It is clear that the Ramadan meal was merely delayed (Dkt. No. 1 at ¶ 6; Dkt. No. 17 at 3—handwritten portion of plaintiff's response), and there is no indication when, if ever, another meal was denied. In any event, even assuming that one meal was delayed and another was denied, the deprivation does not rise to the level of a constitutional violation.

9    Courts have considered the following factors in making the determination of whether a "tight handcuff" claim rises to the level of excessive force. *See Ahmad v. Port Authority of New York and New Jersey,* No. 09–CV–3134, 2011 WL 7080691, at *7 (E.D.N.Y. Dec. 7, 2011). Courts consider whether the handcuffs were unreasonably tight; the defendants ignored the individual's pleas regarding the tightness of the cuffs, and the degree of injury to the wrist. *Id.* (citations omitted). Plaintiff in this case never claims that he requested defendant to loosen the cuffs, and there is no injury asserted.

10    Plaintiff also refers to this claim as "medical negligence" although he does not allege that he suffered any harm as a result of wearing different boots. Because plaintiff's boots were returned to him, and it does not appear as though defendant Depolo was even involved in the deprivation, the court will not address the issue of medical care.

11    The court also notes that plaintiff's response to the defendant's motion to dismiss, dated March 1, 2012 contains some misleading statements. Plaintiff continued to state that defendant threw plaintiff's boots away and adds that he did this to "be evil." (Dkt. No. 17 at 5). However, plaintiff's letter, dated October 3, 2011 states that Woodbourne returned his property to him, including his medical boots. Thus, it is unclear why plaintiff would still be claiming on March 1, 2012 that defendant threw away plaintiff's boots to be "evil" when plaintiff was well aware by that time, that defendant did not throw away plaintiff's property.

End of Document               © 2016 Thomson Reuters. No claim to original U.S. Government Works.