ITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SHABAKA SHAKUR,

                              Plaintiff,

                                                          9:14-CV-00427
v.
                                                          (MAD/TWD)
JUSTIN THOMAS, et al.,
                              Defendants.
_____

APPEARANCES:                              OF COUNSEL:

SHABAKA SHAKUR
Plaintiff pro se
190-19 118 Avenue
St. Albans, New York 11312

HON. BARBARA D. UNDERWOOD               NICOLE E. HAIMSON, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

## I.    INTRODUCTION

On April 16, 2014, *pro se* Plaintiff Shabaka Shakur commenced this civil rights action

under 42 U.S.C. § 1983 asserting claims for violation of his rights under the First, Eighth, and

Fourteenth Amendments to the Constitution and the Religious Land Use and Institutionalized

Person Act ("RLUIPA"), arising out of his incarceration at Auburn Correctional Facility

("Auburn").[1]  (Dkt. No. 1.)

On September 9, 2016, the Hon. Mae A. D'Agostino, U.S. District Judge, granted in part and denied in part Defendants' motion to dismiss Plaintiff's amended complaint for failure to state a claim brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt. Nos. 41, 47.)  Defendants' motion was denied as to Plaintiff's claims against Defendants: (1) Auburn Deputy Superintendent of Programs Justin Thomas ("Thomas"), Auburn Food Service Administrator Donna Martin ("Martin"), and Corrections Officer ("C.O.") John Pelc ("Pelc") for violation of Plaintiff's rights under the First Amendment Free Exercise Clause in denying him an Eid ul-Adha religious meal on October 27, 2012 (First Cause of Action); (2) Thomas for violation of Plaintiff's rights under the First Amendment Free Exercise Clause in refusing to provide him with halal meals and sahoor bags from July 29, 2013, through August 3, 2013, thereby preventing him from participating in the mandatory religious fasting during Ramadan (Second Cause of Action); (3) Auburn C.O. Ralph Hewite ("Hewite") and Auburn C.O. Gary Steinberg ("Steinberg") for violation of Plaintiff's rights under the First Amendment Free Exercise Clause in preventing him from participating in the congregate prayer during Shawwal and denying him a halal meal on August 12, 2013 (Third Cause of Action); (4) C.O. Steinberg for filing a misbehavior report against Plaintiff in retaliation for filing grievances in violation of his rights under the First Amendment (Fourth Cause of Action); (5) Auburn C.O. Andrej Gifford ("Gifford") for planting a weapon in Plaintiff's cell and filing a false misbehavior report based

---

[1]  Plaintiff was released from the custody of the New York Department of Corrections and Community Supervision ("DOCCS") in June of 2015 upon the vacation of his double homicide conviction and grant of a new trial, followed by the dismissal of the charges for which he had been incarcerated for twenty-seven years at the request of the Brooklyn District Attorney.  (Dkt. No. 58-7 at 15.)  *See Shakur v. State of New York*, 47 N.Y.S.3d 214 (N.Y. Ct. Claims 2016); www.nytimes.com/2015/06/09/myregion/released-after-27-years-an-ex-inmate-is-mindful-of-a-detectives-cases.html (last visited May 24, 2018).

upon the weapon in retaliation for Plaintiff serving as the inmate facilitator for the Shia Muslim community at Auburn, in violation of Plaintiff's rights under the First Amendment  (Fourth Cause of Action); (6) Chuttey for First Amendment retaliation with respect to instructing Gifford to write the false misbehavior report against Plaintiff (Fourth Cause of Action); and (7) Auburn Captain Fagan ("Fagan") for First Amendment retaliation with respect to placing Plaintiff in administrative segregation for having filed a grievance complaining of the refusal to provide halal meals and sahoor bags during Ramadan (Fourth Cause of Action).  (Dkt. No. 47.)

Defendants Thomas, Martin, Pelc, Hewite, Steinberg, Gifford, Chuttey, and Fagan have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the surviving claims.  (Dkt. No. 58.)  Plaintiff has responded in opposition to the motion, and Defendants have filed a reply.  (Dkt. Nos. 61, 64.)  For reasons explained below, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

## II.    FACTUAL BACKGROUND

### A.    September 17, 2012, Cell Search, Alleged Weapon Plant, and Misbehavior Report

In 2012, Defendant Chuttey was Security Captain at Auburn, and as Security Captain, was responsible for the care, custody, and control of the inmate population, oversight of C.O.s, Lieutenants, and Sergeants, and ensuring the overall safety and security of the facility.  (Dkt. Nos. 58-1 at ¶¶ 2-3; 61 at ¶¶ 2-3.[2])  In September 2012, Plaintiff learned from inmate Rashad Ruhini ("Ruhini") that he and Plaintiff were the subject of an investigation ordered by Chuttey

_____

[2] Paragraph numbers are used where documents identified by CM/ECF docket number contain consecutively numbered paragraphs.

based on confidential information that parts of the inmate population were planning a riot.  (Dkt. Nos. 39 at ¶¶ 20, 22-23; 58-7 at 134[3]; 58-24 at ¶ 6.)   At the time, Plaintiff was the inmate facilitator for the Shia Muslin community at Auburn, and Ruhani was the inmate facilitator for the Sunni Muslim community.  (Dkt. No. 39 at ¶ 21.)

Chuttey delegated the matter to the Watch Commander with instructions for him to delegate any investigation deemed necessary, including having a C.O. interview inmates and staff, search cells, and frisk inmates.  (Dkt. No. 58-24 at ¶¶ 7-9.)  Chuttey directed a Lieutenant to order security staff to search the cells of several inmates, including Plaintiff.  (Dkt. No. 58-24 at ¶ 11.)

On September 17, 2012, a Sergeant ordered Defendant Gifford to search Plaintiff's cell, specifically instructing him to look for dangerous contraband.  (Dkt. No. 58-25 at ¶¶ 5, 7.) Gifford claims to have recovered a sharp metal weapon under the desk in Plaintiff's cell during his search.  *Id*. at ¶ 9.  Plaintiff claims that the weapon was planted by Gifford, and Gifford denies doing so.  (Dkt. Nos. 39 at 28; 58-7 at 127-29; 58-25 at ¶ 11.)  Ruhani's cell was searched the same day and a weapon was also found.  (Dkt. No. 58-7 at 130.)  Plaintiff claims to have been told by the Muslim Chaplain, Ali Muhsen, that Muhsen believed Plaintiff was being targeted because of his position as inmate facilitator.  (Dkt. No. 39 at ¶ 31.)  Plaintiff believes Chuttey thought that because of the rumors of a riot, which never occurred, Plaintiff's position in the Muslim community necessitated his removal from general population.  (Dkt. No. 58-7 at 144, 151.)

---

[3] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

Gifford wrote an inmate misbehavior report on Plaintiff for possessing a weapon.  (Dkt. Nos. 58-25 at ¶ 15; 58-26 at 1.)  Gifford claims never to have spoken with Chuttey about the weapon or the misbehavior report.  *Id*. at ¶ 16.  Plaintiff was found guilty of weapons possession at his disciplinary hearing and given ninety days in the Special Housing Unit ("SHU"), with a corresponding loss of privileges.  (Dkt. No. 39  at ¶ 33.)  The Superintendent reversed and expunged the guilty finding after Plaintiff had been released from SHU.  (Dkt. Nos. 1-1 at 52; 58-7 at 125, 154.)

## B.    Failure to Give Plaintiff a Religious Meal for Eid ul-Adha on October 27, 2012

Eid ul-Adha ("Eid") was observed on October 27, 2012.  (Dkt. Nos. 58-1 at ¶ 29; 61 at ¶ 29.)  According to Plaintiff, when he awoke on October 27, 2012, he told Defendant Pelc, who was assigned to SHU where Plaintiff was being confined, that it was the day of the Eid and Plaintiff was supposed to receive a special Eid meal.  (Dkt. Nos. 58-1 at ¶ 28; 58-7 at 23; 61 at ¶ 28.)  Plaintiff testified at his deposition that Pelc told him if he was supposed to receive an Eid meal and the kitchen sent it, Pelc would give it to him, and if not, Plaintiff would not receive it.  (Dkt.  No. 58-7 at 23.)  Plaintiff asked Pelc to call the kitchen to ensure the meal would be sent, and Pelc declined to do so.  *Id.* 23-24.

On religious holidays for which inmates require a special diet, the Auburn Chaplains provide Defendant Martin's office with a callout sheet containing the names of those inmates participating in the holiday.  (Dkt. Nos. 58-1 at ¶ 30; 61 at ¶ 30.)  On October 27, 2012, Martin was given a callout sheet for Eid that had been prepared by Chaplain Muhsen and the kitchen staff prepared the Eid meals for those on the list.  (Dkt. No. 58-10 at ¶¶ 11, 12 and pp. 1-3, 8.)

5

Plaintiff's name was on the Eid callout sheet and an Eid meal was prepared for him. (Dkt. Nos. 58-1 at ¶ 43; 58-11 at 8; 61 at ¶ 43.) Inmates housed in SHU receive the Eid meals in their cells so Plaintiff's meal should have been brought to his cell. (Dkt. Nos. 58-1 at ¶¶ 37, 44; 61 at ¶¶ 37, 44.)

The Eid meals prepared for SHU are placed in an insulated box and delivered by kitchen staff to the first floor of the building housing SHU. (Dkt. Nos. 58-1 at ¶ 38; 61 at ¶ 38.) An officer collects the boxes and puts them in the elevator for delivery to SHU, and the officer on duty in SHU compares the number of meals with the names on the callout sheet before distributing the meals to those on the callout sheet. (Dkt. Nos. 58-1 at ¶¶ 39-41; 58-13 at ¶ 12; 61 at ¶¶39-40.) If there are not enough meals to feed every one on the callout sheet, the C.O. will call the kitchen and request additional meals. (Dkt. No. 58-13 at ¶ 13.) According to Pelc, there were several occasions during the time he was assigned to SHU at Auburn where an inmate who wanted to participate in a religious holiday did not receive a special holiday meal, and Pelc would have taken steps to assist the inmate in receiving a holiday meal. *Id*. at ¶¶ 14-15.

Plaintiff claims that when he asked Pelc for his Eid meal at the time of the distribution of his noon meal, Pelc responded that the mess hall had not sent any Eid meals. (Dkt. No. 39 at ¶ 41.) Pelc did not call the mess hall or take any other steps to procure Plaintiff's meal. *Id*. at ¶ 42. At his deposition, Plaintiff testified that none of the SHU inmates received an Eid meal, and that Pelc had told him SHU never received any Eid meals. (Dkt. No. 58-7 at 27, 44.) Pelc states in his declaration that he does not recall Plaintiff and does not remember any specific tasks he performed on October 27, 2012. (Dkt. No. 58-13 at ¶ 17.) He does not recall Plaintiff or any SHU inmates complaining about not receiving an Eid meal on October 27, 2012. *Id*. at ¶¶ at 21-

6

22.  However, Pelc believes that if Plaintiff had informed him he had not received his Eid meal, he would have called the kitchen as was his practice.  *Id.* at ¶ 23.

Plaintiff spoke to SHU Sergeant Manna ("Manna") when he was doing his rounds in SHU on October 27, 2012, and told Manna he had not received his Eid meal.  (Dkt. Nos. 39 at ¶ 43.)  Manna conducted an investigation and returned to inform Plaintiff that none of the SHU inmates had received their Eid meal, and that since the event was over, it was too late to obtain the meals.  (Dkt. No. 58-7 at 45-46.)

Defendant Martin did not receive notice that Plaintiff had not been given his Eid meal until receiving a letter from him on October 29, 2012.  (Dkt. Nos. 39-1 at 5; 58-10 at ¶¶ 19, 22.)  To Martin's knowledge, all of the Eid meals designated for SHU inmates had been delivered by kitchen staff to the elevator and properly distributed to the SHU inmates.  (Dkt. No. 58-10 at ¶ 18.)  Martin explained to Plaintiff that Muslim kitchen staff had confirmed the meals were prepared and delivered to the elevator to be brought to SHU.  *Id*. at ¶ 20; Dkt. No. 39-1 at 7.  According to Martin, if Plaintiff had notified her he had not received his SHU meal, she would have directed kitchen staff to try to prepare an additional meal for Plaintiff and send it to him.  (Dkt. No. 58-10 at ¶ 21.)  Martin does not recall receiving complaints about not receiving an Eid meal on October 27, 2012, from any other SHU inmates.  *Id*. at ¶ 23.

In his declaration, Defendant Thomas states that he was never involved in the preparation or distribution of meals at Auburn and did not learn Plaintiff had not received his Eid meal on October 27, 2012, until Plaintiff's grievance was forwarded to him some six weeks later.  (Dkt. No. 58-4 at ¶¶ 11, 16, 18.)  According to Thomas, had he been made aware of the missing meal before the conclusion of the Eid holiday, he could have remedied any mistakes and made sure

Plaintiff had his Eid meal.  *Id*. at ¶ 17.

In the November 2, 2012, grievance Plaintiff filed complaining about his Eid meal, he asked that a policy be established to ensure that religious meals were sent and received by religious adherents in SHU.  (Dkt. No. 61-2 at 3.)  Plaintiff's grievance was forwarded to the Superintendent by the Inmate Grievance Resolution Committee ("IGRC").  (Dkt. No. 39-1 at 18.)  The grievance decision by Thomas, as Acting Superintendent, granted the grievance to the extent of indicating that "[f]ood service staff has been reminded to closely monitor special diet delivery locations."  *Id*. at 20.

Plaintiff thereafter sent Thomas a request that a signing sheet be sent to SHU with the meals and returned to the food supervisor to prevent a recurrence of October 27, 2012, incident.  *Id*. at 22.  In its decision on appeal, CORC wrote:

> CORC notes that the holiday meals for the Eidul Adha (sic) religious observance were transported to SHU, and that there were no other complaints received on 10/27/12 alleging that they were missing.  CORC asserts that there is no requirement or department policy for inmates to sign confirming receipt of their religious holiday meal, and finds no compelling reason to revise current procedures.  CORC has not been presented with sufficient evidence to substantiate malfeasance by staff.

(Dkt. No. 39-1 at 26.)  Plaintiff testified at his deposition that he was unaware of any occasion other than on October 27, 2012, in the eleven years he was at Auburn where holiday religious meals were not ordered or not delivered.  (Dkt. No. 58-7 at 55.)

### C.    Denial of Ramadan Meals During Facility Lockdown in 2013

In 2013, the holy month of Ramadan began on the evening of Monday, July 8, 2013, and lasted through the evening of August 7, 2013.  (Dkt. Nos. 58-1 at ¶ 66; 61 at ¶ 66.)  Muslims fast

from dawn to sunset during Ramadan.  (Dkt. Nos. 58-1 at ¶ 67; 61 at ¶ 67.)  Muslims eat a light pre-dawn meal called sahoor prior to beginning the fast each day, and at night they congregate for prayer and a hot halal meal to break fast.  (Dkt. Nos. 58-1 at ¶¶ 70-71 61 at ¶¶ 68-69.)  In the evening during Ramadan, Muslim inmates at Auburn are provided a sahoor bag containing food such as cereal or oatmeal, eggs or cheese, wheat bread, dates, milk, fresh fruit, peanut butter, jelly, and sugar packets for their pre-dawn meal.  (Dkt. Nos. 58-1 at ¶¶ 68-69; 61 at ¶¶ 68-69.)  The Muslim inmates at Auburn generally prepare their own evening meal that may consist of a salad, meat (fish or chicken), potatoes, vegetable, bread, juice, and dessert to break fast.  (Dkt. Nos. 58-1 at ¶ 72; 61 at ¶ 72.)

Plaintiff and other Muslim inmates were able to fully participate in Ramadan at Auburn from the beginning on July 8, 2013, through the evening of July 29, 2013, and again from August 3, 2013, through the conclusion of Ramadan.  (Dkt. Nos. 58-1 at ¶ 73; 61 at ¶ 73.)  During that time were provided with hot halal meals to break their fast and sahoor bags for their pre-dawn meal, and they were able to congregate to pray.  *Id*.  On July 29, 2013, Auburn Superintendent Graham instructed Defendant Thomas that Auburn was being locked down, which according to Plaintiff, was the first time there had been a lockdown during Ramadan in his twenty-seven and a half years in prison.  (Dkt. Nos. 58-4 at ¶ 29, 58-7 at 61.)  The lockdown was based on a number of factors, including an increase in incidents at the facility during the period from June 22, 2013, through July 29, 2013.  *Id*.

During a facility lockdown, all inmate movement is ceased to ensure that the facility can be properly and thoroughly searched without the distraction of normal operation, in order to eradicate the ability of inmates to move or eliminate contraband they have concealed in facility

areas or living quarters, and also to make security staff available to conduct the facility wide frisk.  *Id*. at ¶ 26.  Ceasing inmate movement results in no programs being run, no religious ceremonies or congregate prayers being held, and inmates staying confined to their cells for all meals.  *Id*. at ¶ 27.  Therefore, beginning with the evening meal on July 29, 2013, and ending with the evening meal on August 2, 2013, while Muslim inmates could pray in their cells, they were not permitted to congregate to break fast and were not given sahoor bags for their pre-dawn meal or hot halal meals to break fast.  (Dkt. Nos. 58-1 at ¶¶ 85, 92; 58-4 at ¶ 33; 61 at ¶¶ 85, 92.)

According to Defendant Thomas, it would have been impossible during the lockdown to deliver a hot meal to every inmate in his cell because, under normal circumstances, the majority of inmates received their hot meal in the mess hall.  (Dkt. No. 58-4 at ¶ 36.)  Martin was instructed to discontinue preparation of the general population meal menu and Ramadan meal menu and prepare standard bagged meals for the entire population.  (Dkt. No. 58-10 at ¶ 27.)

Plaintiff claims that the Muslim inmates spoke to Chaplain Muhsen about being denied proper Ramadan meals, and Muhsen indicated he had spoken with Thomas about providing the meals and Thomas had refused, and that the inmates could write grievances.  (Dkt. No. 39 at ¶ 71.)  In his declaration, Chaplin Muhsen states that he has no specific recollection of the lockdown during Ramadan in 2013.  (Dkt. No. 58-14 at ¶ 12.)  According to Chaplain Muhsen, although the Muslim inmates were not provided with sahoor bags, they could have saved one of their three bagged meals to eat as their pre-dawn sahoor meal and two of them to break fast as the food items in the bagged meals, including items such as cereal, non-pork meat, cheese, fruit, bread, and juice, constituted an acceptable pre-dawn meal or meal to break the fast.  *Id*. at ¶¶ 18-20; *see also* Dkt. Nos. 58-1 at ¶ 95; 61 at ¶ 95; 64-1 at ¶¶ 15-16.

10

Plaintiff testified at his deposition, however, that Muslim inmates were given cereal and milk in the morning too late for the pre-dawn meal, and there was no way to keep the milk cold, so when he was allowed to eat, all he had was a little cereal and the cookies or whatever had come with the cereal.  (Dkt. No. 58-7 at 73.)  Plaintiff also testified that the bagged meals contained bologna and cheese sandwiches which he could not eat because it was not halal compliant.  *Id*. at 75.  Plaintiff believed that because the bologna would contaminate the cheese and bread, he could not take it off and eat the rest of the sandwich, and that whether a Muslim inmate would take off the bologna and eat the cheese and bread depended upon the level of his religious commitment.  *Id.* at 75-76, 79.  According to Plaintiff, he only ate the vegetarian food given to them, and when they gave them vegetarian pizza for the evening meal at three or four o'clock he would save it to break fast.  *Id*. at 77.  If it was meat, like a bologna and cheese sandwich, he did not eat it.  *Id*. at 78.

Plaintiff and more than sixty other inmates filed grievances complaining of the denial of Ramadan meals from July 29, 2013, through August 3, 2013.  (Dkt. No. 58-20 at ¶ 18.)

**D.**   **Denial of Congregate Prayer and Holiday Meal on Shawwal in 2013 and Retaliation by Steinberg**

On August 12, 2013, Plaintiff began the six day fast of the Muslim holiday Shawwal. (Dkt. No. 39 at ¶ 76.)  Plaintiff testified at his deposition that Shawwal is an extension of Ramadan and those who are really committed to the faith continue the practices of Ramadan though the extra days of Shawwal to increase their spiritual awareness.  (Dkt. No. 58-7 at 98-99.) A Shawwal prayer can be made in private, but when you make a congregate prayer you receive more blessings because of the unity of the Muslim brotherhood.  *Id*. at 99.

11

While Plaintiff was at the mosque for congregate prayer, he was summoned to the officer's desk around 8:00pm and was taken by an escort officer to the first aid clinic for a urinalysis.  (Dkt. Nos. 39 at ¶ 76; 58-7 at 98-99.)  Plaintiff was not allowed to make his congregate prayer, which would ordinarily take around ten minutes, because the sun had not yet set.  (Dkt. No. 58-7 at 99.)  Because the sun had not set, Plaintiff had not yet been able to break fast.  *Id*.  Nor was he, as was generally done during Shawwal, able to go to the mess hall for a halal meal to break fast after the congregate prayer.  *Id*.

According to Defendants, the administration had received confidential information that day that put Plaintiff under suspicion of using drugs or alcohol and resulted in Sergeant Rogofsky ordering Plaintiff to submit a urine specimen for urinalysis.  (Dkt. No. 58-15 at ¶¶ 11-12.)  Defendant Hewite, who was assigned to the first aid clinic at Auburn, was not involved in ordering the urinalysis or in removing Plaintiff from prayer to obtain the specimen.  (Dkt. Nos. 58-1 at ¶ 112; 61 at ¶ 112.)  Hewite and Steinberg's responsibility was merely to collect Plaintiff's urine sample and store it for testing.  (Dkt. Nos. 58-1 at ¶¶ 113-14; 61 at ¶¶ 113-14.)  Hewite informed Plaintiff that the urinalysis was being done based on confidential information.  (Dkt. No. 39 at ¶ 77.)  When Plaintiff arrived at the clinic, he told Hewite it was still daylight and he was fasting for Shawwal and would drink water and do a urinalysis when the sun went down.  (Dkt. Nos. 58-7 at 89; 58-15 at ¶¶ 20, 24.)

Because per DOCCS Directive # 4937, inmates participating in an approved religious fast should not be required to provide a urine specimen during fasting periods since consumption of water might be necessary, Plaintiff was not given water until after sunset.  (Dkt. Nos. 58-15 at ¶¶ 23-24; 58-17 at 2.)  Plaintiff was unable to urinate at 8:32pm because he had been fasting and

12

was then given a cup of water by Hewite. (Dkt. Nos. 58-7 at 89-90; 58-15 at ¶¶ 20, 27.) Hewite

explained to Plaintiff that he would be given three hours (until 11:32pm) to urinate and would be

given a glass of water every hour. (Dkt. Nos. 58-7 at 90; 58-15 at ¶¶ 19, 22.) Failure to provide

a urine sample within three hours was deemed a refusal under the directive. (Dkt. No. 59-18 at ¶

24.)

       Hewite and Steinberg both state in their declarations that they were present at 8:32pm,

and Steinberg states that he ordered Plaintiff to provide a urine sample at 8:32pm and told him he

would have three hours to submit a urine sample and would be given one glass of water per hour.

(Dkt. Nos. 58-15 at ¶ 27; 58-18 at ¶¶ 15, 20.) Hewite claims to have given Plaintiff a second

glass of water at 9:32pm and a third at 10:32pm, and to have left at around 11:00pm, at which

time Steinberg took over his post. (Dkt. No. 58-15 at ¶¶ 30, 33, 35.) Plaintiff testified, however,

that Hewite left early after giving him the water at 8:32pm.[4] (Dkt. No. 58-7 at 115.)

       Steinberg also claims that Plaintiff was given water at 9:32pm and 10:32pm, and that he

was unable to provide a urine sample at 11:32pm. (Dkt. No. 58-18 at ¶¶ 22.) Plaintiff testified at

his deposition that the only water he received was at 8:32pm, and that Steinberg was assigned to

the yard and was not in the clinic when Plaintiff allegedly had the drinks at 9:32pm and 10:32pm.

(Dkt. No. 58-7 at 91-92.) According to Plaintiff, Steinberg came in at the end to finish up

because Hewitt had left early and asked Plaintiff if he was ready to urinate. *Id*. at 115. Plaintiff

claims to have told Steinberg he had not had his water, with Steinberg responding that Larry was

supposed to have done that. *Id*. Steinberg wrote a misbehavior report on Plaintiff for failure to

---

    [4] Despite his deposition testimony, Plaintiff admitted item 131 in Defendants' statement of material facts
which states "Defendant Hewite left Auburn at approximately 11:00 p.m. and defendant Steinberg took over
Hewite's post." (Dkt. Nos. 58-1 at ¶ 131; 61 at ¶ 131.)

follow a direct order and failure to follow guidelines and instructions regarding urinalysis testing because Plaintiff did not urinate by 11:32pm. (Dkt. Nos. 58-1 at ¶¶ 18, 27-28; 58-19.) Plaintiff was placed on keeplock status and returned to his cell. Id. The hearing officer eventually dismissed the charges against Plaintiff. (Dkt. No. 39 at ¶ 19.)

Plaintiff claims that when he was brought to the clinic for the urinalysis, he asked Hewite to have his halal evening meal sent either to the clinic or his cell. (Dkt. No. 58-7 at 89.) Plaintiff never received his halal evening meal or any other food. (Dkt. No. 58-7 at 91.) Hewite denies being asked by Plaintiff and claims that had Plaintiff asked for a meal to be brought to his cell, Hewite would have called the kitchen to arrange it. (Dkt. No. 58-15 at ¶¶ 37-38.) According to Hewite, Plaintiff could not have eaten in the clinic because it is a sterile environment, and by the time Plaintiff was returned to his cell, the mess hall was closed and no meal could be made for him. *Id*. at ¶¶ 40-41.

Plaintiff filed a grievance complaining that he was not given his halal meal or sahoor bag on August 13, 2013, despite making a request. (Dkt. No. 1-1 at 38.) Superintendent Graham issued a decision on the grievance finding that "[a]rrangements should have been made to have a meal delivered to grievant's Cell once staff realized that he was not going to make it back to the messhall in time." *Id*. at 52.

### E.    Placement in Administrative Segregation

On August 13, 2013, Defendant Fagan issued an Administrative Segregation Recommendation on Plaintiff based upon an investigation he had begun in early August 2013 after receipt of numerous forms of communication identifying Plaintiff as the facilitator of information that would have a negative impact on the operation of the facility. (Dkt. Nos.1-1 at

14

36; 58-28 at ¶¶ 6, 8.)  According to Fagan, the Superintendent's Office had received a note on

August 8, 2013, indicating the Muslim community, including Plaintiff, was planning a riot.  *Id.* at

¶ 7.  Fagan determined, based upon a thorough investigation that Plaintiff's presence in the

general population would have a detrimental effect on the safety and security of the facility and

issued the recommendation.[5]  *Id.* at ¶ 8.  Fagan contends his recommendation was based solely

on his investigation which revealed that Plaintiff was a potential threat to safe operation.  *Id.* at ¶

18.

Plaintiff has denied having anything to do with facilitating information about a work stoppage or

riot and believes he was put in administrative segregation in retaliation for filing a grievance over

being denied sahoor bags and halal meals to break fast for Ramadan during the lockdown.  (Dkt.

No. 58-7 at 156-58.)

## III.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the

---

[5]  Pursuant to the Court's Text Order of June 30, 2017 (Dkt. No. 57), Defendants submitted documents regarding the investigation leading to Plaintiff's placement in administrative segregation for an in camera review by the Court in support of their summary judgment motion. (Dkt. No. 60).  While the Court has reviewed the documents, given the recommendation herein that Fagan be granted summary judgment on exhaustion grounds, the Court has given no consideration to those documents.

nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[6] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*.

---

[6] The Court finds that Plaintiff's amended complaint is properly verified under 28 U.S.C. § 1746. (Dkt. No. 39 at 17.)

(citation and internal quotation marks omitted).  "To defeat summary judgment, . . . nonmoving

parties may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426

F.3d at 554 (citation and internal quotation marks omitted).  "[T]o satisfy Rule 56(e), affidavits

must be based upon 'concrete particulars,' not conclusory allegations.  "*Schwapp v. Town of

Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted).  "Statements that are devoid of any

specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for

summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all

ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball

Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is proceeding *pro

se*, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret

them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790

(2d Cir. 1994).  However, "a pro se party's 'bald assertion,' unsupported by evidence, is not

sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981

(WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[7] (citing *Carey v. Crescenzi*, 923

F.2d 18, 21 (2d Cir. 1991)).

## IV.    PLAINTIFF'S FAILURE TO COMPLY FULLY WITH N.D.N.Y.  L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status

"does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a

motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

---

[7] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3) by neglecting to set forth a specific citation to the record in numerous instances where he "disagreed" with Defendants' individually numbered statements of undisputed facts.[8]  (See Dkt. Nos. 58-1, 61.)

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under N.D.N.Y. L.R. 7.1(a)(3), the facts in the movant's statement to which Plaintiff has not properly responded will be accepted as true (1) to the extent they are supported by evidence in the record,[9] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[10]  *See Champion,v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a

---

[8]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."

[9]  L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1 800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[10]  Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion.  (Dkt. No. 58 at 2.)

statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal

quotation marks omitted).  In deference to Plaintiff's *pro se* status and the significant degree of

effort he has shown in his response to Defendants' material statement of facts (Dkt. No. 61), the

Court has opted to review the entire record.

## V.    FIRST AMENDMENT FREE EXERCISE CLAIMS

### A.    Legal Standard

"Prisoners have long been understood to retain some measure of the constitutional

protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352

F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  The Second

Circuit has held that the Free Exercise clause protects an inmate's right to participate in religious

services, *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993), and "that prison authorities

must accommodate the right of prisoners to receive diets consistent with their religious scruples."

*Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir. 1975).

Those rights, however, are not without limits, and the task of defining the contours

requires striking a balance between the rights of prison inmates and the legitimate interests of

prison officials responsible for maintaining prison security.  *O'Lone v. Estate of Shabazz*, 482

U.S. 342, 348-49 (1987);   *Ford*, 352 F.3d at 588 (prisoner's free exercise rights are "[b]alanced

against . . . the interests of prison officials charged with complex duties arising from

administration of the penal system") (internal quotation marks omitted)).  Accordingly, a prison

inmate's free exercise claims are "judged under a reasonableness test less restrictive than that

ordinarily applied to alleged infringements of constitutional rights." *Id*.

To succeed on a claim under the free exercise clause, the plaintiff must make a threshold

19

showing that the challenged conduct "substantially burdens his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274-75 (citing *Ford*, 352 F.3d at 591).  In determining whether a religious belief is sincere, "an individual . . . need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious."  *Ford*, 352 F.3d at 588. "[A] substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Jolly v. Coughlin*, 76 F.3d 468, 476-77 (2d Cir. 1996).

Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. *See Williams v. Does*, 639 F. App'x 55, 56 (2d Cir. 2016) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs."); *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim).  In the absence of any controlling precedent to the contrary, courts in this District have continued to apply the substantial burden test.  *See, e.g.*, *Wright v. Stallone*, No. 9:17-CV-0487 (LEK/TWD), 2018 WL 671256, at *9 (N.D.N.Y. Jan. 31, 2018) (applying substantial burden test); *Berisha v. Farrell*, No. 9:13-CV-1191 (LEK/ATB), 2016 WL 1295178, at *3 (N.D.N.Y. Mar. 8, 2016) (same); *Skates v. Shusda*, 9:14-CV-1092 (TJM/DEP), 2016 WL 3882530, at *4 & n.6 (N.D.N.Y. May 31, 2016) (same). This Court will do the same.

Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened by a practice of prison officials infringing upon the religious belief,  "[t]he defendants

then bear the relatively limited burden of identifying the legitimate penological interests that

justify the impinging conduct; the burden remains with the prisoner to show that these articulated

concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595)

(punctuation omitted). To make that determination, a court must consider:

> whether the challenged official action has a valid, rational
> connection to a legitimate governmental objective; whether
> prisoners have alternative means of exercising the burdened right;
> the impact on guards, inmates, and prison resources of
> accommodating the right; and the existence of alternative means of
> facilitating exercise of the right that have only a de minimis
> adverse effect on valid penological interests.

*Holland*, 785 F.3d at 222-23 (quoting *Salahudin*, 467 F.3d at 274, citing *Turner v. Safley*, 482

U.S. 78, 89-91 (1987)). The rule requiring a legitimate penological interest is equally applicable

to individual actions of prison personnel as it is to generally applied policies or regulations. *See*

*Salahuddin*, 467 F.3d at 272 n.4 ("An individualized decision to deny a prisoner the ability to

engage in religious exercise is analyzed in the same way as a prison regulation denying such

exercise.")

**B.      Failure to Provide Plaintiff with an Eid Meal on October 27, 2012**

Plaintiff has asserted a First Amendment Free Exercise Clause claim against Defendants

Martin, Thomas, and Pelc arising out of their failure to ensure he was given an Eid meal while he

was in SHU on October 27, 2012. (Dkt. No. 39 at ¶¶ 108-10.) Defendants Martin and Thomas

seek summary judgment on absence of personal involvement and qualified immunity grounds.

(Dkt. No. 58-2 at 7-11.) Pelc seeks summary judgment solely on qualified immunity grounds.

*Id*. at 9-11.

1.    Martin and Thomas

The undisputed record evidence shows that as Food Service Administrator at Auburn, Martin was responsible for supervising the kitchen staff and overseeing the preparation of special religious meals for religious holidays observed by prisoners.  (Dkt. No. 58-10 at ¶ 4.)  The evidence further shows that Martin received a list from Chaplain Muhsen of all inmates, including Plaintiff, who were to participate in Eid and receive holiday meals on October 27, 2012; holiday meals were prepared for all of the inmates on the list by kitchen staff; and the Eid meals for inmates in SHU were placed in an insulated box and delivered by kitchen staff to the first floor of the SHU building where they were to be picked up by an officer for delivery to the SHU inmates in their cells.  *Id.* at ¶¶ 11-15.   Neither Martin nor her staff were involved in distributing meals to the inmate's cells, and to her knowledge all of the meals were delivered by kitchen staff to the elevator and properly distributed in SHU.  *Id.* at ¶ 18.  Plaintiff acknowledged at his deposition that Martin, as food supervisor, watches as the food is prepared and the food is taken to the SHU elevator.  (Dkt. No. 58-7 at 38.)  Plaintiff sent Martin a letter after the fact informing her that he had not received his Eid meal, at which point Martin could not direct kitchen staff to try and prepare a meal for him.  (Dkt. No. 58-10 at ¶¶ 21- 22.)

As to Defendant Thomas, the undisputed record evidence shows that Thomas was never involved in the preparation or distribution of meals at Auburn.  (Dkt. No. 58-4 at ¶ 11.)  Moreover, Thomas did not learn that Plaintiff had not received his Eid meal on October 27, 2012, until Plaintiff's grievance was forwarded to him six weeks later.  *Id.* at ¶¶ at 16, 18.  In his decision on Plaintiff's grievance complaining that he had been deprived of his Eid meal, Thomas

indicated that the food service had been reminded to closely monitor special meal delivery

locations.  (Dkt. No. 39-1 at 22.)

The law is clear that "personal involvement of defendants in the alleged constitutional

deprivations is a prerequisite to an award of damages under § 1983."  *McKinnon v. Patterson*,

568 F.2d 930, 934 (2d Cir. 1977).  "[W]hen monetary damages are sought under § 1983, the

doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility

of the defendant is required."  There is a sufficient showing of personal involvement if:

> (1) the defendant directly participated in the alleged constitutional
> violation, (2) the defendant, after being informed of the violation
> through a report or appeal, failed to remedy the wrong, (3) the
> defendant created a policy or custom under which unconstitutional
> practices occurred, or allowed the continuation of such a policy or
> custom, (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the
> defendant exhibited indifference to the rights of inmates by failing
> to act on information indicating that unconstitutional acts were
> occurring.

*Colon ,*58 F.3d at 873[11]  Accordingly, "supervisory liability may be imposed when an official has

actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or

'deliberate indifference' by failing to act."  *Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d

Cir. 1989) (quoting *McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir. 1983).

The Court finds no evidence in the record showing that either Martin or Thomas

participated directly in the alleged violation of Plaintiff's constitutional rights under the free

exercise clause.  Martin was not personally involved in the delivery to the SHU building of the

---

[11]  The Second Circuit has thus far expressly declined to determine whether *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) eliminated any of the *Colon* bases for supervisory liability.  *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

Eid meals prepared for delivery to the SHU inmates on the list. (Dkt. Nos. 58-1 at ¶¶ 38-41; 61 at ¶¶ 38-41.) Thomas's only personal involvement occurred when Plaintiff's grievance was forwarded to him. (Dkt. No. 58-4 at ¶¶ 11, 16, 18.)

The evidence reveals that by the time Martin and Thomas learned Plaintiff had not received his Eid meal, there was nothing they could do to remedy the wrong. (Dkt. Nos. 39-1 at 5; 58-10 at ¶¶ 18, 21; 58-4 at ¶¶ 11, 16, 18.) Furthermore, there is no evidence that the failure to give Plaintiff his Eid meal resulted from any custom or policy at Auburn, or that Martin or Thomas exhibited deliberate indifference to Plaintiff's right to an Eid meal by failing to act on information indicating that unconstitutional acts were occurring. Plaintiff himself acknowledged in his deposition testimony that he was unaware of any other time during his eleven years at Auburn where holiday meals were not ordered or not delivered. (Dkt. No. 58-7 at 55.) Finally, there is no evidence of gross negligence. Even if an argument could be made that Martin was negligent in failing to check to make sure that the Eid meals left at SHU for the inmates there had been distributed to them, "damages claims based solely on the negligent infringement of a prisoner's right to religious freedom are not actionable under § 1983." *Powell v. City of New York*, No. 14-CV-09937 (PAC) (BCM), 2016 WL 4159897, at *6 (S.D.N.Y. July 14, 2016) (citation and internal quotation marks omitted) (collecting cases).

Based upon the foregoing, the Court finds that none of the *Colon* factors are present, and Martin and Thomas were not personally involved in the failure of Plaintiff to receive his Eid meal on October 27, 2012. Therefore, the Court recommends that Martin and Thomas be granted summary judgment on Plaintiff's First Amendment Free Exercise Clause claim that he was deprived of his Eid meal.

2.    Pelc

According to Plaintiff, Eid ul-Adha is a major religious observance central to the Islamic faith. (Dkt. No. 39 at ¶ 37.)  It is one of only two Eids observed yearly.  *Id*.  Plaintiff reminded Pelc the morning of October 27, 2012, that he would be celebrating Eid with a special Eid meal at lunchtime; Pelc responded that if an Eid meal was delivered for Plaintiff, he would have it, if not he would not; and Pelc then refused Plaintiff's request to call the kitchen to make sure his Eid meal would be delivered.  (Dkt. No. 58-7 at 23-24.)  When Plaintiff asked Pelc for his Eid meal at noon, Pelc responded that no Eid meals had been delivered from the mess hall.  (Dkt. No. 39 at ¶ 41.)  Plaintiff claims that Pelc, who was in charge of feeding the inmates, took no steps to procure Plaintiff's Eid meal.  *Id*. at ¶ 42.  Plaintiff did not receive his meal and subsequently learned from Sergeant Manna that none of the SHU inmates had received their Eid meals.  *Id*. at ¶¶ 43-44.

Pelc concedes in his declaration that he has no recollection of Plaintiff and does not remember any specific tasks he performed on October 27, 2012.  (Dkt. No. 58-13 at ¶ 17.)  Pelc has no recollection of Plaintiff or any other SHU inmates complaining about not receiving their Eid meal on October 27, 2102.  *Id*. at ¶¶ 21-22.  According to Pelc, over the years it had been his practice to call the kitchen staff to obtain a religious holiday meal if an inmate did not receive one and if Plaintiff had informed him he had not received his Eid meal, Pelc would have called kitchen staff as was his practice.  *Id*. at ¶ 23.

Defendants have not submitted evidence challenging the sincerity of Plaintiff's religious beliefs.  The Court finds, in any event, that the record evidence regarding Plaintiff's position as inmate facilitator for the Shia Muslim community at Auburn and his demonstrated strict

observance of Ramadan, Shawwal, Eid, and the Muslim dietary laws satisfies Plaintiff's burden for purposes of this motion of establishing he held a sincere religious belief.  (Dkt. Nos. 39 at ¶¶ 21, 37-40, 66, 76.)  *See Ford*, 352 F.3d at 588 (court should consider whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things religious.").  Furthermore, in *Ford*, 352 F.3d at 593-94, the Second Circuit found that preventing a Muslim inmate from participating in one meal for Eid ul-Fitr, which like Eid-ul-Adha is a significant Muslim holiday, may substantially burden an inmate's religious exercise in violation of the free exercise clause.  *See also McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004) ("courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights"); *Skates,* 2016 WL 3882530, at *4 (denial of a sahoor bag meal for consumption prior to dawn of the Muslim Holy Day of Atonement plausibly alleges plaintiff's First Amendment rights were substantially burdened).

Defendants do not claim there was a legitimate penological interest justifying the failure to provide Plaintiff with his Eid meal or Pelc's alleged failure to inform the kitchen that the meals had not arrived or take any other steps to have the Eid meals delivered to SHU.  (Dkt. No. 58-2 at 7-11.)  Instead, they seek a finding of qualified immunity for Pelc.

"Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Zahra v. Town of Southold*, 48 F.3d 674, 686 (2d Cir. 1995).  "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, ___ U.S. ___, 138 S.Ct.

1148, 1152 (2018) (internal quotation marks omitted).

The Supreme Court has long recognized that prison inmates retain some measure of the protection afforded by the First Amendment's Free Exercise Clause. *O'Lone*, 482 at 348; *Pell,* 417 U.S. at 822; *see also Turner,* 482 U.S. at 95 (a prison inmate retains those constitutional rights that are not inconsistent with his status as a prisoner or the legitimate penological objectives of the facility administration). The Second Circuit has clearly established that a prisoner has the right to a diet consistent with his religious scruples. *See Ford*, 352 F.3 at 597 (citing *Kahane*, 527 F.2d at 495).

Plaintiff has presented evidence that he asked Pelc to call the kitchen the morning Eid ul-Adha to make sure Plaintiff would have his Eid meal, and Pelc refused. (Dkt. No. 58-7 at 23-24.) Plaintiff has also presented evidence that when the Eid meals did not arrive at lunch time, he asked Pelc to call the kitchen to find out where they were, and Pelc took no steps to obtain the Eid meals. (Dkt. No. 39 at ¶¶ 41-42.) If, as appears to be supported by the record evidence, there was no legitimate penological basis for denying Plaintiff his Eid meal, and Pelc took no steps to obtain the Eid meal for Plaintiff when the meals were not delivered, he would not be entitled to qualified immunity. *See Ford,* 352 F.3d at 597.

In his declaration, Pelc, who admits having no recollection of Plaintiff or the events of October 27, 2012, as they relate to Plaintiff's claim, nonetheless states upon information and belief that the correct number Eid meals were delivered to SHU, and that he distributed the meals to the inmates. (Dkt. No. 58-13 at ¶¶ 17-22.) Pelc also states in his declaration that it was his practice during the many years he was assigned to SHU in Auburn to take steps to assist an inmate in receiving a holiday meal when there was a problem, including calling the kitchen and

requesting that an extra meal be sent to SHU.  (Dkt. No. 58-13 at ¶¶ 14-16.)

Federal Rule of Evidence 406 provides in part that "[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice."  However, even if the conclusory evidence of habit submitted by Pelc were found admissible, Plaintiff's evidence regarding Pelc's inaction on October 27, 2012, creates a question of material fact precluding summary judgment in Pelc's favor on qualified immunity grounds.

Therefore, the Court recommends that Pelc be denied summary judgment on qualified immunity grounds.[12]

### C.    Denial by Thomas of Sahoor Bags and Hot Halal Meals to Break the Fast During the Lockdown that Occurred During Ramadan in 2013

In 2013, Ramadan began on the evening of July 8th and ended on the evening of August 7th.  (Dkt. Nos. 58-1 at ¶ 66; 61 at ¶ 66.)  According to Plaintiff, fasting during Ramadan is a major tenet of the Islamic faith and one of the five pillars every Muslim must observe.  (Dkt. No. 39 at ¶ 66.)  Plaintiff claims that Defendant Thomas violated his rights under the First Amendment Free Exercise Clause by failing to provide him with sahoor bags for a pre-dawn meal prior to fasting and halal meals to break fast after sunset during a prison lockdown that took place during Ramadan from July 29, 2013, through August 3, 2013.[13]  (Dkt. No. 39 at ¶ 112.)

---

[12]  The qualified immunity defense will remain available to Pelc at trial "where it must be evaluated in light of the character and quality of the evidence received in court."  *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011).

[13]  The Court notes that in *Booker v. Graham*, No. 9:13-CV-1342 (GTS/ATB), 2016 U.S. Dist. LEXIS 149332, the Hon. Andrew T. Baxter, U.S. Magistrate Judge, recommended summary judgment in defendants' favor on Plaintiff inmate's First Amendment Free Exercise Clause claim arising out of the denial of sahoor bags and halal meals during the Ramadan lockdown in 2013.  The Hon. Glenn T. Suddaby accepted and adopted Judge Baxter's Report-Recommendation in its entirety.  *Booker v. Graham*, 9:13-CV-1342 (GTS/ATB), 2016 U.S. Dist. LEXIS 170497 (N.D.N.Y. Dec. 9, 2016).

Defendants have not, for purposes of this motion, significantly disputed Plaintiff's claim

that denial of the Ramadan meals substantially burdened his sincerely held religious beliefs.

(Dkt. No. 58-2 at 12-13.)  Rather, they claim that any burden was reasonably related to legitimate

penological interests and in furtherance of the compelling governmental interest in prison

security.  (Dkt. No. 58-4 at ¶¶ 39-40.)   As noted above, assuming that Plaintiff's sincerely held

religious beliefs were substantially burdened, Defendants "bear the relatively limited burden of

identifying the legitimate penological interests" that justified the lockdown, and Plaintiff has the

burden to show that the Defendants' concerns were "irrational."  *Salahuddin*, 467 F.3d at 275

(citing *Jones v. N.C. Prisoner's Labor Union, Inc.*, 433 U.S. 119, 127-28 (1977) (prison officials

need only testify to the legitimate penological interests behind the challenged to meet their

burden of proof); *Ford*, 352 F.3d at 595.

　　In making a determination as to whether the burden imposed on Plaintiff was reasonably

related to the articulated legitimate penological interest, the Court must consider the criteria set

forth in the *Turner* analysis and articulated by the Second Circuit in *Salahuddin*, 467 F.3d at

274.[14]

　　Defendants justified the need for the lockdown during Ramadan by citing the increase in

security incidents in June and July of 2013, and other signs of potential unrest in the facility.

(Dkt. No. 58-4 at ¶¶ 29-30.)  According to Thomas, during the period from June 1, 2013, through

June 21, 2013, there was one assault on staff, three assaults on inmates, four fights, two weapon

---

[14]  District courts must consider "whether the challenged official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Salahudin*, 467 F.3d at 274.

recoveries, and two uses of force.  (Dkt. No. 58-4 at ¶ 29.)  From June 22, 2013, through July 29, 2013, there were seven assaults on staff, eleven assaults on inmates, twenty-one fights, twelve weapon recoveries, and twelve uses of force.  *Id.*  In addition, there had been an increase in visits, packages, and commissary purchases which could indicate inmates are stocking up on food.  *Id.* at ¶¶ 29-30.  That, in turn, was seen as an indicator that the inmate population was aware that an event was going to take place which could cause the facility to be locked down and the kitchen to operate with minimal staff, resulting in the inmates being fed bagged meals.  *Id.* at ¶¶ 29-30.

Thomas explained in his declaration that "[t]he presence of contraband within a facility and its subsequent possession and/or use by inmates threatens the security of the facility, endangers the safety of inmates, employees, visitors, and the community, and impairs rehabilitation programs."  *Id.* at ¶ 23.  Thomas further explained that "[t]he experience of correctional authorities in the operation of facilities has demonstrated that special unannounced, as well as routine periodic, searches of facility areas, inmate living quarters, and the inmate's person are essential to the discovery and elimination of contraband."  *Id.* at ¶ 24.  The discovery of "contraband and other potentially dangerous items" has been recognized as a "clearly legitimate objective" for prison officials.  *Lewis v. Zon*, 920 F. Supp. 2d 379, 385 (W.D.N.Y. 2013).

During a lockdown, with few exceptions not relevant in this case, all inmate movement is ceased for the purpose of ensuring that "the facility can be properly and thoroughly searched without the distraction of the normal operation of the facility, to eradicate the ability of inmates to move or eliminate contraband they have concealed in facility areas or living quarters, and also to make security staff available to conduct the facility wide frisk."  *Id.* at ¶ 26.

30

The Court concludes, based upon the undisputed evidence presented by Defendants, that the lockdown had a legitimate, rational connection to the governmental objective of reducing contraband and enhancing prison security. Correction facility officials are entitled to "wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *see also Covino v. Patrissi*, 967 F.2d 73, 80 (2d Cir. 1992) ("As Turner requires, we defer to the expertise of the state prison officials, who may anticipate security problems and adopt appropriate solutions for the may problems associated with prison administration.").

Thomas was aware from his discussions with Muslim inmates and clergy that the lockdown would impose a burden on the ability of Muslim inmates to satisfy the dictates of their faith by not being able to break fast in a congregate setting with their communities. *Id*. at ¶ 37. However, according to Thomas, it was understood that during a facility lockdown the security need to confine inmates in their cells outweighed the religious need for congregate meals or prayer services, and inmates could pray in their cells. *Id*. at ¶ 38. Chaplain Muhsen stated in his declaration that "the minimal burdens placed on the Muslim community for five days during Ramadan in 2013 were certainly outweighed by the security need determined by DOCCS to lockdown the facility to ensure the safety of the facility, staff, and inmates. (Dkt. No. 58-14 at ¶ 22.)

Martin was instructed to discontinue preparation of the general population and Ramadan meal menus and prepare standard bagged meals for the entire population. (Dkt. No. 58-10 at ¶ 27.) Martin states in her declaration that inmates at Auburn were given three standard,

31

nutritionally adequate, bagged meals per day in their cell, and that the bagged meals were approved by the Office of Nutritional Services in Albany and contained bread, non-pork meat, cheese, a condiment, fruit or a cookie, and juice. *Id*. at ¶¶ 28-30. Because of staffing limitations in the kitchen, breakfast and lunch were served during the 7:00am to 3:00pm shift, and dinner was served toward the beginning of the 3:00pm to 11:00pm shift. (Dkt. No. 64-1 at ¶¶ 23-24.) The contents of the bagged meals were selected because they were generally non-perishable and would typically last for hours and even overnight without spoiling. *Id*. at 12. Although Plaintiff and the other Muslim inmates were not provided with sahoor bags or halal meals to break fast, the bagged meals were, according to Chaplain Muhsen, a "perfectly acceptable meal to eat pre-dawn before the daily fast begins or to break fast in the evening." (Dkt. No. 58-14 at ¶ 20.)

Plaintiff has questioned whether there was an emergent security situation at the facility warranting a lockdown during Ramadan. (Dkt. Nos. 61-1 at 7-8.) Plaintiff testified at his deposition that the only thing that would cause an institutional shutdown was a riot or some major event that was not confined to a single block, and that everyone would know about that type of event. (Dkt. No. 58-7 at 67.) Plaintiff described the lockdown during Ramadan as a "routine contraband search." *Id*. He downplayed the receipt of threatening letters as a legitimate reason for a lockdown, testifying at his deposition that facility officials routinely receive threatening letters. *Id*. at 68-69.

The Court is required to afford a measure of judicial deference to the prison officials expertise in judging whether action was supported by legitimate penological interests. *Turner*, 482 U.S. at 78. Plaintiff's questioning of whether there were adequate grounds for a lockdown during Ramadan, given that threats occur all the time, and his contention that unscheduled

complete facility lockdowns only occur when there is a wide-spread riot in the facility, is unsupported by evidence in the summary judgment record and insufficient to trump the judicial deference shown the prison officials' expertise.  Defendants, on the other hand, have submitted evidence of a significant increase in the number of security incidents in support of their contention that there was a legitimate penological interest in locking down the facility.  The fact that Plaintiff may not have known of the incidents leading to the lockdown does not render the decision irrational.  *See, e.g., DeJesus v. Bradt,* No. 6:13-CV-6066 (EAW), 2016 WL 1266652, at *9-10 (W.D.N.Y. Mar. 31, 2016) (policy that banned the removal of food from the messhall during Ramadan could not be deemed irrational merely because plaintiff was unaware of the security problems caused by the practice); *Jermosen v. Coughlin*, No. 87 Civ. 6267 (RJW), 1993 WL 267357, at *4 (S.D.N.Y. July 9, 1993) (mere fact that plaintiff lacked personal knowledge of perceived security risk was not evidence of nonexistence of the risk).

According to Plaintiff, all of the food for the sahoor bags and halal meals had been purchased for Ramadan prior to the lockdown and should to have been fed to the Muslim inmates during the lockdown rather than giving them the three bagged meals a day approved by Albany. (Dkt. No. 58-7 at 81-82.)  Plaintiff claims that during the lockdown, the Muslims could have been given sahoor bags at night for the next morning and halal meals in the evening, with only a *de minimis* effect, since someone was going to have to come to the block to feed the inmates anyway.  (Dkt. Nos. 58-7 at 81-82; 61-1 at 8-9.)

Plaintiff disputes Thomas' and Muhsen's contention that the bagged meals served three times a day were acceptable as a pre-dawn meal and to break fast in the evening, in large part because of the delivery times.  (Dkt. Nos. 58-7 at 83; 58-14 at ¶¶ 17-20; 64-1 at ¶¶ 13-16.)

Plaintiff claims they should have been brought at more convenient times for the Muslim inmates, rather than having the first meal of the day delivered after sunrise when the fast had started, leaving the milk to get warm and perhaps spoil during the day, and the two remaining meals, which often contained bologna, delivered well before sundown.  (Dkt. Nos. 58-7 at 83; 61-1 at 9.)

The problem with Plaintiff's claim is that the undisputed evidence shows that during the lockdown, the facility kitchen operated initially with only minimal civilian staff and then minimal inmate kitchen workers after the B-Block and kitchen/messhall had been frisked.  (Dkt. Nos. 58-4 at ¶ 36; 58-10 at ¶ 32.)   As a result, preparation of all regular general population meals and Ramadan meals was shut down and all inmates at Auburn were given the standard bagged meals and standard deliveries were made three times a day to each inmate.  (Dkt. No. 58-10 at ¶¶ 27-30.)

Because of staffing limitations in the kitchen, breakfast and lunch were delivered during the 7:00am to 3:00pm shift, and dinner towards the beginning of the 3:00pm to 11:00 shift because Auburn has more staff during the 7:00am to 3:00pm shift.  (Dkt. No. 64-1 at ¶¶ 22-24.) There was not enough staff available to prepare and serve bagged meals between 8:00pm and 9:00pm.  *Id*. at ¶ 26.  According to Thomas, it would have been impossible to deliver special meals to the 172 Muslim inmates signed up to participate in Ramadan, who were spread throughout the entire facility, during the lockdown.  *Id.* at ¶¶ 18-20.  The Court finds that requiring the minimally staffed kitchen to prepare sahoor bags and halal meals to break fast for the 172 Muslim inmates and the diversion of security staff from frisking the facility to deliver those meals would have had more than a *de minimis* impact on prison operations during the

34

lockdown.

Inasmuch as Defendants have demonstrated a legitimate penological purpose for the burden imposed on Plaintiff's First Amendment rights, and the Court has found no evidence showing that the facility exaggerated the response to the security matters leading to the lockdown or that giving all of the inmates the bagged meals was irrational, the Court recommends that Defendant Thomas be granted summary judgment on Plaintiff's claim that he violated his First Amendment Free Exercise Clause in connection with the lockdown during Ramadan in 2013. *See Covino,* 967 F.2d at 80.

> **D.    Denial by Hewite and Steinberg of the Opportunity for Plaintiff to Engage in Congregate Prayer and Failure to Ensure he was Given a Halal Meal on August 12, 2013, During Shawwal**

> 1.    Congregate Prayer

Plaintiff has alleged in his amended complaint that Defendants Hewite and Steinberg violated his rights under the First Amendment Free Exercise Clause by depriving him of the opportunity to participate in congregate prayer and denying him a hot halal meal for Shawwal. (Dkt. No. 39 at ¶ 114.)  Plaintiff has, however, conceded that Sergeant Rogofsky ordered the urinalysis and Hewite and Steinberg were only responsible for collecting Plaintiff's urine sample in compliance with Sergeant Rogofsky's order.  (Dkt. Nos. 58-1 at ¶¶ 113-14; 61 at ¶¶ 113-14.)

Plaintiff opposes Hewite and Steinberg's motion by claiming they could have waited to do the urinalysis until after the congregate prayer.  (Dkt. No. 58-7 at 107-09.)  That, however, is speculation since the urinalysis was ordered by a superior officer and Plaintiff was taken for the urinalysis by an escort officer.  "Speculation by the party resisting the motion will not defeat summary judgment."  *See Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1991).  Therefore, the

Court finds that evidence establishes that Hewite and Steinberg were not personally involved in Plaintiff being deprived of the opportunity to take part in the congregate prayer and are entitled to summary judgment on Plaintiff's free exercise clause claim regarding participation in congregate prayer.

### 2.    Halal Meal

Because Plaintiff was taken for the urinalysis prior to sunset he was unable to go to the messhall with the other inmates at congregate prayer for a halal meal to break fast.  (Dkt. No. 58-7 at 100.)  According to Plaintiff, when he arrived at the clinic, he told Hewite that he had been fasting for the past fifteen hours and would need water since he was dehydrated.  (Dkt. No. 39 at ¶ 78.)  Plaintiff claims to have asked Hewite to have Plaintiff's halal meal sent to his cell or the infirmary.  *Id.*; Dkt. No. 58-7 at 100.  Plaintiff testified at his deposition that he asked Hewite to call the kitchen to let them know Plaintiff was in the clinic and he needed to have a meal delivered to his cell.  *Id.* at 104.

Plaintiff also claims to have spoken with Steinberg about having his halal meal delivered to his cell or the infirmary.  (Dkt. No. 58-7 at 106.)  According to Plaintiff, Steinberg responded that he didn't care about any of that; he only cared about Plaintiff pissing in a cup.  *Id.*  When Plaintiff was returned to his cell shortly after 11:30pm, there was no halal meal waiting for him.  (Dkt. No. 58-7 at 102-03.)

Hewite states in his declaration that Plaintiff never informed him he needed a meal brought to his cell, and if Plaintiff had asked him, Hewite would have called the kitchen and made arrangements.  (Dkt. No. 58-15 at ¶¶ 37-38.)  Hewite also stated Plaintiff could not have eaten his meal in the first aid clinic because it was a sterile environment.  *Id.* at ¶ 40.  Hewite

claims it was the responsibility of the officers on Plaintiff's block to retain a meal for him once they realized he was not coming back before the messhall closed. *Id.* at ¶ 44. Steinberg also denied that Plaintiff informed him that he needed a religious meal brought to him and states that had Plaintiff done so, he would have called the kitchen to make arrangements. (Dkt. No. 58-18 at ¶¶ 29-30.)

The Court has already found for purposes of this motion that Plaintiff has satisfied his burden of establishing his sincerely held religious beliefs. The Court has also acknowledged that preventing a Muslim inmate from participating in even one religious meal on a holy day may substantially burden an inmate's rights under the free exercise clause. *See Ford*, 352 F.3d at 593-94. Plaintiff explained at his deposition that Shawwal is an extension of Ramadan and that those who are really committed to their faith continue the practices of Ramadan, including breaking fast with a hot halal meal at sunset, for the six day Shawwal fast in order to increase spiritual awareness. (Dkt. No. 58-8 at 98-99.)

Defendants contend, as explained by Hewite, that there was a legitimate penological interest in removing Plaintiff from the mosque before the congregate Shawwal prayer. (Dkt. No. 58-15 at ¶¶ 7-11.) The facility administration had received confidential information that put plaintiff under suspicion of using drugs or alcohol; that the use by inmates of illicit drugs and alcohol presents a serious threat to the safety and security of the facility; and urinalysis testing can be an effective means for detecting use by inmates. *Id.*

However, even if that were the case, it would not necessarily justify failing to provide Plaintiff with a hot halal meal, and Defendants do not appear to make the argument it would. (Dkt. No. 58-2 at 20-21.) Moreover, in deciding Plaintiff's grievance, Superintendent Graham

37

found that arrangements should have been made for a halal meal to be delivered to Plaintiff's cell.  (Dkt. No. 1-1 at 38.)

Hewite and Steinberg claim they are entitled to summary judgment because it is evident that Plaintiff never asked Hewite or Steinberg to arrange to have a meal brought to his cell, and if he had, they would have done so.  (Dkt. No. 58-2 at 20.)  That argument ignores Plaintiff's deposition testimony that he asked both Hewite and Steinberg to contact the kitchen to request that Plaintiff's halal meal sent to his cell or the infirmary.  (Dkt. No. 58-7 at 100, 104, 106.)

The Court finds that there are material questions of fact as to whether Plaintiff asked either or both Hewite and Steinberg to contact the kitchen regarding his halal meal and, if Plaintiff did ask, whether under the circumstances presented, Hewite and Steinberg were required to do so.  Therefore, the Court recommends that Defendant Hewite and Steinberg be denied summary judgment on Plaintiff's First Amendment Free Exercise Clause claim with regard to their failure to provide him with a hot halal meal on October 12, 2013.

## VI.   EXHAUSTION OF ADMINISTRATIVE REMEDIES WITH REGARD TO PLAINTIFF'S RETALIATION CLAIMS AGAINST CHUTTEY, GIFFORD, STEINBERG, AND FAGAN

### A.   Legal Standard for Exhaustion of Administrative Remedies

Defendants seek summary judgment on Plaintiff's First Amendment retaliation claims against Defendants Gifford, Chuttey, Steinberg, and Fagan on the ground that Plaintiff failed to exhaust his administrative remedies under the DOCCS Inmate Grievance Procedure ("IGP") with regard to those claims.  Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are

available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, __ U.S. ___, 136 S. Ct. 1850, 1854-55 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted). In New York State prisons, DOCCS has a well-established three-step IGP. *See* N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id*. § 701.5(a)(1). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id*. § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent

must issue a written decision within twenty calendar days of receipt of the grievant's appeal.  *Id*. § 701.5(c)(3)(ii).  Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step.  *Id*. § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision.  *Id*. § 701.5(d)(1)(i).  CORC is to render a written decision within thirty calendar days of receipt of the appeal.  *Id*. § 701.5(d)(3)(ii).

Special procedures are used when the grievance involves a claim of staff misconduct.  *Id*. § 701.8.  A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days.  *Id*. § 701.8(f).  If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the Superintendent's decision within seven days of receipt of the decision.  *Id*. § 701.8(h).  CORC is required to render a written decision within thirty calendar days of receipt of the appeal.  *Id*. § 701.8(i) (incorporating § 701.5).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period.  "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step,'" assuming there is another step in the IGP.  *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2)); *see also Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance . . . can   and must   be appealed to the next level . . . to complete the grievance process.").

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotations and citations omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id*. at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end   with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing

that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds, Woodford*, 548 U.S. at 94-95. Plaintiff must then establish that the IGP grievance procedure was unavailable to him. *See Jones*, 549 U.S. at 216.

### B.    Analysis

Plaintiff claims that Defendants Chuttey and Gifford engaged in retaliation against him because of his position as inmate facilitator for the Shia Muslim community at Auburn when on September 17, 2012, Chuttey ordered the search of Plaintiff's cell, with Gifford planting a weapon in Plaintiff's cell during the search and thereafter, at Chuttey's instruction, issuing a false misbehavior report against Plaintiff with regard to the weapon. (Dkt. No. 39 at ¶¶ 21-30, 119.) Plaintiff also claims that Steinberg filed a false misbehavior report against him when he was unable to urinate for a urinalysis on August 12, 2013, and Captain Fagan issued a recommendation that Plaintiff be placed in administrative segregation on August 13, 2013, in retaliation for filing grievances to redress the violation of his rights under the First Amendment Free Exercise Clause. *Id*. at ¶¶ 120, 121.

Defendants have submitted evidence establishing that Auburn had a fully functioning inmate grievance process available and inmates had full access to CORC during the relevant time period. (Dkt. No. 58-22 at ¶ 11.) The Auburn IGP Supervisor searched the IGP files to ascertain whether Plaintiff had filed any grievances at Auburn in 2012 and 2013 relating to alleged retaliation against Plaintiff by Chuttey, Gifford, Steinberg, or Fagan. (Dkt. No. 58-20 at ¶ 10.) She determined that Plaintiff had filed four grievances in 2012, three of which preceded the alleged retaliation by Chuttey and Gifford, and one filed after the retaliation which did not allege

42

retaliation by Chuttey or Gifford.  *Id*. at ¶¶ 11-14.  A grievance filed by Plaintiff on August 7, 2013, complained of the denial of Ramadan meals from July 29, 2013, and predated the alleged retaliation by Steinberg and Fagan.  *Id*. at ¶¶ 15-19.  A grievance filed on August 20, 2013, also predated the alleged retaliation and did not allege retaliation by Steinberg or Fagan.  *Id*. at ¶¶ 20-21.  According to the Assistant Director of the DOCCS IGP, Plaintiff filed no appeals to CORC on grievances alleging retaliation by Chuttey, Gifford, Steinberg, or Fagan.  (Dkt. No. 58-22 at ¶¶ 13-17.)

In his response to Defendants' statement of material facts, Plaintiff has admitted that Auburn had a fully functioning grievance process during the relevant period and that none of the grievances identified by Defendants as having been filed by Plaintiff alleged retaliation by Chuttey, Gifford, Steinberg, or Fagan.  (Dkt. Nos. 58-1 at ¶¶ 167-70, 172-74.)  Moreover, Plaintiff has submitted no evidence that he did file grievances on the retaliation claims in his opposition to Defendants' motion.

Based upon the foregoing, the Court finds that Plaintiff failed to exhaust his administrative remedies with regard to his First Amendment retaliation claims against: (1) Chuttey and Gifford relating to the planting of a weapon in his cell and filing a false misbehavior report; (2) Steinberg relating to the filing of a false misbehavior report; and (3) Fagan relating to the placement of Plaintiff in administrative segregation.  *See Jones*, 549 U.S. at 218 (exhaustion requires proper use of all steps required by the applicable administrative review process). Furthermore, Plaintiff, who has the burden of establishing that the IGP grievance procedure was unavailable to him, *Jones*, 549 U.S. at 216, has submitted no evidence suggesting that the grievance procedure was unavailable to him under the *Ross* criteria or for any other reason.

43

Therefore, the Court recommends that Chuttey, Gifford, Steinberg, and Fagan be granted summary judgment on Plaintiff's retaliation claims on the ground that he failed to exhaust administrative remedies.

 **ACCORDINGLY**, it is hereby

 **RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 58) be **GRANTED** in part and **DENIED** in part; and it hereby

 **RECOMMENDED** that summary judgment be **GRANTED** as to Plaintiff's: (1) First Amendment Free Exercise Clause claim against Defendants Martin and Thomas regarding his not being provided with an Eid meal on October 27, 2012, during Eid ul-Adha; (2) First Amendment Free Exercise Clause claim against Defendant Thomas with regard to Plaintiff not receiving sahoor bags and hot halal meals during Ramadan while the facility was on lockdown; (3) First Amendment Free Exercise Clause claim against Defendants Hewite and Steinberg with regard to Plaintiff's claim that they prevented him from engaging in communal prayer during Shawwal on August 12, 2013; (4) First Amendment retaliation claims against Defendants Chuttey and Gifford with regard to the September 12, 2012, cell search, planting of a weapon, and issuance a false inmate misbehavior report; (5) First Amendment retaliation claim against Defendant Steinberg with regard to the filing of a false inmate misbehavior report regarding Plaintiff's failure to urinate for a urinalysis on August 12, 2013; and (6) ) First Amendment retaliation claim against Fagan with regard to the recommendation that Plaintiff be placed in administrative segregation on August 13, 2013; and it is further

 **RECOMMENDED** that summary judgment be **DENIED** as to Plaintiff's: (1) First Amendment Free Exercise Clause claim against Defendant Pelc regarding the failure to provide

him with an Eid meal on October 27, 2012; and (2) First Amendment Free Exercise claim against

Defendants Hewite and Steinberg for failing to ensure that Plaintiff was provided a halal meal on

Shawwal on August 12, 2016; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-

Recommendation, along with copies of the unpublished decisions cited herein in accordance with

the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.[15]  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.

Dated:  May 25, 2018
         Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[15]  If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

Ⓐ Neutral

As of: May 24, 2018 8:55 PM Z

## *Booker v. Graham*

United States District Court for the Northern District of New York

December 9, 2016, Decided; December 9, 2016, Filed

9:13-CV-1342 (GTS/ATB)

**Reporter**

2016 U.S. Dist. LEXIS 170497 *; 2016 WL 7176607

AMIN B. BOOKER; and PAUL COLON, Plaintiffs, v. HAROLD D. GRAHAM, Superintendent, Auburn Corr. Facility; JUSTIN THOMAS, Deputy Superintendent of Programs at Auburn Corr. Facility; GRAFTON ROBINSON, Deputy Superintendent of Security at Auburn Corr. Facility; JOHN DOE #1, Corr. Officer, Auburn Corr. Facility; JOHN DOE #2, Corr. Officer, Auburn Corr. Facility; DONNA MARTIN, Food Serv. Admin. at Auburn Corr. Facility; CAPTAIN FAGAN, Auburn Corr. Facility; ARRIA, Corr. Officer, Auburn Corr. Facility; D. CARPENTER, Corr. Officer, Auburn Corr. Facility; GRIFFIN, Corr. Officer, Auburn Corr.; and STEVENS, Corr. Officer, Auburn Corr. Facility, Defendants.

**Prior History:** <u>Booker v. Graham, 2016 U.S. Dist. LEXIS 149332 (N.D.N.Y, Oct. 26, 2016)</u>

## Core Terms

Defendants', Report-Recommendation, magistrate judge, recommendations, summary judgment motion, grievances, confinement, motion for sanctions, further ordered, district court, clear error, reasons, administrative segregation, retaliation claim, admissible, objected, cases

**Counsel:** [*1] AMIN B. BOOKER, 92-A-6245, Plaintiff, Pro se, Elmira, New York.

PAUL COLON, 03-A-5813, Plaintiff, Pro se, Beacon, New York.

For Defendants: ADRIENNE J. KERWIN, ESQ., Assistant Attorney General, OF COUNSEL, HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, Albany, New York.

**Judges:** HON. GLENN T. SUDDABY, Chief United States District Judge.

**Opinion by:** GLENN T. SUDDABY

## Opinion

## **DECISION and ORDER**

Currently before the Court, in this *pro se* prisoner civil rights action filed by Amin B. Booker and Paul Colon ("Plaintiffs") against the eleven above-captioned employees of the New York State Department of Corrections and Community Supervision ("Defendants") arising from alleged religious rights violations at Auburn Correctional Facility in 2013, are the following: (1) Defendants' motion for summary judgment; (2) Plaintiff Booker's motion for sanctions pursuant to <u>Fed. R. Civ. P. 11</u>; (3) United States Magistrate Judge Andrew T. Baxter's Report-Recommendation recommending that Plaintiff Booker's motion for sanctions be denied, that Defendants' motion for summary judgment be granted as to Plaintiffs' *First Amendment* and <u>Religious Land Use and Institutionalized Persons Act ("RLUIPA")</u> claims, and that Defendants' motion for summary judgment [*2] be denied as to Plaintiff Booker's retaliation claims against Defendants Graham, Robinson and Fagan; (4) Defendants' Objections to the Report-Recommendation; (5) Plaintiff Booker's Objections to the Report-Recommendation; and (6) Plaintiff Booker's letter-motion requesting that the Court strike Defendants' Objections as untimely. (Dkt. Nos. 201, 215, 224, 225, 226, 228.) Plaintiff Colon has not submitted an Objection to the Report-Recommendation and the time in which to do so has expired. (*See generally* Docket Sheet.) For the reasons set forth below, the Report-Recommendation is adopted in its entirety: Plaintiff Booker's motion for sanctions is denied; Defendants' motion for summary judgment is granted as to Plaintiffs' *First Amendment* and *RLUIPA* claims, and denied as to Plaintiff Booker's retaliation claims against Defendants Graham, Robinson and Fagan; and Plaintiff Booker's motion for sanctions is

2016 U.S. Dist. LEXIS 170497, *2

denied. (Dkt. No. 224, at Parts III-V.) Finally, Plaintiff Booker's letter-motion to strike Defendants' Objections is denied.

## I. RELEVANT BACKGROUND

### A. Claims and Facts

Because this Decision and Order is intended primarily for the review of the parties, the Court will not recite Plaintiffs' claims and [*3] the events giving rise to them, which are accurately summarized in Part I of Magistrate Judge Baxter's Report-Recommendation. (Dkt. No. 224, at 1-6.)

### B. Magistrate Judge Baxter's Report-Recommendation

Generally, in his Report-Recommendation, Magistrate Judge Baxter rendered the following four recommendations: (1) that Plaintiffs' *First Amendment* and *RLUIPA* claims be dismissed because (a) Defendants have demonstrated a legitimate penological interest for the burden imposed on Plaintiffs' *First Amendment* rights, and (b) in light of Plaintiffs' current places of incarceration, their *RLUIPA* claims are moot as against the only Defendants that they have named; (2) that Plaintiff Booker's *First Amendment* and *RLUIPA* claims against Defendant Graham arising from Plaintiff Booker's confinement in administrative segregation be dismissed because Defendant Graham has demonstrated that security concerns justified a restriction on congregate religious services, and that available alternative means of religious exercise did not infringe on those security concerns; (3) that Plaintiff Booker's retaliation claim against Defendants Graham, Robinson and Fagan remain pending because (a) the record contains admissible evidence of a temporal proximity [*4] between his Ramadan grievances and his confinement in a Special Housing Unit ("SHU"), (b) the record contains admissible evidence that Defendants Fagan and Robinson admitted a connection between his Ramadan grievances and his confinement in confinement in SHU, (c) the record contains admissible evidence that inmate Mark McCoy heard an unidentified hearing officer admit that Auburn Correctional Facility officials were retaliating against those who filed Ramadan grievances, (d) in support of their argument that they would have confined Plaintiff Booker in SHU in the absence of his Ramadan

grievances (because he was involved in organizing a work strike), Defendants have submitted only a summary of the confidential information that purportedly implicated Plaintiff Booker, improperly offering the actual confidential information to the Court for *in camera* review without disclosure to Plaintiffs, and (e) under the circumstances, it is impossible to conclude that these three Defendants are protected from liability as a matter of law by the doctrine of qualified immunity; and (4) that Plaintiff Booker's motion for sanctions be denied because Defendants' motion for summary judgment had factual [*5] and legal merit (as evident from the fact that the Court has partially granted Defendants' motion). (Dkt. No. 224, at Parts III-IV.)

### C. Plaintiff Booker's Objections to the Report-Recommendation

Generally, in his Objections to the Report-Recommendation, Plaintiff Booker asserts the following three arguments: (1) Magistrate Judge Baxter erred in recommending that Plaintiff Booker's *First Amendment* and *RLUIPA* claims be dismissed, because, *inter alia*, he omitted from his analysis numerous undisputed facts, he applied the incorrect legal standard, and he placed a heightened burden of proof on Plaintiff Booker; (2) Magistrate Judge Baxter erred in recommending that Plaintiff Booker's *First Amendment* and *RLUIPA* claims against Defendant Graham (arising from Plaintiff Booker's confinement in administrative segregation) be dismissed, because, *inter alia*, he addressed the issue *sua sponte*, and accepted Defendants' post-hock justification without record support; and (3) Magistrate Judge Baxter erred in recommending that Plaintiff Booker's motion for sanctions be denied, because Defendants' motion for summary judgment lacks proper evidentiary support in violation of *Fed. R. Civ. P. 11(b)*. (Dkt. No. 225.)

### D. Defendants' Objections to the Report-Recommendation [*6]

Generally, in their Objections, Defendants argue that Magistrate Judge Baxter erred by denying Defendants' motion for summary judgment as to Plaintiff Booker's retaliation claims against Defendants Graham, Robinson and Fagan for each of two alternative reasons: (1) as a threshold matter, Magistrate Judge Baxter was incorrect in ruling that Defendants did not submit sufficient evidence that they would have confined Plaintiff Booker in SHU in the absence of his Ramadan

2016 U.S. Dist. LEXIS 170497, *6

grievances, because (a) the declarations submitted by Defendants Graham, Robinson and Fagan show that Defendant Fagan (who ultimately recommended that Plaintiff Booker be placed in administrative segregation and who never knew of Plaintiff Booker's grievances) initiated a fruitful investigation into Plaintiff Booker's strike activities before Plaintiff Booker filed his grievances, and (b) in any event, the actual confidential information relied on by Defendants (which Magistrate Judge Baxter refused to review *in camera*) may be used by Defendants without disclosure to Plaintiff Booker under any circumstances, given Defendants' right to defend themselves and the need for security; and (2) in the alternative, Magistrate Judge [*7] Baxter was incorrect in rejecting Defendants' qualified immunity argument, because (a) Defendant Fagan (who, again, was not aware of Plaintiff Booker's grievances before the hearing investigation) is not liable for the actions of Defendants Graham or Robinson, (b) Defendant Robinson's sworn declaration states that he decided to place Plaintiff Booker in administrative housing based on evidence presented at the administrative hearing, and (c) Magistrate Judge Baxter misread Paragraph 82 of Plaintiffs' Amended Complaint as alleging that Defendant Graham retaliatorily transferred Plaintiff Booker, warranting (at the very least) that Defendants be given a brief opportunity to submit evidence as to why Plaintiff Booker was actually transferred. (Dkt. No. 226.)

## II. STANDARD OF REVIEW

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. *Fed. R. Civ. P. 72(b)(2)*; *28 U.S.C. § 636(b)(1)(C)*. To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. *L.R. 72.1(c)*.[1] When performing such [*8] a *de novo*

review, "[t]he judge may . . . receive further evidence. . . ." *28 U.S.C. § 636(b)(1)*. However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance.[2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y., 04-CV-0210, 2011 U.S. Dist. LEXIS 90502, 2011 WL 3610717, at *1 (E.D.N.Y. Aug. 15, 2011)* ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009)* ("In this circuit, it is established law that a district court will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. *Fed. R. Civ. P. 72(b)(2),(3)*; *Fed. R. Civ. P. 72(b)*, Advisory [*9] Committee Notes: 1983 Addition; *see also Brown v. Peters, 95-CV-1641, 1997 U.S. Dist. LEXIS 14718, 1997 WL 599355, at *2-3*

---

[1] *See also Mario v. P&C Food Markets, Inc., 313 F.3d 758, 766 (2d Cir. 2002)* ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to

specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

[2] *See Paddington Partners v. Bouchard, 34 F.3d 1132, 1137-38 (2d Cir. 1994)* ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters, 894 F.2d 36, 40, n.3 (2d Cir. 1990)* (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz, 447 U.S. 667, 676, n.3, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (1980)* ("We conclude that to construe *§ 636(b)(1)* to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); *Fed. R. Civ. P. 72(b)*, Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

*(N.D.N.Y. Sept. 22, 1997)* (Pooler, J.) [collecting cases], *aff'd without opinion, 175 F.3d 1007 (2d Cir. 1999).* Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review.[3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. *Fed. R. Civ. P. 72(b),* Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*[4]

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *28 U.S.C. § 636(b)(1)(C).*

## III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Baxter's thorough Report-Recommendation, [*10] the Court can find no error in those parts of the Report-Recommendation to which the parties specifically objected, and no clear error in the remaining parts of the Report-Recommendation:

---

[3] *See Mario, 313 F.3d at 766* ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either *Fed. R. Civ. P. 72(b)* or *Local Civil Rule 72.3(a)(3).");* **Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)** (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady, 09-CV-0924, 2010 U.S. Dist. LEXIS 98067, 2010 WL 3761902, at *1, n.1 (N.D.N.Y. Sept. 20, 2010)* (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue, 07-CV-1077, 728 F. Supp. 2d 168, 2010 WL 2985968, at *3 & n.3 (N.D.N.Y. 2010)* (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole, 04-CV-0484, 2006 U.S. Dist. LEXIS 2926, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006)* (Sharpe, J.).

[4] *See also Batista v. Walker, 94-CV-2826, 1995 U.S. Dist. LEXIS 10687, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995)* (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

Magistrate Judge Baxter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons stated therein. (Dkt. No. 224, at Parts III-IV.) To those reasons, the Court adds the following five points.

First, Plaintiff Colon never opposed Defendants' motion for summary judgment. (Dkt. No. 216.) In this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.[5] Here, the arguments presented by Defendants against Plaintiff Colon met this modest threshold burden, at the very least. Moreover, the fact that Plaintiff Colon never objected to the dismissal of his claims means that the recommendations of the dismissal [*11] of those claims are entitled to only a clear-error review, which they easily survive.

Second, Defendants' heavy reliance on the declarations of Defendants Graham, Robinson and Fagan is misplaced. The declarations do not somehow eradicate Plaintiff Booker's sworn statements that two of these three Defendants (i.e., Robinson and Fagan) admitted in his presence that the actual reason he was being placed in administrative segregation was his filing of grievances (and not his asserted involvement in organizing a work strike). (See, e.g., Dkt. No. 178, at ¶¶ 74-76 [Plfs.' Am. Compl.]; Dkt. No. 201, Attach. 2, at 69-72 [attaching pages "68" through "71" of Plf. Booker's Depo. Tr.].)[6]

---

[5] *See* N.D.N.Y. *L.R. 7.1(b)(3)* ("Where a properly filed motion is unopposed and the Court determined that the moving party has met to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini, 07-CV-0279, 2009 U.S. Dist. LEXIS 101160, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009)* (Suddaby, J.) (collecting cases); *Este-Green v. Astrue, 09-CV-0722, 2009 U.S. Dist. LEXIS 69054, 2009 WL 2473509, at *2 & nn.2, 3 (N.D.N.Y. Aug. 7, 2009)* (Suddaby, J.) (collecting cases).

[6] The Court notes that Plaintiffs' Verified Amended Complaint has the force and effect of an affidavit for purposes of Defendants' motion for summary judgment. *See, e.g., Patterson v. County of Oneida, 375 F.3d 206, 219 (2d. Cir.2004)* ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson, 251 F.3d 345, 361 (2d*

2016 U.S. Dist. LEXIS 170497, *11

Given the nature of the asserted admissions (i.e., why Plaintiff Booker was actually being placed in administrative segregation, not simply that Defendants Robinson and Fagan disliked his grievances), the admissions may be used to establish both (1) Plaintiff Booker's prima facie case that Defendants acted with a retaliatory animus, and (2) a genuine dispute of material fact that Defendants would *not* have taken the adverse action in the absence of the protected conduct. [*12]

Third, in their Objections, Defendants cite no authority for their argument that they may rely on confidential information in support of a motion for summary judgment without disclosing that information to their opponent, because of their right to defend themselves and the need for security. (Dkt. No. 225, at 2.) This omission is conspicuous, given the cases cited by Magistrate Judge Baxter in his Report-Recommendation. (Dkt. No. 224, at 25-26 [citing *Spiteri, Gibson* and *Hansberry* decisions].) The Court notes that its review of the issue has yielded cases similar to those cited by Magistrate Judge Baxter. *See, e.g., Kinoy v. Mitchell, 67 F.R.D. 1, 15-16 (S.D.N.Y. 1975)*; *Benitez v. Locastro,* 04-CV-0423, Order, at 2 (N.D.N.Y. filed Feb. 4, 2009) (Treece, M.J.); *Benitez v. Locastro,* 04-CV-0423, Order, at 2-5 (N.D.N.Y. filed May 8, 2009) (Treece, M.J.); *Palacio v. Goord, 03-CV-0836, 2008 U.S. Dist. LEXIS 976, 2008 WL 87551, at 2, n.3 (N.D.N.Y. Jan. 7, 2008)* (Mordue C.J.). At trial, Defendants will have another opportunity to submit evidence and argument to persuade the Court of the existence of compelling security concerns necessitating non-disclosure of the evidence to Plaintiff Booker. If Defendants fail to so persuade the Court, they may either disclose the evidence to Plaintiff Booker [*13] or choose not to use it. *Cf. Kinoy, 67 F.R.D. at 15* ("Either the documents are privileged, and the litigation must continue as best it can without them, or they should be disclosed at least to the parties . . . ."). If Defendants succeed in so persuading the Court, the Court will consider whether Plaintiff Booker's *pro bono* counsel may review the evidence and devise an adequate response (including cross-examination).

Fourth, with regard to Defendants' request that they be given a brief opportunity to submit evidence as to why Plaintiff Booker was actually transferred, that request is

denied. Although Defendants apparently did not construe Paragraph 82 of Plaintiffs' Amended Complaint with the special liberality appropriate for *pro se* pleadings, the Court may, and does, do so.[7] When considered in context with prior paragraphs, Paragraph 82 alleges facts plausibly suggesting that Defendant Graham was acting in a retaliatory manner in conjunction with Defendants Robinson and Fagan when he transferred Plaintiff Booker to another facility. (Dkt. No. 178, at ¶ 82 [Plfs.' Am. Compl.].) As a result, Defendants should have submitted the referenced evidence to Magistrate Judge Baxter. Under the circumstances, the Court [*14] will refuse to consider evidentiary material that was not presented to Magistrate Judge Baxter, for reasons of judicial efficiency and the Federal Magistrate's Act. *See, supra,* Part II of this Decision and Order.

Fifth, the Court rejects Plaintiff Booker's request to strike Defendants' Objections based on untimeliness. Magistrate Judge Baxter's Report-Recommendation was issued on October 26, 2016. (Dkt. No. 224.)

---

[7] *See Rodriguez v. Estate of Drown, 10-CV-1172, 2011 U.S. Dist. LEXIS 112526, 2011 WL 4592386, at *6 (N.D.N.Y. Sept. 30, 2011)* (Suddaby, J.) ("While Defendant did not specifically challenge this portion of Plaintiff's due process claim in his memorandum of law (no doubt because it takes an extension of special solicitude to Plaintiff to discern that portion of his claim in his Complaint), it was proper for Magistrate Judge Lowe to do so pursuant to *28 U.S.C. § 1915(e)(2)(B)* and *28 U.S.C. § 1915A(b)*."); *Green v. LaClair, 07-CV-0351, 2012 U.S. Dist. LEXIS 42876, 2012 WL 1144569, at *14, 20 (N.D.N.Y. Feb. 24, 2012)* (Peebles, M.J.) ("Apparently misconstruing plaintiff's submissions, the defendants have addressed only a single instance in which defendant Blood is alleged to have been involved [in the deprivation of exercise during plaintiff's keeplock confinement] . . . Accordingly, it is hereby respectfully RECOMMENDED that defendants' motion for summary judgment, Dkt. No. 145, be GRANTED as to all claims in plaintiff's complaint, with the exception of his **Eighth Amendment** claim against defendant Blood relating to the alleged deprivation of exercise during his keeplock confinement . . . ."), *adopted, 2012 U.S. Dist. LEXIS 42591, 2012 WL 1048764 (N.D.N.Y. March 28, 2012)* (Suddaby, J.); *cf. McCarroll v. Fed. Bureau of Prisons,* 08-CV-1343, Decision and Order, at 5-6 (N.D.N.Y. filed March 2, 2010) (Lowe, M.J.) ("Despite the clarity of Plaintiff's complaint, Defendants repeatedly state that Plaintiff 'alleges the DNA Act is unconstitutional' and devote several pages to arguing that Plaintiff has failed to state a **Fourth Amendment** claim. . . . As a result of this focus on issues that are not raised by this case, Defendants' briefs largely fail to discuss the issues that are raised by this case.").

---

*Cir.2001)* (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied, 536 U.S. 922 (2002)*; *Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1993)* ("A verified complaint is to be treated as an affidavit for summary judgment purposes.").

Defendants' Objections were due 14 days later, on November 9, 2016. *Fed. R. Civ. P. 72(b)(2)*; N.D.N.Y. *L.R. 72.1(c)*; *Fed. R. Civ. P. 6(a)(1)(B),(C)*; *Fed. R. Civ. P. 6(d)*. However, the Objections were filed on November 13, 2016. (Dkt. No. 226.) As a result, the Objections were four days late. Under the circumstances, the Court finds cause to *nunc pro tunc* extend the deadline for Defendants' Objections to November 13, 2016, for three reasons. First, Defendants appear to have been misled by a docket entry.[8] Second, the Court can find no undue prejudice to Plaintiffs. Third, the Court previously granted Plaintiffs numerous deadline extensions. (*See, e.g.,* Text Order filed July 7, 2014; Text Order filed October 8, 2014; Text Order filed Dec. 9, 2014; Text Order filed Apr. [*15] 13, 2015; Text Order filed May 6, 2015; Text Order filed June 15, 2016.)

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 224) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff Booker's motion for sanctions (Dkt. No. 215) is **DENIED**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 201) is **GRANTED** as to Plaintiffs' *First Amendment* and *RLUIPA* claims against Defendants Thomas, Martin, Arria, Carpenter, Griffin, Stevens, John Doe No. 1, and John Doe No. 2, who are **DISMISSED** from this action; and it is further

**ORDERED** that all of Plaintiff Paul Colon's claims in his complaint are **DISMISSED**, and he is terminated from this action; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 201) is **DENIED** as to Plaintiff Booker's retaliation claims against Defendants Graham, Robinson and Fagan, which claims **SURVIVE** Defendants' motion; and it is further

**ORDERED** that Plaintiff Booker's letter-motion to strike Defendants' Objections (Dkt. No. 228) is **DENIED**; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the Plaintiff Booker for purposes of trial only; any appeal [*16] shall remain the responsibility of the plaintiff alone unless a motion for appointment of counsel for an appeal is granted; and it is further

**ORDERED** that upon assignment of Pro Bono Counsel, a pretrial conference with counsel will be scheduled in this action, at which time the Court will schedule this case for trial. The parties are directed to appear at that pretrial conference with settlement authority.

Dated: December 9, 2016

Syracuse, New York

/s/ Glenn T. Suddaby

HON. GLENN T. SUDDABY

Chief United States District Judge

_____

End of Document

---

[8] The docket entry reflecting the filing of the Report-Recommendation stated, in pertinent part, "Objections to R&R due by 11/14/2016." (Docket Entry for Oct. 26, 2016.) However, while that deadline applied to Plaintiffs' Objections, it did not apply to Defendants' Objections: it was only *Plaintiffs'* Objections that were due beyond the fourteen (14) calendar day deadline for objections, because it is only Plaintiffs who were served with the Report-Recommendation by mail. *Fed. R. Civ. P. 72(b)(2)*; N.D.N.Y. *L.R. 72.1(c)*; *Fed. R. Civ. P. 6(d)*.



Positive

As of: May 24, 2018 8:56 PM Z

## *Booker v. Graham*

United States District Court for the Northern District of New York

October 26, 2016, Decided; October 26, 2016, Filed

9:13-CV-1342 (GTS/ATB)

**Reporter**

2016 U.S. Dist. LEXIS 149332 *

AMIN B. BOOKER, et al., Plaintiff, vs. HAROLD
GRAHAM, et al., Defendants.

**Subsequent History:** Adopted by, Summary judgment
granted, in part, summary judgment denied, in part by,
Dismissed by, in part, Sanctions disallowed by *Booker
v. Graham, 2016 U.S. Dist. LEXIS 170497 (N.D.N.Y.,
Dec. 9, 2016)*

**Prior History:** *Booker v. Graham, 2016 U.S. Dist.
LEXIS 37100 (N.D.N.Y., Mar. 21, 2016)*

## Core Terms

inmates, lockdown, defendants', recommendation,
summary judgment motion, prison, administrative
segregation, staff, confidential, retaliation, congregate,
religious, confined, grievances, meals, summary
judgment, bagged, substantial burden, penological
interest, plaintiffs', cell, religious services, adverse
action, observance, burdened, frisk, exercise of religion,
retaliation claim, in camera, allegations

**Counsel:** [*1] AMIN B. BOOKER, Plaintiff, Pro se.

PAUL COLON, Plaintiff, Pro se.

ADRIENNE J. KERWIN, Asst. Attorney General for
Defendants.

**Judges:** Hon. Andrew T. Baxter, United States
Magistrate Judge.

**Opinion by:** Andrew T. Baxter

## Opinion

### ORDER and REPORT-RECOMMENDATION

This matter has been referred to me for Report and

Recommendation pursuant to *28 U.S.C. § 636(b)* and
*Local Rules N.D.N.Y. 72.3(c)*. In their amended civil
rights complaint, plaintiffs Booker and Colon[1], both
practicing members of the Nation of Islam ("NOI") and
inmates at Auburn Correctional Facility ("Auburn") at the
time relevant to this action, allege that defendants
violated their *First Amendment* right to practice their
religion and their rights under the Religious Land Use
and Institutionalized Persons Act, ("RLUIPA"), *42 U.S.C.
§ 2000cc-1(a)* by interfering with their observance of the
holy month of Ramadan during a facility-wide lockdown
from July 29, 2013 through August 4, 2013. (Dkt. No.
178, Am. Compl.). Plaintiff Booker also alleges a
separate violation of his rights under the *First
Amendment* and RLUIPA that occurred when he was
denied access to weekly congregate religious services
while administratively segregated in the Auburn Special
Housing Unit ("SHU") for approximately thirty days in
August and September 2013. (Am. Compl. [*2] at
14-15[2]). Plaintiff Booker further alleges that the charges
which prompted his SHU confinement were made in
retaliation for his grievance of the Ramadan lockdown.
(Am. Compl. at 13). Plaintiffs seek injunctive and
monetary relief. (Am. Compl. at 25-26).

Presently before the court is the defendants' motion for
summary judgment pursuant to *Fed. R. Civ. P. 56*. (Dkt.
No. 201). Only plaintiff Booker has responded in
opposition to the motion. (Dkt. No. 216). Plaintiff Booker
also filed a separate motion for sanctions in which he
alleged that defendants' summary judgment motion was
frivolous. (Dkt. No. 215). Defendants responded in
opposition to the sanctions motion and in further support
of their motion for summary judgment. (Dkt. No. 217).
Defendants also requested that they be permitted to

---

[1] A third plaintiff, Lawrence Wilson, voluntarily withdrew from
this action with prejudice while the summary judgment motion
was pending. (Dkt. Nos. 213, 214).

[2] All page references are to the pagination in the CM/ECF
system unless otherwise indicated.

submit certain confidential exhibits under seal for *in camera* review, if necessary to the determination of the summary judgment motion. (Dkt. No. 218). Plaintiff Booker opposed [*3] the request for *in camera* review and restated his arguments in favor of sanctions. (Dkt. No. 219, 220).

For the following reasons, this court recommends that defendants' motion for summary judgment be granted as to all of plaintiffs' *First Amendment* and RLUIPA claims. This court further recommends that defendants' motion for summary judgment be denied as to plaintiff Booker's retaliation claim. Because this court has found that defendants' summary judgment motion was appropriate, it further recommends that plaintiff Booker's motion for sanctions be denied. Finally, this court denies defendants' request for *in camera* review of additional confidential documents in support of their motion.

## DISCUSSION

### I. Facts and Contentions

#### A. Ramadan Lockdown

In 2013, the Muslim holy month of Ramadan took place from July 8 to August 7. (Dkt. No. 201-17, ¶ 1). During this period, plaintiffs, as members of the NOI, had certain spiritual obligations: (1) to fast from sun up to sundown; (2) to congregate at sundown with other members of the community for prayer and a communal Halal[3] meal; (3) to consume the contents of a Sahoor bag[4] before sunrise; and (4) to engage in ritualistic washing prior to prayer. (Dkt. No. 201-2, Booker [*4] Dep. at 10-19).

From July 8, 2013 through the evening of July 28, 2013, the Muslim inmates at Auburn were provided hot halal meals to break their fast, Sahoor bags to eat prior to sun up, an opportunity to shower, and permission to congregate in a designated room. (Dkt. No. 201-17, ¶ 3). On July 29, 2013, Auburn Superintendent Harold Graham, a named defendant, instituted a lockdown

order so that security staff could conduct a facility-wide frisk for contraband. (Graham Decl. ¶¶ 13, 22-23). The lockdown order was issued with the permission of New York State Department of Corrections and Community Supervision ("DOCCS") Deputy Superintendent Joseph Bellnier. (Graham Decl. ¶ 20). The lockdown lasted from approximately 2 p.m. on July 29, 2013 until 1:45 p.m. on August 3, 2013. (*Id.* ¶ 22).

During the lockdown, most inmate movement within the facility ceased. (*Id.* ¶ 7). No inmate [*5] programs were run for the general population, no religious ceremonies or congregate prayer services were held, and inmates remained confined to their cells for all meals. (*Id.* ¶ 8). There were certain exceptions: movement to a "clean cell" for urinalysis testing; escorts to the infirmary for insulin injections; and previously scheduled family visits. (*Id.* ¶¶ 9-12). The facility also accommodated the needs of approximately fifty Auburn inmates who were receiving mental health treatment in an Intermediate Care Program ("ICP") unit that was separate from the general population. (Dkt. No. 217-1, Graham Reply Decl. ¶¶ 5-10). The ICP unit was searched at the beginning of the lockdown, so that those inmates could resume their mental health programs with minimal interruption. (Graham Reply Decl. ¶ 11).

Because of the lockdown, plaintiffs were not permitted to meet for communal meals or prayer with fellow NOI inmates. (Graham Decl. ¶ 24). They were also not provided the customary hot halal meal to break their fast at sundown. (*Id.* ¶ 24). Instead, Auburn provided the same bagged meal three times a day to all inmates, regardless of religious affiliation. (Dkt. No. 201-12, Martin Decl. ¶ 7). These [*6] meals, which had been approved by the DOCCS Office of Nutritional Services, contained non-pork meat, cheese, condiments, fruit or a cookie, bread, and juice. (Martin Decl. ¶ 8). Sahoor bags were provided on the first day of the lockdown, but after that, plaintiffs were expected to use one of the bagged meals as a substitute. (Dkt. No. 201-17, ¶¶ 7, 66). Due to the movement restrictions, no inmates were allowed to use the showers. (Dkt. No. 201-17, ¶ 27). Standard lockdown policy called for hot water to be distributed to inmates to wash in their cells once the frisk of their cell block was completed, but plaintiff Booker denies that any hot water was ever delivered to his cell. (Dkt. No. 201-17, ¶ 27; Dkt. No. 216-2, ¶ 27). When the lockdown was fully concluded on August 3, plaintiffs were able to resume their traditional observance of Ramadan for the remainder of the holy month. (Graham Decl. ¶ 26).

---

[3] At his deposition, plaintiff Booker explained that Halal food has been blessed and prepared in accordance with Islamic law. (Dkt. No. 201-2, Booker Dep. at 12).

[4] Plaintiff Booker testified that the Sahoor bag typically contained breakfast items such as boiled eggs, cereal, fruit, juice, and milk. (Booker Dep. at 17-18).

2016 U.S. Dist. LEXIS 149332, *6

## B. Booker Confinement in SHU

On August 13, 2013, defendant Fagan issued a recommendation that plaintiff Booker be confined to administrative segregation in SHU because his "presence in general population would have a detrimental effect to the safety and security of this facility." (Dkt. No. [*7] 216-4, at 80). This recommendation was based on defendant Fagan's conclusion, drawn largely from confidential material, that plaintiff Booker was involved in the production and distribution of a flyer that encouraged an inmate strike and the potential use of violence in response to alleged inhumane treatment at prisons nationwide, including the Ramadan lockdown at Auburn. (Dkt. No. 201-9, Fagan Decl. ¶¶ 9, 12-13; Dkt. No. 216-4, at 105). After an administrative hearing, defendant Robinson, who served as hearing officer, agreed with the recommendation that plaintiff Booker be administratively segregated in SHU. (Dkt. No. 216-4, at 114-115). While confined in SHU, defendant Graham, in accordance with DOCCS policy, prohibited plaintiff from attending weekly Jumah religious services. (Am. Compl. at 14, 25; Graham Decl. ¶¶ 35-36). Approximately thirty days after plaintiff Booker was assigned to administrative segregation, defendant Graham transferred him to another facility. (Booker Dep. at 75).

## II. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of [*8] law. _Fed. R. Civ. P. 56_; _Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)._ "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." _Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)._ It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. _Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)._

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. _Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)._ If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that

there is a genuine issue for trial. _Salahuddin, 467 F.3d at 273._ In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." _Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)._ However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. See _United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)_; _Salahuddin v. Goord, 467 F.3d at 272._

## III. Religion Claims

### A. Legal Standards

#### 1. First Amendment

Inmates have the right under the _First_ and _Fourteenth Amendments_ to freely exercise a chosen religion. _Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003)_ (citing _Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974))._ However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. [*9] _Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990)._ The analysis of a free exercise claim is governed by the framework set forth in _O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987)_ and _Turner v. Safley, 482 U.S. 78, 84, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987)._ This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. _Ford, 352 F.3d at 588._

In O'Lone, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. _482 U.S. at 349_ (quoting _Turner, 482 U.S. at 89_). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. _Salahuddin, 467 F.3d at 274 n.4._ In _Farid v. Smith, 850 F.2d 917, 926 (2d Cir. 1988)_, the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3)

2016 U.S. Dist. LEXIS 149332, *9

whether the challenged practice of the prison officials furthers some legitimate penological interest."

The Second Circuit has examined the standard for analyzing a *First Amendment* religion claim. *Holland v. Goord, 758 F.3d 215, 220-22 (2d Cir. 2014)*. In *Holland*, the court discussed the degree of burden required for a *First Amendment* claim. *Id. at 220-21*. The court noted that it **[*10]** has not been decided in this Circuit whether, to state a claim under the *First Amendment*, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs." *Id.* (citing *Salahuddin, supra at 274-75*; *Ford, supra at 592* (where the court assumed without deciding that the substantial burden test applies)). The court in *Holland* did not decide the issue, rather the court assumed the continued validity of the substantial burden test and analyzed the case accordingly.[5] *Id.* This court will follow the analysis in *Holland* and proceed to consider the *First Amendment* analysis, assuming that the substantial burden test is still valid. *See also Williams v. Doe, 639 Fed. App'x 55, 56 (2d Cir. 2016)* (discussing the unsettled status of the substantial burden test).

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating **[*11]** that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett, No. 02-CV-349, 2007 U.S. Dist. LEXIS 27702, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007)* (citing *Salahuddin, 467 F.3d at 274*). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford, 352 F.3d at 595*.

## 2. Religious Land Use and Institutionalized Persons Act

RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -
>
> > (A) is in furtherance of a compelling governmental interest; and
> > (B) is the least restrictive means of furthering that compelling governmental interest.

> *42 U.S.C. § 2000cc-1(a)*.

Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial.[6] *Marria v. Broaddus, 200 F. Supp. 2d 280, 297 (S.D.N.Y. 2002)* (citing *42 U.S.C. § 2000cc-2(b)*). The burden then shifts to the government to show that the burden furthers a compelling governmental interest *and* that it is the **least restrictive** means of achieving that **[*12]** interest. *Id.* The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *42 U.S.C. § 2000cc-5(7)(A)*.

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord, 520 F. Supp. 2d 487, 498 (S.D.N.Y. 2007)* (citing, *inter alia, Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996)*). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck, 379 F. Supp. 2d 550, 557 (S.D.N.Y. 2005)*). Furthermore, the substantial burden test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis, 357 F.3d 197, 203 n.6 (2d Cir. 2004)* (discussing in a footnote the applicability of the "time-honored maxim '*de minimis non curat lex*'"). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis, 352 F.3d 582, 593-94 (2d Cir. 2003)* (discussing *First Amendment* protections).

---

[5] This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland, 758 F.3d at 221*.

[6] RLUIPA uses the term "substantial burden" in the language of the statute, removing any ambiguity with respect to the extent of the burden required to establish a statutory claim.

Nancy Pontius

## B. Application - Ramadan Lockdown

### 1. *First Amendment*

For purposes of this motion only, defendants have not significantly disputed[7] plaintiffs' contention that [*13] the lockdown's interference with their observance of Ramadan substantially burdened their ability to practice their religion. (Dkt. No. 201-18, Def.'s Br. at 8). Rather, they argue that any burden was reasonably related to legitimate penological interests and in furtherance of the compelling governmental interest of prison security. They also argue that qualified immunity would prevent the assessment of damages against defendants Martin, Thomas, Robinson, Arria, Carpenter, Griffin and Stevens.[8]

### a. Legitimate Penological Interest

Assuming that plaintiffs' sincerely held religious beliefs were substantially burdened, the court must consider whether defendants meet the "relatively limited burden" of identifying the legitimate penological interests that justified the lockdown and resulting interference [*15] with Ramadan. *Salahuddin, 467 F.3d at 275* (citing *Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 127-28, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977)* (prison officials need only testify to the legitimate penological interests behind the challenged conduct to meet their burden of proof)). Once a legitimate penological interest is articulated, its reasonableness is then subject to the *Turner* analysis. *Sproul v. Goord, No. 9:05-CV-75, 2007 U.S. Dist. LEXIS 104111, 2007 WL 2609787, at *11 (N.D.N.Y. Sept. 5, 2007)*.

Defendants justified the security need for the lockdown and facility-wide frisk, and its timing during the holy month of Ramadan, by citing the increase in security incidents at the facility in June and July 2013. (Dkt. No. 201-17, ¶ 17). Between June 22, 2013, and July 29, 2013, there were seven assaults on Auburn staff, eleven assaults on inmates, twenty-one fights between inmates, twelve weapons recovered, and twelve documented uses of force by Auburn staff. (Graham Decl. at ¶ 13). Defendants compared this to data which showed that there had been only one assault on staff, three assaults on inmates, two weapons recoveries, and two documented uses of force during the immediately previous twenty day period from June 1, 2013 through June 21, 2013. (*Id.*). Defendant Graham's request to DOCCS Deputy Commissioner Bellnier (who is not named as a defendant in this case) for permission [*16] to order a lockdown was approved on July 29, 2013, and the lockdown was implemented that afternoon. (Graham Decl. ¶¶ 20, 22).

In explaining his lockdown order, defendant Graham stated that "[t]he presence of contraband within a facility and its subsequent possession and/or use by inmates threatens the security of the facility, endangers the safety of inmates, employees, visitors, and the community, and impairs rehabilitation programs." (Graham Decl. ¶ 4). The discovery of "contraband and other potentially dangerous items" has been recognized as a "clearly legitimate objective" for prison officials. *Lewis v. Zon, 920 F. Supp. 2d 379, 385 (W.D.N.Y. 2013)*.

This court agrees with defendants that the lockdown had a legitimate, rational connection to the governmental objective of reducing contraband and enhancing prison security. Defendant Graham explained in his declaration that "[t]he purpose of halting inmate movement is to ensure that the facility can be properly

---

[7] Defendants did submit a declaration from Ali Muhsen, Chaplain for the Muslim faith at Auburn, who concluded that the five day lockdown imposed "minimal burdens on the Muslim community" that were outweighed by legitimate security needs. (Dkt. No. 201-13, Muhsen Decl., ¶ 23). Plaintiff Booker rejected this contention, and noted that Muhsen was a Sunni Muslim, who was not subject to the same religious dietary restrictions as an NOI member. (Dkt. No. 216, Booker Decl. ¶¶ 24-26).

[8] Defendants Martin, Thomas, Robinson, Arria, Carpenter, Griffin, and Stevens argue that they are entitled to qualified immunity, because they had no input into the development or implementation of the lockdown order, and were [*14] following what they believed to be a lawful order. (Dkt. Nos. 201-12, Martin Decl. ¶¶ 12-13; Dkt No. 201-16, Thomas Decl. ¶ 14; Dkt. No. 41-6, Robinson Decl. ¶¶ 19, 31; Dkt. No. 201-7, Arria Decl., ¶¶ 11, 14; Dkt. No. 201-8, Carpenter Decl. ¶¶ 11, 13; Dkt. No. 201-11, Griffin Decl. ¶¶ 11, 13; and Dkt. No. 201-15, Stevens Decl. ¶¶ 11, 13 ). This court need not address this issue because I find that the lockdown did not violate plaintiffs' *First Amendment* rights, and the related RLUIPA claims are moot. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. If the defendants have not violated the plaintiff's rights in the first instance, the court need not reach the issue of whether a reasonable person would have known of the violation.

and thoroughly searched without the distraction of the normal operation of the facility, to eradicate the ability of inmates to move or eliminate contraband they have concealed in facility areas or living quarters, and also to make security staff available to conduct the facility wide frisk." [*17]  (Graham Decl. ¶ 7).

Defendant Graham recognized that the lockdown would interfere with the observance of Ramadan, but believed that the intrusion was justified under the circumstances. (Graham Decl. ¶ 19). Fully accommodating the observance of Ramadan would have either required postponing the frisk despite the perceived need for an immediate response, or delaying completion of the frisk by diverting staff. Prison officials are entitled to "wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). "In the absence of evidence showing that the officials have exaggerated their response to security matters, their expert judgment should be accepted by the courts." Hurley v. Ward, 549 F.Supp. 174, 184 (S.D.N.Y.1982) (citing Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 128, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977); Pell v. Procunier, 417 U.S. 817, 827, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)).

Defendants provided plaintiffs with an alternative, albeit incomplete, means of meeting some of their Ramadan obligations while confined to their cell. (Graham Decl. ¶¶ 17, 23). Plaintiffs were provided bagged meals to break their fast, and to use as a substitute for the traditional Sahoor bag. (Graham Decl. ¶ 25). Although there is some dispute as to whether hot water was provided [*18] to plaintiffs once the frisk of their cell block was complete, such accommodation was Auburn's standard policy. (Graham Decl. ¶ 27; Dkt. No. 216-2, ¶ 27).

Throughout this litigation, plaintiffs have questioned the need for a lockdown, and argued that even if the lockdown was necessary, Auburn had sufficient staffing to avoid interrupting the observance of Ramadan. (Booker Decl. ¶¶ 29-31, 41). In his response to this motion for summary judgment, plaintiff Booker further contends that defendant Graham misled DOCCS officials when he initially advised that he did not anticipate any interference with Ramadan during the lockdown. (Dkt. No. 216-1, at 4-5). Plaintiff Booker also argues that multiple defendants misled inmates about the length of time that the lockdown would interfere with

the holy month. (Dkt. No. 216-1, at 4). This court has considered these arguments, but concludes that plaintiffs have failed to raise any material question of fact regarding the rationality of defendants' implementation of the lockdown, and have not proposed any viable alternatives that would not adversely impact staff, inmates, and prison resources.

Plaintiff Booker argues that, based on his experience at Auburn [*19] and other DOCCS facilities, he did not observe any significant inmate behavioral changes in June or July 2013 that would prompt a lockdown. (Booker Decl. ¶¶ 29-31). In particular, plaintiff Booker argues that the data relied upon by defendants Graham and Robinson to document the rise in inmate violence prior to the lockdown could not be accurate because such an increase "would have been noticeable." (Booker Decl. ¶ 30). At their depositions, plaintiffs testified that they never received an adequate explanation for the lockdown from Auburn officials. (Booker Dep. at 54; Dkt. No. 201-3, Colon Dep. at 31). However, the fact that plaintiffs were unaware of any increase in violent incidents does not create an issue of fact regarding defendants' security concerns. See DeJesus v. Bradt, Case No. 6:13-CV-6066 EAW, 174 F. Supp. 3d 777, 2016 U.S. Dist. LEXIS 44716, 2016 WL 1266652, at *9-10 (W.D.N.Y. Mar. 31, 2016) (policy that banned the removal of food from the mess hall during Ramadan could not be deemed irrational merely because plaintiff was unaware of security problems caused by the practice); Jermosen v. Coughlin, Case No. 87 Civ. 6267 (RJW), 1993 U.S. Dist. LEXIS 9283, 1993 WL 267357, at *4 (S.D.N.Y. July 9, 1993) (mere fact that plaintiff lacked personal knowledge of perceived security risk was not evidence of its nonexistence); see also Seymour/Jones v. Vaughn, Civ. A. No. 89-8087, 1991 U.S. Dist. LEXIS 13720, 1991 WL 195737, at *1 (E.D. Pa 1991) ("In order for [*20] a decision to lock down a prison to be reasonable, the prison authority must believe that a valid prison purpose exists for the lock down, and not simply be acting out of spite or malice. It is not necessary for his information to, with the clarity of 20-20 hindsight, turn out to have been true.").

Plaintiffs further argue that, even if the lockdown was warranted, Auburn officials could easily have accommodated their observance of Ramadan. (Booker Decl. at ¶ 43). At his deposition, plaintiff Booker testified that approximately 65 to 75 NOI inmates were observing Ramadan at Auburn that year. (Booker Dep. at 14). He was unsure of the number of Sunni Muslims who were also observing the holy month, but testified that the

Sunni community was larger than the NOI community. (*Id.*). Based on his experience as an inmate at Auburn and other DOCCS facilities, plaintiff Booker estimated that it would only require a total of eleven correctional officers to escort Muslim inmates to the showers, services, and cell blocks; supervise the NOI and Sunni Muslim inmates during their separate congregational services; and deliver halal meals and Sahoor bags to inmates observing the holy month. (Booker Decl. [*21] ¶ 35). He also argued that the kitchen staff could have prepared halal meals and Sahoor bags at the same time as the rest of the facility's bagged meals. (Booker Decl. ¶ 41). In addition, plaintiff Booker alleges that the lockdown was conducted in an inefficient manner that unnecessarily extended the length of the contraband search and prolonged the burden on the observation of Ramadan.[9] (Booker Decl. ¶ 66-67).

Plaintiffs' criticism of the lockdown and their suggested alternative are based solely on their own observation of prison operations while incarcerated at various DOCCS facilities. (Booker Decl. ¶¶ 39, 41; Colon Dep. at 25-28). Their suggested approach, which would have allowed greater freedom of movement to the more than one hundred Auburn inmates observing Ramadan, would have increased inmate movement in the facility, negatively impacted security staff and kitchen employees, and likely prolonged the duration [*22] of the lockdown. As explained by defendant Graham, the purpose of restricting inmate movement is to allow an efficient and thorough search "without the distraction of the normal operation of the facility." (Graham Decl. ¶ 7). Plaintiffs' suggested diversion of security staff from the facility-wide frisk, and re-structuring of Auburn's existing lockdown protocols, would have more than a *de minimis* impact on prison operations. Because defendants have demonstrated a legitimate penological purpose for the burden imposed on plaintiff's *First Amendment* rights, this court recommends that defendants' motion for summary judgment be granted as to plaintiff's *First Amendment* claims.

## 2. RLUIPA

To the extent that plaintiffs assert RLUIPA claims for injunctive or declaratory relief against any of the

defendants in either their individual or official capacities for their roles in the lockdown and the resulting interference with Ramadan, those claims should also be dismissed.[10] Although plaintiffs could ordinarily pursue claims for such relief under RLUIPA against defendants in their official capacities, neither plaintiff is currently incarcerated at Auburn. Plaintiff Booker is currently incarcerated at Elmira Correctional Facility, [*23] and plaintiff Colon is currently incarcerated at Fishkill Correctional Facility. (Dkt. Nos. 104, 105). Transfer to another facility moots claims for declaratory or injunctive relief against Auburn officials. *Shepherd v. Goord, 662 F.3d 603, 610 (2d Cir. 2011)* (citing *Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006)*); *see also Wright v. New York State DOCCS, 568 Fed. App'x 53, 55 (2d Cir. 2014)*; *Wood v. Captain Colon, No. 3:13-CV-1467, 2016 U.S. Dist. LEXIS 66235, 2016 WL 2930882, at *3 (D. Conn. May 18, 2016)*.

If plaintiffs had named an individual who had authority to change state-wide policy regarding lockdowns during religious holidays, it is possible that their RLUIPA claim would not be moot as to that individual in his or her official capacity. *See Smith v. Artus, 522 F. App'x 82, 84 (2d Cir. 2013)* (finding that plaintiff's transfer to a new facility did not render moot his claims for injunctive and declaratory relief under the *First Amendment* or RLUIPA when plaintiff was subjected to the same policy banning inmate demonstrative prayer in the recreation yard at his new facility, and there was a state-wide policy banning such conduct). None of the named defendants have such state-wide authority. Therefore, all of plaintiffs' remaining RLUIPA claims are moot as against the only defendants that they have named.

## C. Application - Booker SHU Confinement

### 1. *First Amendment* & RLUIPA

Separate [*24] from the lockdown, plaintiff Booker claims that defendant Graham violated his rights under the *First Amendment* and RLUIPA by enforcing DOCCS policy that inmates housed in SHU may not attend congregate religious services. Plaintiff Booker was housed in administrative segregation in Auburn SHU for approximately thirty days before being transferred to another facility. (Booker Dep. at 75). This court

---

[9] Plaintiff Booker also speculated that prison staff intended to allow the observation of Ramadan during the lockdown, but so enjoyed the minimal workload during the facility wide contraband search that they made a collective decision to "drop Ramadan." (Booker Decl. ¶ 69).

[10] Judge Suddaby dismissed plaintiffs' claims for monetary damages under RLUIPA with prejudice on March 31, 2014. (Dkt. No. 24, at 25).

2016 U.S. Dist. LEXIS 149332, *24

recommends that defendant Graham be granted summary judgment as to these *First Amendment* and RLUIPA claims.

Prohibiting a particular inmate's attendance at congregate religious services because he is housed in administrative segregation does not violate the *First Amendment* if the restriction serves a valid penological purpose. *Graham v. Coughlin, No. 86 Civ. 163, 2000 U.S. Dist. LEXIS 14396, 2000 WL 1473723, at *6 (S.D.N.Y. Sept. 29, 2000)* (citing *Bellamy v. McMickens, 692 F. Supp. 205, 214-15 (S.D.N.Y. 1988))*. Similarly, denial of an inmate's request to participate in congregate religious services while housed in SHU does not violate RLUIPA when it furthers compelling government interests of promoting prison security, and the burden placed on the inmate is the least restrictive means of serving those interests. *Walker v. Artus, 998 F. Supp.2d 18, 28-29 (N.D.N.Y. 2014)* (denial of inmate's request to participate in Jumah services by audio or video feed while in SHU did not violate RLUIPA); *see also Smith v. Artus, No. 9:07-CV-1150 (NAM/ATB), 2010 U.S. Dist. LEXIS 104660, 2010 WL 3910086, at *30* [*25] on other grounds, *522 F. App'x 82, 84 (2d Cir. 2013)*.

The summary judgment record provides the rationale for defendants' placement of plaintiff Booker in administrative segregation. Although plaintiff Booker has disputed the accuracy of the charges against him, he was placed in administrative segregation after Auburn staff concluded that he distributed a flyer that encouraged an inmate strike and promoted violence against Auburn staff. (Fagan Decl. ¶ 10, 12; Dkt. No. 216-4, at 105). In light of those findings, it was reasonable to conclude that allowing plaintiff Booker to attend congregate services would allow further opportunity to communicate or pass correspondence to other inmates. The prohibition of such attendance was related to security concerns, and thus, clearly served a valid penological purpose.[11]

Although plaintiff was not permitted to attend congregate religious services, Auburn did provide other religious accommodation in accordance with DOCCS policy. Religious counseling was available upon written request to the facility's ministerial staff. (Graham Decl. ¶ 37). DOCCS rules also allowed plaintiff Booker to keep a Quran and prayer rug in his cell, or similar devotional articles. (*Id.*). Plaintiff Booker has not challenged the legitimacy or the availability of these alternative means of practicing his religion. Therefore, in light of the security concerns that justified a restriction on congregate religious services, and the availability of alternative means of religious exercise that did not infringe on those security concerns, this court recommends that defendants' motion for summary judgment be granted as to plaintiff Booker's *First Amendment* and RLUIPA claims arising from his confinement in administrative segregation.

## IV. Retaliation Claim

### A. Legal Standards

In order to establish a claim of retaliation for the exercise of a [*27] constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendant. *Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)*. The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004)* (citations omitted). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Id. at 380*. The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett, 343 F.3d at 137*.

### B. Application

Plaintiff Booker contends that defendants Graham, Robinson, and Fagan falsified the allegations against him that led to his confinement in administrative segregation in retaliation for his multiple complaints and

---

[11] Defendants also argue that plaintiff's history of gang affiliation and prior rules violations provided additional security reasons to restrict his attendance at congregate religious services. (Graham Decl. ¶¶ 38-39). This court need not determine this issue, or address defendants' argument that the general prohibition on congregate services for SHU inmates serves a valid penological objective. (Dkt. No. 201-18, at [*26] 12). It is clear that the specific charges that prompted plaintiff Booker's placement in administrative segregation in August 2013 provided a valid penological reason.

2016 U.S. Dist. LEXIS 149332, *27

grievances related to the Ramadan lockdown. (Booker Dep. at 69-71). In particular, plaintiff Booker contends that [*28] defendant Fagan falsified his investigation and recommendation of administrative segregation; that defendant Robinson had a retaliatory motive to adopt that recommendation after the administrative hearing; and defendant Graham coordinated this retaliatory scheme and ultimately transferred plaintiff to another facility.[12] (Am. Compl. at 13-14).

Participation in the grievance process by an inmate is clearly protected conduct in the context of a retaliation claim. *Roseboro v. Gillespie, 791 F. Supp. 2d 353, 367 & n. 21 (S.D.N.Y. 2011)* (collecting cases). Confinement in administrative segregation, and the resulting loss of privileges, would certainly constitute "adverse action because it would [*29] deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Gill, 389 F.3d at 381*. However, plaintiff must still plausibly allege that there is a causal connection between his grievances and the alleged wrongful conduct. The type of evidence required to establish a causal connection between a plaintiff's protected activity and a defendant's alleged adverse action includes: temporal proximity, prior good discipline, a finding of not guilty at a disciplinary hearing, and statements from the defendants regarding their motives. *Santiago v. Whidden, No. 3:10-CV-1839, 2012 U.S. Dist. LEXIS 26172, 2012 WL 668996, at *7 (D. Conn. Feb. 9, 2012)* (citing *Barclay v. New York, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007))*.

Plaintiff Booker has demonstrated that his confinement in SHU was close in time to his administrative complaints and grievances. Defendant Fagan stated that his August 13, 2013 Administrative Segregation Recommendation was based upon the results of an investigation that began in early August 2013. (Fagan Decl. ¶ 7). Plaintiff Booker has provided evidence of his written complaints regarding the Ramadan lockdown dated July 29, 2013 and July 31, 2013, and an August

2, 2013 grievance raising the same issues. (Dkt. No. 216-4, at 27-28, 77-79). He also filed a separate grievance on August 8, 2013, alleging [*30] that Auburn officials refused to provide all of the halal food that NOI inmates had purchased for Ramadan. (Dkt. No. 201-5, at 5-6).

Although a "'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' '[s]uch circumstantial evidence of retaliation, . . . without more, is insufficient to survive summary judgment." *Roseboro, 791 F. Supp. 2d at 370* (citations omitted). Moreover, "[a]s a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *See, e.g., Hare v. Hayden, 09 Civ. 3135, 2011 U.S. Dist. LEXIS 40683, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011)* (citing *Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009)* (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another corrections officer); *Roseboro v. Gillespie, 791 F. Supp. 2d at 369* (plaintiff has failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in). Relying on this caselaw, defendants point out that defendant Fagan, who was the primary witness at plaintiff Booker's administrative hearing, was not named in any of these complaints or grievances, and had no involvement in the Ramadan lockdown. (Dkt. No. 201-18, at 13). [*31] Defendant Fagan has also specifically denied any knowledge of the relevant grievances at the time of his investigation. (Fagan Decl. ¶ 10-11).

However, plaintiff Booker has countered defendants' denials of any retaliatory motive by alleging that defendants Fagan and Robinson each admitted a connection between his Ramadan grievances and his placement in administrative segregation. Although the court recognizes that plaintiff Booker's recollections may be self-serving, it also notes that his description of these statements has been consistent across his amended complaint, deposition testimony, and his response to this summary judgment motion. (Am. Compl. ¶ 74-76; Booker Dep. at 69-71; Dkt. No. 216-1, at 18.). The summary judgment record also includes a sworn declaration by inmate Mark McCoy, dated March 15, 2016, describing an unidentified hearing officer's admission that Auburn officials were retaliating against those who filed complaints related to Ramadan. (Dkt. No. 216-4, at 87). Faced with this conflict between sworn statements, this court must conclude that a

_____

[12] Defendant Graham has argued that, as a supervisory official who merely assigned a hearing officer to evaluate the administrative segregation recommendation, he had no personal involvement in any alleged retaliation. (Dkt. No. 201-18, at 16-17). However, in light of plaintiff's assertion that defendant Graham also transferred him from Auburn in retaliation for grievances, summary judgment is unavailable on this ground. *See Meriwether v. Coughlin, 879 F.2d 1037, 1045 (2d Cir. 1989)* (officials have broad discretion to transfer inmates, but may not transfer them solely in retaliation for the exercise of their constitutional rights).

2016 U.S. Dist. LEXIS 149332, *31

reasonable fact-finder could potentially find plaintiff Booker's allegations of retaliation to be credible.

Even when a plaintiff [*32] has shown a causal connection, defendants may still be entitled to summary judgment if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. _Mount Healthy Sch. Dist. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)_. Thus, under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. _Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir.2002)_; _Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996)_. Defendants argue that there was sufficient evidence, most of which was confidential, to conclude that plaintiff Booker was involved in organizing a work strike and instructing other inmates to arm themselves and use violence, which justified administrative segregation. (Dkt. No. 201-14, Robinson Decl. ¶ 36).

Due to security concerns, defendants have not included the confidential information that implicated plaintiff as part of their motion. (Fagan Decl. ¶ 9; Graham Reply Decl. ¶ 18-19). Defendants' summary of this evidence provides little substantive information. Defendant Fagan stated that his investigation included information from a confidential informant that plaintiff Booker was "not only involved in organizing the work strike, but was the likely leader of the plan." (Fagan Decl. ¶ 13). Defendant Robinson, who presided [*33] over the hearing and agreed that plaintiff should be placed in administrative segregation, based his determination on defendant "Fagan's recommendation, his confidential testimony, [and] the confidential letters received which indicated plaintiff was involved in organizing a work strike and instructing other inmates to arm themselves and use violence." (Robinson Decl. ¶ 36).

The only relevant evidence found in the summary judgment record is the text of the flyer that had been distributed to inmates, and the observation of an increase in visits, packages, and commissary purchases at Auburn.[13] (Robinson Decl. ¶ 37; Dkt. No. 216-4, at 105). Even though such evidence may support the defendants' conclusion that a potentially violent inmate strike was being organized at Auburn, it does not resolve the key inquiry of this motion for summary

judgment: namely, whether there was a non-retaliatory reason to identify plaintiff Booker as a leader and organizer of the planned work stoppage.

To remedy this gap in the evidence, defendants have offered to provide relevant confidential information that supports the administrative determination to the court under seal, for _in camera_ review without disclosure to plaintiffs. (Graham Reply Decl. ¶¶ 19-20; Dkt. No. 218). This court has previously requested that defendants provide authority for their position that the court may grant summary judgment based on evidence that is unavailable to the non-moving party.[14] (Dkt. Nos. 203, 209). Defendants have identified only two cases on the issue. (Dkt. No. 217, at 7-19). The first, _Spiteri v. Russo, Case No. 12-CV-2780 (MKB), 2013 U.S. Dist. LEXIS 5327, at *2-3 (E.D.N.Y. Jan. 14, 2013)_, permitted the state defendants to file a confidential exhibit in support of their motion to dismiss "under seal on ECF with limited access to the parties in the litigation." Based on the language of the decision, the plaintiff in _Spiteri_ already had access to the confidential document, and moved to strike it from the record due to the potential for public disclosure. _Id., 2013 U.S. Dist. LEXIS 5327, at *3_. Accordingly, it has no bearing on defendant's request in this case.

To her credit, defendants' counsel has also identified _Gibson v. Rosati, Case No. 9:13-CV-503 (GLS/TWD), 2016 U.S. Dist. LEXIS 66677, at *5, fn.1 (N.D.N.Y. May 19, 2016)_, adopted, _2016 U.S. Dist. LEXIS 131850, 2016 WL 5390344 (N.D.N.Y. Sept. 27, 2016)_. In that case, the magistrate judge refused to consider _in camera_ evidence offered in support of the defendants' motion for summary judgment that had not been disclosed to the inmate plaintiff. _Id._ (citing _Hansberry v. Father Flanagan's Boys' Home, Case No. CV-03-3006 (CPS), 2004 U.S. Dist. LEXIS 26937, 2004 WL 3152393, at *4 fn. 9 (E.D.N.Y. Nov. 28, 2004)_ (collecting cases)). After consideration of the limited authority provided, and finding that defendants have not provided

---

[13] Defendant Robinson explained that this data is used as an indicator that "the inmate population is aware that an event is going to take place which could cause the facility to be locked down." (Robinson Decl. ¶ 37). [*34]

---

[14] This court notes that this issue is different from prison officials' withholding of confidential information from an inmate during an administrative hearing. That practice has [*35] been found to satisfy due process in specific circumstances. _Wolff v. McDonnell, 418 U.S. 539, 564-65, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974)_; _Sira v. Morton, 380 F.3d 57,74-75 (2d. Cir. 2004)_. In this case, plaintiff's due process claims were previously dismissed (Dkt. No. 177, at 13-15), and his thirty day confinement in SHU would not ordinarily give rise to a liberty interest implicating due process. _Sandin v. Conner, 515 U.S. 472, 487, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)_.

2016 U.S. Dist. LEXIS 149332, *35

any support for their request regarding the filing of confidential information, this court denies defendants' motion for *in camera* review of *ex parte* evidence.

In *Gibson*, the court still recommended granting defendants' motion for summary judgment, based only on evidence that was disclosed to both parties. *2004 U.S. Dist. LEXIS 26937, [WL] at *17-18*. As described above, such evidence is lacking in this summary judgment record. While this court appreciates that legitimate security concerns likely influenced the amount of information **[*36]** offered in support of their motion, I recommend that defendants' motion for summary judgment be denied as to plaintiff Booker's retaliation claim.[15]

### V. Motion for Sanctions

*Rule 11 of the Federal Rules of Civil Procedure* authorizes sanctions under various circumstances, including where: an attorney has certified groundless and frivolous papers; a document has been presented for an improper purpose, such as to harass or cause unnecessary delay or expense; the claims or defenses are not supported by law; and/or the allegations and other factual contentions lack evidentiary support. *Fed. R. Civ. P. 11*. The imposition of sanctions is purely discretionary, and that discretion should be exercised only when improper conduct is clear. *Welch v. Selsky, Case No. 9:06-Cv-812 (LEK/DEP), 2007 U.S. Dist. LEXIS 99112, 2008 WL 238553, at *7 (N.D.N.Y. Jan. 28, 2008)*. A test of objective unreasonableness is employed to assess whether conduct is sanctionable; that is, the conduct must be "totally without merit or utterly lacking in support." *Id.* (citation omitted).

Plaintiff Booker's motion for sanctions is premised on his belief that defendants have no factual or legal basis to seek summary **[*37]** judgment. (Dkt. No. 215). This court disagrees. In light of my finding that defendants' motion had merit and the resulting recommendation that summary judgment should be partially granted to defendants, I further recommend that plaintiff Booker's motion for sanctions be denied.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary

judgment (Dkt. No. 201) be **GRANTED** as to plaintiffs' *First Amendment* and RLUIPA claims, and it is further

**RECOMMENDED**, that defendants' motion for summary judgment be **DENIED** as to plaintiff Booker's retaliation claim[16]; and it is further

**RECOMMENDED**, that plaintiff Booker's motion for sanctions (Dkt. No. 215) be **DENIED**, and it is further

**ORDERED**, that defendants' motion to submit documents for *in camera* review under seal (Dkt. No. 218) is **DENIED**.

Pursuant to *28 U.S.C. § 636(b)(1)* and *Local Rule 72.1(c)*, the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993)* (citing *Small v. Sec. of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989))*; *28 U.S.C. § 636 (b)(1)*; *Fed. R. Civ. P. 6(a)*, *6(e)*, *72*.

Dated: October **[*38]** 26, 2016

/s/ Andrew T. Baxter

**Hon. Andrew T. Baxter**

**U.S. Magistrate Judge**

---

Ꭼnd ᴏf Ꭰᴏᴄᴜᴍᴇɴᴛ

---

[15] Because of the outstanding material questions of fact, I also cannot conclude at this time that defendants Graham, Robinson, and Fagan are entitled to qualified immunity.

[16] If the district court accepts all of these recommendations, Booker would be the only remaining plaintiff, and Graham, Robinson, and Fagan would be the only remaining defendants in this case.

2016 WL 1295178
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Merim Berisha, Plaintiff,

v.

Sergeant Farrell, Defendant.

9:13-CV-1191 (LEK/ATB)
|
Signed 03/08/2016

**Attorneys and Law Firms**

MERIM BERISHA, Plaintiff, pro se.

JOSHUA L. FARRELL, Ass't Att'y Gen., for the
Defendants.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

 *1 This matter has been referred to me for Report
and Recommendation by the Honorable Lawrence E.
Kahn, Senior United States District Judge. In his amended
civil rights complaint, plaintiff, a practicing Muslim,
alleges that his right to the free exercise of religion under
the First Amendment and the Religious Land Use and
Institutionalized Person Act ("RLUIPA") was violated
when defendant ordered him on two consecutive days
to shave his beard or face disciplinary sanctions. (Dkt.
No. 11, Am. Compl.). Plaintiff's amended complaint also
raised due process, equal protection and retaliation claims
that were dismissed by Judge Kahn on December 11,
2014. [1] (Dkt. No. 12).

Presently before this court is defendant's motion for
summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt.
No. 19). Plaintiff has responded in opposition to the
motion. (Dkt. No. 23). Defendant submitted a reply, to
which plaintiff also responded. (Dkt. Nos. 24, 25). For the
following reasons, this court agrees with defendants and
will recommend dismissal of the amended complaint.

### I. *Summary Judgment*

Summary judgment is appropriate where there exists
no genuine issue of material fact and, based on the
undisputed facts, the moving party is entitled to judgment
as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,*
467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over
["material"] facts that might affect the outcome of the suit
under the governing law will properly preclude the entry of
summary judgment." *Anderson v. Liberty Lobby,* 477 U.S.
242, 248 (1986). It must be apparent that no rational finder
of fact could find in favor of the non-moving party for a
court to grant a motion for summary judgment. *Gallo v.
Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.
1994).

The moving party has the burden to show the absence of
disputed material facts by informing the court of portions
of pleadings, depositions, and affidavits which support the
motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).
If the moving party satisfies its burden, the nonmoving
party must move forward with specific facts showing that
there is a genuine issue for trial. *Salahuddin v. Goord,*
467 F.3d at 273. In that context, the nonmoving party
must do more than "simply show that there is some
metaphysical doubt as to the material facts." *Matsushita
Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475
U.S. 574, 586 (1986). However, in determining whether
there is a genuine issue of material fact, a court must
resolve all ambiguities, and draw all inferences, against the
movant. *See United States v. Diebold, Inc.,* 369 U.S. 654,
655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

### II. *Facts*

The relevant facts in this case were outlined in Judge
Kahn's December 11, 2013 Decision and Order (Dkt. No.
12) and will be recited herein for clarity and continuity,
with additional details drawn from the exhibits submitted
by the parties in connection with this motion. This court
will cite to additional details from the parties' motion
papers as necessary in its analysis of defendant's summary
judgment motion.

 *2 Plaintiff is an inmate incarcerated at Greene
Correctional Facility in Coxsackie, New York
("Greene"). (Am. Compl. at 1). Plaintiff alleges that on
September 16, 2013, at approximately 4:30 p.m., he was
in the Greene mess hall when defendant pulled him aside
to ask if plaintiff had a permit for his beard. (Am. Compl.
at 4). Plaintiff responded that he did not, but told Farrell
that he was a practicing Muslim who was prohibited from

trimming his beard by the Qu'ran. *Id.* Although plaintiff had recently transferred to Greene from another New York State Department of Corrections and Community Supervision ("DOCCS") facility, he was unaware of the DOCCS directive requiring a beard permit for facial hair in excess of one inch. (Dkt. No. 19–3, Joshua L. Farrell Decl. Ex. 1, Transcript of Pl.'s April 24, 2015 deposition ("Dep.") at 13). Plaintiff alleges that defendant then gave him a direct order to cut his beard off and said that he would come to plaintiff's dormitory to see that he complied. *Id.* Plaintiff returned to his dormitory, but did not have access to a beard trimmer. (Dep. at 14). Plaintiff packed his belongings, believing that he was going to be sent to the Special Housing Unit ("SHU"). (*Id.*). At his deposition, plaintiff testified that following this first encounter with defendant, "I wasn't even going to cut my beard. That's honest, I wasn't going to cut my beard. I didn't care." (*Id.*). Defendant never came to check on plaintiff. (*Id.*).

On September 17, 2013, plaintiff informed the Offender Rehabilitation Counselor, Mr. Dobbs ("Dobbs"), and the Superintendent, Mr. Smith ("Smith"), of the prior day's encounter with defendant.[2] (Am. Compl. at 4–5). Smith confirmed that plaintiff was registered in the DOCCS system as a practicing Muslim, and told plaintiff that there would be a temporary hold on cutting his beard. (Dep. at 14). Smith also had plaintiff submit a written request for a DOCCS beard permit, pursuant to the available religious exemption. (Am. Compl. at 5, Dep. at 14–15). Plaintiff asked Smith what he should do if he was stopped or harassed by defendant about his beard. (Dep. at 15). Smith told plaintiff to mention his discussion with the superintendent and advise defendant that he had a temporary hold on shaving. (Am. Compl. at 5; Dep. at 15).

During evening meal service on September 17, 2013, defendant asked plaintiff why he had not shaved his beard, despite his direct order to do so. (Am. Compl. at 5; Dep. at 15). When plaintiff told defendant about the discussion with Smith and the temporary hold on shaving, defendant "went into a rampage" and told plaintiff that he had to comply with defendant's direct order. (Dep. at 15). Defendant did not threaten any physical violence, but based on defendant's statements, plaintiff believed that he would be sent to "the box," or SHU, if he did not comply.[3] (Dep. at 17). Plaintiff returned to his dorm, obtained a beard trimmer, and shaved his beard. (Am. Compl. at 5; Dep. at 15). Plaintiff claims that he shaved

his beard[4] out of fear, and that he would not have done so otherwise, because plaintiff considered the Islamic prohibition on shaving his beard to be a serious religious commitment. (Am. Compl. at 5).

On September 18, 2013, plaintiff filed a grievance alleging that defendant ordered him to shave his beard, in conflict with plaintiff's Muslim faith. (Am. Compl. at 4). The grievance was accepted in part, although the Superintendent concluded that plaintiff had not advised defendant that he applied for an exemption to the grooming policy. (Dkt. No. 23, Ex. D to Pl.'s Mem. of Law). To prevent similar issues from arising in the future, plaintiff was advised to speak to the facility Imam regarding his beard permit, and the DOCCS grooming directive was read at a subsequent security staff line up to address any misunderstandings regarding its implementation. (*Id.*).

**\*3** On October 25, 2013, DOCCS Assistant Counsel Leslie H. Becher advised plaintiff by letter that she had reviewed his request for a beard permit, and would be recommending that a permit be issued granting him a religious exemption from the one-inch beard rule. (Dkt. No. 23, Ex. A to Pl.'s Memo. of Law). DOCCS records show that the beard permit was formally issued on November 4, 2013. (Dkt. No. 19–4, Ex. 2 to Joshua L. Farrell Decl.).

### III. *Compliance with Local Rule ("L.R.") 7.1*
As required under L.R. 7.1, defendants have filed a Statement of Material Facts. (Dkt. 19–1.) Plaintiff failed to initially respond to the Statement of Material Facts, but he filed a sur-reply stating that "[t]he facts on record are not in dispute, plaintiff agreeds [sic] with defendant about the 'Material Facts' that plaintiff was not physically harmed as stated on the record." (Dkt. No. 25, ¶ 3). This response does not comply with the requirements of L.R. 7.1(a)(3). Under this rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." Defendant provided plaintiff with notice of L.R. 7.1 and the consequences of non-compliance as part of his summary judgment motion. (Dkt. No. 19, at 3).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the L.R. provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (citation and internal quotation marks omitted). In deference to plaintiff's pro se status and his attempt, albeit inadequate, to respond to defendant's statement of material facts, the court has opted to review the entire summary judgment record.

## IV. *Free Exercise of Religion*

### A. Legal Standards

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However, the right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* No. 04–CV–57, 2007 WL 3046703, at *4 (N.D.N.Y.Oct.17, 2007).

To succeed on a claim under the Free Exercise Clause, the plaintiff must show at the threshold, that the challenged conduct "substantially burdens his sincerely held religious beliefs." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 (S.D.N.Y.2008) (quoting *Salahuddin,* 467 F.3d at 274–75) (citing *Ford,* 352 F.3d at 591). The issue of whether a "substantial burden" is required has been discussed at length, and although not specifically decided, recent cases still apply the requirement to Free Exercise cases. *Holland v. Goord,* 758 F.3d 215, 220–23 (2d Cir.2014); *Walker v. Artus,* No. 9:10–CV–1431(MAD/DEP), 2013 WL 564909,

at *8–9 (N.D.N.Y. Sept. 30, 2013) (citing *Salahuddin,* 467 F.3d at 274–75). This court will follow the analysis in *Holland* and will consider the First Amendment claim, assuming that the substantial burden test is still valid.

**\*4** The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects inmates' religious rights. RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000cc-l(a). For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith. In addition, this interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at *14 (S.D.N.Y. Apr. 22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

### B. Application

#### 1. RLUIPA Claim

Plaintiff's amended complaint, which seeks only monetary damages,[5] asserts a RLUIPA claim. (Am. Compl. at 10). It is well-established that monetary damages are not available against state actors in their official capacities for a violation of RLUIPA. *Sossamon v. Texas,* 563 U.S. 277, 293 (2011). In addition, the Second Circuit has held that "RLUIPA does not provide a cause of action against state officials in their individual capacities." *Washington v. Gonyea,* 731 F.3d 143, 145 (2d Cir.2013). Because his damage claim is precluded, this court recommends that plaintiff's RLUIPA claim be dismissed.

#### 2. First Amendment Claim

Beard grooming standards for all inmates at DOCCS facilities, including Greene, are established by DOCCS Directive 4914(B)(1)(b). Both parties have submitted a copy of this directive in connection with this motion. (Dkt.

No. 19–6, Ex. 1 to Mark Farrell Decl.; Dkt. No. 23, Ex. C to Pl.'s Mem. of Law). The directive provides in pertinent part that:

> An inmate may grow a beard and/or mustache, but beard/mustache hair may not exceed one (1) inch in length unless:
>
> a. The inmate has a Court Order restraining the Department from enforcement; or
>
> b. The inmate has requested and received an exemption based upon his or her documented membership in a religion which has an established tenet against the trimming of beards including, but not limited to, inmates who are Rastafarian, Orthodox Jew, or Muslim. All inmate requests for such exemption shall be referred to and reviewed by Counsel's Office after consultation with the facility Chaplain. After such review, Counsel's Office will make a recommendation to the Deputy Commissioner for Correctional Facilities. If the request is approved by the Deputy Commissioner for Correctional Facilities, a permit will be issued to the inmate.

> Further, pending Counsel's Office's determination of requests for exemption from the one (1) inch rule, inmates shall not be required to cut or trim their beards, disciplined for refusing the order to shave, or subject to repeat orders to shave.

> An inmate who refuses to comply with this rule will be given 14 days from the date of the written order to shave in which to request an exemption. If the inmate fails to submit a request for an exemption within 14 days, he may be disciplined for refusal to obey such order.

Plaintiff does not allege that the grooming policy itself violates his right to free exercise of religion – an argument that has been considered and rejected in other cases. *See Fromer v. Scully,* 874 F.2d 69, 75–76 (2d Cir.1989) (rejecting First Amendment challenge to one inch beard rule); *Young v. Goord,* No. 1–CV–626, 2005 WL 562756, at *8 (E.D.N.Y. 2005), *aff'd* 192 Fed. App'x 31 (2d Cir. 2006) (rejecting RLUIPA challenge to one inch beard rule); *Verdal v. Frantz,* No. 9:01–CV–910, 2002 WL 31309175, at *3 (dismissing First Amendment challenge to separate DOCCS requirement that new inmates shave upon their arrival to prison); *see also Holt v. Hobbs,* ___ U.S. ____, 135 S.Ct. 853, 868 (2015) (Sotomayor, J., concurring)

(describing New York DOCCS inmate grooming policy as "more permissive" than the complete ban on inmate facial hair that the Supreme Court unanimously found to violate RLUIPA). Instead, plaintiff argues that defendant failed to follow the established DOCCS policy that allows fourteen days for an inmate to submit an exemption request before any disciplinary action is taken. (Am. Compl. at 8). As plaintiff characterized his complaint at his deposition, defendant "just jumped the gun" and ordered plaintiff to immediately shave or trim his beard. (Dep. 28).

**\*5** Courts generally do not question the centrality of particular beliefs or practices to a faith, or the validity of a litigant's interpretation of those creeds. *Amaker v. Goord,* No. 06–CV–490A, 2010 WL 2595286, at *11 (W.D.N.Y. Mar. 25, 2010). The Supreme Court has rejected the notion that to claim the protection of the free exercise clause, the plaintiff must be "responding to the commands of a particular religious organization." *Frazee v. Ill. Dep't of Employment Sec.,* 489 U.S. 829, 834 (1989). Courts may, however, consider whether an inmate sincerely holds a particular belief and whether the belief is religious in nature. *Id.* (citing *Ford,* 352 F.3d at 590).

Plaintiff has demonstrated that DOCCS recognizes him as a practicing Muslim. (Dkt. No. 23, Ex. B to Pl.'s Mem. of Law). In addition, defendant's motion for summary judgment has not challenged the sincerity of plaintiff's belief that his religion forbids him from shaving or trimming his beard, and this court finds no reason to question it. *See Holt,* ___ U.S. ____, 135 S.Ct. at 862–63 (2015) (noting that the belief that men must grow beards is widely followed by observant Muslims across the various schools of Islam).

However, even viewing all facts in the light most favorable to the non-moving party, plaintiff has not demonstrated that defendant's actions on September 16–17, 2013 imposed a substantial burden upon plaintiff's religious exercise. [6] A substantial burden on religious expression is one that " 'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.' " *Guillory v. Weber,* No. 9:12–CV–280 (LEK/RFT), 2015 WL 1419088, at *8 (N.D.N.Y. April 6, 2015) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.,* 450 U.S. 707, 717–18 (1981)). Plaintiff's encounters with defendant in the mess hall do not rise to that level. On September 16, 2016, defendant accurately told plaintiff that his beard was in violation

of DOCCS policy. (Am. Compl. at 4). Plaintiff admitted that he chose to ignore defendant's September 16, 2013 order to shave, and faced no repercussions. (Dep. at 14). Instead, plaintiff spoke to Dodd and Smith, who advised him that no disciplinary action could take place for at least fourteen days, and helped plaintiff submit an application for a beard permit. (Am. Compl. at 4–5; Dep. at 14–15). At the time, plaintiff did not express any doubts about the validity of the fourteen day "temporary hold" on shaving, and only asked Smith how to respond if defendant stopped him again. (Dep. at 15).

The next day, September 17, 2013, defendant again challenged plaintiff about the length of his beard. Plaintiff followed Smith's instructions and advised defendant of his application for a beard permit and the resulting temporary hold. (Am. Compl. at 5; Dep. at 15). Even if, as plaintiff contends, defendant "went into a rampage" and used threats and abusive language toward him, plaintiff knew that any disciplinary action related to his beard would be delayed by the terms of Directive 4914. (Dkt. No. 19–6, Ex. 1 to Mark Farrell Decl.; Dkt. No. 23, Ex. C to Pl.'s Mem. of Law). Moreover, although plaintiff alleged that defendant threatened to take him to SHU, defendant did not issue any disciplinary ticket to plaintiff. (Dkt. No. 19–1, Statement of Material Facts, ¶ 11). Defendant did not make any physical contact, threaten to physically harm plaintiff or attempt to shave plaintiff himself. (Dep. at 16, 28, 31). Besides the two encounters in the mess hall, plaintiff does not allege any further contact with defendant.

**\*6** Defendant's behavior, while clearly frustrating to plaintiff, does not give rise to a constitutional claim. *See Mack v. Griffin,* No. 9:04–CV–588 (NAM/RFT), 2006 WL 2792736, \*7 (N.D.N.Y. Sept. 27, 2006) (granting summary judgment where Muslim inmate alleged that he had been threatened with SHU if he did not comply with DOCCS beard policy); *see also Hamilton v. Erhardt,* No. 10–CV–6234, 2011 WL 3476475, at \*2–5 (W.D.N.Y. Aug. 9, 2011) (dismissing claims under Fed.R.Civ.P. 12(b)(6) that defendants ordered inmates to shave his beard while mocking and harassing him, but allowing claim that defendants had later threatened physical harm and punished plaintiff). Plaintiff, who had been advised by Superintendent Smith that no disciplinary action was imminent, never faced a "forced choice" to decide between the "equally unpleasant alternatives" of disciplinary sanctions and abandonment of his religious

beliefs. *See Smith,* No. 9:07–CV–1150 (NAM/ATB), 2010 WL 3910086, at \*17. As the facts of this case demonstrate, plaintiff had other options that presented a high likelihood of success and would not have impacted his religious beliefs, such as further discussion with Dobbs and Smith or the filing of an administrative grievance.

In addition, plaintiff's encounters with defendant qualify as the type of isolated incident, promptly corrected by the facility, that courts have typically treated as a *de minimis* burden on religious expression. *See, e.g., Williams v. Rock,* 2014 WL 4685035 (N.D.N.Y. Sept. 19, 2014) (staff failure to deliver meals at appropriate time during Ramadan was *de minimis* burden on First Amendment rights); *Smith v. Graziano,* No. 9:08–CV–469 (GLS/RFT), 2010 WL 1330019, at \*9 (N.D.N.Y. March 16, 2010) (cancellation of two religious services, that was the result of a "breakdown of communication between prison officials and security staff," constituted a *de minimis* burden on inmate's ability to freely exercise his religion); *Allan v. Woods,* No. 9:05–CV–1280 (NAM/GJD), 2008 WL 724240, at \*4–5 (N.D.N.Y. Mar. 17, 2008) (finding that there was no substantial burden where inmate was assigned to work detail on Sabbath one time before officials approved religious accommodation). Prison officials promptly assisted plaintiff with his application for a beard permit after his first encounter with defendant. Responsive measures were also taken after plaintiff filed a grievance related to the second encounter, and plaintiff now has a valid beard permit recognizing his religious exemption.

Based on the record in this case, this court concludes that defendant's actions did not substantially burden plaintiff's ability to practice his religion. Even though plaintiff chose to shave or trim his beard following the alleged threats by defendant, plaintiff did so even though he knew that he had been afforded a fourteen day "temporary hold" on any disciplinary enforcement while his application for a beard permit was pending. At most, defendant's actions imposed a *de minimis* burden on plaintiff's First Amendment rights. Thus, this court recommends that plaintiff's First Amendment claim be dismissed. [7]

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 19) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY**.

Berisha v. Farrell, Not Reported in F.Supp.3d (2016)
Case 9:14-cv-00427-MAD-TWD    Document 65    Filed 05/25/18    Page 68 of 131
2016 WL 1295178

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993)(citing

*Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 1295178

---

Footnotes

1    In addition, defendants Brian Fischer and Anthony Annucci were dismissed as defendants due to a lack of personal involvement. (Dkt. No. 12, at 3).

2    Neither Dobbs or Smith were named as defendants in this action.

3    During his deposition, plaintiff could not recall if the threat of being taken to SHU occurred during his first or second encounter with defendant. (Dep. at 16).

4    The record is unclear whether plaintiff shaved off his beard completely, or only trimmed it to comply with the one inch limit. (Am. Compl. at 5; Dkt. No. 23, Ex. D to Pl.'s Mem. of Law). Given plaintiff's belief that any alteration of his beard would violate his religious commitment, this ambiguity does not impact the constitutional analysis.

5    Injunctive relief is unnecessary because plaintiff now has a beard permit allowing him to have facial hair in excess of one inch. (Dkt No. 19–4, Ex. 2 to Joshua L. Farrell Decl.; Dep. at 32).

6    Even if injunctive relief were available, dismissal of plaintiff's RLUIPA cause of action would still be warranted because substantial burden is a necessary element of a claim under that statute.

7    Defendant also argues that he is entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Because the defendant has not violated plaintiff's constitutional rights in the first instance, the court need not reach the issue of whether a reasonable person would have known of the constitutional violation.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

## MEMORANDUM & ORDER

PAULEY, J.

**\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

## REPORT AND RECOMMENDATION

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

### Background

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the
gate officer before being released to attend the services.
(Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

## A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174

F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

**B.** *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to

maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III,

1999 WL 983876

Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

   Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

174 F.Supp.3d 777
United States District Court,
W.D. New York.

Denny DeJesus, 10-B−2030, Plaintiff,
v.
Mark L. Bradt, Superintendent of Attica
Correctional Facility, and William Hughes,
Deputy Superintendent of Attica, Defendants.

6:13−CV−6066 EAW
|
Signed March 31, 2016

**Synopsis**
**Background:** Muslim state prisoner brought action against prison officials under § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA), alleging that prison officials interfered with his ability to observe Ramadan by not allowing him to take pre-prayer showers and by preventing him from taking hot food from mess hall to eat in his cell during non-fasting nighttime hours. Prison officials filed motion for summary judgment.

**Holdings:** The District Court, Elizabeth A. Wolford, J., held that:

[1] prisoner could not maintain action under RLUIPA;

[2] prison's food policy did not substantially burden prisoner's religious beliefs;

[3] prison's food policy was reasonably related to legitimate penological interests; and

[4] fact issues existed as to free exercise claim concerning pre-prayer showers.

Motion granted in part and denied in part.

West Headnotes (20)

[1]     **Time**
🔑 Mailbox rule in general

Under the prisoner mailbox rule, a pro se prisoner's papers are deemed filed in the court the day that he signed and turned the papers over to prison officials for mailing.

Cases that cite this headnote

[2]     **Time**
🔑 Mailbox rule in general

Absent evidence to the contrary, the court assumes that a prisoner gave his papers to prison officials for mailing on the date he signed them, for purposes of the prisoner mailbox rule.

Cases that cite this headnote

[3]     **Federal Civil Procedure**
🔑 Pro Se or Lay Pleadings

Pro se litigants generally are entitled to a liberal construction of their pleadings, which should be read to raise the strongest arguments that they suggest.

Cases that cite this headnote

[4]     **Federal Civil Procedure**
🔑 Pro Se or Lay Pleadings

A pro se litigant should be afforded every reasonable opportunity to demonstrate that he has a valid claim.

Cases that cite this headnote

[5]     **Civil Rights**
🔑 Liability of Public Employees and Officials

RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities. Religious Land Use and Institutionalized Persons Act of 2000 § 2 et seq., 42 U.S.C.A. § 2000cc et seq.

Cases that cite this headnote

[6]     **Civil Rights**

Criminal law enforcement;prisons

**Civil Rights**

Criminal law enforcement;prisons

**Prisons**

Religious Practices and Materials

Pro se Muslim state prisoner could not maintain action against prison officials under RLUIPA, relating to alleged interference with his observance of Ramadan, where prisoner was seeking monetary damages from prison officials, and where he could not properly seek injunctive relief; RLUIPA did not authorize claims for monetary damages against state prison officials, and injunctive relief would not be warranted because he was no longer housed at the prison and his complaints related to practices at the prison. Religious Land Use and Institutionalized Persons Act of 2000 § 2 et seq., 42 U.S.C.A. § 2000cc et seq.

Cases that cite this headnote

**[7]    Constitutional Law**

Prisons and Pretrial Detention

Prisoners retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause. U.S. Const. Amend. 1.

Cases that cite this headnote

**[8]    Constitutional Law**

Prisons and Pretrial Detention

A state prisoner's claim under the Free Exercise Clause, made actionable against state officials through § 1983, requires that a prisoner show that he has a sincerely held religious belief, that it was substantially burdened, and that the officials' conduct was not reasonably related to some legitimate penological interest. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[9]    Constitutional Law**

Freedom of religion and conscience

When a prisoner asserts a claim under the Free Exercise Clause, the burden remains with the prisoner to show that the penological concerns raised by prison officials are irrational. U.S. Const. Amend. 1.

Cases that cite this headnote

**[10]    Constitutional Law**

Beliefs protected;inquiry into beliefs

In cases invoking the Free Exercise Clause, courts must resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith, because it is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of these creeds; rather, a court should consider whether the plaintiff has demonstrated that the beliefs professed are sincerely held and, in the plaintiff's own scheme of things, religious. U.S. Const. Amend. 1.

1 Cases that cite this headnote

**[11]    Constitutional Law**

Burden on religion

A substantial burden on religious belief exists, as element for violation of Free Exercise Clause, where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs. U.S. Const. Amend. 1.

Cases that cite this headnote

**[12]    Constitutional Law**

Diet;meals

**Constitutional Law**

Religious services and ceremonies;study and prayer groups

For prisoners, the reach of the First Amendment's Free Exercise Clause extends beyond mere attendance at congregate religious services into other aspects of prison life, including an inmate's diet and

participation in religious meals. U.S. Const. Amend. 1.

Cases that cite this headnote

[13]    **Constitutional Law**
        👉 Diet;meals

        **Prisons**
        👉 Diet and meals

        Prison policy that barred Muslim state prisoner from carrying a portion of his hot meal from prison's mess hall back to his cell, to consume overnight during Ramadan, was not a substantial burden on prisoner's religious beliefs, as would be required for violation of Free Exercise Clause; prisoner was allowed to carry back to his cell cold meals to consume during non-fasting nighttime hours, and prisoner had alternative means to obtain approved food to store in his cell overnight if he was unable to finish his entire hot meal in mess hall before sunset. U.S. Const. Amend. 1.

        Cases that cite this headnote

[14]    **Constitutional Law**
        👉 Prisons and Pretrial Detention

        In determining whether the burden on a prisoner's religious belief is reasonably related to legitimate penological interests, as required under Free Exercise Clause, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a de minimis adverse effect on valid penological interests. U.S. Const. Amend. 1.

        1 Cases that cite this headnote

[15]    **Constitutional Law**
        👉 Diet;meals

[16]    **Prisons**
        👉 Diet and meals

        Prison policy that barred Muslim state prisoner from carrying a portion of his hot meal from prison's mess hall back to his cell, to consume overnight during Ramadan, was reasonably related to legitimate penological interests, as required under Free Exercise Clause; prison officials were concerned that allowing large amounts of food to be taken back to an inmate's cell threatened hygiene and threatened security because much of the food brought back by Muslim prisoners would be given away or bartered, which could lead to extortion, bribery, and theft. U.S. Const. Amend. 1.

        Cases that cite this headnote

[16]    **Federal Civil Procedure**
        👉 Civil rights cases in general

        Genuine issues of material fact as to whether Muslim state prisoner was denied pre-prayer daily showers on nine or ten occasions during Ramadan, and whether such denials were a substantial burden on the practice of his faith, precluded summary judgment for prison officials, in prisoner's § 1983 action asserting a violation of Free Exercise Clause. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

        Cases that cite this headnote

[17]    **Civil Rights**
        👉 Criminal law enforcement;prisons

        In order to bring a § 1983 claim against a prison official, a prisoner must allege the official's personal involvement in the violation of the prisoner's constitutional rights. 42 U.S.C.A. § 1983.

        Cases that cite this headnote

[18]    **Civil Rights**
        👉 Vicarious liability and respondeat superior in general;supervisory liability in general

Supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[19]  **Civil Rights**
🔑 Vicarious liability and respondeat superior in general;supervisory liability in general

Supervisory officials may be found personally involved in a constitutional violation, as required for supervisory liability in a § 1983 action, in the following ways: (1) actual direct participation in the constitutional violation; (2) failure to remedy a wrong after being informed through a report or appeal; (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue; (4) grossly negligent supervision of subordinates who committed a violation; or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[20]  **Civil Rights**
🔑 Vicarious liability and respondeat superior in general;supervisory liability in general

A supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find that the supervisor was personally involved in the alleged deprivation of a constitutional right, as required for supervisory liability in a § 1983 action. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*780**  Denny DeJesus, Marcy, NY, pro se.

J. Richard Benitez, NYS Attorney General's Office, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

*INTRODUCTION*

**\*\*1**  Plaintiff Denny DeJesus ("Plaintiff"), proceeding *pro se,* is a practicing Muslim inmate currently housed at Marcy Correctional Facility. Plaintiff brings the instant action pursuant the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.,* and 42 U.S.C. § 1983, alleging defendants Mark L. Bradt and William Hughes ("Defendants") interfered with Plaintiff's ability to properly observe Ramadan in the year 2012, while he was housed at Attica Correctional Facility. (Dkt.8). Specifically, Plaintiff alleges that he was not permitted to fast and shower during Ramadan as required by his faith.

Presently before the Court is Defendants' motion for summary judgment (Dkt.35). For the reasons set forth below, Defendants' motion is granted in part and denied in part.

*PROCEDURAL BACKGROUND*

Plaintiff filed the original complaint in this action on February 8, 2013 (Dkt.1), followed by the filing of a first amended complaint on March 22, 2013 (Dkt.6), and a second amended complaint on June 7, 2013 (Dkt.8). The second amended complaint is the operative pleading in this matter. On June 25, 2013, the Court granted Plaintiff leave to proceed *in forma pauperis.* **\*781**  (Dkt.9). Defendants answered the second amended complaint on January 6, 2014 (Dkt.13), and the case proceeded to discovery before Magistrate Judge Jonathan W. Feldman.

On February 17, 2015, Defendants filed a motion for summary judgment, arguing "the treatment of plaintiff was in furtherance of the facility's interest in the preservation of order and security." (Dkt. 35–1 at 2). The parties continued to engage in discovery (Dkt.39; Dkt.43; Dkt. 44; Dkt. 46; Dkt. 47; Dkt. 48; Dkt. 51), and Plaintiff

filed a motion to compel further discovery on June 4, 2015. (Dkt.52).

Plaintiff then filed three motions for discovery and extensions of time (Dkt. 57; Dkt. 58; Dkt. 61), which the Court construed as further responses in opposition to Defendants' motion for summary judgment and a request to file a supplemental brief in response to the motion for summary judgment. (Dkt.62). The Court directed Plaintiff to file any papers in opposition to Defendants' motion for summary judgment on or before August 21, 2015, and Defendants to file any reply papers on or before September 4, 2015. (*Id.*).

[1]  [2]  Plaintiff filed a further response to Defendants' motion on August 26, 2015. (Dkt.64).[1] Defendants did not submit reply papers.

**2  On March 23, 2016, Magistrate Judge Feldman denied Plaintiff's outstanding motion to compel. (Dkt.66).

### FACTUAL BACKGROUND

The following facts are undisputed and drawn from the parties' Rule 56 Statements of Fact unless otherwise noted.

Plaintiff is a practicing Muslim and is currently an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). (Dkt. 35–2 at ¶ 1; Dkt. 64 at 1). He resided at Attica Correctional Facility during Ramadan in the year 2012. (Dkt. 35–2 at ¶¶ 1–2; Dkt. 64 at 1). During that year, Ramadan commenced on July 20, 2012, and ended on August 18, 2012. (Dkt. 35–2 at ¶¶ 1–2; Dkt. 35–3 at 14:18–24; Dkt. 64 at 1).

In a memorandum dated July 18, 2012, Defendant Hughes stated, in part, as follows:

> Staff is advised that no containers will be allowed to be carried into the messhalls [sic] and only those food items normally allowed to exit the regular meals will be allowed to be carried out of the messhall [sic] by Ramadan participants, in addition to a Sahur bag.

(Dkt. 35–2 at ¶¶ 3–4; Dkt. 35–3 at 63; Dkt. 64 at 3–4). Prior to this direction by Defendant Hughes, "observant inmates were granted permission to bring plastic  *782 bowls, containers and thermoses to the mess hall for the Ramadan evening meal, and bring food back with them to their cells." (Dkt. 35–2 at ¶ 5; Dkt. 64 at 5).

According to Defendant Hughes, the prior practice created an opportunity for inmates observing Ramadan to collect food at their cells and engage in unauthorized bartering in violation of DOCCS standards for inmate behavior. (Dkt. 35–2 at 6; Dkt. 35–3 at 75). Defendant Hughes claims there was also a concern about hygiene related to the collection of food in cells. (Dkt. 35–2 at 6; Dkt. 35–3 at 75). Defendant Hughes purports he "decided to eliminate the provision allowing inmates to bring plastic bowls, containers and thermoses to the mess hall for Ramadan evening meals" because of the order, safety, and security concerns the provision created. (Dkt. 35–2 at 7; Dkt. 35–3 at 75). Plaintiff argues that no misbehavior reports were issued to Muslim inmates during Ramadan for bartering of food, and asserts that there was no legitimate hygiene concern because the inmates would only bring one meal back to the cell to consume during the night. (Dkt. 64 at 6–7).

Under the new policy, at the breaking of the fast, Muslim inmates were allowed approximately one or one and one half hours to consume two meals, and were sent back to their cells with a Sahur bag. (Dkt. 35–2 at 8; Dkt. 35–3 at 16:4–7). The Sahur bag contained a third meal (a cold meal) to eat in the night hours before starting the fast. (Dkt. 35–3 at 19:2–22). Defendant Hughes claims that "observant inmates are allowed to take back to their cells the same items and portions of food which general population inmates are allowed to take to their cells following a meal." (Dkt. 35–2 at ¶ 9; Dkt. 35–3 at 76). The inmate orientation/guideline manual for Attica Correctional Facility indicates: "[c]ertain rationed items may be carried from the mess hall but all other food must be consumed in the mess hall. Inmates may be permitted to take out a maximum of 2 rationed items." (Dkt. 64–3 at 6).

**3  Plaintiff contends that one hour and thirty minutes was not sufficient time for him and other Muslim inmates to eat the two meal portions at once. (Dkt. 35–3 at 16:13–25–26:1–2; Dkt. 64 at 7). Specifically, Plaintiff argues that the Muslim inmates were using that time to

perform other tasks besides just eating, and ultimately had approximately 30 minutes to consume two meals. (Dkt. 55 at 2–3, 8–9). As a result, Plaintiff claims, he was denied the second portion of his double portion because he could not take it back to his cell after implementation of the new policy. (Dkt. 35–3 at 20:7–17; Dkt. 64 at 7–8).

Plaintiff also claims that he was denied a shower on nine or ten occasions during Ramadan. (Dkt. 8 at ¶ 8; Dkt. 35–3 at 20:18–25–21:1–22; Dkt. 64 at 9). Specifically, Plaintiff alleges he was denied showers during the four weekends of Ramadan and one Wednesday. (Dkt. 35–3 at 21:10–13; Dkt. 64 at 9).

### DISCUSSION

### I. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). **\*783** Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec.,* 475 U.S. at 586–87, 106 S.Ct. 1348) (emphasis in original). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

**[3]** **[4]** In addition, "[i]t is well-settled that *pro se* litigants generally are entitled to a liberal construction of their pleadings, which should be read to raise the strongest arguments that they suggest." *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (internal quotations and citation omitted); *see also Hemphill v. New York,* 380 F.3d 680, 687 (2d Cir.2004) (alteration in original) (internal citation omitted) ("It is well-established that 'when [a] plaintiff proceeds *pro se* ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.' "). Moreover, "a *pro se* litigant should be afforded every reasonable opportunity to demonstrate that he has a valid claim." *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir.1984).

### II. Plaintiff's RLUIPA Claims

**[5]** Defendant moves for summary judgment as to Plaintiff's claims for damages based on RLUIPA. (Dkt. 35–1 at 5–6). "Section 3 of RLUIPA provides that '[n]o government shall impose a substantial burden on the religious exercise [of an institutionalized person],' 42 U.S.C. § 2000cc–1(a), 'in a program or activity that receives Federal financial assistance,' *id.* § 2000cc–1(b)(1), or in a way that affects or would affect 'commerce with foreign nations, among the several States, or with Indian tribes,' *id.* § 2000cc–1(b)(2)." *Washington v. Gonyea,* 731 F.3d 143, 145 (2d Cir.2013) (alterations in original). It is well established that "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland v. Goord,* 758 F.3d 215, 224 (2d Cir.2014).

**\*\*4** **[6]** Having reviewed the papers, the Court concludes that dismissal of Plaintiff's RLUIPA claims is warranted. Plaintiff seeks only monetary damages. (Dkt. 8 at 1, 6). Specifically, Plaintiff indicates that the relief he is seeking is "in no event less than 500,000, together with the attorney's fees and costs and such additional relief as this Court may deem just and proper." (Dkt. 1 at 6). RLUIPA does not support a claim for monetary damages against state officials like Defendants. *See Holland,* 758 F.3d at 224. Plaintiff does not seek injunctive relief against Defendants. Indeed, given the fact that Plaintiff is no longer housed at Attica Correctional Facility and his complaints relate to practices at Attica, injunctive relief would not be warranted. *See Thompson v. Carter,* 284 F.3d 411, 415 (2d Cir.2002) ("A prisoner's transfer to a different correctional facility generally moots his request for injunctive relief against employees of the transferor facility."). Under these circumstances, Plaintiff cannot maintain a claim based on RLUIPA, and Defendants' motion for summary judgment is granted with respect to this claim.

## III. First Amendment Claim Pursuant to 42 U.S.C. § 1983

Defendant moves for summary judgment against Plaintiff's First Amendment **\*784** claim, arguing that Plaintiff has failed to demonstrate that there is a question of fact with respect to any substantial burden he sustained in practicing Ramadan at Attica in 2012, and that any restrictions were narrowly tailored to legitimate penological interests. (Dkt. 35–1 at 7–8). Alternatively, Defendants contend Plaintiff has failed to demonstrate that Defendant Bradt was personally involved in the alleged constitutional violations. (*Id.* at 8).

[7] [8] [9] "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). A claim under the Free Exercise Clause, made actionable against state officials through 42 U.S.C. § 1983, requires that "a plaintiff must show that he has a sincerely held religious belief, that it was substantially burdened,[2] and that defendants' conduct was not reasonably related to some legitimate penological interest." *Barnes v. Furman,* 629 Fed.Appx. 52, 55 (2d Cir.2015). "[T]he burden remains with the prisoner to show that these penological concerns were irrational." *Ford,* 352 F.3d at 595 (quotation omitted).

### A. Sincerely Held Belief

[10] The Second Circuit Court of Appeals has explained:

> Our founding principles require that courts resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith. For, it is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of these creeds.

*McEachin v. McGuinnis,* 357 F.3d 197, 201 (2d Cir.2004) (quotation omitted). Rather, a court should consider whether the plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford,* 352 F.3d at 595 (quotation omitted).

**\*\*5** Defendants acknowledge that Plaintiff is "an adherent of Islam." (Dkt. 35–1 at 1). Defendants do not address, and therefore do not contest, that Plaintiff's fasting and shower requirements were part of a sincerely held religious belief.

### 1. Meals

Plaintiff asserts that, "[a]ccording to Islamic law and tradition, if a muslim has fasted during the daylight hours, he is allowed to eat during the entire night until dawn." (Dkt. 55 at 2). Attached to Plaintiff's response papers is an excerpt from the Qur'an, indicating that during Ramadan, an adherent of Islam should eat and drink through the night and fast during the daylight hours. (Dkt. 64–2 at 4). This belief is not contested by Defendants, who attach in support of their motion various **\*785** menus and programs provided by Attica to Muslim inmates during Ramadan. (Dkt. 35–3 at 84–105).

### 2. Showers

Plaintiff further claims "Islamic law and tradition dictate that muslims are required to take showers prior to performing congregational prayer, this includes the period during Jumah services and Ramadan, as a form of purification." (Dkt. 55 at 5). Attached to Plaintiff's June 10, 2015 response papers is an affidavit of Muslim inmate Jerry Garrett, 11–B–3337. (*Id.* at 10–12). Mr. Garrett states under penalty of perjury that showers are required daily during Ramadan "for purification before reciteing [sic] congregational prayers." (*Id.* at 11).

Also attached to Plaintiff's response papers is the May 22, 2012 memorandum of Imam Z. Gasmalla, addressed to the Watch Commander and copied to, *inter alia,* the executive team, captain office, chart office, food service, program sergeant, mess hall sergeant, mess hall officers, SHU, and the hospital. (Dkt. 64–1 at 43–50). This memorandum advises that: "Showers will be provided daily in each block during the 7–3 shift for inmates without programs during this time and on the 3–11 shift for those inmates with programs during the day." (*Id.* at 46). The document further states: "In the past, inmates who are housed at E5–2nd floor have experienced difficulty in getting their shower. Special attention ought to be

given to ensure that the working inmates receive their shower upon returning from the Ramadan observance every night." (*Id.*).

In sum, these assertions demonstrate that Plaintiff's belief that he should be permitted to shower daily before prayer during the month of Ramadan is related to a sincere religious belief maintained not only by Plaintiff, but by other observant Muslim inmates housed at Attica.

Therefore, there is no material question of fact with respect to whether Plaintiff has demonstrated that his beliefs with respect to diet and shower requirements were part of his sincerely held religious beliefs.

### B. Substantial Burden

[11] "[A] substantial burden exists where the state put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (quotation omitted) (alteration in original).

Defendants assert that "the issue of the provision of Ramadan meals has been addressed by the defendants and shown that observant inmates are provided with more than adequate amounts of food during their non-fasting hours, as well as plenty of time in which to consume that food." (Dkt. 35–1 at 7). They further assert that Plaintiff has "failed to demonstrate that [the] memorandum he complains of is a burden to the practice of his religion, let alone a substantial burden." (*Id.* at 7–8). Defendants do not address Plaintiff's allegations concerning the denial of showers on approximately 10 occasions during the month of Ramadan in 2012.

### 1. Meals

**6 [12]** "Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life, including, pertinently, that of an inmate's diet and participation in religious meals." *Johnson v. Guiffere,* No. 9:04–CV–57, 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007). "[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights."

*McEachin,* 357 F.3d at 203; *see* **786** *Ford,* 352 F.3d at 593–94 (Muslim inmate's free exercise rights substantially burdened if prison officials denied request for a meal to celebrate Eid ul-Fitr feast); *Holland,* 758 F.3d at 221–22 (ordering Muslim inmate practicing Ramadan to drink water for a urine sample during fast substantially burdened free exercise rights); *Torres v. Aramark,* No. 14–CV–7498 (KMK), 2015 WL 9077472, at *9–10 (S.D.N.Y. Dec. 16, 2015) (Muslim plaintiff's allegations that he was forced to choose between eating nutritionally adequate meals and complying with his religious fasting requirements during Ramadan stated more than a *de minimis* violation).

Oftentimes, however, an impingement on an inmate's diet is found to constitute no more than a *de minimis* burden on the inmate's ability to practice his or her religion. *See Lewis v. Zon,* 920 F.Supp.2d 379, 385–86 (W.D.N.Y.2013) (plaintiff did not sustain substantial burden where denied kosher meals during transfers between facilities); *Washington v. Afify,* 968 F.Supp.2d 532, 537–38 (W.D.N.Y.2013) (denial of three consecutive Ramadan meals, including two breakfasts and one evening meal, does not violate First Amendment); *Jean–Laurent v. Los,* No. 12–CV–132S (F), 2015 WL 1015383, at *6–7 (W.D.N.Y. Mar. 9, 2015), *appeal denied* (July 6, 2015) ("missing two of the Ramadan meals ... does not constitute a violation of Plaintiff's First Amendment right to the free exercise of his religion"); *Odom v. Dixion,* No. 04–CV–889F, 2008 WL 466255, at *10–12 (W.D.N.Y. Feb. 15, 2008) (failure to provide kosher meals on 7 occasions over several days insufficiently substantial to establish a First Amendment claim); *Thomas v. Picio,* No. 04–CV–3174(KMW)(RLE), 2008 WL 820740, at *6 n. 8 (S.D.N.Y. Mar. 26, 2008) (even assuming inmate plaintiff was denied three or four Kosher meals for one or two consecutive days, "such denial is not a substantial burden" on her free exercise of religion).

[13] Under the circumstances of the present case, Plaintiff has not established that he sustained more than a *de minimis* burden on his religious beliefs to the extent that he was not permitted to carry a portion of his hot meal back to his cell to consume overnight. As Plaintiff acknowledges, he did "have proper food but the case at hand is not having enough time to consume it...." (Dkt. 64 at 28). Moreover, it is undisputed that Plaintiff was allowed to carry and maintain some food in his cell, including the cold meal in the Sahur bag, but not his hot

meal. (Dkt. 35–2 at ¶¶ 3–4; Dkt. 35–3 at 63; Dkt. 64 at 3–4).

According to Defendant Hughes, Muslim inmates were "called out of any program activities at least one hour prior to sunset each day during Ramadan," "were allowed to gather in the mess halls prior to the sunset, to break their fast," and had this time to "break their fasts, engage in prayers, and ... access the commissary." (Dkt. 35–3 at 76). He claims the inmates had "more than one hour to eat." (*Id.*). Additionally, inmates were provided a Sahur bag containing a cold meal to carry to their cells to consume before commencing the daily fast, were allowed to access commissary during the evening meal, and "were allowed to take back to their cells what ever food they **787** purchase[d] at commissary." (*Id.* at 76–77). Acting Deputy Superintendent for Programs at the Attica Correctional Facility, Julie Goodrich, explained in her August 27, 2012 Declaration that Muslim inmates were permitted to "take back to their cells the same items and portions of food which general population inmates [were] allowed to take to their cells following a meal" and could also "take back to their cells what ever food they purchase[d] at commissary." (*Id.* at 80). Ms. Goodrich further stated that Muslim inmates were provided with ample time to engage in evening prayer and fast-breaking rituals, explaining that on July 12, 2012, the first day of Ramadan, for example, inmates were given almost two hours to eat and pray before being returned to their cells. (*Id.* at 80–81).

**\*\*7** Jerome Curry, 98A6098, one of the inmates who drafted an affidavit included in support of Plaintiff's opposition papers (Dkt. 64–2 at 27–29), filed a motion for injunctive relief based on the change in policy from permitting inmates to consume two separate hot meals to providing one hot meal. *See Curry v. Bradt,* No. 13–CV–355A, 2014 WL 7339039, at \*1 (W.D.N.Y. Dec. 22, 2014). On December 22, 2014, the court denied Mr. Curry's motion, finding he had failed to "point to any Islamic teaching, law, or rule indicating the requirement of two hot meals per day in observance of Ramadan to allege how Defendants' policy infringed Plaintiff's exercise of Islam." *Id.* at \*7.

Similarly, in *Perilla v. Fischer,* No. 13–CV–0398M, 2013 WL 5798557, at \*5–6 (W.D.N.Y. Oct. 28, 2013), the court found that the plaintiff's allegations that he was denied, among other things, double portions of meals during

Ramadan was "no more than a *de minimus* burden, if at all, on plaintiff's right to practice his Muslim faith during Ramadan." *Id.*

Here, Plaintiff has also failed to point to any Islamic teaching, law, or rule indicating that Plaintiff was required to have a certain amount of time to consume his hot meal, or requiring that he consume a hot meal at his cell during the evening break of his fast (in addition to the cold meal).

This is not a case where the defendants have forced the plaintiff to reduce his caloric intake in providing only two meals during Ramadan, *see Lovelace v. Bassett,* No. 7:07CV00506, 2008 WL 4452638, at \*3 (W.D.Va. Sept. 27, 2008); in fact, Plaintiff agrees that the food provided would satisfy the caloric intake requirements if he had the time to eat it all. (Dkt. 64 at 8). Further, Plaintiff has alternative means to obtain approved food to store in his cell overnight in the event he is unable to finish his entire hot meal. *See Powers v. Washington Dep't of Corrs.,* No. C11–5806 RBL/KLS, 2013 WL 1755790, at \*17 (W.D.Wash. Mar. 29, 2013), *report & recommendation adopted,* No. C11–5806 RBL/KLS, 2013 WL 1755787 (W.D.Wash. Apr. 24, 2013) ("Mr. Powers has failed to raise a genuine issue of material fact as to his claim that the Ramadan 2010 policies and meals burdened the practice of his religion. As noted above, the evidence does not support Mr. Powers's characterization of the amount of calories in the Ramadan meals or the effect of those calories. Moreover, if he was still hungry during the fast, he had access to additional food.").

For these reasons, Plaintiff has failed to demonstrate that his religious beliefs were substantially burdened when Defendants changed the policy to prohibit Muslim inmates from storing portions of their hot meals in personal containers in their cells.

### 2. Showers

Plaintiff claims his religious beliefs were substantially burdened because he was not permitted to take a shower and engage in ritualistic cleansing before congregational or group prayer on ten different occasions during Ramadan 2012. (Dkt. 64 at 28). There is case law referencing the Muslim practice of showering before prayer services during Ramadan. *See Gibb v. Crain,* No. 6:04cv81, 2008 WL 4691049, at \*13–14 (E.D.Tex. Oct.

21, 2008) (discussing grooming policy that permitted Muslim inmates to shower before prayer services during **\*788** Ramadan); *Murrell v. Bukowski,* No. 08–2044, 2011 WL 884736, at \*4 (C.D.Ill. Mar. 11, 2011) (noting the plaintiff was "permitted to read his Qur'an, pray in his cell throughout the day, pray over meals, use a 'prayer towel' provided by the JCDC, shower regularly (to stay clean so as not to pray with any impurities), and fast during the holy month of Ramadan").

**\*\*8** There are also cases, at least from other Circuits, suggesting that denying a Muslim inmate the ability to shower daily during Ramadan does not rise to the level of a substantial burden. *See Blackwell v. Green,* No. RDB–13–372, 2013 WL 5883396, at \*2 (D.Md. Oct. 29, 2013) ("Further, the limitation on showers on Fridays does not constitute a substantial burden on Plaintiff's exercise of his religious practices as the shower taken on Thursday is sufficient, under Islamic law, to satisfy the requirement of ritual cleansing before Friday services. Moreover, Plaintiff has access to running water in his cell with which he may cleanse himself prior to the Friday services. The limitations placed on showering on Fridays does not impair Plaintiff's ability to comply with the religious requirements of ritual cleansing."); *Crump v. Best,* No. 10–13787, 2012 WL 1056806, at \*8 n. 3 (E.D.Mich. Mar. 5, 2012) *report & recommendation adopted,* No. 10–CV–13787, 2012 WL 1021703 (E.D.Mich. Mar. 27, 2012), *aff'd in part, appeal dismissed in part* (Jan. 8, 2014) ("Plaintiff also complains that during Ramadan he was not allowed to shower during standard meal times when other prisoners were in the dining hall. At best, that describes a minor inconvenience to Plaintiff which clearly does not constitute a 'substantial burden' on his overall ability to observe Ramadan.").

Notwithstanding the foregoing, the Court will not make a determination that, as a matter of law, Plaintiff was not substantially burdened by the deprivation of approximately ten showers before prayer services during the month of Ramadan in 2012, particularly in light of the fact that Defendants have not opposed Plaintiff's assertions in this respect.

Plaintiff claims that on approximately nine or ten occasions, he was not permitted by corrections officers to take Ramadan showers despite the fact that a memorandum was issued by Imam Zakira Gasmalla on May 22, 2012, detailing the requirement that Muslims

attending Ramadan and Jum'ah should be permitted daily showers prior to going to the mess hall. (Dkt. 8 at ¶ 8; Dkt. 35–3 at 21:10–13). At his deposition, Plaintiff further explained that showers were not allowed indoors on the weekends at any time and were only available outdoors during recreational time. (Dkt. 35–3 at 25:7–24). Because Plaintiff was participating in Ramadan, he could not go outdoors for recreational time on the weekends, and therefore could not shower. (*Id.* at 24:10–25–25:1–11). Plaintiff contends he should have been permitted to shower indoors on the weekends during Ramadan. (*Id.* at 35:17–25–36:1–8). Accordingly, Defendants have failed to establish that there are no genuine issues of material fact as to whether Plaintiff's religious beliefs were substantially burdened as a result of the alleged denial of showers. Indeed, as noted above, Defendants have not even asserted an argument in this regard.

### C. Legitimate Penological Interests
"Under the First Amendment ... a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy is reasonably related to legitimate penological interests." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (quotation omitted).

**[14]** **\*789** "In determining whether the burden imposed by the defendants is reasonable or irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Lewis,* 920 F.Supp.2d at 384 (quotation omitted).

### 1. Meals

**[15]** Here, even if Plaintiff could establish for purposes of this summary judgment motion that the inability to carry and maintain a hot meal in his cell to consume during the evening break of his fast constituted more than a *de minimis* burden on his religious beliefs, summary judgment is still warranted in favor of Defendants on this issue because there are no genuine issues of material fact

that the restrictions imposed were reasonably related to legitimate penological interests.

**\*\*9** Defendants assert that the "arrangements for the 2012 Ramadan celebration at Attica were reasonable, and narrowly tailored to address legitimate security concerns," insofar as "[i]t is the opinion of the Deputy Superintendent for Security that allowing large amounts of food to be taken back to an inmate's cell creates threats to security and hygiene." (Dkt. 35–1 at 7–8).

According to Defendant Hughes, the former provision of permitting Muslim inmates to take rationed food from the mess hall to their cells had never occurred at any of the facilities at which he was formerly employed. (Dkt. 35–3 at 75). Defendant Hughes indicates that he informally investigated how this provision was carried out in practice and learned that often Muslim inmates would return to their cells with "more food than one man could possibly consume in a night." (*Id.*). Defendant Hughes concluded that based on his experience and training, "this information raised serious concerns about the security risks inherent in such activity," particularly because Corrections Officers indicated that much of the food brought back by Muslim inmates was given or bartered away. (*Id.*). He further stated that "[b]artering or selling among inmates can also lead to extortion and bribery, as well as theft, all of which undermine the safety and good order of a facility." (*Id.*). Additionally, Defendant Hughes noted that permitting large amounts of unpackaged food to return to inmate cells could lead to hygienic problems with "odor and vermin." (*Id.*). Based on this information, Defendant Hughes decided to eliminate the provision permitting inmates to bring plastic bowls, containers, and thermoses to the mess hall for Ramadan evening meals. (*Id.*).

Defendants have satisfied their "relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin v. Goord,* 467 F.3d 263, 275 (2d Cir.2006). Defendants have articulated a valid, rational connection to facility safety and security by eliminating the ability of inmates to return to their cells with excess food in personal containers. (Dkt. 35–3 at 75). Further, the inmates have alternative means of exercising their burdened right, insofar as they are able to take the same two items of food back to their cells as any other inmate, and are also permitted to return to their cells with any food purchased at commissary. (*Id.* at 76–

77, 80). These alternative means of exercising the right are available to all other inmates at the Attica facility, and do not create an **\*790** adverse effect on the legitimate penological interests.

In an attempt to show that the penological interest cited by Defendants is not rational, Plaintiff asserts that he has never been issued a misbehavior report during the month of Ramadan for bartering or mishandling food, and claims that he has "personally never heard of any muslim being given a Misbehavior report during the month of Ramadan at attica correctional facility for such during the 2011 or 2012 Ramadan or years prior of my incarceration at attica and to my belief and knowledge no muslim has ever be[en] written a misbehavior report during the month of Ramadan of any year back to 1970." (Dkt. 55 at 5).

Attached to Plaintiff's response papers are the affidavits of Harold Hill, 09B3044 (Dkt. 64–2 at 20), Anthony Bottom, 77A4283 (*id.* at 24–25), and Jerome Curry, 98A6098 (*id.* at 27–29). These Muslim inmates each state under penalty of perjury that they were present for Ramadan at Attica in 2012, were not written a misbehavior report for bartering or mishandling food during Ramadan, but were denied one of their three daily meals due to lack of time to consume their two evening meals at once and the inability to return to their cells with one meal in a personal bowl. (*Id.* at 20, 24–25, 27–29).

**\*\*10** Even accepting Plaintiff's argument that no misbehavior report was ever issued to a Muslim inmate during Ramadan for bartering or mishandling of food (and the Court makes no finding in that regard), Defendants would retain a legitimate interest in controlling the potential for unhygienic cell conditions caused by storing certain foods in individual cells. (Dkt. 35–3 at 75). Moreover, the alleged lack of any prior inmate misbehavior reports does not raise an issue of fact concerning the rationality of Defendants' cited security concerns. Security concerns can be legitimate and rational even without formal disciplinary proceedings against inmates. In sum, Plaintiff has not met his burden of demonstrating a genuine issue of material fact as to whether Defendants' legitimate penological interest concerning the change in policy for personal bowls and storing food overnight in cells is irrational.

Defendants' motion for summary judgment as to Plaintiff's claims concerning diet restrictions only is granted.

### 2. Showers

Defendants do not discuss, and therefore do not proffer, any legitimate penological interest for denying Plaintiff the ability to shower on approximately 10 occasions during the month of Ramadan in July 2012.

The event proposal reviewed and approved by Defendants Hughes and Bradt states that Muslim inmates should be provided daily showers. (Dkt. 35–3 at 93–94; Dkt. 64–1 at 61–62). When asked if Plaintiff was supposed to receive a Ramadan shower "everyday [sic] during the whole month of Ramadan in 2012," Defendant Hughes responded that "[t]o the best of [his] recollection, Muslim inmates received showers whenever possible." (Dkt. 64–3 at 94). When Defendant Bradt was presented with the same question, he responded that Muslim inmates "received showers if security was available to provide them." (*Id.* at 86). As a result, it seems that the typical practice would be to permit Muslim inmates to shower daily during Ramadan.

**[16]** Because Plaintiff has raised an issue of material fact as to whether he was denied daily showers on nine or ten occasions during Ramadan in 2012 and whether that was a substantial burden on the practice of his faith, and because Defendants have failed to address this argument or proffer any legitimate penological interest **\*791** for the denial, Defendants are denied summary judgment as to these claims.

### E. Personal Involvement
Alternatively, Defendants argue that summary judgment should be granted in favor of Defendant Bradt, insofar as they claim that Plaintiff's grievance to Defendant Bradt was filed after the offending conduct and because it was too late for Defendant Bradt to intervene, he cannot be found personally involved with the alleged denial of meals. (Dkt. 35–1 at 8–9).

**[17]    [18]    [19]** In order to bring a § 1983 claim against a prison official, "a plaintiff must allege that individual's personal involvement...." *Ippolito v. Goord,* No. 05–CV–6683 (MAT), 2012 WL 4210125, at \*7

(W.D.N.Y. Sept. 19, 2012). Furthermore, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior.*" *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). Supervisory officials such as Defendants Bradt or Hughes may be found personally involved in a constitutional violation in the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Ippolito,* 2012 WL 4210125, at \*7 (internal quotations and citation omitted).

**[20]** Plaintiff claims he sent a letter to Defendant Bradt on July 24, 2012, "to inform him of the violations that were taking place and not [receiving] showers before writing a grievance on the issues but [he] never received a response...." (Dkt. 55 at 6, 13). "[I]t is well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find that the defendant was personally involved in the deprivation alleged." *Rodriguez v. Rock,* No. 9:13–CV–01106 DNH, 2015 WL 5147045, at \*6 (N.D.N.Y. Sept. 1.2015) (collecting cases).

**\*\*11** Plaintiff also filed a grievance related to the alleged denial of showers on August 27, 2012, and Defendant Bradt denied this grievance on September 12, 2012. (Dkt. 64–3 at 27). With respect to the alleged denial of showers, Defendant Bradt stated: "The grievant is further advised that showers are provided for Jumah services only." (*Id.* at 27).

Plaintiff also argues that Defendant Bradt was part of developing and approving the policies and practices related to the ability of inmates to observe Ramadan at Attica. (Dkt. 64 at 31–32).

Defendant focuses its argument about the lack of supervisory liability on the absence of involvement of Defendant Bradt with respect to the alleged constitutional deprivation of Plaintiff's meals. As discussed previously, the Court finds that summary judgment should be granted in favor of Defendants on the underlying merits of that

claim, so correspondingly, there is no supervisory liability. However, Defendants fail to address the merit with respect to the supervisory claims related to the shower deprivations (and indeed wholly fail to even address Plaintiff's claim in that regard). Accordingly, while the Court questions whether a claim may be maintained against either one of the supervisory defendants based upon the claims related to the showers, particularly since it appears that the policy in place should have allowed Plaintiff access to the showers required by his religion, it is not this **\*792** Court's job to raise arguments that Defendants have failed to address.

Defendants' motion for summary judgment as to the claims against Defendant Bradt on the grounds of personal involvement is denied.

### CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Dkt.35) is granted in part and denied in part.

SO ORDERED.

**All Citations**

174 F.Supp.3d 777, 2016 WL 1266652

### Footnotes

1   Although Plaintiff's response was not received and filed in the District Court until August 26, 2015, he is entitled to the benefit of the prisoner mailbox rule. Pursuant to that rule, his papers are deemed filed the day that he signed and turned the papers over to prison officials for mailing. *See Houston v. Lack,* 487 U.S. 266, 276, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) (defining the mailbox rule); *Cummings v. Conway,* No. 09–CV–740 (MAT), 2011 WL 2516581, at *2 (W.D.N.Y. June 23, 2011)* ("the 'prisoner mailbox rule' ... deems litigation papers mailed by a *pro se* prisoner to the clerk of court as 'filed' the moment the papers are turned over to prison authorities for posting to the court through the prison log system."). Here, Plaintiff's response is signed and dated August 21, 2015. (Dkt. 64 at 36–37). "Absent evidence to the contrary, the Court assumes that [the prisoner] gave his [papers] to prison officials for mailing on the date he signed it." *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998). Accordingly, the Court will consider Plaintiff's response as timely filed on August 21, 2015, pursuant to the mailbox rule.

2   There is arguably an outstanding question in this Circuit as to whether a plaintiff must establish the second element of a substantial burden. "It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland,* 758 F.3d at 220 (quotation omitted); *see also Barnes v. Furman,* 629 Fed.Appx. 52, 55 n. 3 (2d Cir.2015) ("We have not decided whether the substantial burden test remains viable in our Circuit following *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).... "). Because the issue has not yet been squarely addressed by the Second Circuit, this Court will continue to apply the substantial burden test. *See Hamilton v. Countant,* No. 13–CV–669(RA), 2016 WL 881126, at *3 (S.D.N.Y. Mar. 1, 2016); *Smith v. Artus,* No. 9:07–CV–1150NAM/ATB, 2015 WL 9413128, at *9 (N.D.N.Y. Dec. 22, 2015).

End of Document      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 986123
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terrell K. ELEBY, Plaintiff,
v.
G. SMITH and N. Vevone, Defendants.

Civil Action No. 9:15-CV-0281 (TJM/DEP)
|
Signed January 9, 2016
|
Filed 01/09/2017

**Attorneys and Law Firms**

TERRELL K. ELEBY, 86-A-0908, Sing Sing
Correctional Facility, 354 Hunter Street, Ossining, NY
10562, Pro Se.

FOR DEFENDANTS:ERIC T. SCHNEIDERMAN,
New York State Attorney General, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant
Attorney General, The Capitol, Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

 **\*1** This is a civil rights action brought by *pro se*
plaintiff Terrell Eleby against three individuals employed
by the New York State Department of Corrections and
Community Supervision ("DOCCS"), one of whom has
since been dismissed from the action, pursuant to 42
U.S.C. § 1983. In his complaint, plaintiff alleges that two
of the defendants assaulted him in violation of his Eighth
Amendment rights, and the third defendant violated his
Fourteenth Amendment rights by issuing an allegedly
false misbehavior report against him and confining him in
the special housing unit ("SHU") at the prison facility in
which he was housed.

Currently pending before the court is a motion brought
by the remaining two defendants seeking the entry of
summary judgment in their favor based upon plaintiff's
alleged failure to exhaust available administrative

remedies before filing suit. For the reasons set forth below,
I recommend that the defendants' motion be granted.

I. BACKGROUND [1]

Plaintiff is a prison inmate currently held in the custody
of the DOCCS. *See, e.g.,* Dkt. No. 29-2 at 13. Although
plaintiff is now confined elsewhere, at the times relevant
to this action he was housed in the Auburn Correctional
Facility ("Auburn") located in Auburn, New York. *Id.* at
18.

In his complaint, plaintiff alleges that on January 14, 2015,
he was waiting in one of Auburn's hospital dormitory
rooms to be escorted to an outside facility for a medical
examination. Dkt. No. 1 at 4; Dkt. No. 29-2 at 54. At
approximately 10:00AM, defendants Smith and Vevone,
both of whom are corrections officers, arrived at plaintiff's
room to escort him on the medical trip. Dkt. No. 1 at
4. While plaintiff was attempting to remove his clothes
for a mandatory strip search, defendant Smith "violently
and physically attacked [him]." *Id.*; *see also* Dkt. No. 29-2
at 58. According to plaintiff, both defendants Smith and
Vevone "jumped on [his] back," and defendant Smith
punched him repeatedly in the eye, head, neck, back, and
ribs. Dkt. No. 29-2 at 58, 62-63. After approximately five
minutes Sergeant Cudla, who is not a named defendant
in the action, arrived at plaintiff's dorm, physically
intervened, and ordered defendants Smith and Vevone to
cease the assault and leave the room. Dkt. No. 1 at 4-5;
Dkt. No. 29-2 at 58-59, 64. As a result of the alleged
assault, plaintiff suffered various injuries, including a
bloody and swollen eye, swelling and redness to his neck,
and sore ribs. Dkt. No. 1 at 5; Dkt. No. 29-2 at 62-63, 67.

Following the use-of-force incident, defendants Smith and
Vevone issued plaintiff a misbehavior report accusing
him of violating six prison rules. Dkt. No. 22 at 9; Dkt.
No. 29-2 at 72. Following a superintendent's hearing to
address the charges, plaintiff was found guilty on four
of the six counts. Dkt. No. 22 at 13; Dkt. No. 29-2 at
72. As a result of that finding, plaintiff was sentenced
to serve thirty days of disciplinary SHU confinement,
with a corresponding loss of commissary, package, and
telephone privileges. Dkt. No. 22 at 13; Dkt. No. 29-2 at
73-72.

II. PROCEDURAL HISTORY

**\*2** Plaintiff commenced this action on or about March 12, 2015, with the filing of a complaint and accompanied by an application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. On May 12, 2015, Senior District Judge Thomas J. McAvoy issued a decision and order granting plaintiff's IFP application and accepting his complaint for filing, with the exception of one cause of action.[2] Dkt. No. 11. In his third cause of action, plaintiff asserted a Fourteenth Amendment claim against defendant Lieutenant Quinn based on the allegation that defendant Quinn "conspire[d] and aided ... in writing a false [misbehavior] report after ascertaining the facts [sic] that [defendants Smith and Vevone] were in the wrong." Dkt. No. 1 at 6. Judge McAvoy dismissed that cause of action for failure to state a cognizable claim pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 11 at 9-12.

Following the close of discovery, defendants Smith and Vevone filed the currently pending motion for summary judgment seeking dismissal of plaintiff's complaint, arguing that plaintiff failed to fully exhaust available administrative remedies before filing this action. Dkt. No. 29-5. Plaintiff has filed a response in opposition to defendants' motion, which is now fully briefed, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Legal Standard Governing Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Plaintiff's Exhaustion of Administrative Remedies

**\*3** In their motion, defendants contend that plaintiff's complaint is subject to dismissal because plaintiff has failed to exhaust available administrative remedies as required under the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), prior to commencing this action. *See generally* Dkt. No. 29-5 at 2.

### 1. Legal Principles Governing Exhaustion Under the PLRA

The PLRA, which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136

S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna, —— Fed.Appx. ——*, No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." [3] *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

New York affords state prison inmates the opportunity to seek redress of complaints regarding prison conditions through a grievance procedure that is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC")[4] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [5] *Id.* at § 701.5(c)(3)(i), (ii).

**\*4** The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to

render a written decision within thirty days of receipt of an appeal. *Id.* at § 701.5(d)(2)(i).

It is worth noting that, as in this case, where an inmate complains of harassment or other misconduct by corrections officers or prison employees, the IGP provides for an expedited review process. 7 N.Y.C.R.R. § 701.8. In particular, the IGP requires inmates "who wish[ ] to file a grievance complaint that alleges employee harassment [to] follow the procedures set forth in [7 N.Y.C.R.R §] 701.5(a)[.]" *Id.* at § 701.8(a). As was noted above, section 701.5(a)(1) provides that, *inter alia*, the inmate shall submit his grievance to the clerk within twenty-one days of the incident of which he complains. *Id.* at § 701.5(a)(1). On the same day the clerk receives a grievance complaining of employee harassment, he must forward it "to the superintendent by the close of business." *Id.* at § 701.8(b).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/ or superintendent do not timely respond, an inmate must appeal "to the next step." *Id.* at § 701.6(g)(2); *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, J.) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can— and must—be appealed to the next level ... to complete the grievance process."). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).") (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to

exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA. [6] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

## 2. Analysis

**\*5** The record now before the court firmly establishes that plaintiff did not exhaust the available administrative remedies in accordance with the PLRA before commencing this action. According to plaintiff, following the alleged assault, he submitted a (1) grievance, [7] (2) letter to the superintendent at Auburn, (3) memorandum to the IGP supervisor at Auburn, and (4) letter to the New York State Inspector General ("IG") complaining of the alleged assault by defendants Smith and Vevone. [8] Dkt. No. 29-2 at 25-26, 39-40, 46-47, 50, 94-99, 104. Plaintiff did not receive any written response to any of his correspondence. Dkt. No. 29-2 at 40-42, 48-49, 51-53. He claims, however, that an officer stationed at Auburn, Sergeant Cudla, conducted an in-person interview of him on January 22, 2015, in connection with the grievance allegedly filed, and the IG's office conducted an investigation that included an interview of plaintiff in or about April 2015. *Id.* at 40-42, 48-49, 51-53. He also contends that he spoke directly to Deputy Robisson, the Deputy of Superintendent for Security at Auburn, regarding the assault. *Id.* at 31-32, 47-48, 100.

Notwithstanding the fact that he did not receive a written response to any of his correspondence regarding the alleged assault, plaintiff admittedly neglected to appeal the lack of a response to the next level of the IGP. *Id.* at 48-51. Because the IGP has been interpreted by courts in this circuit as requiring inmates to appeal to the next level when they do not receive a timely response to their grievance, plaintiff should have appealed to the superintendent and/or the CORC when he failed to receive a written response to the grievance he allegedly filed. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."); *Dabney v. Pegano*, 604 Fed.Appx. 1, 4-5 (2d Cir. 2015) (citing section 701.6(g) and concluding that, based on that provision, the plaintiff had "an unimpeded path to the CORC, notwithstanding his claims that the Great Meadow grievance clerk failed to process his complaint and that the Clinton superintendent ignored his appeal"); *Hyliger v. Gebler*, 624 Fed.Appx. 780, 782 (2d Cir. 2015) ("Under the regulations ..., if at any step of the grievance process[ ] an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to appeal to the next step. Thus, when [the plaintiff] did not receive a written response from the IGRC, appeal to the superintendent was still an available administrative remedy." (quotation marks, alteration, citation, and footnote omitted)). The record in this case shows, without contradiction, that while plaintiff appealed other grievance denials to the CORC, he did not do so in connection with defendants' alleged assault. Dkt. No. 29-3 at 4. This default constitutes a failure to exhaust available administrative remedies for purposes of the PLRA.

Liberally construing plaintiff's response to defendants' pending motion, he contends that he fully exhausted administrative remedies before commencing this action because his grievance involved allegations of employee harassment, and, consequently, by sending his letter directly to the superintendent he satisfied the requirements of the IGP. Dkt. No. 31 at 5. The IGP, however, clearly mandates that even those grievances complaining of employee harassment must be filed with the IGP clerk, who then must forward the grievance to the superintendent on the day of receipt. 7 N.Y.C.R.R. § 701.8(a). Writing and sending a letter directly to a superintendent does not satisfy the IGP. *See Dabney*, 604 Fed.Appx. at 3 ("The IGP also has an expedited

process for harassment grievances, which pertains to employee conduct meant to annoy, intimidate, or harm an inmate. These grievances go directly to a superintendent." (quotation marks, citations omitted)); *see also Lopez v. Bushey*, No. 11-CV-0418, 2014 WL 2807532, at *9 (N.D.N.Y. Apr. 7, 2014) (Dancks, M.J.) ("If the grievance involves a claim of misconduct by staff, harassment or discrimination, it receives a code of 49.... [T]he grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility.").

**\*6** Plaintiff next argues that he appealed the disciplinary hearing determination related to the misbehavior report he was issued, following the alleged assault by defendants Smith and Vevone, on January 14, 2015. Dkt. No. 31 at 3. Appealing a disciplinary hearing determination, however, is no substitute for filing and pursuing to completion a grievance through the IGP. [9] *See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 256 (S.D.N.Y. 2003).

Plaintiff also "asserts ... that the defendants hinder[ed] [his] complaint from reaching the CORC and from being properly filed with the IGRC." Dkt. No. 31 at 5. While I am mindful of my obligation to draw all inferences in favor of the non-moving party on summary judgment, *Terry*, 336 F.3d at 137, this conclusory allegation is not supported by any record evidence. Indeed, plaintiff sets forth this contention in an unsworn memorandum of law, which is decidedly not evidence. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 142 (2d Cir. 2003) ("In support of the assertion that the police had received complaints of drug activity in the area, the district court cited, not to admissible evidence, but to the defendants' memorandum of law, which is not evidence at all."). In any event, even assuming plaintiff's contention constitutes competent evidence, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996). At his deposition in this matter, plaintiff unequivocally testified that he did not file an appeal of his grievance to the CORC. Dkt. No. 29-2 at 49-51. He now attempts to create a dispute of fact by arguing that defendants thwarted his appeal from reaching the CORC. Dkt. No. 31 at 5. This he cannot do. *Hayes*, 84 F.3d at 619.

Finally, to the extent plaintiff contends that his letter to the IG and any subsequent investigation constitutes exhaustion under the PLRA, plaintiff is incorrect. *See, e.g., Goodson v. Silver*, No. 09-CV-0494, 2012 WL 4449937, at *9 (N.D.N.Y. Sept. 25, 2012) (Suddaby, C.J.) ("[A]n IG's investigation of a matter and conclusion that it is unsubstantiated does not satisfy the exhaustion requirement[.]" (citing cases)).

In summary, because plaintiff admittedly failed to pursue a grievance filed under the IGP to completion by filing an appeal to the CORC, and because he has failed to set forth any evidence that the IGP was rendered unavailable to him, I recommend that defendants' motion be granted.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's remaining cause of action alleges that defendants Smith and Vevone applied excessive force against him on January 14, 2015. Although plaintiff alleges that he filed various written documents—including a grievance in accordance with the IGP—complaining of defendants' use of force, he admits that he did not pursue the matter through the IGP by seeking review of his grievance by the CORC, as required under the available grievance program. Accordingly, it is respectfully

**\*7** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 29) be GRANTED and that plaintiff's complaint in this matter be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [10] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

The clerk of the court is respectfully directed to serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

## All Citations

Slip Copy, 2017 WL 986123

Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

2    Plaintiff's first and second IFP applications were denied as incomplete. Dkt. Nos. 4, 7. Following those denials, plaintiff filed a third IFP motion, on or about April 2, 2015, which was then granted by Judge McAvoy. Dkt. Nos. 9, 11.

3    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

4    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

5    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of an appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

6    According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

7    Aside from plaintiff's testimony at his deposition, there is no record evidence to support his allegation that he filed a grievance in accordance with the IGP. *See, e.g.,* Dkt. No. 29-3 at 4; Dkt. No. 29-4 at 2.

8    In or about 2014 the DOCCS Office of Special Investigations assumed the role previously played by the IG, including investigating complaints regarding prison conditions. *See* DOCCS Directive No. 0700, available at http://www.doccs.ny.gov/Directives/0700.pdf.

9    In any event, plaintiff's appeal of the disciplinary hearing determination does not complain of excessive force used by defendants Smith and Vevone. Dkt. No. 22 at 22-23. Instead, plaintiff argued on appeal that the hearing determination was based on insufficient evidence. *Id.* Accordingly, even assuming the appeal from the disciplinary hearing could act as a substitute for filing and pursuing a grievance through the IGP, plaintiff's appeal did not place prison officials on notice of his complaints of excessive force because he did not raise them in his appeal. *Id.*

10   If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:14-cv-00427-MAD-TWD   Document 65   Filed 05/25/18   Page 92 of 131

Jermosen v. Coughlin, Not Reported in F.Supp. (1993)

1993 WL 267357

1993 WL 267357
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Donald R. JERMOSEN, Plaintiff,

v.

Thomas A. COUGHLIN, et al., Defendants.

No. 87 Civ. 6267 (RJW).
|
July 9, 1993.

MEMORANDUM DECISION

ROBERT J. WARD, District Judge.

 *1 Donald R. Jermosen, appearing *pro se,* has moved, pursuant to Rule 56, Fed.R.Civ.P., for summary judgment. Defendants have cross-moved for summary judgment. By order dated December 14, 1990, the motions were referred to the Honorable Naomi Reice Buchwald, United States Magistrate Judge, to hear and report pursuant to 28 U.S.C. § 636(b)(1)(B).

On March 30, 1993, Magistrate Judge Buchwald filed a Report and Recommendation ("the Report"), which recommended that plaintiff's motion be denied and defendants' cross-motion be granted. Plaintiff filed a timely objection ("the Objection") to the Report. For the reasons that follow, the Court modifies the magistrate judge's findings and recommendations in accordance with this decision; denies plaintiff's summary judgment motion in part and grants it in part; and denies defendants' summary judgment motion in part and grants it in part.

BACKGROUND

In his Amended Complaint, Jermosen claims that defendants have: (1) violated the terms of the *Hurley* Consent Decree [1] ("the *Hurley* Decree") and (2) deprived him of his rights under the United States Constitution, in violation of 42 U.S.C. § 1983.

Jermosen was an inmate in the New York State Department of Correctional Services ("DOCS") Shawangunk Correctional Facility ("Shawangunk") during July 1987. On July 23, 1987, a facility-wide strip frisk was conducted. The strip frisk was initiated by First Deputy Superintendent Christopher Artuz, following receipt of information that an extortion ring was operating within Shawangunk. Artuz also noted a rise in the number of assaults, requests for protective custody, confiscation of weapons and drugs, and other manifestations of a potential security problem. Following a discussion with Superintendent Louis Mann, Artuz recommended a lock-down of the facility and a strip frisk of the inmates. Mann then requested and received permission from Deputy Commissioner Philip Coombe to conduct the lock-down and strip frisk during the week of July 20, 1987. DOCS Commissioner Thomas Coughlin subsequently granted final approval for the lock-down and strip frisk.

On July 23, 1987, Corrections Officers Nuttall and O'Connor, with their nightsticks raised, approached plaintiff to strip frisk him and search his cell. Jermosen objected to the frisk as illegal and demanded to see the sergeant responsible for supervising the search and frisk. As a result, Correction Sergeant Valleau, accompanied by Corrections Officer Sperry, joined Nuttall and O'Connor. Following this, Nuttall and O'Connor proceeded with the strip frisk.

The procedure for a strip frisk required Jermosen to: remove his clothes, open his mouth and move his tongue in all directions, remove dentures, if any, run his hands through his hair, allow his ears to be visually examined, lift his arms, spread his fingers, lift his feet, lift his testicles, and bend over to spread the cheeks of his buttocks.

Plaintiff then filed the instant action, asserting that defendants violated the terms of the *Hurley* Decree by conducting a strip frisk without probable cause and in the absence of a major threat to the facility. Jermosen claims he is entitled to a finding of civil contempt as a matter of law. In his § 1983 claim, Jermosen asserts that his rights under Article One of the New York State Constitution, as well as the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, were violated. Plaintiff also claims that defendants subjected him to visual rape and sodomy.

 *2 Defendants argue that the language of the *Hurley* Decree sanctioned the strip frisk that is the subject of this action and that plaintiff is estopped from bringing a separate § 1983 action challenging the events associated with the frisk because the decree governs the

Case 9:14-cv-00427-MAD-TWD    Document 65    Filed 05/25/18    Page 93 of 131

Jermosen v. Coughlin, Not Reported in F.Supp. (1993)

1993 WL 267357

administration of strip frisks. Defendants assert that summary judgment is warranted inasmuch as plaintiff has failed to establish a prima facie case. Finally, defendants contend that they are entitled to qualified immunity on plaintiff's § 1983 claims.

## DISCUSSION

A. *Standards for Reviewing a Magistrate Judge's Report and Recommendation*

To accept the Report and Recommendation of a magistrate judge to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record. *See* Rule 72, Fed.R.Civ.P., notes of Advisory Committee on Rules (citing *Campbell v. United States Dist. Court,* 501 F.2d 196, 206 (9th Cir.), *cert. denied,* 419 U.S. 879 (1974)). 28 U.S.C. § 636(b)(1) affords the district court broad latitude in considering a magistrate judge's recommendation, even if no party objects to it. *Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir.1989).

When timely objection has been made to a portion or portions of a magistrate judge's report, however, the district judge must "make a de novo determination ... of any portion of the magistrate's disposition to which specific written objection has been made." Rule 72(b), Fed.R.Civ.P. *See also,* 28 U.S.C. 636(b)(1). The judge may then accept, reject, or modify, in whole or in part, the magistrate judge's proposed findings and recommendations. 28 U.S.C. § 636(b)(1).

The district court's obligation to make a *de novo* determination of properly contested portions of a magistrate judge's report does not require that the judge conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676 (1980). It is sufficient that the District Court "arrive at its own, independent conclusion about those portions of the [magistrate judge's] report to which objection is made." *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983). To this end, the court must "exercise ... sound judicial discretion with respect to whether reliance should be placed on [the magistrate judge's] findings." *American Express Int'l Banking Corp. v. Sabet,* 512 F.Supp. 472, 473 (S.D.N.Y.1981), *aff'd without opinion,* 697 F.2d 287 (2nd Cir.), *cert. denied,* 459 U.S. 858 (1982).

Plaintiff has objected to all recommendations contained in the Report. Accordingly, the Court has conducted a *de novo* review of the entire Report.

B. *Standards for Granting Summary Judgment*

Summary judgment may be granted when the moving party establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Rosen v. Thornburg,* 928 F.2d 528, 532 (2d Cir.1991). If no rational fact-finder could find in the nonmovant's favor, there is no genuine issue of material fact and [ ]summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). In making this determination, the court should not resolve disputed issues of fact, but rather, while " 'resolving ambiguities and drawing reasonable inferences against the moving party,' " must assess whether material factual issues remain for the trier of fact. *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (quoting *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932 (1987)).

C. *Plaintiff's Objections*

1. *Violation of the Hurley Decree*

**\*3** Jermosen claims that defendants violated the *Hurley* Decree in four ways: (a) by conducting a strip frisk under conditions not authorized by the terms of the decree; (b) by strip frisking plaintiff without individual probable cause; (c) by having four corrections officers present during plaintiff's strip frisk; and (d) by failing to post the *Hurley* Decree in the facility.

With respect to the first three parts of this claim, all of which arise from the events surrounding the July 23, 1987 strip frisk, Jermosen has not established a violation of the *Hurley* Decree. After a *de novo* review of Jermosen's objections, the Court accepts the magistrate judge's proposed findings and recommendations on these parts of Jermosen's claim.

However, in connection with the fourth part of his claim, concerning the posting of the *Hurley* Decree, Jermosen has alleged a violation which, except for a general denial in their answer, has not been refuted by defendants. Accordingly, this part of plaintiff's motion will be granted.

Case 9:14-cv-00427-MAD-TWD    Document 65    Filed 05/25/18    Page 94 of 131

Jermosen v. Coughlin, Not Reported in F.Supp. (1993)

1993 WL 267357

a. *Appropriate Conditions for a Facility–Wide Strip Frisk*

Under the terms of the *Hurley* Decree, facility-wide strip frisks are permissible only if DOCS officials perceive a "major threat" to the security of the facility:

strip frisks and strip searches shall not be conducted as a part of a general search of any facility or portion of a facility except as follows:

....

2. During a search undertaken in response to a major threat to the security of the facility and such search having been duly authorized by the Commissioner or a Deputy Commissioner, a strip frisk of an inmate may, if necessary, be conducted.

*Hurley* Decree at 7.

Plaintiff contends that, because no major threat existed at the time of the July 1987 lock-down, the strip frisk violated the *Hurley* Decree. This contention rests on two grounds. First, he asserts that, contrary to Artuz's information, an extortion ring did not exist at Shawangunk. Jermosen bases this assertion on his lack of awareness of the existence of an extortion ring. Second, plaintiff notes that the facility was equipped with television cameras to monitor inmate activity. Plaintiff contends that if an extortion ring existed, the cameras would have recorded activity documenting its existence. Objection at 2.

Prison officials are entitled to "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979). "In the absence of evidence showing that the officials have exaggerated their response to security matters, their expert judgment should be accepted by the courts." *Hurley v. Ward,* 549 F.Supp. 174, 184 (S.D.N.Y.1982) (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128 (1977); *Pell v. Procunier,* 417 U.S. 817, 827 (1974)).

**\*4** With this principle of deference in mind, the Court finds that the DOCS officials held a reasonable belief that a major threat to the security of Shawangunk existed which warranted a strip frisk of plaintiff and other inmates. In reaching this conclusion, the Court relies upon the affidavit of First Deputy Superintendent Artuz. This

affidavit presents convincing evidence that the decision to conduct the strip frisk was based upon a reasonable belief that an extortion ring threatened the security of the facility. It catalogs the information and incidents upon which Artuz based his belief, including "the general increase in the number of inmate-on-inmate assaults, inmate requests for placement in protective custody, needless sick call reports, reports of inmates not wanting to go out to the exercise yard, and an increase in the number of weapons confiscated by corrections officers at the facility." Artuz Aff. ¶ 2.

The mere fact that plaintiff lacked personal knowledge concerning the operation of an extortion ring is not evidence of its nonexistence. In addition, the presence of television monitors at the facility does not guarantee that they would consistently record any illegal activity related to the existence of an extortion ring.

In accordance with the principle set forth in *Bell,* and absent any convincing evidence from plaintiff to contradict Artuz' statement concerning the evidence of an extortion ring, this Court defers to the professional judgment and experience of the DOCS officials. The Court adopts the magistrate judge's finding that the decision to conduct the lock-down and strip frisk was based upon a reasonable belief that an extortion ring posed a major threat to the facility.

b. *Presence of Individual Probable Cause*

The Report found that the *Hurley* Decree authorizes a strip frisk when there is a major threat to a facility and that it is not necessary for DOCS to make an individual determination of probable cause for each inmate to be strip frisked. Plaintiff disagrees and interprets the terms of the decree as requiring that individual probable cause be ascertained prior to any strip frisk of an inmate. However plaintiff has not pointed this Court to any part of the *Hurley* Decree which requires an individual determination of probable cause. By the terms of the decree itself, if there is "a major threat" to the security of a facility, a strip frisk may be conducted as part of a duly authorized general search. *Hurley* Decree at 7. The Court adopts the Report's findings in this regard and holds that the strip frisk of Jermosen, which was conducted without individual probable cause, did not violate the terms of the *Hurley* decree.

Case 9:14-cv-00427-MAD-TWD    Document 65    Filed 05/25/18    Page 95 of 131

Jermosen v. Coughlin, Not Reported in F.Supp. (1993)

1993 WL 267357

c. *Presence of More than Two Officers at Strip–Frisk*
Plaintiff next claims that the presence of four corrections officers at his strip frisk violated the terms of the *Hurley* Decree, which provides, in relevant part, "every strip frisk or strip search shall be conducted with only the individual searching officer and, if necessary, a supervisor able to observe the search...." *Hurley* Decree at 8.

**\*5** Jermosen admits that the four officers were present at his strip frisk only because "plaintiff demanded to know the actual identity of the sergeant or person responsible for supervising the strip frisk." Plaintiff's Memorandum in Support at 3. Initially, plaintiff's strip frisk was to be conducted by two officers, Nuttall and O'Connor, in accordance with the terms of the decree. However, because plaintiff verbally resisted and demanded to see the sergeant in charge, Sergeant Valleau and Officer Sperry came to plaintiff's cell and were also present during the strip frisk.

It is undisputed that the four officers present in Jermosen's cell exceeded the number of officers authorized at strip frisks by the decree. Nevertheless, it was Jermosen who requested this deviation from the terms of the *Hurley* Decree and he has therefore waived his right to use the presence of additional officers as a basis for relief. The Court adopts the Report's findings in this regard and holds that the presence of four officers, in response to a request by Jermosen, did not violate the terms of the *Hurley* decree.

d. *Failure to Post Hurley Decree*
Plaintiff asserts that a copy of the *Hurley* Decree was not posted at Shawangunk, in violation of the terms of the decree, which provides, in relevant part, "a copy of this decree shall be posted in each housing unit and each law library located in a correctional facility operated by the New York State Department of Correctional Services...." *Hurley* Decree at 8–9. In particular, plaintiff claims that defendants failed to make "this Consent Decree/Order to be posted at the Facility Law Library and other required areas." Amended Complaint ¶ 6; *see also* Plaintiff's Rule 3(g) Statement ¶¶ 10–11. Defendants deny this allegation only in general terms. Answer to the Amended Complaint ¶ 5.

Other than in their amended answer, defendants have not refuted plaintiff's allegations. Thus, plaintiff is entitled to summary judgment on this issue.

However, by virtue of Jermosen's response to the strip frisk on July 23, 1987 and his assertion of this claim in the instant lawsuit, it is apparent that plaintiff had personal notice of the *Hurley* Decree and has failed to demonstrate any injury incurred in connection with the failure to post. Accordingly, the appropriate relief is an order requiring compliance by defendants with the posting requirements of the *Hurley* Decree.

2. *Plaintiff's § 1983 Claim*
Plaintiff alleges that the strip frisk deprived him of his rights under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution,[2] in violation of 42 U.S.C. § 1983.[3] Amended Complaint ¶ 12.

a. *Fourth Amendment Claim*
Plaintiff asserts that the strip frisk deprived him of his constitutionally protected right to privacy under the Fourth Amendment. As the magistrate judge noted, however, prisoners do not enjoy the same privacy rights as non-prisoners because, "[l]oss of ... privacy [is an] inherent incident[] of confinement." Report at 11 (quoting *Bell* v. *Wolfish*, 441 U.S. at 537). In addition, prison administrators are accorded a high level of deference when dealing with threats to institutional security and internal order. *Bell v. Wolfish*, 441 U.S. at 546–48.

**\*6** Having found that the strip frisk at issue was conducted in accordance with the terms of the *Hurley* Decree, the Court defers to the judgment of the DOCS administrators and rejects plaintiff's claim that his right to privacy has been violated. The strip frisk was justified in view of defendants' reasonable concern for maintaining the security of the facility. Accordingly, plaintiff's Fourth Amendment claim cannot withstand defendants' motion for summary judgment on this issue.

b. *Eighth Amendment Claim*
Plaintiff alleges that defendants used excessive force during the strip frisk, in violation of the Eighth Amendment prohibition on cruel and unusual punishment. For the reasons that follow, the Court finds plaintiff's claim to be meritless.

Case 9:14-cv-00427-MAD-TWD    Document 65    Filed 05/25/18    Page 96 of 131

Jermosen v. Coughlin, Not Reported in F.Supp. (1993)

1993 WL 267357

As the Supreme Court has recently held, "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 112 S.Ct. 995, 999 (1992) (citing *Whitley v. Albers,* 475 U.S. 312, 320–21 (1986)).

Plaintiff does not allege that any officer or any object came into physical contact with him. Rather, he asserts that the officers approached his cell with their nightsticks raised in a threatening position and "deliberately inflicted mental pain, anguish, embarrassment and humiliation." Objection at 5. Jermosen further claims that this is tantamount to visual rape and sodomy. *Id.* at 3.

The Report states that, "[w]ith respect to defendants' threatening stance, the plaintiff has not shown that this conduct constituted a use of force that caused him *physical* pain." Report at 13 (emphasis added). While this is indisputably true, it does not carry the analysis far enough, because the infliction of *psychological* pain may also be a violation of the Eighth Amendment. *See Hudson v. McMillian,* 112 S.Ct. at 1004 (Blackmun, J., concurring) ("[T]he Eighth Amendment prohibits the unnecessary and wanton infliction of 'pain,' rather than 'injury.' 'Pain' in its ordinary meaning surely includes a notion of psychological harm. I am unaware of any precedent of this Court to the effect that psychological pain is not cognizable for constitutional purposes.")

In the instant matter, however, the Court finds that any psychological pain caused to Jermosen was *de minimus.* As the Supreme Court has indicated, "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.' " *Id.* at 1000 (quoting *Whitley v. Albers,* 475 U.S. at 327).

The same reasoning applies to any infliction of psychological pain. The officers in the instant matter conducted a constitutionally permitted strip frisk. The fact that they approached Jermosen with their nightsticks raised in a threatening position was not enough to cause the degree of psychological pain which rises to the level

of a constitutional violation. Moreover, plaintiff has not introduced any evidence that the incident left him with significant psychological scars. Based on the undisputed facts, the Court finds that any force was applied in a good-faith effort to maintain discipline during the facility-wide lock-down and strip frisks and any psychological harm to Jermosen caused by the incident was *de minimus.* Therefore, plaintiff's Eighth Amendment rights were not violated.

c. *Fourteenth Amendment Claim*

**\*7** Jermosen contends that the strip frisk deprived him of his liberty without due process of law, in violation of the Fourteenth Amendment. While prisoners do retain their Fourteenth Amendment due process rights, these rights are also subject to restrictions and limitations, particularly in order to maintain institutional security. *Bell v. Wolfish,* 441 U.S. at 545–46. Thus, "even when an institutional restriction infringes a specific constitutional guarantee ... the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* at 547 (citations omitted).

In light of these principles, the Court finds that the strip frisk did not deprive Jermosen of his liberty interest without due process of law. As noted above, the strip frisk was conducted in response to a perceived "major threat" to the security at Shawangunk. The strip frisk was duly authorized by a procedure established in the *Hurley* Decree and was conducted in accordance with the terms of that decree. Finally strip frisks of prison inmates have passed constitutional muster. *See, e.g., id.* at 558–60. For these reasons, the Court finds that plaintiff's Fourteenth Amendment due process rights were not violated.

d. *Qualified Immunity for Defendants*

Defendants assert they are entitled to qualified immunity on the § 1983 claim. Because the Report found that defendants did not violate plaintiff's constitutional rights, it did not reach this issue. Inasmuch as this Court has found that all of plaintiff's § 1983 claims should be dismissed, it need not decide this issue either.

3. *Plaintiff's Discovery Request*

Jermosen seeks discovery pertaining to defendants' knowledge of the existence of an extortion ring at

1993 WL 267357

Shawangunk. He argues that Artuz's affidavit is not proof of the existence of the extortion ring and is based on "pretext and false information." Objection at 4.

The Court finds Artuz's affidavit was submitted in good faith and accepts it as evidence of the reasonableness of the DOCS officials' decision to conduct the strip frisk. There is no indication that Artuz has attempted to mislead this Court concerning facts involving the existence of the extortion ring.

As such, the Court finds that further discovery on this issue would be unduly cumulative or duplicative, as well as unduly burdensome and expensive. Rule 26(b) (1), Fed.R.Civ.P. Accordingly, the Court denies plaintiff's discovery request.

CONCLUSION

For the foregoing reasons, Magistrate Judge Buchwald's Report and Recommendation is adopted in part and modified in part. Plaintiff's summary judgment motion is granted in part and denied in part. Defendants' summary judgment motion is likewise granted in part and denied in part.

Defendants are directed to serve and file, with the undersigned, an affidavit, on or before August 20, 1993, indicating compliance with the posting requirements of the *Hurley* Decree. Accordingly, the complaint is dismissed without prejudice to an application to the Hon. Robert L. Carter to enforce the posting requirements of the *Hurley* Decree.

**\*8** It is so ordered.

**All Citations**

Not Reported in F.Supp., 1993 WL 267357

Footnotes

1    The *Hurley* Consent Decree was entered on July 21, 1983 in *Hurley v. Coughlin,* 77 Civ. 3847 (RLC) (S.D.N.Y.), a class action suit brought on behalf of all inmates in the custody of the New York State Department of Correctional Services seeking to enjoin certain strip frisk and strip search policies of the department. The decree sets forth the specific procedures that prison officials must follow during a strip frisk or strip search of any prisoner or group of prisoners. *See* Artuz Aff.Ex.K at 7.

2    In the Amended Complaint, plaintiff also alleges that his rights under the First and Fifth Amendments were denied by defendants. *Id.* at ¶ 12. However, nowhere in his submissions in support of the instant motion or in the Objection does plaintiff discuss these additional claims or present any argument as to precisely how he suffered a deprivation under the First or Fifth Amendment. For this reason, the Court finds that plaintiff has failed to state a colorable claim in connection with these amendments.

In addition, plaintiff asserts that he was deprived of his rights under the New York state constitution, in violation of § 1983. This claim must be rejected, inasmuch as § 1983 does not apply to the deprivation of rights, privileges or immunities independently created by state statutes or state constitutions. *Stiltner v. Rhay,* 322 F.2d 314, 315 (9th Cir.1963), *cert. denied,* 376 U.S. 920 (1964); *Newcomer v. Coleman,* 323 F.Supp. 1363, 1365 n. 4 (D.Conn.1970).

3    Section 1983, provides, in relevant part,

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or any other proper proceeding for redress.

42 U.S.C. § 1983.

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jonathan Mena, Plaintiff,
v.
City of New York, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City
Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

 *1  Plaintiff Jonathan Mena, who is currently
incarcerated and proceeding *pro se*, brings this action
pursuant to 42 U.S.C. § 1983 ("Section 1983") against
Correction Officer Benjamin Eason ("Defendant"),
alleging violations of the Eighth Amendment. Now before
the Court is Defendant's motion for summary judgment.
For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

On September 9, 2012, while incarcerated at the Otis
Bantum Correctional Center ("OBCC") on Rikers Island,
Plaintiff was placed in an intake cell in the OBCC's
receiving area, which he shared with two other individuals.
(56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell
was extremely cold, vermin-infested, and too small to
accommodate three men. (*See* Doc. No. 54-1 ("Compl.")
4, 8.) Plaintiff further alleges that these conditions,
coupled with the constant noise made by the two other
inmates, prevented him from sleeping for the entire 60-
hour period that he was held in the cell. (*See id.* at 4.)

Consequently, he asked Defendant, who was on duty,
to transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.)
According to Plaintiff, Defendant responded that there
was "nothing he could do" about the situation. (*Id.* ¶ 9; *see
also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC
to complain about his experience in the cell. (*See* Compl.
at 7.) The New York City Department of Correction
("DOC") has an administrative grievance procedure,
known as the Inmate Grievance and Request Program
("IGRP"), for inmates housed at facilities such as the
OBCC. The IGRP, which was available and in effect at all
times relevant to this lawsuit, requires that inmates first
file a complaint with the Inmate Grievance Resolution
Committee ("IGRC") within ten days of the complained-
of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP
Directive") § IV(D)(1).) The IGRC then attempts to
resolve the grievance informally within five days, and if the
grievance is not informally resolved, then the inmate may
request a formal hearing before the IGRC. (56.1 Stmt. ¶
12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may
appeal the IGRC's decision to the commanding officer, or
her designee, and subsequent appeals may be taken to the
Central Office Review Committee ("CORC"). (56.1 Stmt.
¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's
decision is the final and binding decision of the DOC; if
an inmate disputes the decision of the CORC, he may
independently appeal to the Board of Correction. (IGRP
Directive at 47.) Finally, if an inmate does not receive a
timely disposition at any point throughout the grievance
process, he has the option of either granting an extension
of time to the relevant decisionmaker (i.e., the IGRC,
the commanding officer, or the CORC) or appealing and
proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see
also* IGRP Directive §§ IV(D)(9)(b), (10).)

 *2  As Plaintiff himself acknowledges, after submitting
the grievance and receiving no response, he neither
granted the DOC an extension of time nor appealed. (*See*
Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits
that he is "still waiting" for a disposition of his grievance,
but does not indicate any steps he has taken to appeal any
decision before the IGRC. (*See* Compl. 7.) In response
to a question on the Southern District of New York
Prison Complaint form asking a plaintiff to "set forth any
additional information that is relevant to the exhaustion
of your administrative remedies," Plaintiff repeated a
number of his substantive allegations against the OBCC

staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

### II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court

to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at *1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

### III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's

effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at *3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days [,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at *7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at *8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question," but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly

rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ____, ____, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no

response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D) (9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.,* *Winston v. Woodward,* No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis,* the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis,* any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 3948100

Footnotes

1    The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

2    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4159897
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Daniel Powell, Plaintiff,
v.
City of New York, Imam Habib Hasan,
and Warden V. Vasquez, Defendants.

14-CV-09937 (PAC)(BCM)
|
Signed 07/14/2016

**Attorneys and Law Firms**

Daniel Powell, Philadelphia, PA, pro se.

Elizabeth Edmonds, Kate Fay McMahon, New York City
Law Department, New York, NY, for Defendants.

## REPORT AND RECOMMENDATION TO
## THE HONORABLE PAUL A. CROTTY

BARBARA MOSES, United States Magistrate Judge

Plaintiff Daniel Powell claims that for two weeks he was
denied the opportunity to attend congregate religious
services while incarcerated at the Eric M. Taylor Center
(EMTC) on Rikers Island. Now before me for report
and recommendation is a motion by defendants City of
New York (City), Imam Habib Hasan, and Warden V.
Vasquez for summary judgment. For the reasons set forth
below, I respectfully recommend that defendants' motion
be GRANTED and the case be DISMISSED.

## BACKGROUND

### I. Procedural Background
Plaintiff filed this pro se action on December 9, 2014. His
complaint (Dkt. No. 1) asserts that he is a practicing and
registered Muslim but that during the period November
7-19, 2014, while he was held at the EMTC in the custody
of the New York City Department of Correction (DOC),
he was denied the opportunity to attend Friday Muslim
services. Compl. at 3-4. During that period there were
two Fridays, which fell on November 7 and November
14, 2014. Plaintiff claims that defendants violated his

constitutional right to freely practice his religion and
claims that he was singled out because he was Muslim. *Id.*
He alleges that he experienced fear and emotional distress,
and demands $100 million in compensation. *Id.* at 3, 5.

By letter dated February 22, 2015 (Dkt. No. 11), plaintiff
notified the Court that he was no longer incarcerated, and
supplied an address in Brooklyn.

Defendants answered on March 31, 2015 (Dkt. No.
14), denying most of plaintiff's material allegations, but
admitting that DOC records identified Powell as Muslim
and that Muslim services were held on November 7
and 14, 2014. Ans. ¶¶ 10-11. On October 7, 2015, after
the close of discovery, defendants moved for summary
judgment, filing a notice of motion (Dkt. No. 22), a
brief (Dkt. No. 23), a statement of undisputed material
facts pursuant to Local Civil Rule 56.1 (Dkt. No. 25)
and a declaration executed by Assistant Corporation
Counsel Elizabeth Edmonds (Dkt. No. 24), attaching
three exhibits: plaintiff's complaint; excerpts of the
transcript of plaintiff's deposition, conducted on May
28, 2015; and a document entitled "Inmate Movement
History Log." Edmonds Decl. ¶¶ 2-3 & Exs. A-C.

Plaintiff responded to the motion with a two-page hand-
written letter, bearing a return address in Philadelphia,
which cited case law and repeated his assertions that he
was "singled out" and "not allowed to practice my religion
freely." Pl. Ltr. dated Nov. 1, 2015 (Dkt. No. 29) at 2.
Plaintiff did not provide any new factual details or attach
any evidentiary material. On January 4, 2016, defendants
filed a reply brief (Dkt. No. 30), and on January 13,
2016, this action was referred to me for general pretrial
management and report and recommendation.

### II. Undisputed Facts
Unless otherwise noted, the following facts are based on
plaintiff's complaint, which he executed under penalty of
perjury, [1] and his deposition testimony:

**\*2** During the period November 7-19, 2014, plaintiff
was in the custody of the DOC and housed in the
EMTC on Rikers Island. *See* Compl. at 2-3; Powell
Dep. at 13:01-14:14. There were two Fridays during that
period. Although plaintiff is a practicing Muslim, and
was registered as such with the DOC, he was not called
to attend Jummah services on either Friday November

7 or Friday November 14. Compl. at 3; Powell Dep. at 14:4-9, 19:9-25. [2] No one else in plaintiff's housing unit was called for Muslim services on those days either, *id.* at 21:25-22:11, although there were "a few" other Muslims there. *Id.* at 22:16-20. However, "every other house and everybody else in the building was called." *Id.* at 14:8-9. Plaintiff was not in solitary confinement at the time; nor was his housing unit on lockdown. Compl. at 3.

After the first missed service, when plaintiff asked the correction officer on duty why he was not called for the Jummah service, he was told that "religious services never called, never called for anybody to go out." Powell Dep. at 19:14-15. The officer added that there were "alarms," and people were not allowed to move around. *Id.* at 19:16-18; 20:3-13. After the second missed service, the officers to whom plaintiff spoke "said they was never called, they didn't call at all." *Id.* at 20:5-6. Similarly, the area captain told plaintiff that "they suppose to call it but they never called it for [plaintiff]." *Id.* at 13:12-14. Plaintiff also spoke to the "officer that runs the service," that is, the officer who is responsible for calling the housing units; that officer told plaintiff that he "tried to call" on both occasions. *Id.* at 19:18-19; 20:5-6; 20:14-21:12. Plaintiff does not recall the names of any of the correction officers he spoke to about the missed services. *Id.* at 19:1-8; 20:25-21:2.

The next week, after plaintiff filed two grievance slips, he was called to attend the Jummah service on Friday, November 21, 2014. Powell Dep. at 13:16-18; 24:2-24. There, he complained to Imam Hasan, who gave the service, about not being called previously, but the imam did nothing. *Id.* at 26:7-27:2. During the same two-week period when Powell missed Friday services, he was called to attend Muslim classes every Wednesday, *id.* at 13:6-9, and other prisoners were called for church services. *Id.* at 22:4-9.

Powell sued Imam Hasan because he was "supposed to know all the Muslims that is within the building," and therefore, in plaintiff's view, "it is [the imam's] job to make sure that every housing unit is called, that each housing area is called. That is what an imam is for." *Id.* at 30:1-12. As for Warden Vasquez, plaintiff explained, "this is his facility." *Id.* at 31:1. There are no other facts in the record concerning either Imam Hasan or Warden Vasquez.

## ANALYSIS

### I. Standard for Summary Judgment

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp.,* 477 U.S. at 322-23, 106 S. Ct. at 2552; *Amaker v. Foley,* 274 F.3d 677, 680-81 (2d Cir. 2001). The moving party bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c); *Celotex Corp.,* 477 U.S. at 322, 106 S. Ct. at 2552; *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir. 2002). "[T]he district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Amaker,* 274 F.3d at 681. If not, "summary judgment is inappropriate, for 'no defense to an insufficient showing is required.' " *Id.* (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 161, 90 S. Ct. 1598, 1610 (1970)). *See also Smith v. Graziano,* 2010 WL 1330019, at *5 (N.D.N.Y. Mar. 16, 2010) ("[e]ven in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law"), *report and recommendation adopted,* 2010 WL 1332503 (N.D.N.Y. Apr. 6, 2010).

**\*3** Assuming that the moving party meets its initial burden, the burden shifts to the non-moving party to establish a genuine dispute of material fact. *Celotex Corp.,* 477 U.S. at 322, 106 S. Ct. at 2552; *Beard v. Banks,* 548 U.S. 521, 529, 126 S. Ct. 2572, 2578 (2006); *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir. 2001). At this stage, the non-moving party cannot "rely merely on allegations or denials" of the factual assertions of the moving party. Fed. R. Civ. P. 56(e)(2). Moreover, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir. 1996). *See also Salahuddin v. Goord,* 467 F.3d 263,273 (2d Cir. 2006) ("the non [-]movant cannot rest on allegations in the pleadings"). Rather, the non-moving party must present admissible evidence in support of its contention that there is a genuine dispute as to the material facts. *See Celotex Corp.,* 477 U.S. at 324, 106 S. Ct. at 2553; *Presbyterian Church of Sudan v. Talisman Energy,*

*Inc.,* 582 F.3d 244, 264 (2d Cir. 2009); *Salahuddin v. Goord,* 467 F.3d at 273 (the non-movant "must point to specific evidence in the record to carry its burden on summary judgment"). As noted above, a verified complaint – if its contents are otherwise admissible – may be treated as an affidavit and relied on as evidence for this purpose. *Colon,* 58 F.3d at 872.

The court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); *In re "Agent Orange" Prod. Liab. Litig,* 517 F.3d 76, 87 (2d Cir. 2008). In order to defeat a summary judgment motion, the evidence – so construed – must be sufficient to permit a reasonable jury to return a verdict in the non-moving party's favor. *See Liberty Lobby,* 477 U.S. at 248, 106 S. Ct. at 2510; *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 101 (2d Cir. 2001).

In this District, the Local Civil Rules require the party moving for summary judgment to submit a statement, in numbered paragraphs, setting forth "the material facts as to which the moving party contends there is no genuine issue to be tried." Loc. Civ. R. 56.1 (a). The opposing party must specifically controvert each numbered paragraph in a corresponding paragraph of its own. Loc. Civ. R. 56.1(b). If the opposing party fails to do so, that paragraph is deemed admitted. Loc. Civ. R. 56.1(c); *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir. 2003) (if the non-moving party fails to submit Rule 56.1 counter-statement, all material facts offered by the movant, if supported by the record, will be deemed admitted).

"Pro se litigants are 'not excused from meeting the requirements of Local Rule 56.1' " *Diggs v. Volpe,* 2013 WL 4015758 at *1 n.1 (S.D.N.Y. Aug. 7, 2013) (quoting *Wali v. One Source Co.,* 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009)). Here, plaintiff's only response to defendant' motion was a hand-written letter that does not address, much less controvert, defendants' Rule 56.1 statement. Nonetheless, "where a pro se plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali,* 678 F. Supp. 2d at 178. *See also Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir. 2001) ("while a court is not required to consider what the parties

fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement") (internal quotation marks omitted).

Additionally, for a pro se litigant, courts "read [the litigant's] supporting papers liberally and will interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994) (citing *Mikenberg v. Baltic S.S. Co.,* 988 F.2d 327, 330 (2d Cir. 1993); *accord McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir. 1999); *Diggs,* 2013 WL 4015758 at *6. However, " 'bald assertions,' unsupported by evidence, will not overcome a motion for summary judgment," regardless of whether the party opposing summary judgment is counseled or pro se. *Diggs,* 2013 WL 4015758 at *6 (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir. 1991)).

**\*4** In this case, I have examined defendants' motion papers assiduously to determine whether they have met their burden of demonstrating that no material issue of fact remains for trial, and I conclude that they have. In addition, even though plaintiff failed to file a Rule 56.1 counter-statement, I have carefully read his submissions, interpreted them to raise "the strongest arguments they suggest," *Burgos,* 14 F.3d at 790, and treated his complaint, to the extent otherwise admissible, as an affidavit in opposition to defendants' motion Even giving plaintiff every favorable inference, however, I cannot find any genuine factual dispute in the record that might prevent the entry of judgment in defendants' favor.

## II. Free Exercise Claim

Plaintiff's primary claim appears to be that defendants deprived him of his rights under the Free Exercise Clause of the First Amendment, U.S. Const. amend. I, as applied to the states through the Fourteenth Amendment, U.S. Const, amend, XIV § 1, in violation of 42 U.S.C. § 1983. "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974)). Among other things, prisoners retain the "constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir. 1993). However, "a prisoner's right to practice his religion is not absolute." *Id.* at 308. It must be balanced against "the interests of prison officials charged with

complex duties arising from administration of the penal system." *Ford,* 352 F.3d at 588 (quoting *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir 1990)).

To establish a free exercise claim, the prisoner must show "(1) that he has a sincerely held religious belief, (2) that it was substantially burdened, and (3) that defendants' conduct was not reasonably related to some legitimate penological interest." *Hamilton v. Countant,* 2016 WL 881126, at *3 (S.D.N.Y. Mar. 1, 2016) (quoting *Barnes v. Furman,* 629 Fed.Appx. 52, 55 (2d Cir. 2015)). *See also Salahuddin v. Goord,* 467 F.3d at 274-75 ("[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs"). [3]

Moreover, "a prison official must *knowingly* place a substantial burden on a prisoner's religious beliefs." *Hamilton,* 2016 WL 881126, at *4 (emphasis in the original). "[D]amages claims based solely on the negligent infringement of a prisoner's right to religious freedom" are not actionable under § 1983. *Id. See also Scott v. Shansiddeen,* 2013 WL 3187071, at *4 (N.D.N.Y. Jun. 20, 2013) (granting summary judgment on plaintiff's free exercise claim where defendants' error in preparing call-out list for religious meals was not more than "negligence, which is not actionable under the First Amendment") (quoting *Tafari v. Brown,* 2012 WL 1098447, at *6 (N.D.N.Y. Mar. 30, 2012); *Odom v. Dixion,* 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008) (granting summary judgment on plaintiff's free exercise claim where defendants' administrative error "at most, constitutes negligence," and therefore "provides no basis for § 1983 relief"); *Young v. Scully,* 1993 WL 88144, at *7 (S.D.N.Y. Mar. 1, 1993) ("[n]egligence alone will not carry a § 1983 action") (quoting *Paulsen v. Gotbaum,* 1992 WL 8361, at *8 (S.D.N.Y. Jan. 15, 1992)). [4]

**\*5** Defendants do not dispute the sincerity of Powell's religious belief, nor the importance to him of attending Friday services. I therefore proceed to the next step of the analysis, which asks whether defendants' conduct, which caused plaintiff to miss two consecutive Jummah services, "substantially burdened" his religious practice.

"The Second Circuit defines a substantial burden as a situation where 'the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.' " *Hamilton,* 2016 WL 881126, at *4 (quoting *McEachin,*

357 F.3d at 202-03 n.4). Alternatively, plaintiff must demonstrate "that the government's action ... prevent[ed] him from engaging in conduct or having a religious experience mandated by his faith." *Smith v. Artus,* 2010 WL 3910086, at *11 (N.D.N.Y. Sept. 30, 2010) (quoting *Muhammad v. City of New York Dep't of Corr.,* 904 F. Supp. 161, 188 (S.D.N.Y. 1995) (citations omitted)), *vacated in part on other grounds,* 522 Fed.Appx. 82 (2d Cir. 2013).

Although demonstrating a substantial burden is "not a particularly onerous task," *McEachin,* 357 F.3d at 202, the requirement is not met "by a *de minimis* imposition on the free exercise of religion." *Leach v. New York City,* 2013 WL 3984996, at *5 (S.D.N.Y. Aug. 2, 2012). " '[M]ere inconvenience' is insufficient to establish a substantial burden." *Salvatierra v. Connolly,* 2010 WL 5480756, at *12 (S.D.N.Y. Sept. 1, 2010) (quoting *Pugh v. Goord,* 571 F. Supp. 2d 477, 505 (S.D.N.Y. 2008)), *report and recommendation adopted,* 2011 WL 9398, at *1 (S.D.N.Y. Jan. 3, 2011); *accord Woodward v. Perez,* 2014 WL 4276416, at *4 (S.D.N.Y. Aug. 29, 2014). Even if the "substantial burden" test were rejected entirely, "[t]here may be inconveniences so trivial that they are most properly ignored." *McEachin,* 357 F.3d at 203 n.6.

It is well-settled in this Circuit that missing two weekly religious services does not substantially burden a prisoner's right to freely exercise his religion. *See, e.g., Smith v. Goord,* 541 Fed.Appx. 133, 134 (2d Cir. 2013) (affirming jury verdict for defendants where prison failed to hold any Islamic services during plaintiff's stay, which included four Fridays); *Hanton v. Mathiau,* 29 Fed.Appx. 772, 773 (2d Cir. 2000) (affirming district court's grant of summary judgment to defendants where prison officials prevented plaintiff from attending weekly services once in August 1997 and "for a three-week period in October 1997"); *Blalock v. Jacobsen,* 2014 WI 5324326, at *7 (S.D.N.Y. Oct. 20, 2014) (dismissing plaintiff's free exercise claim pursuant to Fed. R. Civ. P. 12(b)(6) because "the denial of two religious services ... does not substantially burden an inmate's right to religious observation"); *Shapiro v. Cmty. First Servs., Inc.,* 2014 WL 1276479, at *11 (E.D.N.Y. Mar. 27, 2014) (dismissing plaintiffs free exercise claim pursuant to Fed. R. Civ. P. 12(b)(6), even though defendants did not brief the point, because "not permitting a prisoner to attend two religious services 'is a *de minimis,* or insubstantial, burden on an inmate's ability to freely exercise his religion' ")

(quoting *Graziano,* 2010 WL 1330019, at \*9); *Williams v. Weaver,* 2006 WL 2794417, at \*5 (N.D.N.Y. Sep. 26, 2006) (collecting earlier cases and holding, on a Rule 12(c) motion, that depriving a prisoner of the right to attend Friday services and religious classes for two weeks did not, "as a matter of law," substantially burden his right to practice his religion).

**\*6** In this case, not only was the deprivation *de minimis*; there is no evidence that the failure to call Powell for two consecutive Friday services was more than a negligent oversight, quickly remedied when plaintiff complained through prison channels. *See* Powell Dep. at 13:15-18; 24:2-24 (after "dropping a grievance," plaintiff was called for the next Jummah service). Significantly, plaintiff was able to attend weekly religious classes on Wednesdays during the same period. *See id.* at 13:5-9. Moreover, although the explanations plaintiff was given as to why he was not called for two Jummah services suggest a certain degree of bureaucratic finger-pointing, nothing that he was told, and no other evidence in the record, indicates that the underlying sin was graver than inattention. *See id.* at 19:18-19, 20:5-6, 20:14-21:12. This case most resembles *Graziano,* where the prisoner missed two consecutive weekly religious services "due to a lack of communication involving security staff and ministerial services." 2010 WL 1330019, at \*7. In *Graziano,* as here, the burden was minimal and the oversight quickly remedied. The court concluded:

> [W]hether we apply the substantial burden test or simply look to the level of infringement on Plaintiff's ability to freely exercise his religion, we find that the cancellation of two services did not violate Plaintiff's free exercise rights and such First Amendment claim should be dismissed.

*Id.* at \*9. *See also Graham v. Mahmood,* 2008 WL 1849167, at \*15 (S.D.N.Y. Apr. 22, 2008) (granting summary judgment on plaintiff's free exercise claim arising out of correction officers' shut-down of two weekly religious meetings where officers were "confused" but defendants quickly took "measures to ensure that similar shut downs did not occur").

Defendants here have made no effort to demonstrate that their conduct was "reasonably related to some legitimate penological interest." *Hamilton,* 2016 WL 881126, at \*3. Nonetheless, because the conduct complained of did not substantially burden plaintiffs religious practice, and in any event was no worse than negligent, I respectfully recommend that the District Judge grant summary judgment to defendants with respect to plaintiff's free exercise claim.

### III. RLUIPA Claim

Plaintiff's papers may also be construed to charge that defendants violated § 3 of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1. Under RLUIPA, the government may not "impose a substantial burden on the religious exercise" of a prisoner, even if the burden results from a "rule of general applicability," unless the government demonstrates a "compelling governmental interest" and that the imposition of the burden is "the least restrictive means" of furthering that interest. *Id.* Once the plaintiff produces "prima facie" evidence of a violation of RLUIPA, "the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the ... practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc-2(c).

Although claims under RLUTPA and under the Free Exercise Clause proceed "under a slightly different framework," *Salahuddin v. Goord,* 467 F.3d at 274, "[t]he required 'substantial burden' is identical under both provisions." *Hamilton,* 2016 WL 881126, at \*4. *See also Lopez v. Cipolini,* 136 F. Supp. 3d 570, 587 (S.D.N.Y. 2015) ("[w]hether or not a prisoner sufficiently pleads a substantial burden ... under RLUIPA involves the same threshold analysis as under the First Amendment"); *Loccenitt v. City of New York,* 2013 WL 1091313, at \*3 (S.D.N.Y. Mar. 15, 2013) (plaintiff must make the same threshold showing "[i]n order to make out a claim of a violation of the Free Exercise Clause or the RLUIPA").

Once a plaintiff makes the required threshold showing, "the Court's analysis of a First Amendment claim and a RLUIPA claim will diverge." *Valdez v. City of New York,* 2013 WL 8642169, at \*12 (S.D.N.Y. Sept. 3, 2013), *report and recommendation adopted,* 2014 WL 2767201 (S.D.N.Y. June 17, 2014).[5] However, under RLUIPA, as under § 1983, "damages claims based solely on the

negligent infringement of a prisoner's right to religious freedom are not actionable." *Hamilton,* 2016 WL 881126, at *4. *See also Guillory v. Ellis,* 2014 WL 4365274, at *9 n.10 (N.D.N.Y. Aug. 29, 2014) ("negligent action" is "not actionable under section 1983 or under RLUIPA"); *Scott,* 2013 WL 3187071, at *4 (negligent actions are not "sufficient to support a claim under the Religious Land Use and Institutionalized Person Act"); *Odom,* 2012 WL 466255, at *11 (negligent conduct was insufficient to support liability "under either the First Amendment or RLUIPA"). [6]

**\*7** Because the "substantial burden" test is the same under RLUIPA as under the Free Exercise Clause, evidence that a plaintiff was unable to attend two Jummah services does not make out a claim for violation of RLUIPA. *See, e.g., Smith,* 541 Fed.Appx. at 134 (affirming jury verdict for defendants under both RLUIPA and § 1983 where prison failed to hold any Islamic services for four weeks); *Graziano,* 2010 WL 1330019, at *10 (dismissing claims under both RLUIPA and § 1983 because cancellation of two weekly religious services did not substantially burden plaintiffs religious exercise). Similarly, the relatively brief failure of corrections officers to call out one housing unit for Jummah services – promptly corrected after complaint – does not rise beyond the "lowest common denominator" of negligence, which is not actionable under RLUIPA. *Lovelace,* 472 F.3d at 194.

Even if there were evidence from which a jury could conclude that plaintiff's religious exercise was substantially burdened, by conduct that was more than negligent, his RLUIPA claim would fail because the only relief he seeks is $100 million in damages. Compl. at 5. Money damages are not available under RLUIPA. *See Sossamon v. Texas,* 563 U.S. 277, 280, 131 S. Ct. 1651, 1655 (2011); *Holland,* 758 F.3d at 224; *Washington v. Gonyea,* 731 F.3d 143, 145 (2d Cir. 2013) (per curiam); *Brandon v. Schroyer,* 2016 WL 1638242, at *9 (N.D.N.Y. Feb. 26, 2016), *report and recommendation adopted,* 2016 WL 1639904 (N.D.N.Y. Apr. 25, 2016); *Lopez,* 136 F. Supp. 3d at 589; *Ramrattan v. Fischer,* 2015 WL 3604242, at *9 (S.D.N.Y. June 9, 2015). Moreover, to the extent Powell's complaint could be construed to seek injunctive relief that request became moot on or before February 22, 2015, when he wrote to the Court to advise that he was out of custody and living in Brooklyn. *See Brandon,* 2016 WL 1638242, at *9 (former

inmate's claims for injunctive and declaratory relief under RLUIPA "are now moot" based upon plaintiff's transfer out of the prison where his rights were allegedly violated); *Lopez,* 136 F. Supp. 3d at 589 ("because Plaintiff is no longer incarcerated, to the extent Plaintiff requests any injunctive relief, this request is moot"); *Pugh,* 571 F. Supp. 2d at 498-99 (dismissing former inmate's RLUIPA claim because, "[w]here a prisoner has been released from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot"). I therefore respectfully recommend that the District Judge grant summary judgment to defendants with respect to plaintiff's RLUIPA claim.

## IV. Equal Protection Claim

Because plaintiff alleges that he was "singled out for being Muslim," Compl. at 3, I also construe his pleadings to assert a claim under § 1983 for violation of the Equal Protection Clause, U.S. Const. amend. XIV, § 1. To sustain such a claim, a plaintiff "must prove purposeful discrimination directed at an identifiable or suspect class." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir. 1995) (internal citation omitted). *See also Snyder v. Pugliese,* 144 Fed.Appx. 174, 175 (2d Cir. 2005) (equal protection claimant must prove that he was "selectively treated" based on "impermissible considerations," and that the discrimination was "purposeful"); *Dilworth v. Goldberg,* 2014 WL 3798631, at *6 (S.D.N.Y. Aug. 1, 2014) (equal protection claim requires proof of "purposeful discrimination directed at an identifiable or suspect class"); *accord Hamilton,* 2016 WL 881126, at *8; *Williams v. King,* 56 F. Supp. 3d 308, 322 (S.D.N.Y. 2014).

If prison rules and policies make distinctions between religious groups, those rules or policies "must be examined to determine whether [they are] are reasonably related to legitimate penological interests." *Benjamin,* 905 F.2d at 575. *See also Williams v. King,* 56 F. Supp. 3d at 323 (distinctions between "similarly situated religious groups in prison" must "withstand a rational basis review and be reasonably related to legitimate penological interests"). "Thus, even if plaintiffs can demonstrate that two groups are similarly situated, disparate treatment may still be warranted if the government can demonstrate that the distinctions are 'reasonably related to legitimate penological interests.' " *Pugh,* 571 F Supp. 2d at 502 (citing *Benjamin,* 905 F.2d at 575).

**\*8** Here, plaintiff has adequately adduced evidence of his membership in a suspect class, but there is no evidence of purposeful discrimination against that class. At most, plaintiff could show that the Muslim prisoners in his housing unit were not called for Jummah services for two consecutive weeks while Christian prisoners in the same unit were called for church services. *See* Powell Dep. at 22:4-9. Plaintiff concedes, however, that during the same two-week period he was able to attend Muslim classes on Wednesdays, *see id.* at 13:6-9 ("I was there every Wednesday"), and that Muslim prisoners in other housing units were called for Jummah services. *Id.* at 14:8-9 ("every other house and everybody else in the building was called except my MOD"). He also concedes that his complaints were quickly addressed and that he was properly called for the Jummah service on the third Friday he was housed at the EMTC. *Id.* at 24:16-24. There is thus no evidence that prison rules or policies disadvantaged Muslim prisoners in general, nor that defendants intentionally slighted plaintiff (or other Muslim prisoners in his housing unit) on the basis of religion.

As noted above, defendants make no effort to show that their failure to call Powell for two Muslim services during the period November 7-19, 2014 was "reasonably related to legitimate penological interests." *Benjamin,* 905 F.2d at 575. Defendants do not even discuss plaintiff's potential Equal Protection claim in their summary judgment papers. Nonetheless, because no reasonable factfinder could conclude that plaintiff missed those two services because of purposeful discrimination, I recommend that summary judgment be granted in defendants' favor with respect to plaintiff's Equal Protection claim.

## V. Municipal and Supervisory Liability under § 1983
Since there is insufficient evidence in the record to establish any constitutional violation for which plaintiff could seek redress, it is unnecessary to consider whether and to what extent each named defendant could be held liable under § 1983 for such a violation, For the avoidance of doubt, however, I briefly address each defendant in turn.

### A. New York City
A municipality cannot be sued on a *respondeat superior* theory for a constitutional tort committed by its employees or agents. *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978).

> Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.,* 436 U.S. at 694, 98 S. Ct. at 2037-38. To make out a *Monell* claim against: a municipality, a plaintiff must establish: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York,* 490 F.3d 189, 195 (2d Cir. 2007).

"An 'official policy' within the meaning of *Monell* [can] be inferred from informal acts or omissions of supervisory municipal officials." *Turpin v. Mailet,* 619 F.2d 196, 200 (2d Cir. 1980), *cert. denied,* 449 U.S. 1016, 101 S. Ct. 577 (1980); *accord Phillip v. Schriro,* 2014 WL 4184816, at *6 (S.D.N.Y. Aug. 22, 2014). "For example, where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts." *Turpin,* 619 F.2d at 201. However, a municipality "may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees." *Curry v. City of Syracuse,* 316 F.3d 324, 329 (2d Cir. 2003).

In this case, the summary judgment record contains no evidence suggesting that the failure to call plaintiff for Jummah services for two weeks in November 2014 resulted from an "official policy or custom," formal or informal. *Cf. Phillip,* 2014 WL 4184816, at *6 (holding that for pleading purposes plaintiff adequately alleged a "policy or custom" where he alleged "consistent, repeated" denials of his right to attend Jummah services for ten consecutive weeks, including eight weeks after he first filed a grievance). Here, by way of contrast, plaintiff missed two services altogether, including one (at most) after he first filed a grievance. Moreover, it is undisputed that other Muslim prisoners, in other housing units, were properly called for services every Friday. I therefore respectfully recommend that summary judgment

on plaintiffs' § 1983 claims be granted in favor of the City for the additional reason that plaintiff cannot satisfy *Monell.*

**B. Warden Vasquez and Imam Hasan**

**\*9** The complaint does not set out the basis of plaintiff's claims against Warden Vasquez or Imam Hasan. At deposition, plaintiff explained that he sued the warden because "this is his facility. So, this is his programs." Powell Dep. at 31:1-2. He sued the imam because "they know, they are supposed to know all of the Muslims that is within the building. So, that is their job .... [I]t is their job to make sure that ... each housing area is called. That is what an imam is for." *Id.* at 30:1-12.

### 1. Official Capacity

To the extent plaintiff intended to sue the warden and the imam in their official capacities, "that is equivalent to bringing a claim against the City itself." *Phillip,* 2014 WL 4184816, at \*6; *see also Jackler v. Byrne,* 658 F.3d 225, 244 (2d Cir. 2011) ("a claim asserted against a government official in his official capacity is essentially a claim against the governmental entity itself"). Such claims therefore fail along with plaintiff's *Monell* claims against the City.

### 2. Individual Capacity

To the extent plaintiff intended to sue the warden and the imam in their individual capacities, he must show "more than the linkage in the prison chain of command; the doctrine of *respondeat superior* does not apply." *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985). "It is well-settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)). In a § 1983 suit (as in its federal counterpart, the *Bivens* action), "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S. Ct. 1937, 1948 (2009). Moreover, "[p]ersonal involvement is a question of fact and must be satisfied as to each individual defendant." *Lloyd v. City of New York,* 43 F. Supp. 3d 254, 266 (S.D.N.Y. 2014) (quoting *Cabassa*

*v. Oshier,* 2013 WL 1183296, at \*8 (N.D.N.Y. Mar. 21, 2013)).

In *Colon,* the Second Circuit set out a five-factor test for supervisory liability:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873 (citing *Wright,* 21 F.3d at 501).

In *Iqbal,* however, the Supreme Court cast doubt on the continuing viability of the *Colon* factors, at least where the *mens rea* element of the underlying constitutional tort is more demanding than the *mens rea* element of the *Colon* factor on which the plaintiff hopes to rely. "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676, 129 S. Ct. at 1948. The Court went on to explain that where "purpose rather than knowledge" is required to impose liability on a subordinate (as in *Iqbal* itself, where the claim was for "invidious discrimination" based on race, religion and national origin) "purpose rather than knowledge" is also required to impose liability on "an official charged with violations arising from his or her superintendent responsibilities." *Id.,* 566 U.S. at 676, 129 S. Ct. at 1949. At a minimum, therefore, the second, fourth, and fifth *Colon* factors – which do not require any showing of discriminatory "purpose" by the supervisor

– can no longer be relied on to hold a senior official personally liable for conduct by her juniors in violation of the Equal Protection Clause. *See, e.g., Reynolds v. Barrett,* 685 F.3d 193, 204 (2d Cir. 2012) ("liability for an Equal Protection Clause violation under § 1983 requires personal involvement by a defendant, who must act with discriminatory purpose"); *Marom v. City of New York,* 2016 WL 916424, *15 (S.D.N.Y. Mar. 7, 2016) ("the second, fourth and fifth *Colon* factors should not be viable bases for holding the supervisory defendants liable for the First Amendment retaliation claims because those claims have an intent requirement").

**\*10** The principle announced by *Iqbal,* however, is not confined to intentional discrimination cases. Nor is there a static list of *Colon* factors that remain viable in all § 1983 cases. "The proper inquiry is not the name we bestow on a particular theory or standard, but rather whether that standard – be it deliberate indifference, punitive intent, or discriminatory intent – reflects the elements of the underlying constitutional tort." *Turkmen v. Hasty,* 789 F.3d 218, 250 (2d Cir. 2015) (holding that where the underlying tort required "deliberate indifference," plaintiffs were required to plead that the supervisory defendants "kn[e]w of, and disregard][ed], an excessive risk to inmate health or safety") (internal quotation marks omitted; alterations in the original). *Accord Stephens v. Venettozzi,* 2016 WL 929268, at *12 (S.D.N.Y. Feb. 24, 2016), *report and recommendation adopted,* 2016 WL 1047388 (S.D.N.Y. Mar. 10, 2016); *see also Manning v. Griffin,* 2016 WL 1274588, at *12 (S.D.N.Y. Mar. 31, 2016) (the *Colon* factors "remain relevant" only to the extent that the type of conduct sufficient for supervisory liability under *Colon* "could serve as conduct that supports a theory of direct liability"); *Marom,* 2016 WL 916424, at *14 ("[t]he *Iqbal* decision rejected *Colon's* one-size-fits-all 'supervisory liability' test"); *Lloyd,* 43 F. Supp, 3d at 267 ("the personal involvement analysis varies by claim"); *Delgado v. Bezio,* 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) ("the applicability of each *Colon* category will depend on the nature of the violation alleged").

In this case, both of the underlying constitutional torts – the free exercise claim and the equal protection claim – require more than negligence, *see Hamilton,* 2016 WL 881126, at *4, *8, but only the equal protection claim requires proof of "purposeful" discrimination. *Giano,* 54 F.3d at 1057. Under *Iqbal* and *Turkmen,* therefore, the *Colon* factors may not apply equally to these two claims.

To survive summary judgment on an equal protection claim, a plaintiff must adduce evidence from which a jury could conclude that "each supervisory defendant actively participated in the alleged constitutional violations," *Lloyd,* 43 F. Supp. 3d at 267, or "created a policy or custom under which unconstitutional practices occurred." *Colon,* 58 F.3d at 873. *See also Firestone v. Berrios,* 42 F. Supp. 3d 403, 416-17 (E.D.N.Y. 2013) ("only the first and part of the third *Colon* categories appears to pass *Iqbal's* muster" in the case of "intent-based constitutional claims" under the Equal Protection Clause). In such cases, "a defendant's failure to act will not result in liability." *Lloyd,* 43 F. Supp. 3d at 267.

Lesser proof is required with respect to free exercise claims, which "do not require a showing of discriminatory intent." *Lloyd,* 43 F. Supp. 3d at 267 (holding that all five *Colon* factors may still be relied on to establish supervisory liability for free exercise violations). *See also El Badrawi v. United States,* 2011 WL 13086946, at *4 (D. Conn. May 16, 2011) ("with respect to El Badrawi's free exercise claim, *Iqbal* does not limit application of *Colon*"); *Phillip,* 2014 WL 4184816, at *4 (holding, in a free exercise case, that "*Colon* remains good law"); *Smolen v. Fischer,* 2012 WL 5928282, at *5 (S.D.N.Y. Nov. 27, 2012) ("where the constitutional claim does not require a showing of discriminatory intent ... the personal involvement analysis set forth in *Colon* may still apply"), *report and recommendation adopted,* 2013 WL 765315 (S.D.N.Y. Feb. 28, 2013).

I am not convinced that all five *Colon* factors have survived *Iqbal* and *Turkmen* as to a free exercise claim [7] Regardless of how many *Colon* factors remain viable, however, it is clear in this case that the plaintiff has not adduced evidence sufficient to proceed against either Warden Vasquez or Imam Hasan on either of his constitutional claims. Neither of the individual defendants participated directly in the events claimed by plaintiff to have violated his rights. As to the warden, there is no evidence that he was even aware of those events, much less that he "failed to act" on such information or "failed to remedy the wrong." *Colon,* 58 F.3d at 873. Nor is there any evidence that either individual defendant created or tolerated a policy under which prisoners were kept from congregate services, or was "grossly negligent" in supervising those responsible for facilitating their attendance at such services. *Id.*

**\*11** Plaintiff did inform Imam Hasan that he missed two Jummah services, but only after the wrong had been "resolved." Powell Dep. at 27:2. In fact, plaintiff testified, the conversation occurred after he attended the Jummah service on November 21, 2014. *Id.* at 26:7-27:4. Since no additional action was required at that point, the imam's inaction could not render him retroactively liable for the wrong. *See Harnett v. Barr,* 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) (a supervisory official who is presented with a grievance concerning a violation "that has already occurred and not ongoing" will not be found liable, on that basis, for failing to "remedy" the violation). *See also McIntosh v. United States,* 2016 WL 1274585, at \*16 (S.D.N.Y. Mar. 31, 2016) (mere receipt of a complaint or grievance from an inmate is insufficient to establish "personal involvement" in the underlying violation). Here, as in *Washington v. Chaboty,* 2015 WL 1439348, at \*14 (S.D.N.Y. Mar. 30, 2015), there is simply no evidence that either individual defendant played any role in causing, or failing to prevent or remedy, the circumstances that led to plaintiff missing two congregate religious services. For this reason as well, I respectfully recommend that summary judgment be granted in their favor.

### 3. Qualified Immunity

Even where prison officials are personally involved in the conduct complained of, they are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford,* 352 F.3d at 596; *accord Saucier v. Katz,* 533 U.S. 194, 201,121 S. Ct. 2151, 2156 (2001) (even if a constitutional violation "could be made out on a favorable view of the parties' submissions," the court must also "ask whether the right was clearly established"). "Thus, qualified immunity protects government officials when they make 'reasonable mistakes' about the legality of their actions." *Doninger v. Niehoff,* 642 F.3d 334, 353 (2d Cir. 2011) (quoting *Saucier,* 533 US. at 206, 121 S. Ct. 2151). *See also Pearson v. Callahan,* 555 US. 223, 236, 129 S. Ct. 808, 818 (2009) (court may exercise its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be ad dressed first"). A right is "clearly established," for qualified immunity purposes, if "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized

the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir. 2003) (quoting *Young v. Cty. of Fulton,* 160 F.3d 899, 903 (2d Cir. 1998)) (alterations in original).

There is no need to linger on the qualified immunity analysis in this case, since, as shown above, no constitutional violation can be made out, even "on a favorable view of the parties' submissions." *Saucier,* 533 U.S. at 201, 121 S. Ct. at 2156. However, "should the District Court disagree with the above analysis and determine that Defendants are not entitled to summary judgment on the merits of Plaintiff['s] claims, Defendants have nonetheless established that they are entitled to qualified immunity." *Persad v. Savage,* 2004 WL 1570286, at \*7 (W.D.N.Y. May 25, 2004) (holding that a reasonable prison official could not have understood that cancelling two Jummah services would result in a constitutional violation), *report and recommendation adopted,* 2004 WL 1858140 (W.D.N.Y. Aug. 19, 2004). By 2014, when Powell was in the EMTC, the law on this issue was, if anything, even more favorable to the defendants than when *Persad* was decided in 2004. *See, e.g., Hanton,* 29 Fed.Appx. 773; *Blalock,* 2014 WL 5324326, at \*7; *Shapiro,* 2014 WL 1276479, at \*11; *Williams v. Weaver,* 2006 WL 2794417, at \*5. The individual defendants are therefore entitled to summary judgment as to plaintiffs § 1983 claims on qualified immunity grounds as well.

### CONCLUSION

For the foregoing reasons, I respectfully recommend that defendants' motion for summary judgment be GRANTED and that the case be DISMISSED. The Clerk of the Court is requested to mail a copy of this Report and Recommendation to the plaintiff.

### NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

**\*12** The parties shall have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon.

Paul A. Crotty at 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned magistrate judge. Any request for an extension of time to file objections must be directed to Judge Crotty. Failure to file timely objections will preclude appellate review. *See Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir. 2010).

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 4159897

## Footnotes

1    Ordinarily, allegations in a pleading are not considered evidence for purposes of a motion for summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324-25, 106 S. Ct. 2548, 2553-54 (1986). However, plaintiff executed his complaint under penalty of perjury, in substantial compliance with 28 U.S.C. § 1746. To the extent its contents are otherwise admissible, therefore, the Court may treat the complaint as an affidavit. *See Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995) (where plaintiff "verifie[s] his complaint by attesting under penalty of perjury that the statements in the complaint [are] true to the best of his knowledge," the "verified complaint is to be treated as an affidavit for summary judgment purposes"); *Rickett v. Orsino,* 2013 WL 1176059, at *2 n.5 (S.D.N.Y. Feb. 20, 2013) (construing plaintiff's verified pleading as an affidavit for purposes of summary judgment), *report and recommendation adopted,* 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013); *Barrington v. New York,* 806 F. Supp. 2d 730, 737 (S.D.N.Y. 2011) ("Since Barrington verified his complaint under penalty of perjury, the complaint can serve as an affidavit for summary judgment purposes."). In this case the complaint is the *only* admissible evidence in the record other than the plaintiff's deposition testimony. Although defendants attached a third document to their summary judgment papers the "Inmate Movement History Log," Edmonds Decl. Ex A – they make no effort to authenticate that document. *See id.* ¶ 2. Moreover, although defendants rely on the log to show that plaintiff was transferred to the EMTC on November 2, 2014, *see id.,* the document actually states that he was housed at the "CIFM" from November 2 to December 3, 2014. *Id.* Ex. A. As a result of independent research, the Court can deduce that "CIFM" likely stands for "Correctional Institution for Men," the former name of the EMTC. For summary judgment purposes, however, the Court cannot rely on the un-authenticated, uninterpreted log. Instead, the Court relies on plaintiff's verified pleading, *see* Compl. at 2-3, partially corroborated by his deposition testimony, *see* Powell Dep. (Edmonds Decl. Ex. C) at 13:01-14:14, to establish that he was in the EMTC during the relevant period.

2    Plaintiff initially testified at deposition that he missed four Jummah services. Powell Dep. at 14:4-19. He then conceded that it was possible he missed only two, which would be consistent with the time period described in his complaint. *Id.* at 14:12-19.

3    The continuing viability of the *Salahuddin v. Goord* threshold test "has not been decided in this Circuit." *Holland v. Goord,* 758 F.3d 215, 220-21 (2d Cir. 2014). The underlying concern is the courts reluctance to "pass[ ] judgment on 'the centrality of different religious practices,' which is a misguided enterprise that the Supreme Court has called 'akin to the unacceptable business of evaluating the relative merits of differing religious claims.' " *McEachin v. McGuinnis,* 357 F.3d 197, 202 (2d Cir. 2004) (quoting *Empl. Div. v. Smith,* 494 U.S. 872, 887, 110 S. Ct. 1595, 1604 (1990)). However, "the Second Circuit and judges in this district have continued to require such a threshold showing, particularly in cases where the parties have not argued otherwise." *Rossi v. Fischer,* 2015 WL 769551, at *6 n.8 (S.D.N.Y. Feb. 24, 2015). *See also Hamilton,* 2016 WL 881126, at *3 (collecting cases). Here, no party has "argued otherwise." Moreover, neither party has asked this Court to evaluate the "centrality" of different religious practices or the "relative merits" of differing religious claims.

4    As Judge Abrams noted in *Hamilton,* "the Second Circuit does not appear to have addressed whether negligence can sustain a First Amendment claim outside the context of retaliatory litigation" 2016 WL 881126, at *4. At least four Circuits have addressed the issue, however, and have uniformly "found negligence insufficient." *Id.* (citing *Schreane v. Seana,* 506 Fed.Appx. 120, 124 (3d Cir. 2012); *Gallagher v. Shelton,* 587 F.3d 1063, 1070 (10th Cir. 2009); *Lovelace v. Lee,* 472 F.3d 174, 201 (4th Cir. 2006); and *Eason v. Thaler,* 73 F.3d 1322, 1328 (5th Cir. 1996)).

5    "To prevail on a First Amendment claim, a plaintiff must also show that his religious belief is 'sincerely held,'; '[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct,' although 'the burden remains with the prisoner to show that these articulated concerns were irrational.' " *Valdez,* 2013 WL 8642169, at *12 (quoting *Salahuddin v. Goord,* 467 F.3d at 274-75). "Under RLUIPA, however,

the defendants bear the heavier burden of demonstrating that their challenged conduct '(1) [was] in furtherance of a *compelling* governmental interest, and (2) [was] the *least restrictive* means of furthering that compelling governmental interest.' " *Valdez,* 2013 WL 8642169, at *12 (quoting § 2000cc-1(a) and adding emphases).

6    Although the Second Circuit has not yet spoken on this issue, the Fourth Circuit reasoned that a negligence standard, which it termed the "lowest common denominator of customary tort liability," would "open prison officials to unprecedented liability for burdening an inmate's religious exercise," contrary to Congress's intention when enacting RLUIPA. *Lovelace,* 472 F.3d at 194 (quoting *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 848-49, 118 S. Ct. 1708, 1718 (1998)).

7    For example, the fourth factor, which explicitly asks whether the supervisory defendant was "grossly negligent," begs the question whether "gross negligence," as opposed to ordinary negligence, is sufficient for liability under the Free Exercise Clause.

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Skates v. Shusda, Not Reported in F.Supp.3d (2016)
2016 WL 3882530

2016 WL 3882530
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Elijah Skates, Plaintiff,
v.
Jarrod Shusda, et al., Defendants.

Civil Action No. 9:14-CV-1092 (TJM/DEP)
|
Signed 05/31/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: ELIJAH SKATES, Pro se, 97-35 104th Street, Apt. 1, Queens, NY 11416.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN, New York State Attorney General, The Capitol, OF COUNSEL: ORIANA L. CARRAVETTA, ESQ., Assistant Attorney General, Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

This is a civil rights action brought by *pro se* plaintiff Elijah Skates, a former New York State prison inmate, pursuant to 42 U.S.C. § 1983, against five employees of the New York State Department of Corrections and Community Supervision ("DOCCS"), one of whom has been dismissed from the action. In his complaint, as amended and narrowed as a result of earlier court orders, plaintiff alleges that (1) he was denied his First Amendment right to freely exercise his chosen religion because he was not provided a proper religious meal on one occasion; (2) his right to equal protection under the Fourteenth Amendment was denied because he was not treated similarly to those inmates who are members of other religions; and (3) one of the named defendants issued an adverse disciplinary hearing determination in retaliation for plaintiff filing a grievance regarding his religious rights.

Currently pending before the court is a motion brought by the defendants to dismiss plaintiff's remaining three claims. For the reasons set forth below, I recommend that the motion be granted, in part, but otherwise denied.

I. BACKGROUND [1]

Prior to his release on or about September 11, 2015, [2] plaintiff was a New York State inmate held in the custody of the DOCCS. *See generally* Dkt. No. 33. At the times relevant to his claims in this action, plaintiff was confined in the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York. *Id.* Plaintiff is a member of the Nation of Islam ("NOI") Faith Group and observes Islamic religious beliefs and practices. *Id.* at 3.

In accordance with his religious beliefs, plaintiff planned to observe the NOI Holy Day of Atonement on October 15 and 16, 2013. Dkt. No. 33 at 3. In connection with that religious observance, plaintiff alleges he was supposed to have received a Sahoor bag meal on October 15, 2013, for consumption prior to dawn the following morning in order to begin the fasting process associated with the holy day. *Id.*; *see also* Dkt. No. 33-1 at 1. Despite notifying corrections staff of his request for a Sahoor bag meal prior to the evening of October 15, 2013, plaintiff did not receive his meal. Dkt. No. 33 at 3-4.

**\*2** Unrelated to this isolated incident, plaintiff alleges that, in general, corrections personnel at Great Meadow have failed to properly recognize and support the NOI religion. Specifically, in his amended complaint plaintiff alleges that the "NOI Faith Group is the only religion in D.O.C.C.S. [that] does not have a [ministerial program coordinator ('MPC') ] in [the] Central Office." Dkt. No. 33 at 6. Plaintiff also appears to allege that there is no NOI chaplain at Great Meadow. *Id.* at 7. Notwithstanding this allegation, plaintiff confusingly alleges that Great Meadow, in fact, has a facility chaplain, identified as Imam Aboulkadir Elmi, but that Elmi's "religious outlooks and subjective and objective are in complete contradiction with the (N.O.I.) beliefs." [3] *Id.*

Plaintiff further alleges that defendant Jarrod Shusda conducted a Tier III disciplinary involving plaintiff on August 11, 2014, and that he found plaintiff guilty during the proceeding in retaliation for plaintiff's earlier grievance concerning the Sahoor bag meals. [4] Dkt. No. 33 at 6.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on or about September 4, 2014. Dkt. No. 1. Following a series of initial procedural developments, plaintiff sought and was granted leave to file an amended complaint in a decision and order issued by Senior District Judge Thomas J. McAvoy on October 22, 2015. [5] Dkt. No. 32. Named as defendants in plaintiff's amended are (1) Jarrod Shusda, who appears to be a food-service worker at Great Meadow; (2) Brent Yukoweic, a clergy member employed by the DOCCS; (3) Cheryl Morris, the DOCCS Director of Ministerial Services; and (4) Robert Schattinger, the DOCCS Director of Nutritional Services. *Id.* at 2. In his decision, Judge McAvoy accepted the amended complaint for filing only with respect to plaintiff's (1) First Amendment free exercise claim for damages against all defendants, in their individual capacities, arising from the alleged failure to provide him with a religious meal in October 2013; (2) an Equal Protection claim for damages, also against all defendants in their individual capacities; and (3) a retaliation claim for damages against defendant Shusda in his individual capacity. Dkt. No. 32 at 10.

In lieu of answering plaintiff's amended complaint, on November 19, 2015, defendants filed the pending motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 34. Defendants' motion, to which plaintiff has not responded, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Standard of Review

**\*3** A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. 677-78 (quoting Fed.

R. Civ. P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The tenet that a court must accept as true all of the allegations contained in a complaint does not apply, however, to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

### B. Free Exercise Claim

Plaintiff asserts a First Amendment claim against defendants based on allegations that he did not receive a Sahoor bag meal on October 15, 2013. Dkt. No. 33 at 3-4. Defendants contend that this isolated incident is not sufficient to support a cognizable cause of action. Dkt. No. 34-1 at 6-8.

While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection, including their right to participate in religious meals. See *Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."); *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) ("We ... have clearly established that a prisoner has a right to a diet consistent with his or her religious scruples."). That right, however, is not without limits, and the task of defining the contours of that right in a prison setting requires striking a balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-49 (1987); *Ford*, 352 F.3d at 588; *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). When determining whether a defendant's failure to provide a plaintiff with his religious meals impinges upon his First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin*, 905 F.2d at 574 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *Ford*, 352 F.3d at 588; *see also Farid v. Smith*, 850 F.2d 917, 925 (2d Cir. 1988).

**\*4** As a threshold matter, "[t]he prisoner must show ... that the disputed conduct substantially burdens his sincerely held religious beliefs." [6] *Salahuddin v. Goord*, 467 263, 274-75 (2d Cir. 2006). In evaluating this factor, the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' " *McEachin v. McGuinness*, 357 F.3d 197, 201 (2d Cir. 2004) (quoting *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d]

that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (quotation marks omitted).

In their motion, defendants do not question the genuineness of plaintiff's religious beliefs. Dkt. No. 34-1 at 6-9. They do, however, contend that plaintiff's amended complaint does not allege sufficient facts to plausibly suggest that his rights were substantially burdened by defendants' actions. *Id.*

Plaintiff's free-exercise claim turns upon a single instance of the denial of a religious meal. Plaintiff alleges that, as a result of the failure to provide him with a Sahoor bag, he "was unable to properly worship and was forced to not be able to receive the full blessings and enjoy the full effect of the [Holy Day of Atonement]," and, instead, "was forced to dwell in sin" causing him "to inflict self-harm upon himself." [7] Dkt. No. 33 at 7. Various courts in this circuit addressing similar claims have concluded that such isolated incidents that are not representative of larger, systemic deprivations are constitutionally *de minimis* and do not rise to a level sufficient to support a First Amendment claim. *See, e.g., Washington v. Afify*, 968 F. Supp. 2d 532, 538-39 (W.D.N.Y. 2013) (finding the plaintiff's allegations that he was denied two religious breakfast meals and one evening meal were not sufficient to state a plausible First Amendment free exercise claim, noting that the plaintiff had "alleged no facts to suggest that this brief deprivation was significant enough to more than minimally burden his religious practice"); *Perrilla v. Fischer*, No. 13-CV-0398, 2013 WL 5798557, at \*5 (W.D.N.Y. Oct. 28, 2013) [8] (finding the plaintiff's allegations that he was denied double portions of meals and oatmeal in his Sahoor bag and that some religious meals were ill-prepared amounted to no more than a *de minimis* burden of the plaintiff's constitutional rights). In light of the Second Circuit's recent decision in *Williams*, however, in which the court criticized this court's determination that the plaintiff's allegation that he was denied, at most, five religious meals over the course of one month was a *de minimis* burden on plaintiff's rights, it appears that the Second Circuit may now equate a district court's finding of a *de minimis* burden with a finding that a plaintiff's beliefs are insincere. *See Williams*, 2016 WL 2610028, at \*1 ("The district court relied on non-binding case law when it determined that [the plaintiff]'s burden was *de minimis* because only a few of his meals were delivered

prematurely; its reasoning is inconsistent with this Court's case law, which cautions against the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent[.]" (quotation marks omitted)). With this in mind, I find that plaintiff's allegation that the denial of a single religious meal, which allegedly did not allow plaintiff to "enjoy the full effect" of the holy day and caused him to "dwell in sin," Dkt. No. 33 at 7, plausibly alleges that his First Amendment rights were substantially burdened.

**\*5** Defendants contend that, even assuming plaintiff's rights were substantially burdened, dismissal of plaintiff's First Amendment claim is warranted because the exhibits attached to plaintiff's amended complaint reflect that the denial of a single religious meal to plaintiff on October 15, 2013, was the result of a mistake, and negligence is not actionable under the First Amendment. Dkt. No. 34-1 at 8-9. Notwithstanding whether defendants are correct with respect to their legal conclusion, [9] their factual conclusion mischaracterizes the evidence. In particular, a careful review of the e-mails attached to the amended complaint reveal that at least some of the named defendants were aware in advance that the NOI holy day was approaching and that some prisoners would require Sahoor bag meals. Dkt. No. 33-1 at 8-12. According to the e-mails, and assuming the facts in plaintiff's amended complaint are true, notwithstanding this knowledge, no one took further steps to ensure that plaintiff, or any other NOI prisoner, received a religious meal on October 15, 2013. *Id.* Because it is not clear that plaintiff was denied his religious meal on October 15, 2013, as a result of a mistake or negligence, I cannot recommend dismissal of the First Amendment claim on this basis. Accordingly, I recommend that defendants' motion to dismiss plaintiff's free exercise claim be denied.

### C. Equal Protection Claim

In his complaint, plaintiff intimates that the DOCCS treats the NOI faith group differently than other religious groups in violation of plaintiff's equal protection rights under the Fourteenth Amendment. Dkt. No. 33 at 7. In their motion, defendants also request dismissal of this claim as lacking in facial merit. Dkt. No. 34-1 at 10-11.

The equal protection clause of the Fourteenth Amendment directs state actors to treat similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living*

*Ctr.*, 473 U.S. 432, 439 (1985). To state a cognizable equal protection cause of action, a plaintiff must allege sufficient facts that plausibly suggest that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995). The plaintiff must also show "that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to any legitimate penological interests.' " *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (alteration omitted) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)).

Plaintiff's amended complaint is internally inconsistent with regard to his allegation that the NOI inmates at Great Meadow do not have a facility chaplain. Dkt. No. 33 at 7. Specifically, while plaintiff contends, at paragraph forty-two, that "the (N.O.I.) Faith Group has no facility Chaplain (N.O.I. Minister), like the other faith groups," in the next paragraph plaintiff states that Great Meadow does, in fact, have a NOI chaplain but that the chaplain's "religious outlooks and subjective and objective are in complete contradiction with the (N.O.I.) beliefs." *Id.* Separately, plaintiff also alleges that there is no NOI MPC within the DOCCS. *Id.* at 6.

Conspicuously absent from plaintiff's amended complaint are any allegations linking the allegations described above and the named defendants. It is well established that the personal involvement of a defendant "in alleged constitutional deprivation is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *see also Iqbal*, 556 U.S. at 683 ("Petitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In this case, because the amended complaint contains no allegations connecting any of the named defendants with the alleged disparity in treatment between the NOI and other religious groups, I recommend that plaintiff's equal protection cause of action be dismissed.

### D. Retaliation Claim

**\*6** Plaintiff also asserts a retaliation claim against defendant Shusda based on allegations that Shusda found him guilty during a disciplinary hearing on August 11, 2014, in retaliation for a grievance plaintiff filed

concerning his failure to receive his religious meal in October 2013. Dkt. No. 33 at 5-6. Defendants contend that plaintiff's amended complaint fails to allege sufficient facts plausibly suggesting that the hearing determination was motivated by retaliatory animus. Dkt. No. 34-1 at 11-14.

When prison officials take adverse action against an inmate, motivated by the inmate's exercise of constitutional rights, including the free speech provisions of the First Amendment, a cognizable claim of liability under section 1983 lies. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and prone to abuse, and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations showing that (1) he engaged in protected activity; (2) the defendants took adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

In this instance I assume, for the purposes of this report, that plaintiff's amended complaint plausibly alleges that plaintiff engaged in protected activity by filing a grievance and that defendant Shusda's guilty determination is sufficient to constitute adverse action. What is lacking, however, are any allegations of fact that link the two. To satisfy the nexus requirement for a retaliation claim, plaintiff must show that the protected conduct, in this case plaintiff's filing of a grievance, was a "substantial or motivating factor" in defendant's Shusda's disciplinary hearing determination. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003); *accord, Johnson v.*

*Burge*, 506 Fed.Appx. 10, 12 (2d Cir. 2012). The amended complaint, however, neither alleges when plaintiff filed the grievance nor that defendant Shusda was aware of the grievance plaintiff allegedly filed. Assuming plaintiff filed his grievance in or around the time he was denied his religious meal in October 2013, approximately ten months elapsed between the filing of the grievance and the alleged adverse activity by defendant Shudsa in August 2014. While close temporal proximity may, on its own, be enough to prevent dismissal on the pleadings, *Davis v. Goord*, 320 F.3d 346, 352-54 (2d Cir. 2003), ten months is too attenuated to support plaintiff's retaliation claim. *See, e.g., Nicastro v. N.Y. City Dep't of Design & Constr.*, 125 Fed.Appx. 357, 358 (2d Cir. 2005) (concluding that the plaintiff could not, at the summary judgment stage, establish even a *prima facie* case of retaliation where the adverse employment action occurred "almost ten months after" the plaintiff engaged in protected conduct and there was no other evidence of causation); *Figueroa v. Johnson*, 109 F. Supp.3d 532, 552 (E.D.N.Y. 2015). Accordingly, I recommend that plaintiff's retaliation claim against defendant Shusda be dismissed.

E. Whether to Permit Amendment

**\*7** Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc.*, 949 F.2d at 48 ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this instance, it is feasible that plaintiff could amend his currently operative pleading to include additional factual allegations that would plausibly suggest both the requisite personal involvement of the named defendants in connection with his equal protection claim and the missing nexus necessary to plead a cognizable retaliation claim. Accordingly, I recommend that plaintiff be granted leave to file a second amended complaint to cure these deficiencies.

If plaintiff chooses to avail himself of this opportunity, he should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any second amended complaint, plaintiff must clearly set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, plaintiff is informed that any such second amended complaint will replace the existing amended complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (quotation marks omitted)).

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's amended complaint focuses on defendants' alleged failure to provide him with a religious Sahoor bag meal on October 15, 2013. When all inferences are drawn in favor of plaintiff, his amended complaint alleges sufficient facts plausibly suggesting that this deprivation substantially burdened his sincerely held religious beliefs. Accordingly, defendants' motion to dismiss should be denied with respect to plaintiff's First Amendment claim. Plaintiff's equal protection cause of action, however, is subject to dismissal in light of the fact that the amended complaint does not allege facts plausibly suggesting that any of the named defendants were personally involved in the alleged deprivations. Similarly, plaintiff's retaliation cause of action is subject to dismissal based upon his failure to allege facts plausibly suggesting the existence of a causal connection between his filing of a grievance in or about October 2013 and a disciplinary hearing determination rendered in August 2014. Accordingly, it is hereby respectfully

**\*8** RECOMMENDED that defendants' motion to dismiss (Dkt. No. 34) plaintiff's amended complaint (Dkt. No. 33) be GRANTED, in part, and that his equal protection and retaliation claims be DISMISSED, with leave to file a second amended complaint within thirty days from the date of any order adopting this recommendation, but that the remaining portion of the motion, addressing plaintiff's First Amendment free exercise cause of action, be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 3882530

---

Footnotes

1   In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus*,

551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.") (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007)); see also Cooper v. Pate, 378 U.S. 546, 546 (1964). Portions of the background have also been derived from the exhibits that were attached to plaintiff's amended complaint, which may also properly be considered in connection with a dismissal motion. See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."); accord, Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993).

2    See New York State Department of Corrections and Community Supervision, http://nysdoccslookup.doccs.ny.gov/ GCA00P00/WIQ1/WINQ000 (last visited May 27, 2016); see also Dkt. No. 30.

3    Imam Elmi was originally named as a defendant in the action. Dkt. No. 1 at 2. In his amended complaint, however, plaintiff has not asserted any claims against this individual. Dkt. No. 33 at 1, 2.

4    The DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; see also Hynes v. Squillace, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Hynes, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Id. Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. Id.

5    Judge McAvoy noted that, in accepting certain claims asserted in the amended complaint, he "expresse[d] no opinion as to whether [the surviving] claims can withstand a properly filed motion to dismiss or for summary judgment." Dkt. No. 32 at 10.

6    The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in Emp't Div. v. Smith, 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " Ford, 352 F.3d at 592 (quoting Emp't Div., 494 U.S. at 887); see also Williams v. Does, ___ Fed.Appx. ____, No. 15-0692, 2016 WL 2610028, at *1 (2d Cir. May 6, 2016) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs."); Holland v. Goord, 758 F.3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

7    In his SAC, plaintiff alleges that he cut himself and attempted to overdose on medication as a result of defendants' actions. Dkt. No. 33 at 7-8.

8    All unreported cases cited to in this report have been appended for the convenience of the pro se plaintiff.

9    It does not appear that the Second Circuit has rendered an opinion regarding whether negligence is sufficient to sustain a First Amendment claim. See Hamilton v. Countant, No. 13-CV-0669, 2016 WL 881126, at *4 (S.D.N.Y. Mar. 1, 2016) ("Although the Second Circuit does not appear to have addressed whether negligence can sustain a First Amendment claim outside the context of retaliatory litigation, the Third, Fourth, Fifth, and Tenth Circuits have found negligence insufficient." (citations omitted)).

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 671256
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bornallah WRIGHT, Plaintiff,

v.

David STALLONE, et al., Defendants.

9:17-CV-0487 (LEK/TWD)
|
Signed 01/31/2018

**Attorneys and Law Firms**

Lisa Anne Proskin, Proskin Law Firm, Albany, NY, for Plaintiff.

Bornallah Wright, Moravia, NY, pro se.

Katie E. Valder, New York State Attorney General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

**\*1** Plaintiff Bornallah Wright commenced this action by filing a pro se civil rights complaint pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000 *et seq.*, asserting claims arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 1 ("Complaint"). These claims concern Plaintiff's ability to practice his religion at Cayuga Correctional Facility, where he is currently confined, by praying demonstrably in the prison's outdoor yard during recreation. Id.

Presently before the Court are three motions: Plaintiff seeks preliminary injunctive relief, Dkt. No. 9 ("Preliminary Injunction Motion"), [1] and the appointment of counsel, Dkt. No. 46 ("Counsel Motion"); defendants David Stallone, Jeffrey Hale, T. Schadewald, E. Korb, Daniel Figueroa, Ora Perkins, David Haggerty, Mary Coleman, and David Infantino (collectively, "State Defendants") seek to dismiss the claims filed against them. Dkt. No. 38 ("Motion to Dismiss"). For the reasons stated below, Plaintiff's Preliminary Injunction Motion is granted in part and denied in part; his Counsel Motion is granted; and State Defendants' Motion to Dismiss is granted in part and denied in part.

**II. BACKGROUND**

**A. Relevant Facts**

Plaintiff alleges that he is a practicing Muslim who is required by his faith to pray at specific times of day. Compl. at 5. Sometimes these prayers ("commonly known as salaah or salaat") must be performed during recreation, when Plaintiff is outside in the prison's yard. Id. Nevertheless, he and other Muslim inmates were "denied [the] ability to go off to an unoccupied area of the yard to pray [their] salaah." Id. at 6. Plaintiff and the other inmates were informed that a designated area in the yard for prayer could only be used by one inmate—Aurel Smith—in accordance with the terms of an agreement Smith had reached with DOCCS after nine years of litigation. Id. at 6. [2] DOCCS staff also advised Plaintiff and other inmates that they "would have to file a suit, too" if they wanted accommodations for their religious beliefs. Id. [3]

**\*2** On August 18, 2016, Plaintiff filed an inmate grievance complaining that he was not allowed to pray his salaah in the yard. Id. at 6; see also Dkt. No. 1-1, Ex. 6 ("August Grievance"). Plaintiff requested permission to pray in the yard during recreation, as Smith was permitted to do. Aug. Grievance at 1. The Inmate Grievance Review Committee ("IGRC") denied Plaintiff's request. Compl. at 5; Aug. Grievance at 2. In support of that denial, the IGRC provided Plaintiff with a copy of a memorandum dated March 22, 2016, written by Captain J. Rocker and addressed to Cayuga's security staff regarding Smith's exclusive right to pray demonstrably in the yard. Dkt. No. 1-1, Ex. 7. The memorandum states as follows:

The results of a recent law-suit filed by Inmate Smith, A. 02A6279 have granted this inmate the right to practice his religion (Islam) by praying in the yard during open recreation.

Effective Wednesday March 24, 2016 Inmate Smith will be allowed to pray in the yard. There is a white painted area 5' by 5' area in the southwest corner near the weight fence. This area is the only area in which Inmate Smith will be allowed to pray.

Inmate Smith will be the **ONLY INMATE** who will be allowed to pray in the yard.

Id. Plaintiff's appeal of the IGRC decision was denied at the facility level on August 29, 2016. Compl. at 6; Dkt. No. 1-1, Ex. 8. The Central Office Review Committee ("CORC") issued a decision dated March 22, 2017, also denying Plaintiff's appeal. Dkt. No. 1-1, Ex. 9 ("CORC notes that a recent settlement agreement permits only one specific inmate to pray in a designated area of the yard during recreation, and that other inmates are not allowed to pray there."). [4]

Plaintiff commenced this action on May 4, 2017. Compl. On August 24, 2017, officials at Cayuga began to allow Plaintiff to pray demonstrably in the outdoor yard during recreation in a similar fashion to Smith. Dkt. No. 31 ("Preliminary Injunction Opposition") at 1. That is, Plaintiff could pray "in a designated area in the Southwest corner of the yard." Id. at 2. On January 10, 2018, pursuant to a request from the Court, Dkt. No. 57, State Defendants clarified that Plaintiff and Smith could pray simultaneously, but each designated area is separated by fifteen feet, Dkt. No. 58 ("Status Report") at 1. State Defendants also reported that officials at Cayuga had designated a third area in the yard for prayer, and that any Muslim inmate had the right to use the designated areas—not just Plaintiff and Smith. Id. [5] Each designated area could be used by only one inmate at a time, but a maximum of three inmates could pray simultaneously. Id. State Defendants did not explain why Cayuga officials altered its policy regarding demonstrable prayer with respect to Plaintiff or other Muslim inmates.

**\*3** Based upon the foregoing, Plaintiff claims that his right to practice his religion has been and continues to be impermissibly burdened by State Defendants in violation of the First Amendment and RLUIPA. Compl. at 8–9. Plaintiff also asserts a claim for the violation of his rights protected under the Equal Protection Clause of the Fourteenth Amendment. Id. at 10. He seeks an award of monetary damages and injunctive relief. Id. at 11.

**B. Procedural History**

Plaintiff commenced this action on May 4, 2017. Compl. In a Decision and Order dated July 28, 2017, Dkt. No. 8 ("Order"), the Court considered the sufficiency of the allegations set forth in the Complaint in light of

28 U.S.C. §§ 1915(e) and 1915A. The Order dismissed a number of defendants and ordered the remaining defendants to respond to the Complaint and Preliminary Injunction Motion. Order at 12–13. State Defendants filed their opposition to the Preliminary Injunction Motion on October 6, 2017, Prelim. Inj. Opp'n, to which Plaintiff replied on November 13, 2017, Dkt. No. 48 ("Preliminary Injunction Reply"). On October 23, 2017, State Defendants filed their Motion to Dismiss; Plaintiff responded in opposition on January 16, 2018, Dkt. No. 59 ("Dismiss Opposition"), to which State Defendants replied on January 23, 2018, Dkt. No. 60 ("Dismiss Reply"). Finally, Plaintiff filed his Counsel Motion on October 30, 2017. Counsel Mot.

## III. LEGAL STANDARD

**A. Motion to Dismiss**

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the possibility of misconduct based on the pleaded facts, the pleader has not demonstrated that he is entitled to relief, and the action is subject to dismissal. Id. at 678–79. Nevertheless, "[f]act-specific question[s] cannot be resolved on the pleadings." Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012) (second alteration in original) (quoting Todd v. Exxon Corp., 275 F.3d 191, 203 (2d Cir. 2001)). Presented with "two plausible inferences that may be drawn from factual allegations," a court "may not properly dismiss a complaint that states a plausible

version of the events merely because the court finds a different version more plausible." Id.

**B. Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Gen. Mills, Inc. v. Chobani LLC, 158 F. Supp. 3d 106, 114 (N.D.N.Y. 2016) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)). Generally, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20.

**\*4** While a district court typically has wide discretion in determining whether to grant preliminary injunctive relief, Moore v. Consol. Edison Co. of N.Y., 409 F.3d 506, 511 (2d Cir. 2005), "[i]n the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of [ ] prisons," Fisher v. Goord, 981 F. Supp. 140, 167 (W.D.N.Y. 1997). "Under the Prison Litigation Reform Act ("PLRA"), preliminary injunctive relief in any civil action with respect to prison conditions must be narrowly drawn, extend no further than necessary to correct the harm, and be the least intrusive means necessary to correct that harm." V.W. v. Conway, 236 F. Supp. 3d 554, 581 (N.D.N.Y. 2017) (citing 18 U.S.C. § 3626(a)(2)). A court must give "substantial weight" to any adverse impact on public safety the injunctive relief might have. § 3626(a)(1)(A).

**C. Motion to Appoint Counsel**

In Terminate Control Corp. v. Horowitz, 28 F.3d 1335 (2d Cir. 1994), the Second Circuit reiterated the factors that a court must consider in ruling upon a motion for the appointment of counsel. As a threshold matter, a court must first determine whether the plaintiff's position seems likely to be of substance. Id. at 1341 (citing Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir. 1986)). If the claim meets this requirement, a court should then consider a number of other factors in making its determination, including the plaintiff's ability to investigate crucial facts and the complexity of the legal issues presented by the case. Id. Of these criteria, the most important is the merits, i.e., "whether the indigent's position was likely to be of substance." McDowell v. State of New York, No. 91-

CV-2440, 1991 WL 177271, at \*1 (S.D.N.Y. Sept. 3, 1991) (quoting Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 172 (2d Cir. 1989)).

**IV. DISCUSSION**

**A. Motion to Dismiss**

State Defendants move to dismiss the Complaint on two grounds: First, that they are sheltered from liability by the doctrine of qualified immunity, Dismiss Mot. at 2–5, and, second, that State Defendants were not personally involved in the alleged constitutional and statutory violations, id. at 5–7. The Court notes that State Defendants' cursory submission does not distinguish between the multiple violations that Plaintiff has alleged or the different types of relief that Plaintiff sought; Plaintiff has alleged violations of his rights guaranteed by the First Amendment, RLUIPA, and the Fourteenth Amendment, and he seeks monetary damages and injunctive relief. These distinctions make a difference, as the Court will explain below.

*1. Qualified Immunity*

The defense of qualified immunity entitles public officials to freedom from suit for monetary damages, as a result of the consequences of the performance of their discretionary duties, when "their conduct does not violate clearly established rights of which a reasonable person would have been aware." Zalaski v. City of Hartford, 723 F.3d 382, 388 (2d Cir. 2013). [6] Qualified immunity is an affirmative defense, and, as such, defendants bear the burden of proving that the privilege applies. Coolick v. Hughes, 699 F.3d 211, 219 (2d Cir. 2012).

**\*5** "The determination of qualified immunity depends both on the specific facts of an official's actions—e.g., 'what situation confronted [him], what acts he performed, and his motivation in performing those acts'—and on the clarity of the legal rules governing that particular conduct." Village of Freeport v. Barrella, 814 F.3d 594, 609 (2d Cir. 2016) (quoting Lore v. City of Syracuse, 670 F.3d 127, 162 (2d Cir. 2012)). In deciding whether an officer's actions were objectively reasonable in light of existing law, "the inquiry is not how courts or lawyers might have understood the state of the law at the time of the challenged conduct. Rather, '[t]he relevant,

dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a *reasonable officer* that his conduct was unlawful in the situation he confronted." Zalaski, 723 F.3d at 389 (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

### a. Free Exercise Claim

State Defendants are correct that, as a general matter, a prisoner's right to pray demonstrably in the recreation yard—whether alone or in congregate—was not clearly established at the time Plaintiff was prevented from doing so. Dismiss Mot. at 2–5. Although numerous prisoners have raised this claim in this Circuit since the late 1970s, no court has clearly established that prisoners have a right to pray demonstrably in the recreation yard by oneself or in small groups. See Shabazz v. Coughlin, 852 F.2d 697, 700–01 (2d Cir. 1988) ("However, as the district court conceded, this court had not then nor since directly addressed the constitutionality of restrictions on group prayer and prayer in prison yards."); Smith v. Artus, No. 07-CV-1150, 2015 WL 9413128, at *11 (N.D.N.Y. Dec. 22, 2015) ("Smith II") (finding that defendants were entitled to qualified immunity for preventing plaintiff from praying demonstrably in the prison's recreation yard).

However, Plaintiff is also correct that his situation is not analogous to previous cases in which prisoners challenged DOCCS's policy regarding demonstrable prayer in the recreation yard. Dismiss Opp'n at 6–8. Most importantly, between March 24, 2016 and August 23, 2017, Cayuga officials permitted Smith to pray demonstrably in the recreation yard *and yet* denied Plaintiff the ability to do so. This inconsistent treatment should have raised significant concerns among prison officials regarding the alleged penological interests supporting the policy of banning individual, demonstrable prayer. See Smith v. Artus, No. 07-CV-1150, 2010 WL 3910086, at *29 (N.D.N.Y. Sept. 30, 2010) ("Smith I") ("The defendants in this case allege that there are concerns for security, as well as staffing and fiscal concerns, associated with accommodating plaintiff's request to pray demonstratively during the recreation period."), vacated on other grounds, 522 Fed.Appx. 82 (2d Cir. 2013). If Smith could pray demonstrably in the recreation yard, why couldn't Plaintiff? What legitimate penological interests did banning Plaintiff (and other inmates) from praying demonstrably in the recreation

yard serve? State Defendants make no attempt to justify this inconsistent treatment between Smith and the other inmates.

As discussed more fully below, to defend against a First Amendment free exercise claim brought by a prisoner, prison officials bear the "relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." Salahuddin v. Goord, 467 F.3d 263, 275 (2d Cir. 2006). Courts in this Circuit have highlighted the problem that inconsistent treatment of inmates creates for prison officials in their attempt to justify burdens on prisoners' religious exercise. See, e.g., Aziz v. Le Fevre, 642 F.2d 1109, 1111 (2d Cir. 1981) ("We think it would have some bearing upon the ultimate resolution of the constitutional question if, in fact, the state policy as set forth in Directive No. 4203 is not followed at Green Haven, and hence is not a 'policy' at all."); Pilgrim v. Artus, No. 07-CV-1001, 2010 WL 3724883, at *11 (N.D.N.Y. Mar. 18, 2010), adopted by, 2010 WL 3724881 (N.D.N.Y. Sept. 17, 2010) ("Despite the alleged security concerns, DOCS' policy allows inmates of the Rastafarian faith to wear dreadlocks. Also, Directive #4914 allows all inmates to grow their hair long, provided they wear it pulled back in a ponytail, and also allows inmates to wear their hair in a 'Afro-natural' style. Thus, DOCS affords a degree of leeway with respect to inmates' hairstyles, but has drawn a line in the sand with respect to dreadlocks worn by non-Rastafarian prisoners."); Salahuddin v. Coughlin, 999 F. Supp. 526, 536 (S.D.N.Y. 1998) (describing inconsistent application of DOCS policy toward congregate religious services in multiple prisons, which "creates an issue of fact as to ... the legitimacy of the penalogical [*sic*] interest asserted").

**\*6** At this early stage in the litigation and absent any attempt from State Defendants to justify the inconsistent treatment of Smith and Plaintiff, the Court cannot hold that a reasonable prison official would have understood such treatment to be consistent with the First Amendment. If Cayuga officials had no penological interest in denying Smith the ability to pray demonstrably in the outdoor yard during recreation, then there may have been no penological interest in denying Plaintiff the same ability. Moreover, it was clearly established law in 2016 that prison officials needed *some* legitimate penological interest to justify the burdening of an inmate's sincere religious beliefs. See Ford v. McGinnis, 352 F.3d 582, 597 (2d Cir. 2003) ("We find that prior cases make

it sufficiently clear that absent a legitimate penological justification, which for present purposes we must assume defendants were without, prison officials' conduct in denying Ford a feast imbued with religious import was unlawful."). Therefore, at this time, State Defendants are not entitled to qualified immunity regarding Plaintiff's First Amendment Claim.

### b. RLUIPA Claim

Plaintiff may not recover money damages pursuant to RLUIPA against State Defendants either in their individual or official capacities. Smith II, 2015 WL 9413128, at *12 ("RLUIPA does not authorize claims for money damages against state officials in their official capacities and does not create a private right of action against them in their individual capacities." (citing Sossamon v. Texas, 563 U.S. 277, 280 (2011))). However, the doctrine of qualified immunity does not preclude Plaintiff from receiving injunctive relief against State Defendants in their official capacities pursuant to RLUIPA. Id. at *12–13.

### c. Equal Protection Claim

State Defendants do not make any specific arguments in support of their position that they are entitled to qualified immunity regarding Plaintiff's Equal Protection claim. Dismiss Mot. at 4–5. The constitutional questions raised by DOCCS's unequal treatment of Plaintiff and his fellow prisoner, Artus Smith, are distinct from the constitutional questions surrounding Plaintiff's alleged right to pray in the recreation yard pursuant to the First Amendment. Since qualified immunity is an affirmative defense, and, as such, defendants bear the burden of proving that the privilege of qualified immunity applies, Coolick, 699 F.3d at 219, the Court will not dismiss Plaintiff's Equal Protection claim for monetary damages absent an argument from State Defendants.

### 2. Personal Involvement

State Defendants also move to dismiss Plaintiff's claims based on the requirement that "a plaintiff must show some 'tangible connection' between the unlawful conduct and the defendant[s].' " Dismiss Mot. at 5 (quoting

Jackson v. Gunsalus, No. 16-CV-647, 2016 WL 4004612, at *3 (N.D.N.Y. June 24, 2016), adopted by 2016 WL 3983635 (N.D.N.Y. July 25, 2016)). "It is well settled in this circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" is insufficient to show his or her personal involvement in that unlawful conduct. Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003); accord Wright, 21 F.3d at 501. In other words, supervisory officials may not be held liable merely because they held a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). Rather, supervisory personnel may be considered "personally involved" only if they: (1) directly participated in the alleged constitutional violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) were grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir. 1986)). [7]

**\*7** However, "the 'personal involvement requirement does *not* apply to bar actions ... for injunctive relief against a state official.' " Brisco v. Rice, No. 11-CV-578, 2012 WL 253874, at *4 (E.D.N.Y. Jan. 27, 2012) (quoting Marinaccio v. Boardman, No. 02-CV-831, 2005 WL 928631, at *9–10 (N.D.N.Y. Apr. 19, 2005) (emphasis in original)); see also Courts v. Coombe, No. 95-CV-2350, 1996 WL 312357, at *2 (S.D.N.Y. June 11, 1996) ("Personal involvement ... is only required where the complaint seeks monetary damages, not where injunctive or declaratory relief is sought."). Instead, in order to state a claim seeking injunctive relief, a plaintiff must demonstrate that the defendant "has a direct connection to, or responsibility for, the alleged illegal action." Reynolds v. Blumenthal, No. 04-CV-218, 2006 WL 2788380, at *7 (D. Conn. Sept. 26, 2006) (citing Ex parte Young, 209 U.S. 123, 157 (1908)); see also Pugh v. Goord, 571 F. Supp. 2d 477, 517 (S.D.N.Y. 2008) ("Courts in this Circuit have since applied the holding in Ex parte Young to require only that a defendant have a

'connection' with the act, and not more.") (citing In re Dairy Mart Convenience Stores, Inc., 411 F.3d 367, 372–73 (2d Cir. 2005)).

### a. David Stallone

Superintendent Stallone is a supervisory official at Cayuga, and therefore Plaintiff must allege his personal involvement pursuant to Colon with respect to Plaintiff's First Amendment and Equal Protection claims for monetary damages. Plaintiff alleges that Stallone told Smith that any Muslim inmate who wishes to pray demonstrably in the recreation yard "would have to file suits [sic] in order to get similar accommodation." Compl. at 6. Plaintiff also presents evidence that Stallone denied an inmate grievance appeal, similar to the one filed by Plaintiff, and stated that only Smith is permitted to pray demonstrably in the recreation yard. Dkt. No. 1-1, Ex. 4. Stallone did not deny Plaintiff's grievance appeal; a designee did. Dkt. No. 1-1, Ex. 8.

Courts in this Circuit are split regarding the extent of involvement that a plaintiff must allege in order to establish a supervisory defendant's requisite personal involvement. Compare McClenton v. Menifee, No. 05-CV-2844, 2006 WL 2474872, at *10 (S.D.N.Y. Aug. 22, 2006) ("[A] supervisor's mere denial of a grievance is insufficient to establish personal involvement ..."), with Madison v. Mazzuca, No. 02-CV-10299, 2004 WL 3037730, at *10 (S.D.N.Y. Dec. 30, 2004) ("[P]ersonal involvement is present where a supervisory official reviews a prisoner's grievance with respect to a constitutional violation and decides against taking any corrective action."). With regard to Stallone, the Court does not need to take sides in this split, because Plaintiff has alleged that Stallone—outside of the context of grievances—was aware of the alleged violation of Plaintiff's rights, had the authority to remedy such violation, and failed to do so. At this early stage in the litigation, such allegations are sufficient to establish personal involvement under the second prong of Colon. See Saxon v. Attica Med. Dep't, 468 F. Supp. 2d 480, 483 (W.D.N.Y. 2007) (denying a motion to dismiss claims against prison superintendent, even though "allegations ... may be characterized as thin").

With regard to Plaintiff's motion for prospective injunctive relief, Stallone—as the superintendent of Cayuga—has a direct connection to, and is responsible for, the protection of Plaintiff's constitutional and statutory rights. E.g., Jacobson v. Coughlin, 523 F. Supp. 1247, 1249 (N.D.N.Y. 1981) (denying a motion to dismiss claims for injunctive relief against prison superintendent regarding plaintiff's special housing confinement). Plaintiff also has specifically alleged that Stallone was aware of and failed to remedy the alleged constitutional and statutory violations at issue in this case. Therefore, Plaintiff's claims against him for injunctive relief will not be dismissed.

### b. Other State Defendants

**\*8** Plaintiff presents evidence that the other State Defendants—Hale, Schadewald, Korb, Figueroa, Noeth, Perkins, Haggerty, Coleman, and Infantino—were members of either the IGRC or CORC and denied multiple grievances and appeals regarding inmates' ability to pray demonstrably in Cayuga's yard during recreation. Dkt. No. 1-1, Exs. 2–7. Although, as mentioned above, district courts in this Circuit are split regarding the level of involvement represented by a denial of an inmate grievance, the majority of courts have held "that an officer tasked only with reviewing an administrative determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights." Vogelfang v. Capra, 889 F. Supp. 2d 489, 503–04 (S.D.N.Y. 2012) (citing Odom v. Calero, No. 06-CV-15527, 2008 WL 2735868, at *7 (S.D.N.Y. July 10, 2008)); see also Rogers v. Artus, No. 13-CV-21, 2013 WL 5175570 at * 3 (W.D.N.Y. Sept. 11, 2013) ("The denial, or affirmance of a denial, of a grievance by a Superintendent or other supervisory official is insufficient, without more, to create personal involvement in alleged violations." (citing Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) and James v. Poole, No. 06-CV-6007, 2013 WL 132492 at *7 (W.D.N.Y. Jan. 9, 2013))). In addition, Plaintiff has not alleged that any of these defendants are ultimately responsible for the protection of Plaintiff's constitutional and statutory rights, as defendant Stallone is. Therefore, defendants Hale, Schadewald, Korb, Figueroa, Noeth, Perkins, Haggerty, Coleman, and Infantino must be dismissed. [8]

**B. Preliminary Injunction**

2018 WL 671256

Plaintiff seeks injunctive relief with regard to two activities: First, to pray demonstrably in the recreation yard on his own, and, second, to pray demonstrably in the recreation yard in a group of two or three inmates. Prelim. Inj. Mot. at 1. Plaintiff seeks this relief for himself and "similarly situated Muslim prisoners in custody of [ ] DOCCS." Id. However, as a pro se litigant, Plaintiff "has no authority to appear as an attorney for others." Lebron v. Armstrong, 289 F. Supp. 56, 59 (D. Conn. 2003) (citing Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1308 (2d Cir. 1991)). Plaintiff "may seek relief on behalf of himself only." Id. Therefore, his request for relief with respect to other inmates is denied.

*1. Individual, Demonstrable Prayer in the Recreation Yard*

### a. Mootness

State Defendants argue that Plaintiff's request for injunctive relief is moot, and therefore the Preliminary Injunction Motion should be denied, because Plaintiff is now able to pray demonstrably in Cayuga's recreation yard. Prelim. Inj. Opp'n at 1. However, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.' " Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189 (2000) (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)). Instead, a defendant must meet the "heavy burden of persua[ding]" the Court that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Id. (quoting United States v. Concentrated Phosphate Exp. Assn., 393 U.S. 199, 203 (1968)).

Here, State Defendants have not met this burden. They do not deny that Plaintiff is able to pray demonstrably only because he filed suit in federal court; there is no indication that, absent this litigation, Cayuga officials would have altered its previous policy. Moreover, State Defendants have not made any indication that DOCCS has reconsidered its "departmental directive prohibiting demonstrative prayer in the [recreation] yard." Dismiss Mot. at 4. In short, State Defendants have not demonstrated that it is absolutely clear that Plaintiff will not be denied the ability to pray demonstrably in Cayuga's

yard during recreation in the future. Accordingly, Plaintiff's request for relief is not moot.

### b. Likelihood of Success on the Merits

**\*9** In determining whether Plaintiff has established a likelihood of success on the merits, the Court looks to whether the evidence presented demonstrates that he is likely to prevail at trial on a claim concerning the conduct complained of—in this case, the denial of his ability to pray demonstrably on his own in Cayuga's recreation yard. To succeed on a First Amendment free exercise claim, "the prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." Salahuddin, 467 F.3d at 274–75. Defendants then bear the "relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." Id. at 275.

Although State Defendants have not presented an argument on the merits in opposition to the Preliminary Injunction Motion, it is improbable that they would question the sincerity of his religious belief or the fact that the denial of his ability to pray demonstrably in the recreation yard substantially burdens those beliefs. Judge Mordue denied DOCCS's motion for summary judgment advancing such arguments with regard to Smith in 2015. See Smith II, 2015 WL 9413128 at *9 ("The Court rejects defendants' argument that they are entitled to summary judgment dismissing plaintiff's free exercise claim on the ground that the challenged policy does not impose a substantial burden on his sincerely held religious beliefs as a matter of law."). It is also improbable that State Defendants would present an argument that Plaintiff's ability to pray demonstrably threatens legitimate penological interests, since Cayuga now permits Plaintiff—and apparently all other Muslim inmates—to pray demonstrably in the yard during recreation. Status Report at 1.

In sum, Plaintiff is likely to succeed at trial on his claim that denying him the ability to pray demonstrably in the recreation yard at Cayuga violates his First Amendment rights.

### c. Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitute irreparable injury." Elrod v. Burns, 427 U.S. 347 (1976). Because Plaintiff alleges that the deprivation of his First Amendment right to the free exercise of religion resulted directly from prison officials' actions, "irreparable harm may be presumed." Keesh v. Smith, No. 04-CV-779, 2006 WL 516793 at *3 (N.D.N.Y. Mar. 2, 2006).

#### d. Balance of the Equities

In determining whether the balance of equities tips in Plaintiff's favor, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (quoting Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987)). Here, the hardship faced by Plaintiff is potentially substantial: the loss of his right to exercise his religious beliefs. On the other side, the hardship faced by State Defendants is minimal, since Cayuga now permits Plaintiff to pray demonstrably in its recreation yard. State Defendants make no argument that maintaining this new policy during the course of litigation would impose a hardship on prison administration.

#### e. Public Interest

Finally, the Court finds that the issuance of the requested relief serves the public interest. While the Court generally assumes that the acts of a governmental entity are aligned with the interests of the public it serves, N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 488 (2d Cir. 2013), that is not the case here. "[S]ecuring First Amendment rights is in the public interest," and it is decidedly against the public interest to permit the enforcement of an unconstitutional policy or law. Id.

**\*10** Since Plaintiff has established each of the factors required by Winter, the Court will issue a preliminary injunction with regard to individual, demonstrable prayer in Cayuga's outdoor yard during recreation.

*2. Congregate, Demonstrable
Prayer in the Recreation Yard*

Plaintiff's request for injunctive relief regarding his ability to pray in congregate with other inmates is factually distinct from his request for individual prayer. State Defendants have not permitted Plaintiff or other inmates to pray in congregate, and State Defendants maintain that congregate prayer would present serious security threats to prison administration. See Dkt. No. 31-1 ("Kelly Declaration") ¶¶ 20–30. Plaintiff is correct to highlight the apparent contradictions in some of these alleged security threats. E.g., Prelim. Inj. Mot. Reply ¶¶ 36–37. For example, State Defendants do not sufficiently explain why groups of two or three inmates are permitted to gather in the recreation yard for conversation but are not allowed to gather for demonstrable prayer. The fact that Muslims' demonstrable prayer could be "used as code," Kelly Decl. ¶ 25, does not explain why such prayer is different from other activities, such as normal conversation or hand gestures, that may contain "codes" but which are permitted in the recreation yard among two or three inmates.

But at this early stage in the litigation, the Court cannot find that Plaintiff is likely to succeed on the merits regarding this claim. Courts in this Circuit have upheld prison officials' consistent application of bans on congregate, demonstrable prayer under factually similar circumstances. See, e.g., Withrow v. Bartlett, 15 F. Supp. 2d 292, 296 (W.D.N.Y. 1998) ("I find that defendants had a legitimate penological interest in maintaining security, and that this interest was rationally related to their enforcement of policies that prohibit group demonstrative prayer in Elmira's recreational yard."). Moreover, given the direction from Congress that, "[i]n the prison context, a request for injunctive relief must always be viewed with great caution," Fisher, 981 F. Supp. at 167, the Court will not alter the status quo at Cayuga at this point. Accordingly, Plaintiff's request for injunctive relief with respect to congregate, demonstrable prayer is denied.

### C. Motion to Appoint Counsel

As discussed above, Plaintiff's claims are clearly "of substance." Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir. 1986). The heart of Plaintiff's lawsuit—whether prisoners have a First Amendment right to pray demonstrably in an outdoor yard during recreation—has perplexed courts in this Circuit since the late 1970s. E.g., Aziz, 642 F.2d at 1111. The large number of similar

lawsuits that have ended before the merits were reached strongly suggests that the legal issues are complicated and Plaintiff would benefit from legal representation. In addition, litigating this lawsuit properly will benefit from extensive factfinding, particularly with regard to the practices at other prison facilities in New York. Since Plaintiff has been unable to receive legal representation on his own, Counsel Mot. at 1, the Court grants Plaintiff's Counsel Motion and pro bono counsel will be appointed.

## V. CONCLUSION

**\*11** Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 38) is **GRANTED in part** and **DENIED in part**; the Motion is **GRANTED** as to Plaintiff's claim for monetary damages pursuant to RLUIPA against all Defendants; the Motion is **GRANTED** as to all of Plaintiff's claims against defendants Jeffrey Hale, T. Schadewald, E. Korb, Daniel Figueroa, Ora Perkins, David Haggerty, Mary Coleman, and David Infantino; the Motion is otherwise **DENIED**; and it is further

**ORDERED**, that Jeffrey Hale, T. Schadewald, E. Korb, Daniel Figueroa, Ora Perkins, David Haggerty, Mary Coleman, David Infantino, Joseph Noeth, David Jackson, Willie Brown, Jr., and Todd Gage are **DISMISSED** as defendants in this action; and it is further

**ORDERED**, that Plaintiff's Preliminary Injunction Motion (Dkt. No. 9) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that each time Plaintiff is permitted to attend recreation in Cayuga's outdoor yard, Plaintiff shall be permitted to participate in individual, demonstrable prayer absent extraordinary circumstances; and it is further

**ORDERED**, that Plaintiff's Counsel Motion (Dkt. No. 46) is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court is instructed to appoint Lisa Anne Proskin, whose business address is 423 Loudon Road, Albany, New York, 12211, to serve as *pro bono* counsel and to faithfully and diligently represent Plaintiff in this case; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 671256

### Footnotes

1　Plaintiff's Preliminary Injunction Motion, styled as an Order to Show Cause, was docketed as an exhibit to the Complaint. See Dkt. No. 1-2. To avoid confusion, the Court directed the Clerk to file a copy of the Preliminary Injunction Motion as a separate docket entry. See Dkt. No. 8 ("Order") at 1.

2　Among the documents submitted as exhibits to the Complaint is an unsigned draft "Stipulation and Order of Discontinuance Pursuant to Rule 41(A)" bearing the caption of Smith v. Artus, No. 07-CV-1150 (N.D.N.Y. Oct. 29, 2007). Dkt. No. 1-1, at 1–7. A similar Stipulation and Order, signed by the parties and District Judge Mordue, was filed in that action on March 24, 2016. See Stipulation and Order of Discontinuance, Smith v. Artus, No. 07-CV-1150 (N.D.N.Y. Mar. 24, 2016), ECF No. 188. The terms and conditions under which Smith is permitted to engage in demonstrative prayer in any DOCCS facility are set forth in paragraph 10 of the Stipulation and Order. Id. at 4–5.

3　According to Plaintiff, Smith advised defendant David Stallone, Cayuga's superintendent, that a "restriction to others' ability to engage in salaah was not part of Smith's settlement nor an intended effect thereof." Compl. at 7. As alleged, Stallone told Smith that "others will have to still file suits in order to get a court order or settlement." Id.

4　Inmate Jimir McMillan filed a similar grievance, dated May 5, 2016, complaining that only Smith was allowed to pray in the yard. Compl. at 5; Dkt. No. 1-1, Exs. 2–5. The IGRC denied the grievance and referenced the same memorandum written by Captain Rocker. Dkt. No. 1-1, Ex. 3. On May 25, 2016, Stallone denied McMillan's appeal. Dkt. No. 1-1, Ex. 4. CORC upheld the denial on October 19, 2016, stating that "CORC notes that a recent settlement agreement permits only one specific inmate to pray in a designated area of the yard during recreation, and that other inmates are not allowed to pray there." Dkt. No. 1-1, Ex. 5.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

5    Plaintiff filed a response to the Status Report on January 24, 2018. Dkt. No. 61 ("Status Report Opposition"). In this document, Plaintiff disputes State Defendants' characterization of Cayuga's new rules regarding prayer and states that Cayuga officials have not announced that all Muslims have the right to pray demonstrably in the recreation yard. Status Report Opp'n at 2. As described below, this factual dispute does not affect the outcome of the Court's decision.

6    The doctrine of qualified immunity does not "bar any claim for equitable relief." Smith v. Artus, No. 07-CV-1150, 2010 WL 3910086, at *29 (N.D.N.Y. Sept. 30, 2010) (citing Pearson v. Callahan, 555 U.S. 223, 242–43 (2009)), vacated on other grounds, 522 Fed.Appx. 82 (2d Cir. 2013). There is no dispute that Plaintiff has moved for injunctive relief. Compl. at 13; Prelim. Inj. Mot. at 1. Therefore, State Defendants' argument that "the complaint should be dismissed in its entirety" because of the doctrine of qualified immunity is misplaced. Dismiss Mot. at 5.

7    There is disagreement among district courts in this Circuit as to whether all of the Colon factors are still valid following the Supreme Court's decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009). See, e.g., Dilworth v. Goldberg, No. 10-CV-2224, 2011 WL 3501869 at *17 (S.D.N.Y. Jul. 28, 2011) (collecting cases), adopted by 2011 WL 4526555 (Sept. 30, 2011). "[I]n the absence of contrary direction from the Second Circuit, the Court will continue to apply those factors." Jackson v. Goord, No. 06-CV-6172, 2011 WL 4829850, at *9 (W.D.N.Y. Oct. 12, 2011).

8    This analysis also applies to defendant Joseph Noeth, who was a member of CORC but was not properly served the Complaint because of a typographical error. Dkt. No. 53. In addition, the three named defendants who are inmates— David Jackson, Willie Brown, Jr., and Todd Gage—must be dismissed because they are not state actors. Lewis v. Doe, No. 13-CV-3190, 2013 WL 5923723, at *1 (E.D.N.Y. Oct. 31, 2013).

---

**End of Document**                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.